KAJ3SYN1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    SYNTEL STERLING BEST SHORES
3   MAURITIUS LIMITED, SYNTEL, INC.,

4                    Plaintiffs,

5           v.                              15 Civ. 211 (LGS)

6   THE TRIZETTO GROUP, INC., et al.,

7                    Defendants.            Jury Trial

8   ------------------------------x
                                            October 19, 2020
9                                           10:00 a.m.

10  Before:

11                      HON. LORNA G. SCHOFIELD,
                                            District Judge
12
                                APPEARANCES
13

14  KIRKLAND & ELLIS LLP
         Attorneys for Defendants/Counterclaim Plaintiffs
15  BY:  MICHAEL W. DE VRIES
         PATRICIA A. CARSON
16       ADAM R. ALPER
         BENJAMIN HERBERT
17
    PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
18       Attorneys for Plaintiffs/Counterclaim Defendants
    BY:  NICHOLAS GROOMBRIDGE
19       JAREN JANGHORBANI
         J. STEVEN BAUGHMAN
20

21

22

23

24

25

KAJ3SYN1

1              (A jury of 8 was impaneled and sworn)

2              THE COURT:  Good afternoon, everyone.  That was a very

3     efficient voir dire.  Thank you for getting me your lists

4     quickly.  I'm ready to bring the jury in, unless there is

5     something that we need to deal with.

6              MR. GROOMBRIDGE:  Your Honor, just one thing following

7     up on the discussion this morning, we have now confirmed

8     receipt of the payment.  So the rebate claim can be dismissed.

9              THE COURT:  Great.  Thank you.  So, any objection to

10    that?

11             MR. DE VRIES:  No, your Honor.

12             THE COURT:  So, I'll issue a written order later on,

13    but I hereby dismiss the breach of contract claim regarding

14    transition rebates.

15             MR. DE VRIES:  We presume that's with prejudice, your

16    Honor?

17             THE COURT:  It is with prejudice.

18             MR. DE VRIES:  Thank you.

19             THE COURT:  Okay.  Could we have the jury, Mr. Street?

20             THE DEPUTY CLERK:  Yes, your Honor.

21             THE COURT:  It will feel strange not standing for

22    them, but I guess we won't.

23             (Jury present)

24             THE COURT:  Members of the jury, thank you again for

25    serving in these strange and unprecedented times.

1          Now that you've been sworn, I'll tell you about your

2     duties as jurors and give you instructions to help you

3     understand what will be presented during the trial.  At the end

4     of the trial I'll give you instructions again, and those

5     instructions will control your deliberations.

6          At the end of the presentation of evidence, and after

7     my final charge to you, it will be your duty to decide from the

8     evidence in the case what the facts are.  You and you alone are

9     the judges of the facts.  You will hear the evidence, decide

10    what the facts are, and then apply the facts to the law which I

11    will give you.

12         My duty is to instruct you on the law, and it's your

13    duty to accept my instructions and apply them to the facts as

14    you find them.  On these legal issues you must take the law as

15    I give it to you, whether you agree with it or not.  If any

16    attorney states a legal principle different from any that I

17    state to you in my instructions, it is my instructions you must

18    follow.

19         You must not take anything I say or do during the

20    trial as indicating what your verdict should be.  I will not

21    express or imply any opinions about which witnesses you should

22    believe, which facts are established, or what inferences should

23    be drawn from the evidence.  You are the sole judges of all of

24    the questions of fact that are submitted to you.  And as the

25    sole judges of the facts, you must determine which witnesses to

KAJ3SYN1

 1   believe, which portions of their testimony you accept, and what

 2   weight to attach to it.

 3          You will decide what the facts are from the evidence

 4   that will be presented in court.  The evidence will consist of

 5   testimony from witnesses, documents and other things received

 6   into evidence as exhibits, and any facts that the lawyers agree

 7   to or admit or that I may instruct you to find.

 8          There are two kinds of evidence:  Direct and

 9   circumstantial.  Direct evidence is testimony by a witness

10   about what that witness personally saw or heard or did.

11   Circumstantial evidence is indirect evidence, that is, proof of

12   one or more facts from which you can find another fact.  You

13   may consider both direct and circumstantial evidence in

14   deciding this case.  The law permits you to give equal weight

15   to both or to none, it's up to you to decide how much weight,

16   if any, to give to any piece of evidence.

17          There's no magical formula by which you should

18   evaluate the testimony or exhibits, but I'll give you some

19   guidelines for determining the credibility of witnesses at the

20   end of the case.  Right now, I would just say to bring with you

21   into this courtroom all of the experience and background of

22   your lives.  You don't have to leave your common sense outside

23   the courtroom.  The same kinds of tests that you use in your

24   everyday dealings are the tests that you will apply in your

25   deliberations.

KAJ3SYN1

 1          During the trial, I may sustain objections to
 2     questions that are asked.  When that happens, I will not permit
 3     a witness to answer it.  I will instruct that the answer be
 4     stricken from the record, and that you disregard it and dismiss
 5     it from your minds.  In reaching your decision, you may not
 6     draw any inference from an unanswered question, nor may you
 7     consider testimony that I have ordered stricken from the
 8     record.
 9          You should not show any bias against any attorney or
10     the attorney's client because the attorney objected to the
11     admissibility of evidence or asked the Court for a ruling of
12     law.
13          You should also understand what is not evidence.  What
14     the attorneys say in their opening statements, closing
15     arguments, objections or questions is not evidence.  Neither is
16     testimony that I instruct you to disregard.  Also, anything I
17     say is not evidence.  The only oral testimony that is evidence
18     comes from witnesses.  What the lawyers say in their arguments
19     to you is not evidence.  For example, soon you are going to
20     hear opening statements from the lawyers, and they'll tell you
21     what they expect the evidence to show.  But what they say is
22     not the evidence.  And it's only what is actually introduced in
23     the trial that is evidence, and that you may consider in
24     reaching your verdict.
25          If in the course of your deliberations your

1    recollection of the facts differs from what the lawyers tell

2    you, it is your recollection that controls.  Further, anything

3    you may see or hear when the court is not in session, even if

4    you see or hear it from one of the parties or one of the

5    witnesses, for example in the hall or in the elevator, that is

6    not evidence.  Only what is admitted into evidence here in the

7    courtroom in front of all of us that we all hear and see may be

8    considered evidence.

9         So let me say a word about what's called implicit

10   bias.  Everyone, including me, has feelings, assumptions,

11   perceptions, fears, sympathies, generalizations, prejudices and

12   stereotypes that we may or may not be aware of.  The ones we're

13   not aware of are called implicit biases.  They may concern

14   race, gender, national origin, sexual orientation, class,

15   education, many kinds of issues.  These hidden thoughts can

16   affect what we see and hear and how we remember what we see and

17   hear and how we make important decisions.

18        Because you're making a very important decision in

19   this case, I strongly encourage you to evaluate the evidence

20   carefully, and resist jumping to conclusions based on personal

21   likes or dislikes, generalizations, gut feelings, prejudices,

22   sympathies, stereotypes or biases.  The law demands that you

23   return a just verdict, based solely on the evidence, and your

24   individual evaluation of that evidence, your reason and common

25   sense and these instructions.  Our system of justice is

KAJ3SYN1

1   counting on you to render a fair decision based on the

2   evidence, not on any biases.

3          So let me mention that I have imposed time limits on

4   the parties to try this case.  So each side has the same fixed

5   amount of time for argument and for witness testimony.  So if

6   you hear me referring to time with the lawyers, you'll know

7   what I'm talking about.

8          Please remember, also, this is a civil case.  Those of

9   you who have sat on criminal cases will have heard about proof

10  beyond a reasonable doubt.  This requirement does not apply

11  here to a civil case, and you should put it entirely out of

12  your mind.  In civil cases the burden is different, and it's

13  called proof by a preponderance of the evidence.  A

14  preponderance of the evidence means the greater weight of

15  evidence.  So to prove something by a preponderance of the

16  evidence simply means to prove that a fact is more likely true

17  than it's not.  I'll instruct you fully on the burden of proof

18  at the conclusion of the trial.

19         If we could have the next slide, please.

20         This is a civil action involving a business dispute

21  among companies concerning healthcare software and related

22  software consulting services.  On one side, you see there are

23  two related companies:  The TriZetto Group Inc., which I will

24  call TriZetto, and that's why the word TriZetto is underlined,

25  and Cognizant Technology Services Corp, which I will call

KAJ3SYN1

1    Cognizant.  And TriZetto is owned by Cognizant.

2              On the other side of the dispute are two other related

3    companies, Syntel Sterling Shores Mauritius, which I will call

4    Syntel Mauritius, and Syntel Inc.  Syntel Mauritius is owned by

5    Syntel Inc.  And when I refer to Syntel, I'm referring to both

6    of these companies that are on the right side of the screen

7    together.  Next slide, please.

8              In 2010, Syntel Mauritius and TriZetto signed a Master

9    Services Agreement, which I'll call the agreement.  Under the

10   agreement, Syntel Mauritius agreed to provide personnel to

11   provide services to TriZetto for TriZetto's software products

12   called Facets.  Facets is a product used by insurance companies

13   to help process insurance payments to doctors and other

14   healthcare providers.

15             On November 20, 2014, TriZetto was acquired by

16   Cognizant, and Cognizant is a competitor of Syntel.  On the

17   same day, Syntel Mauritius terminated the parties' contractual

18   relationship, in other words, terminated the agreement, which

19   it had a right to do, because TriZetto was acquired by a

20   competitor.

21             TriZetto asserts that Syntel took TriZetto's trade

22   secrets relating to TriZetto's Facets product without

23   TriZetto's permission, and infringed TriZetto's copyrights

24   related to its Facets product.  And these are TriZetto and

25   Cognizant's claims against Syntel.  Syntel denies liability.

1          I told you that both sides are suing each other.  So

2     the claims on the other side are Syntel's claims that TriZetto

3     breached their agreement by using Syntel's confidential

4     information about Syntel employees.  Syntel also claims that

5     TriZetto and Cognizant unlawfully took and used confidential

6     information about Syntel employees, and that Cognizant

7     interfered with the agreement by using the confidential

8     information.  Lastly, Syntel also contends that Cognizant and

9     TriZetto induced five Syntel employees to breach non-compete

10    provisions in their employment contracts.  Cognizant and

11    TriZetto deny liability on these claims.

12         That's just a brief summary of the case.  I'll review

13    it with you in a little more detail right now.  So, I'm going

14    to tell you about some of the law that you'll have to apply to

15    the facts as you find them.  These are just preliminary and

16    summary instructions, and they're to help you evaluate the

17    evidence in light of what you'll be asked to do after you've

18    heard all the evidence.  The final instructions I give you at

19    the end of the trial will be more detailed, and to the extent

20    there are any differences between what I tell you now and what

21    I tell you then, my final instructions will control.  Meaning

22    the final instructions are the ones you'll follow.  Next slide,

23    please.

24         TriZetto claims -- this is TriZetto's first claim --

25    TriZetto claims that Syntel unlawfully took and used TriZetto's

1   trade secrets relating to its software Facets product.  This is

2   called misappropriation.  TriZetto asserts two claims for the

3   misappropriation of trade secrets, one claim under federal

4   law -- and I think it is the prior slide.  No, sorry, this

5   slide.

6           Okay.  One claim under federal law and one claim under

7   New York law.  Syntel denies that it's liable on these claims,

8   and asserts what are called affirmative defenses.  And I'll

9   tell you about affirmative defenses after I tell you about the

10  claim.

11          So, more relevant to this slide:  What is a trade

12  secret?  That's what we are talking about here.  It is

13  something that TriZetto claims to have had that provides it

14  with an opportunity to obtain an advantage over competitors who

15  do not know or use it.  "Secret" means that the information was

16  known substantially only by TriZetto or others who are

17  obligated to keep the information secret, and that TriZetto

18  took precautionary measures to keep the information secret.

19  Information is not secret if it was publicly available.

20  Absolute secrecy in the sense that no one else in the world

21  possesses the information is not required.

22          Now we're on slide 8.

23          So, let me just tell you a word about note taking

24  because I see a lot of you taking your notebooks out.  So,

25  you'll be entitled to take notes and I'll give you some

KAJ3SYN1

1    instructions about notes in just a minute.  But what I'd like

2    you to do for this first part, since we have a PowerPoint, is

3    just listen.  All of this we'll go over again later in the

4    trial, and the lawyers will also go over some of it when

5    they're telling you about what the evidence will show.  So, if

6    you could for the moment just pay attention to the slides and

7    my instructions.

8            So, for TriZetto to prove that Syntel misappropriated

9    the trade secrets under federal law, TriZetto must prove four

10   elements by a preponderance of the evidence.  So in other

11   words, you are going to have to determine whether TriZetto has

12   proved these elements by a preponderance of the evidence:

13           One, that TriZetto owns the information at issue; two,

14   that the information is a trade secret; three, that Syntel,

15   without TriZetto's consent, acquired the trade secret knowing

16   or having reason to know that the trade secret was acquired by

17   improper means, or, disclosed or used the trade secret and

18   either used improper means to acquire it or at the time of

19   disclosure or use knew or had reason to know that the trade

20   secret was acquired through improper means under circumstances

21   giving rise to a duty to maintain the secrecy of the trade

22   secret, or derived from or through a person who owed such a

23   duty; and fourth, a trade secret is related to a product used

24   in or intended for use in interstate or foreign commerce.

25           I've talked about improper means.  That includes

KAJ3SYN1

1    theft, bribery, misrepresentation, breach of a contract or

2    inducement of a breach -- sorry.  Breach of a duty to maintain

3    secrecy or inducement of a breach, or espionage through

4    electronic or other means, and does not include reverse

5    engineering, independent derivation or any other lawful means

6    of acquisition.  That's the federal trade secrets claim.

7            There is also a trade secrets claim under New York

8    law.  And the four requirements to prove misappropriation under

9    New York law are similar, but not identical to those under

10   federal law:  TriZetto must prove by a preponderance of the

11   evidence what the trade secret is, in other words, TriZetto

12   must identify the trade secrets at issue; second, TriZetto must

13   also prove that it possessed the trade secret; third, that

14   Syntel used the trade secret; and fourth, that Syntel's use was

15   in violation of an agreement, confidential relationship, or

16   duty, or that Syntel used the allege trade secret as a result

17   of discovery by improper means.

18           You will have to decide whether TriZetto has proved

19   its trade secret misappropriation claims by a preponderance of

20   the evidence.

21           TriZetto also has a copyright infringement claim

22   against Syntel.  Let's go to the next slide.

23           TriZetto claims that Syntel infringed TriZetto's

24   copyrights related to its Facets product.  So what's a

25   copyright?  A copyright is the legal protection of original

KAJ3SYN1

1     works against unauthorized copying by others.  Syntel denies

2     infringing TriZetto's copyrights, and asserts affirmative

3     defenses which I'll discuss shortly.

4         So, let me say something about registration.  To bring

5     a civil action for copyright infringement of TriZetto's works,

6     TriZetto was required to register each work with the U.S.

7     copyright office.  I instruct you that TriZetto's

8     presentations, the first two that are listed here, called Best

9     Practices and ICD-10 configuration and Facets Roadmap Review

10    are registered.

11        The parties dispute, though, and you will have to

12    determine, whether TriZetto's Data Dictionary software tool

13    satisfies the registration requirements.  There are two ways

14    they can prove the Data Dictionary satisfies the registration

15    requirements.  First, TriZetto can prove by a preponderance of

16    the evidence that the Data Dictionary software tool was

17    registered as a part or subpart of Facets 5.10, or TriZetto may

18    establish by a preponderance of the evidence that the Data

19    Dictionary software tool is what's called a derivative work,

20    based on Facets 5.10, and that the Data Dictionary software

21    tool incorporates protected elements from Facets 5.10 computer

22    software.

23        If you find in favor of TriZetto on that alternative

24    theory, TriZetto can bring an action for copyright infringement

25    for the protected elements from the Facets 5.10 computer

KAJ3SYN1

software that are incorporated in the Data Dictionary software.

Let me tell you now about the elements of the copyright infringement claim.  And that's on the next slide.

So there are two elements that TriZetto must prove by a preponderance of the evidence to succeed on its copyright infringement claim.  First, that TriZetto is the owner of valid copyrights in the TriZetto works at issue; and second, that Syntel copied original elements from the copyrighted works.  I will discuss these elements in turn.

