KAKTSYN1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
SYNTEL STERLING BEST SHORES
MAURITIUS LIMITED, SYNTEL, INC.,

                    Plaintiffs,

          v.                          15 Civ. 211 (LGS)

THE TRIZETTO GROUP, INC., et al.,

                    Defendants.        Jury Trial

------------------------------x
                                       October 20, 2020
                                       11:00 a.m.

Before:

                    HON. LORNA G. SCHOFIELD,
                                       District Judge

                         APPEARANCES


KIRKLAND & ELLIS LLP
     Attorneys for Defendants/Counterclaim Plaintiffs
BY:  MICHAEL W. DE VRIES
     PATRICIA A. CARSON
     ADAM R. ALPER
     BENJAMIN HERBERT
     GIANNA CUTRI

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
     Attorneys for Plaintiffs/Counterclaim Defendants
BY:  NICHOLAS GROOMBRIDGE
     JAREN JANGHORBANI
     J. STEVEN BAUGHMAN

1              (Jury not present)

2              THE COURT:  Good morning.  I understand we have a

3    juror who is running late, I don't know if Mr. Street told you,

4    but I plan to bring the jury out at 11 as promised.  So we're

5    about to do that, but before I do, is there anything that you

6    need to raise?

7              MR. DE VRIES:  Not for TriZetto, your Honor.

8              MR. GROOMBRIDGE:  Not for Syntel either, your Honor.

9              THE COURT:  All right.  Thank you.

10             (Witness Michael Noonan on the stand)

11             (Jury present)

12             THE COURT:  Good morning, everybody.

13             I understand we have one juror who is running late, so

14   we'll just wait.

15             (Juror present)

16             DEPUTY CLERK:  You're reminded you're still under

17   oath.

18             THE WITNESS:  Yes.

19             THE COURT:  Okay, we can proceed.

20   MICHAEL NOONAN,   (Continued)

21       having been previously sworn, testified as follows:

22   DIRECT EXAMINATION

23   BY MR. ALPER:

24   Q.  Good morning, Mr. Noonan.

25   A.  Good morning.

KAKTSYN1                         Noonan - Direct

1    Q.  When we left off yesterday, I was about to ask you about

2    some more specific questions about TriZetto's trade secrets.

3             MR. ALPER:  And to begin, Mr. Thomas, if we could call

4    out Mr. Noonan's DBX14.12, pleas.

5    Q.  Mr. Noonan, what are we looking at here on this slide?

6    A.  Some categories of Facets software, Facets tools and Facets

7    reference manuals and guides.

8    Q.  Are those categories the categories of TriZetto's trade

9    secrets at issue in this case?

10   A.  Yes.

11            MR. ALPER:  Let's start with the first category, and

12   Mr. Thomas, if you could call up DBX14.13.

13   Q.  This is the Facets software category.  At a high level,

14   what trade secrets fall within the Facets software category?

15   A.  That's the Facets product itself, that software, that

16   executable software, and then DBBLD, which we refer to as DB

17   Build, and upgrade framework, that is software to help update

18   our database.

19   Q.  You talked in detail about Facets yesterday.  I have a

20   question for you.  You referred yesterday also to Facets

21   upgrades.  What are Facets upgrades in relation to the Facets

22   software?

23   A.  So once a health insurance company is established on

24   Facets, they're using it as their core administrative platform,

25   we provide updates.  And you don't have to go through a whole

KAKTSYN1                    Noonan - Direct

1    reinstall, but instead we provide an update to the software,

2    and with that update, those new capabilities often have

3    database changes.  So we provide the updates so that they can

4    more quickly move up to that new level and take advantage of

5    those new capabilities.

6    Q.  Are some of the updates related to regulatory changes each

7    year?

8    A.  Yes, there could be regulatory changes, things from CNS,

9    our Blue Cross/Blue Shield association customers, they have

10   regulatory requirements as part of that association, too.

11   Q.  When you have an upgrade version of the software, is that

12   the entire software kind of stand alone or is it just an

13   incremental upgrade or something else?  Could you explain what

14   the upgrades are as a matter of software?

15   A.  Sure.  With our releases we have the executable piece, the

16   binaries or DLLs.  So with a major release we give a new set of

17   those, but we also have smaller upgrade versions where we're

18   just updating certain DLLs.  So there's hundreds, probably

19   close to a thousand of these components that make up the

20   software, the machine code, the executable software that

21   actually runs on the server.

22           So again, we'll replace all the executables in some

23   releases, and in others it's just a few, more of an incremental

24   upgrade.  But with all of them, we -- if it's a major release,

25   we certainly have database upgrades or incremental releases,

KAKTSYN1                          Noonan - Direct

often have database upgrades as well.

Q.  When you have the major release where you're replacing the

entirety of the software, that's a standalone piece of software

that -- that's all you need, basically at that point?

A.  Yeah, that's the new release, yes.

Q.  Let's talk a little bit more about DBBLD and upgrade

framework.  I think you described those yesterday at a high

level, but just as a refresher, what do those pieces of the

software do?

A.  DBBLD is a tool for our customers that are on our releases

that are below the 5.1, so our four dot releases, 4.7, 4.8,

5.01, those are the tools used to upgrade the database to those

levels.  It's handling things along the lines of if we had a

field on a certain table and decided to move it to another

table, or maybe we had to expand a field, sometimes there's --

if a main field was this long, maybe it needs to be longer now.

        So DBBLD has underlying conversion scripts that

upgrade the data in the database, and we need to do it in a way

that we don't lose data, and we need to do it in a way that's

efficient.  Some of our customers have said they wanted

something faster than DBBLD, and we then build an upgrade

framework.  Again with close to 2,000 tables in the database,

an upgrade might affect many tables, and upgrade framework is

built in a way that it can be doing those upgrades against

multiple tables at the same time, so could accomplish that

KAKTSYN1                     Noonan - Direct

1    conversion in a much shorter amount of time.

2              MR. ALPER:  Mr. Thomas, if we could look at 14.14.

3    Q.  And let me ask you, Mr. Noonan, are the upgrade framework

4    and DBBLD data conversion and software programs, are those run

5    in parallel with the Facets software upgrade?

6    A.  Yes, that is what our customers do so that way they can do

7    that upgrade most efficiently.

8    Q.  Okay.  You've got one step ahead of me.  Why do you do them

9    in parallel?

10   A.  So while a systems administrator is applying the new

11   executables to servers, and Facets customer can literally have

12   hundreds and hundreds of servers running Facets to support,

13   they may have thousands of ends users working on a system, so

14   they need more than one or two computers for that.  So while

15   the Windows systems administrator can be applying that upgrade

16   to hundreds and hundreds of servers, the database administrator

17   can be working on the database side and overseeing the run of

18   these tools.  So this way that downtime, as we refer to it, is

19   as short as possible so that the software is updated, the

20   database is updated, and when they're both done, they can get

21   back to work.

22   Q.  How long can a data migration or data conversion take on

23   the data side?

24   A.  It does vary.  If a customer today is very up to date with

25   our software releases, again, we come out with quarterly

KAKTSYN1                    Noonan – Direct

1    releases if they're staying up to date with that, then with

2    upgrade framework and running the software side in parallel,

3    their downtime may be measured in hours or even smaller.

4    Q.  And back to the time frames when DBBLD was being used, at

5    least for those releases, how long would data conversion be?

6    A.  That's a really good question, because at that point we

7    were doing big annual releases, so the amount of database

8    changes was a lot higher, the amount of new functionality was a

9    lot higher in a big annual release.  And with DBBLD, our

10   customers would often have to plan a weekend, maybe even one of

11   the three-day weekends to get through that upgrade process.

12   There was a lot of data to convert.

13   Q.  Is using this data conversion software, is that important

14   to your customers business?

15   A.  Oh, yes, it's absolutely necessary and very important.

16   Q.  Does TriZetto keep its Facets software and the data

17   conversion or data migration software DBBLD and upgrade

18   framework confidential?

19   A.  Yes.

20   Q.  Why is that?

21   A.  These are our assets.  This is our product.  This is our

22   business.

23   Q.  And how much development effort went into making this

24   software?

25   A.  Decades of effort.  Yes, decades of effort.

KAKTSYN1                    Noonan - Direct

1   Q.  Let's talk about the second trade secret category,

2   DBX14.15, please.  This is the tools category.

3         Mr. Noonan, at a high level, what trade secrets fall

4   within the tools category?

5   A.  These are things related to Facets and very helpful to our

6   customers that are going to be depending on Facets.

7   Q.  These items are software?

8   A.  Software and data, yes.

9   Q.  And is there another name people in your field use for

10  tools?

11  A.  Sometimes they will refer to things as accelerators to help

12  them get things done more quickly.

13  Q.  Okay.  Let's take a look at the first of the tools, that's

14  the Data Dictionary, and again, you discussed it very briefly

15  yesterday, but could you refresh us:  What is the Data

16  Dictionary?

17  A.  So the Data Dictionary provides a wealth of information

18  about our database.  It's different than the data models guide,

19  that guide that had the boxes and the lines and such.  With

20  this there's more plain English descriptions that give an

21  explanation for perhaps an abbreviated field name that this has

22  information about that.  It may also give information about

23  valid values, maybe a field should only have A, B or K, that

24  would be listed as what are the valid values, key information

25  attribute information.  It can, again, help explain the data in

KAKTSYN1                      Noonan - Direct

1    our database.

2    Q.  Is the Data Dictionary software that was home made by

3    TriZetto?

4    A.  Yes, we built the underlying table structure there as well

5    to then hold the data in the Data Dictionary so that it can be

6    presented in a useful form.

7    Q.  And do the people on the service teams, do they make use of

8    the Data Dictionary?

9    A.  Oh, yes, our services team, very helpful to customers with

10   all the existing capabilities within Facets.  Each customer

11   tends to have some custom needs; it might need a custom report,

12   it might need a custom way to load data into the database or

13   extract data from it, maybe they want to feed an accounting

14   system or some other system with Facets.  So the Data

15   Dictionary is very helpful to the services team.  There's just

16   so much data within Facets, nobody could read off all the

17   fields and values and such from memory.

18   Q.  If I'm on the service team and I'm going to set up or

19   upgrade a customer system and this customer says okay, I want

20   to receive this kind of data from this provider and this

21   hospital and this set of doctors' offices and so forth and it's

22   this specific set of data, how would I use the -- would the

23   Data Dictionary come in and handy in order for me to know where

24   in Facets I could locate the fields where I put that

25   information?

KAKTSYN1                    Noonan - Direct

1    A.  Yes, and also help confirm it's the correct field.

2    Q.  Well, why don't we -- actually how does the Data Dictionary

3    relate to the Facets software from an architecture perspective?

4    A.  It's exposing aspects of that architecture.  It's, again,

5    describing that data structure that we built at the heart of

6    Facets, what are the tables, what are the key fields, how do we

7    make things, how did we organize things, and so on.

8    Q.  In terms of how the Data Dictionary software is packaged

9    up, is that part of the overall Facets software?

10   A.  Yes, when they download Facets they also get the Data

11   Dictionary.

12   Q.  And does the Data Dictionary contain original elements from

13   Facets?

14   A.  Oh, yes, all of it.

15   Q.  Now I would like to take a look at what the Data Dictionary

16   looks like.  If we could take DBX14.16.

17        Mr. Noonan, what are we seeing here?

18   A.  Here's a screen shot where I started the Data Dictionary,

19   opened it up, and I'm navigating through some of the screens of

20   the Data Dictionary.  And where it says data model, that's now

21   giving me a list of different areas or domains within Facets,

22   and I highlighted the claims domain in this screen shot.

23   Q.  Okay.  And if you were to navigate to a table in -- well,

24   actually, let me go to DBX14.18.

25        And let me ask you, Mr. Noonan, if you were to

KAKTSYN1                    Noonan - Direct

navigate to a table within that claims domain, what would we

see?

A.  So here's an example.  So in this example, I didn't go to

the claims table, but I went to the table that holds diagnosis

codes.  So this table -- and its name is in the upper right,

CMC_CMLD_IA, and this is a table with multiple diagnosis codes

could come in with a claim.  So this is showing the fields on

this table.

Q.  If we could go to DBX14.19, what would you see if you

selected -- you wanted more information about one of those

fields, for instance, because it was relevant to a certain type

of data that a customer was asking you to bring into their

set-up system?

A.  So in this example, I scrolled down a little bit, there was

a field CLMD_POA-IND, that's in that column field on the upper

right under table, and now I'm seeing more information about

that field.  This is a present on admission field.  So this

field is used where if I had a hospital stay and I came in with

certain diagnosis codes, were they present when I was admitted?

And this becomes really important in that if I went into the

hospital for, say, a knee replacement, but while there I had a

post-op infection but I didn't come with that, so anyway, that

information has value.

Q.  Is the Data Dictionary important to customers?

A.  Yes, yes, very important.

1    Q.  And have you ever seen anything like the Facets Data

2    Dictionary out in the world?

3    A.  No, I have not.

4    Q.  How many ways were there to create a tool like the Data

5    Dictionary?

6    A.  I suppose there were a lot of choices and ways this could

7    have been built, but this is how we chose to build it.

8    Q.  Would you expect to see the Data Dictionary software code

9    or the documents describing it out in the public?

10   A.  No.

11   Q.  What would happen if the Data Dictionary was copied by a

12   competitor and used for an unauthorized purpose?

13   A.  That would be damaging to us in that it's not always simple

14   to decide how to save the data, how to organize the data and

15   such.  So I think that would be unfair in that our effort to

16   build it, someone else then could not have to put that effort

17   in themselves.

18   Q.  How much effort did you put into building the Data

19   Dictionary?

20   A.  This has been part of Facets over the years, so again, this

21   has been decades of work.

22   Q.  I would like to switch to the next tool, the custom Code

23   Impact Tool, if we could bring up DBX14.20.

24          Could you explain to us what is the custom Code Impact

25   Tool?

KAKTSYN1                        Noonan - Direct

1    A.  So this is very helpful to our customers, particularly

2    those that have been established customers, in that as they

3    work with Facets and rely on Facets, they will build things

4    around it.  Our services team may help them build things.  And

5    as those accumulate, so dependent still on our data, whether it

6    was a report, whether there's a way to extend Facets, we'll use

7    the term "extension" or "extendability," perhaps it's something

8    as simple they want to add an extra A that's unique to them,

9    they want to check some data as claims are being processed and

10   have another warning check and have someone with higher

11   authority proceed.  But all of that custom code, so much of it

12   can be depending on the Facets data, and if we changed it

13   release over release, they may have to change their custom

14   code, and it could be a challenge to them to understand:  What

15   I should a change?

16          If they upgrade the release, this tool can now be very

17   helpful to them.  It identifies, in this form, here's tables

18   and columns that have changed.  And if they have a good

19   inventory of their custom code about what tables it relies on,

20   this could be a real time saver and accelerator, so to speak,

21   to help them understand that I have to update that report, oh,

22   I don't have to update that report.  So again, something

23   helpful in that upgrade process.

24   Q.  Over the years that TriZetto is working with a customer and

25   providing services, does TriZetto -- will it be many of these

KAKTSYN1                    Noonan - Direct

1   custom code customizations that TriZetto will assist customers

2   with tucked away in various different places in customers'

3   installation of Facets?

4   A.  Yes, customers may have a lot of customizations.

5   Q.  So how important is it during the upgrade process that the

6   customers know how the upgrade is impacting the various

7   customizations that TriZetto has worked with the customers on

8   over the years?

9   A.  It's very important because, again, if it was the example

10  of that extension with the special edit, if they miss, that

11  removes some data and they had to remediate that extension,

12  after the upgrade when they go to run, things wouldn't work.

13  Suddenly there might just be a hard error because the extension

14  is failing, and it could really impact their business.

15  Q.  And the custom Code Impact Tool addresses those issues?

16  A.  It helps identify what they need to focus on, yes.

17  Q.  Is the custom Code Impact Tool kept as a trade secret kept

18  confidential for TriZetto?

19  A.  Yes, it is.

20  Q.  Okay.  I would like to go to the next tool under the

21  category, it was test cases, and ask you:  What are test cases?

22  A.  So test cases are an execution of some capabilities within

23  Facets; a way to verify that Facets is healthy, so to speak,

24  it's working as designed.

25  Q.  And I would like to now call up one of the exhibits.

KAKTSYN1                       Noonan - Direct

1           MR. ALPER:  If we could see, Mr. Thomas, DTX108,

2     please.

3     Q.  And Mr. Noonan, what are we seeing in DTX108?

4     A.  This is a cover page for a Facets test case.

5     Q.  And is this a document -- or rather let me ask, are the

6     test indications kept confidential to TriZetto?

7     A.  Yes.

8     Q.  And when other service people who provide service or the

9     customers get access -- let me ask that another way.

10          When other people get access to these, do they have to

11     agree to confidentiality?

12     A.  Yes.

13     Q.  And that's the case for all of the other tools and other

14     confidential items we have been talking about?

15     A.  Yes.

16     Q.  Okay.  Is there anything in this document that shows that

17     TriZetto keeps this document confidential and that it believes

18     it's its trade secret information?

19     A.  There's the copyright notice that says "confidential and

20     proprietary," and then the limited rights notice underneath it.

21     Q.  Let's go and take a look at one of the test cases.  So is

22     this just one test case in this document or are there multiple

23     ones?

24     A.  I believe this document has a number of test cases.

25     Q.  Let's go to DTX108.6, the sixth page, and I would like to

1    focus on the upper half of the page.

2          What are we seeing there in Section 2.6, which says

3    process claim?

4    A.  So here's the heart of the Facets as far as how to start

5    Facets and navigate into our medical claim processing

6    application and then to test the specific capability there.

7    Q.  And then if you look at the box on the right, you see these

8    little arrows that go down the screen, what are each of those

9    arrows representing?

10   A.  Those are the specific manual steps someone would take

11   sitting in front of the computer.  These are the exact

12   instructions, the keystrokes that they need to follow.

13   Q.  If they will follow them, they're expecting a certain

14   result to occur?

15   A.  Yes, yes.  So in this one they're signing into Facets,

16   they're going to our claims processing plus ITS application,

17   they're opening a specific claim.  And I'm trying to keep this

18   at a high level.  Then in the lower box bulleted items you see

19   that there's a claim and they're pressing the hot key F8, which

20   copies a claim, and hitting F3 to process the claim, F4 to save

21   it and so on.  So that would be a specific test.

22   Q.  And then if the results of that test come out a certain

23   way, you know whether or not the Facets software upgrade or

24   installation is working properly?

25   A.  Yes, this would be a key initial test to verify that the

KAKTSYN1                          Noonan – Direct

1   system is healthy, the executable side and the database side,

2   yes, they have been updated properly and they're in sync.

3   Q.   How many of these test cases has TriZetto created?

4   A.   Thousands.

5   Q.   And are the documents that you put these test cases in, are

6   those confidential to TriZetto?

7   A.   Yes.

8   Q.   Then the last tool is automation scripts.  What are

9   automation scripts?

10  A.   So automation scripts build on these S scripts, because for

11  a person to type these in once is fine, but now to have to type

12  in these always exactly as written, people can sometimes hit

13  the wrong key.  So what we do in the automated test scripts is

14  we have code around them, so we have code that in effect pushes

15  the key in an automated way or enters the data in an automated

16  way.  So by coding these steps, we can now repeat these tests

17  exactly the same way, we know there's not a missed keystroke or

18  a typo, and they can also be run on the computer in a more

19  efficient way.

20  Q.   How many automation scripts has TriZetto created?

21  A.   I know today we're over 13,000.

22  Q.   Are the automation scripts kept confidential?

23  A.   Yes, they are.

24  Q.   How much effort has gone into creating these test cases and

25  automation scripts?

1    A.  Again, we have been building these with Facets for over the

2    course of Facets' life, so I would say decades.

3    Q.  Okay, thank you.  Let's talk about the final category of

4    trade secrets.

5           MR. ALPER:  If we could see DBX14.21, Mr. Thomas.

6    Q.  And the final category you identified were the reference

7    manuals and guides.  And what are reference manuals and guides

8    at TriZetto?

9    A.  So this is accompanying information all about Facets, what

10   it looks like, how to configure it, how to run it and such.  So

11   this is explaining how Facets works and how to use it.