So first, ownership of valid copyrights.  To prove the first element, legal ownership of a valid copyright, TriZetto must prove by a preponderance of the evidence that TriZetto's works are original, independently created by the author and not copied from other works, and possess a minimal degree of creativity, and TriZetto's works were created by TriZetto's employees within the scope of their employment.

As to this other element, copied original elements -- and that's on the next slide -- it must be proved that Syntel copied original elements from the copyrighted works.  TriZetto must prove this by a preponderance of the evidence, and may demonstrate copying directly, for example, a witness who testifies that Syntel copied original elements.  TriZetto may also prove copying indirectly, by what's called circumstantial evidence.  If you find by a preponderance of the evidence that Syntel had access to TriZetto's works, and Syntel's works and

KAJ3SYN1

original elements of TriZetto's works are substantially

similar, you're instructed to find copying, unless Syntel

establishes that its work was independently created or some

other explanation for the similarities.

Let's move on to Syntel's next claim, which is a

breach of contract claim.  I've just summarized for you

TriZetto and Cognizant's claims against Syntel.  So now I'll

tell you about Syntel's claims against Cognizant and TriZetto.

As I said, TriZetto and Syntel Mauritius had an agreement

between them called a Master Services Agreement.  Syntel

Mauritius claims that TriZetto breached the agreement by

violating the confidentiality provision of the agreement, which

prohibited TriZetto from using Syntel Mauritius' confidential

information without consent.

To prevail in its breach of contract claim, Syntel

Mauritius must prove by a preponderance of the evidence four

elements:

First, Syntel Mauritius had a contract with TriZetto;

two, Syntel Mauritius performed as it was required to do under

the contract; three, TriZetto breached the contract by not

doing what it was required to do under the contract; and four,

Syntel Mauritius was damaged by the breach.

As to the first element, the parties agree that the

Master Services Agreement is a valid contract, so you will not

have to decide that element, but you will need to determine the

KAJ3SYN1

second, third and fourth elements of the claim.

So the next claim is Syntel's.  Syntel Mauritius also claims that Cognizant and TriZetto misappropriated Syntel's confidential information about its employees in order to hire them away from Syntel.

You must consider the proof against Cognizant and TriZetto separately.  The parties define "confidential information" under the agreement to mean information that a reasonable person would recognize as confidential.  Matters of general knowledge in an industry are not confidential, and protection afforded to confidential information is lost if it's disclosed to the general public.

To establish the claims against Cognizant and TriZetto, Syntel Mauritius must prove by a preponderance of the evidence that they used Syntel Mauritius' confidential information for the purpose of securing a competitive advantage.  Because Syntel Mauritius and TriZetto were parties to the agreement, for Syntel Mauritius to prevail on its misappropriation claim against TriZetto, Syntel must also prove that TriZetto's use of Syntel Mauritius' confidential information violated a duty, independent from the contractual duty under the agreement.  An independent legal duty must arise from circumstances outside the contract, although it may be connected with and dependent upon the contract.

The focus is on whether a defendant violated a duty

KAJ3SYN1

imposed on the parties as a matter of social policy, as opposed
to a duty that the parties agreed to in their contract.

So the next claim is Syntel's intentional interference
of contract claim.  Syntel also brings a claim against
Cognizant called tortious interference with contract.  As I
mentioned, Cognizant is a company that acquired TriZetto and is
a competitor of Syntel.  Syntel claims that Cognizant
intentionally caused TriZetto to breach the agreement between
Syntel and TriZetto by inducing TriZetto to use confidential
information about Syntel employees to hire them away from
Syntel.

To prove this claim, Syntel must show the following by
a preponderance of the evidence:

One, Syntel had a contract with TriZetto; two,
Cognizant knew about the contract; three, Cognizant
intentionally induced TriZetto to breach the contract; four,
TriZetto did in fact breach the contract; five, TriZetto would
not have breached the contract if it had not been for
Cognizant's conduct; and six, Syntel sustained damages as a
result of TriZetto's breach.

The first element is not in dispute as the Master
Services Agreement was a contract between Syntel and TriZetto.
Syntel must prove that Cognizant knew about the agreement, but
it's not necessary that Cognizant knew about the agreement's
specific terms.

KAJ3SYN1

1          Syntel Inc. makes separate claims against TriZetto and

2     Cognizant that each intentionally and improperly -- slide 17 --

3     interfered with the employment contracts of five employees of

4     Syntel Inc., which I will call the employment contracts.

5          To establish this claim against TriZetto, Syntel Inc.

6     must prove the following six elements as applied to TriZetto.

7     Likewise, to prove this claim against Cognizant, Syntel must

8     prove the six elements as applied to Cognizant.  Syntel Inc.

9     must prove each element by a preponderance of the evidence.

10    First, that Syntel Inc. had employment contracts with the five

11    employees at the time of the interference and that TriZetto, or

12    Cognizant, depending on which one you're considering at that

13    particular time; two, knew of the contracts; three,

14    intentionally interfered with contracts; four, improperly

15    interfered with contracts; five, caused Syntel Inc.'s employees

16    to breach their employment contracts; and sixth, that Syntel

17    Inc. was damaged as a result.

18         When I say that Syntel Inc. must prove that TriZetto

19    or Cognizant intentionally interfered with the employment

20    contracts, the third element, I mean that their primary, but

21    not necessarily sole purpose, was to cause Syntel Inc.'s

22    employees to breach their employment contract, or that they

23    acted knowing that their conduct was certain or substantially

24    certain to cause Syntel Inc.'s employees to breach their

25    employment contracts.

KAJ3SYN1

1        Improper interference, the fourth element, is conduct

2   that is one of the following:  Fraudulent, unlawful, ethical or

3   unjustified under any circumstances.

4        So let me say a brief word about affirmative defenses.

5   An affirmative defense is a defense against a party's claim

6   that, if proven, negates liability on the claim.

7        Slide 18.  Syntel asserts the affirmative defenses of

8   waiver and estoppel against both TriZetto's claims for

9   misappropriation of trade secrets and copyright infringement.

10  To establish waiver, Syntel must prove that TriZetto knowingly

11  and intentionally abandoned its right to sue Syntel for

12  misappropriation of trade secrets or copyright infringement.

13       To establish estoppel, Syntel must prove that TriZetto

14  misled Syntel to believe TriZetto would not claim that Syntel

15  misappropriated trade secrets or infringed copyrights; second,

16  that Syntel relied on this; and third, as a result, Syntel will

17  be materially harmed due to such a claim by TriZetto.  And I'll

18  instruct you further on any applicable defenses at the end of

19  the case.

20       So that brings us to the subject of damages, which

21  means money.  If and only if a party has proved all the

22  elements of its claim, then you must determine the amount of

23  money, if any, that you believe will fairly and justly

24  compensate that party for any injury you believe it actually

25  sustained as a proximate result of the other parties'

misconduct.  As I mentioned, both parties seek damages from

each other, and I'll instruct you further about damages at the

end of the trial.

         So that is it as far as the substance.  I know that

must have felt like a little mini law school course.  Sorry

about that, but I did have to tell you about the law.  Now let

me tell you a little bit about your conduct as jurors, and

first let me tell you about note taking.

         So you'll see that each of you has been provided with

a notebook and pen.  You do not have to take notes, but you may

if you wish.  Please be sure, though, that any note taking does

not interfere with your listening and considering all the

evidence.  Also, if you do take notes, you must not show them

or discuss them with any other juror or anyone else at any

time, even during your deliberations, so not before your

deliberations, not during your deliberations.  Your notes are

for you alone.  They're to be used solely to assist you, and

they're not a substitute for your recollection of the evidence.

The fact that one juror took notes and another one didn't

entitles the first juror's views no greater weight than those

of any other juror.

         If during your deliberations you have any doubt about

the testimony, you'll be permitted to ask that the official

transcript, that you can see is being made right here, be read

to you.

KAJTSYN2

1          So Mr. Street, my courtroom deputy, will safeguard

2     your notebooks during breaks and at the end of each day and

3     secure them and no one will be permitted to review your notes.

4     After the trial is finished, I will ask you to leave your notes

5     and we will collect them and destroy them.  And due to safety

6     concerns, you should not be sharing any paper or any pens.  If

7     you need more paper or pens, let Mr. Street know and we'll

8     arrange to get you some.

9          If you do plan to take notes, I would like you to show

10    me what your notebooks look like.  Somehow, maybe on the inside

11    of the first page or on the back, write your name so that by

12    looking at did you know it's yours.  And that way you can leave

13    it with the backside up and you leave it on your chair and that

14    way we'll know whose it is and we won't touch them.

15         I also want to give you some general instructions

16    about your conduct as jurors.  First, do not talk to each other

17    about the case or anyone about anything to do with it until the

18    end of the case when you're finally permitted to go to the jury

19    room to talk to each other.

20         Second, do not talk to anyone else about the case or

21    about anyone who has anything to do with it until the trial has

22    ended and you have been discharged.  Don't talk to members of

23    your family, your friends, co-workers.  Don't talk to anybody

24    about the case.  You can tell them that you're a juror, but

25    don't tell them anything else until it's over and you have been

KAJTSYN2

discharged by me, but please wait until you're finished and discharged.

Third, don't let anyone talk to you about the case or about anyone who has anything to do with it.  If someone tries to talk to you, please report that immediately to Mr. Street, my courtroom deputy.  I don't think that will happen, but if it does, please report it to him and I will take care of it. Don't talk to anybody else about it.  If that happens, just tell Mr. Street.

Fourth, do not talk in or out of the courtroom with any of the parties or the attorneys or the witnesses.  So people sometimes find this a little strange, but what that means is not only should you not talk about the case, but don't talk to them at all.  And I instructed the lawyers, and I am instructing them now again, don't talk to the jurors, don't look at them, don't smile at them.  You can't smile anyway with these masks on.  And they're not being rude, they're just following my instructions.  And the reason is that someone from watching from a distance might not hear what is being said, and even a pleasantry could create a wrong impression, so just don't have anything to do with them.

Fifth, don't read any news stories or articles or listen to any radio or television reports about the case or anyone that has anything to do with it.

Sixth, do not do any research or investigation about

KAJTSYN2

1     the case on your own.  So what that means is do not go home and

2     Google the names of the parties or the industry or Facets

3     software or anything like that, or my name or their names.

4     Don't do it.  Don't do any research or any investigation.  If

5     you really feel compelled to do that, wait until the case is

6     all over and you can do it to your heart's content.

7          Until you retire to deliberate, again, you must not

8     discuss the case with anyone, even each other.  And that may

9     seem strange.  We'll have a break and you'll go sit in a room

10    together and you can talk about whatever you want except the

11    one thing you have in common, which is the case.  So please

12    don't talk about that until you go to deliberate at the very

13    end.

14         The parties are entitled to have you personally render

15    a verdict in the case on the basis of your independent

16    evaluation of the evidence presented here.  Obviously, speaking

17    to somebody else, including your family or friends, before you

18    deliberate or exposing yourself to to other information, could

19    compromise your service in the fairness of the parties.

20         I hope that for all of you the case is interesting and

21    noteworthy.  The very fact of being here at this strange time

22    is pretty noteworthy, being with the Plexiglas containers where

23    the witness will testify and attorneys will speak.  Those are

24    HEPA filters to clean the air so you could see their faces.

25    But as interesting as all that is, do not pick up your phones

KAJTSYN2

or your iPads or any other electronic device and start typing

things or posting things on social media or anywhere else about

the trial.  Don't do it in private emails, don't do it in

public posts, do not say anything about the trial until it's

over.  If you find that this is being violated somehow, please

tell my deputy, Mr. Street, about it.  Don't talk to each other

about it, just bring it to his attention and he will tell me

and I will take care of it.

Finally, the Court has gone to great lengths to try to

ensure your safety and the safety of everyone here.  I would

ask you, please, as difficult as it is, to please continue to

wear your masks and maintain social distancing.  And if you see

anybody who is not who is associated with the case, again,

please bring it to Mr. Street's attention so that I can do

something about it

Finally, let me tell you what is about to happen.

First, each side will make an opening statement.  As I told

you, that's not evidence or argument, it's just a tool to help

you understand what the evidence will show.

Next, you'll hear from live witnesses.  You'll also

hear from some witnesses remotely, because not everybody can be

here because of the coronavirus.  So some witnesses you will

see on your screens, some witnesses you will see live from the

witness stand.  You should not consider the ability or

inability of any witness to be here in person as a factor in

KAJTSYN2

1    evaluating their testimony or any part of the claims.  Whether

2    a witness testifies remotely or in person should not impact

3    your deliberations at all.  Instead, you should consider each

4    witness in the same way as I will instruct you.

5         After all of the testimony, I'll give you instructions

6    again on the law and I will actually hand you paper

7    instructions that you can bring with you in the jury room.  So

8    don't be too concerned about understanding or retaining all of

9    what I just tried to tell you.  And after I do that, the

10   parties will make closing arguments, and you'll hear from the

11   lawyers a final time when they make their arguments about what

12   they believe the evidence has shown.  And then you'll retire to

13   deliberate and decide what your verdict is.

14        Please don't make up your mind at any point until

15   then, meaning until you have gone into the jury room that last

16   time and you have a chance to confer with each other and hear

17   each other's views.  Keep an open mind until then.  The parties

18   deserve and the law requires that you give them a full

19   opportunity to be heard

20        So I'll tell you the hours again at the end, but in

21   general you should be in the jury room by 9:45 in the morning,

22   and please allow time to get through security and temperatures

23   and all of that, and we'll sit from 10:00 to 4:00 each day

24   until we are finished

25        Now there will be one exception, and that is tomorrow,

KAJTSYN2

1    everything will be an hour later.  So tomorrow I'll ask you to

2    be here by 10:30, bring you into the courtroom at 11:00 and

3    we'll sit until around 5:00.  I expect the trial will be done

4    early to middle of next week.  It's very likely we will not sit

5    on Friday.  But depends on where we are in the trial and what's

6    happening with the witnesses, so I will advise you of that a

7    little later in the week.  Please don't make plans for Friday,

8    but you may have Friday off.  We'll take one break in the

9    morning, one break in the afternoon, and a break for lunch.  No

10   other breaks, so please plan accordingly

11          Okay.  So those are my remarks, and you won't hear

12   from me in quite a long time, I hope.  And so now what we'll

13   hear are opening statements.

14          Actually, I have one other instruction.  The parties

15   have asked me to read this to you before they make their

16   opening statements:

17          You will see evidence and hear argument concerning the

18   non-solicitation provision of the Master Services Agreement,

19   the agreement I told you about, including documents in which

20   TriZetto questioned whether or Cognizant could hire Syntel's

21   employees in light of that provision.  Prior to trial, I

22   determined that the non-solicitation provision did not prohibit

23   TriZetto or Cognizant from hiring Syntel employees, and that

24   neither TriZetto nor Cognizant violated this provision of the

25   MSA or the Master Services Agreement by hiring Syntel

KAJTSYN2                     Opening - Mr. De Vries

employees.  However, you may consider such evidence in your

consideration of Syntel's misappropriation claim that TriZetto

provided Syntel confidential employee information to Cognizant.

        With that, we will hear the first opening statement

from TriZetto.

        MR. DE VRIES:  Your Honor, under the protocol, I may

take my mask off, is that correct?

        THE COURT:  You may.  The person in the respective

boxes are the only people who may.

        MR. DE VRIES:  And I understand I cannot turn the

podium towards the jury so I will align myself as so.

        THE COURT:  That's correct.

        MR. DE VRIES:  Your Honor, may I proceed?

        THE COURT:  You may.

        MR. DE VRIES:  Good afternoon, members of the jury.

My name is Mike De Vries, I'm one of the attorneys that

represents TriZetto and Cognizant in this case.  I, along with

my colleagues and my clients, and I know everyone that is here

for these proceedings, thanks you for participating in this

very important process during what I know are challenging and

unprecedented times.

        This is a case about theft.  Syntel secretly stole

TriZetto's trade secrets and it copied TriZetto's copyrighted

software.  You will see the evidence that Syntel lied about

what it did and it tried to cover up its misconduct.  Through

KAJTSYN2                    Opening – Mr. De Vries

1    these proceedings we have had access to the Syntel computer

2    systems, their internal emails, their internal computer

3    repositories, and you will see evidence in this trial that is

4    largely undisputed that Syntel took my client's trade secrets

5    and knew it was wrong.  And you will also see evidence that

6    Syntel continues to use my client's trade secret and

7    copyrighted technologies even today, just as of today.  And at

8    the end of the trial we will ask you, based on the evidence, to

9    hold Syntel accountable for what it did.  If Syntel is not held

10   accountable for this theft, this case will serve as a playbook

11   for other companies out there like Syntel who are thinking

12   about whether to take another company's technology rather than

13   investing the time and the money and the ingenuity that it

14   takes to create that.