12   Q.  And are the TriZetto Facets reference manuals and guides

13   like the type of a user guide that you get when you buy

14   off-the-shelf software like Microsoft Word or something like

15   that?

16   A.  I think these are different.  These go into so much detail

17   about how Facets works internally and how to use it, I think

18   these are very different.

19   Q.  And how many of the reference manuals and guides are there

20   at TriZetto?

21   A.  Hundreds.

22   Q.  If we take a look at DBX14.21, which is on the screen, what

23   are we seeing here?

24   A.  These are just some of them, and we even have them live

25   version and release, but for example, towards the bottom left,

1   we have the data models guide, so that was one that we showed

2   earlier.  So that was just one of the items.

3   Q.   That was the one with all those tables and the

4   interconnections between the tables?

5   A.   The rectangular boxes, the lines, yes.

6   Q.   What aspects of Facets do the reference manuals and guides

7   cover?

8   A.   All aspects of Facets.

9   Q.   And that includes the architecture?

10  A.   Yes.

11  Q.   And understanding that they go to different areas of

12  Facets, do they all include about the same level of detail as

13  we saw with the data models guide?

14  A.   They go into a lot of detail.  Some will focus more on

15  configuration than data, but across the wealth of these, yes,

16  they explain a lot of the inner workings of Facets, how to make

17  use of it and how to extend it.

18  Q.   Are the reference manuals and guides important?

19  A.   Oh, very important.  We use them constantly ourselves, our

20  service business uses them, our customers rely on these.  Yes,

21  these are very important.

22  Q.   And are they kept confidential?

23  A.   Yes, they are.

24  Q.   And I believe yesterday you testified about how you could

25  have access to them on the customer exchange.

1   A.   Right, so you can only get these via that customer -- that

2   secure access into customer exchange.

3   Q.   And how much effort went into making the manuals and

4   guides?

5   A.   A lot of effort.  Again, as we have been building the

6   software we have been building the documentation.  The phrase

7   we have internally is:  No job is finished until the paperwork

8   is done.  So our customers are very dependent on this.  We have

9   a subcommittee dedicated to documentation, our customer group.

10  It's that important.

11  Q.   And how would TriZetto be impacted if a competitor in the

12  service business were to have access to reference guides and

13  manuals and use them for an unauthorized purpose?

14  A.   That would be damaging to us.  These are our materials.

15  These help our service teams support our customers running

16  Facets, running our product.  So that would be damaging to us

17  to have someone else using our guides unauthorized to take

18  service business from us.

19  Q.   I would like to call back up DBX14.10.  And you testified

20  about this yesterday, these were the Facets feature areas.  And

21  I would like to ask you:  Which of these features are the

22  subject of the reference manuals and guides?

23  A.   All of them are included.

24  Q.   And is there a way -- actually let me call up now DBX14.22

25  and ask you:  Is there a way to further subcategorize the

content of the reference manuals and guides below those feature

areas?

A.  Yes.  So another way of looking at it is that the manuals

expose data, they expose configuration, user interface, what

the screens look like, how we decided to put data on the

screens for efficiency when someone is working, as well as the

processing that's happening internally.  So that was another

way to describe what the manuals conveyed.

Q.  And how much content in the reference manuals and guides is

associated with each of those four subcategories?

A.  So overall we felt that the data conveyed 40 percent

configuration, 20 percent user interface, 15 and 20 percent

processing.

Q.  I would like to briefly touch on each of those four

categories.  Which categories, in terms of the feature areas of

the manuals and guides, have material content regarding data?

A.  All of them except the commissions, FXI, HIPAA privacy,

third party and work flow.

Q.  Which categories of the manuals and guides have material

content regarding configuration?

A.  All of them.

Q.  And which categories of the reference manuals and guides

have material content regarding the user interface aspects?

A.  All of them except FXI and third party.

Q.  And which categories of the reference manuals and guides

1    have material content regarding processing?

2    A.   All of them except commissions and work flow.

3              MR. ALPER:   Thank you very much, Mr. Noonan.

4              Your Honor, I pass the witness.

5              THE COURT:   Okay.   Cross.

6              You may proceed.

7              MR. GROOMBRIDGE:   Thank you, your Honor.

8    CROSS-EXAMINATION

9    BY MR. GROOMBRIDGE:

10   Q.   Good morning, Mr. Noonan.

11   A.   Good morning.

12   Q.   I would like to start by just looking at some of the slides

13   that you showed.

14             MR. GROOMBRIDGE:   And Mr. Stevens, could we put up

15   DBX14.5, please.

16   Q.   And now Mr. Noonan, you mentioned a few times, I think, the

17   service side of TriZetto's business, is that right?

18   A.   Yes.

19   Q.   And when you say that, are you talking about what we see in

20   blue on the right-hand side here?

21   A.   I'm talking about things that our services team may make

22   use of, yes.

23   Q.   And there's also a software side to your business, right?

24   A.   Yes, there is.

25   Q.   And that's what you show in green on the left, right?

KAKTSYN1                      Noonan - Cross

A.  I was speaking specifically to Facets and the Facets

upgrades there, yes.

Q.  So when a customer, let's say it's someone, by way of

example, like UnitedHealth, comes to you and says we would like

to use Facets, the first thing that happens is they pay you

some money and you give them the software that you show here in

green, correct?

A.  They would get that, but they would also get some other

things that they use with -- that they could use themselves

that our services team make use of.

Q.  But the first way that you would make money would be by

doing a contract with them in which they got the Facets

software and they pay you money for it, correct?

A.  That is correct.

Q.  Now then over time, indeed perhaps immediately, you would

also offer them services to support the software, right?

A.  That is correct.

Q.  That's the blue that we're looking at here, right?

A.  Again, those would be used by our services team, but there

is software there as well.

Q.  Thank you.  We'll come to that, that's a very good point,

that things like the tools would be used by your services team

if they were providing support, for example, to UnitedHealth,

right?

A.  Our team would certainly use tools, yes.

KAKTSYN1                        Noonan - Cross

1   Q.  Now if we look at Syntel's business, Syntel doesn't sell

2   the software, correct?

3   A.  I don't believe Syntel sells Facets.

4   Q.  You can't go to Syntel and say I would like to pay you

5   money to get Facets, right?

6   A.  To the best of my knowledge, that's correct.

7   Q.  And you can't go to Syntel and say I would like to pay you

8   money and get a different piece of software that competes with

9   Facets, right?

10  A.  I don't know everything that Syntel offers.  They may have

11  some other offering.

12  Q.  To your knowledge, you can't go to Syntel and say I would

13  like to buy a piece of software that would do the same thing as

14  Facets, fair?

15  A.  I think they could ask and they might offer to build

16  something custom.

17  Q.  Let me explore this a little bit.  Would it be fair to say

18  that the relationship between software and services is a bit

19  like if I went to the Honda dealer and bought a car, I might

20  then come back later on and they would do service work on the

21  car every year or whenever it needed it?

22  A.  I think that might be too simplistic because I could just

23  drive the car off the lot on my own.  I think when a customer

24  buys Facets, they need our services help.

25  Q.  Fair enough.  And that was actually where I was going to go

1   next.  But it's a lot more complicated than when you buy a car,

2   right?

3   A.  Yes.

4   Q.  You can't just drive Facets off the lot, so to speak?

5   A.  That would be challenging.

6   Q.  So in fact, right, you would need a lot more help, and

7   that's why the services business is actually an opportunity for

8   folks to make money, right?

9   A.  Yes, it is, and I think our customers find value in it.

10  Q.  Now could we agree that Syntel is competing with you on the

11  services side of the business?

12  A.  I believe today Syntel is a competitor on the services

13  side, yes.

14  Q.  So when a company like UnitedHealth, that has obtained

15  Facets from you, wants to do one of these big upgrades, they

16  can go out and they can come to you and they can say give me a

17  quote for the upgrade and then come to Syntel and say give me a

18  quote and they could maybe go to other people as well, fair?

19  A.  I believe we let our customers decide who they get their

20  services from, so yes.

21  Q.  So when you give them the software, you don't say:  And the

22  only company that could do the service is us.  Correct?

23  A.  I believe there's a process where we have to make sure that

24  proper authorization is in place so that appropriate -- we're

25  assured that our assets and intellectual property is treated

KAKTSYN1                         Noonan - Cross

1   appropriately.

2   Q.  Right.  But what I'm saying is it's not your business model

3   to say once you bought Facets you could never get support

4   services from anybody except us, correct?

5   A.  That's my understanding.

6   Q.  Now just before we move on, is a fair take away from your

7   testimony that Facets is still extremely valuable?

8   A.  Very valuable.  I believe it's the most successful health

9   care administration product in the U.S.

10  Q.  And that's true as of today, October 20th, 2020, right?

11  A.  Yes.

12  Q.  And as of today, TriZetto is still making a whole lot of

13  money out of giving or selling Facets to companies like

14  UnitedHealthcare, right?

15  A.  I believe UnitedHealthcare continues to be a satisfied

16  customer.

17  Q.  But as of today you still have a lot of satisfied customers

18  who are paying you money to keep using Facets, correct?

19  A.  Yes, there's an annual maintenance fee and support fee to

20  continue to use the software and get our upgraded versions and

21  releases.

22  Q.  And I know you're not on the commercial side, but a company

23  like UHG would probably be paying you several tens of millions

24  dollars a year to use Facets, right?

25  A.  I don't know the exact dollars that each customer pays us.

KAKTSYN1                    Noonan - Cross

1   Q.  In the millions of dollars per year, at least?

2   A.  A company like United, I would expect that across the

3   software that they use, and they have multiple subsidiaries and

4   the expanded services that go beyond Facets, yes, I believe

5   that Cognizant does a lot for UnitedHealth Group that -- yes.

6   Q.  Thank you.  Now let's look, if we could, at the three

7   categories of items that we talked about as trade secrets, and

8   let's put up DBX14.13, please.

9         And this is your slide showing the first of the three

10  categories of software, correct?

11  A.  Yes, just trying to convey in a useful way what we're

12  discussing here.

13  Q.  And now I think you mentioned something called customer

14  exchange during your direct testimony, is that right?

15  A.  Yes, I did.

16  Q.  And is that a website your company operates?

17  A.  Yes.

18  Q.  And it's a secure website, correct?

19  A.  Correct.

20  Q.  It's not one that I could just get on a computer and go and

21  find whatever I want, correct?

22  A.  That is correct, you need a specific ID and password to

23  make use of customer exchange.

24  Q.  So during the period of time that TriZetto was working with

25  Syntel, is it accurate that TriZetto gave Syntel access to the

KAKTSYN1                          Noonan - Cross

1    things we're looking at on your slide here through customer

2    exchange?

3    A.   Yes.  As people were on-boarded, as we had Syntel

4    subcontractors come on, they were our teammates and they got

5    assignments like others.  And as per their assignments, they

6    would need access so that they could get a specific manual for

7    a specific assignment, or if they were working with our hosting

8    facility, if they needed to work on upgrading a customer then

9    that made sense for them to download the software, perhaps, in

10   that role.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  So, let's just pin down the time.  Is it correct that

2    TriZetto and Syntel started working together in about 2007?

3    A.  That sounds correct to me.

4    Q.  They continued working together until around the end of

5    2014 or the beginning of 2015, correct?

6    A.  Yes.

7    Q.  Now, so during that time, one of the things that happened

8    was in 2010, the two companies signed the agreement that you

9    mentioned, the Master Services Agreement, correct?

10   A.  Yes.

11   Q.  The idea of the Master Services Agreement was Syntel people

12   were going to help TriZetto on the services side of the

13   business, correct?

14   A.  I believe they were assisting on services and software

15   development.

16   Q.  In addition to services, they were going to help your team

17   in particular with what you called fund development, correct?

18   A.  Yes, we would add capacity so we could take on more

19   development from our customers, yes.

20   Q.  In this software world, development means building

21   something, correct?

22   A.  Yes, it does.

23   Q.  So you were hiring on Syntel people, software programmers,

24   to come and write pieces of Facets software for you, correct?

25   A.  They were going to assist.  We continued to, in a budget

1   type of way, we'll talk about adding capacity, so we can get

2   more work done as a team.  So certainly the newest people

3   joining we're not going to give the most complex key thing to

4   add.  They might do some bug fixes and other things they learn.

5   By it frees up somebody else who is more experienced to now

6   work on something more complex.

7   Q.  During this time, so let's say right after the agreement

8   has been signed, it is 2010, you and your colleagues were

9   bringing in these Syntel people and helping to train them and

10  educate them about Facets, correct?

11  A.  Yes.

12  Q.  Let's look at the next category.  Can you put up DDX.15.

13  Mr. Noonan, this is the second category of things you talked

14  about just now, correct?

15  A.  Yes.

16  Q.  And these talks, am I right that you don't sell these to

17  your customers on a free-standing basis?

18  A.  I believe the Data Dictionary comes with Facets, so I would

19  agree with that.  The other items, I think as part of services

20  agreements, they may, there may be some aspects where things

21  are sold.

22  Q.  Well, do you have a price list, like I could go on your

23  website and say, custom code impact tool, that's going to cost

24  me $50,000?

25  A.  I'm not sure about the custom code impact tool.

KAK3SYN2                         Noonan - Cross

1  Q.  So for example, if I'm United Health, right, when they do a

2  deal and they get Facets from you, is it correct that one of

3  the things you also give them is the ability to use these

4  tools?

5  A.  Again, the custom code impact tool and our test cases and

6  automation scripts are handled by our services team.  They

7  would be the ones that would handle that.  So I'm not sure the

8  contractual implications with a new customer as far as whether

9  our services -- I thought our services team is typically

10  running these.  But, I'm not sure what they might agree to in a

11  contract with a customer on this.

12  Q.  In your direct testimony when you were saying that these

13  tools were really useful for the customer --

14  A.  Yes.

15  Q.  If we drill into that with a little more specificity, do

16  you mean they're really useful to your services colleagues when

17  they're doing work for the customer?

18  A.  Yes.

19  Q.  You mentioned Data Dictionary and I think you said it comes

20  with Facets.  Is that right?

21  A.  Yes.

22  Q.  If I get just plain Facets, all by itself, all those many

23  millions of lines of computer code, do I have Data Dictionary?

24  A.  Yes.

25  Q.  So, included in those millions of lines of code is Data

KAK3SYN2                         Noonan - Cross

1    Dictionary?

2    A.   I believe it's -- I'm trying not to use the most complex

3    terms, I'm not sure if everybody knows what a self-extracting

4    Zip file is.

5              THE COURT:  Don't do that.

6    A.   When they get Facets, there is the executables of Facets,

7    a directory structure is laid down, and as part of that

8    directory structure, is one area of that is the Data

9    Dictionary.  So, as they take, if we wanted to say the Facets,

10   right now we're up to 5.7 R4 is out in the field.  If they take

11   that, they are getting the 5.7 R4 Data Dictionary, the

12   executable of Facets and such.

13   Q.   Is it ever possible to get Facets and not have Data

14   Dictionary?

15   A.   I suppose in our -- that yes, you can, you can break those

16   things up.  Technical folks can do that.

17   Q.   Just looking back at the slide here, is it also true that

18   when the two companies were working together, Syntel and

19   TriZetto, you gave Syntel people access to everything we're

20   looking at on this slide?

21   A.   I didn't personally do that to all the Syntel people.  But,

22   yes, the company, as we onboarded folks, they typically would

23   get access as an employee, and, you know, the expectation that

24   they had been through all the appropriate non-disclosure

25   agreements and such.

1  Q.  So they could go on the customer exchange website and get a
2  copy of the custom code impact tool, for example?
3  A.  I don't believe we had the custom code impact tool on
4  customer exchange.  That probably is somewhere else in our
5  network.
6  Q.  But they could go somewhere and get it?
7  A.  Yes, yes, they were, you know, in the system, treated like
8  teammates with very similar access.
9  Q.  During this period of time, focused in on 2010 to 2014.
10  You were working together with the Syntel people, as you just
11  said, like teammates, right?
12  A.  Yes, yes, as you bring new folks on, and maybe some are in
13  the office sitting with you or maybe some are on the other side
14  of the world, and the goal is to get your new teammates up to
15  speed, show them as much as you can, because they're going to
16  help you get more work done.  As we got more people, the
17  expectation is we're going to get more work done.
18  Q.  Now, let's look at your slide DDX 14.21, please.  This is
19  the third category of the reference manuals and guides, right?
20  A.  Yes.
21  Q.  Once again, is it true when the two companies were working
22  together, you gave the Syntel people access to each and every
23  item that we see on slide 14.21?
24  A.  Yes, yes.  Perhaps you could think of it as they also were
25  allowed into the library, and could take a book for an

1   assignment, yes.

2   Q.  Let's look at an example of that.  Could we pull up DTX

3   893, please.  Let's go to page two.

4           Now, Mr. Noonan, this is one of the items that you

5   showed us on direct examination, correct?

6   A.  Yes, this is the Facets Data Models Guide for the 5.1

7   release.

8   Q.  This particular one is dated August of 2014.

9   A.  Yes.

10  Q.  Let's look at the text that appears at the very top of the

11  page here.  You see that it says:  "TriZetto Corporation

12  confidential and proprietary.  Contains trade secret

13  information.  This file is for the exclusive use of Anjulika

14  Srivastava, TriZetto India, Syntel," and then there is a date

15  August 6, 2014.  You see that?

16  A.  Yes, I do.

17  Q.  This is what we could call the watermark, right?

18  A.  Yes, we started stamping our manuals with these so we could

19  understand who downloaded them, and to help make sure that they

20  weren't passed to others improperly.

21  Q.  Anjulika Srivastava was someone who was working with you

22  then, but she was a Syntel employee, correct?

23  A.  Yes, she was one of the subcontractors that we started to

24  work with.

25  Q.  If she went on customer exchange, as she apparently did,

1    and downloaded this document, you would know that, right?

2    A.  Not at the moment.  I know that customer exchange logs who

3    did things, but they didn't have a system that said someone on

4    my team downloaded a manual to then send me an alert.  So that

5    didn't exist.

6    Q.  Customer exchange keeps a record of everybody who

7    downloaded something and what they downloaded, correct?

8    A.  Yes, I believe customer exchange keeps a log of what is

9    downloaded.

10   Q.  So, all the time that the two companies were working

11   together, if you wanted to know what information Syntel

12   employees had taken from customer exchange, that information

13   was there for the looking at, right?

14   A.  Yes, if there was a reason to go look at the logs, yes, I

15   agree they could have been examined.

16   Q.  Let's go to page 55 of the Data Models Guide, please.  This

17   is, you see that's the claim data model there?

18   A.  Yes.

19   Q.  Did I hear you on your direct examination say this is the

20   heart of Facets?

21   A.  Many of our customers will refer to claims as a key part of

22   Facets.  Again, it's very much in the forefront of our

23   customers' minds.  But, yes, it is a key part of Facets, and

24   needs to operate with the rest of Facets.

25   Q.  You showed us some of the next page, which we'll look at.

KAK3SYN2                    Noonan - Cross

It is a little on the complicated side.  But these boxes and

lines, remember that?

A.  Yes.

Q.  Would it be fair to say that this shows some of the most

important architecture of Facets?

A.  Yes, I think showing information about claims, since that's

so important to Facets and how we've decided to organize the

data, I think is very important to Facets, and exposes a lot of

information about decisions we've made on how to do that.

Q.  You see again the same watermark appears at the top that

"This is for the use exclusive use of Anjulika Srivastava," and

the text is a little jumbled up, but we can see it is the same

date there?

A.  I see that.

Q.  Mr. Noonan, was there any reason to believe that

Ms. Srivastava wasn't getting this for an entirely legitimate

purpose?

A.  I'm sorry, could you repeat that?

Q.  Let's try it a little differently.  Let's look at a

different document.  Let's look at PTX 1519.

        Mr. Noonan, is this a letter that you wrote?

A.  Yes.

Q.  You wrote it on the 28th of August, 2014, correct?

A.  Yes.

Q.  You wrote it to a gentleman named Bipin Ranade at Syntel,

KAK3SYN2                        Noonan - Cross

1    correct?

2    A.  Yes, this was in support of Anjulika to get a business visa

3    to come and visit us.