15          I'm going to briefly summarize the evidence for you

16   here, what you'll see at trial.  And as her Honor explained, I

17   cannot explain every bit of evidence that you will see, but I

18   will try to give you a roadmap for the evidence that you'll see

19   through the witnesses.

20          First, you'll see evidence about my client TriZetto.

21   TriZetto was founded in 1997 and it was merged with a company

22   called Erisco in 2000.  That company created a software program

23   called Facets that I know you've heard about.  And Facets,

24   along with TriZetto's other software technologies, are used by

25   large health insurance companies throughout the country, and

KAJTSYN2                    Opening – Mr. De Vries

all told, that software is responsible for health care for over
170 million people in this country.

         Facets is probably not a software product that you've
ever heard of before, but it's all around us.  It's a software
product that automates and manages in an automated fashion many
aspects of what health insurance companies do with hospitals,
with patients, with employers, and with doctors.  Part of that
involves processing claims, but it also involves many other
aspects of the health care system.  Facets automates member
plans and benefit elections and communications with patients
and doctors and hospitals and other providers.  It's quite
literally all around us.  And as I mentioned, Facets, the
software program, is used by many, many of the largest health
care country companies in the country, including Blue
Cross/Blue Shield, CIGNA, United Health Care, one you'll hear
quite a bit about, and others.

         Now there's an important part of the Facets software
that you're going to hear about I would like to explain.  So
the software itself is very, very complicated.  It is millions
and millions of lines of computer code.  It consists of
thousands of data tables and tens of thousands of data fields.
And that architecture is used to perform and automate in an
automated fashion many of these different activities that I
explained.  And because of that complexity, installing the
software, customizing and upgrading it takes a tremendous

KAJTSYN2                    Opening – Mr. De Vries

amount of time and effort.  And it can take dozens or hundreds

of people months or month, beyond a year, in order to install

or upgrade the system because it is of such a tremendous degree

of complexity.

         And TriZetto has created some very innovative software

tools that you're going to hear a lot about in this case, one

is the Data Dictionary, the other is the Code Impact Tool,

another are test cases and automation scripts.  And these tools

of used in conjunction with the Facets software in order to

allow and improve this installation and customization and

upgrade process, and those tools are my clients' intellectual

property.  They involve the trade secrets and the copyrights

that you'll hear about in this case.

         And this is a software that has been around for a very

long time.  Facets began development in 1992.  As you saw,

that's even before TriZetto came into being.  Erisco was the

company that originally began to develop it.  But since 1992,

TriZetto and its predecessors have invested in excess of $500

million in research and development developing the Facets

software, the software tools and the related technologies that

you're going hear about in this case.  And it protects those

technologies in a number of different ways through intellectual

property protection that federal law and state law provides, so

federal trade secret raw and state copyright law.  You'll hear

evidence that TriZetto obtained copyright registrations, and

KAJTSYN2                    Opening - Mr. De Vries

1    that it goes to a number of different efforts to ensure the

2    secrecy of its trade secret technologies.

3            That brings me to Cognizant.  Cognizant is one of the

4    leading, if not the leading global IT technology and services

5    companies in the world.  Its world headquarters are in New

6    Jersey, its executive headquarters are here in Manhattan, and

7    it was founded in 1994.  As you can see, it has many, many

8    employees, tens of thousands of employees in the United States,

9    many, many more abroad.

10           And Cognizant comes into the picture in 2014 when it

11   acquires TriZetto and its Facets software technology

12   intellectual property for $2.7 billion.  It was at the time and

13   remains today the largest acquisition that Cognizant was ever

14   involved in.  And the reason for that acquisition was because

15   of the value in the intellectual property that TriZetto owns in

16   its Facets software.  And you'll also see evidence that as a

17   result of this merger, Cognizant and TriZetto expected to make

18   a tremendous amount of money because of the synergy that they

19   were able to bring together between the two parties; for

20   example, they expected to make $1.5 billion additional in just

21   the first five years after this acquisition took place.

22           So let's talk about Syntel, and I would like to

23   explain how they came into the picture.  Syntel is an IT

24   staffing company.  It provides what are called staff

25   augmentation services, and essentially they provide temporary

KAJTSYN2                    Opening – Mr. De Vries

labor, skilled IT labor, to come into a company and can help

that company out with certain things that they're working on.

They are paid for that.  In other words, Syntel is paid for

providing those services, and then the companies that they

provide the services to, those companies continue to, of

course, operate their business, own the things that they worked

on.

        And so here, long after Facets was developed -- so as

I mentioned, development of Facets began in 1992, the first

version was released in 1993.  Some long time later in 2008,

when demand for Facets had really started to explode, and so

insurance companies around the country were really wanting to

expand their use of Facets, and so TriZetto entered into a

contract with Syntel where Syntel provided some temporary

staffing services.  The employees that Syntel provided, they

had no prior experience with Facets, they were trained in

Facets by TriZetto, and they worked, for all intents and

purposes, as TriZetto employees.  They would help out with some

of the installations with customers, they would help out with

some upgrades, and in time they helped out with some of the

development aspects of the software.  In exchange for that,

Syntel was paid tens of million of dollars for that work.  But

the relationship between the parties was relatively

short-lived, and by 2014 that relationship was over, as her

Honor explained, in part because Syntel terminated its

KAJTSYN2                    Opening - Mr. De Vries

1   agreement with TriZetto because of the Cognizant merger.

2         Now when performing services for TriZetto, not

3   surprisingly, Syntel agreed to keep everything that it did for

4   TriZetto confidential.  It was exposed to certain of my

5   client's trade secrets and copyrighted technologies while

6   performing those services, but it agreed that it would keep

7   those confidential and to use those only for purposes of

8   providing those services to TriZetto.

9         But it turns out that, unbeknownst to my client,

10  Syntel came up with a secret plan in 2012, years before the

11  merger, to take my client's trade secrets and use those trade

12  secrets to compete with TriZetto in the market.  I'm going to

13  show you just a couple of the very important documents that

14  you're going to see in this case.

15        This is an email from 2012, it's written by Mr. Mohan

16  Parthsarathy to Murli Reddy, Manish Mehta, and others, and he's

17  laying out a plan that, unbeknownst to TriZetto, Syntel had

18  come up with.  And you can see at the bottom that the plan

19  ultimately was to go to war in 2015 years later.  And I will

20  point out this was a plan that Syntel came up with before it

21  ever had any idea that Cognizant was going to acquire TriZetto.

22  And what it planned to do was to build tools and accelerators.

23  Remember I told you about the Data Dictionary, the Code Impact

24  Tool, the test cases and automation scripts.  Well, the very

25  first part of their plan was to build those tools and

KAJTSYN2                    Opening - Mr. De Vries

accelerators, and the reason was that to go to war they thought

that they needed credentials and an arsenal.  So they wanted to

ultimately go to war with TriZetto, who had been their partner,

and from TriZetto's perspective, they were working together

cooperatively.

But what Syntel needed, because it had obtained the

credentials by working with TriZetto, it needed its arsenal,

the tools, an accelerator that it was going to tell the market

were its differentiators.  But what you will see is that

instead of developing those tools on their own -- and this will

be undisputed -- they stole my client's technology, they

rebranded it as theirs, and they're now selling it in the

market, even as of today, at a lower cost.  And why?  Because

they thought there was an addressable market, at that time $500

million, a couple of years later they revised that estimate to

a billion dollars, and that's why they decided to take the

trade secrets that they had been given access to as part of the

providing those temporary services.

And you'll see document after document after document

that are internal presentations at Syntel that explain that the

key to their success was that they needed to create

differentiated tools; Impact Analyzer, that was the new name

they gave to our custom impact tool, a Data Dictionary, and

that they were going to use the services that they were

providing to TriZetto as a Trojan horse to secretly obtain

KAJTSYN2                      Opening – Mr. De Vries

1    access to this information.  And if you fast forward to the

2    time of the merger, this was now two years later when Cognizant

3    acquired TriZetto, the importance of these tools, which they

4    had by that time been calling their own IT, was paramount.  At

5    that point, as I explained, they were looking at a market that

6    was not 500 million but a billion dollars.

7         After the relationship ended with TriZetto, Syntel

8    began to advertise its own tools.  It called them Syntel tools.

9    And what you'll see is that each of these tools, the D2 Data

10   Generator, they were taken taking the technology that was

11   developed by TriZetto.  We will show you that the computer code

12   for Syntel's D2 Data Dictionary is literally copied.  It is

13   exactly the same in its core constituent part as TriZetto's

14   Data Dictionary code.  It simply copied the code.  The same is

15   true for its Step-Up Probe.  At the heart of that tool, Syntel

16   is using the TriZetto trade secret.  This document on the

17   right, it's a rule sheet that TriZetto created, it is used by

18   that tool.

19        And similarly, Factory, a tool that they claim is a

20   repository of 3,000 Facets test cases and automation scripts,

21   if you look on the right, this is a document from the Syntel

22   files.  It is literally a TriZetto document labeled

23   confidential and proprietary.  So they're out there selling

24   these as their own, but the evidence will show you that they

25   were taken.

KAJTSYN2                    Opening - Mr. De Vries

1        And in fact, and I will come back to this in my

2   closing argument, you will see no evidence at this trial that

3   Syntel independently developed its D2 Data Generator, its

4   Factory or Step Up Probe tools, and you will see absolutely no

5   evidence that Syntel did not unlawfully copy the test cases and

6   automation scripts.

7        So what will they say?  Well, if they say what I

8   expect they will, they will say that there was an amendment to

9   the Master Services Agreement in 2012 that allowed them to

10   compete that deleted a non-competition provision in the

11   agreement.  That makes no sense.  As a matter of contract, it

12   did not delete the confidentiality provision.  They were

13   obligated to continue to use our trade secrets only for the

14   work that they performed.  But there's an even more common

15   sense reason why you know that's not correct.  None of their

16   witnesses told us that that is what they believed.  In fact,

17   they told us that they didn't use the trade secrets.

18        This is Mr. Ankur Chadha.  He was the senior director

19   of client solutions and head of the products group at Syntel.

20   We asked him whether he had access to TriZetto's information.

21   He said no, not that he knew of.  He said that twice under

22   oath.  But you will see email after email after email where in

23   fact Mr. Chadha has possession of TriZetto materials,

24   distributes them around within Syntel, including long after the

25   contract with TriZetto was over, and even that he's taken steps

KAJTSYN2                    Opening – Mr. De Vries

that we believe indicated clear desire to cover up what he's

done.  So you can see here in the subject line of his email it

says T dollar sign Z.  By adding that dollar sign there, that

keeps this email from coming up in electronic searches, and we

believe shows a clear motive to try to cover up what he's done.

Similarly, here, remember this is the witness who said

that he hadn't been exposed to Facets information, Mr. Chadha

is sending emails that says attached Facets implementation

documents, and the name Trizetto Group, which is actually, we

discovered, found in a hidden header in that document, has been

changed to YYYYY, again, from our perspective, a clear

indicator that Mr. Chadha was attempting to keep this document

from being discovered in electronic searches and to cover up

what they have done.  And document after document in this case

shows a use of the materials that they took from TriZetto at

Syntel.

There's one other thing that you will hear a lot

about, and that is this neutral forensic examiner's report.

There was a forensic examiner, a computer specialist who went

into Syntel's computers, went to India to inspect those

computers.  And what Mr. Rubin found in his inspection of the

computers there, in 2017, years after the termination of the

agreement, hundreds of TriZetto files found and hundreds of

TriZetto files deleted.  There is no question that these trade

secrets were kept and used and that Syntel attempted to cover

KAJTSYN2                    Opening - Mr. De Vries

1    up what it did so it could not be discovered.

2              And the last thing that I will mention on this part is

3    that the merger does play into the plan in the following way:

4    When Syntel learned that Cognizant was going to acquire

5    TriZetto, it said, as you can see in the bottom of this email,

6    that one of the things that they needed to do that was already

7    in action was build Syntel capabilities very strong around

8    TriZetto products in the next two months.  The program needs to

9    be rolled out immediately because once we are out from TriZetto

10   we are not having access to products, documents, manuals

11   anymore.  So they knew that the access that they had been using

12   for years to build their competing tools to copy into their

13   competing services, they wouldn't have that anymore.

14             And that's what tipped us off.  So when we were to go

15   back to December of 2014 after the agreement was terminated by

16   Syntel, we discovered that Syntel employees had downloaded

17   large quantities of our materials in their last couple of days

18   on the job.  And one example, for instance, one employee in the

19   last few hours that he worked at our company downloaded dozens

20   and dozens and dozens of our trade secrets.  We brought that up

21   to Syntel, and we said in December of 2014, in almost six years

22   ago now, you need to stop.  Did they stop?  No.  Instead, they

23   filed this lawsuit and asserted the claims that you're going to

24   hear about next.

25             So I would like to talk about those claims.  There's

KAJTSYN2                    Opening - Mr. De Vries

1    no merit to the claims that Syntel asserted against my clients.

2    You're going to hear a lot about a non-solicitation provision

3    in the Master Services Agreement.  And what you'll hear is, and

4    as her Honor instructed you, the Court has already determined

5    that this provision did not prohibit TriZetto or Cognizant from

6    hiring Syntel employees and that neither of my clients violated

7    this provision.  There were certain hires that were made.

8    Cognizant hired some Syntel employees, and it was perfectly

9    proper to do that.  There was absolutely nothing wrong under

10   the contract with them hiring those employees.

11            So what is their actual claim?  Their claim is not

12   that there was a problem with Syntel -- sorry, with Cognizant

13   hiring these employees, but rather they say that TriZetto

14   shared certain information that belonged to Syntel with

15   Cognizant about these employees.  That is 100 percent

16   incorrect.  They're actually accusing a person.  Sometimes when

17   you get into these cases it's easy to think about this as

18   companies, but there are people that appear.  And Chuck Sanders

19   is in fact here.  He's sitting right there.

20            What counsel for Syntel is going to tell you is that

21   Mr. Sanders provided confidential information to Syntel.  And

22   that is absolutely incorrect.  Information that was provided

23   belonged to TriZetto, and you will hear evidence that the

24   employees of Syntel, they were permitted to and not restricted

25   from sharing exactly this kind of information, and in fact many

KAJTSYN2                     Opening - Mr. De Vries

1    did publicly on websites like the LinkedIn website.

2            I'll say one other thing because I think it's going to

3    come up.  There was one other claim in the case, it was around

4    transition rebates.  There was a legal dispute between the

5    parties.  That was part of the complaint that Syntel filed.

6    There was a dispute that involved, during this lawsuit, my

7    client disputing, for legal reasons, that claim.  However, that

8    claim has now been resolved, those transition rebates have been

9    paid, and it is no longer a dispute in the case.  So that

10   leaves for them, although there are a number of different

11   claims that we saw in the instructions, really this claim that

12   confidential information about employees was shared.  And as I

13   said, there's no basis for that claim.

14           So that brings me to the end of my presentation and

15   where we are today.  So Syntel is no longer a standalone

16   company.  In 2018 it was acquired by a company called Atos.

17   They're a large IT services provider that is headquartered in

18   France.  And instead of stopping the use of the trade secret

19   technologies and my client's copyrighted code, they doubled

20   down on what they have done.  This is the advertisement that is

21   available on the internet right now on their website.  And

22   instead of calling them the Syntel tools, they now call them

23   the Atos Syntel tools, but these tools, the Step Up Probe,

24   Factory, D2 Data Generator that they say are what gives them

25   the superior position in the market, those were all unlawfully

KAJTSYN2

1    taken from my client.

2            So finally, you will hear from our witnesses.  As her

3    Honor said, what I am here to say is what I believe the

4    evidence will see.  I will come back in closing argument and

5    explain to you what the evidence did show.  But you will hear

6    from our witnesses, Mr. Mike Noonan, he is a software engineer

7    who works at TriZetto.  He's been working on the Facets program

8    since the 1990.

9            THE COURT:  You need to wrap it up.

10            MR. DE VRIES:  Yes, your Honor.

11            Mr. Chuck Sanders, who I have introduced, Dr. Bergeron

12    and Thomas Britven.