4    Q.  If we look at the first paragraph, that's what you say,

5    right?  "We are inviting Ms. Anjulika Srivastava to come and

6    visit us," right?

7    A.  Yes.

8    Q.  For two weeks, correct?

9    A.  Yes.

10   Q.  And the purpose of the visit was she was going to gather a

11   whole lot of information to take back to India so she could do

12   her work better at Syntel there, right?

13   A.  Yes, but I don't think she followed up on the trip.

14   Q.  No, because it turns out that right after this was when the

15   announcement was made that Cognizant was going to buy TriZetto,

16   correct?

17   A.  Yes, in October I believe that became public.

18   Q.  Wasn't it September 15, 2014?

19   A.  I don't recall the exact date that Cognizant announced they

20   were buying TriZetto, but that time period sounds correct.

21   Q.  Can we agree that caused a profound change to the

22   relationship between TriZetto and Syntel?

23   A.  I don't know the precise feelings that -- but yes, there

24   was a change that happened after that.

25   Q.  If we go, let's just look at the next page of this letter,

KAK3SYN2                          Noonan - Cross

1    which can we agree, we look at the information, this is an

2    explanation that you wrote about what Ms. Srivastava was going

3    to be doing when she came on this visit that never happened,

4    right?

5    A.  Yes.

6    Q.  For example, if we look at item C, in the first paragraph,

7    it says, "Understand the applications of the client with

8    respect to architecture database, framework etc., three working

9    days."

10   A.  Yes, we were laying out a detailed training plan.

11   Q.  When she downloaded this document a few weeks earlier, was

12   she doing her homework so she could come and have this meeting

13   with you?

14   A.  Possibly.

15   Q.  Now, you mentioned the Master Services Agreement; do you

16   remember that?

17   A.  Yes.

18   Q.  And that was entered in 2010 between TriZetto and Syntel,

19   right?

20   A.  I believe that was 2010.

21   Q.  Just so there is no doubt about it, we don't need to go

22   into detail, let's pull up Plaintiff's Exhibit 27, please.

23           Mr. Noonan, is this the Master Services Agreement?

24   A.  I hadn't been party to it, but I believe that is the Master

25   Services Agreement.

1   Q.  Would it be fair to say that this agreement was intended to

2   set out the rules by which the two companies would work while

3   they were engaging in this business relationship?

4   A.  Yes.

5   Q.  Now, you also said that -- let me back up.

6           Did I understand correctly you to be saying in your

7   direct examination that TriZetto never gave Syntel permission

8   to compete with TriZetto?

9   A.  Excuse me?  Could you ask that again?

10  Q.  Maybe it is a poor question.  Let me take another run on

11  it.

12          On your direct examination, you answered some

13  questions about whether Syntel had ever been given permission

14  to use TriZetto's information in ways that might be

15  competitive.

16  A.  I believe I said that Syntel wasn't supposed to use any of

17  this information in an unauthorized way.

18  Q.  Okay.  Let's be clear.  Let's look at what was authorized.

19  Are you aware that there was a change made to the Master

20  Services Agreement in 2012?

21  A.  I've since come to have learned that, yes.

22  Q.  When did you first learn that?

23  A.  Recently.

24  Q.  Let's look at Plaintiff's Exhibit 162.  Is this the change?

25  A.  I see that this is an amendment to a contract, yes, but I

KAK3SYN2                         Noonan - Cross

1    don't know what it entails.

2    Q.  Let's look at one piece of it.  Let's go to page two, and

3    look at the first couple of items there.  You see it says, next

4    to the number two, it says, "Section 29.17 and any other

5    provision in the agreement related to service provider being

6    restricted from competing with TriZetto are deleted in their

7    entirety."  Correct?

8    A.  I see that highlighted, yes.

9    Q.  Service provider means Syntel, right?

10   A.  I think -- I believe so, but I'd like to examine this a

11   little bit better.

12   Q.  Unfortunately we're under a little bit of time pressure.

13   So I'm sorry if you've not had a chance to study this.

14          Let me just ask you one final question:  Assuming

15   "service provider" does mean Syntel, would you agree with me

16   that after the date of this amendment, it would not be

17   unauthorized if Syntel was competing with TriZetto?

18   A.  No, I wouldn't say that, because I can't see the rest of

19   the document and sometimes there's still other exclusions and

20   such.

21   Q.  Well, I thought that was going to be the end, but maybe I

22   should follow up a little bit.

23          In your direct testimony, you said you had a Claritin

24   moment, right?  What you meant by that was you were referring

25   to the advertising for the drug Claritin?

KAK3SYN2                    Noonan - Cross

A.   I was actually referring to, like, in that commercial it's

going along and then suddenly, you peel back a layer and you

see a whole lot more clearly what was really going on.

          So that was, I was talking about when I found out

about all these downloads right at the end of the relationship,

and I was really surprised.  I felt like that was my Claritin

moment.  I was like, wow, I didn't know that was going on, but

it was like a layer being peeled off, and I could see all these

things were being downloaded as the relationship was ended, and

it really looked like they were going to be used against us.

Q.   Hold on a second.  Are you suggesting that when

Ms. Srivastava downloaded that document on August 6 of 2014,

she was going to be using it against you?

A.   I wasn't sure of Anjulika, but I had gone through an effort

to review who was working on my team at the time, and I knew

their assignments.  So some made sense for those downloads, but

there were others that I had no explanation for my team -- some

of those teammates about why they would be downloading some

other manuals.

Q.   When exactly did you have this Claritin moment?

A.   I suppose it was a little bit after finding out about these

downloads.

Q.   Is that a time when the two companies had gotten into a

legal dispute?

A.   You know, I don't know exactly when things were filed and

KAK3SYN2                     Noonan - Redirect

1   counter-filed, so, I'm not on the legal team, so I'm not kept

2   apprised of those exact things as they occur.

3           MR. GROOMBRIDGE:  Thank you, Mr. Noonan.  That wraps

4   up my questions.

5           MR. ALPER:  Your Honor?

6           THE COURT:  Yes.

7           MR. ALPER:  May I have a brief redirect?

8           THE COURT:  You may.

9   REDIRECT EXAMINATION

10  BY MR. ALPER:

11  Q.  Just a few additional questions, Mr. Noonan.  You were

12  asked some questions just now by counsel about Syntel's access

13  to TriZetto's trade secrets.  Do you recall that?

14  A.  Yes.

15  Q.  What rights did Syntel have to use TriZetto's trade

16  secrets?

17  A.  I don't believe they had rights.

18  Q.  Could Syntel use TriZetto's trade secrets for purposes that

19  TriZetto did not authorize?

20  A.  No.

21  Q.  Did the access that Syntel had to TriZetto's trade secrets

22  allow Syntel to use TriZetto's trade secrets for any purposes?

23  A.  No, it was to use it for our purposes.

24  Q.  You were shown, if we could look at DTX 893, please.  If we

25  go to the flip forward to page two.  This is the Facets Data

KAK3SYN2                     Noonan - Redirect

1    Models Guide.  Correct?

2    A.  Yes.

3    Q.  This is one of the documents that you testified about

4    during your direct testimony when I was asking you questions?

5    A.  Yes.

6    Q.  There is that watermark at the top, if we can zoom in on

7    that.  It says, "This file is for the exclusive use of Anjulika

8    Srivastava."  You see that?

9    A.  Yes.

10   Q.  Ms. Srivastava was one of the additional people that Syntel

11   was providing to augment the TriZetto team?

12   A.  Yes, yes.

13   Q.  And Ms. Srivastava, she had access to this document; is

14   that fair?

15   A.  Yes.

16   Q.  Could Ms. Srivastava use this document for any purposes

17   that she wanted to?

18   A.  No, no.  This was expected to, you know, stay on our

19   system, and be used for doing our work.

20   Q.  If we could go, and if we look right above where it says

21   that this is files for the use of Ms. Srivastava, what does the

22   top line of that watermark say?

23   A.  "TriZetto Corporation confidential and proprietary."

24   Q.  Have you ever seen a watermark on one of TriZetto's trade

25   secrets that says "Syntel confidential and proprietary"?

KAK3SYN2                    Noonan - Redirect

1    A.  No.

2    Q.  Have you ever seen a watermark that says "Syntel can use

3    this for any purpose it wants"?

4    A.  No.

5    Q.  If we can call up, Mr. Thomas, PTX 1519.

6          You were shown this letter that you wrote regarding

7    Ms. Srivastava.  Do you recall that?

8    A.  Yes.

9    Q.  If we look at that first paragraph in the letter, the

10   second sentence says, "Ms. Srivastava will jointly study and

11   understand the requirements of Facets application in TriZetto,

12   gather all information required, and take due diligence

13   exercise back to offshore to execute the development and

14   testing from Syntel offshore facility."

15         I want to focus on that phrase "gather all information

16   required."  When Ms. Srivastava was being provided access to

17   TriZetto's confidential information, was that to perform work

18   that was authorized by TriZetto?

19   A.  Yes.

20   Q.  Was Ms. Srivastava authorized to use this information that

21   she was being allowed to gather for other purposes?

22   A.  No, no, this was going to stay on her TriZetto VM, and she

23   could access it from offshore and hopefully share some other

24   knowledge with the other software engineers and QA folks to

25   accomplish our work.

1    Q.  Did you ever tell Ms. Srivastava that she could use

2    TriZetto's confidential information for any purpose that she or

3    Syntel wanted to?

4    A.  No.

5    Q.  Did you trust Syntel with TriZetto's confidential

6    information?

7    A.  Yes, we did trust them to treat it just like any of our

8    other employees.

9    Q.  Are you aware of anyone at TriZetto or Cognizant who has

10   ever told Syntel that it could use TriZetto's confidential

11   information for any purpose that it wanted, beyond what it was

12   specifically authorized to do?

13   A.  No.

14   Q.  All right.  You were asked a couple of questions about the

15   customers' access to TriZetto's confidential information.  Do

16   you recall that?

17   A.  Yes.

18   Q.  Are TriZetto's customers allowed to have access to certain

19   of the TriZetto trade secret materials?

20   A.  Yes.

21   Q.  Are TriZetto's customers allowed to provide TriZetto's

22   trade secret materials to anyone they want to?

23   A.  No, no, I believe they have to get our approval and

24   authorization.

25   Q.  Are TriZetto's customers allowed to provide trade

KAK3SYN2

1    secrets -- withdrawn.

2            Are TriZetto's customers allowed to provide TriZetto

3    trade secret materials to Syntel without TriZetto's

4    authorization?

5    A.   Not without TriZetto's authorization.

6    Q.   Would it be harmful to TriZetto if TriZetto's customers did

7    that without authorization?

8    A.   I believe it would be.

9    Q.   Why is that?

10   A.   I believe that if they were using our materials without our

11   authorization, then we're not controlling our assets, we don't

12   know where they are, and they could be used against us in a

13   service or other situation.

14           MR. ALPER:  Thank you very much, Mr. Noonan, nothing

15   further, your Honor.

16           THE COURT:  You may be excused, Mr. Noonan.  Thank

17   you.

18           (Witness excused)

19           MR. ALPER:  I apologize, I forgot to take my mask off.

20           THE COURT:  It's fine, I could understand you.

21           Under the protocols, we're supposed to wait five

22   minutes between witnesses to give the HEPA filter in the box

23   time to clean the air.  So we've got about three and a half

24   more minutes.  Since we got started a little bit late, I'm not

25   going to take a morning break with your indulgence, unless

```
 1    somebody really needs a bathroom break.  If you do, okay.  You
 2    may be excused.  Go ahead, but the rest of us will sit here.  I
 3    am going to keep everyone here, unless you really need a break.
 4    Okay.  And I don't know if we have facilities for multiple
 5    people to go.
 6              THE DEPUTY CLERK:  We do.
 7              THE COURT:  Anyone who absolutely needs a break,
 8    please take one.  That goes for the lawyers too.
 9              (Pause)
10              THE COURT:  Very efficient.  Thank you.  You may call
11    your next witness.
12              MR. DE VRIES:  Thank you, your Honor.  TriZetto calls
13    as its next witness Syntel employee Mr. Sandeep Sinha.
14              THE COURT:  Just a reminder, ladies and gentlemen.  I
15    told you earlier you'll be hearing some witnesses by video.
16    This is a videotaped deposition, meaning it was prior testimony
17    that was videotaped but was also under oath.  But you judge the
18    testimony and the credibility of witnesses by the same
19    standards, regardless of whether it's recorded video or live
20    video or live in the courtroom.
21              (Video deposition of Sandeep Sinha played)
22              THE COURT:  Okay.
23              MR. DE VRIES:  Your Honor, that concludes that
24    testimony.
25              As our next witness, TriZetto now calls Syntel
```

KAK3SYN2

1    employee Mr. Ankur Chadha, again by video deposition.

2             (Video deposition of Ankur Chadha played)

3             MR. DE VRIES:  Your Honor, that concludes Mr. Chadha's

4    testimony.

5             THE COURT:  Okay.

6             MR. DE VRIES:  And as our next witness, TriZetto will

7    call Syntel employee Mr. Vipul Dekhtawala, by videotape

8    deposition.

9             THE COURT:  Let me just ask, how long is that?

10            MR. DE VRIES:  It's approximately three and a half

11   minutes, your Honor.

12            THE COURT:  Okay.  Let's go ahead with that one.

13            (Video deposition of Vipul Dekhtawala played)

14            MR. DE VRIES:  Your Honor, that concludes that

15   testimony.

16            THE COURT:  I know you have one more very short

17   deposition.  And it's how many minutes?

18            MR. DE VRIES:  Two and a half minutes, your Honor.

19            THE COURT:  Let's -- and then we're done with the

20   depositions?

21            MR. DE VRIES:  Yes, your Honor.

22            THE COURT:  Let's do the two and a half minutes and

23   then we'll break for lunch.

24            MR. DE VRIES:  Your Honor, TriZetto next calls as a

25   witness Syntel employee Mr. Alex Philip, again by video

KAK3SYN2

1   deposition.

2            (Video deposition of Alex Philip played)

3            THE COURT:  We just lost the sound.

4            THE TECHNICIAN:  I think the system has disconnected.

5            THE COURT:  Maybe it is a good time for our lunch

6   break.

7            A little piece of advice I often given to jurors at

8   this time, which is if you eat a lot of carbs at lunch, you

9   will sleep through the afternoon, so I suggest you try not do

10  that.  Try to stick to protein if you can.

11           Let's break for 45 minutes.  It is 1:08 now.  So 1:55

12  roughly, okay?  We're adjourned briefly.

13           (Jury excused)

14           THE COURT:  If I could just ask the attorneys, when

15  you next see Mr. Street, if could you give him the time

16  breakdown for the video depositions, that would be very

17  helpful.

18           MR. DE VRIES:  Yes, your Honor, we will.

19           THE COURT:  Thank you.  You are adjourned, too.  Thank

20  you.

21           (Luncheon recess)

22           (Continued on next page)

23

24

25

KAKTSYN3

AFTERNOON SESSION

(1:55 p.m.)

(In robing room with the Court, Mr. De Vries, Mr. Groombridge and one juror present)

THE COURT:  So we have two issues to talk about, one was this morning.  What happened?

JUROR:  I had to take my niece to school.  She does half and half.

THE COURT:  And so did you leave a little late or what exactly happened?

JUROR:  Traffic.

THE COURT:  Did you drive?

JUROR:  Yeah.

THE COURT:  And then you drove here?

JUROR:  No, I took the train because it was faster.

THE COURT:  Now I notice you had an issue you wanted to raise.

JUROR:  Yes, my job only pays me two days.  I wasn't aware of this until yesterday when I left.  I called my boss and he explained to me.

THE COURT:  Your job is required to pay you when you're on jury duty.

JUROR:  I'm not staff, I'm with a temp agency.  They only pay me two days.

THE COURT:  I believe they are required to pay you

KAKTSYN3

1    when you are on jury duty.

2          JUROR:  It's only like $40, I believe, it's not like

3    the whole day, and I can't afford to lose -- I supply my

4    family.

5          THE COURT:  Let me have somebody check to see whether

6    that could be accommodated, because I understand that you have

7    to eat, but we also started a trial and we really need to have

8    you here.

9          Let me see what can be done about that.  And do we

10   have the name of your employer?

11         JUROR:  I could give it to you.

12         THE COURT:  If you could give it to Mr. Street and

13   we'll make inquiries.

14         JUROR:  Okay.  Thank you.

15         THE COURT:  And tomorrow, if you could please try not

16   to be late.

17         JUROR:  Sure.

18         THE COURT:  We'll work this out.

19         (Juror not present)

20         THE COURT:  So I'll just say I'm loathe to excuse her

21   because I hear from Mr. Street another juror has been mumbling

22   about not wanting to come.  And normally I would have ten

23   jurors for a civil trial.  They told me they could only

24   accommodate eight in the box.

25         MR. GROOMBRIDGE:  We have the same concern, your

KAKTSYN3

```
 1      Honor.  Also it may sort of the start an effect, right, that --
 2               THE COURT:  With everyone.
 3               MR. GROOMBRIDGE:  And we don't have the luxury of
 4      being so far that we could get into dangerous territory here.
 5               THE COURT:  And it is a short trial.  It's not like
 6      we're asking people to be here for months.  So I will certainly
 7      consult with you before I do anything.  And what I'm hoping, I
 8      hope I'm right, that an employer of any kind can't discriminate
 9      against someone and not pay them because they're doing jury
10      duty.
11               MR. GROOMBRIDGE:  I had a situation like this a couple
12      of years ago, and I think the judge in that case, which was
13      Judge Cecchi in New Jersey, may have actually had a little
14      outreach to the employer and things got worked out.
15               MR. DE VRIES:  We had a similar experience with Judge
16      Bumb in New Jersey last fall, and she called the employer.
17      Actually as it turned out in that case, the employee had
18      misunderstood, and so I don't think it was a change in policy,
19      it was just a better understanding of the policy.
20               THE COURT:  Okay.
21               MR. GROOMBRIDGE:  But I think --
22               THE COURT:  Fingers crossed.
23               MR. GROOMBRIDGE:  Exactly.  But sometimes the employer
24      doesn't understand the kind of the gravity of the situation.
25               THE COURT:  Right.  All right.  Well, maybe what I'll
```

KAKTSYN3

1   try and do during a break is reach out and see what we can find

2   out.

3           MR. DE VRIES:  Yes, your Honor.

4           THE COURT:  Thank you.

5           MR. GROOMBRIDGE:  We appreciate it.

6           (In open court)

7           (Jury present)

8           THE COURT:  Who is your next witness?

9           MR. ALPER:  Your Honor, the technical issue with the

10  audio for the end of Mr. Philips' deposition has been resolved.

11  We're going to play approximately the last minute.

12          THE COURT:  Okay.

13          MR. DE VRIES:  The portion for which the audio

14  dropped.

15          THE COURT:  All right.

16          (Playing of video deposition of Alex Philips continued

17  and concluded)

18          THE COURT:  Okay, thank you.  Now you can call your

19  next witness.

20          MR. DE VRIES:  Thank you, your Honor.  TriZetto calls

21  as its next witness Mr. Chuck Sanders.

22          (Continued on next page)

23

24

25

KAKTSYN3                       Sanders - Direct

1    CHUCK SANDERS,

2         called as a witness, having been duly sworn, testified as

3    follows:

4    DIRECT EXAMINATION

5    BY MR. CUTRI:

6              THE COURT:  Pull the mic up close and speak directly

7    into it so that you're as close to it as possible.

8              You may proceed.  Could you introduce yourself to us?

9              MR. CUTRI:  May name is Gianna Cutri and I represent

10   Cognizant and Trizetto.

11             THE COURT:  You may proceed.

12             MR. CUTRI:  Thank you, your Honor.

13   BY MR. CUTRI:

14   Q.  Mr. Sanders, would you mind introducing yourself to the

15   jury?

16   A.  Yes, good afternoon, my name is Chuck Sanders.

17   Q.  Where do you work, Mr. Sanders?

18   A.  I work for Cognizant TriZetto Software Group.

19   Q.  Is that group sometimes referred to as just TriZetto?

20   A.  Yes, it is.

21             THE COURT:  Mr. Cutri, if you could get closer to the

22   mic as well.  I'm having a little trouble hearing you.