13            So I will just end with this, if I may, your Honor,

14    these are our bedrock facts:  So I summarized in detail what we

15    believe the evidence will show.  At a high level, we believe

16    that the evidence that you will see will show that Syntel stole

17    TriZetto's Facets trade secrets and copied its copyrighted

18    technology, it lied about and attempted to conceal its theft.

19    By doing that, it avoided nearly $300 million in R and D costs

20    that it would have had to spend if it decided to develop it

21    independently instead of taking the technologies.  And that

22    even today, six years later, Syntel still has not taken any

23    steps to stop using this stolen technology.

24            Thank you for your time.  I will be able to talk to

25    you again at the end of the case.

KAJTSYN2

```
 1              THE COURT:  Thank you, Mr. De Vries.

 2              So we'll hear the other opening statement from whoever

 3    is making it.

 4              Sorry, so we need a minute to -- if you could take the

 5    mic cover and then we need to wipe down the little box and

 6    then, Mr. Groombridge --

 7              MR. GROOMBRIDGE:  I'm happy to proceed, but I wanted

 8    to know if your Honor would want to take a break.

 9              THE COURT:  Okay, we could do a quick break.  Let's do

10    ten minutes.

11              And Mr. Street, do they know where they can go?

12              DEPUTY CLERK:  Yes.

13              THE COURT:  Leave your notebooks there, and if you

14    file out in the reverse order of how you came in.

15              Remember, don't talk about the case.  You can leave

16    your things in the courtroom or in the jury room.

17              This will be a pretty quick break since we're having a

18    short day.

19              (Jury not present)

20              THE COURT:  I wanted to make sure there was nothing

21    that we had to discuss.

22              MR. GROOMBRIDGE:  There is one juror, I think

23    Ms. Smith, who walks with a cane, and I think she's in -- I

24    think that's her garment there.  And if it's all right with

25    your Honor, we thought it might make sense for her to get a
```

1    seat that's closer to the exit so it's less work for her to get

2    in and out.

3              THE COURT:  That's very thoughtful.  And maybe,

4    Mr. Street, what we can do first thing tomorrow is put her in

5    this seat and shuffle everyone else around.

6              Thank you for the suggestion.

7              We can break until 2:47.

8              MR. GROOMBRIDGE:  Thank you, your Honor.

9              THE COURT:  What are we doing after that?

10             MR. DE VRIES:  Your Honor, we're ready to present our

11   first witness, Mr. Noonan.

12             THE COURT:  Okay.

13             (Recess taken)

14             (Jury present)

15             THE COURT:  Welcome back.  We have another opening

16   statement.

17             MR. GROOMBRIDGE:  Your Honor, may I remove my mask?

18             THE COURT:  You may.

19             MR. GROOMBRIDGE:  Thank you.

20             Good afternoon, ladies and gentlemen.  I'm sure one

21   thing Mr. De Vries said that we all share is a desire to thank

22   you for being here under these unprecedented and challenging

23   circumstances, so thank you.

24             Now Mr. De Vries said this was a case about theft.  It

25   is not.  What it is a case about is a relationship gone bad.

KAJTSYN2                    Opening – Mr. Groombridge

1   What do I mean by that?  This is where I want to started

2   because it's one of the most important parts of what I have to

3   say is these two companies had a relationship for seven years,

4   and it is in the course of that relationship when they were

5   working together side by side as partners that all of this

6   information, so-called trade secrets, were provided voluntarily

7   by TriZetto to Syntel.

8          And if you noticed, Mr. De Vries tried to suggest that

9   Syntel provided just some temporary staffing services.  They

10  were the help.  They were helping out.  That's not true either.

11  They were at the heart of TriZetto's business.  And if you

12  think about it, ladies and gentlemen, what happened here,

13  whether it was right or wrong, which will be for you to decide,

14  you will hear evidence that 84 employees were hired away by

15  TriZetto and Cognizant from Syntel.  If they were just the help

16  and didn't really matter, why would it have been so important

17  to do that?

18         Now in that seven-year relationship, that is when the

19  vast majority of the information that we're focused on was

20  provided, and provided voluntarily by TriZetto to Syntel.

21  There was one other thing.  At the end of that time there came

22  into the picture a company called UHG or UnitedHealth.  You'll

23  be hearing a lot about that.  And that is another place where

24  some of the information was provided.  UnitedHealth is one of

25  the biggest health insurance payers in the country, and it's

KAJTSYN2                    Opening - Mr. Groombridge

1    also one of biggest customers that TriZetto has, and they had a

2    whole lot of this Facets software.  And there came a point

3    where they wanted to do an upgrade, and both TriZetto and

4    Syntel bid in 2014 for those services, and the customer, UHG,

5    selected Syntel, and TriZetto was mighty unhappy about it.

6           And you're going to hear evidence that as part of

7    that, Syntel got ready to provide those services and work on

8    that and said we know you have other Facets information, but

9    don't give us anything unless it's entirely authorized and

10   legitimate, and if they have a problem, if TriZetto was unhappy

11   about the information that its customer, UHG, gave to Syntel,

12   we're going to see, ladies and gentlemen, maybe they could have

13   gone to complain to their customer, but they didn't want to do

14   that, instead they're here complaining about what we did.

15          Now you also heard reference to the neutral forensic

16   examiner and you'll hear a lot about that in the trial.  That

17   neutral forensic examiner looks for -- had full access to our

18   relevant computer systems, went through all of the emails,

19   looked at all of these documents.  And you may be aware of

20   this, ladies and gentlemen, or not, but you'll hear about it,

21   it is possible, given the way computer systems work, to track

22   every time someone downloads a document, every time when its

23   sitting on the computer, when they open it, the computer keeps

24   a record of that.  And the neutral examiner went through all of

25   those, and I will show you one of the very important things

KAJTSYN2                    Opening - Mr. Groombridge

1    that he found.

2            This was a chart showing the last time when the files

3    that TriZetto was complaining about were opened or changed.

4    And you can see that the vast majority of times that that

5    happened was during that seven-year relationship.  And the

6    reason for that is you're going to hear, ladies and gentlemen,

7    what was going on was that Syntel's employees were working hard

8    side by side to develop software, write software, and solve

9    problems for TriZetto.  They weren't stealing the information,

10   they were using it for TriZetto's business.  And at the end, in

11   2015, they were using information that they got fair and square

12   from UnitedHealth Group, from UHG.  And what is really going on

13   here, I suggest, ladies and gentlemen, is that TriZetto was

14   unhappy that Syntel was competing with it.

15           Now let's talk about Syntel.  Syntel is an IT company.

16   It was founded in 1980 and works in a number of industries,

17   health care, banking, manufacturing.  And it provides these

18   software development customization services.  Mr. De Vries

19   mentioned services like installing, customizing, upgrading

20   complicated pieces of software like Facets.  Importantly,

21   ladies and gentlemen, what Syntel does not do is sell software.

22   You can't go and buy a piece of software like Facets from

23   Syntel.  Syntel's business is selling the expertise of its

24   people.  That's all it has.  It has lots and lots of very

25   skilled engineers and technical people, and that its business

KAJTSYN2                      Opening - Mr. Groombridge

1    is selling their services.  And that's going to be important,

2    because if you take away Syntel's people, you take away its

3    business.

4            Now I'm going to talk here about basically three

5    things.  The first thing is that relationship and how it

6    changed, then I will talk about some of the hiring that went on

7    and then talk about some of the other things that happened as

8    this contractual relationship broke down.

9            And you can really look at the history between these

10   two companies in three phases.  It started back in 2007, began

11   working together, and in 2010 they negotiated the contract.

12   And you heard her Honor talk about this.  This is that

13   contract.  It's a huge legal document.  And it was the rules of

14   the road for the relationship between the two companies.  And

15   you will hear, in fact we have witnesses in the courtroom, the

16   two men who negotiated this contract, both of them will testify

17   in this trial.  And after that, between 2010 and 2012, Syntel

18   was providing those services, those valuable services, to

19   TriZetto.  TriZetto didn't complaint about it.

20           But in 2012, there came a change to that relationship

21   which is very important to what is going on here.  And let me

22   talk about that.  There was an amendment to this contract.  An

23   amendment is another word for a change.

24           Let's see how that came about.  In the original

25   contract there was a provision that said Syntel, you are not

KAJTSYN2                    Opening - Mr. Groombridge

1   allowed to compete with TriZetto.  You see that?  In order to

2   prevent any misuse or disclosure of confidential information,

3   which is exactly what we're talking about in this trial,

4   service provider, that's Syntel, will not provide products or

5   services that require technical design, process or

6   architectural knowledge of TriZetto's.  We can't compete with

7   them.  We are going to be working with them and we'll learn a

8   lot about their product, and we can't use that to go out and

9   compete with them.

10          If that is where things stopped, then they might well

11  have something to complain about, but it's not where it

12  stopped, because in 2012 there was a change to this.  And the

13  change was that TriZetto was unhappy with the deal it made two

14  years earlier.  That deal required TriZetto to pay, to buy a

15  certain amount of services.  In fact, it had to pay for the

16  time of hundreds of Syntel employees, and their business wasn't

17  going so well and they wanted to change that.  And so they came

18  to Syntel and said let's negotiate, we want lower prices.  And

19  there was a negotiation and they got the lower prices.  But in

20  return, that provision and any other part of this agreement

21  that restricted Syntel from competing were deleted.  So the way

22  you might think of this is Syntel said I will give you lower

23  prices, but in return I get to go out in the marketplace and

24  compete.  And that is exactly what happened.

25          Now why would TriZetto have wanted to delete this

KAJTSYN2                    Opening – Mr. Groombridge

1    non-competition provision?  Because their business was in

2    serious trouble.  This is the Syntel lawyer executives writing

3    at that time saying look, here's what is wrong with TriZetto's

4    business:  Too expensive, weak post sales, poor implementation,

5    indifferent customer service.  What was going on was that in

6    2012 they were having trouble in the marketplace.  So that is

7    why they came and said please give us a break on the prices,

8    and that is why the non-competition provision was struck out of

9    the agreement.

10            And did you notice -- I wrote this down because I

11   thought it was important, but Mr. De Vries said that Syntel

12   came up with a secret plan unbeknownst to my client.  That

13   really isn't correct.  It was TriZetto who came to Syntel and

14   said let's change the agreement.  They knew perfectly well that

15   they were allowing Syntel to compete with them, and now they're

16   unhappy because Syntel did exactly the thing that Syntel was

17   given the right to do.

18            (Continued on next page)

19

20

21

22

23

24

25

Kaj3syn3                    Opening - Mr. Groombridge

1              MR. GROOMBRIDGE:  (Continuing)  Let me point out to

2       you also, that Syntel even at that time wasn't trying to

3       sabotage TriZetto.  Here, the highlighted pieces you see, the

4       first one talks about that's the change, the amendment.  And

5       you see the next highlighted piece says "collaborate, if

6       possible."  Syntel still wanted to work together as partners.

7       And the last thing it says -- and this is important -- is

8       protect TriZetto.  No one was going out and destroying them.

9       But, as time ran on another couple of years, TriZetto again

10      decided it was unhappy, they wanted to change the deal, and now

11      they don't like the change.

12              Let's look at that highlighted section.  This is the

13      TriZetto executives talking amongst themselves:  "Our current

14      partnership does not support our financial ties," that means

15      their pay more than they wanted.  Here is the key part:

16      "Educate one of our competitors with product and process

17      knowledge that allows them to better compete with us in the

18      marketplace."  That's what you just heard TriZetto complaining

19      about.  But what that's saying is that's the deal we struck,

20      and now they don't like the deal.

21              And here is another, this is written by Mr. Sanders

22      who is sitting with us here in the courtroom talking about

23      this.  "Unfortunately, Jake Sorg" -- that he was his

24      predecessor -- "eliminated the non-compete language in its

25      entirety.  I can't explain the rationale for this change."

Kaj3syn3                    Opening - Mr. Groombridge

We'll ask him.  But, I think it's clear, ladies and gentlemen,
they were unhappy with the deal that they struck.

          Let's talk about the hiring that happened here.  It
will be up to you to decide whether this was right or wrong.
TriZetto believed it could not recruit Syntel employees.  As
her Honor told you, turns out they were wrong.  The important
thing for our purposes is this is what they thought at the
time, because it plays into what they then did.  And it turns
out also that TriZetto really wanted to hire Syntel's
employees.  Here is the CEO writing in August of 2014 to one of
his direct reports.  "If you can hire anybody from Syntel, who
would you pick."  And there's an e-mail exchange with the CEO
says I really need this information right now.  And when the
CEO wants something, you get it to them.  At 9:17 on a Friday
night, they said they have 87 resources.  87 people from Syntel
and we've ranked them.  Best ones we give a 1.  The medium ones
we give a 2, and the others we give a 3.  There are 33 number 1
grades, we'd like to hire all of those if we could.

          Why was the CEO asking about this?  That became clear,
because just a few weeks later, it was announced that Cognizant
was going to buy TriZetto.  And as we're going to see, ladies
and gentlemen, what that really meant was now Syntel had a
target.  Why do I say that?  Because it was clear to all
concerned that once Cognizant was on the scene -- Cognizant was
one of Syntel's biggest competitors -- there was not going to

Kaj3syn3                       Opening - Mr. Groombridge

1   be a place at the table for Syntel anymore.

2           And what happened then, during the course of this time

3   between that announcement in September of 2014 and the end of

4   the year, was a period of great activity.  In the course of

5   this trial we'll see a whole lot of things that happened during

6   this four months.  A lot of e-mails, a lot of discussions, as

7   the two parties were going back and forth to try to figure out

8   how they would separate.  How their relationship would come to

9   an end.

10          And as soon as that announcement was made, Syntel's

11  employees were worried.  Frankly, when you look at these, these

12  are very human concerns.  This is Mr. Reddy who will testify

13  during the week, he went around and did a kind of town hall.

14  Here's what he heard.  Do I need to go back to India?  Do I

15  need to break my lease?  What about my visa?  I've just

16  arrived, my family is coming, what about relocation?

17          Why does that matter?  Because these were vulnerable

18  people.  It was going to be easy to pick them off.  And

19  Mr. Reddy wrote to TriZetto, e-mailed them, and he said I'm

20  sorry to have to raise this, but we have a concern.  We've been

21  hearing that our people have been actively contacted by

22  Cognizant.  And they've received offers, it appeared to be a

23  targeted effort.  What happened?  TriZetto wrote back and said

24  no, no, no, we're two separate companies.  Yes, they intend to

25  buy us, but for the time being we're just working separately.

Kaj3syn3                     Opening - Mr. Groombridge

1   We don't know anything about what they're doing.

2           Again, in these lawsuits we get to see not just what

3   the two companies say to each other, but what they're saying

4   internally.  And it turns out when you look at that, what they

5   told Mr. Reddy wasn't entirely straightforward.  Because one of

6   the things here they told Cognizant is we have the confidential

7   plan to get rid of Syntel.  We have to keep it confidential

8   because if they found out about it, they wouldn't like it.

9           And Cognizant, when it heard that, said can we go

10  after Syntel people and hire them.  And again the response,

11  also talking amongst itself, the en masse hiring can only

12  happen after close.  That means when the legal t's are crossed.

13  But, our team is keeping a pipeline of Syntel candidates warm

14  so we can make offers on close.  En masse hiring is what they

15  decided they were going to do.  Again, these people were just

16  the help.  They were temporary staffing services.  Why would

17  you go through this trouble?

18          And Mr. Sanders here said, again, turns out wrongly,

19  we can't hire them.  But he said Cognizant can.  Cognizant is

20  hiring as requirements for people with this experience.  And

21  Cognizant wrote to Mr. Sanders and they said what we need is

22  names, locations, current role, and current pay.  And everyone

23  agreed that approach was fine.

24          And Mr. Sanders worked feverishly.  You'll hear from

25  him.  This is the day before Thanksgiving 2014.  He sends them

Kaj3syn3                        Opening – Mr. Groombridge

1   this document that you see there in the lower part of this.

2   Hiring plan.  In that document there is a list of literally

3   more than a hundred Syntel employees with details of what they

4   did.  And for each and every one, a desired hire date.  I

5   suggest you can't go on the Internet and find this.

6           Cognizant, when they got that, jumped into action.

7   They said they started hiring people, they were going full

8   throttle.  And it turns out that they were targeting 128 people

9   from Syntel.  And here's where they ended up in that process,

10  they hired 84.