23             MR. CUTRI:  Is that better?

24             THE COURT:  Slightly.

25             MR. CUTRI:  We've lifted the microphone.  I don't know

1    that I can do --

2            THE COURT:  I don't want you do anything that would be

3    uncomfortable.

4            MR. CUTRI:  I'll try to lean in a little more.

5    Q.  Mr. Sanders, what does TriZetto do?

6    A.  TriZetto is a software and services company that develops

7    technology for hospitals, physicians, and health insurance

8    companies.

9    Q.  And Mr. Sanders, what is your position at TriZetto?

10   A.  I am the vice president and head of strategic alliances for

11   TriZetto.

12   Q.  And what are your job responsibilities as the vice

13   president of head of strategic alliances at TriZetto?

14   A.  So I work with the business leaders as they develop their

15   technology.  I negotiate agreements with third party entities

16   and make sure that we have the appropriate confidentiality and

17   disclosure agreements.  I also interface from time to time with

18   sales, finance, and marketing.

19   Q.  Who do you report to?

20   A.  I report to the chief executive of TriZetto.

21   Q.  How long have you worked at TriZetto?

22   A.  About 15 and a half years.

23   Q.  Where are TriZetto's offices located?

24   A.  We have offices in Bridgewater, New Jersey, and also

25   Teaneck, New Jersey.

KAKTSYN3                      Sanders - Direct

1    Q.   And is TriZetto owned by Cognizant?

2    A.   Yes, we are.

3    Q.   And where are Cognizant's executive offices located?

4    A.   Cognizant has offices in Teaneck, New Jersey and here in

5    Manhattan.

6    Q.   Prior to working at TriZetto, Mr. Sanders, where did you

7    work?

8    A.   I worked for AT&T.

9    Q.   What you did do for AT&T?

10   A.   I had a variety of executive positions.  I was the vice

11   president and general manager for their global hosting

12   business, I was also the head of our new business development

13   team, which is the equivalent of what is called strategic

14   alliances here.  And I was in sales, I had one of the 18th

15   largest customers as a sales executive.

16   Q.   Mr. Sanders, do you have any formal education?

17   A.   Yes, I do.  I graduated from the State University of New

18   York in Fredonia with a bachelor's in psychology.

19   Q.   Do you have any other professional education or coursework?

20   A.   Yes, when I was at AT&T I was nominated and attended a

21   number of senior executive training sessions and advanced

22   education.

23   Q.   Where did you grow up, Mr. Sanders?

24   A.   I grew up on Long Island.

25   Q.   Are you married?

1   A.  Yes, I am.

2   Q.  Do you have any children?

3   A.  Yes, I have three.  I have a daughter, who lives in the

4   same town, she has three beautiful children that I get to see.

5   I have a son who is married, and he just had a baby two weeks

6   ago.  And then my youngest is Kevin, and he works at Kessler

7   Institution for Rehabilitation.  He's a doctor of physical

8   therapy.

9   Q.  And where do you live now?

10  A.  I live in Randolph, New Jersey.

11  Q.  Now Mr. Sanders, do you understand that this case involves

12  intellectual property?

13  A.  Yes, I do.

14  Q.  Mr. Sanders, is intellectual property important to

15  TriZetto's business?

16  A.  Yes, it is.  It's extremely important.

17  Q.  Why is that?

18  A.  Well, we have invested a lot of our time and resources in

19  developing our technology.  You heard from Mike Noonan that we

20  have invested more than $500 million into our technology.  And

21  really what's core to our business is our innovations.  It's a

22  unique value product for us and it's extremely important for

23  us.

24  Q.  Have TriZetto's innovations been successful?

25  A.  Yes, very much so.

1   Q.  Have you prepared some slides to help illustrate your

2   testimony today?

3   A.  Yes, I did.

4   Q.  Let's go ahead and take a look at DDX12.2.

5           Mr. Sanders, what are we seeing on this slide?

6   A.  This is just a small sample of some of our customers.  On

7   the upper left you can see that there are a number of Blue

8   Cross/Blue Shield companies that we have relationships with.

9   Excellus happens to but one of those Blues.  Next to that you

10  could see United Health Care, which happens to be the largest

11  health plan in the United States.  On the bottom right we have

12  health plans that provide Medicare and Medicaid services.  We

13  have approximately 66 percent share of those health plans.  On

14  the lower left you can see Eye Med.  We also have customers

15  that provide vision care.  At the top I think a lot of people

16  recognize Cigna and Cambia also as huge health plans.

17  Q.  On the left slide could you talk a little bit about

18  TriZetto's coverage?

19  A.  Sure.  So what this is representing, we have over 170

20  million lives that are on our platform.  I think we talked

21  yesterday of someone who is receiving health care, that would

22  be basically anybody here, their family members, their

23  dependents.  That 170 million lives represents approximately

24  59 percent of the U.S. insured population.

25  Q.  Mr. Sanders, does TriZetto protect its innovations?

1    A.   Absolutely.

2    Q.   Let's go to the next slide in this presentation.  What are

3    some of the things that TriZetto does to protect its

4    innovations?

5    A.   We protect our intellectual property through trade secrets,

6    through copyrights, and through patents.

7    Q.   Now have you personally been involved in helping secure,

8    protect intellectual property at TriZetto?

9    A.   Yes.  As I mentioned, I negotiate third-party agreements, I

10   also negotiate non-disclosure agreements with third parties.

11   I'm also one of the few business people that is authorized to

12   sign these agreements because they're so carefully negotiated.

13   Q.   Have you helped negotiate agreements related to Facets?

14   A.   I have.

15   Q.   What types of intellectual property do you understand to be

16   at issue in this case?

17   A.   Trade secrets and copyrights.

18   Q.   Let's talk about trade secrets.  What do you mean when you

19   refer to trade secrets?

20   A.   Trade secrets has to do with our innovation.  They're

21   secret, we don't want them in the public, and we protect those.

22   Q.   Do they give you a competitive or unique advantage?

23   A.   Absolutely.

24   Q.   Have you prepared some slides to help explain how TriZetto

25   protects its trade secrets?

1    A.  Yes.

2    Q.  Let's go to DX12.2.  What does TriZetto do, if anything, to

3    keep its innovations secret?

4    A.  So at a high level there are these areas that we protect

5    our technology.  We have physical security, network security,

6    secure customer portal, which I think we talked a little bit

7    about before.  We secure our intellectual property through

8    contracts and also through government filings and

9    registrations.

10   Q.  Let's go through each of those very briefly.

11        Go to DDX12.6, seeing DDX 523, 526, 1320, what are we

12   looking at?

13   A.  This is again physical security on the left-hand side.  All

14   of our buildings are secured with card key access.  Every one

15   of our employees needs to have a picture ID that needs to be

16   displayed at all times.  They have a requirement to report

17   anybody who is not wearing an ID.  And this is also when there

18   are visitors in the building, they also have to have a visitor

19   ID.

20        You could see in the middle two slides here that there

21   are areas within the building that are considered restricted

22   access.  So it's not once you get in the door you can go

23   anywhere.  On the right-hand side demonstrates one of those

24   restricted areas; kind of makes sense, our intellectual

25   property people, like our lawyers, only have access to the law

1    library, our IT folks would only get access to the servers.

2    Q.  The next slide on the top says network security.  Can you

3    explain to the jury what that is that we're look at here.

4    A.  By network security, our applications are all on the

5    TriZetto network, it's behind a secure fire wall, and the only

6    way to access them would be through a user name and password.

7    Q.  And you were here for Mr. Noonan's testimony concerning the

8    trade secrets that are at issue in this case, right?

9    A.  Yes.

10   Q.  Are the trade secrets Mr. Noonan discussed, including

11   TriZetto's Facets related tools, Facets itself and Facets

12   manual, protected by the physical and network protections you

13   just discussed?

14   A.  Yes, they are.

15   Q.  You also mentioned a customer portal.  What does that mean?

16   A.  So the name of it is it customer exchange, and this is a

17   secure portal that our customers are able to go to to get

18   access to our documentation.

19   Q.  Let's go to DDX12.8, which is DTX527.  Is this a screen

20   shot of the actual customer exchange log-in number?

21   A.  Yeah, I would call this the landing page.  So this is the

22   first page that you would see.  You need to enter a user name

23   and password and get authenticated before you could move on.

24   Q.  I notice there's some text at the bottom of this screen.

25   If we go to the next slide, we enlarged that text, so can you

1    read it?

2    A.   Sure.  It says the software documentation and other

3    materials provided in the site are confidential trade secret

4    and proprietary information of Cognizant TriZetto Software

5    Group, Inc. or its affiliates.  You shall not disclose such

6    confidential information and shall use it only in accordance

7    with the terms of the license agreement you entered into with

8    Cognizant TriZetto Software Group, Inc. or its predecessors.

9    Q.   Let's go to the next slide.  And please explain briefly

10   what this slide is.

11   A.   So if you follow what I was saying before, you hit the

12   landing page, you can authenticate.  You are now into customer

13   exchange, and the next thing that's presented to you are the

14   terms of use, which are explained here.

15           If you go to the next page you will see that before

16   you can proceed you have to agree to the terms of the

17   agreement, and that's the click through, you have to hit the

18   radio button and then submit.

19   Q.   Can TriZetto track what individual users have downloaded

20   from customer exchange?

21   A.   Yes, we can.

22   Q.   Let's go to the next slide and show me, if you would, what

23   is -- or explain to me what is being disclosed on this slide.

24   A.   So this is actually our next step in our travel through

25   customer exchange.  So now you want to look at a document, and

```
1    so what I have pulled up here is the Facets data modules guide
2    which you heard Mike Noonan talk about.  And the first thing
3    that you'll see is that this is confidential and proprietary
4    information, it contains trade secret information, and this is
5    for the exclusive use of, and in this case, it's me, I
6    downloaded this in February of 2015.
7    Q.  Now are the manuals that Mr. Noonan discussed available
8    through customer exchange?
9    A.  Yes, they are.
10   Q.  Now the last thing or the next thing you mentioned were
11   contractual protections.  What did you mean by contractual
12   protections?
13   A.  Anybody that needs to get access to our confidential
14   information, and that is actually both our software and our
15   technical manuals and everything that we own, we need to sign a
16   non-disclosure agreement, and also there are confidentiality
17   provisions around how you can use it.
18   Q.  Let's please publish PTX848 at page 2.
19         What is this document?
20   A.  So this is one of our customers, it's the UnitedHealthcare
21   Services, Inc., and this is a master license and services
22   agreement.
23   Q.  Why is it called the master license agreement?
24   A.  Well, when we talk about selling our products, we actually
25   just license our products to our customers.  We still own the
```

KAKTSYN3                     Sanders - Direct

1   products, there's a license for them to use the product.

2   Q.  Does this agreement define the rights and responsibilities

3   of UnitedHealth with respect to TriZetto's Facets software?

4   A.  Yes, it does.

5   Q.  And does it include confidentiality restrictions?

6   A.  It does.

7   Q.  Let's please publish page 38.

8           Mr. Sanders, what is this on page 38?

9   A.  So this is an excerpt from the license agreement that we

10  just talked about.  It's talking about confidentiality

11  protection and it goes on to say that when this is disclosed to

12  United that it's solely for the purposes for which such

13  information or access to it is provided pursuant to the terms

14  of this agreement or the business associated agreement.

15  Q.  Now in addition to this confidentiality agreement, did

16  TriZetto and UnitedHealth Group agree that specific companies

17  could not see or use TriZetto's confidential information?

18  A.  Yes, we did.

19  Q.  And was Syntel one of those companies?

20  A.  Yes, it was.

21  Q.  Please go to page 72 of this document, which is PTX848.

22          There is a list here of TriZetto competitors, right?

23  A.  Yes.

24  Q.  And if you scroll down, do you see third from the bottom

25  that Syntel is listed?

KAKTSYN3                          Sanders - Direct

1    A.  Yes, I do.

2    Q.  So Syntel is a TriZetto competitor under this agreement?

3    A.  Yes.

4    Q.  Let's go back to page 38.

5           Now we're looking at the confidentiality inclusion,

6    there are four paragraphs listed here, right?

7    A.  Yes.

8    Q.  The fourth paragraph, if we he could zoom in on that, would

9    you please read the fourth paragraph through just the letter A?

10   A.  Okay.  No notwithstanding anything to the contrary in this

11   Section 11.1, subject to Section 1.7(3), UHS will not provide

12   any TriZetto competitor with access to any licensed software,

13   deliverables, source materials or documentation.

14          THE COURT:  Excuse me, we're going to pause for just a

15   minute.  I understand we're having some audio problems with the

16   live stream.  If it could be fixed quickly we'll try and do

17   that.

18          (Pause)

19          THE COURT:  Let's proceed.

20          MR. CUTRI:  Thank you, your Honor.

21   BY MR. CUTRI:

22   Q.  We were looking at the UnitedHealth Group confidentiality

23   agreement.  Do you require other companies to sign

24   confidentiality agreements before they access TriZetto

25   software?

KAKTSYN3                          Sanders - Direct

1   A.  Yes, all companies have to sign the confidentiality

2   agreement before they could access our software or any of our

3   confidential information.

4   Q.  Does TriZetto use contracts like these to protect the trade

5   secrets that Mr. Noonan testified about?

6   A.  Yes, absolutely.

7          MR. CUTRI:  Mr. Thomas, we could take that down.

8   Q.  Mr. Sanders, why does TriZetto take all of these steps to

9   keep its technologies confidential?

10  A.  As I said previously, we have invested a lot of time and

11  development dollars to develop our technologies.  To have

12  somebody just come in and take it and use it without making

13  these investments would really destroy our company.

14  Q.  Now you also mentioned government filings and registrations

15  as another way that TriZetto protects its intellectual

16  property.  Does TriZetto own any copyrights?

17  A.  Yes, we do.

18  Q.  Does TriZetto register copyrights?

19  A.  Yes, we do.

20  Q.  Does TriZetto register copyrights in its technology with

21  the United States Copyright Office?

22  A.  Yes, we do.

23  Q.  Let's pull up DTX1381.

24          Mr. Sanders, what is being shown on this slide?

25  A.  So this is a certificate of registration.  The title work

1    is Facets 5.10.  It shows that the copyright claimant is

2    TriZetto Corporation.  As I said, this was filed with the

3    Copyright Office of the United States.

4    Q.  Earlier we heard testimony from Mr. Noonan concerning the

5    Data Dictionary.  Do you recall that?

6    A.  Yes, I do.

7    Q.  Is the Data Dictionary part of Facets 5.10?

8    A.  Yes, it is.

9            MR. CUTRI:  Mr. Thomas, please publish DTX532 at page

10   13.  Highlight the first paragraph.

11   Q.  Mr. Sanders, would you please explain the first two

12   sentences here and how they relate to the inclusion of Data

13   Dictionary and Facets?

14   A.  Yes, I can.  So just to be clear, this is from the Facets

15   Systems Reference Manual for 5.10, that's at the top.  And in

16   that manual it says the base Facets system also includes two

17   Microsoft access-based support applications that provide

18   reporting and reference services.  The Data Dictionary is a

19   data repository for every table and column used in Facets.

20   Q.  So is the Data Dictionary one of the two support

21   applications that's included with the base Facets system?

22   A.  Yes, it is.

23   Q.  Let's look at DTX496 at page 4.

24           Can you please explain what this document shows.

25   A.  Yes, this is coming out of the Facets Data Dictionary guide

1   that's for all releases.  It states that this document

2   describes the functionality and use of the Facets Data

3   Dictionaries for both Sybase Microsoft and/or for databases.

4   The Data Dictionary for Sybase Microsoft can be found on your

5   main Facets installation DVD at Facets SPC/Data Dictionary.

6   That might refer to the fact that we even tell the customers

7   exactly where it is.

8   Q.  And to be clear, is the Data Dictionary delivered to

9   customers as part of Facets?

10  A.  Yes, it is.

11  Q.  And was it delivered to customers as part of Facets 5.10?

12  A.  Yes.

13  Q.  Mr. Sanders, are TriZetto's copyrights important to

14  TriZetto's business?

15  A.  Yes, it is.

16  Q.  Why is that?

17  A.  Well, it is important to get recognition from the

18  government that we have a right to protect our property and

19  prevent others from copying it.

20       MR. CUTRI:  Now we can take that down, Mr. Thomas.

21  Q.  Now TriZetto is owned by Cognizant, is that right?

22  A.  That is correct.

23  Q.  And briefly, what is Cognizant?

24  A.  So Cognizant is a global services company that provides

25  information technology solutions.

KAKTSYN3                    Sanders - Direct

1    Q.  When did Cognizant announce the acquisition of TriZetto?

2    A.  It was announced on September 15, 2014.

3    Q.  And was the dollar amount that Cognizant paid for TriZetto

4    also announced?

5    A.  Yes, it was $2.7 billion.

6    Q.  Let's talk a little bit about that.  Let's pull up your

7    slides at slide 13.  If you would, Mr. Sanders, explain to the

8    jury what the value proposition was that TriZetto presented for

9    Cognizant.

10   A.  So TriZetto had a unique set of assets on the technology

11   side.  I think we already talked about the market share that we

12   had, and the fact that we're also the leading technology

13   provider for this kind of solution in the United States.  What

14   Cognizant was looking to do is by owning the software they

15   could also wrap services around that software.  You could see

16   here on the right-hand side some of those services are to do

17   testing, to create custom code for the customer, our health

18   plans -- just about every health plan looks for some type of

19   custom code, the installation of that, and then, as Mike

20   mentioned, the upgrade to new versions.

21   Q.  Is there any numerical relationship that you're aware of

22   between the amount of money that one could make selling

23   services versus licensing the actual software itself?

24   A.  There is actually a general rule of thumb in the industry

25   that for every dollar of enterprise software on the left-hand

KAKTSYN3                         Sanders - Direct

1    side, you should be able to generate six dollars of services to

2    surround that.

3    Q.  Over the timeframe from 2004 to 2018, approximately what

4    percent of TriZetto's revenue was attributable to Facets?

5    A.  Facets revenue was about 55 percent.

6    Q.  Now did Cognizant have a projection for the value that it

7    thought TriZetto would provide?

8    A.  Yes, it did.

9            MR. CUTRI:  Mr. Thomas, could you please pull up

10   DTX1174, pages 1 and 2.

11   Q.  Now Mr. Sanders, you see here a document.  Can you tell me

12   what this is that we're looking at?

13   A.  So this is the news wire that was announcing the

14   acquisition of TriZetto.  The date is September 15, 2014.  At

15   the time that we made this announcement, our CEO forecasted to

16   the market and to the street that we felt that there was

17   approximately 1.5 billion in potential revenue synergies coming

18   from this acquisition.

19   Q.  Now Mr. Sanders, who is Syntel?

20   A.  Syntel is a services company that provides services.

21   Q.  What was TriZetto's relationship with Syntel?

22   A.  At this time we had an agreement with Syntel back in 2010.

23   We were the customer, frankly, and Syntel was the supplier of

24   staff augmentation services.

25   Q.  And how were the roles and responsibilities of the

1   relationship with TriZetto and Syntel defined?

2   A.   They were defined in a Master Services Agreement, which we

3   call an MSA, and it goes into great detail as to roles and

4   responsibilities, obligations of the parties, scope of use of

5   our technologies, et cetera.  It's a pretty long document.

6   Q.   When was that MSA signed?

7   A.   That was signed in 2010.

8   Q.   Were you involved in negotiation of certain of those terms?

9   A.   Yes, I represented TriZetto in those negotiations.

10  Q.   Now what kind of services was Syntel going to be providing

11  to TriZetto?

12  A.   Staff augmentation services.

13  Q.   And can you explain why, for example, in an installation

14  TriZetto might need to augment its staff?

15  A.   So again, market leading software, we have been very

16  successful.  There are times that we would have spikes in

17  activity.  It turns out when you have a major implementation

18  for the software, sometimes it takes 18 to 24 months to

19  install, sometimes even longer.  And so if we had multiple

20  implementations that we needed to do, we needed someone who is

21  going to help us with some of the subfunctions associated with

22  those implementations.  An example would be if we're going to

23  go from one system to another you need to pull a list of all of

24  the physicians, you need to pull all of the members.  That's

25  considered a subfunction of the entire implementation.