11          And as I said, Syntel is a business, its business is

12  its people.  It doesn't have software.  It doesn't have

13  computers to sell.  It doesn't make computers.  What it sells

14  is the skill and expertise of those people.  If you hire them

15  away, you harm its business.  And one of the things we're going

16  to hear is testimony about not just how this happened, but how

17  much it harmed Syntel's business.  That was the en masse

18  hiring.

19          Let me talk about the last thing I wanted to cover

20  which is what happened, how did these two companies deal with

21  each other during that critical four-month time when it was

22  clear their relationship was over?  Syntel saw good and bad in

23  this.  There were risks, they are going to lose money.  The

24  revenue that they thought they would be getting from TriZetto

25  was going away.  And there would be a competitive threat.

1   CT -- that means Cognizant TriZetto -- together will be a

2   threat.  Unmatched competitive advantage.  We're going to be

3   the 800-pound gorilla of this industry.

4          On the other side you see Syntel also saw

5   opportunities.  Some of the customers weren't going to like

6   having to deal with the 800-pound gorilla.  One of them you see

7   there was UHG.  That's part of why I think you'll hear that UHG

8   decided to pick Syntel when the two companies were bidding.

9          The CEO gets to come in here again and he personally

10  asked Mr. Sanders to step in.  Jude, that's the CEO.  And

11  Mr. Sanders was going to deal with the relationship with Syntel

12  during this critical few months.  And you see there he says

13  follow up on the agreement if we need to play hardball.  And

14  then he has a suggestion.  And here's what he says.  It is a

15  little bit of a stretch, but we can tie them up in a dispute if

16  necessary.

17         You see the kind of business practice that we're

18  looking at here.

19         And as her Honor told you, on November 24, Syntel

20  terminated the contract.  The very next day was the first time

21  that TriZetto said Syntel had done anything wrong.  And I think

22  what, ladies and gentlemen, it is up to you to draw inferences.

23  I'm not going to suggest an inference here.  But, we're going

24  to talk about this in the trial.  They knew what we were doing

25  when we were working together all those years side by side.

1   They never once said we did anything wrong.  It was only when

2   we said this contract is over, this relationship is finished.

3   And I'll come back to that in just a moment.

4            At this point now it was clear that there was no

5   longterm future to the relationship.  But, in the short term,

6   TriZetto still needed Syntel.  They desperately needed Syntel.

7   And one of the things that the two companies were talking about

8   is how are we going to deal with that.  And you see here

9   Mr. Sanders reporting on some of his discussions, he's talking

10  to his colleagues about the negotiations he's had with Syntel.

11  He says we're not entitled to name resources.  What that means

12  is, we can't say we would like these specific individuals to

13  work on our projects.  Because it was Syntel who got to decide

14  who would do that.  But then he goes on to say, but we've been

15  successful in getting them.  What he means there is Syntel was

16  playing nice.  Syntel was giving TriZetto what it wanted, even

17  though Syntel had no obligation, as Mr. Sanders candidly

18  admitted.  No entitlement.

19           And here's how his colleagues responded when he

20  reported this.  Here is a list of the people that will continue

21  to support us for the next few months.  And one of his

22  colleagues responded, she says I'm relieved that I don't have

23  to worry about CAESI Syntel resources for a while.  I wish

24  Infosys was as supportive as Syntel.

25           I think what you'll see is clear evidence that Syntel

1  honored its obligations and played nice, even while this

2  campaign was going on to try to take away its employees that

3  were its lifeblood.

4        One other thing I want to talk about.  Mr. De Vries

5  mentioned something about transition rebates and said it had

6  all been taken care of, and that is true.  He also mentioned

7  that Syntel filed a lawsuit, and that is also true.  One of the

8  things that happened in the separation was Syntel said we think

9  you owe us some money, a few million dollars, sort of like

10  severance, if you will.  And TriZetto disputed that and fought

11  it in this lawsuit for five years until Friday.  On Friday, it

12  decided to pay every penny that it owed.  $5 million.  Rather

13  than to have to come into this court and have us talk about

14  this.  And that, again, I think tells you something about

15  what's going on here.

16        So, I'll finish by describing the witnesses that you

17  will hear from Syntel.  Mr. Daniel Moore, who is sitting right

18  over there.  He is the chief in-house lawyer and chief

19  administrative officer of Syntel, and he negotiated this huge

20  contract and some of the other ones, and you'll hear from him.

21        Mr. Reddy.  He runs this business.  He is in India,

22  and because of the pandemic, he can't come here.  He will

23  testify remotely.

24        Mr. Manish Mehta.  He's not in India, he is in the

25  U.S. but he also can't come here.  He has a new job and he's

Kaj3syn3                    Opening – Mr. Groombridge

very graciously agreed to testify, but we will hear from him

remotely.

          Mr. Plumpe is a damages expert and he will talk about

why in our view, with utmost respect, that number of $300

million that you heard from Mr. De Vries is really divorced

from reality.

          And Mr. Sheets, another damages gentleman, will talk

about how the harm, the monetary harm that that hiring away

caused to Syntel.

          There are a number of other Syntel employees you may

hear testimony from or about.  I can't promise you that you

will hear all of these people.  These are Syntel's employees.

These people are in India.  Each and every one of them gave

testimony in this case by deposition, which is testimony

recorded before the trial.  And if TriZetto really thinks that

it wants to, it can show you these people, their testimony.

Because ultimately, this is about people.  And when you say

that this a case about theft, what you are saying is these

people are thieves.

          Ladies and gentlemen, it will be up to you to decide

that.  But I think you'll agree it is actually a case about a

relationship that went wrong, as relationships sometimes do.

          Thank you very much.  We appreciate your service.

          THE COURT:  All right.  Thank you.  Would you like to

call your first witness?

Kaj3syn3                        Noonan - Direct

1              MR. DE VRIES:  Yes, your Honor.  TriZetto calls Mike

2    Noonan.

3              THE COURT:  Can you hear in there?

4              THE WITNESS:  Yes, I can.

5              THE COURT:  Great.

6     MICHAEL NOONAN,

7         called as a witness by the Plaintiff,

8         having been duly sworn, testified as follows:

9    DIRECT EXAMINATION

10   BY MR. ALPER:

11   Q.  Good afternoon, Mr. Noonan.

12   A.  Good afternoon.

13   Q.  You've already presented us with your name.  Could you

14   please tell the jury where you work.

15   A.  I work in Bridgewater, New Jersey.

16   Q.  Who do you work for?

17   A.  I work for Cognizant.

18   Q.  What is your position at Cognizant?

19   A.  I'm associate vice president of software engineering for

20   Facets development.

21             THE COURT:  Mr. Noonan, if I could ask you to talk

22   into the mic as close as I am, that would be really helpful.

23             THE WITNESS:  Okay.

24             THE COURT:  You can move it so you can be comfortable

25   and see whoever you need to see.

Kaj3syn3                          Noonan – Direct

1              THE WITNESS:  Okay.  Is this better?

2              THE COURT:  It is much better.  Thank you.

3   Q.  Is there a business unit at Cognizant that you work in?

4   A.  Yes.  It's the Cognizant TriZetto software group.

5   Q.  You said that you work in Facets development.  What is

6   Facets?

7   A.  Facets is a core healthcare administrative platform.

8   Q.  What types of companies use Facets?

9   A.  Large healthcare insurance companies, Blue Cross Blue

10  Shields, for example, United Healthcare type companies.

11  Q.  At a high level, what does Facets do for health insurance

12  companies?

13  A.  It helps them administer their business.  Everything from

14  understanding their membership, holding the members, the

15  provider information, processing claims.  It's central to

16  healthcare insurance companies' business.

17  Q.  How many people in the United States today have healthcare

18  programs that are managed using Facets?

19  A.  Our customers have over 170 million covered lives running

20  on Facets.

21  Q.  Generally speaking, what does your job entail?

22  A.  So, today my job entails managing a team of software

23  developers, making sure we produce new features in the system,

24  participating in some of the high-level designs, removing

25  obstacles if there is problems to us delivering on a quarterly

Kaj3syn3                         Noonan - Direct

1   release commitment.

2   Q.  How long have you been working on Facets for?

3   A.  Over 20 years.

4   Q.  I'd like to just very briefly talk about your background.

5   Where do you currently live?

6   A.  I live in Hazlet, New Jersey.

7   Q.  You already said you work currently in Bridgewater.

8   A.  Well, working from home since March due to COVID.

9   Q.  Do you have a family?

10  A.  Yes, I do.

11  Q.  Do you have children?

12  A.  I have four children, two stepchildren, grandchildren.

13  Q.  I'd like to ask you, how did you get into the technology

14  that we're here to talk about today?

15  A.  When I was 18, I started working for Prudential.  It was

16  more or less in the mailroom, as a night shift control clerk.

17  Q.  After the mailroom, where did you go next at Prudential?

18  A.  That room processed out from the computer room, so then I

19  moved into the computer room, and started dealing with

20  mainframe programs, as far as mounting tapes, scheduling the

21  jobs to start and tracking them, dealing with microfiche and so

22  on.

23  Q.  This case has to do with computer software and computer

24  tools.  In that room, with the mainframe computer, did that

25  involving writing computer code and computer tools and computer

Kaj3syn3                          Noonan - Direct

1    software?

2    A.  Not at that point.

3    Q.  So what happened next?

4    A.  Prudential would give an aptitude test to certain folks,

5    and I did well on it for coding.  And then they sent me to

6    their coding school in Roseland, New Jersey.

7    Q.  What happened after that?

8    A.  And then I had my first coding assignments at their office

9    in South Plainfield, New Jersey.

10   Q.  How did you come to work on Facets?

11   A.  So that time in Prudential was the early '80s.  I started

12   working for a company called Erisco in 1989.  They were the

13   ones that created Facets.  At first, I worked on some other

14   mainframe systems that Erisco had for group administration,

15   claims administration.  And then in the late '90s, I started

16   working on Facets.

17   Q.  In the late '90s when you started working on Facets, was

18   that at Erisco?

19   A.  Yes, that company was still Erisco, but in the year 2000

20   Erisco became part of a company called TriZetto.

21   Q.  You said a few moments ago that you're currently working at

22   Cognizant.  How did you come to work at Cognizant?

23   A.  TriZetto was acquired by Cognizant in 2014.

24   Q.  Over the years, what have your responsibilities been with

25   respect to Facets?

1    A.  When I first went from our mainframe team on to Facets in

2    the late '90s, I was directly coding certain new features in

3    Facets.  I worked on a claim archive feature, and then moved on

4    to helping design some key additional components of Facets.

5    And my work has progressed since then, you know, raising from

6    writing the code to managing the teams that write the code.

7    Q.  Mr. Noonan, have you prepared demonstratives to assist with

8    your testimony today?

9    A.  Yes, I have.

10        MR. ALPER:  Mr. Thomas, if you could please display

11   DDX 14.2.

12   Q.  Mr. Noonan, what are we seeing here on this picture?

13   A.  This is a group shot of the larger Facets team, and we're,

14   this was in 2018, I believe, and we were going to be leaving an

15   office building we had been in Union, New Jersey, for over 25

16   years and move to our Bridgewater office.  This was sort of a

17   going away from the building photo.

18   Q.  This is a picture of your Facets team?

19   A.  Yes.  If you advance to the next slide, you can see me in

20   the middle.

21        MR. ALPER:  Mr. Thomas, if we can now display --

22   Q.  Actually, let me ask you.  How many versions and releases

23   of Facets have there been over the years?

24   A.  Probably upwards of many dozens, many dozens.  70s, 80s.

25        MR. ALPER:  If we can see, Mr. Thomas, DDX 14.4.

Kaj3syn3                        Noonan - Direct

1    Q.   What are we seeing on and this slide, Mr. Noonan?

2    A.   These are a series of my prior ID badges.  So on the left

3    was Erisco, and then a picture of that building in Union across

4    from Kean College.  And then the next badge shows the TriZetto

5    logo, that triangle.  And then the right-most badges are a bit

6    more recent, they show my mustache being grayer and my forehead

7    bigger, but with Cognizant logos.

8    Q.   We see down underneath the badges, we see some Facets

9    versions and releases.  What are those meant to depict?

10   A.   Just showing points in time.  So, our Facets 2.9 release

11   went out in August of 99.  4.71 in December 2009.  Or our 5.2

12   version in November 2014, and 5.6 became available in August of

13   2018.

14   Q.   As associate vice president of Facets, what are your

15   responsibilities today?

16   A.   So today my responsibilities involve making sure we meet

17   the commitments to our customers.  They expect new features to

18   be in these quarterly releases.  Overseeing some of the key

19   design decisions, dealing with our customers that are

20   upgrading.  And if my team of software engineers, if they

21   encounter a problem, they'll turn to me to get that problem

22   resolved.

23   Q.   How many people work on your team today in Facets

24   development?

25   A.   Facets development has 208 people today.

Kaj3syn3                         Noonan - Direct

1    Q.  I'd like to show you another one of your demonstratives, if

2    we can see, Mr. Thomas, DDX 14.5.  And if at a high level, can

3    you tell us what we are seeing to on this slide?

4    A.  Sure.  In the green box on the left is software.  So

5    speaking about Facets and Facets upgrades software.  And on the

6    right-hand side, things related to Facets, more of a services

7    nature.

8    Q.  I'll follow up with some questions about each of these two

9    boxes, but are these things that TriZetto and Cognizant provide

10   to its customers?

11   A.  Yes.

12   Q.  So, on the Facets software side, in addition to the

13   software itself, what are Facets upgrades?

14   A.  So our customers that rely on Facets use it for their core

15   business of healthcare.  They rely on us for upgrades, the

16   upgrades are the changes to the software.  Maybe there is a new

17   law, maybe there is a new capability, a new way to process COB,

18   or a new way to process how providers and networks should be

19   worked on.

20          So those upgrades provide new features, new

21   capabilities, and responses to regulatory requirements.

22   Q.  On in the blue box on the right, what is that referring to,

23   services?

24   A.  So, with Facets, we provide services to help a new customer

25   install the system.  It is a big, complex system.  They may

1    actually need to do some changing how they run their business

2    to now run on Facets.  So, that installation and set up is one

3    of the services that we provide.

4    Q.  Does TriZetto provide the services itself?

5    A.  Yes.

6    Q.  Do the service people, you have a team for service?

7    A.  Yes, yes, we call them the services team, yes.

8    Q.  How much training does the services team need in order to

9    provide these installation and set up and upgrade services?

10   A.  They get a lot of training.  We've developed computer-based

11   training.  There is on-the-job training, initial training with

12   a lot of oversight.  We even have designations of

13   certification, are you a certified Facets claims person.  You

14   know, indicating you've attained that knowledge.

15   Q.  Why does TriZetto offer these installation upgrade and

16   customization of services to its customers?

17   A.  Facets is complex.  The health insurance is complicated.

18   And with this training, we can do it more efficiently, and it

19   makes sense for those health insurance companies to turn to us

20   for those services.

21   Q.  I'd like to focus on a couple of the bullet points within

22   the blue box under services.  That second bullet says DBBLD,

23   and upgrade framework.  What does that refer to?

24   A.  So, DBBLD, we'll often refer to that as "DB-Build."  And

25   this is something we've built, it's specific to the Facets

Kaj3syn3                          Noonan - Direct

database.  So when you asked me earlier about upgrades, with

each of those upgrades we tend to make changes to the database,

and in our versions and releases that were in the 4 series,

DBBLD was the utility that made the corresponding database

changes to also work with that new release.  So our 4s all the

way through 5.0 would rely on DBBLD.  After that, we developed

upgrade framework, which, while accomplishing the same thing,

could do it in much less time.

Q.  If we look at the next bullet down, we see something called

Data Dictionary and Custom Code Impact tool.  What are those?

A.  The Data Dictionary is something we built.  We'll refer to

it as the Facets Data Dictionary.  It contains information

about our database.  It gives in more plain English what's a

logical description of an otherwise abbreviated field name,

information about its attributes, is it key or not, some of the

valid values for a field.  So it's a very important tool that

we have.  And the custom code impact tool, that comes into play

in that with all the features Facets has, and brings to health

insurance companies, there's typically other things they need

to do around it.  Maybe they need to feed an accounting system,

maybe they want to load some data to it, maybe they want to

create some custom reports.  And the Custom Code Impact tool

helps identify what has changed between a series of versions

and releases in the database.  That can be very helpful to them

to then say, oh, if these database changes occurred, what if my

Kaj3syn3                    Noonan - Direct

1    custom code looks at those tables in the database.  Where do I

2    need to focus my attention in remediating some custom code as I

3    upgrade.  It makes use of information from the Data Dictionary

4    as well.