KAKTSYN3                         Sanders - Direct

1   Q.  Mr. Sanders, did Syntel have any experience in Facets

2   before they started working with TriZetto?

3   A.  No.

4   Q.  Did Syntel have any experience with any of TriZetto's

5   products before they started working with TriZetto?

6   A.  They did not.

7   Q.  How did Syntel learn about Facets?

8   A.  We had to train them on the products themselves and then

9   how they were used.

10  Q.  As part of providing services that we just talked about,

11  did Syntel have access to TriZetto's confidential information?

12  A.  Yes.  After the MSA was signed when we defined the roles

13  and responsibilities and terms of use, they did get access to

14  our confidential information.

15  Q.  Have you created a demonstrative to explain access that

16  Syntel had?

17  A.  Yes.

18  Q.  Let's go to DDX12.14.  What does this slide show?

19  A.  So as Mike Noonan explained, Syntel was actually working

20  right alongside us in some of these subfunctions.  Some of

21  these were reporting in to Mike's team.  So they had physical

22  access to our buildings, they did have a contractor pass to get

23  into the building, they had access to the applications that

24  were behind our firewall, and they also had access to our

25  secure customer portal customer exchange.

KAKTSYN3                     Sanders – Direct

Q.   Did Syntel have access to the trade secrets that Mr. Noonan

testified about?

A.   Yes, they did.

Q.   Why would you let Syntel have access to TriZetto's trade

secrets?

A.   Well, first and foremost, after we had the agreement signed

and we had very strict provisions on confidentiality and how

you could use the documentation and confidential information,

we have to train these people who are going to performing

services for us.

Q.   If we go to the next slide, is that what you're

illustrating in terms of what the access was conditioned on?

A.   Yes.   I was just going to add that one of the provisions in

the agreement -- we may get to this later -- is in performing

the services to TriZetto, that's how it was defined, your

access to the confidential information is to provide services

to TriZetto.

Q.   Since you mentioned it, let's go to some of those

provisions now.   DTX1, if you could please go to page --

          So what is DTX1?

A.   This is the master service agreement between TriZetto and

Syntel.

Q.   And if we could go to page 51, is this one of the

confidential provisions that you referenced?

A.   Yes, it's one of many.   This has to do with

1   confidentiality, it's the general obligations, and it states

2   that neither party shall use, store, publish, disseminate,

3   transfer or disclose confidential information.  And then each

4   party shall use the highest level of care to prevent

5   misappropriation or dissemination.

6   Q.  Now you mentioned that Syntel's contract with TriZetto

7   limited what Syntel could use TriZetto's information for,

8   right?

9   A.  That's correct.

10  Q.  Let's look at page 44 of this agreement.  Would you please

11  take us through the first sentence and just read what it says

12  here in terms of ownership and use of TriZetto data.

13  A.  Sure.  So ownership of TriZetto data.  All TriZetto data

14  is, or shall be, and shall remain the property of TriZetto.

15  Obviously very important.  Without TriZetto's approval, the

16  TriZetto data shall not be used by service provider or service

17  provider agents other than in connection with providing the

18  services.  And that was meant to TriZetto, that's how it's

19  defined.  And in romanette three it says they shall not -- the

20  TriZetto data shall not be used or commercially exploited by or

21  on behalf of service provider or service provider agents.

22  Q.  Now you said that Cognizant bought TriZetto in 2014, right?

23  A.  Yes.

24  Q.  And the acquisition was announced on September 15, 2014?

25  A.  That's correct.

KAKTSYN3                        Sanders - Direct

1   Q.  Did Syntel do anything in response to that announcement?

2   A.  Yes, in fact almost immediately they started pulling their

3   people off of our significant projects.

4   Q.  Did that have an impact on TriZetto's business?

5   A.  Yes, it had an impact not only on our business but on our

6   customers.

7   Q.  What do you mean?

8   A.  So these were very targeted removals of people.  So we had

9   implementations that we were providing to customers that had

10  very tight time frames.  So here we are, just to set the date,

11  this is in the September time frame, I could think of one huge

12  upgrade that had a requirement to be up by December 31st.  So

13  on one of these accounts they pulled seven people that were

14  helping us in the implementation for this particular customer,

15  put the entire implementation in jeopardy.

16  Q.  Now was Syntel allowed to just unilaterally pull people

17  from projects the way you described?

18  A.  No, they were not.

19  Q.  Did Syntel have an obligation to, if they were going to

20  pull someone, replace them with someone of equal comparable

21  skill?

22  A.  Yes, the same scope, the same quality of services.  That's

23  all defined in the agreement.

24  Q.  Did Syntel do that?

25  A.  They did not.

1    Q.  Did you talk with anyone at Syntel about this issue?

2    A.  Yes, I had a call with Murli Reddy.

3    Q.  And what did you two discuss?

4    A.  So this was -- I explained to Murli, we had a long

5    relationship with Syntel, actually went about back to 2007, and

6    some of the actions that Syntel was taking was actually causing

7    us harm and causing harm to our customers.  I offered up to him

8    that we would be willing to extend all the resources, the

9    resources that we had on that day all the way through December

10   of the next year.  And the reason that I offered that up was as

11   a significant customer to Syntel, as a sign of good faith, this

12   would help protect the revenue stream that they had forecasted.

13   Being in sales and being in management, I know how important

14   this is.  It also helped us because it would help us with our

15   customers that had ongoing implementations throughout the year.

16   Q.  Now did Syntel agree to that proposal that you made?

17   A.  No, they didn't.

18   Q.  Did Mr. Reddy say why?

19   A.  Well, he said that he really wasn't interested in

20   protecting TriZetto, his job was to protect Syntel.

21   Q.  Thereafter, did Syntel do anything with respect to the MSA

22   on or about November 20, 2014?

23   A.  November 20th is the day that we received regulatory

24   approval for the acquisition, and on the same day we got a

25   notice from Syntel that they -- there was a notice of

1    termination that we received on that day.

2    Q.  So November 20th was the day that the government approved

3    Cognizant purchasing TriZetto?

4    A.  That's correct.

5    Q.  And that same day you received a notice of termination from

6    Syntel?

7    A.  Yes.

8    Q.  Were you surprised by Syntel's decision to terminate the

9    MSA?

10   A.  Yes, actually for a number of reasons.  I already stated we

11   were a huge customer and we had a strong relationship with

12   them, so I would think that they would have looked to continue

13   on with that relationship.

14   Q.  When you say a huge customer, can you give me, in 2012,

15   what was your understanding of how much money, just that one

16   year, TriZetto was projecting and paid to Syntel for services?

17   A.  We were in the neighborhood of 2.2 million per month, so it

18   was in the neighborhood of $26 million a year for the staffing

19   that they were providing to us.

20   Q.  Over the multiyear relationship, all told, did Syntel earn

21   more than $100 million from TriZetto?

22   A.  That would be very fair, yes.

23   Q.  Now after November 20, 2014, did TriZetto learn anything

24   about what it believed were Syntel's plans to use TriZetto

25   confidential information?

KAKTSYN3                         Sanders - Direct

1  A.  Yes, we did.

2  Q.  Did TriZetto write to Syntel about this issue?

3  A.  Yes, we did.

4  Q.  Let please publish PTX42.

5       Now is this a November 21st, 2014 letter?

6  A.  Yes, it is.

7  Q.  And it looks like it's signed by someone who is the chief

8  legal officer.  Is that the chief legal officer of TriZetto?

9  A.  Yes, it is.

10  Q.  Who is it to?

11  A.  It's to Mr. Daniel Moore.

12  Q.  And is that Mr. Moore here in the courtroom sitting in that

13  first row behind me?

14  A.  Yes.

15  Q.  Now what did Syntel -- what did TriZetto write to Mr. Moore

16  in this letter?

17  A.  So we had received reports from reliable independent

18  sources that Syntel was planning to disclose our confidential

19  information for the benefit of a third party.

20  Q.  What did you go on to say in that next sentence?

21  A.  Mr. Schaefer said that, if true, these actions of

22  misappropriation of our confidential information and

23  intellectual property would constitute a willful and

24  intentional breach of your obligations in the MSA.

25  Q.  Would you read what TriZetto wrote in the last sentence?

KAKTSYN3                        Sanders - Direct

A.   Sure.   It says in the event that you do not comply with the
terms of the MSA regarding disclosure of TriZetto's
confidential information and use of TriZetto's intellectual
property, TriZetto will be compelled to pursue any and all
rights and remedies under the MSA, including the right to
pursue damages or injunctive relief.

Q.   Now did TriZetto ultimately learn that Syntel was, in fact,
planning to use TriZetto's confidential information?

A.   Yes, we did.

Q.   Did you conduct an audit of customer exchange?

A.   Yes, we did.

Q.   What did that audit show?

A.   So we found that there was suspicious downloads that we
wanted to explore further.

Q.   Let's please publish DTX87.   Please explain what DTX87 is,
and I believe we have a tear off of pages 49 and 47.

A.   Okay.   This is a listing, and this again is coming from
customer exchange.   You can see who the Syntel employee is at
the top.   This activity took place on November 24th of 2014,
and there were 88 downloads of confidential information.

       The interesting piece about all of this is that this
was the last day that this person was going to be providing
services to TriZetto.   So I don't remember exactly what the --
how long it took him to download 88 documents, but it's hard to
imagine with somebody going off roll or leaving TriZetto, why

1    they would need 88 of these documents.

2    Q.  In fact, Mr. Sanders, at the top it says 2:59 a.m., and at

3    the bottom right it says 1:38 a.m., and I believe on the column

4    furthest to right it shows these manuals being downloaded two

5    to three every minute for about 90 minutes, is that right?

6    A.  Yes.

7    Q.  Let's look at DTX87 pages 48 to 50.  Are these the actual

8    documents that were downloaded by this individual on his last

9    day?

10   A.  These are the actual documents downloaded by this person.

11   Q.  What are we looking at here in terms of what was

12   downloaded?

13   A.  Some of these are manuals that Mike Noonan referenced

14   earlier, just at a glance, the Facets system reference manual,

15   lot of Facets documentation here.  I mean some of these manuals

16   and user guides are in excess of like 200 pages.

17          The other thing that was also interesting is we said

18   that you could only access confidential information for the

19   services that you are providing to TriZetto.  So if there was

20   somebody who was working on Facets, it was unusual that

21   somebody was going down at the bottom of the left-hand page and

22   downloading documents for Networks, which is another TriZetto

23   product, and that wasn't allowed.

24          MR. CUTRI:  Let's go back to PTX42 just for a moment,

25   Mr. Thomas, and if we could have the tear out that we had

KAKTSYN3                          Sanders – Direct

1    before.

2    Q.  Now we read this letter, and it makes reference to

3    confidentiality obligations under the MSA, right?

4    A.  Yes.

5    Q.  Now did Mr. Moore write back to you after this letter was

6    sent?

7    A.  Yes, he did.

8    Q.  Let's look at DTX753 -- sorry, it's PTX753.

9            Now is this the letter that Mr. Moore wrote back on

10   December 4?

11   A.  Yes, it is.

12   Q.  And that's his signature at the bottom?

13   A.  Yes, it is.

14   Q.  And Mr. Moore is the top lawyer for Syntel, right?

15   A.  That is correct.

16   Q.  What does Mr. Moore say in this letter?

17   A.  To me, one of the most important things is what is

18   highlighted -- actually underlined in red:  Syntel maintains

19   and will continue to maintain its confidentiality obligations.

20   Q.  Now you heard some suggestions, sitting here in the

21   courtroom -- you've been sitting here in the courtroom, haven't

22   you?

23   A.  Yes.

24   Q.  And you heard some suggestion, I think, by Syntel's counsel

25   that there was an amendment in 2012, and that somehow that

KAKTSYN3                        Sanders - Direct

1    meant that Syntel was free of certain confidentiality

2    obligations.  Right?

3    A.  I did hear that.

4    Q.  Okay.  In 2014 TriZetto writes a letter to Syntel talking

5    about confidentiality obligations under the MSA.

6    A.  Yes.

7    Q.  Is it your understanding that just a few weeks later Syntel

8    wrote back and said we are obligating those confidentiality

9    obligations?

10   A.  Yes, they will continue to maintain.

11                   (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KAK3SYN4                          Sanders – Direct

1    Q.  Just so it's clear, if we can pull back and see a different

2    sentence of 753, PTX 753 by itself.

3           Would you read the second sentence that begins "Syntel

4    has not breached."

5    A.  "Syntel has not breached the MSA and maintains

6    confidentiality."

7    Q.  Did Mr. Moore's letter specifically reference both the MSA

8    and the confidentiality obligation that's contained therein?

9    A.  Yes.

10   Q.  Now, let's go to DTX 1429.  Now, Mr. Moore had asked for

11   some information about confidentiality issues in the prior

12   letter; is that right?

13   A.  Yes.

14   Q.  What did TriZetto write back?

15   A.  We said that TriZetto was aware that Syntel employees who

16   have been assigned by Syntel away from TriZetto's account have

17   downloaded TriZetto confidential information and intellectual

18   property.  In one such case, a Syntel employee expressly stated

19   that the employee was intending to use TriZetto confidential

20   information and intellectual property on his next assignment

21   with another Syntel client, UnitedHealthcare.

22   Q.  At this time, was TriZetto bidding on a project for

23   UnitedHealthcare?

24   A.  Yes, we were.

25   Q.  Did you come to find out later that Syntel was also bidding

1  on a project for UnitedHealthcare?

2  A.  Yes, much later.

3  Q.  Who got that project, to your understanding?

4  A.  My understanding is that Syntel won that business.

5  Q.  Do you know precisely what it was that Syntel was planning

6  to do for UnitedHealthcare; in other words, did you see their

7  bid?

8  A.  I did not.

9  Q.  You don't know what services or offerings they were

10 planning to give to UnitedHealthcare?

11 A.  I did not.

12 Q.  Did Mr. Moore, at this time or any other time before this

13 lawsuit was filed, say that he believed that there were no

14 confidentiality obligations because of an amendment in 2012?

15 A.  No, he didn't.

16 Q.  To be clear, you know Mr. Moore, and you have spoken with

17 him on the phone in context of this relationship, right?

18 A.  Yes, I have.

19 Q.  He never picked up the phone and said, Chuck, listen, I

20 don't know what you're talking about, we don't even have these

21 obligations, remember we got rid of them in 2012.

22         He never said that, right?

23 A.  That never happened.

24 Q.  What did Syntel do instead after you wrote a letter -- what

25 did Syntel do in January of this following year, after you

1    wrote a letter asking them not to utilize your confidential

2    information?

3    A.  They sued us.

4    Q.  Now, let's turn to that suit and the claims of Syntel.  You

5    understand, Mr. Sanders, that Syntel is asserting claims

6    against TriZetto and Cognizant relating to the alleged use of

7    Syntel confidential information; is that right?

8    A.  Yes.

9    Q.  Is it your understanding that Syntel is alleging that

10   TriZetto, and in particular you, provided Syntel confidential

11   information about Syntel employees to Cognizant?  Do you

12   understand that?

13   A.  I understand that.

14   Q.  Mr. Sanders, did you provide any Syntel confidential

15   employee information to Cognizant?

16   A.  I did not.

17   Q.  To your knowledge, did anyone at TriZetto provide any

18   Syntel confidential employee information to Cognizant?

19   A.  Yeah, not to my knowledge.

20   Q.  Did TriZetto provide any information about Syntel personnel

21   to Cognizant?

22   A.  Yes, we did.

23   Q.  Was it Syntel confidential information?

24   A.  No, it was not.

25   Q.  So, let's take a look at what information was provided.

1   Let's please publish PTX 763.

2           Mr. Sanders, would you take us through this e-mail and

3   tell us what it is.

4   A.  This is an e-mail from me to Maureen Brennan, and it has an

5   attachment to it, it's called the Consolidated Replacement Plan

6   and Job Descriptions, and it's dated November 26, 2014.  And in

7   the body it says:  "Attached are the hiring requirements by

8   business unit that were sent to Aslam."

9   Q.  Now, who is Aslam?

10  A.  Aslam is a manager in Cognizant that was doing hiring at

11  the time.

12  Q.  Let's please publish the attachment to this document, which

13  is PTX 764.

14          What is this document?

15  A.  Again, this is the cover page here.  It just, as I said,

16  this is the contractors replacement hiring plan and job

17  descriptions.

18  Q.  Let's please go to page eight.  I believe this was a slide

19  that was shown in the opening of Syntel's counsel in this case.

20  Did you see that?

21  A.  Yes.

22  Q.  Let's talk about this.  What is this document?

23  A.  So this is an excerpt from the entire document.  This

24  happens to be just one product group within TriZetto.  It's the

25  Facets Custom Product Consulting Group, and the owner of that

KAK3SYN4                          Sanders - Direct

1    is Tony Westover.

2    Q.   Tony Westover is someone who works at TriZetto?

3    A.   Yes, he is a TriZetto employee.

4    Q.   I see in this document there is a listing for consulting

5    team name, in -- it looks like the fourth column over.  Do you

6    see that?

7    A.   Yes, I do.

8    Q.   What is that in reference to under consulting team name?

9    A.   So this is the account that -- so in consulting, they were

10   assigned to accounts.  These are accounts that some of the

11   Syntel people were assigned to.

12   Q.   Who assigned these Syntel people to these accounts?

13   A.   TriZetto did.

14   Q.   So, TriZetto decided which consulting team each of these

15   individuals would be assigned to?

16   A.   Yes.

17   Q.   So whose information is it in terms of which consulting

18   team these people worked for?

19   A.   That is TriZetto information.

20   Q.   The next column over says job title.  You see that?

21   A.   Yes, I do.

22   Q.   Who gave those job titles to the people on this

23   spreadsheet?

24   A.   TriZetto did.

25   Q.   What do you mean by that?  How did TriZetto decide?

KAK3SYN4                          Sanders - Direct

1   A.  So when each one of these people were assigned to someone

2   within consulting for TriZetto, there was a role that was

3   defined for them.  And some of these could have been

4   developer/analyst, and that was really the function that they

5   were performing.

6   Q.  Okay.  Then there is a work location.  Is Denver, Colorado,

7   one of the places where TriZetto had offices?

8   A.  Yes.

9   Q.  And did you also have offices in India or what's called

10  offshore here?

11  A.  Yes.

12  Q.  And TriZetto decided where these individuals would work

13  when working on assignment for TriZetto?

14  A.  Yes.  And it really got back to the consulting team name.

15  Where was the opportunity where we needed to have these people.

16  Was it at the time our Denver headquarters or was it somewhere

17  else.

18  Q.  Now, what is LinkedIn?

19  A.  LinkedIn is a public website where businesspeople typically

20  put their things like résumé, it would be obviously their name

21  is in there, what their title is, who their employer is, how

22  long they've been there, what their roles and responsibilities

23  are.  May even have what their educational background is, and

24  previous employment.

25  Q.  If we can go back to that spreadsheet.  I'd like to take a

1    look at one of the names there.

2           Number 14 is Chetan Kumar Chaudhary.  Do you see that?

3    Does Chetan Kumar Chaudhary have a LinkedIn profile?

4    A.  Yes, he does.

5    Q.  Let's publish DTX 1368, page 35.  What does this show?

6    A.  This is the LinkedIn page for the person we were just

7    talking about.  It has basically all the public information

8    that was on my PowerPoint that I sent to Aslam.  So you could

9    see who they worked for, they're in Littleton, Colorado.

10   Software development, they worked for Syntel before that in the

11   Greater Denver area.  They were providing consulting services.

12          I mean, for me, this is public information.  This

13   certainly isn't confidential.

14   Q.  Let's go back to PTX 764, page eight.

15   A.  If I could, there's just one other point.  There is one

16   column that I wanted to point out here.  And it says sub, it

17   says contractor to be replaced.

18          I think this is important because at this point in

19   time, as I mentioned previously, Syntel was pulling resources

20   from us, and really not getting us any backfills that were the

21   same quality or scope.

22          And so, when I say that this is a contractor

23   replacement plan, these people are being pulled off our

24   projects, and we needed to have new people come on board in

25   order to provide the services that Syntel had abandoned.