5    Q.  If we go to the next bullet, testing and automation

6    scripts, what does that refer to in the context of services?

7    A.  So we'll provide services, and these speak to verifying

8    that the system's working as designed.  It could be after a big

9    upgrade, maybe some configuration has gone into the system.

10   And these are more or less tests specific to Facets, specific

11   Facets steps to help verify functionality.

12           THE COURT:  I'm going to interrupt for just a second

13   and invite everybody, even though we don't do this during

14   COVID, to stand up and stretch.

15           Sorry to interrupt.  You may proceed.

16           MR. ALPER:  Thank you very much, your Honor.

17   Q.  So, Mr. Noonan, let's take a look at that last bullet,

18   reference manuals and guides.  What does reference manuals and

19   guides refer to?

20   A.  The Facets reference manuals and guides.  So these are a

21   wealth of documentations that speak to how to install Facets,

22   how to set it up, how to configure it, talks about the

23   underlying data within it.  It is very important to people that

24   are running their business on Facets, it's very important to us

25   internally.  Very important to our services team, as they

1   support our customers with Facets.

2   Q.   These software tools and the reference manuals and guides,

3   are those things that are publicly available?

4   A.   No.

5   Q.   What does TriZetto do to keep those materials confidential?

6   A.   There's copyrights, we -- we make these available via a

7   special portal.  We call it our customer exchange website.

8   Anybody that tries to get, you need an assigned ID and password

9   to have access to these.  So, we go through a number of steps

10  to keep these things secure.

11  Q.   When TriZetto provides these items to say a customer or one

12  of its contractors, do they need to agree to a non-disclosure

13  agreement?

14  A.   Yes.

15  Q.   They need to agree to keep those confidential?

16  A.   Yes.

17  Q.   You just mentioned about providing these via a website.

18  How does TriZetto provide access to the reference manuals and

19  guides to its customers?

20  A.   So, that customer exchange website, when a customer buys

21  Facets, we designate someone or a small number of people at

22  that customer site as the super user of customer exchange at

23  that company.  And they have the responsibility to make sure

24  that other employees of that company, that they then give

25  access, follow our restrictions about maintaining the copyright

Kaj3syn3                         Noonan - Direct

1    and permitted use of these materials.

2             So, we grant it to a customer, and customer's

3    employees then can obtain this information from the customer

4    exchange.

5    Q.  Can anyone go on the Internet and get into the customer

6    exchange?

7    A.  No, they would be stopped.  They would need a specific ID

8    and password to be able to get in.

9    Q.  Is it important to TriZetto's business that the software

10   tools and documentation that you have been discussing be kept

11   secret?

12   A.  Yes, yes, these are our trade secrets.  This, these are the

13   assets of our business.  So, this is the culmination of our

14   decades of work, and this is what drives our business.

15   Q.  If one of your competitors on the services side of the

16   business was able to have access to those tools and reference

17   manuals and software, and use them for purposes for which they

18   were not permitted, how would that impact your business?

19   A.  That would be detrimental to our business.  That, that

20   would hurt our business.

21   Q.  I think you mentioned this in one of your answers a moment

22   ago.  Are these materials, the software, the software tools and

23   the reference manuals and guides, are those TriZetto's trade

24   secrets?

25   A.  Yes.

Kaj3syn3                          Noonan - Direct

1    Q.  In addition to keeping TriZetto's technologies protected as

2    trade secrets, does TriZetto protect its technologies in other

3    ways?

4    A.  I know we make use of copyright, copyright registrations,

5    and such.

6    Q.  I'd like to talk a little bit more about how Facets impacts

7    people and ask you, is Facets -- so you've talked about how

8    Facet is used by the health insurance companies, right?

9    A.  Yes.

10   Q.  Okay.  Is Facets something that also affects the lives of

11   people out in the world?

12   A.  I think so.  Yes.

13   Q.  How is that?

14   A.  Well, in, I know for myself, I have insurance through my

15   company, and I know that the health insurance company that I

16   picked they make use of Facets.  So, I know that if I want to

17   hit their website to find a doctor in the network that I can do

18   that, I know that if I see a doctor, that that claim is going

19   to be paid accurately.  If I needed something with a

20   preauthorization or a referral, that will be processed quickly,

21   I shouldn't have to wait as long.  So, I think those things,

22   you know, it makes it a nice place to work because I get to in

23   some ways make use of what we've built.

24           MR. ALPER:  Mr. Thomas, if we can show DDX 14.6.

25   Q.  Mr. Noonan, what are you showing on the top half of this

Kaj3syn3                        Noonan - Direct

1    slide?

2    A.   So, on the top half showing some of the things that we've

3    heard back from our customers as they take on running their

4    business in Facets.  That there were reductions in time for

5    processing claims, and significant reduction in the claims

6    backlog.

7    Q.   Have you experienced over 75 percent time savings as a

8    result of using the Facets software with your customers?

9    A.   They've been able to process more claims in less time.

10   Yes.

11   Q.   In terms of the insurance companies' businesses, and the

12   bottom line, what does processing more claims in less time

13   mean?

14   A.   Well, when they're processed accurately the first time, and

15   there's less people that have to manually work the claims, all

16   of those things contribute to savings, administrative savings,

17   they're sometimes referred to as.  And also via technology, a

18   lower total cost of ownership.  So all of those things, you

19   know, relate to dollars saved, many dollars saved, which allows

20   them to have -- push lower premiums, and make lower premiums

21   available, and again, again to improve that access to

22   healthcare.

23   Q.   I was going to ask you.  How do those savings impact people

24   out in the world?

25   A.   Instead of paying to work a backlog of claims, they are

1  able to push more dollars towards other programs that a health

2  insurance company may wish to pursue.  Maybe you get the

3  information about healthier living or time for a checkup.  And

4  or even just the simple aspect of less of a delay if you're

5  trying just to get a referral or a preauth or find out the

6  status of a claim.

7           THE COURT:  Can I ask a question.  Sorry, I missed the

8  topic sentence.

9           Here what caused all these savings?

10           THE WITNESS:  By making use of Facets as a core

11  administrative platform, compared to using perhaps a legacy

12  system, more manual systems.  So very often, when Facets comes

13  into a health insurance company's offices, there's things that,

14  oh, they used to do this manually.  Every claim.

15           THE COURT:  I didn't mean to hijack the testimony.  I

16  just wanted to make sure I understood.  Thank you.  That's

17  helpful.

18           THE WITNESS:  You're welcome.

19  Q.  Mr. Noonan, I am going to switch gears here.  Have you

20  heard of Syntel?

21  A.  Yes.

22  Q.  When did you first hear about Syntel?

23  A.  That was in the mid 2000s.

24  Q.  What were the circumstances that you came to know Syntel?

25  A.  Our company entered into an agreement with Syntel in that

1    our business was growing, we had a lot of Facets sales, and as

2    part of that, that was a higher demand for services, a higher

3    demand for software development, too.  And Syntel was going to

4    be hired on to supply some labor.

5    Q.  Was Syntel the only company that TriZetto has had a

6    relationship with over the years for surplus labor?

7    A.  I know, I know we've also worked with Infosys, we've worked

8    with another IT services company called EPAM.

9    Q.  Does TriZetto still use service providers like Syntel to

10   provide services to its Facets customers?

11   A.  Largely no.

12   Q.  Why is that?

13   A.  Well, when we were acquired by Cognizant, Cognizant is a

14   much larger IT services company, and they have the people.

15   Q.  Back when TriZetto was working with Syntel, did TriZetto

16   have an agreement with Syntel allowing Syntel to provide

17   services to TriZetto's Facets customers?

18   A.  So yes, there was an agreement where, working as

19   subcontractors, Syntel could provide those services.

20   Q.  Do you know the name of that agreement?

21   A.  A Master Services Agreement.

22   Q.  Do you have personal knowledge of Syntel's work for

23   TriZetto when Syntel first began working with TriZetto?

24   A.  Yes, yes, I was there.

25   Q.  Now, when Syntel first started working on Facets with

Kaj3syn3                        Noonan – Direct

1   TriZetto, what experience did the Syntel folks have with

2   Facets?

3   A.   In my experience, they were very limited.  A lot of folks

4   were just out of college, very often this was their first

5   corporate job right out of college.  So, really no experience

6   with Facets.

7   Q.   How did the Syntel folks learn to provide Facets services?

8   A.   We trained them.

9   Q.   Did you personally train Syntel personnel on the Facets

10  architecture?

11  A.   Yes.

12  Q.   What of TriZetto's confidential software, software tools,

13  documentation, did the Syntel people have access to?

14  A.   All of it.

15  Q.   For what purpose was Syntel provided access to those

16  confidential materials?

17  A.   Well, they were going to be working just like us, you know.

18  The message we had for management was, you know, we're a team,

19  and these people from Syntel were going to be working with us.

20  So to accomplish the same jobs, they needed the same access.

21  Q.   Was Syntel allowed to do anything it wanted with the

22  TriZetto confidential software and tools and documentation?

23  A.   No, no.  Like all of us, it should be what is your assigned

24  job, and if you need a certain manual for that job, well then,

25  that make sense for you to access it.

Kaj3syn3                        Noonan - Direct

1    Q.  Those were jobs assigned by TriZetto to Syntel?

2    A.  Yes.

3    Q.  Are you aware of TriZetto's allegations against Syntel

4    concerning Syntel's theft of TriZetto's confidential software,

5    software tools, and documents?

6    A.  Yes, I am.

7    Q.  What impact have Syntel's actions at issue in this case had

8    on you and your business?

9    A.  It -- I'm sort of an even-keeled guy, and it took me a

10   little bit to realize it.  But almost like that Claritin moment

11   where the commercial, they peel a layer off and then you see

12   clearly that, wow, these materials were taken, and were now

13   going to be potentially used against us to compete with our

14   services business.  So, it -- it was a shock personally, and

15   it, you know, I realize it can compromise some of our business.

16   Q.  The people, the folks at Syntel involved here, these were

17   people you and your colleagues trained to learn about those

18   materials?

19   A.  Yes.

20   Q.  Let me ask you, how long have you personally been working

21   on technologies in the software and the software tools and the

22   documentation that are the subject of TriZetto's claims against

23   Syntel in this case?

24   A.  Over 20 years.

25   Q.  Did you sign a confidentiality agreement as part of your

Kaj3syn3                        Noonan - Direct

1   employment at TriZetto?

2   A.  Yes, I did.

3   Q.  What is your understanding of your obligations under that

4   agreement?

5   A.  Well, I understand that what I've built, the company owns,

6   and that I can't take it home and use it for other things.

7   Q.  As an employee of TriZetto who signed a confidentiality

8   agreement, are you allowed to use TriZetto's software and tools

9   and other trade secret information for any purpose that you'd

10  like?

11  A.  No.

12  Q.  Let me ask you, Mr. Noonan, did you ever tell Syntel that

13  it could keep the materials, the trade secret materials, and

14  use them for any purpose that they want?

15  A.  No.

16  Q.  Are you aware of anyone at TriZetto or Cognizant who ever

17  told or even implied to Syntel that Syntel could use your trade

18  secrets for any purpose that it would like?

19  A.  No.

20  Q.  All right.  I'd like to switch gears and if we could, I'd

21  like to ask you a few more detailed questions about Facets now.

22          MR. ALPER:  If we could see DDX 14.7., Mr. Thomas.

23  Q.  Let me ask you, before Facets, how were insurance companies

24  administering their health plans?

25  A.  Some may have been doing things with paper, others had,

Kaj3syn3                    Noonan – Direct

whether you want to call them a legacy system, a homegrown

system, or maybe some other, an older system that wasn't as

flexible and scalable and less able to keep up with changes in

healthcare.

Q.  What were some of the issues that came up in connection

with sort of the manual approach to handling claims and

insurance plans?

A.  Well, when things are done manually, there's human error

creeps in, as much as people try, and if there is standard

operating procedures, there is still a typo.  There are still

things that get processed wrong.  Sometimes things can be

physically misplaced or misrouted.  So, those were some of the

problems.

Q.  What about some of the problems when insurance companies

would attempt to have their own sort of legacy system software?

A.  I know that some of our customers today had prior systems

that over time they just found them very difficult to maintain.

They weren't in the primary business of software development.

So, while they had development teams, they may have had an

architecture of a system that just didn't adapt to change well.

As healthcare changed and new things were needed in the

marketplace, it became difficult to maintain those older

systems.

Q.  How does Facets, with that background, how does Facets fit

into an insurance company's business?

A.  Well, with Facets, Facets is able to satisfy that need.  So

with Facets, there is a community of customers asking us for

the next changes, we're doing those changes.  All the customers

now get the benefit of those changes.  So, we have teams

keeping up with the regulatory requirements, getting those

changes into the software, becomes more economical to those

customers in that while we do it, and yes, we're selling it to

them, but we can spread that cost over all those customers.

Where it would be really expensive for them to do it all of

that work but just for themselves.

        MR. ALPER:  If we could, Mr. Thomas, look at DDX 14.8.

Q.  Could you describe, Mr. Noonan, what we are seeing here

with reference to how Facets fits into your insurance

customers' businesses?

A.  Sure.  Sure.  So here's a perspective more from that health

plan insurance company.  So, on the far left, there's options,

different plan products, it is open enrollment time, so someone

might be familiar with do they want the 80 percent plan or the

high deductible plan.  So someone picks that, let's their

employer know.  In the center that's just depicting all

employees letting the employer know what they picked, what

plans they picked.  And then forwarding that to that health

insurance company using Facets.

        And at that point, there is a lot of works that goes

on accepting that information and understanding their plans.

Kaj3syn3                        Noonan - Direct

1    Are there dependents, what are the coverages they pick, what's

2    the related premiums that go on with that.

3           MR. ALPER:  If we can now, Mr. Thomas, look at DDX

4    14.9.  Actually go back to 14.8 for a moment.

5    Q.  The frame on the far right, that's at the insurance

6    company?

7    A.  Yes.

8    Q.  Who is sitting there at the desk?

9    A.  That would be one of the Facets customers.  One of the

10   health plan insurance company employees.

11   Q.  And they're actually operating the Facets software to

12   receive the health plan information?

13   A.  Yes.

14   Q.  If we can now go back to DDX 14.9.  Does this depict

15   another way that Facets is used by health insurance companies?

16   A.  Sure.  A big part of Facets is processing claims.  So this

17   is that common example of someone goes to the doctor, the

18   doctor is going to send in a claim with specifics, what was the

19   diagnosis, what were the procedures, what's the charge, dates

20   of service and so on.  So that information, very often it's

21   electronic these days and not paper.  But that gets to Facets.

22          And on the far right, again, showing how Facets is

23   that system processing the claims, pulling together what was

24   the coverage this person picked, as well as what's the

25   information that that health insurance company negotiated with

1    providers.  In certain networks, what was those pricing

2    agreements, looking at claims history and so on.

3            So all of that processing within Facets, and the

4    majority, the vast majority of the time claims are processed

5    without human intervention.  But, certainly there are instances

6    where people are working those claims that need further review.

7    Q.  You've been talking about Facets generally.  Are there

8    specific feature areas that are important to the operation of

9    Facets?

10   A.  Yes, there are.

11           MR. ALPER:  Mr. Thomas, if we can pull up DDX 14.10.

12   Q.  And at a high level, what are we seeing on the two sides of

13   this slide?

14   A.  Well, similar to what we were talking about just a moment

15   ago, on the left-hand side, some of the things more with

16   insurance plan management, and on the right more focused on

17   claims adjudication.

18   Q.  Let's take a look at the feature areas under insurance plan

19   management.  What are these green boxes and the circle, what

20   are they meant to represent?

21   A.  So, as we developed Facets, we'll refer to areas of it as

22   domains.  So central is the member domain.  Just keeping track

23   of members, subscribers, all that information.  And some of the

24   others are important like billing, you know, we need to

25   understand the premium for what those members selected for

Kaj3syn3                    Noonan - Direct

1  their coverages and such.

2  Q.  In the member domain, what are some examples of the types

3  of information that you keep track of and are updating in the

4  member domain?