KAK3SYN4                        Sanders – Direct

1   Q.  Now, there are two other names on here, item six is Shekhar
2   Kadam.  And item number eight is Ananda Kumar Muthusamy.  Do
3   these individuals have LinkedIn profiles?
4   A.  Yes, they do.
5   Q.  Let's look at DTX 1368 at pages 95 and 96.  This is Shekhar
6   Kadam's LinkedIn profile?
7   A.  Yes, and for those who know about LinkedIn, this is
8   probably obvious to you, but for those who don't, this is the
9   same information we talked about:  Who they worked for, the
10  time period, what their specialties are, and so on.  It even
11  has who previous employers were.
12  Q.  If we can go to page 52 and 53.  What is this?
13  A.  Basically the same thing.  Person's name, the format they
14  have here a little summary of their work experience, who they
15  work for, the projects, who they worked for before this,
16  basically the same information.
17  Q.  Mr. Sanders, do you understand that Syntel is also
18  asserting that TriZetto and Cognizant intentionally interfered
19  with Syntel, certain Syntel employee contracts?
20  A.  Yes, I do.
21  Q.  Let's go back to your slide presentation, DDX 12.16.
22  Syntel asserts that there are five contracts that you
23  interfered with here, right?
24  A.  Yes.
25  Q.  Are these the individuals whose contracts Syntel maintains

1    TriZetto interfered with?

2    A.  That's my understanding, yes.

3    Q.  Did Syntel communicate to TriZetto about its claim?

4    A.  Yes, they did.

5    Q.  Let's please publish PTX 47.  And this is a letter on New

6    Year's Eve of 2014 from Mr. Moore, right?

7    A.  Yes.

8    Q.  And would you please read what Mr. Moore says the

9    employment agreements that these individuals have prohibit,

10   with the highlighted portion?

11   A.  It says that it "prohibits the employee from directly or

12   indirectly working for or providing services to any entity that

13   is or was a Syntel client with whom the employee had contact

14   while employed by Syntel for a period of two years after

15   leaving Syntel."

16   Q.  Did any of the five people listed by Syntel go to work for

17   a Syntel client after they left Syntel?

18   A.  They did not.

19   Q.  Who did they go to work for?

20   A.  They went to work for Cognizant.

21   Q.  Is Cognizant a Syntel client?

22   A.  No.  In fact, they were a competitor, which is why they

23   terminated the agreement.

24   Q.  Mr. Sanders, is it common for Syntel employees to go to

25   work for Cognizant and then to Syntel and vice versa?

KAK3SYN4                          Sanders - Direct

1    A.  Yes, it's actually pretty common in this industry to jump

2    from job to job.

3    Q.  Let's please publish DTX 167.  Is this a LinkedIn profile?

4    A.  Yes, it is.

5    Q.  Have you taken some excerpts here to illustrate a point

6    about this individual and his job history?

7    A.  You can see the name at the top.  Let me start from the

8    bottom, that you can see for a period of time from 2010 to 2014

9    they worked for Syntel.  Then they worked for Cognizant for

10   seven months.  Then they went to work for Syntel again from

11   2014 until, you know, whenever we printed this.

12   Q.  Actually, this is an instance where someone went from

13   Cognizant to Syntel, right?

14   A.  That is correct.

15   Q.  And they did it in November of 2014, right?

16   A.  Yes.

17   Q.  Just about the time that Syntel was writing saying

18   Cognizant shouldn't be hiring any Syntel people, right?

19   A.  Yes.

20          MR. CUTRI:  Would you please publish DTX 166.

21          THE COURT:  While you're publishing it, maybe we

22   should all get up and stretch.

23          Thank you.

24   Q.  I believe we were on DTX 166.

25   A.  Yes.

KAK3SYN4                        Sanders - Direct

1    Q.   What is being shown on this LinkedIn profile?

2    A.   Similar experience here, that we have somebody who worked

3    for Cognizant, a TriZetto company, from 2014 to 2016, and then

4    in 2016 they became an associate consultant over at Syntel

5    working on Facets.

6    Q.   Again, this is someone who goes from Cognizant to Syntel,

7    right?

8    A.   Yes.

9    Q.   Mr. Sanders, let's return to TriZetto's claims.

10             You understand that there are documents that will be

11   shown during this case that TriZetto was going to offer in

12   support of its claim that Syntel misappropriated TriZetto's

13   confidential information, right?

14   A.   Yes.

15   Q.   You understand that some of those documents came from

16   Syntel's internal e-mails and files, right?

17   A.   I understand that, yes.

18   Q.   And have you been allowed to review Syntel's internal

19   information and e-mails?

20   A.   No, I have not.  I understood that this is considered -- I

21   think it's privileged.  I wasn't able to see it.

22   Q.   So to this date, you haven't seen the evidence that's

23   forthcoming about what happened at United Health Group or what

24   Syntel was doing.  The first time you are seeing that

25   information is as we're all seeing it?

1   A.  Yes.

2   Q.  Today and yesterday?

3   A.  Yes.

4   Q.  Notwithstanding that, Mr. Sanders, do you have any reason

5   to believe that Syntel is still using and is currently using

6   today TriZetto's confidential information?

7   A.  Yes, I do.

8   Q.  Have you ever looked at Syntel's website?

9   A.  Yes, I have.

10  Q.  Let's please pull it up, DTX 1162.  If we can go to the

11  first page of it before we turn to this page.

12          Tell us, Mr. Sanders, did you actually go and look at

13  Syntel's website recently?

14  A.  Yes, I have.

15  Q.  Is this document on their website?

16  A.  It's on their website as of last -- I last saw this last

17  week.  This is, again, the Atos Syntel website.  Talks about

18  providing greater business impact to healthcare products,

19  services at lower costs, and then it defines some of their

20  solutions.

21  Q.  One of the things that Syntel says are their solutions are

22  these tools and accelerators, right?

23  A.  Yes.

24  Q.  Let's look at the next page.  Actually, if we look at the

25  top.  It says:  "Tools and accelerators.  Leveraging Atos

KAK3SYN4                        Sanders - Direct

Syntel tools and accelerators to deliver tangible benefits."

           Do you see that?

A.  Yes.

Q.  Mr. Sanders, do you believe this shows that Syntel's using

TriZetto confidential information?

A.  Yes, I do.

Q.  Why?

A.  Let's say you look at the first solution that they have

that's called a step-up probe.  And they define this as being a

multi-format Facets custom code impact analyzer.  Which

actually is the same name of the custom code impact analyzer

that we created.

           There's also something that's called factory.  Factory

is a repository of 3,000 plus Facets test cases.  And at the

time we still had a relationship with Syntel, that was the

exact number of test cases that we developed.

           And then the 500 automation scripts, those were the

exact number of automation scripts that we had at that point in

time.

           And last but not least is the D2 data generator.

Which is a dictionary for the Facets database, batches and

common interfaces.  I think based on the descriptions that Mike

Noonan gave you this morning, this is what Data Dictionary is.

It's interesting that it's called D2, Data Dictionary.

           This is our information.

KAK3SYN4                    Sanders - Direct

Q.  Mr. Sanders, what was your reaction to seeing and learning
about this website on Syntel's website?
A.  You know, I've been working here for 15 years.  I know that
TriZetto is very passionate about improvements to healthcare.
You hear somebody like Mike Noonan who has been here 20 years
trying to improve software for our customers and for healthcare
and for families that actually use it.

          We established a relationship with Syntel, we signed,
you know, a very strict confidentiality agreement which was the
MSA, that defined roles and responsibilities, terms of use,
confidentiality, etc.  We trained these people on our
confidential information.  We taught them how to use it.
Because we knew -- we thought -- we were protected
contractually.

          We paid them over $100 million over the life of this
agreement.  And to find that they stole our intellectual
property, and then they went and sued us, it's just -- just
blows my mind.  This is not right.  And the fact that it's
still on their website today as their tools, it's not right.
It's just not right.

          MR. CUTRI:  I'll pass the witness, your Honor.

          THE COURT:  Cross?

          MR. GROOMBRIDGE:  Your Honor, I'm reminded we have an
agreement to provide one physical binder to Mr. Cutri and one
for your Honor.

KAK3SYN4                        Sanders - Direct

1              THE COURT:  Thank you.

2              MR. GROOMBRIDGE:  May we approach and do that?

3              THE COURT:  Yes.  I'm not sure how best to do this.

4              MR. CUTRI:  Your Honor, I don't know if the witness or

5    anyone else needs a drink of water.

6              MR. GROOMBRIDGE:  I wouldn't mind a glass of water.

7    If now is a time for a break, I would be happy to do that or

8    continue.  Whatever is appropriate.

9              THE COURT:  Why don't we take a short break.  Let's

10   take a 10-minute break and then we'll come back.  And maybe we

11   can get some water for the witness the meantime also.  First

12   let's excuse the jury.

13             What are we doing here?

14             A JUROR:  We're putting our lunch orders in.

15             THE COURT:  Wonderful.  That's a good cause.

16             (Jury excused)

17             THE COURT:  We'll take a break for 10 minutes.

18             (Recess)

19             (Jury present)

20             THE COURT:  May I start.

21             MR. GROOMBRIDGE:  May I remove my mask?

22             A JUROR:  I think we're missing a juror.

23             THE COURT:  Oh, I'm sorry.  I didn't realize.

24             Whenever you'd like.

25             MR. GROOMBRIDGE:  Thank you, your Honor.

KAK3SYN4                      Sanders – Cross

1  CROSS-EXAMINATION

2  BY MR. GROOMBRIDGE:

3  Q.  Good afternoon, Mr. Sanders.

4  A.  Good afternoon, sir.

5  Q.  I'd like to start with the amendment to the contract.

6  Could we put up, please, Plaintiff's Exhibit 74.  And

7  Mr. Sanders, this is the amendment that you mentioned in your

8  direct testimony, correct?

9  A.  Yes, it is.

10 Q.  And this was entered into, it says it's dated as of

11 August 17, 2012; do you see that?

12 A.  Yes.

13 Q.  A little lower down it says it's effective as of July the

14 1st, 2012.  Do you see that?

15 A.  That's correct.

16 Q.  Now, you did not negotiate this amendment, correct?

17 A.  No, I did not.

18 Q.  This was negotiated by another executive at TriZetto by the

19 name of Jake Sorg, right?

20 A.  That is correct.

21 Q.  And Mr. Sanders, is it correct that what happened here was

22 that TriZetto came to Syntel and said we would like to reduce

23 the financial commitments that are in the 2010 contract?

24 A.  My understanding is that both parties were looking to make

25 a change to the agreement.

```
 1   Q.  Would you agree with me that one of the things this
 2   amendment does is to reduce how much money TriZetto had to pay
 3   Syntel under the agreement you had negotiated?
 4   A.  My understanding is, I mean, technically, it was the
 5   ability to reduce the number of people, which equates to how
 6   much money.
 7   Q.  Let's tease that apart.  You do agree, then, that this
 8   amendment allowed your company to take fewer people from Syntel
 9   to work, right?
10   A.  It gave us the option to use fewer people.
11   Q.  And that means less money, because you had to pay for all
12   of those people, right?
13   A.  We have to pay for the people we use, yes.
14   Q.  And the agreement that you had negotiated said that in the
15   year 2012, your company guaranteed it would take 475 people
16   from Syntel and pay for all of them, right?
17   A.  At that time, that was the minimum.
18   Q.  And but, come 2012, your company decided it didn't want to
19   have to pay that much, correct?
20   A.  We decided that we didn't need as many resources.
21   Q.  And that's why Article 1 here says "amendments related to
22   minimum commitment."  What that means in ordinary person's
23   speak is we're not going to have to buy as much from you; fair?
24   A.  I would say that that's fair.
25   Q.  And if we look down, you see the part that begins Section
```

KAK3SYN4                    Sanders - Cross

1    3.13 is replaced in its entirety with the following.

2    A.  Yes.

3    Q.  And in there it says, in the middle fourth line, "TriZetto

4    presently intends to continue to use the services through

5    December 31, 2012, at a level such that the fees for services

6    equal an estimate range of 1.7 to $2.2 million per month."

7         Do you see that?

8    A.  Yes, I do.

9    Q.  That's more or less the amount that you were talking about

10   in your direct examination, right?

11   A.  That is correct.

12   Q.  Then it goes on and it says, "Provided that the foregoing

13   shall constitute only an expression of TriZetto's current

14   intent, and shall not restrict in any manner whatsoever

15   TriZetto's ability to terminate the agreement in accordance

16   with Article 23 or otherwise reduce its consumption of services

17   at any time."

18        You see that?

19   A.  Yes, I do.

20   Q.  What that was saying is if we want to pay Syntel less

21   money, we can.  Correct?

22   A.  Yes.

23   Q.  And in return, Syntel got some things out of this

24   amendment, right?

25   A.  Yes, they did.

KAK3SYN4                    Sanders – Cross

1   Q.  If we look down right at the bottom of this page, it says

2   Article 2, "Amendments related to non-competition."

3          You see that?

4   A.  Yes, I do.

5   Q.  That's part of what Syntel got out of this change to the

6   deal, right?

7   A.  I would not say that that's all they got out of this.

8   Q.  It's not all they got out of it, but part of what they got

9   out of it?

10  A.  Yes.

11  Q.  Let's go to the top of page two, please.  And you see there

12  it says "Section 29.17 and any other provision in the agreement

13  related to service provider being restricted from competing

14  with TriZetto are deleted in their entirety."

15         Right?  That's what it says, right?

16  A.  Yes, it does.

17  Q.  And 29.17 was a provision that said, in so many words,

18  Syntel, you're not allowed to compete with TriZetto; fair?

19  A.  Yes.

20  Q.  But there were other things in the agreement, too, in all

21  those detailed rules and regulations that you had negotiated

22  that pertained to competition, right?

23  A.  I think there may have been just one other piece that had

24  to do with competition.

25  Q.  Regardless of how many there were, whether it was one or

1   whether it was 20, all of them were deleted by this amendment;

2   fair?

3   A.  I mean, that is an accurate statement.

4   Q.  So after this amendment, it was nothing in the Master

5   Services Agreement that was to restrict Syntel's ability to

6   compete with TriZetto; fair?

7   A.  I would say that that's fair, in that the other provisions

8   in the MSA still held; for example, use of confidential

9   information.

10  Q.  Let's look at, for example, one of the ones you pointed to.

11         MR. GROOMBRIDGE:  Mr. Stevenson, can we pull up

12  Defendant's Exhibit 1, please.

13  Q.  And that's the Master Services Agreement, right?

14  A.  That's correct.

15         MR. GROOMBRIDGE:  And let's go to page 44, please.

16  And let's enlarge the first six or so lines of Article 13.

17  Q.  Mr. Sanders, this is part of what you showed us in your

18  direct examination just now, correct?

19  A.  That is correct.

20  Q.  And let's just read through it, right.  So, it says

21  "TriZetto data shall not" and then there's three things that

22  shall not be done, right?

23  A.  Yes.

24  Q.  And one of them is "Used by the service provider other than

25  in connection with providing the services."

KAK3SYN4                      Sanders - Cross

1              You see that?

2     A.  Yes, I do.

3     Q.  What that means, when this agreement was negotiated by you

4     in 2010, was that when Syntel got some information, and it was

5     sitting there in the heads of the Syntel employees, and on

6     their computers, it was not allowed to use that information,

7     for example, if it wanted to go out and bid on some work out at

8     United Health Group; fair?

9     A.  Let me think about what you just said.

10    Q.  I mean, let's walk through one point at a time.

11    A.  Sure.

12    Q.  2010, you start your relationship with Syntel, and I think

13    you told us you were training them all about Facets, right?

14    A.  That's right.

15    Q.  And at that time, before the amendment, they were not

16    allowed to use whatever they learned, whether it was sitting in

17    their heads or whether it was in a manual or whether it was on

18    their computers, they couldn't use that to go out, for example,

19    and bid on work in competition with TriZetto, right?

20    A.  I would say that this, you know, the MSA speaks for itself.

21    That the service provider and service provider agents could

22    only provide -- use our intellectual property for the -- for

23    providing services to TriZetto.  I mean, that was paramount to

24    this agreement.

25    Q.  That was what it said in 2010, right, that they could only

1   use it if they were using it for your benefit, right?

2   A.  And that's what it says in 2012, too.

3   Q.  When you changed it, you took out any restriction on use

4   that would restrict their ability to compete with you; fair?

5   A.  No, I disagree.

6   Q.  Didn't it say anything in the agreement that restricted

7   their ability to compete with you was deleted?

8   A.  It says that -- you were deleting the non-competition

9   clause, and then any other provisions relating.

10  Q.  So, for example, let's look at number three here.  That

11  says they couldn't commercially exploit your data, right?

12  A.  Yes.

13  Q.  And that would mean, for example, using it to go and bid on

14  a contract with United Health Group.  That would be

15  commercially exploiting it, right?

16  A.  Yes, it would.

17  Q.  But you took that out, right?

18  A.  We did not.

19  Q.  You are saying they can't commercially exploit it, that was

20  a restriction on their ability to compete with you; was it not?

21  A.  In my opinion, that is not correct.

22  Q.  So you think that when you said they were allowed to

23  compete with you, and when you made a bargain and they gave you

24  something and they got something, right, that it didn't change

25  this?

1  A.  So, when we deleted the non-competition clause, Syntel is

2  in the services business.  They could not do anything to

3  compete with us, with our customers or anybody else.  When we

4  removed that, it gave Syntel the ability to do things like

5  consulting services, or business process reengineering, which

6  is the business that Syntel is in.

7  Q.  Let's -- did you finish?

8  A.  What it didn't do is say that they could use our

9  confidential information any way and anywhere at any time.

10  That was never changed in the agreement.

11            And if I could just add just one more thing.  I mean,

12  we talked about in my direct that there were letters from

13  Syntel that said that they were maintaining the confidentiality

14  provisions in the agreement.  And if anybody thought that

15  confidentiality was removed, then, you know, then that wouldn't

16  have been the case.

17  Q.  Confidential is different from use, right?

18  A.  You know, the devil is in the details.  You're talking

19  about there is confidential information which is a defined

20  term.  TriZetto data is a defined term.  It also talks about

21  the terms of use and the restrictions that you have.  Now --

22  Q.  Break it down.  Saying something is confidential means I

23  can't put it on the internet or I can't tell another person

24  about it, right?

25  A.  That's like a small portion of what that means.

KAK3SYN4                          Sanders - Cross

1    Q.  Saying I can't use it means that even if I don't put it on
2    the internet, or tell someone else about it, I still can't --
3    even if I keep it secret -- I can't use it for certain things,
4    right?
5    A.  It also means you can't download it.
6    Q.  Well --
7    A.  If it's not --
8    Q.  We may have a dispute about that.  I am not asking you what
9    it also means.  I'm saying it means I can't use it, and that's
10   different from disclosing it; fair?
11   A.  I mean, I just want to be very careful about what you're
12   asking me to agree to.  And there are things, there are details
13   around here that are very important.
14   Q.  Let's see if we can work our way through them while we
15   still have -- let's go back to the amendment.
16   A.  Okay.
17   Q.  Now, at the time of this amendment, when TriZetto agreed
18   that Syntel would be able to compete with it, did TriZetto
19   think that Syntel wasn't going to be very good at competing?
20   A.  Did TriZetto think that?  Or did Chuck Sanders think that?
21   Q.  Let's take it first with TriZetto.
22   A.  I mean, I really don't know.  I would think that because
23   they were performing just subfunctions for us on
24   implementations, that they probably didn't have the experience
25   to do an 18-to-24-month large-scale implementation soup to

KAK3SYN4                    Sanders - Cross

1    nuts.

2    Q.  Did you underestimate their ability to compete when you

3    agreed that they could do that?

4    A.  I'm giving you my opinion right now of what I thought

5    Syntel would have been able to do.

6    Q.  The gentleman who negotiated this and signed it, Jake Sorg,

7    he would undoubtedly have known about that rule of thumb that

8    you spoke of in your direct testimony, no?

9    A.  It's a general rule of thumb.  I think most people in the

10   services industry have come to adopt that.

11   Q.  So he would undoubtedly have known that the rule of thumb

12   that if you sell $1 worth of software, you could expect to make

13   $6 worth of services business, right?