5  A.  So certainly it's what we call demographics, where do you

6  live, birth dates, some premiums vary based on age.  Whether

7  there's other insurance, perhaps a spouse also has insurance,

8  so that's COB.  Other carrier information becomes very

9  important.  Within the member domain, we keep track of what we

10  call eligibility, what things were they eligible for at certain

11  times.

12  Q.  Just to pick another one of the boxes around under

13  insurance plan management, what does "commissions" refer to?

14  A.  So, you might not think about it, but if your employer has

15  insurance with a large health insurance company, there may have

16  been a broker, an agent that helped place that business with

17  that insurance company, and then they'll get a commission based

18  on the premium that we calculate.  So, commissions is another

19  area of Facets.  That helps that health insurance company pay

20  the commissions to their brokers that sold business.

21  Q.  If we go over to the claim adjudication side.  What is

22  claim adjudication?

23  A.  Adjudication is just our perhaps fancy word for processing

24  the claim.

25  Q.  There is a circle in the middle on the claim adjudication

1     side called claims.  What feature area does that refer to?

2     A.  Claims are so central to Facets.  That's why it's in the

3     center here.  And it speaks to the wealth of information that

4     can come in on a claim.  A claim could be pretty simple and

5     small, but there's hospital claims that could have hundreds and

6     hundreds of lines and information from a hospital, all sorts of

7     different revenue codes.  So claims in that box talking to the

8     information about claims, how to process claims, and then get

9     payment back out to providers.

10    Q.  Let's just pick a couple of other examples here to

11    illustrate.  If we go to the left of claims, we see a box

12    called HIPAA privacy.  Let me ask you a question before we talk

13    about that box.  Is the privacy of the confidential information

14    of the patients out in the world, the individual subscribers or

15    members out in the world, is that important to TriZetto?

16    A.  Very important.

17    Q.  So how does the HIPAA privacy box relate to that?

18    A.  This is an area that makes sure that only the people with

19    the appropriate access can get access to claims information.

20    If someone was to call up and say, I want to look at your

21    claims information, this is able to say, like, Mike's not an

22    authorized person to look at your claims information and would

23    not allow that.

24    Q.  By the way, I should have asked this earlier.  What is a

25    member?  What does a member refer to in the health insurance?

Kaj3syn3                    Noonan - Direct

A.   One of the people, one of the insured people that are being

held within the Facets system and processing.

Q.   Let's go over to the right of claims, there is the box

called work flow.  What is work flow?

A.   Work flow is a good part of Facets in that, while we have a

high rate, a first passed rate.  As these claims come in, they

get processed untouched by human hands, there are still things

that a health plan might do.  They might say if this is over a

certain dollar amount, I want a person to look at this claim.

I don't want it to just pass through.  Or perhaps when a

provider sent the claim in, they typed something wrong and it

is illogical and there is an error on that claim.

        So what work flow can do is it can look at what were

the reasons that the claim pended.  That's the phrase we'll use

if it didn't process completely.  Pended.  And it can route

them into certain queues.  And then there's workers assigned to

work those queues.  So the health insurance company has

knowledge workers that would be more familiar with how to

process a high dollar claim.  They've had extra training, what

should they look for before they let it proceed.

        For example, if something was miskeyed on a claim,

they can help identify that resolution, contact the provider,

so that can get corrected as well.

        So, in the past, maybe things that pended would just

be printed out on a list.  Maybe they'd have to rip up the

Kaj3syn3                          Noonan - Direct

paper report and pass it around.  With work flow, that's

automated within the system, that routing, to the point that

people working those queues of certain types of claims, they

can hit a key.  Get next.  And they go on to the next one

that's routed to them.

Q.  Does that work flow functionality help patients get their

claims paid faster?

A.  Oh, yes.

Q.  Just lastly, if we go up above claims, we see there's a box

that's called open access.  What does open access refer to?

A.  Open access, it is a newer name for what we used to call

FXI.  And that's the area of Facets that wraps up a lot of our

business logic into web services.

          So, this allows, in one popular example, our health

insurance companies that perhaps have a portal that lets people

look at, hey, what are my claims.  Let me see a list of my

claims.  So I know my health insurance has Facets, and I know

if I go to their website and I sign on with the ID and password

I have with them, underneath that, if I want to look at claims,

it is executing a Facets list claims service.  Going into

Facets, finding my claims, and then showing them.

                    (Continued on next page)

KAJTSYN4                        Noonan - Direct

1    BY MR. ALPER:

2    Q.  Now is your company the company that makes the decision

3    about whether a claim gets paid or not?

4    A.  No, that -- while we make the software and we assist the

5    companies with services in running the software, it's up to the

6    health insurance company to configure it and make decisions on

7    what gets paid.

8    Q.  I would like you to take a look at DX14.11.  What are we

9    seeing here?

10   A.  Here we're seeing a Facets' medical processing screen for

11   processing a claim.  So on the left-hand side it's a pretty

12   simple one we entered showing the simplest information of

13   subscriber and the provider the diagnosis code and such, but

14   this is a Facets medical claims processing screen.

15   Q.  And who is it who is actually sitting in front of the

16   computer seeing these screens?

17   A.  This would be someone within the health insurance plan.

18   Q.  And so that's what the user sees.  What is happening behind

19   the scenes with Facets in the software?

20   A.  So as they enter all the data and hit F3 to process and F4

21   to save within Facets, all of this information concerning the

22   coverage they picked, their claims history, the Facets

23   underneath it is looking up this provider, seeing which network

24   that provider was in, what's the pricing agreement and such.

25   So hundreds if not thousands of IOs, input outputs, reads

KAJTSYN4                    Noonan – Direct

1   interactions with our database to process this claim and come

2   up with a final amount to then say here's how much is

3   deductible and here's how much is the co-pay, here's how much

4   can be paid to the provider.

5   Q.  Does TriZetto have a computer architecture that is

6   developed to handle that data processing and information?

7   A.  Yes.

8          MR. ALPER:  Mr. Thomas, if you could call up DTX893.

9   Q.  And Mr. Noonan, what is DTX893?

10  A.  This is our Facets data models guide.

11  Q.  Is this for a particular release of Facets?

12  A.  Yeah, this was our Facets 5.1 release.

13  Q.  Okay.  And what is this document used for, the data models

14  guide?

15  A.  We use it internally but also share it with customers, and

16  it describes in a technical way the architecture of our

17  database.

18  Q.  And when you share it with customers -- actually let me ask

19  a different question.

20          Is this a document that contains TriZetto's trade

21  secrets?

22  A.  Oh, yes.

23  Q.  And is this a document that you keep confidential?

24  A.  Yes, we do.

25  Q.  When you share it with your customers, they need to agree

KAJTSYN4                        Noonan - Direct

1    to keep it confidential?

2    A.   Yes.

3    Q.   And are they restricted in the way that they're allowed to

4    use this?  Could they give it to anyone?

5    A.   They are restricted.  They can't just give it to anyone.

6    Q.   And is there anything in this document that reflects that

7    it is a trade secret of TriZetto?

8    A.   Yes, yes, I believe -- if you could page down, yes.

9              So we mentioned its copyright, and then under that

10   limited rights notice in that second paragraph in the middle,

11   TriZetto maintains this work as confidential trade secret

12   property.

13   Q.   Now let's take a look at some of this -- the other

14   substance in this data model guide.  If we could go to

15   DTX893.55, please.

16             So this is entitled Chapter 8, Claim Data Model.  What

17   are we seeing here?

18   A.   So in effect, the heart of Facets, the beginning of our

19   claim data model.

20   Q.   And if we go to the next page, page 56, at a high level,

21   what are we seeing on this page?

22   A.   So these are the depictions of our claim tables, some of

23   them.  That first one in the center is a key one, but in this

24   data models guide we're showing tables and more details.

25   Q.   So we see a number of boxes around the screen.  What do

KAJTSYN4                          Noonan - Direct

1   each of those boxes represent?

2   A.  So in speaking about relational databases we refer to

3   tables, and tables contain the data.  So these were our

4   decisions on how to organize the data into these specific

5   tables, and we made decisions on what should be together in a

6   table or what should be its own separate table.

7   Q.  If we could zoom in on this middle the top of the middle

8   table, what's the name of that middle table?

9   A.  So this is the CMC_CLCL_claim table.

10  Q.  And we see some rows of text inside that box.  What do

11  those rows of text represent?

12  A.  These represent the data that is on that table.

13  Q.  Okay.  And then if we see -- if we zoom back out we see a

14  bunch of other tables that are connected by lines radiating out

15  from that middle table, what is that?

16  A.  So it's a relational database, so those lines are meant to

17  indicate there's a relationship between these tables that are

18  connected with a line.  So on this page the relationship is

19  based on the claim ID, so that upper most point in the CLCL

20  claim table, we have CLC ID, that character 12, that's a key

21  field, and that's how these tables -- they have that in common,

22  that's their relationship.

23  Q.  And why do you need to have separate tables -- actually,

24  let me ask that a different way.

25          Why did you decide to have separate tables instead of

1   just one big table with all the data in it?

2   A.  We could have had different table layouts, but we've made

3   decisions based on the type of data.  Some things come in at

4   we'll call it at a claim level, some things meet occur multiple

5   times, like lines on a claim, maybe on that office visit they

6   also gave you a flu shot, that would be another line.  So by

7   making use of this table structure and relational database,

8   we're able to have data grouped efficiently for processing.

9   And that needs to be done in a way that can support claims

10  processing quickly as well as all the other times when maybe

11  there are inquiries into the database.  So as the transaction

12  is processed, that might have us design things one way, but

13  knowing that there's also going to be inquiries, reports from

14  the database would have us adjust that design at times.  So

15  there's a lot that goes into all of these decisions.

16  Q.  If you look at the upper right-hand corner it says page 1

17  of 13.  What are the other twelve pages of this section on

18  claims?

19  A.  You said it right, all on claims.  So if we page through,

20  these are all different claims domain tables.

21  Q.  And how long is this data model guide all together?

22  A.  I believe it's at least, I will say, 200 pages.

23  Q.  And would we see the same level of detail in term of the

24  architecture of tables and the fields throughout the entire

25  document?

KAJTSYN4

1    A.   Yes.

2    Q.   How many tables are there in Facets in all?

3    A.   Approximately 2,000 tables.

4    Q.   And how many fields within those tables?

5    A.   I would say tens of thousands.

6    Q.   In your experience working on databases for the last

7    several decades, how complex and large is Facets compared to

8    other databases?

9    A.   This is very large and complex.  I know our customers have

10   told us that when they're using Facets that with the volumes of

11   data they work with that they're into the multiple terabytes of

12   data.

13   Q.   And how much work went into developing this Facets

14   architecture and the tables and fields and relationships?

15   A.   This is an accumulation of over 25 years of work.

16   Q.   And how much has been spent over the years on research and

17   development on Facets?

18   A.   I believe it's upwards of 500 million.

19            MR. ALPER:  Okay.  I'm going to shift gears, but I

20   would like to ask your Honor if I should --

21            THE COURT:  I think this is a good time for us to

22   break, so thank you for asking.

23            Ladies and gentlemen, just a reminder, don't talk

24   about the case or communicate about the case with anybody.

25   We're starting an hour later tomorrow which means we're

KAJTSYN4

starting at 11:00, so I would like everybody to be here in the
jury room by quarter of 11:00.

I will tell you about one of my practices, I apologize
in advance for it, but here's what I do.  We come out at 11:00
to start because that's our start time.  If anybody is not
here, whether it's a juror, whether it's a lawyer, we'll sit
here and wait for you in the courtroom, which is a little
awkward.  If that ever happens, it never happens again.

So I would just encourage everybody to be on time.
Your time, frankly, is the most precious thing we have and we
try really hard not to waste it.  I will see you tomorrow at
quarter of 11:00, we'll try to go until 4:30 or 5:00 tomorrow,
and have a good evening.

Thank you.  We would normally stand to show respect to
you all but we don't stand with Covid, so you can stand and
leave.

(Jury not present)

THE COURT:  Mr. Noonan, you may be excused.

(Witness not present)

THE COURT:  I know you all have been here all day, but
perhaps you've been communicating with others.  I want to find
out, perhaps you've already filed it, but where we are on
getting a revised jury charge for the main claims?

MR. DE VRIES:  Your Honor, I know the teams have been
working on that today.  We received an updated draft yesterday

KAJTSYN4

1    and I believe that there's been an exchange today.  So my

2    belief, unless someone knows differently, is that we will be

3    submitting to your Honor today the results of that back and

4    forth.  I don't believe everything has been resolved, at least

5    last that I heard, but we'll keep trying to resolve as much as

6    possible.

7              THE COURT:  Okay.  Were you planning on getting me a

8    revised verdict form?

9              MR. DE VRIES:  Yes, your Honor.

10             MR. GROOMBRIDGE:  Yes.

11             THE COURT:  What was your planned timing for that?

12             MR. DE VRIES:  Tonight as well.

13             MR. GROOMBRIDGE:  Tonight as well, your Honor.

14             THE COURT:  Okay.  Great.  All right.  And is there

15   anything that anyone needs or wants to raise?

16             MS. CARSON:  Your Honor, we have a number of witnesses

17   going tomorrow, and --

18             THE COURT:  Actually we're supposed to have you sit

19   down.  Have a seat and use the mic, please.

20             MS. CARSON:  It's very hard.

21             THE COURT:  I know it's habit.

22             MS. CARSON:  We have a number of witnesses going

23   tomorrow, and Syntel has objected to a number of the

24   demonstratives.  I have been checking my email to see if we

25   have been able to work some of it out.  I just don't want you

KAJTSYN4

1      to be surprised tomorrow if we haven't been able to work it

2      out, but I think we did make a proposal to them on most of

3      their objections.

4               THE COURT:  What you need to do, though, is tell me --

5      I'm going to start at 11:00, and unfortunately the reason we're

6      starting late is because I can't start before then.  But you

7      need to tell me if there are issues that I need to resolve, and

8      you need to tell me tonight so that I can do that tonight or

9      early tomorrow.

10               MS. JANGHORBANI:  Your Honor, I believe there are

11      issues that we need to resolve in connection with

12      demonstratives and testimony that will we're likely to go over

13      tomorrow.

14               THE COURT:  So when are you in a position raise them?

15               MS. JANGHORBANI:  I'm happy to address them now.

16               THE COURT:  Let's do that.  That's very efficient.

17               MS. JANGHORBANI:  Yes, your Honor.

18               MR. DE VRIES:  Your Honor, maybe I'll ask, there's a

19      member of team prepared to address that, one practical issue we

20      wanted to know is how that member of the team could -- can they

21      come up to the podium at the appropriate time?

22               THE COURT:  Are they here in the courtroom?

23               MR. DE VRIES:  Yes.

24               THE COURT:  I don't know.  We need that person to be

25      in front of a mic.  So perhaps that mic is the one that makes

KAJTSYN4

1    sense since it's free, but we need to remove the mouthpiece

2    from the mic.  But the HEPA filter has been going for a while,

3    so that's good.

4              MR. DE VRIES:  I could also move if that's a better

5    solution.  I didn't want to do it incorrectly.

6              THE COURT:  No, this is a different world for all of

7    us.

8              And you're Mr. --

9              MR. HERBERT:  I'm Mr. Herbert, and I'm here to address

10   the claims related to Dr. Bergeron on behalf of Cognizant and

11   TriZetto.  I will be addressing the objections to

12   Dr. Bergeron's slides, and Ms. Carson will be addressing the

13   objections to Mr. Britven.

14             THE COURT:  Would it make sense for us to hear the

15   objections first?

16             MS. JANGHORBANI:  I think that make sense, your Honor.

17   I don't know if one of the courtroom techs could put up the

18   Dr. Bergeron slides so your Honor could see them.

19             So your Honor, you will recall we had a motion in

20   limine related to Dr. Bergeron, and you indicated that

21   Dr. Bergeron can provide testimony on whether TriZetto's

22   confidential and proprietary information constitutes trade

23   secrets, whether Syntel used TriZetto's confidential and

24   proprietary information, and whether Syntel's source code is

25   similar to the Data Dictionary.  We're not disputing any of

KAJTSYN4

that.

    But what it would appear from the slides that we received last night that they intend to use Dr. Bergeron essentially as a sort of super juror who is going to take emails from the record not related to the use of trade secrets and interpret what it is that they mean for the jury, or in the instance of certain emails that are related to the use of trade secrets, interpret what the motives of the folks sending those trade secrets might in fact be.