14   A.  Yes.  And services is extremely broad.  I think I gave a

15   couple of examples that consulting is considered, staff

16   augmentation for one of our customers would also be considered

17   services.  Business process reengineering.  So we did open up

18   the door for them to compete with us.  But it was obvious that

19   it was never using our confidential information.

20   Q.  Isn't that what we're all here to decide, with all due

21   respect, sir?

22   A.  True.

23   Q.  Now, Mr. Sorg would have known that what he was allowing

24   Syntel to do when he signed this amendment was compete for that

25   six times amount of service business, right?  That's what he

KAK3SYN4                          Sanders – Cross

1    was signing on for when he signed on the dotted line and said

2    now you can compete with us.  True?

3    A.  So, I think the $6 really comes down to the organization

4    that's providing the services and the scope and breadth of

5    their capabilities.  So, I'm accustomed to -- sometimes there

6    are boutique-ish services companies that perform certain

7    functions.  Some of them do, as I mentioned before, business

8    process reengineering and that's all they do.  So they're only

9    getting a slice of the 6.  Others will be doing consulting,

10   etc.

11   Q.  Was it your opinion when you found out about this amendment

12   that it was a bad idea for your company to have done it?

13   A.  No.

14   Q.  Would you take a look, please, let's put it up on the

15   screen, Plaintiff's Exhibit 427.  Let's enlarge the e-mail at

16   the bottom there.

17          Now, that's an e-mail from you to someone called Tom

18   Kearns on August 20, 2014, correct?

19   A.  That's correct.

20   Q.  And you're responding to an e-mail from him, right?

21   A.  Yes, I am.

22   Q.  The subject line is "Syntel expanding footprint in BSC and

23   conflicts with our agreement to subcontract???"

24          Right?

25   A.  Yes.

1   Q.  And he is asking you -- BSC means Blue Shield California,

2   right?

3   A.  That's correct.

4   Q.  That was a big customer, right?

5   A.  Yes, it was.  Still is.

6   Q.  He asked you how is it that Syntel could be out there

7   bidding on work that Blue Shield of California when we have

8   this contract with them, right?

9   A.  If I could ask that they scroll down so I could see the

10   question that he's asking me.

11   Q.  Certainly.  Let's look at the next e-mail.  I think his

12   question is at the top of the second page here.

13          So, now we have up on screen his question and your

14   answer.  You see that?  Let me know when you've had a chance to

15   look at it.

16   A.  I mean, if it would be okay, I'd like to take a look,

17   instead of expanding, let me take a look at the e-mail.

18   Because I recall at this time he asked me just a very specific

19   question.

20          Oh.  In fact it's very, very top of the page.

21   Q.  Now, sir, we're on a tight time clock here, so I would like

22   to keep moving if we can.  Is that okay with you?

23   A.  I'd like to read the question, then I can answer your

24   question.  It says his response was "that's what I recall

25   hearing as well."

KAK3SYN4                    Sanders - Cross

1          Oh, that wasn't it.  He was asking if they could go

2   direct to the customer, and I just said unfortunately, no.

3   That that was deleted from the agreement, with the amendment.

4          So your original question was, was I unhappy with the

5   agreement.  And I wasn't.

6   Q.  So your response to him was, "Tom, we had very strong

7   language in the original MSA restricting Syntel from going

8   direct to our customers and offering competitive services."

9          Right?

10  A.  Yes.

11  Q.  And then you say, "Unfortunately, Jake Sorg eliminated the

12  non-compete language in its entirety when negotiated amendment

13  1 in August 2012."

14         You see that?

15  A.  Yes.

16  Q.  You say you thought that was unfortunate then?

17  A.  Unfortunate in answer to his question, "Isn't there

18  something in the contract that restricts them from going

19  direct."

20         Unfortunately, Tom, you know, Jake Sorg eliminated

21  that.

22  Q.  Let's move on a bit and talk about what was happening in

23  the fall of 2014 after it was announced that Cognizant was

24  going to buy TriZetto.

25         That announcement was made on September 15, 2014,

KAK3SYN4                        Sanders - Cross

1   correct?

2   A.   That is correct.

3   Q.   When did you get involved in the dealings with Syntel?

4   A.   Actually, if I might just explain the dealings.  My team

5   actually negotiated the agreement in 2007.  I personally

6   negotiated the one in 2010.  In the 2014 timeframe, our chief

7   executive asked me to step in, since I had a longstanding

8   relationship with Syntel, I negotiated that first agreement,

9   and try to settle this.

10          One of the reasons was there were people that were

11  being pulled off our projects from at least four different

12  business units, and each one of the four business units was

13  going back to Syntel saying I need this resource for a longer

14  period of time.  You can't take them away.  And it made sense

15  that there be a single point of contact from TriZetto in order

16  to interface with Syntel.  So that's --

17  Q.   My question to you was when did the chief executive say,

18  Chuck, I'd like for you to pick this up?

19  A.   It was November of 2014.

20  Q.   So there was a period of about seven weeks that you weren't

21  involved at all in the dealings between Syntel and TriZetto

22  about staffing termination?

23  A.   Not on the day to day, but one of the first things I did

24  when I came on board was talk to the executive leadership to

25  find out who you had been talking to, what was discussed.

KAK3SYN4                          Sanders - Cross

1  Q.  So, all those things about people being pulled away, and

2  Murli Reddy talking to your colleagues about that.  That all

3  happened before you got involved, right?

4  A.  That is correct.

5  Q.  Let's look at what you wrote after the chief executive had

6  asked you to step in.  Let's put up Plaintiff's Exhibit 765,

7  please.  This is dated November 7, correct?

8  A.  Yes.

9  Q.  It's from you to two of your colleagues who had been

10  involved in the front line of the discussions with Syntel,

11  correct?

12  A.  That is correct.

13  Q.  You start off -- you mentioned Jude, right?  That's the

14  chief executive, right?

15  A.  That's correct.

16  Q.  "He's asked me to step in and help with the

17  hiring/transition plan for the technology track including EPAM,

18  Syntel, Infosys, etc."

19        You see that?

20  A.  That is correct.

21  Q.  Just so we're all clear, EPAM and Infosys were two other

22  companies with whom TriZetto had contract arrangements,

23  correct?

24  A.  That is correct.

25  Q.  So they were similarly situated to Syntel in some ways

1    here, right?

2    A.   Service providers and they were ramping down.

3    Q.   When it was announced that Cognizant was going to buy

4    TriZetto, all three of these companies terminated their

5    contracts with you, right?

6    A.   I don't recall the exact dates, but there was a wind down

7    period.

8    Q.   Is there some reason why nobody wanted to work with

9    Cognizant?

10   A.   No, I think, you know, this was something that I had

11   discussed with Murli.  There's a common business term which is

12   called coopetition, which we see all the time, which is you

13   cooperate with your competitors, especially someone like

14   TriZetto who is providing a significant amount of revenue to

15   Syntel.

16            In discussions with Infosys, they had explained to me

17   that they were interested in providing services with us into

18   2015.

19            So it really had nothing to do with not wanting to

20   work with Cognizant.

21   Q.   Just all three of these companies independently decided

22   they were going to terminate their contracts with TriZetto,

23   correct?

24   A.   It was a ramp down.  I don't recall exactly when the actual

25   agreements terminated and actually who initiated the

1    termination.

2    Q.  Now, when the CEO tapped you to get involved here, what was

3    going on was you, your company wanted to make sure that it was

4    going to get continued support from Syntel for at least a few

5    more months, correct?

6    A.  That's not entirely accurate.  So, upon termination there's

7    a term that's called termination assistance services.  And so,

8    when the contract terminates, Syntel was obligated to provide

9    us with 24 months of services based on our requirements, and

10   then there was an exit plan that was to be executed.  So what

11   it clearly was not for another couple of months, the actual

12   termination of the agreement, after the 90 day notice, was

13   February 17 or 18 of 2015.  Which means that they needed to

14   provide services to us until 2017.

15   Q.  Fair enough.  Maybe I misspoke.

16            But what was going on here was everybody realized that

17   in the long term, this relationship was coming to an end,

18   correct?

19   A.  Syntel had the right to terminate, and they did.

20   Q.  But in the short term, their people were still working on a

21   lot of really important projects for you, correct?

22   A.  Yes.

23   Q.  And when you came into the picture here, part of your job

24   was to try to make sure that you got the support you needed

25   from Syntel to work on those current and important projects,

1   right?

2   A.   That is correct.

3   Q.   And in fact, in this e-mail to your colleagues, one of the

4   things you're talking about is ways that you might put a little

5   pressure on Syntel to make them give you what you wanted in

6   terms of resources, correct?

7   A.   With all due respect, I'd probably phrase that a different

8   way.

9        So, Syntel was pulling resources.  The first objective

10  was for me to talk to their leadership and appeal to them based

11  on the relationship.  The second part was to go to the

12  agreement where the agreement had language about things that

13  they could and could not do as far as pulling resources.  And

14  that's what I was referring to here in this e-mail.

15       And putting pressure on them was -- and I even

16  included, you know, the definition of change and whether they

17  were authorized to be able to just pull resources, abandon

18  their responsibilities, and not provide a backfill with similar

19  skills and scope.

20  Q.   Just so the ladies and gentlemen are clear.  You used the

21  word "resources" to refer to human beings, right?

22  A.   Yes.

23  Q.   You used the word "backfill" to mean another human being

24  who is going to come in and take over if the one you were

25  working with has moved on, correct?

A.  Yes, if they were no longer there, we still had a project

to deliver to our customer.  We had to figure out how we were

going to do that in the timeframe that we committed to.

Q.  And just so we're clear, you said you would phrase things a

little bit differently.  The way you phrased it in this e-mail

was talking about needing to play hardball with Syntel, right?

A.  Well, a hardball would be that, you know, talk to them

about the contract, are they going to breach the agreement, you

know, yes or no.  And if they did breach the agreement, we

could talk, this was just a planning exercise internally.

Another option would be do we get into a dispute with them and

try to resolve this, you know.

Q.  A legal dispute?

A.  No.  Well, we had a dispute resolution section in the

agreement that said if there is a dispute, you bring it to the

senior-most executives of the company, and you sit down and you

say you're pulling people from my accounts or not giving me a

resource, how come you're not going to do that.

        That's what the agreement says.  And they try to

resolve that as executives.

Q.  Now, when you say here -- and again I'm using your

phraseology -- "It is a little bit of a stretch, but we can

also tie them up in a dispute if necessary."

        What you're talking about is starting that procedure,

and if it can't be resolved, getting into a legal action,

KAK3SYN4                        Sanders - Cross

1   right?

2   A.  So let me explain what was happening.  Pulling resources,

3   my first option was to talk to them.  The stretch is, I could

4   talk to them about change, and a change control process which

5   is clearly defined in the MSA.  The stretch is, I have no

6   guarantee that they're even going to listen to me.

7   Q.  Now, did you provide information to Cognizant about Syntel

8   people who were working for you at TriZetto at this time?

9   A.  I provided information to Cognizant about people who were

10  leaving TriZetto, because Syntel was pulling these resources,

11  these people.

12  Q.  And let's go to Plaintiff's Exhibit 433, please.  Is this

13  an e-mail exchange that you had with various people, including

14  some at Cognizant?

15  A.  Yes.

16  Q.  And here we are, November 21.  That's the day after Syntel

17  sent you the notice of termination, right?

18  A.  Yes.

19  Q.  And you're asking here what is the best way for these

20  experienced people to contact Cognizant, correct?

21  A.  Yes, and I also said that we've received several inquiries

22  from Syntel and Infosys employees on how they can join TriZetto

23  or Cognizant.

24  Q.  Now, the gentleman at Cognizant that you were writing to,

25  Rey Ramirez, he wrote back to you and we see that in the e-mail

1   just above, right?

2   A.  Yes, I see this here.

3   Q.  He wrote, "Chuck, we need names, locations, current role

4   and current pay."

5           Do you see that?

6   A.  Yes, I do.

7   Q.  Whatever you and I disagree about, we agree that current

8   pay is confidential information, right?

9   A.  I agree that personal -- current pay is personal

10  information.  My salary is personal to me.  I mean, that's my

11  opinion.

12  Q.  It's also your opinion that it's confidential, someone's

13  current pay, right?

14  A.  Yes.  And in response to this letter, I never provided

15  current pay, because frankly, nobody at TriZetto knew what

16  their current pay was.

17  Q.  Well, somehow or another, Cognizant got that information,

18  didn't it?

19  A.  I wouldn't know.

20  Q.  Let's take a look.  Cognizant is a company that you now

21  work for and you're here testifying on their behalf, right?

22  A.  Yes.

23  Q.  So let's pull up Plaintiff's Exhibit 558.

24          MR. CUTRI:  Sorry, counsel, I did not get that in my

25  binder.

1              THE COURT:  Is that in the binder?

2              MR. GROOMBRIDGE:  It should be in the binder.

3              MR. CUTRI:  It's not in my binder, your Honor.  Sorry.

4              THE COURT:  I doubt there are any hard copies

5     anywhere.

6              MR. CUTRI:  I know.  Well, I guess it's just a

7     two-page document.

8              MS. JANGHORBANI:  Mr. Cutri, there are two sections of

9     the binder.

10             THE COURT:  I see PTX 558 in mine.

11             MR. CUTRI:  I can do it off of here.  I don't want to

12    slow everything down.  I'm sorry.  I'm not seeing it.

13             THE COURT:  It is about 40 percent of the way through

14    the binder.

15             MR. CUTRI:  You can go ahead.  I can see it on the

16    screen.

17             MR. GROOMBRIDGE:  May I proceed, your Honor?

18             THE COURT:  You may.

19    Q.  Now, looking at the second page of this, do you see what

20    appears to be an e-mail here from Aslam Mohamed to some other

21    people?

22    A.  Yes, I see that.

23    Q.  Aslam Mohamed was the gentleman you mentioned in your

24    direct examination, right?

25    A.  Yes, that's correct.

KAK3SYN4                    Sanders - Cross

Q.   And here he's talking about three hires, two from Syntel
and one from Infosys, right?

A.   Yes.

Q.   There is a column here "current compensation," right?

A.   Yes, I see that.

Q.   In fact, in the case of these particular individuals, in
order to persuade them to move to Cognizant, Cognizant had to
offer them some huge pay increase, right?

A.   I don't know what the motivation would be for each one of
these.  I see what the chart says, but, you know, the details
on this, these could have been three people that asked to join
Cognizant.  I can't tell that from the e-mail here.  And their
current compensation could be something that the employee told
the Cognizant person.  I can't ascertain that from this.

Q.   You don't know how it is that this current compensation
information made its way to Cognizant; fair?

A.   The current compensation?  No.

Q.   Let's look at Plaintiff's Exhibit 421, please.  This is an
e-mail from you to various people, including Aslam and Rey at
Cognizant that we were just talking about, right?

A.   Yes.

Q.   And do you remember that this was a Wednesday, the day
before Thanksgiving of that year?

A.   I don't recall if it was the day before, but there is a
time stamp here, so I would say that this is valid.

KAK3SYN4                          Sanders - Cross

Q.  Do you remember that for the couple of three days before
this you had been in frequent communication with your
colleagues?

A.  Yes.

Q.  Right?  Gathering the information that you were here
sending?

A.  Yes.

Q.  You had been working very hard to get this to Cognizant as
quickly as possible, right?

A.  Yes.

Q.  What you sent them was the document that you showed us on
your direct examination, the consolidated replacement plan and
job descriptions, right?

A.  Yes.

Q.  And that's Plaintiff's Exhibit 422.  Let's put that up.  I
think it is a PowerPoint presentation if we can find it.

        While we're looking for that, Mr. Sanders, that was
what you showed us a page from, right, with various columns and
names, right?  And there was a desired hire date column, right?

        Would you agree with me that in that PowerPoint
presentation, all together you listed over 130 Syntel employees
by name?

A.  I don't recall the exact number, but again, this is a
replacement plan based on what Syntel told us.  I was working
with Syntel on a daily basis.  Because, frankly, every day it

KAK3SYN4                     Sanders – Cross

1    seemed like there were more and more people that were being

2    removed.  We had detailed spreadsheets of every person who was

3    providing staffing to TriZetto, and when Syntel told us that

4    they were going to be pulled, and then this spreadsheet wound

5    up being pretty long, because the dates kept changing, they

6    kept getting shorter and shorter and shorter from Syntel.

7              So the detailed replacement plan took into account all

8    the resources that -- all the people, I'm sorry -- that were

9    providing services to TriZetto, when their end date was.  This

10   would give Cognizant an opportunity to take a look at what kind

11   of skills do I need when.  I gave detailed job descriptions

12   that are also part of this plan, so that they could put

13   together a hiring plan for replacements.

14   Q.  So whatever we disagree about, we agree that you gathered

15   up a lot of information?

16   A.  Yes.

17   Q.  That was information on more than 100 Syntel employees

18   identified by name, correct?  Correct?

19   A.  Yes.

20   Q.  And that you sent that to Cognizant, correct?

21   A.  Yes.

22   Q.  And you didn't say to Cognizant, why are you asking me for

23   these names and roles?  You could just go on LinkedIn and find

24   it for yourself.

25             You never said that to them, right?

KAK3SYN4                         Sanders – Cross

A.  No, but that's actually what they were doing.  They were
going to social media.  They had recruiters.  I mean, at the
time, Syntel was looking to hire 1,000 people.  This goes back
to the acquisition.

Q.  You didn't say, why are you asking me for the information,
you could just get it off of social media.

        You never said that, right?

A.  No, what they needed to know was what were the skills that
you needed so whether, you know, these people had worked in
consulting, what kind of background.  And so what we did was
these are the projects that are still outstanding, here are the
replacements that we need.

Q.  Now let's talk about whether this was for benefit of
Cognizant or for benefit of TriZetto.

A.  Okay.

Q.  Or something else.

        You mentioned that on your direct examination, right?

A.  Yes.

Q.  Let's look at Plaintiff's Exhibit 762, please.  And you see
there, there is an e-mail here in the middle of the page
December 8, 2014, from someone called Angela Kress-Thompson,
and she begins, "Chuck, one more question."

        Let's scroll down a bit.  Scroll up a page.

        So, this lady is asking you a question, correct?

A.  Yes, she is.

KAK3SYN4                          Sanders - Cross

1    Q.  She says, "Are these positions going to be not only hired

2    by CTS, but will be employees on their side as well?"

3           Do you see that?

4    A.  Yes.

5    Q.  CTS means Cognizant Technology Services, right?

6    A.  That is correct.

7    Q.  And then she goes on, she says "or are they going to be

8    hired under Tom's, Cindy, and Dale's budget here at TriZetto,"

9    correct?

10   A.  Yes.

11   Q.  What she's saying is who is really going to be paying for

12   them, right?

13   A.  Yes.

14   Q.  And at the top of the page we see your response, right?

15   A.  Yes.

16   Q.  "My understanding is that CTS will hire and a budget

17   transfer arrangement will be worked out between TZ and CTS,"

18   right?

19   A.  That was my best guess at that point in time.

20           (Continued on next page)

21

22

23

24

25

KAKTSYN5                          Sanders - Cross

1    BY MR. GROOMBRIDGE:

2    Q.  So what you are saying is they will be hired under the name

3    of Cognizant, but TriZetto will pay for their work, right?

4    A.  I really didn't have a complete understanding of how that

5    was going to work.

6    Q.  While we're touching on the LinkedIn and social media,

7    let's look at Defendant's Exhibit 166.

8            This is one of the LinkedIn entries that you showed

9    us, right?

10   A.  Santosh Ram, yes.

11   Q.  This is a gentleman who had worked at Cognizant and then he

12   went to work at Syntel afterwards, correct?

13   A.  Yes.

14   Q.  And he joined Syntel in September 2016 and apparently was

15   still there when this was printed out, correct?

16   A.  That is correct.

17   Q.  If we look at the top of the second page, it gives a

18   description of what he has done at Syntel, correct?

19           It says working with Facets, product testing, renewal

20   product testing, and agreement pricing testing working with

21   config testing team creating test cases and test scripts, test

22   plan.  Do you see that?