    So if you want to look first at Slides 7 through 10.

    THE COURT:  Do these slides reflect the accommodations that TriZetto has proposed or not yet?

    MS. JANGHORBANI:  I do believe there are some issues that have been taken off of the table due to these accommodations.  These are the ones I understand to still be live.

    THE COURT:  So we're looking at DDX 2.7.

    MS. JANGHORBANI:  Right.  From 7 to 10 what occurs here is that Dr. Bergeron intends to narrate a story from a series of emails about Syntel's plan to compete against TriZetto.  Now all of these emails are, of course, in the record, and obviously TriZetto can argue that, but we object to the use of Dr. Bergeron in his expert capacity getting up there and interpreting emails that the jury is perfectly capable of interpreting themselves.  So that would be our objection to

KAJTSYN4

these three.

THE COURT:  I understand.

Mr. Herbert?

MR. HERBERT:  Dr. Bergeron, in addition to being a
medical doctor and someone with vast experience in computer
technology and programming, is also the president of his own
company that is in this field.  This is evidence that that's
directly related to the use of trade secrets.  He is going to
talk from a technical perspective about what these emails mean
in terms of the tools that are referenced, and in DDX2.7 he
will talk about what it means in the context of these tools are
a key part of the strategy.

THE COURT:  So just give me an example what would he
say, for example.

MR. HERBERT:  This slide is essentially introducing
the next slide.  This is the email that the claim is attached
to.  And the next slide, DDX2.8, and he's talking about how
this email, from his technical perspective and also being
someone who is the president of a company in this space, shows
that in 2012 they had this plan that was built on tools and
accelerators.  And those are the exact same tools and
accelerators that we have alleged that Syntel misappropriated
TriZetto's trade secrets to build.

So he is going to testify that this plan includes
using the TriZetto trade secrets to build these tools and

KAJTSYN4

1    accelerators.  And without that testimony tying these tools and

2    accelerators to the trade secret issue in the case, the jury,

3    we feel, will be at a loss.  So his expert testimony is going

4    to help them understand how this relates to the trade secret

5    issues and it's also directly related to the use of those trade

6    secrets because this is circumstantial evidence of why they

7    were misappropriating trade secrets.

8            I also note all of this is disclosed in Dr. Bergeron's

9    expert report, and the Daubert motion that Syntel filed did

10   reference that he was making an improper factual narrative.  We

11   directly addressed that issue in our opposition, and your

12   Honor's opinion did not exclude that testimony; instead, he was

13   allowed to testify about use of the trade secrets.  This is

14   directly related to the use of circumstantial evidence.

15           MS. JANGHORBANI:  Your Honor, if I may briefly.

16           THE COURT:  Yes.

17           MS. JANGHORBANI:  I agree that Dr. Bergeron is

18   entitled to testify about the tools, but this whole idea -- I

19   tried to catch the words as he said it, that the tools are a

20   key part of Syntel strategy, Dr. Bergeron has not been offered

21   as a business strategy expert or anything of the kind.  He was

22   offered as a medical technology expert to speak as to the

23   nature of whether this information is trade secrets and whether

24   or not Syntel used it.  I.

25           I also just want to flag what he just said, that

KAJTSYN4

1    Dr. Bergeron wants to testify that this is circumstantial

2    evidence of something.  That is in fact a turn of phrase that

3    shows up throughout Dr. Bergeron's report.  And once again, I

4    submit that that is not the appropriate role of an expert.

5    This evidence can go before the jury, he can testify about that

6    to which he is an expert, which is what your Honor recognized

7    in the MILs, but he should not be saying this is circumstantial

8    evidence of this or this is what Syntel must have been planning

9    and here's why it was nefarious.

10            THE COURT:  I assume he's not going to say that.

11            MR. HERBERT:  Your Honor, the words "circumstantial

12    evidence" will not come out of his mouth.  I was merely

13    explaining to your Honor why this evidence is actually related

14    to the use of the trade secrets.

15            As you know --

16            THE COURT:  I will stop you there.

17            So what we purport to be arguing about is the

18    demonstratives, but it sounds like what we're really arguing

19    about is his testimony.  As I understand it, this has been

20    disclosed, I will allow it.

21            Do we have another?

22            MS. JANGHORBANI:  We do, your Honor, which is another

23    set where we go to, I think 16 where it begins.

24            Now again, your Honor, this is probably an instance of

25    our fighting over the testimony rather than the demonstratives,

KAJTSYN4

but I do think it's likely to come up so I wanted to raise it

with your Honor in advance.

THE COURT:  I appreciate that.

MS. JANGHORBANI:  It would appear from 16 through 19

and then a handful of slides further into the deck that

Dr. Bergeron intends to testify as to the intent or motive of

folks who were sending these emails.  Now Dr. Bergeron is not a

psychologist or a psychiatrist, he does not know anything about

these individuals beyond what evidence is in the record, and I

would submit it's improper for him to be testifying about the

intent or the motive, and that's really a usurpation of the

jury's function here.

THE COURT:  I suspect I will not hear that he's not

testifying about intent or motive but about what happened, but

let me hear what you have to say.

MR. HERBERT:  Exactly, your Honor.  He's not going to

testify that the intent, for example, of that, the intent of

sending this email was to cover up, what he is going to say is

based on his review of the evidence that this email indicates a

cover up.  That is what he's going to say.  He's going to say I

looked he evidence, here's the email, they used this dollar

sign, and in my review of this evidence and experience --

THE COURT:  Is that an opinion he expressed in his

report?

MR. HERBERT:  It is, your Honor, there's an entire

KAJTSYN4

section in his report that deals with additional evidence, and
these are emails that are expressly called out in that section,
and it is related to --

            THE COURT:  Does he provide the opinion that the use
of the dollar sign would foil electronic searches?

            MR. HERBERT:  He does, your Honor.

            THE COURT:  Okay.

            MS. JANGHORBANI:  Your Honor, I would submit the point
of saying that a dollar sign would foil electronic searches,
that's fine, but suggesting that he included -- Mr. Chadha
included the dollar sign for the purpose of or in order to --

            THE COURT:  I understand.  So I would ask you to be
careful in the phrasing of your questions and also to speak to
him in advance so that we don't have objections.  I think what
you're proposing is fine as long as he doesn't step over the
line that Ms. Janghorbani was objecting to.

            MR. HERBERT:  Could I ask one point of clarification?

            THE COURT:  Sure.

            MR. HERBERT:  If he is asked how is this evidence
indicative of a cover up, and his response is essentially from
the evidence I have seen --

            THE COURT:  I wouldn't ask how is it indicative of a
cover up.  That's a leading question and he'll be on direct.
You might say:  What does using the dollar sign in the middle,
what's the significance of that or the impact?

1          MR. HERBERT:  Understood, your Honor.

2          THE COURT:  So I will allow that.

3          Another objection?

4          MS. JANGHORBANI:  The next objection is –- I apologize

5     because I did see some emails flew around during the day, but I

6     think this one is still live as well, DDX2.20.

7          THE COURT:  Let's have somebody confirm.

8          MR. HERBERT:  My understanding this is still live.

9          MS. JANGHORBANI:  Our only objection, here, your Honor

10    is that Dr. Bergeron doesn't need to vouch for the

11    qualifications of the forensic examiner.  I don't think that we

12    intend to argue that the forensic examiner is not a qualified

13    forensic examiner.  So we don't need to have Dr. Bergeron up

14    there touting his various experience, which presumably –-

15         THE COURT:  He will do himself.

16         MS. JANGHORBANI:  Right.

17         MR. HERBERT:  Dr. Bergeron is in fact not going to

18    testify to his qualifications.  They're just listed on the

19    slide for information for the jury, and also support why he

20    relied on this, based on these qualifications.  So there's

21    going to be no testimony about these qualifications, they're

22    just shown on the slide.

23         MS. JANGHORBANI:  If he's not going to testify about

24    it, take them off and put them on the closing slide.

25         THE COURT:  Or he could use it during Mr. Rubin's

KAJTSYN4

testimony, but I wouldn't use them during -- it feels a little like gilding the lily and it's not an opinion of his.

But what he can say is I relied on -- if he did, I relied on the findings of Samuel Rubin specifically on these findings, and you can list the findings.

MR. HERBERT:  Thank you, your Honor, understood.

MS. JANGHORBANI:  The next objection, your Honor, and it's probably more in the nature of a preservation objection, which is Dr. Bergeron is going to speak repeatedly about the use of these materials in advertising.  As you know, we've maintained the position that advertising does not constitute use under the law.  We don't think the testimony is appropriate.

MR. HERBERT:  On this point, this is, from our perspective, now the law of the case.  This was raised by prior counsel in opposition to our motion for summary judgment that advertising was by law not a use.  That was rejected squarely in the magistrate judge's R and R, which her Honor adopted in full.  So from our perspective, it is a decided issue.

THE COURT:  I don't think there's any dispute about that.

MS. JANGHORBANI:  One final issue, which is not really in the nature of an objection, it's more that you asked that the parties flag if they had concerns that someone may be opening the door to something.  And from the slides it's not

KAJTSYN4

apparent, but I'm putting it out there so I can't be accused of

not raising it ahead of time.

On slide 34 to 37, these fit squarely into the zone of

preclusion order.  And so as I understand it, your Honor, we

can't argue any sort of independent creation of our tools and

we can't argue that we didn't copy the test cases or the

scripts.  They can put them up, show they're the same.  So what

I'm concerned about is, one, to the extent that they put them

up and showed that they're the same, I assume I am allowed to

cross on the ways that they are different.

THE COURT:  That's an interesting question.  Let me

hear your view.

MR. HERBERT:  Your Honor, from my perspective, and I

asked last night in the meet and confer to give the example,

because I think preclusion order is quite clear, and I also

think that your Honor's opinions on this issue with respect to

the MILs, it is quite clear that we could argue through

witnesses that there was no evidence of any independent

development, and that in response, Syntel could say nothing.

So from our perspective, there is no opening the door.  We are

allowed to say this and Syntel cannot proffer evidence in

response.

THE COURT:  So I guess what's troubling me is if -- I

don't know what this particular evidence actually says, and

yes, you're right in your characterization of what I have said

KAJTSYN4

1    and what I intended to do in the motions in limine.  But let's

2    just imagine, for example, that they were totally different,

3    and that's a different argument and one that might be

4    permissible.  So I guess it depends on what the evidence is.

5            Can someone help me with that?

6            MR. HERBERT:  From my perspective, Dr. Bergeron will

7    be indicating that he has seen no evidence of independent

8    development.  In response to that statement, it would be our

9    position that Syntel cannot then put forward evidence.

10           THE COURT:  That's true.

11           MR. HERBERT:  If they want to try and -- for example,

12   what is shown on demonstrative DDX2.36, if they would like to

13   try to point out that there is not an identical similarity

14   between these two, I let them at it.  I think they will be

15   unsuccessful.

16           THE COURT:  Okay.  So I agree with everything that I

17   just heard Mr. Herbert say.  I'm not sure it's necessarily

18   inconsistent with anything that I heard you say.

19           MS. JANGHORBANI:  I think that's right, your Honor.  I

20   want to raise just one more thing.  What I heard him to be

21   saying is that we can, in fact, argue that these two things are

22   not the same.

23           I would also raise this issue of independent creation

24   of tools.  I think that as I understand it -- and I understand

25   what counsel is saying, and maybe I don't understand what

KAJTSYN4

1    counsel is saying, but they are obviously going to argue that

2    there's no independent creation.  However, I think that to the

3    extent that they directly contradict something that was in fact

4    seen by Dr. Bergeron or whatever, that would open the door.

5           Now I can't say:  Hey, my folks independently created

6    something.  But if he were to put something up and say this was

7    not independently created and I saw nothing that supported

8    that, I could cross him on the thing that would in fact support

9    that, or no?

10          THE COURT:  No.

11          MS. JANGHORBANI:  Okay, thank you, your Honor.

12          THE COURT:  Sure.  Anything else regarding

13   Dr. Bergeron?

14          MS. JANGHORBANI:  Not from me, your Honor.

15          THE COURT:  All right.  Okay.

16          So Mr. Britven.

17          MR. GROOMBRIDGE:  Your Honor, I think we have -- I

18   apologize because I just now tried to skim through today's

19   emails, but here's where I think we are:  I think we resolved

20   some things.  I think we have two remaining disputes.

21          I think, according to the emails that I have been

22   looking at, I think one of them is about Slide Number 8.  So I

23   believe that this suggests that Mr. Britven is going to testify

24   that Syntel incurred zero development costs, and the issue we

25   think, your Honor, is it's not in his expert report.  And it

KAJTSYN4

1    seems to us that is capable of an answer, and maybe counsel

2    could confer this evening, and if they could show us where it

3    is in his expert report, maybe this gets resolved or not.  But

4    that's the nature of the dispute.  I don't have his report with

5    me, and I think it would be probably more productive if we

6    engage on that and see where we come out.  But, of course, I'm

7    amenable to whatever your Honor thinks is the best.

8            THE COURT:  Unless Ms. Carson can point to it right

9    now.  I don't mean to put you on the spot and say this is your

10   only chance, but if it saves us coming back to it, that would

11   be great.

12           MS. CARSON:  Your Honor, we have a proposal that I

13   think will address this, that it is in his report.  Because

14   what Mr. Britven has said is there isn't any information about

15   R and D.  And so I think that we could just change this and get

16   rid of the zero dollars and that would simply no longer convey

17   zero dollars.

18           THE COURT:  I will let you discuss that with them.

19           MS. CARSON:  Okay.

20           MR. GROOMBRIDGE:  Thank you, your Honor.

21           The only other issue I think pertains to slides 33 and

22   35.  This frankly may be again in the category of a

23   preservation objection.  Your Honor will recall, I expect, that

24   Mr. Britven has first of all avoided the cost number.  And then

25   he says as an alternative I have a reasonable royalty, which is

KAJTSYN4

1    I take a 50/50 split of the avoided costs.

2            In our view, the law is -- in case it matters, I will

3    give what seems to be the most significant case, which is

4    *VirnetiX v. Cisco Systems, Incorporated*, 767 F.3d, 1308,

5    1331-34 (Fed. Cir. 2014) squarely holds that you can't -- it is

6    impermissible as a matter of law to calculate reasonable

7    royalty that way.  I understand there have been prior -- this

8    issue has come up previously in the case.  What we want to do

9    is make sure that by failing to place an objection on the

10   record we're not subsequently going to be held to have waived

11   that issue.

12           THE COURT:  Okay.  Did you want to say anything in

13   response?

14           MS. CARSON:  Your Honor, our first point is this would

15   have been a Daubert issue and it is waived.  But more than

16   that, what Mr. Groombridge is actually talking about is

17   applying the *Georgia Pacific* factors to get to where the

18   parties are on an even playing field.  So we don't believe that

19   that his analysis is contrary to law either.

20           THE COURT:  Did this go to these particular slides?

21           MS. CARSON:  Yes, I believe they're objections to

22   these two slides.

23           THE COURT:  All right.  So I will accept it as you're

24   preserving your record and you may use the slides.

25           And what I would ask is if you aren't able to resolve

KAJTSYN4

the slide, I think it was Slide Number 8, if you could just, as

soon as you know that, even if it's whatever crazy hour it is,

put it in a letter and please file it with your respective

positions so that I could try to get you a ruling perhaps early

tomorrow morning so you could revise the slide before we

actually have the testimony.

Is that testimony before lunch or after?

MS. CARSON:  It will almost definitely be after lunch

because Mr. Britven is our last witness.

THE COURT:  It sounds like there will be time.

MR. GROOMBRIDGE:  It's conceivable it won't even be

until Wednesday morning, so we'll see how that goes.

THE COURT:  That sounds good.

Anything else that we need to talk about?  We all know

who the witnesses are tomorrow consistent with the most recent

witness list we got.

MR. DE VRIES:  Yes, your Honor.

THE COURT:  And you all have exchanged exhibits for

those witnesses.

MR. DE VRIES:  Correct.

THE COURT:  All right.  Then we'll see you all

tomorrow.

MR. GROOMBRIDGE:  Thank you, your Honor.

MR. DE VRIES:  Thank you, your Honor.

(Adjourned to October 20, 2020 at 10:45 a.m.)

```
1                        INDEX OF EXAMINATION

2     Examination of:                          Page

3      MICHAEL NOONAN

4     Direct By Mr. Alper  . . . . . . . . . . . . .59

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```