23   A.  I do see that.

24   Q.  When he talks about creating test cases, is he stealing

25   your intellectual property?

1    A.  Is he stealing?  It's hard to come up with a response to

2    that just based on something that's listed, to be honest.

3    Q.  What he's telling the world is this is his experience,

4    right?

5    A.  That was his current experience, his previous experience,

6    he could have worked for -- I will just use Tom Noonan as an

7    example, in that he could be providing support services to Tom

8    Noonan's team.  If you go up and decide to put on LinkedIn that

9    you were creating test cases and test scripts, I have no way of

10   validating that.

11   Q.  Let's move on.  Let's look at Plaintiff's Exhibit 51.

12   We'll look at the email that's at the bottom part of the page

13   here.  There is you, December 15, 2014, and you're writing to

14   one of your colleagues called Tyler Barhydt, right?

15   A.  Yes.

16   Q.  You say, as you know, we are not entitled to named

17   resources from Syntel, but we have been successful in getting

18   them.  Right?

19   A.  I see that.

20   Q.  What you mean by "named resources" is you were saying to

21   Syntel here are the specific individuals that I would like for

22   you to keep assigning to my project by name, right?  That's

23   what you meant, right?

24   A.  Yes, in so many words.  But it also meant that the people

25   who were staying on, so it's the skill, the training, the

1    ability to work with that particular customer.  I think another

2    important piece that the jury should know is not only is it how

3    the software works or anything that is around it, it's how the

4    customer is using it.  So if this is a Medicaid or Medicare

5    health plan, they have certain nuances that you have to be

6    aware of as to how you set up your system.  It's pretty

7    complex.  So somebody who is working on a Medicare

8    implementation, it would be extremely difficult for someone

9    like Syntel to pull that person and have an adequate

10   replacement plugged right in to have the same skills, the same

11   knowledge of Facets, the same knowledge of how the customer is

12   using the application in a very short period of time.  So when

13   I heard that there were named resources that were being

14   applied, we were successful in getting that because there was

15   continuity, whereas before this it was complete disruption.

16   Q.  Under the contract, Syntel was not obligated to give you

17   the specific individuals you were asking for, correct?

18   A.  Unless they were a named resource, which is a term that's

19   in the agreement.

20   Q.  But what you meant when you said we're not entitled to

21   named resources was the contract didn't obligate, didn't

22   require Syntel, for these people, to say if you asked for

23   someone by name, Ron Byron, they wouldn't have to put the

24   person on the task that you wanted.

25   A.  You're right.  The way the agreement worked, if you wanted

1    a named resource, there was a strategic key personnel, you

2    would have to flag that person sometime during the agreement,

3    and they couldn't pull that person without our approval.  And I

4    was telling him that in his business unit he didn't have any

5    named accounts that were designated.

6    Q.  When you say we've been successful in getting them, what

7    you mean is Syntel had agreed to give you something even though

8    it wasn't obligated to, correct?

9    A.  Yes, and I will tell you that that is a statement made at a

10   certain point in time, and this -- when you take a look at what

11   happened from December until July, some of these people that we

12   were successful in getting, we no longer have them.  So this

13   was a moving target for us.

14   Q.  Also because you were hiring them away to go work at

15   Cognizant, right?

16   A.  We were hiring them, and there were some that were coming

17   to us because they had a five, six, seven-year relationship

18   with TriZetto, and they wanted to stay in Denver, they wanted

19   to stay working on the products they had been trained on.

20   Q.  And let's look at Plaintiff's Exhibit 301.  Here's an email

21   exchange between you and a whole bunch of your colleagues.

22   A.  Yes.

23   Q.  I want to look at the first email, meaning the one that's

24   upper most here.  This is a response to you from someone called

25   Praveen Khana, right?

1   A.   Yes.

2   Q.   And the response is:  I'm relieved that I don't have to

3   worry about CAE SI Syntel resources for a while.  I wish

4   Infosys was as supportive as Syntel is being, exclamation mark.

5   Right?

6   A.   Yes.

7   Q.   Fair to infer that Syntel was providing you better support

8   than Infosys?

9   A.   To be honest, again, this is a snapshot in time, and this

10  is when we got what was called the Syntel final.  As I

11  explained, that wasn't the final.  It turned out that Praveen

12  was one of the resources that was working on this huge Excel

13  spreadsheet, and he was relieved to know that he thought we had

14  a final final, so he could go back to doing his day job and not

15  have to manage this massive Excel spreadsheet.

16  Q.   Let's talk about UnitedHealth Group.

17  A.   Okay.

18  Q.   Now in September of 2014, both you, TriZetto, and Syntel

19  submitted bids to UnitedHealth Group for a particular piece of

20  work, correct?

21  A.   Yes.

22  Q.   And that piece of work was a very big project, correct?

23  A.   Yes, that is correct.

24  Q.   That part of UnitedHealth Group had fallen behind and it

25  needed to upgrade its Facets software from version 4.71 to

1    version 4.52, correct?

2    A.  I believe so.

3    Q.  And that, in the scheme of these upgrades, is a very big

4    upgrade, right?

5    A.  It is.  It's very big and it's very complex because, I

6    don't know if Mike went into this, but you don't just jump from

7    4.7 to 5.2.

8    Q.  Right, you have to actually take a middle step, right?

9    A.  Yes.

10   Q.  And you both submitted bids.  You put your best offer in

11   there, right, to UnitedHealth?

12   A.  Yeah, we did submit a bid.  There was an RFP, or Request

13   For Proposal, and we submitted a proposal.

14   Q.  And the proposal that TriZetto submitted was a great big

15   document about an inch thick, right?

16   A.  In order to respond to the RFP, they have a lot of

17   questions, yes.

18   Q.  And it turned out that Syntel got the business, right?

19   A.  Yes.

20   Q.  And in the end, Syntel performed that upgrade for

21   UnitedHealth, right?

22   A.  I know I was informed that they did win the business.  I

23   assume that if they won the business then they would have

24   performed the work.

25   Q.  When you showed us those letters between the lawyers, and

1    you pulled out some things about how there was an allegation of

2    misappropriation and such like, and information being disclosed

3    to a third party, the third party was UnitedHealth Group,

4    right, that's what you were talking about?

5    A.   That's right.

6    Q.   So you knew in November of 2014 that Syntel had won

7    UnitedHealth business, right?

8    A.   I can't say that we knew then that they won the business.

9    I know that we submitted a proposal.  I thought I saw something

10   in the last day or two that this was sometime in 2015.

11   Q.   Are you saying that when in November and December of 2014

12   the lawyer at your company sent those letters threatening legal

13   action, you didn't actually know whether Syntel had got the

14   UnitedHealth business?

15   A.   I'm saying that I personally did not know when they won the

16   business.  I'm on the business side, I'm certainly not in

17   sales, and when United awarded the business, frankly, I'm just

18   not in the loop on that.

19   Q.   Let's look at the contract that you showed us on direct

20   examination, PTX848.  Let's go to page 2, please.

21          This is the contract between UnitedHealth and TriZetto

22   that you testified about on your direct, right?

23   A.   Yes.

24   Q.   Now it's dated as of December 31st, 2014, correct?

25   A.   Yes.

KAKTSYN5                        Sanders - Cross

1    Q.  So prior to that date, this was not the contract that was

2    in force between your company and UnitedHealth, right?

3    A.  I'll be honest, I wouldn't know.  UnitedHealthcare has been

4    a longstanding customer of ours.  We have multiple agreements

5    with them, and those agreements do get modified from time to

6    time.  This is not an amendment, this appears to be a

7    full-blown master license and services agreement.

8    Q.  On your direct examination you pointed us to a piece of

9    this and you said it prohibited UnitedHealth from sharing

10   software documentation with Syntel.  Do you remember that?

11   A.  Yes, I do.

12   Q.  Before December 31st, 2014, was there any such contract

13   that prohibited UnitedHealth from sharing those things with

14   Syntel?

15   A.  I would have to take a look at all the agreements that we

16   have with UnitedHealthcare.

17   Q.  While we're on the subject, do you see the text, the header

18   on the upper right-hand side on this first page?  It says UHS

19   and TriZetto confidential information, right?

20   A.  Yes.

21   Q.  UHS means UnitedHealthcare Services, right?

22   A.  Yes.

23   Q.  So this entire contract is a confidential document between

24   UnitedHealth and TriZetto, correct?

25   A.  Yes.

KAKTSYN5                    Sanders – Cross

Q.  And Syntel has no idea of what is in this contract because

it is not a party to this contract, right?

A.  That is correct.

Q.  Now sir, did you ever say to UnitedHealth:  How come Syntel

is doing this upgrade for you?  We have a problem with that.

          Did you ever say such a thing?

A.  I did not.  I have no idea if TriZetto did.

Q.  And you surely wouldn't want to sue UnitedHealth, right?

A.  Why would we sue them?

Q.  Indeed, they are your biggest customer, right?

A.  Why would we sue a customer?

          THE COURT:  The problem is you're not supposed to ask

questions, he's only supposed to ask you questions.

Q.  Following your Honor's lead, let me see if I could do this

rightly.

          Is UnitedHealth your biggest customer for Facets?

A.  I would say it's in our top five.  Is that close enough?

Q.  And they pay you millions of dollars every year to be able

to use Facets, right?

A.  I would take a guess and say yes, being one of the top

five.

Q.  If they came to you and said we want for you to sign a

piece of paper that will allow Syntel to do the upgrade work on

our Facets, you would have signed it, right?

A.  It depends on what that piece of paper said.  We have

1   something that is called a third-party access agreement, which

2   there are restrictions for UnitedHealthcare Services, we saw

3   that earlier, of what they can and can't do with our

4   confidential information.  If they want someone else, a third

5   party, to be able to access our confidential information, there

6   needs to be a confidentiality agreement with that company.  And

7   that's called a third-party access agreement, and I know that

8   Syntel is familiar with those.

9   Q.  Right, because, for example, when another customer, the

10  Capital District Physician's Health Plan or CDPHP came to you

11  and asked you to sign one, you did, right?

12  A.  We did.  And that agreement describes what the scope of

13  services are that the third party is going to perform.

14  Q.  So for that particular customer, there is an agreement that

15  says Syntel is authorized to do the upgrade work and the

16  support services on Facets, right?

17  A.  I don't have the TPA in front of me, but it would define

18  the scope of services that they could perform.

19  Q.  And one last thing I would like to cover here, the

20  downloads that you talked about, let's look at Defendant's

21  Exhibit 87, sir, is this everybody from Syntel who downloaded

22  any information about Facets from a particular time period from

23  one day to another day?

24  A.  Yes, this is what the audit had revealed.

25  Q.  And you're not suggesting, are you, that every download in

1   this list is in some way wrongful?

2   A.  No, I don't think that we inferred that.  There are some

3   things that need to be downloaded in order to perform the

4   services that they were required to do to TriZetto.

5   Q.  And some of the downloads on this are before the

6   acquisition by Cognizant was even announced, right?

7   A.  Yes.

8   Q.  Now the people who did the downloading, sir, how many of

9   them did you hire in the end?

10  A.  I don't have an exact number.  There were people that did

11  wind up with Cognizant.  The downloads that we had were when

12  they were Syntel employees and they were providing services to

13  us, and we were just taking a look to see:  Is this appropriate

14  use based on the scope that was defined for providing services

15  to TriZetto?

16  Q.  Let's look at page 7.

17          Do you see there's a whole long list of downloads by

18  someone named Chetan Chandhary?

19  A.  I do.

20  Q.  You hired him, right?

21  A.  I believe that eventually he came to Cognizant.

22  Q.  And you certainly wouldn't have hired him if you thought he

23  was a thief, right?

24  A.  If we thought he was a thief?  Chances are we would not

25  hire someone who we thought was a thief.

1          MR. GROOMBRIDGE:  Thank you.  That concludes my

2    questioning.

3          THE COURT:  Could you do redirect quickly?

4          MR. CUTRI:  Yes, I will, your Honor.

5    REDIRECT EXAMINATION

6    BY MR. CUTRI:

7    Q.  Mr. Sanders, I have a few questions.

8    A.  Okay.

9          MR. CUTRI:  First, DTX1, if you have that, Mr. Thomas.

10   We could go to page 44.

11   Q.  And we were talking, you and I were talking and you and

12   Mr. Groombridge were talking about this provision 13.01.  This

13   provision was not deleted by the amendment that took place in

14   2012, correct?

15   A.  That is correct.

16   Q.  PTX433.  Actually before we leave, nor was the other

17   confidentiality provision looked at, 19.01?

18   A.  You're absolutely correct.  That all is intact and was

19   never changed.

20   Q.  And Mr. Moore, the general counsel of Syntel, assured you

21   in December that Syntel was abiding by the confidentiality and

22   was abiding by the MSA, is that correct?

23   A.  Yes, we actually have a letter.

24   Q.  That we looked at on your direct.

25   A.  Yes.

KAKTSYN5                    Sanders - Redirect

Q.   PTX433.  This is a document Mr. Groombridge was looking at.
If we could start at the bottom, it's just your email from
November 21st.  You talked about this in your cross-examination
that you were aware Syntel provided notice -- provided TZ a
notice of termination on Thursday, you just received a
termination notice from Infosys, then it says --

          Now this is Friday at 6:42 p.m., right?

A.   Yes.

Q.   -- we have received several inquiries from Syntel and
Infosys employees as to how they could join TriZetto or
Cognizant.  I wonder if you could explain just in real terms,
in terms of the people, what did it mean to them to hear on the
Thursday before the Thanksgiving week that Syntel, their
employer, was going to terminate their engagement with
TriZetto?

A.   Yes, I actually think I saw something yesterday that was
put up as a slide that says that there was a lot of morale
issues at Syntel when they heard this.  There was also a
meeting in Denver that Murli Reddy attended where he announced
that, in so many words, he was going to be pulling resources,
you're not going to be on the TriZetto account anymore, and
people were devastated by this.  I think I gave the example
that you could have somebody who is working two, three, five
years -- I mean Syntel gave them their paycheck, but they were
working for us, they were working on our customers, we trained

KAKTSYN5                    Sanders - Redirect

them, we taught them how to use the product, we taught them
about our customers' use.  We would have our staff meetings,
who was there?  Syntel, along with our people.  They were like
one of our employees and we treated them that way.  We would
have an all-hands meeting in our huge cafeteria.  Syntel was
there.  They were part of our team.  We would have a charity
event, they were invited.  When we had a successful
implementation, there's a recognition that goes out.  Syntel
employees were on that recognition list because they
participated in that like they were working for us.

           They were closer to TriZetto --

Q.  Mr. Sanders, I apologize, just in interest of time, in real
terms, they lived in Colorado, right?

A.  Yes.

Q.  Syntel assured them -- I think you saw this in the
documents -- there would be other places for these individuals
in health care, including potentially on Facets, right?

A.  Yes.

Q.  Were there other businesses that you knew of in Denver,
Colorado where these people could go to work for Facets?

A.  Facets, Denver, Colorado, service provider, I mean not that
I'm aware of.

Q.  For some of these people they either would get another job
working on Facets or they would have to move to somewhere else?

A.  Yes.

KAKTSYN5                        Sanders - Redirect

Q.   Finally, with respect to Syntel, I believe you saw some
videotape deposition today, right?

A.   Yes.

Q.   And did you see in the videotaped deposition there was an
instance where someone named Vincent Bucchare downloaded a
TriZetto manual and his watermark was at the top of it?

A.   I did see -- yes, I saw the watermarks.

Q.   And if a Syntel employee received from a UHG employee one
of TriZetto's manuals, in the first instance it would have the
watermark on the top, right?

A.   That is correct.

Q.   But second, let's look at DTX532.

        This is the first page of the manual, right?

A.   Yes.

Q.   If we go to the second page of the manual, when a Syntel
employee receives this manual from wherever they get it, does
it have the second page on it?

A.   Sorry?

Q.   When a Syntel employee receives this manual, does it have
this on it?

A.   Yes.

Q.   Let's scroll down, and if you would please read the two
paragraphs, the one beginning -- we read the first paragraph,
the one that begins "TriZetto" and talking about who owns this
document, but if you would, please, read the paragraph

KAKTSYN5

1    beginning "Access to this work," that anyone who receives this
2    document could be able to use it.
3    A.    Access to this work and the right to use this work are
4    provided only by written license agreement from TriZetto,
5    including agreement to maintain both this manual and any and
6    all related software and confidential trade secrets.  Those
7    having access to this work may not copy, use, disclose this
8    work, nor any of the confidential trade secret information
9    embodied in this work, nor adopt or copy any design features of
10   the work into other software programs or documentation, except
11   as expressly permitted under the written agreement with
12   TriZetto.  Any wrongful misuse or misappropriation will be
13   fully prosecuted under the law.
14             MR. CUTRI:  Thank you, that's all I have.
15             THE COURT:  Thank you, you may be excused,
16   Mr. Sanders.
17             All right.  Ladies and gentlemen, we are finished for
18   the day.  We're going to start back to our usual schedule.
19   It's not quite usual yet, but tomorrow we'll be starting at
20   10 o'clock, so I would like everybody out here at 10 o'clock.
21   If you could please bee here at 9:45 and in the jury room by
22   9:45, and please around to get here in time to get through
23   security and for everything that you need to do.  Remember not
24   to talk about the case, and leave your notebooks here on your
25   chairs.  I hope you have a good night and a good sleep and a

KAKTSYN5

1    fresh day tomorrow.  Thank you very much for your service.

2              (Jury not present)

3              THE COURT:  Could I see one lawyer from each side in

4    the robing room.

5              (In the robing room with the Court, Mr. De Vries and

6    Mr. Groombridge present)

7              THE COURT:  I tried and then I had Mr. Street try to

8    reach Ms. Pimentel's employer, and apparently the issue is that

9    she works for a staffing company that staffs her where she

10   works.  And I have not been able to reach the person, I have

11   left messages, and I did have my law clerk confirm that the

12   employer is not required to pay her more than $40 for two days.

13   And I don't feel like I can impose that kind of financial

14   hardship on her, even though in theory she was told all of this

15   back when she was selected.  So I am prepared to excuse her

16   based on hardship unless there is some objection or unless

17   someone has some better solution.

18             MR. DE VRIES:  No objection from TriZetto.

19             MR. GROOMBRIDGE:  Sad to see her go, but I don't have

20   an answer for it.

21             THE COURT:  Okay.  So if you could get her to come in,

22   please.

23             DEPUTY CLERK:  Ms. Pimentel?

24             THE COURT:  Yes.  We'll keep our fingers crossed that

25   we don't lose anyone else, and perhaps I will speak to the jury

KAKTSYN5

1    tomorrow when everyone comes in and thank them effusively and

2    tell them how much we need them.

3              MR. DE VRIES:  That sounds good, your Honor.

4              (Juror present)

5              THE COURT:  Ms. Pimentel, we have not been able to

6    reach your employer, but I understand that they're not willing

7    to pay you for more than the two days.  And so on the basis of

8    hardship, I'm willing to excuse you.  I would appreciate it,

9    though -- I don't know if all the other jurors have left

10   already, but if you wouldn't speak with them, because the last

11   thing I want is everybody else to say:  We want to leave, too.

12             JUROR:  Of course.

13             THE COURT:  I will speak with them tomorrow, but you

14   are excused.

15             JUROR:  Thank you.

16             THE COURT:  And Mr. Street will tell you anything that

17   you need to know about documentation.

18             JUROR:  Thank you so much.

19             THE COURT:  Thank you.

20             JUROR:  Have a blessed day.

21             THE COURT:  You too.

22             (Juror not present)

23             THE COURT:  I wish you both a good night, and we'll

24   see you tomorrow.

25             (Adjourned to October 21, 2020 at 10:00 a.m.)

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                           Page

 3    MICHAEL NOONAN

 4    Direct By Mr. Alper  . . . . . . . . . . . . 112

 5    Cross By Mr. Groombridge . . . . . . . . . . 132

 6    Redirect By Mr. Alper  . . . . . . . . . . . 152

 7    CHUCK SANDERS

 8    Direct By Mr. Cutri  . . . . . . . . . . . . 164

 9    Cross By Mr. Groombridge . . . . . . . . . . 208

10    Redirect By Mr. Cutri  . . . . . . . . . . . 246

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```