KAQ3SYN1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
SYNTEL STERLING BEST SHORES
MAURITIUS LIMITED, SYNTEL, INC.,

                 Plaintiffs,

          v.                   15 Civ. 211 (LGS)

THE TRIZETTO GROUP, INC., et al.,

                 Defendants.      Jury Trial
------------------------------x
                            October 26, 2020
                            9:30 a.m.

Before:

               HON. LORNA G. SCHOFIELD,
                          District Judge

                    APPEARANCES
KIRKLAND & ELLIS LLP
     Attorneys for Defendants/Counterclaim Plaintiffs
BY:  MICHAEL W. DE VRIES
     PATRICIA A. CARSON
     ADAM R. ALPER
     RYAN KANE

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
     Attorneys for Plaintiffs/Counterclaim Defendants
BY:  NICHOLAS GROOMBRIDGE
     JAREN JANGHORBANI
     CRYSTAL LOHMANN PARKER

KAQ3SYN1

1          THE COURT:  Good morning, everyone.  It's exceedingly

2    hard to smile with a mask on.

3          I thought since we had a couple minutes, what I would

4    do is try and give the oral ruling from the order that I issued

5    over the weekend about exhibits.  And the point of this is just

6    to put on the record what my ruling is.

7          As you all know, Syntel seeks to admit certain

8    exhibits or sought to admit certain exhibits pertaining to a

9    Google search conducted by Mr. Stevenson, their technical

10   consultant, and purportedly relate to the cross-examination of

11   Mr. Bergeron.  Those were Plaintiff's Exhibits 1531, 1532,

12   1533, 1530, 1535, and 1537.

13         So, first let me comment on the cross-examination

14   about the Google search.  There was no objection to the

15   testimony, so what is in the record is in the record and it is

16   what it is.  And I stated at the time that we would have to

17   take screenshots and mark them as exhibits.  But counsel

18   declined because of the documents that are at issue.  So no

19   screenshots were taken, and the exhibits now proffered are

20   actually not screenshots of what was shown to the jury on

21   October 21; instead, they predated the testimony by five days.

22         So, apart from what was said by the witness or adopted

23   by the witness, and observed although not preserved, there is

24   no evidence of what the Google searches were or what they

25   found, including website name, URL, or the contents of the

KAQ3SYN1

entirety of the documents that were retrieved.  And just to be clear, I'm not saying that none of that is in the record, but it's only in the record to the extent it was observed, and it is not in the record to the extent that it was stated by counsel but not adopted by the witness.

The other thing I would mention is that the documents, some of them were quite lengthy, but there is no document that we saw in its entirety.  There was no testimony comparing it to the entirety of any documents in evidence.

There is a separate question, however, of whether the documents and corresponding Google search pages that are the subject of Mr. Stevenson's declaration are admissible as evidence independent of Mr. Bergeron's cross-examination.  And that's the question that I primarily looked at.

I hold that they are not, because they have not been properly authenticated under Rules 901 and 902, and because they're potentially more prejudicial and confusing than probative, and therefore not admissible under Rule 403.

Mr. Stevenson's declaration references three Facets documents:

Facets Data Models Guide Release 4.51 February 2008.  Second, Facets Membership Maintenance Subsystem Guide Release 4.80 August 2010.  And three, Facets Extended Enterprise Provider Batch Import Release 4.41 February 2007, revised April 2007.

KAQ3SYN1

1          These correspond roughly to trade secrets that are on

2     TriZetto's trade secret list:  That is number 25, Data Models

3     Guide; 63, Membership Maintenance Subsystem Guide; 89, Provider

4     Batch Import Subsystem Guide.

5          So because of that, because there is a rough

6     correspondence to proffered exhibits that seem to pertain at

7     least generally to a trade secret and have some relevance under

8     Rules 401 and 402.

9          Regarding TriZetto's hearsay objections, portions of

10    the documents are hearsay, for example, the upload date and the

11    number of downloads.  This information is inadmissible as

12    hearsay but could be redacted.  But the lion's share of the

13    Facets documents are not hearsay because they're not offered

14    for the truth.  So those things I don't find are impediments to

15    admissibility.

16         However, the proffered exhibits are not properly

17    authenticated under Rules 901 and 902.  The rules of evidence

18    offer an avenue of authenticating by a written certification in

19    lieu of a live witness in these circumstances, but the

20    requirements of that rule are not met here.  Federal Rule

21    902(13) allows authentication of "a record generated by an

22    electronic process or system that produces an accurate result,

23    as shown by certification of a qualified person that complies

24    with the certification requirements of 902(11) or (12).  The

25    proponent must also meet the notice requirements of 902(11)."

KAQ3SYN1

1    That's the notice requirement that's not satisfied.

2          The notice requirement of 902(11) requires that

3    "Before the trial, the proponent must give an adverse party

4    reasonable written notice of the intent to offer the record and

5    must make the record and the certification available for

6    inspection so that the party has a fair opportunity to

7    challenge them."  No such notice was given in this case.  There

8    was no notice before trial of Mr. Stevenson's affidavit or the

9    referenced exhibits.

10          So, in the alternative, authentication can consist of

11   written or oral testimony.  In this case that would be under

12   Rule 901(b)(1), testimony that an item is what it is claimed to

13   be.  The proposed exhibits are claimed to be documents

14   available on the internet on October 16 as a result of certain

15   Google searches.

16          However, Mr. Stevenson has never been identified to

17   the Court or to counsel as a trial witness, and apparently was

18   not identified as a possible witness during the prior lengthy

19   period of discovery.

20          So, for all those reasons, I find that there is no

21   evidence here to authenticate the proffered exhibits.

22          Even if there were, in the alternative, I am also

23   excluding them under Rule 403 on the ground that the probative

24   value is substantially outweigh by danger of unfair prejudice

25   and confusing the issues.

KAQ3SYN1

1          First, the probative value is slight, if the hearsay

2    information about the number of downloads and dates of posting

3    are excluded.  That leaves the jury with the information that

4    the Facets documents in question were available on the internet

5    on October 16, 2020, without any information about whether they

6    were posted as late as that date or substantially earlier, and

7    without any information about the number of downloads or

8    whether the information otherwise was "generally known," a

9    critical fact for a trade secret.

10          This slight probative value is substantially

11   outweighed by the danger of unfair prejudice and confusion.

12   The jury can be confused into thinking the proffered documents

13   are the documents displayed at trial, and the documents

14   displayed at trial are the same as the asserted trade secret

15   documents in evidence, when there is no evidence making these

16   connections.  Or, the jury could improperly conclude that the

17   proffered exhibits somehow show that the asserted trade secrets

18   were generally known prior to October 16, when the non-hearsay

19   portion of the documents say nothing about that matter.  Or the

20   jury could improperly conclude that because the proffered

21   exhibits are displayed on the internet, that the other asserted

22   trade secrets must be as well, even when there is no evidence

23   of the same.

24          So I'm excluding the proffered exhibits on the grounds

25   of Rule 403 as well.

KAQ3SYN1

1           Finally, the documents are not properly admissible as

2      demonstrative aids or usable as demonstrative aids.

3      Demonstrative aids are typically used to demonstrate something

4      somebody is saying.  So, for example, a witness to better

5      demonstrate oral testimony like many of the demonstrative aids

6      we've seen collecting the evidence or highlighting portions of

7      exhibits in evidence or illustrating testimony about background

8      facts.  Similarly, demonstrative aids are sometimes used by the

9      lawyers in opening or summation to better explain the lawyer's

10     argument or summarize the evidence.  And even this Court

11     sometimes uses a demonstrative aid like the PowerPoint that I

12     used with the preliminary charge.  But demonstrative aids are

13     not a backdoor to getting documents in front of the jury that

14     are not admissible as evidence.

15           I've already issued a written order to that effect,

16     but I wanted my reasoning to be on the record.

17           I see it's 9:33 so we are a couple minutes late.

18     Mr. Groombridge, did you want to speak?

19           MR. GROOMBRIDGE:  We have a number of other issues

20     that we may need to bring to the Court's attention now because

21     they pertain, we expect, to the witness presentations this

22     morning.

23           THE WITNESS:  Can you just give me the list?

24           MR. GROOMBRIDGE:  We have objections to a number of

25     exhibits that we understand are likely to be used in

KAQ3SYN1

1    cross-examination of Mr. Plumpe or Mr. Sheets.  And the ones to

2    which we object are Defendant's Trial Exhibits 1542 through

3    1545, and 1547 through 1550.

4              THE COURT:  Okay.

5              MR. DE VRIES:  Your Honor, I may be able to simplify

6    that a bit.  I think there is actually -- I want to double

7    confirm -- but I think there is only three of those documents

8    that will pertain to my cross-examination of Mr. Plumpe.  And I

9    can address that if whenever you'd like.

10             THE COURT:  Let me get an idea of what the entirety of

11   the list is so I know what I absolutely must deal with now.

12   Because having brought the jury in early, I'm loath to have

13   them sit around.

14             Anything else?  Was that it?

15             MR. GROOMBRIDGE:  Just by way of reminder, we wanted

16   to make sure following Mr. Moore's redirect, the Court will

17   read the stipulation regarding rebates.

18             THE COURT:  Thank you for the reminder.

19             MR. GROOMBRIDGE:  We wanted to just inform the Court

20   that we will be filing a motion, a written motion under Rule

21   50(a) this morning just to make sure that's properly preserved.

22             THE COURT:  Okay.  So here's what I propose.  I

23   propose we get the jury, we do Mr. Moore, we do the

24   stipulation, we do direct of whoever is next, and then during

25   the short break I will try to deal with exhibits, and during

KAQ3SYN1                    Moore - Redirect

1    that time maybe you can refine or reduce what is at issue.

2    Okay?

3              MR. GROOMBRIDGE:  Certainly, your Honor.  Thank you.

4              THE COURT:  Mr. Street.

5              (Jury present)

6              MR. GROOMBRIDGE:  Your Honor, may I remove the mask?

7              THE COURT:  You may.

8              THE DEPUTY CLERK:  Just a reminder, you're still under

9    oath, sir.

10             THE COURT:  You understand you're still under oath?

11             THE WITNESS:  Yes, your Honor.

12    DANIEL MOORE,

13         called as a witness by the Syntel,

14         having been duly sworn, testified as follows:

15   REDIRECT EXAMINATION

16   BY MR. GROOMBRIDGE:

17   Q.  Good morning, Mr. Moore.

18   A.  Good morning.

19   Q.  I just have one issue I'd like to clarify here, and let me

20   ask Mr. Stevenson to please put up Plaintiff's Trial Exhibit

21   1483.

22             Mr. Moore, do you recall that you testified about this

23   in the direct testimony and then again that Mr. De Vries asked

24   you some questions about these documents?

25   A.  Yes.

KAQ3SYN1

1    Q.  What I want to clarify and be sure about this.  Now, the

2    jury has heard evidence of a number of employees who left

3    TriZetto and went to Cognizant, perhaps as many as something in

4    the 80s.  This agreement, do you agree that just because this

5    is a form agreement you're not testifying that it was used with

6    any employees, other than the five that you specifically

7    mentioned?

8    A.  That is correct.

9            MR. GROOMBRIDGE:  Thank you, and I have no other

10   questions.

11           THE COURT:  Thank you.  You are excused.

12           (Witness excused)

13           THE COURT:  Ladies and gentlemen, under the COVID

14   protocol, we need to give the booth a five-minute rest between

15   each witness.  But in the meantime, I have a stipulation

16   between the parties that I would like to read into the record.

17           Mr. Street, can you tell me what court exhibit number

18   this is?

19           THE DEPUTY CLERK:  This one will be 5.

20           THE COURT:  You'll remember, ladies and gentlemen,

21   that a stipulation is an agreement between the parties as to

22   certain facts or other matters.  And if counsel will agree, I'm

23   not going to read the full names of all the parties.  I'll just

24   say "the parties have agreed."  Is that okay?

25           MR. DE VRIES:  Yes, your Honor.

KAQ3SYN1

1          MR. GROOMBRIDGE:  Yes, your Honor.

2          THE COURT:  So, the parties hereby stipulate to the

3     following facts:

4          First, the Master Services Agreement between TriZetto

5     and Syntel, which I will call the MSA, provided for the payment

6     of certain so-called transition rebates.

7          2.  Syntel sent a notice of termination of the MSA and

8     the requested payment of the rebates due pursuant to the MSA on

9     November 20, 2014.

10         3.  TriZetto disputed that it was obligated to pay,

11    and on January 12, 2015, Syntel sued TriZetto asserting certain

12    claims, including a claim to recover the rebates.

13         4.  Syntel asked that TriZetto admit to the amount

14    owed, and TriZetto stated that it could not confirm "to the

15    cent" what rebates were owed.

16         5.  TriZetto continued to dispute for legal reasons

17    that it was obligated to pay the amounts sought by Syntel.

18         6.  As of October 16, 2020, TriZetto agreed to pay

19    $5,183,241 reflecting the amount due for the rebates.

20         7.  TriZetto paid that sum on October 19, 2020.  And

21         8.  As a result, Syntel's legal claim for the rebates

22    is no longer in dispute.

23         So that is the agreement of the parties.

24         Mr. Street?

25         THE DEPUTY CLERK:  Two more minutes.

KAQ3SYN1                    Plumpe - Direct

1              MS. JANGHORBANI:  The next witness is actually remote.

2              THE COURT:  Wonderful.  Okay.

3              MS. JANGHORBANI:  Your Honor, Syntel calls John

4    Plumpe.

5              THE COURT:  It looks like we have the witness on the

6    screen.

7              (Witness sworn)

8              THE DEPUTY CLERK:  Please state and spell your first

9    and last name for the record.  Also if you can keep your voice

10   up so we can hear you clearly.

11             THE WITNESS:  My name is John Plumpe.

12   J-O-H-N P-L-U-M-P-E.

13             THE COURT:  Mr. Plumpe, this is Judge Schofield.

14   Would you mind getting closer to the mic?

15             THE WITNESS:  I'm inching up towards my computer, your

16   Honor.

17             THE COURT:  That's better.  Thank you.

18    JOHN PLUMPE,

19        called as a witness by the Syntel,

20        having been duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MS. JANGHORBANI:

23   Q.  Good morning, Mr. Plumpe.

24   A.  Good morning.

25             MS. JANGHORBANI:  Mr. Stevenson, if you can display

1    the slide, please.

2    Q.  Mr. Plumpe, can you briefly introduce yourself to the jury.

3    A.  Yes.  My name is John Plumpe, and I'm a managing director

4    of an economics consulting firm known as Epsilon Economics.

5    Q.  Did you prepare slides to accompany your testimony today?

6    A.  I did.

7    Q.  Do you see them on the screen where you are?

8    A.  I do.

9    Q.  Are those the slides that you prepared?

10   A.  Yes.

11   Q.  Mr. Stevenson, can we go to slide two, please.

12         Mr. Plumpe, if you can walk us briefly through what

13   you do and your background.

14   A.  Sure.  I'm managing director of Epsilon Economics and I'm

15   based in Chicago.  For the past 21 years, my practice has

16   focused on intellectual property valuation and damages

17   assessment in intellectual property litigation and related

18   litigation.

19         My education includes an MBA, which is a master of

20   business administration degree, from the University of Chicago,

21   and I also have a bachelor of science and a master of science

22   degree in mechanical engineering from the University of

23   Illinois.

24   Q.  Do you have experience with the types of intellectual

25   property damages at issue in this case?

1   A.  Yes.  As I said, the past 21 years, I've focused on

2   intellectual property valuation, including the types of assets

3   at issue in this case.

4   Q.  Have you testified previously as an expert?

5   A.  Yes.

6   Q.  If we can go to demonstrative three, Mr. Stevenson.

7          Do you have any professional affiliations?

8   A.  Yes, I've highlighted a couple of them on the screen for

9   you here.

10          I'm active in the International Trademark Association,

11  which is the largest global organization that works on behalf

12  of intellectual property owners with particular focus on

13  trademarks and related assets, and I've had a number of

14  leadership roles, including the board of directors level brand

15  valuation project team.

16          I'm active within the Intellectual Property Owners

17  Association, and with the group I'm on the trademark, the U.S.

18  trademark litigation committee and I chair the monetary relief

19  working group.

20  Q.  If you can describe for us briefly what it is that you did

21  in this case, and if we go to demonstrative four,

22  Mr. Stevenson.

23  A.  Sure.  I was retained by counsel to Syntel about two years

24  ago, a little over two years ago, to be involved in regards to

25  being a rebuttal witness to Mr. Britven's damage assessment

KAQ3SYN1                          Plumpe - Direct

1     that he offered on behalf of TriZetto.  So, in doing so, I

2     started my work, as shown here on the slide, by reviewing

3     TriZetto's counterclaims against Syntel, regarding the trade

4     secret misappropriation and copyright infringement claims.  I

5     then reviewed a large number of documents and data information

6     that were provided by either TriZetto on one hand or Syntel on

7     the other in this litigation.  I read the deposition

8     transcripts of numerous witnesses from TriZetto, as well as

9     from Syntel.  I conducted research of information available in

10    the public domain that could have been relevant or shed some

11    light on the case, and I also read Mr. Britven's expert report

12    and prepared a rebuttal report and analysis to his report.

13    Q.  You're here today talking about damages.  Are you offering

14    an opinion that damages are appropriate in this case?

15    A.  No, I'm here as a rebuttal to Mr. Britven's damages

16    calculation.

17    Q.  If we can go to demonstrative five.  If you can walk us

18    briefly through, Mr. Plumpe, your views as to Mr. Britven's

19    opinions.

20    A.  Sure.  Like I said, I'm here to provide some rebuttal

21    commentary opinions regarding what Mr. Britven did and what he

22    testified to.  And I have two general conclusions regarding his

23    work.  First --

24             THE COURT:  You may have to get very close to your

25    computer.  And we'll turn up the volume on this end as much as

KAQ3SYN1                      Plumpe - Direct

1    we can.

2                THE WITNESS:  I can also try putting on headphones,

3    although I don't know if that will work or not, but I can try

4    that.

5    Q.  Do you think that will improve your sound quality,

6    Mr. Plumpe?

7    A.  We can give it a try.

8    Q.  Mr. Plumpe, can you hear me?

9    A.  Can you hear me now?

10   Q.  Yes, although I can't tell whether or not it's better but

11   we'll give it a try and see as we go along.

12   A.  Okay.  I'll try.  Can you hear me now better?  I'm holding

13   the microphone right next to my mouth.

14   Q.  Yes, Mr. Plumpe.

15   A.  Okay.

16                THE COURT:  You had two general conclusions.

17                THE WITNESS:  Yes.  Okay.

18   A.  So, in general, I determined that Mr. Britven's avoided

19   costs calculation and his reasonable royalty calculations are

20   economically unreasonable.  The regarding the avoided cost

21   calculation, on the trade secret misappropriation claim, the

22   amount that Mr. Britven calculated and testified to is not

23   proportional to either Syntel's profits from using the trade

24   secrets or to TriZetto's losses that may have stemmed from

25   Syntel's use of the trade secrets.  The avoided cost

1    calculation is not tied to the specific IP, the intellectual

2    property, that TriZetto claims is misappropriated.  So as a

3    result, the avoided cost calculation is economically

4    unreasonable and is orders of magnitude different than Syntel's

5    profits or any losses suffered by TriZetto from Syntel's use.

6              Second, Mr. Britven's reasonable royalty calculation

7    suffers from the same flaws as the avoided cost calculation

8    because they simply are the avoided cost calculation divided in

9    half.  So, starting with an avoided cost flawed calculation

10   resulted in a flawed reasonable royalty.

11             But perhaps most fundamentally is that the reasonable

12   royalty amount that Mr. Britven testified to is in fact not

13   reasonable, and is not an amount that Syntel would have agreed

14   to pay for the limited use of the trade secrets or copyright in

15   this case.

16   Q.  Mr. Plumpe, let's move specifically to the avoided cost

17   calculation, if we can go to demonstrative six, Mr. Stevenson.

18             And could you explain to us why it is that you believe

19   that Mr. Britven's avoided cost calculation is economically

20   unreasonable?

21   A.  Sure.  I've listed some key thoughts here on the slide.

22   The first is that Mr. Britven's analysis of avoided costs

23   looked at the period from 2004 through a later part of 2014, so

24   it was over 10 years.  And in doing so, he swept in everything

25   that TriZetto did during that 10-year period for Facets.  And

KAQ3SYN1                        Plumpe - Direct

in doing so, an award of the amount offered by Mr. Britven
would make TriZetto's entire 10-year development costless to
it, despite the fact that TriZetto continues to make abundant
use of Facets software, products, and services, and the various
assets.  In fact, I think we've heard from I believe it was
Mr. Sanders and perhaps Mr. Noonan that revenues are well over
$100 million per year.

        On the other hand, there has been much less use by
Syntel that I will describe for you.  The business that Syntel
has that has used or been accused of using trade secrets is
much, much smaller and much less use, and Syntel has not
offered a competing product to Facets.  They only compete in a
narrow niche of consulting services regarding Facets
installation.

        The fundamental disconnect here is there is no tie
between the alleged wrongdoing and the cost to developing the
asset, and we'll talk about that in a minute.

        Then, if you look a little bit into how Mr. Britven
did his avoided cost calculation, he makes a critical error
that inflates his opinion more than threefold, and I'll show
that using Cognizant and TriZetto documents, if Mr. Britven had
just made the one adjustment that he needed to make, it would
have reduced his amount by two-thirds.
Q.  Are you offering an opinion that avoided costs should never
apply?

KAQ3SYN1                          Plumpe - Direct

A.   No.   It's just not appropriate in the way that Mr. Britven

calculated it in this case.

Q.   If we can go to demonstrative seven.   When might avoided

costs be appropriate?

A.   Well, avoided costs may be economically reasonable in some

circumstances, and could be considered such as if the defendant

published the trade secret, thereby making them not as valuable

to the plaintiff.   If the defendant created and launched a

competitive software product, which would involve using perhaps

all of the information that had been developed, all the files.

Or if the defendant had sold or licensed the trade secret to

somebody else.

Q.   Did any of those things happen in this case, Mr. Plumpe?

A.   If you go to the next slide, I've indicated that it's my

understanding that those have not happened in the case.

Q.   If we can go to demonstrative 10, Mr. Stevenson.

          If you can explain to us what's reflected on this

slide, Mr. Plumpe.

A.   Sure.   I mentioned a moment ago in the overview that there

was no tie between the alleged wrongdoing and the cost to

develop the assets, and I've shown that graphically here.

You'll see on the right bar that is the number approaching 300

million, and that was Mr. Britven's opinion of the avoided

costs for developing Facets during a period of more than 10

years.   The little bar on the left is the bar that represents

KAQ3SYN1                         Plumpe - Direct

1   the profits that Syntel actually earned from its Facets

2   consulting business during the period of 2012 through June of

3   2018.  And this shows that Mr. Britven's avoided cost

4   calculation is in a completely different order of magnitude

5   than what Syntel actually did with their Facets consulting

6   business.  And in fact, Mr. Britven's avoided costs opinion is

7   27 times the profits that Syntel made from providing Facets

8   consulting services for period of June -- 2012 through June of

9   2018.

10            THE COURT:  Excuse me, what is that number?  We have

11   300 million on the right.  And how much on the left?

12            THE WITNESS:  Mr. Britven's number on the right is

13   about 285 million, and as we'll see quite soon, your Honor, the

14   Facets consulting business profits that Syntel earned from all

15   six clients was a little over $10 million.

16            THE COURT:  Thank you.

17   Q.  Mr. Plumpe, Dr. Bergeron testified that certain IP related

18   to Facets is not at issue in this case.  How does that impact

19   your analysis of Mr. Britven's avoided costs?

20   A.  Yes, I heard that testimony from Dr. Bergeron when he said

21   that the number of the assets were not at issue in this case,

22   were not being litigated.  And that highlights that when

23   Mr. Britven swept in the entirety of everything that was

24   developed for Facets over that 10-year period, that he was not

25   connecting the assets that he was providing a cost to with the

1   actual accused misappropriation of Syntel.  There's two

2   different things, two different buckets.

3   Q.  Do you understand what Mr. Britven -- strike that.

4           Do you understand what a TPAA is, Mr. Plumpe?

5   A.  Yes, I believe we've heard some testimony regarding that it

6   is a third-party access agreement.

7   Q.  Is that relevant at all to your analysis of Mr. Britven's

8   calculation?

9   A.  Sure.  A third-party access agreement, which I believe is

10  sometimes been called an NDAA, a non-disclosure access

11  agreement, is an element that has been available, and it's

12  where TriZetto provides access through its clients to a

13  consulting vendor so that the vendor is able to provide

14  services, consulting services to the TriZetto client.  It gets

15  the third-party consulting provider access to TriZetto files

16  that are part of the license that the TriZetto client, i.e.,

17  the payer, has already paid for or paid for maintenance with

18  the TriZetto.

19  Q.  What does TriZetto charge to the consultant for access to

20  that information under a TPAA?

21  A.  My understanding is that there's no charge for that.

22  Q.  Why is that significant?

23  A.  Well, the cost, there's no cost to the consulting provider

24  because it's already being provided to the client, the payer

25  that has already paid TriZetto for the software and for the

KAQ3SYN1                    Plumpe - Direct

1    files and for everything else that they get when they take a

2    license.  The fact they pay the annual maintenance fees that

3    Mr. Noonan or Mr. Sanders testified about earlier.

4    Q.  Thank you, Mr. Plumpe.  If we can go to demonstrative 11,

5    Mr. Stevenson.

6            And the jury has already heard about the Duff & Phelps

7    report.  What does that refer to in this case?

8    A.  The Duff & Phelps report was a report that was prepared at

9    the request of Cognizant regarding its acquisition of TriZetto.

10   So you may recall that Duff & Phelps, Mr. Britven described

11   Duff & Phelps as one of the leading valuations firms in the

12   world and I agree with him.  Mr. Britven in fact worked for

13   Duff & Phelps until some point in 2014.

14           And Duff & Phelps was asked to do, in early 2015, was

15   to put themselves back in 2014, and carve out the value of

16   different categories of assets that Cognizant acquired from

17   TriZetto on November 20 of 2014.  So this is something that was

18   prepared by Duff & Phelps at Cognizant's request because it's

19   required by accounting regulations and is something that the

20   company, the acquiring company, that's Cognizant, and its

21   auditors, accounting firms, used to provide a report to the

22   government and to investors regarding the value of the assets

23   that were acquired by Cognizant from TriZetto.

24   Q.  Mr. Plumpe, Mr. Britven suggested that this report was not

25   of much use here because it was prepared for a different

1    purpose.  Do you agree with that?

2    A.  No.  This report is extremely useful, because Cognizant

3    asked Duff & Phelps to look at what the assets were worth, and

4    what a willing buyer and a willing seller would have agreed to

5    regarding the values and rates for those assets.

6    Q.  The jury has heard some testimony about a six-to-one ratio,

7    that TriZetto supposedly makes $6 in selling services for every

8    $1 they make from selling product licenses.  Are you aware of

9    that testimony?

10   A.  Yes, I heard that testimony.

11   Q.  What's your view of that testimony?

12   A.  I think that testimony needs to be a little more specific.

13   And I can explain that or if you'd like to ask a question, I'm

14   fine with that.

15   Q.  I was going to suggest we go to the Duff & Phelps report.

16   Mr. Stevenson, if you can pull up 846 and go to page 151.

17           What are we looking at here, Mr. Plumpe?

18   A.  This is an exhibit which is one of the calculations that

19   Duff & Phelps prepared in the purchase accounting report for

20   Cognizant.  It's regarding the purchase price allocation of

21   TriZetto from 2014, and for the payer reporting unit, the payer

22   reporting unit, this is a profit-and-loss statement which

23   reflects the revenues or sales and costs and profits of a

24   portion of the payer business unit.

25           And what they're looking at here is the license fee,

1  the license revenue that TriZetto had collected from licensing

2  programs like Facets, QNXP, and other platforms it licenses

3  into the payer business.

4  Q.  What was the revenue they were getting from their licensing

5  business?

6  A.  2014, which was the last full year of actual data prior to

7  this report being prepared, shows that they were $93,293,000.

8  So the number you are seeing here has the last three zeros cut

9  off just for brevity.  That's the way accountants and

10  consultants typically prepare these types of reports when they

11  involve numbers like this.

12         So a little over 93 million was the license fee from

13  licensing different software platforms, products, to payers in

14  2014.

15  Q.  If we can go to page 152 of the same exhibit.  Mr. Plumpe,

16  what does this page reflect?

17  A.  This is the next page of the report.  It is another

18  exhibit.  And this shows for TriZetto the consulting business

19  profit-and-loss statement.  So the consulting business is where

20  it provides services to the clients that have their platforms,

21  their products, they provide consulting services.

22         So in the full year 2014, that looks like TriZetto

23  earned about $151,436,000 in consulting sales or consulting

24  revenue.

25  Q.  So how does all this pertain to the six-to-one ratio that

KAQ3SYN1                              Plumpe - Direct

1   the jury's heard about?

2   A.   Well, it shows that the six-to-one ratio, if you look at

3   the details and you look at just the consulting business, the

4   consulting services is not a six-to-one ratio.

5           If you take 101 million and divide it by the 93

6   million from the previous slide, that ratio is about 1.6.  So

7   it is less than two to one.

8   Q.   If you can go to demonstrative 12.

9           Mr. Plumpe, what is obsolescence?

10  A.   Obsolescence is a very common concept that applies to many

11  assets, most notably to the technology asset.  It's written

12  about in all the valuations literature and written about in the

13  Duff & Phelps report.

14          Obsolescence is the concept of decay or depreciation

15  in value.  Much like how you buy, if you buy a new car, you

16  drive it off the lot, the value continues to decline, continues

17  to decay.  Similarly, if you think about your phone, and you're

18  constantly having software updates pushed out to you or the

19  apps on your phone, you constantly have to update your apps

20  because the older version is obsolete due to the advancement of

21  technology.

22          So obsolescence adjusts for the decay in the value of

23  technology assets.

24  Q.   So, Mr. Noonan testified in this case that there have been

25  70 to 80 versions released of Facets.  How does that interplay

KAQ3SYN1                          Plumpe - Direct

1   at all or does it interplay at all with this concept of

2   obsolescence?

3   A.   It absolutely does.  So the 70 to 80 versions, and I think

4   Mr. Noonan also testified that Facets is about 25 years old.

5   So just in simple math, you would say on average there have

6   been three versions of Facets per year over that time period.

7   And so, as new versions of Facets are released, that renders

8   the older versions obsolete in some respect.

9   Q.   So you mentioned that the Duff & Phelps reports talks about

10  obsolescence.  Mr. Stevenson, if we can go to page 56.  It

11  talks about obsolescence rate.

12          How does this impact your analysis of Mr. Britven's

13  opinions?

14  A.   So what we're seeing here is Duff & Phelps' conclusion

15  based on their discussion with Cognizant management regarding

16  the obsolescence rate of the technology that it was acquiring

17  from TriZetto.  And what Duff & Phelps and Cognizant management

18  concluded at the time is that technology had a useful life of

19  eight years.  And so, something that they made a note here that

20  something that was worth 100 percent eight years ago was only

21  worth 5 percent now.

22          So, in valuing the technology assets that were

23  acquired by Cognizant from TriZetto, Duff & Phelps in

24  consultation with management had to multiply the revenues

25  downward to account for obsolescence.

KAQ3SYN1                          Plumpe - Direct

1    Q.  If you apply this Duff & Phelps obsolescence factor to

2    Mr. Britven's opinion, what would be the change in his cost

3    number?

4    A.  It would knock over two-thirds of it off.  It would be a

5    little bit less than one-third of the total amount that he

6    testified to.

7    Q.  Go now to a different topic.  Moving to your reasonable

8    royalty opinion, Mr. Plumpe.  And Mr. Stevenson, if you can

9    pull up demonstrative 13.

10             So, Mr. Plumpe, what is a reasonable royalty?

11   A.  A reasonable royalty is a concept in intellectual property

12   litigation that puts together a hypothetical negotiation around

13   the time that the infringement first started.  So on the

14   graphic you have two parties sitting across the table from each

15   other.  And the concept here is that you have a willing buyer

16   and a willing seller who have to come to an agreement.  And the

17   agreement is based on the full knowledge of all the facts and

18   circumstances and information, and they need to reach an

19   agreement that is something that both parties can live with.

20   And there is a number of factors that experts consider when

21   approaching a reasonable royalty.

22   Q.  Is the reasonable royalty meant to reflect the price to

23   purchase the technology or is it meant to reflect something

24   else?

25   A.  It is not a purchase.  The reasonable royalty negotiation

KAQ3SYN1                         Plumpe - Direct

1    is for a period of time, just like any license negotiation

2    where one party wants to use another party's technology, it's

3    for a period of time.  And it is not to take the -- not to buy

4    the asset, just to rent them, to license them for use for a

5    period of time.  Much like you would rent an apartment.

6    Q.  If we can go to demonstrative 14, Mr. Stevenson.

7         What is your view of Mr. Britven's reasonable royalty

8    opinion?

9    A.  His reasonable royalty opinion is economically

10   unreasonable, and he starts with the avoided costs, and we've

11   just talked about all the problems with his avoided cost

12   analysis.  So he starts with the avoided costs, and in the end

13   he concludes it should be split in half and Syntel should have

14   to pay half of the avoided costs for a reasonable royalty.

15   Q.  Mr. Britven, testified that the $2.7 billion acquisition of

16   TriZetto by Cognizant helps to support his avoided cost and

17   reasonable royalty numbers.  Is that consistent with your

18   views?

19   A.  No.  I completely disagree with that.

20   Q.  Why?

21   A.  Well, the $2.7 billion acquisition of Cognizant, I mean of

22   TriZetto by Cognizant, is really irrelevant in this case

23   because we have more specific data regarding the technology

24   assets that were acquired.  The technology assets that were

25   acquired was much more than the trade secrets.  In fact, I

KAQ3SYN1                      Plumpe - Direct

1  believe we talked or there has been testimony earlier about

2  patent and other assets.  So, a starting point for any analysis

3  regarding that transaction is not 2.7 billion.  It is the value

4  of the payer business technology.  And then you have to look

5  specifically to trade secrets within that bucket.

6  Q.  We've been speaking about avoided costs and reasonable

7  royalty in the context of trade secrets.  If you can turn

8  briefly to Mr. Britven's opinions as to the copyright and

9  reasonable royalty.

10           Mr. Stevenson, if you can go to demonstrative 15.

11           What is your view of Mr. Britven's copyright

12  infringement reasonable royalty?

13  A.  Well, his view of a copyright infringement reasonable

14  royalty is also economically unreasonable.  He, very much like

15  he did for the trade secrets, he based it on the value of the

16  Data Dictionary instead of a license for use of the Data

17  Dictionary.  So he took, he put together what his view of the

18  calculation of the avoided costs to develop the Data Dictionary

19  was, and he again just put that and divided it in half.  But

20  that includes the avoided costs that he attributed to trade

21  secrets too, not just the copyright.

22           So the number is, again, it starts from a flawed

23  premise so the result is flawed.

24           I would also note that my understanding of copyright

25  infringement litigation, having been involved in the industry

KAQ3SYN1                        Plumpe - Direct

1    for 21 years, is that copyright infringement reasonable

2    royalties are often considered as a proxy for lost profits if

3    the damages -- if the lost profits damages to the copyright

4    owner could not be determined.

5              However, as we saw in Mr. Britven's testimony, he

6    calculated a view of the lost profits of TriZetto.

7    Q.   Generally, what's your view of his calculation of the lost

8    profits?

9    A.   So that number I believe is about $8.5 million, and it is

10   more reasonable.  It is the right ballpark here.  There are a

11   few things in his calculation that I think he should have done

12   differently.  But it is certainly in the right ballpark.

13   Q.   Is that lost profit calculation limited to the conduct at

14   issue in this case?

15   A.   No.  So, the lost profits that he calculated was for -- I

16   believe it was related to UHG.  And he made some assumptions

17   and some calculations that I think could have been done a

18   little bit differently that may have resulted in a different

19   lower number.  But for the purposes of being conservative here

20   and lean toward TriZetto, again, the number's in the ballpark.

21   Q.   And does the lost profit number tie specifically to the

22   three documents at issue in the copyright case?

23   A.   Not that I am aware of, no.  I believe it was, I believe

24   the starting point was the totality of Syntel's revenues from

25   offering its Facets consulting business.

1    Q.   If we can go to demonstrative 16, Mr. Stevenson.

2              Did you also calculate a reasonable royalty?

3    A.   Well, what I've shown here is an illustration of what a

4    royalty payment would have been if one -- a royalty rate for

5    technology specified in the Duff & Phelps report.  When Duff &

6    Phelps conducted its valuation of TriZetto's assets, it valued

7    the technology using a royalty rate of 10 percent.  And if you

8    look at Syntel's Facets consulting revenues from 2012 through

9    June of 2018, its revenues to UHG were $17.2 million.

10             So I've shown here an illustration if you take those

11   revenues that Syntel earned, the sales Syntel earned from UHG

12   of $17.2 million and multiply it by the 10 percent royalty rate

13   specified in the Duff & Phelps report regarding TriZetto

14   technology, you get $1.7 million.

15   Q.   Can you go to the Duff & Phelps report and go to page 57.

16   And you will see at the top of the page it discusses royalty

17   rate.  Is that consistent with what you've done here,

18   Mr. Plumpe?

19   A.   Yes.  Duff & Phelps concluded, after discussions with

20   management and its own research and looking at the information

21   that was available to it, that the royalty rate of 10 percent

22   was selected based on the significance of the technology asset

23   to the payer business and to the overall company relative to

24   other assets.

25   Q.   The jury heard testimony from Mr. Britven about a $950

KAQ3SYN1                          Plumpe - Direct

1    million calculation of royalty in the Duff & Phelps report.

2    Are you familiar with that testimony?

3    A.  I did hear that testimony.

4    Q.  And Mr. Britven testified that he believed that that helped

5    justify his opinion in this case.  Correct?

6    A.  I believe I heard that.  I believe I heard that testimony.

7    Q.  What is your view of the testimony as to the $950 million

8    number and how that impacts Mr. Britven's opinion?

9    A.  Well, the $950 million number is nowhere in the Duff &

10   Phelps report.  Mr. Britven did not describe what that number

11   was.  He did not show in the Duff & Phelps report where that

12   number came from.  So, I don't see any connection between that

13   $950 million number and monetary relief or damages in this

14   case.

15   Q.  If we can go to demonstrative 17.  The jury's heard about

16   profits and lost profits.  If you can walk us through what

17   profits are and walk us through what lost profits are.

18   A.  Profits is a very simple determination.  The profits of a

19   business are the revenues or sales that the business earns,

20   minus the costs that are necessary that the business spent in

21   order to earn those sales.  So profits are sales minus the

22   costs.

23           Another way of thinking about profits is you take the

24   revenues or sales times what's called a profit margin which is

25   a percentage calculation that effectively take --

KAQ3SYN1                     Plumpe - Direct

1    Q.  You were just turning to lost profits I believe.

2    A.  Correct.  Can you hear me now?

3    Q.  We can right now.

4    A.  Lost profits are a very similar concept.  Lost profits are

5    what were the profits that a plaintiff would have earned had

6    the defendant had not committed the infringement that it is

7    accused of infringing.

8    Q.  If we can go to demonstrative 22, Mr. Stevenson.

9              And this does this summarize your views as to

10   Mr. Britven's opinion?

11   A.  Yes, it does.  For the misappropriation of trade secrets

12   and confidential information, Mr. Britven's avoided development

13   costs for the 10-year period 2004 to 2014 are economically

14   unreasonable and overstated.

15             His reasonable royalty calculation, which is simply

16   50 percent of the avoided costs, of all avoided costs, again,

17   economically unreasonable and overstated.  It is not the

18   outcome of what would happen in a reasonable royalty

19   negotiation.

20             And the copyright infringement claim, again,

21   Mr. Britven only talked to the jury about reasonable royalty

22   where he took 50 percent of certain avoided costs, and that

23   number is economically unreasonable and overstated.

24   Q.  If we can go to demonstrative 23, and we promised we were

25   going to talk about the profits from the consulting business.

KAQ3SYN1                        Plumpe - Direct

1      Can you walk us through what's reflected in this slide.

2      A.   Sure.  If you look at Syntel's Facets consulting business

3      from June 2012 through June 2018, it earned revenues on about

4      27 projects.  It had 27 projects.  And from all six clients to

5      which it sold some of those 27 projects, profits that Syntel

6      earned from the Facets consulting business were $10,270,349.

7           You may recall then that there was a TPAA in place

8      with the payer client CDPHP.  So if you move over to the bottom

9      right, those, the top two -- the bottom two bars, there is a

10     little bracket that shows if you exclude CDPHP from the

11     analysis, then Syntel's profits from its Facetting consulting

12     business from five clients, not to include CDPHP, were

13     $3,256,294.

14          And then the last in which I looked were from UHG

15     only.  A number of witnesses talk about UHG.  And the UHG was

16     also the only client that in those 27 projects that Syntel did

17     any complex consulting work.  There were two complex consulting

18     projects for UHG, and the profits on those projects to UHG came

19     to $823,889.

20     Q.   So, then did you reach an opinion as to, if damages are

21     appropriate in this case, what they could potentially be?

22     A.   Yes.

23          MS. JANGHORBANI:  If we can go to demonstrative 24,

24     Mr. Stevenson.

25     A.   What I've shown here are for misappropriation of trade

KAQ3SYN1                          Plumpe - Direct

secrets and confidential information, Syntel's profits on its

projects that it earned revenue from UHG were $823,889.

Correspondingly, if you look at -- if you assume that if Syntel

was not in the market offering those projects to UHG and

instead TriZetto made those sales, TriZetto's lost profits on

those sales would have been more.  They would have been

4,611,523.

Q.  Why is there such a huge difference between those numbers?

A.  Well, Syntel, for the UHG project, Syntel offered the

projects at lower profit margins.  They weren't as profitable

as what TriZetto typically offered its projects for.  TriZetto

typically earned higher profit margins than Syntel did on those

actual UHG projects.

Q.  If we can go to demonstrative 25.  I think we walked

through most of these opinions, but if you can summarize

briefly and also explain what your opinion is as to the

copyright infringement damages.

A.  Sure.  So for misappropriation of trade secrets and

confidential information, Mr. Britven's avoided development

costs are not appropriate and economically unreasonable.  I

illustrate reasonable royalty using the 10 percent technology

royalty rate specified in the Duff & Phelps report for the UHG

projects that Syntel sold would amount to $1.7 million.

TriZetto's lost profits on the UHG work, if it had sold the UHG

work instead of Syntel, TriZetto would have earned about $4.6

KAQ3SYN1                         Plumpe - Direct

1    million.

2              Syntel's unjust enrichment or its profits that it

3    earned on the project to UHG from its Facets consulting

4    business were about 824,000, shorthand of which can be written

5    as $0.8 million.

6              On the copyright infringement claim, the reasonable

7    royalty as shown by Mr. Britven is economically unreasonable,

8    and in light of other information available in the case, one

9    can easily determine TriZetto's lost profits or Syntel's unjust

10   enrichment for its profits which, again, from the Facets

11   consulting business, which is broader than the use of just the

12   copyright, of course, that was about $824,000 which can be

13   written as $0.8 million.

14   Q.  Thank you, Mr. Plumpe.  I just have one final question.  We

15   heard testimony from Mr. Britven that he didn't have access to

16   Syntel's actual financial information so that he could be

17   confident in his profit and lost profit numbers.  What is your

18   view of that, Mr. Plumpe?

19   A.  I'm not sure why he said that.  Because when I issued my

20   report in 2018, I was provided with significant amount of

21   financial data that was taken directly from Syntel's accounting

22   system of record.  That's the PeopleSoft accounting database

23   that is maintained in the ordinary course of business and is

24   used by its auditors.

25             And so, I requested a significant amount of data

1    regarding Syntel's revenues and costs on a very detailed basis,

2    and that's how I prepared my analysis.

3    Q.   Did Mr. Britven have access to that information?

4    A.   My understanding is that at some point that information was

5    provided to him.

6            MS. JANGHORBANI:  Thank, Mr. Plumpe.  I have no

7    further questions.

8            THE COURT:  My question is for cross of this witness,

9    does that raise the issue that we had alluded to before?

10           MR. DE VRIES:  Yes, your Honor.

11           THE COURT:  I think we'll take a quick midmorning

12   break right now, 10 minutes.  Hopefully 10 minutes.  And we'll

13   see you back soon.

14           (Jury excused)

15           THE COURT:  Who wanted to raise the issue first?

16   Maybe you should tell us first which exhibits you plan to use

17   and if I could get a copy of them.

18           MR. DE VRIES:  Yes.  With your Honor's permission, I

19   can hand this up.

20           THE COURT:  That's fine.  If you can maybe hand them

21   to Mr. Street.  Which exhibit numbers are they?

22           MR. DE VRIES:  So it is DTX 1542, DTX 1543, and DTX

23   1545, your Honor.

24           THE COURT:  I assume these are not in evidence, and

25   you would either offer them now, subject to whatever foundation

KAQ3SYN1                           Plumpe - Direct

1    you can lay, or you would offer them during testimony.

2              Is that what we're talking about?

3              (Continued on next page)

KAQTSYN2

1            MR. DE VRIES:  Yes, your Honor, and they are Syntel

2    Atos publicly available documents from their internet website

3    with statements that, from our perspective, directly rebut two

4    of the primary messages that Mr. Plumpe just provided to the

5    jury.  One is the avoided cost is not commensurate with the

6    actual profits and, two, that the $2.7 billion, which is in its

7    Duff & Phelps report, is highly relevant, according to

8    Mr. Plumpe, to his damages analysis.

9            To put these in perspective, two of the documents are

10   Atos Syntel public financial documents.  One is a registration

11   statement from 2018, the other is from '2020, it's an investor

12   presentation.  They both go into detail about the Syntel

13   business and how it's done since the merger, and so that is DTX

14   1542 and DTX 1545.

15           And then the third, DTX 1543 --

16           THE COURT:  I'm a little confused.  You said two are

17   Atos public financial documents, one is a registration

18   statement and one is investor presentation.  And what website

19   are they from?

20           MR. DE VRIES:  On the Atos website.

21           THE COURT:  Okay.

22           MR. DE VRIES:  So those are 1542 and 1545.  1542 is

23   the investor presentation, 1545 is the registration statement.

24   And again, Atos is a publicly traded company that makes these

25   disclosures pursuant to securities regulations.

KAQTSYN2

1            Okay.  And then the last one, your Honor, is 1543,

2      it's a joint statement from Syntel and also Atos about the 2018

3      acquisition of Atos by Syntel.  Mr. Plumpe will testify here,

4      if he does so consistently with his deposition, that the $2.7

5      billion acquisition of Cognizant by TriZetto is relevant to the

6      damages analysis because it involves a transaction for the

7      intellectual property.  So, of course, does the 2018

8      acquisition of Atos by Syntel if we're right about the

9      intellectual property.  And there's a specific statement in

10     that merger announcement about the investments that Syntel made

11     in IP.  It's a statement made by the co-chairman of Syntel.

12     And I could show another document, about which there no

13     dispute, that the IP investments relate, not surprisingly,

14     perhaps, to the tools and accelerators that we talked a lot

15     about.

16            THE COURT:  So I'm concerned with what they show only

17     to a limited extent, and that is to establish their relevance.

18     It sounds like they are relevant, but what about authentication

19     and hearsay?  Why don't you address authentication for each

20     document and then hearsay.

21            MR. DE VRIES:  As your Honor knows better than I do,

22     there's not a requirement to have testimony to authenticate

23     documents, and these documents are authentic on their face.

24     They're provide by Atos and Syntel.

25            THE COURT:  You're saying they're self-authenticating

KAQTSYN2

1   documents under 903.

2           MR. DE VRIES:  Yes.

3           THE COURT:  903 what?

4           MR. DE VRIES:  I think it may be 11, your Honor, but I

5   honestly have to do a search, and so we'll look for that right

6   now.

7           THE COURT:  Okay.

8           MR. KANE:  Your Honor, Ryan Kane on behalf of

9   TriZetto.

10          THE COURT:  Yes.

11          MR. KANE:  I believe we're looking for 902(7), trade

12   inscriptions and the like, self authenticating.

13          MR. DE VRIES:  Thank you, Mr. Kane.

14          I also note, I don't believe there is a dispute that

15   these are --

16          THE COURT:  Wait, trade inscriptions and the like.  An

17   inscription, sign, tag or label purporting to have been affixed

18   in the course of business and indicating origin, ownership or

19   control.  I don't think that's it.

20          But anyway, you were telling me you think there's not

21   a dispute as to authentication but the dispute is something

22   else, in which case I will let Mr. Groombridge tell me what the

23   dispute is.

24          MR. DE VRIES:  Correct.  There were five of these

25   documents that all came from the Atos Syntel website.  We

1    initially have a declaration, as I understand it.  I don't

2    believe it's necessary under the rules, but I don't think there

3    is a dispute.  On two of them they agreed.  On these three, I

4    think that there is a concern that we're somehow attempting

5    to -- this is how I will characterize it -- put in additional

6    evidence in support of our direct case rather than rebut the

7    testimony that we just heard from Mr. Plumpe.  Your Honor, I

8    will assure you that I only intend to ask him questions that

9    directly rebut the testimony that he just gave the jury about

10   the relationships that I just described.

11            THE COURT:  I'll let Mr. Groombridge speak for

12   himself.

13            MR. GROOMBRIDGE:  Thank you, your Honor, and I would

14   treat --

15            THE COURT:  Sorry to interrupt you, this was

16   Ms. Janghorbani's witness, but I take it you're making an

17   evidentiary argument?

18            MS. JANGHORBANI:  He is, your Honor.  We didn't know

19   through whom they would attempt to offer these.

20            THE COURT:  That's fine.

21            MR. GROOMBRIDGE:  Your Honor, I will start with the

22   first two, which are Defendant's Exhibit 1542 and 1545.

23            First of all, your Honor, we have a hearsay objection

24   that these are statements made by the parent company Atos, not

25   by Atos Syntel, and they are apparently taking from the Atos

KAQTSYN2

website.  And so one of our concerns here, your Honor, is that

they're going to attempt to use these to say that Atos, the

parent company, makes a huge amount of money, one of the

documents is the first half results, and they're going to say:

Well, Atos made 5.6 billion Euros, that's more than $6 billion,

and they will argue that is relevant either to damages or to

punitive damages, which we think are legally incorrect, and I

will come back and say why on damages, compensatory damages.

        We have a foundation objection to all three of these

documents in that in order for them to be relevant, the

statements must be tied to the intellectual property that is

the subject of this the dispute, not just any intellectual

property.  And the fact here, your Honor, as we see it, is the

intellectual property that's in dispute in this case is a tiny

portion of the intellectual property of either Syntel or parent

company Atos.  And that it is because of the lack of foundation

connecting these statements and these numbers to the

intellectual property that is the subject of this dispute, what

you have here is an effort to suggest something that isn't

right, and so there's a foundation problem, there's a relevance

problem, and there's a Rule 403 problem.

        And that, for example, if you look at the registration

statement is apparently the European equivalent of something

like a 10K, it's a 380-page document, and we understand it's

going to be offered into evidence so that it could be used for

KAQTSYN2

1    the truth of anything that is stated in here.  And there's a

2    huge amount of information in here, including, for example, if

3    you were to dig into it you would actually find a number for

4    litigation reserve, not I think for this lawsuit, but in

5    general.  And we suggest that is a perfect example of what

6    shouldn't be going to the jury.

7            And there is law, and this mostly comes up in the

8    patent context, so the cases that we think are most relevant

9    are from the federal circuit, both *Uniloc* case, *Uniloc USA v.*

10   *Microsoft Corp.*, 632 F.3d 1292, 1319, which is the Federal

11   Circuit, 2011, and later *Dynamics, Inc. v. Quanta Computer,*

12   *Inc.*, 694 F.3d 51, 68, that's the federal circuit in 2012,

13   which were cases that reversed judgments based on jury verdicts

14   because very large numbers had been admitted into evidence that

15   have no connection with the actual intellectual property that

16   was at issue and alleged to have been infringed or

17   misappropriated.  And the Circuit Court there used the term

18   "tainted."  In fact, one of the cases quotes a district court

19   saying "the $19 billion cat was never put back in the bag."

20   And once we have these kind of numbers that are untethered to

21   the alleged misappropriation, these cases say no curative

22   instruction or nothing can ever fix that, the jury heard an

23   enormous number.  So to the extent that is going on here, we

24   object.

25           And we think finally as the last document about the

KAQTSYN2

1  acquisition, Defendant's Trial Exhibit 1543, again we think the

2  same principle applies, that what is going to be made -- an

3  argument is going to be made that because Atos paid $3.4

4  billion to buy Syntel, that shows that this intellectual

5  property must have tremendous value, whereas in fact there's no

6  foundational evidence connecting this intellectual property

7  with what was the basis for the purchase price.  And this

8  document on its face says certain things that are inconsistent

9  with the thesis that we believe TriZetto is offering, but we

10  have no witness yet coming who can address these things.  So

11  even if they were permitted to make this, we are now without a

12  means to respond it because our witnesses have come and gone.

13           So we think this is simply not appropriate and that

14  putting up big numbers saying well, that just shows how

15  valuable some intellectual property is, unless you have

16  rigorous connecting evidence saying it's actually this

17  intellectual property, that's improper and, in the words of the

18  federal circuit, it taints the entire trial.

19           THE COURT:  I understand your arguments.

20           Go ahead, Mr. De Vries.

21           MR. DE VRIES:  Your Honor, let me assure the Court and

22  directly respond to Mr. Groombridge that I intend to focus only

23  on Syntel-specific information that we can show is directly

24  tied to what is in this case.  And if we are not able to do it,

25  we will be irremediably prejudiced because the jury will be

KAQTSYN2

1   left with a profound misimpression based on what Mr. Plumpe

2   just told them.

3        I saw them writing down things that I believe –– I

4   don't know what they were writing, but at times when he was

5   talking about things that I can directly call into question

6   from Syntel-specific information in these documents, statements

7   made by Syntel and about the Syntel business that relate to

8   healthcare and insurance companies and the IP in dispute, the

9   tools.

10       I am not intending to talk about a litigation reserve.

11  I'm not intending to ask him about the huge amount of money

12  that Atos made.  I am here to ask him questions about

13  compensatory damages.

14       By the way, the overall amount of money that Atos

15  Syntel made is certainly relevant to punitive damages.  As I'm

16  sure your Honor knows, sometimes the amount of punitive damages

17  is bifurcated.  Your Honor's instructions specifically instruct

18  the jury that they are to take into account the financial

19  condition of the company.  That said, I think that that's a

20  hypothetical issue because I do not intend to ask Mr. Plumpe

21  about the amount of money that Atos made.  I intend to ask him

22  about three never specific parts of these documents, all of

23  which relate directly to Syntel's business related to this

24  case.

25       And then the last thing I will say, your Honor, is

KAQTSYN2

1    there is no hearsay problem here.  They're the same company

2    now.  They have been acquired.  This is an admission of a

3    corporate party opponent --

4              THE COURT:  Sorry to interrupt you.  At the time the

5    documents were published, were they one company?

6              MR. DE VRIES:  Yes.  Let me clarify one thing, which

7    is the merger announcement, 1543, that's actually a statement

8    of Syntel, a joint statement of Syntel and Atos.  And so they

9    weren't, as of that time, merged, but this is a statement that

10   Syntel made.  In fact, what I'm planning to point to is a

11   statement of a Syntel co-head person.  But in any event, there

12   isn't a hearsay problem and there's no indicia of unreliability

13   here.  These are documents provided to securities regulations.

14   There is nothing inherently unreliable about those.

15             But the last thing I will say is I believe --

16             THE COURT:  And the other two documents -- sorry to

17   interrupt, the other two documents postdated the merger?

18             MR. DE VRIES:  Yes, your Honor.  And they both

19   specifically say -- and just to tell your Honor so you know

20   where I'm going, and here they talk about the business post

21   merger.  Because one thing, in case it wasn't clear, he is

22   talking about profits only through June 2018.  He is telling

23   the jury that we shouldn't get our damages for that.  We asked

24   Atos Syntel to provide those data.  They would not do so.  And

25   your Honor's instructions, as you know, say:  What are damages

KAQTSYN2

through October 17, 2020?  The jury, we think, will be misled

into thinking oh, I guess that they haven't made all this much

money, when all they've been given by Mr. Plumpe right now is

an incomplete picture.

THE COURT:  So what is the number?

MR. DE VRIES:  I can show your Honor.

THE COURT:  Just tell me in order of magnitude what

the number is.  You're saying this is money --

MR. DE VRIES:  Yes, so in one there is a statement --

I want to make sure I got it exactly right.

In the 2018 registration statement there is a

paragraph about Syntel at page 35.  It talks about half a

billion Euros in full pipeline with a hundred percent retention

of Syntel customers.

And I'm going to say, so that your Honor has no

concerns here:  You understand, Mr. Plumpe, that Facets

consulting is not the only business that Syntel does, right?

So I'm not going to suggest otherwise, and I will specifically

acknowledge that, but as you can see here, half a billion Euros

in full pipeline.  Very similarly, at page 18 of the 2020

investor presentation, under an entire slide about Syntel, it

talks about 107 deals closed in the first half of this year,

pipeline opportunities a billion Euros.  Again, I am going to

say, and it's apparent on the face of that document, these

aren't all, obviously, Facets consulting, but what we're seeing

KAQTSYN2

1    here is an indication of the merger and post-merger business

2    going well.  That's what they're telling the market.

3              MR. GROOMBRIDGE:  Your Honor, if I may respond.

4              THE COURT:  In just a moment, thank you.

5              So Mr. De Vries, to the extent the documents were

6    admitted, the plan would be to send to the jury only the

7    portions that were actually read into the record?

8              MR. DE VRIES:  We can certainly do that, and I have

9    not intention of --

10             THE COURT:  So there won't be any prejudice from

11   either irrelevant or confusing statements that might give the

12   jury the wrong impression.

13             MR. DE VRIES:  Absolutely.

14             THE COURT:  Mr. Groombridge?

15             MR. GROOMBRIDGE:  Your Honor, this is exactly the

16   problem that we see under the cases that I mentioned.  I'm

17   looking at the page that Mr. De Vries mentioned.  He said he

18   wants to talk about 107 deals worth a billion Euros, and then

19   if we look at the lower part of the page, it tells us one is

20   for a global truck manufacturer and one was for one of the

21   world's leading food and beverages company and one was for a

22   leading European conservation charity and another for a

23   multinational credit reporting company.  Those obviously have

24   nothing whatsoever to do with the intellectual property that is

25   at issue in this lawsuit.  What is going on is an effort to

KAQTSYN2

1    pump up the numbers by saying look at these big numbers,

2    therefore our damages demand is reasonable.  That's exactly

3    what the law prohibits.

4              THE COURT:  Mr. De Vries, do you have a number that is

5    traceable to Facets as opposed to these bigger numbers?  Even

6    with your caveat that the Facets piece is only a piece, that

7    doesn't tell the jury very much about how big it is and doesn't

8    tell me very much about how probative it is.

9              MR. DE VRIES:  The answer is I don't, and it's

10   Syntel's fault.  Unlike every other case, as Mr. Plumpe will

11   admit, what typically happens is the parties provide

12   supplemental expert reports and provide supplemental financial

13   data.  We asked Syntel to provide that to us.  That was

14   ignored.  And now Mr. Plumpe, with the knowledge that we don't

15   have these data, is telling the jury:  Yeah, jury, you've been

16   asked to decide damages through last week, but ha ha, we never

17   gave them the data, and so I'm going to tell you that we never

18   made that much money.

19             So the very direct answer to your Honor's question is

20   no, I don't know that amount, but, two, as you heard before

21   Mr. Groombridge said, and I know he doesn't mean to suggest

22   about me personally, but I don't intend to say what

23   Mr. Groombridge said.  In fact, before Mr. Groombridge got up I

24   told your Honor that I would not do that and acknowledge the

25   things that he's talking about.

KAQTSYN2

1          So I think that if they had been concerned about

2     giving us the real data, they should have done what we asked

3     and provided it to us.

4          THE COURT:  So the problem here is that I don't have

5     the documents, I didn't have any prior notice of this, I don't

6     want to prejudice the jury, and so I am not going to allow the

7     documents into evidence.  I think the hearsay problems is not a

8     problem, but I think that they are potentially prejudicial

9     because there's no way to break out the piece that is relevant

10    to Facets.  So I'm not going to allow them on that basis.

11         But one question I would have is, Mr. Groombridge,

12    would you object to cross-examination that didn't introduce the

13    billion Euro numbers and didn't introduce the document in the

14    form of a leading question but without the admission of the

15    documents?  So we would excuse the proving up of his trying to

16    make the point he's making but without the billion dollar

17    number.

18         MR. GROOMBRIDGE:  We do not object to that, your

19    Honor.

20         THE COURT:  Okay.

21         MR. DE VRIES:  And your Honor, then I guess for the

22    merger, where he has testified to the $2.7 billion merger

23    number and the underlying valuation is relevant, where I could

24    draw a connection between the IP investments and the merger

25    announcement and the tools based on their own documents, may I

KAQTSYN2

1    use that document?

2                THE COURT:  Any objection?

3                MR. GROOMBRIDGE:  If the connection is -- we have no

4    objection to the cross-examination.  It may be a point for

5    redirect, your Honor, if in fact no connection to these tools

6    is established.

7                THE COURT:  It sounds like there is a connection to

8    the tools, so you may use that.

9                MR. DE VRIES:  Your Honor, may we ask for an

10   instruction from the Court to the jury, it doesn't have to be

11   right now, but that tells the jury that Syntel did not provide

12   financial data after June of 2018, though it was requested to

13   do so?  So that the impression that the jury has been left with

14   Mr. Plumpe's testimony --

15               THE COURT:  So what I will do is let you talk to each

16   other about is that.  I don't want casting stones, so I don't

17   want "even though it was requested, they didn't give it," but

18   the simple fact of what your expert had or didn't have I think

19   probably could be stipulated to.

20               MR. DE VRIES:  Yes, your Honor, I will work with

21   Mr. Groombridge or Ms. Janghorbani, whoever is appropriate.

22               THE COURT:  Okay, let's get the jury.

23               MR. DE VRIES:  Your Honor, may I go ahead and start

24   passing things out?

25               THE COURT:  You may.

KAQTSYN2                    Plumpe – Cross

1            MR. DE VRIES:  My cross binders will have the

2    documents in them.  Of course, I'm not going to use them.

3            (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KAQTSYN2                    Plumpe - Cross

1              (Jury present)

2              MR. DE VRIES:  Your Honor, may I remove my mask?

3              THE COURT:  You may.

4     CROSS-EXAMINATION

5     BY MR. DE VRIES:

6     Q.  Good morning, Mr. Plumpe.

7     A.  Good morning.

8     Q.  We've met each other before, right?

9     A.  Correct.

10    Q.  I've had the chance to ask you questions and for you to

11    answer them under oath?

12    A.  Yes, I believe you took my deposition about a year and a

13    half -- a little over year and a half ago.

14    Q.  Now I would just like to make sure I understand at a high

15    level, your opinion is that if the jury finds that Syntel

16    misappropriated the trade secrets, that total damages should be

17    a little less than $5 million maximum, right?

18    A.  Well, I think I testified to different measures of monetary

19    relief, such as Syntel's profits or TriZetto's lost profits.  I

20    don't have the notice in front of me, but I believe TriZetto's

21    lost profits on UHG were about $4.6 million.

22    Q.  None of those numbers was more than $5 million, right?

23    A.  Correct.

24    Q.  For eight years of misappropriation of 104 trade secrets,

25    your opinion is that Syntel should pay less than $5 million,

KAQTSYN2                    Plumpe - Cross

1    right?

2    A.  Well, if you look at the use that Syntel had, their

3    revenues were pretty limited in the consulting business,

4    particularly with UHG.  So the use is reflected in the profits

5    and revenues that Syntel earned from the Facets consulting

6    business.

7    Q.  Mr. Plumpe, I'm short on time.  May I ask you to just

8    answer my question?

9    A.  Okay.  I thought I was, but please go ahead.

10   Q.  Your total damages, if the jury finds that Syntel copied

11   the Data Dictionary source code into its Data Dictionary

12   technology, is less than $1 million, is that right?

13   A.  Is there anything that you could point to regarding the

14   Data Dictionary that you have in mind?

15   Q.  Sure.  Do you happen to remember your last slide, PDX 3-25?

16          MR. DE VRIES:  Mr. Thomas, could we show that?

17          THE COURT:  Mr. Plumpe, if you could keep your voice

18   up, that would help us a lot.  Thank you.

19          THE WITNESS:  Okay, sorry.

20   Q.  The copyright infringement amount that you have talked

21   about is less than --

22          MR. DE VRIES:  I actually think this is not the

23   current version of the slide, Mr. Thomas, if you could please

24   take this down.

25   Q.  Do you recall that the number that you presented to the

KAQTSYN2                     Plumpe - Cross

1  jury, if they find copyright infringement, is less than $1

2  million?

3  A.  Yes, if you look at the UHG client, the copyright

4  infringement profits of Syntel is less than a million dollars.

5  Q.  You've seen evidence in this trial that Syntel advertises

6  the Data Dictionary technology to all of its clients, right?

7  A.  I believe I know what you're talking about, yes.

8  Q.  Now you know that Syntel tells the market about how it

9  invests in intellectual property, and specifically tools,

10  right?

11  A.  I don't have a specific recollection.  Is there something

12  that you could show me to give me an idea of what you're

13  talking about?

14  Q.  Sure.

15         MR. DE VRIES:  Mr. Thomas, please, DTX 1541.

16  Q.  Do you see that this is a brochure from the Atos Syntel

17  website?

18  A.  I see it looks like a brochure, I don't know where it's

19  from.

20         MR. DE VRIES:  Go to page 2.  Mr. Thomas, if you could

21  please blow up investing in excellence, the second bullet from

22  the bottom on the left.

23         It says:  Investing in excellence.  Sustained

24  investments in world class facilities, domain expertise,

25  IP-based solutions, tools and accelerators.

KAQTSYN2                    Plumpe - Cross

1          Do you see that?

2     A.   I do.

3     Q.   Those investments in tools and accelerators, those are my

4     client's investments, right?

5     A.   I don't know what in particular they're talking about here

6     and whether it's tied to trade secrets or not.

7     Q.   You do agree that Syntel should not be telling the market

8     about investments in trade secrets that it didn't make, right?

9     A.   I don't know what investments they may or may not have made

10    in different categories that are listed here, but if you're

11    asking me if they falsely advertised, I don't know that this is

12    a false advertising case, but I wouldn't endorse that.

13              MR. DE VRIES:  You can take that down, Mr. Thomas,

14    please.

15    Q.   Mr. Plumpe, you're aware that in trade secrets cases,

16    avoided costs have been awarded, right?

17    A.   I'm aware of some cases that avoided costs have been

18    awarded.

19    Q.   And you're also aware that under Congress' Defend Trade

20    Secrets Act, that in addition to damages for actual losses,

21    that a trade secret owner can also get unjust enrichment

22    damages, right?

23    A.   Yeah, I believe unjust enrichment can be defined a number

24    of different ways, but I do have a recollection of what you're

25    talking about.

KAQTSYN2                    Plumpe - Cross

Q.  You haven't done an alternative avoided cost calculation to

Mr. Britven's, right?

A.  Correct.

Q.  Now you do say that Mr. Britven's avoided cost calculations

are not proportional to Syntel's profits, right?

A.  Correct.

Q.  But you're not aware of any rule that prohibits an avoided

cost calculation from exceeding the actual profits that were

earned by the defendant for use of trade secrets, right?

A.  I'm not aware of any rule, I'm just trying to point out

what actually happened here.

           MR. DE VRIES:  Now Mr. Thomas, I would like to make

sure we're showing the correct slide here.  PDX 3-9 should have

the number $10,270,349.

Q.  Now this was your slide, Mr. Plumpe, that showed what

Syntel's actual profits were from the Facets consulting

business, right?

A.  This is a slide I prepared, I don't know if the jury saw

it.

Q.  And what that slide says is those are the profits through

June 2018.

           MR. DE VRIES:  Mr. Stevenson, would you mind just

highlighting that for me, through June 2018 at the bottom

there?

Q.  Mr. Plumpe, the profits you told the jury about were only

KAQTSYN2                          Plumpe - Cross

1    through June of 2018, fair?

2    A.  Correct.

3    Q.  They don't include whatever profits that Syntel made on its

4    Facets consulting business for over the last two years and

5    several months.  Agreed?

6    A.  Yes.  This ends June 2018.

7          MR. DE VRIES:  If we could take that down,

8    Mr. Stevenson, and put Mr. Plumpe back up.

9          Thank you.

10   Q.  But Mr. Plumpe, you know that typically expert reports

11   often are supplemented through a supplemental discovery up to

12   the date of trial, fair?

13   A.  That's typical, yes.

14   Q.  But you did not issue a supplemental report here, right?

15   A.  That's correct.

16   Q.  Syntel did not provide any updated financial data showing

17   whatever money earned since June of 2018, right?

18   A.  I believe that's correct.

19   Q.  So we don't have the data showing how much money Syntel has

20   made using TriZetto's trade secrets over the last two years,

21   right?

22   A.  I believe we have testimony from Mr. Reddy that it's not a

23   focus of their business any longer, but I don't believe he

24   provided numbers.

25   Q.  If that were accurate, would you expect Syntel to have

KAQTSYN2                        Plumpe - Cross

1   provided the actual data to back that up?

2   A.  I don't know, but like I said, in my experience, it's

3   typical that an update would be provided.

4   Q.  Now Atos purchased Syntel in July of 2018, right?

5   A.  Is that when the agreement was or is that when the

6   transaction flowed?

7   Q.  My question is that's when they announced they were

8   acquiring Syntel, is that right?

9   A.  That sounds more like the announcement date.  I don't have

10  it particularly committed to memory, but that sounds like the

11  announcement date.

12          MR. DE VRIES:  Please pull up DTX 1546.  Sorry, we'll

13  come back to that, just in the interest of time.

14  Q.  Coincidentally, July 2018 is when Syntel stopped providing

15  us with its financial data, right?

16  A.  I will agree with you regarding the time, yes.  June 2018

17  was the latest data produced in this litigation.  Our work was

18  in the fall of 2018, so that's kind of typical.

19  Q.  Actually what you said a moment ago is it's typical to

20  issue a supplement with the data up to the time of trial,

21  right?

22  A.  Yes, that would be typical.

23          MR. DE VRIES:  Now Mr. Thomas, could we please show

24  DTX 1546.

25  Q.  Mr. Plumpe, this is another brochure from the Atos Syntel

KAQTSYN2                          Plumpe - Cross

1   website, right?

2   A.  Could you -- are there multiple pages of this?  I don't

3   know if it's from the website or not.

4   Q.  Fair enough.  This is an Atos Syntel brochure, right?

5   A.  It looks to be, yeah.

6           MR. DE VRIES:  Could we go to page 2, Mr. Thomas, and

7   could you blow up the:  Why us?

8   Q.  What Atos Syntel says is "largest third-party Facets

9   service provider."  Is that what it says?

10  A.  It does say that.  What was the date on this again?

11          MR. DE VRIES:  Blow it out.

12  Q.  It was from the website I think two days ago, I don't know

13  if the date is on here.

14  A.  Okay.

15  Q.  And then if we could --

16          MR. DE VRIES:  You can take that down Mr. Thomas.

17          There's a bullet -- sorry, you can keep that page up,

18  thank you.

19  Q.  There's a bullet in the middle just to the right of the

20  words "Why us," projects for 35 plus health plans serving

21  approximately 60 million members.  Do you see that?

22  A.  I do.  I'm wondering what it says right above it because

23  that's blocked right now.

24          MR. DE VRIES:  Show that, Mr. Thomas.

25  Q.  I think it says, "As the leading third provider of Facets

KAQTSYN2                      Plumpe - Cross

services, Atos Syntel combines 1,500 plus person years of

Facets experience with specialized infrastructure and testing

skills to help you seamlessly handle multiple releases and

reduce your overall operations cost.  Our Facets experience

includes," and then it says "projects for 35 plus health plans

serving approximately 60 million members."

     Do you see that?

A.  Okay.  I see what you're saying.

     MR. DE VRIES:  Okay.  Take that down now, Mr. Thomas,

please.

Q.  Now Mr. Plumpe, in your opinion, the Cognizant $2.7 billion

acquisition of TriZetto is a third-party transaction which the

allegedly misappropriated assets were presumably transferred.

Fair?

A.  Yes, I believe that's a good characterization of what

happened.

Q.  And assuming that we're right, that Syntel took the trade

secrets from my client, Atos' acquisition of Syntel also

transferred misappropriated assets, right?

A.  Atos' acquisition -- you're saying if Syntel had

misappropriated trade secrets and those were transferred to

Atos?

Q.  Yes.  Well, let me ask it this way, if it helps.

     MR. DE VRIES:  Please put up DTX 1543, Mr. Thomas.

Q.  You'll see that DTX 1543 is announcement from Atos and

KAQTSYN2                    Plumpe - Cross

1   Syntel about Atos' acquisition of Syntel, and the date of the

2   announcement is July 22nd, 2018.  Do you see that?

3   A.  Yes, I do.

4   Q.  And you see the first bullet below that in the middle that

5   begins Atos and Syntel have entered into a definitive merger

6   agreement under which Atos will acquire Syntel for cash

7   consideration of C $3.4 billion.  Do you see that?

8   A.  I do.  Although, Mr. Thomas, could he put that down a

9   little bit.  It's blocked by one of my Zoom windows.

10          Thank you.

11  Q.  Can you see now where it says that Atos had decided to

12  purchase Syntel for $3.4 billion?

13  A.  Yes, I see that.

14          MR. DE VRIES:  And if we could now, Mr. Thomas, show

15  page 3.

16  Q.  There is a quote from Bharat Desai, co-chairman and

17  co-founder of Syntel.  Do you see that?

18  A.  I do.

19          MR. DE VRIES:  If you could please blow up the

20  paragraph beginning, "Our focus at Syntel."

21  Q.  What Mr. Desai from Syntel says, in connection with the

22  $3.4 billion acquisition, is that our focus at Syntel is to

23  help customers transform and succeed in the digital economy.

24  Since its founding, our customer-for-life ethos has guided our

25  investments in high-impact, domain-led services and

KAQTSYN2                       Plumpe - Cross

1    intellectual property.  Do you see that?

2    A.  Part of it, again, is blocked by the Zoom window.  If you

3    could lower that.

4    Q.  Can you see it now, Mr. Plumpe?

5    A.  Yes, sir.

6    Q.  When he says "our investments in intellectual property,"

7    those are TriZetto's investments, right?

8    A.  I don't have any reason to agree with you on that.  There's

9    no specifics about what that is.  There was a $3.4 billion

10   asset, so the Facets consulting business was only doing about 6

11   or $7 million a year in revenue, so he could very well be

12   talking about other investments that have nothing to do with

13   the Facets consulting business.

14   Q.  And I showed you a document a moment ago also referring to

15   Syntel's investments where it specifically referred to tools

16   and accelerators, didn't I?

17   A.  I recall that, yes.

18   Q.  Now you have seen evidence in the trial that actual Facets

19   development took decades and over $500 million, right?

20   A.  I don't know if I have seen that.  We heard that testimony,

21   but I don't know if I have seen anything to back that up.

22   Q.  Over $500 million is hundreds of millions dollars more than

23   $284 million.  Do you agree about that?

24   A.  That simple math, I would agree with that.

25   Q.  You agree that Syntel advertises itself as the leading

KAQTSYN2                    Plumpe - Cross

third-party Facets service provider, right?

A.  Well, that document you showed me is from 2018, and it's
not specific about what they're saying that they're doing, so
I'm not exactly sure that it is tied to the trade secret
misappropriation.

Q.  What you do know is that Syntel sells competing Facets
services using tools, right?

A.  They have historically.  I know it's been smaller and part
of the business doesn't have much focus on the management.

Q.  And you recall that you showed the Duff & Phelps report in
Exhibit 29.4 in PTX 846 where you showed what the amount of
Facets service revenue was that TriZetto earned in 2014, and it
was about $150 million that year.  Do you recall that?

A.  That was the consulting, which is one of the three
different types of services that TriZetto was offering at this
time.

Q.  And that same document, that same exhibit that you showed
the jury showed that TriZetto anticipated making over $500
million a year in consulting services in 2019 alone, fair?

A.  I don't recall, but that would have been like a merged
Cognizant-Trizetto Group kind of projection, that wouldn't just
be TriZetto standing alone.

Q.  Now you agree that it's appropriate to consider the amount
that the defendant expected to earn from use of IP when
calculating damages, right?

KAQTSYN2                    Plumpe - Cross

1    A.  Could you be more specific, please?

2    Q.  Sure.  You agree that if the record in a trade secret case

3    where you're calculating avoided costs includes things like

4    internal aspirational projections that can be considered,

5    right?

6    A.  I'm not sure I'm following you with avoided costs and

7    someone's aspirations.  I'm not sure I'm following you.

8           MR. DE VRIES:  Mr. Thomas, let's please take a look at

9    page 58 of Mr. Plumpe's deposition, line 8 through 59 line 2.

10   Q.  I asked you:

11   "Q.  In calculating avoided cost as a monetary remedy, do you

12   believe it is appropriate to consider the amount the defendant

13   expected to earn from use of the IP in addition to considering

14   potentially other factors?

15   "A.  So my -- my testimony is the same.  You can consider

16   everything in the record.

17   "Q.  Including what amount the defendant expected to earn from

18   use of the IP?

19   "A.  If the record in a trade secret case where you're

20   calculating avoided cost includes things like internal

21   aspirational projections, that can be considered.  If it

22   includes actual data, you consider that, too.  You consider the

23   totality of the record."

24           Was that your testimony?

25   A.  Yes.

1          MR. DE VRIES:  Mr. Thomas, could we show DTX 83 at

2     page 2.

3     Q.  In 2012, when Syntel came up with a plan to take the trade

4     secrets, they thought the total addressable market was $500

5     million, right?

6     A.  I recall Mr. Reddy talking about this and having some doubt

7     regarding the numbers, and I don't recall what the 500 million

8     was for, but it clearly is not the Facets consulting market

9     that Syntel had anticipated.

10          MR. DE VRIES:  Mr. Thomas, let's put up PTX 189 at

11     page 9.

12     Q.  In 2014, right before it was prepared to launch its all-out

13     war against my client, it was looking at a billion dollar goal,

14     that's what Syntel was looking at, right?

15     A.  Looking down at the bottom, yes.  It didn't define what the

16     billion dollar goal is, what the scope of that is.

17          MR. DE VRIES:  Thank you, Mr. Plumpe, no further

18     questions.

19     REDIRECT EXAMINATION

20     BY MS. JANGHORBANI:

21     Q.  I only have one question for you, Mr. Plumpe.  Mr. De Vries

22     just asked you about the service revenue that we looked at in

23     the Duff & Phelps report.  Do you recall that?

24     A.  Yes.

25          MS. JANGHORBANI:  Let's take a look at that, it's PTX

KAQTSYN2                    Plumpe - Redirect

846 at Exhibit 29.4, page 152, Mr. Stevenson.

Q.  He was asking you about the total revenue that you
testified about, that $150 million per year number.  Do you
recall that?

A.  That was the full year 2014 of TriZetto's consulting
revenues across the entire payer reporting, not just that.

Q.  That's what I was going to ask you.  Is that attributable
only to Facets or is that more than Facets?

A.  No, it's much more than Facets, it's QNXT and other major
platforms that TriZetto offers as product-related services to
the payer industry.

          MS. JANGHORBANI:  Thank you, Mr. Plumpe, I have no
further questions.

          THE COURT:  Mr. Plumpe, thank you very much, you are
excused.

          THE WITNESS:  Thank you, your Honor.

          THE COURT:  Does Syntel have another witness?

          MR. GROOMBRIDGE:  We do, your Honor, Mr. Glenn Sheets.
And my colleague, Ms. Parker, will be presenting Mr. Sheets.

          THE COURT:  Great.  Hello, Ms. Parker.

          MS. PARKER:  Hello.

          May Mr. Sheets approach the witness stand?

          THE COURT:  Please.

          (Continued on next page)

KAQTSYN2                        Sheets - Direct

1    GLENN SHEETS,

2         having been duly sworn, testified as follows:

3    DIRECT EXAMINATION

4    BY MS. PARKER:

5              MS. PARKER:  Mr. Stevenson, if we could please put

6    Plaintiff's Demonstrative 4 on the slide.

7    Q.  Good morning, Mr. Sheets.

8    A.  Good morning.

9    Q.  Could you please introduce yourself to the jury.

10   A.  Yes.  As I just previously testified, my name is Glenn

11   Sheets, S-H-E-E-T-S, and I'm here to give opinions on my

12   evaluation of the economic harm or benefit realized by the

13   parties in this matter.

14   Q.  And Mr. Sheets, have you prepared some slides to help aid

15   in your testimony today?

16   A.  Yes.

17   Q.  Do we see those on the screen?

18   A.  I see, yes, direct examination of Glenn C. Sheets.

19             MS. PARKER:  If we could move to slide 2,

20   Mr. Stevenson.

21   A.  Sorry, I didn't hear.

22   Q.  Mr. Stevenson, will put the slide 2 on the screen?

23   A.  Thank you.  Can you hear me okay?

24   Q.  I can, yes.

25   A.  Great.

KAQTSYN2                          Sheets – Direct

1    Q.  Mr. Sheets, where do you work?

2    A.  I work with the consulting firm now known as Stout.  I'm a

3    managing director for that firm.  We have approximately 450 to

4    500 professionals around the world who provide consultations in

5    a variety of different business and individual situations, some

6    of which deal with quantifying the economic damages in disputes

7    between parties.  And I have been providing 30 years of

8    assessing damages over my career that started back in the early

9    '80s.

10   Q.  And can you tell us a little bit about your educational

11   background, please?

12   A.  Yes, I graduated in the early '80s from the University of

13   California in Santa Barbara, and there I obtained a business

14   economics degree concentrating in accounting which allowed me

15   to subsequently sit for the CPA exam and become a Certified

16   Public Accountant.

17   Q.  And can you talk to us a little bit about what you did

18   after you graduated from college?

19   A.  Yes, I went to work immediately out of college with a

20   regional accounting firm in the southeastern Michigan area.

21   And there, coming out of school, I learned everything about

22   companies from preparing financial statements, tax returns, and

23   then ultimately over a twelve-year period while I was employed

24   by that firm, became a lead consultant for businesses to get

25   into business to help them operate their businesses more

KAQTSYN2                        Sheets - Direct

1   profitably and how to exit a business, whether it was by sale

2   of that business or by a wind down of that business.

3   Q.  And what did you do next?

4   A.  After that I was hired by one of the large national

5   accounting firms by the name of Coopers & Lybrand.  And there I

6   was the director of litigation advisory services for the

7   Michigan and Ohio market where I essentially took all my skill

8   sets and experience, knowledge that I gained over my first

9   twelve years of my professional career, and started focusing on

10  working with parties in disputes to help them understand the

11  economic impact that might be raised from that dispute.

12          THE COURT:  I'm going to interrupt for just a second.

13  I'm told that we lost the Zoom feed, so we need about 30

14  seconds to reconnect.  Apologies.

15          (Pause)

16          THE COURT:  You may proceed.

17          MS. PARKER:  Thank you.

18  BY MS. PARKER:

19  Q.  Mr. Sheets, what did you do after you left Coopers &

20  Lybrand?

21  A.  From there I joined the existing firm I'm at today, that

22  would be the mid to late '90s I joined Stout, and I was a

23  managing director overseeing the litigation consulting business

24  where I focus on a variety of matters across the globe,

25  actually, testifying in matters both in federal, state courts

KAQTSYN2                        Sheets – Direct

and private arbitrations or international arbitrations.  And my

focus is primarily working with the parties in the disputes as

well as their legal counsel to help assess the economic impact

that may be present in any one of those cases.

          MS. PARKER:  Thank you.  Mr. Stevenson, if we could

put up slide 3, please.

Q.  Mr. Sheets, briefly, could you tell us if you're a member

of any professional organizations?

A.  Yes.  The two primary memberships which a Certified Public

Accountant belong to would be the national society, so the

American Institute of Public Accountants.  That governs our

professional conduct and provides us with much of the guides

and guidance on how to provide services from a public

accounting perspective.  And then the state societies are often

one where a CPA would be involved.  I'm one of the members of

Michigan Association of Certified Public Accountants and a

former chairman of the business valuation and litigation task

force, which at that time was essentially the committee that

was providing the technical guidance and practical guidance to

CPAs throughout Michigan that were looking to follow a similar

path that I and colleagues on my task force had provided

through our professional career.

Q.  Do you have professional designations?

A.  I do.  You'll see there are four of them on the slide here.

All of these professional designations I either earned through

KAQTSYN2                        Sheets – Direct

1    taking testing, having the minimum required experience levels,

2    and all of these support my various dispute situations, allows

3    me to bring a variety of learned experiences and formal

4    education and training to allow me to assess the economic

5    impact of the parties in disputes like this.

6              MS. PARKER:  If we could put up slide 4, please,

7    Mr. Stevenson.

8    Q.  Mr. Sheets, the jury has heard testimony from Mr. Britven

9    and Mr. Plumpe regarding TriZetto's damages claims in this case

10   against Syntel.  As part of your work in this case, did you

11   perform any analysis of TriZetto's damages claims in this case?

12   A.  I want to make sure I understood your question.  Damages,

13   Syntel's damages claims?

14   Q.  No, sorry, let me try again.  Mr. Britven and Mr. Plumpe

15   offered testimony in this case about TriZetto's claims of

16   damages against Syntel.  Were looking at those claims any part

17   of your work in this case?

18   A.  No, they were not.

19   Q.  Can you explain what damages were you asked to look at in

20   this case?

21   A.  Syntel has claimed that it has suffered an economic damage

22   or that the defendants have realized an unjust enrichment due

23   to the hiring of 84 specific employees that were hired from

24   Syntel by the defendants shortly after the termination or at

25   least announcement that they were no longer going to provide --

KAQTSYN2                        Sheets – Direct

1    work with the defendants in the contract, I think it's the MSA.

2    Q.  And we see on your slide here it says two measurements,

3    Syntel's lost profits, defendant's unjust enrichment.  Are

4    those two calculations you did in this case?

5    A.  I did.  I looked at both from the perspective of what did

6    Syntel lose associated to having 84 employees hired by the

7    defendants over the time period up to date of trial, and then

8    also looked at it from the perspective of what type of benefit

9    did the defendants realize from hiring the 84 employees and

10   hold them until this date of trial.

11                  (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  I want to take a look at those one a time.  If we can put

2    up slide five, Mr. Stevenson.  Mr. Sheets, what if any

3    conclusion did you reach regarding Syntel's lost profits in

4    this case from the loss their 84 employees?

5    A.  Yes, identifying that the appropriate measure of damages

6    for the losing -- of the economic impact for losing 84

7    employees to the defendants, Syntel's lost profits were

8    14,793,042.

9    Q.  If we can put up slide six, Mr. Stevenson.

10          Mr. Sheets, the jury has heard some testimony in this

11   case regarding the concept of lost profits already.  When we're

12   talking about lost profits in the context of your analysis, can

13   you explain to us what are we talking about?

14   A.  Yes, essentially lost profits is a result of looking at

15   what lost revenue streams are identified to the actions or the

16   claims by the parties, and then applying the appropriate

17   revenue and subtracting the cost or multiplying by a margin.  I

18   think the jury saw that slide as I was in the back of the

19   courthouse.  And in this, my analysis here, is looking at the

20   impact the economic impact to 84 specific employees, so I'm

21   looking at what was the lost revenue and what was ultimately

22   lost profit associated to those employed individuals.

23   Q.  I'd like to take a look at how you reach that.  If we can

24   put up slide seven.

25          Mr. Sheets, can you walk us through what was the first

Kaq3syn3                        Sheets - Direct

1   step you took in identifying or calculating Syntel's lost

2   profits from the loss of its 84 employees?

3   A.   Yes, there was, well, there was a number of documents that

4   I reviewed in coming to my opinions, one of which was a

5   document where Cognizant acknowledged that it had hired 84

6   people from Syntel.  Those are the 84 that I identified.  So

7   starting with how many were hired, and who was hired.  I next

8   then was able to understand when they were hired by Syntel,

9   when they were previously employed by Syntel, and when they

10  left Syntel.  And ultimately, I also had information to allow

11  me to understand when they were hired by the defendants, and if

12  or when they might have left the employ.

13  Q.   If we can take a look at slide eight.  Mr. Sheets, you

14  mentioned a moment ago you had information from the parties

15  regarding when employees left Syntel and when employees started

16  at Cognizant.  Can you explain to us what we are looking at on

17  this slide?

18  A.   Yes.  This is two subsets of the information that I

19  reviewed.  I believe they've been identified by Bates number at

20  the corner of the background documents.

21       Essentially you can see where I've lined up the

22  employees both on Syntel's records which is at the top band

23  that's being shown.  And those that are in the TriZetto or the

24  defendant's records that were provided that shows that same

25  individual, when they started, which was in this case shortly a

Kaq3syn3                         Sheets - Direct

1   few days after they were terminated from Syntel or left

2   Syntel's employ.

3   Q.  So for each of the 84 employees in your analysis, did you

4   have a confirmed start date for Cognizant for each of those

5   employees?

6   A.  Yes, both a confirmed start date and I think 10 of the 84

7   people, confirmed termination date.

8   Q.  We'll talk about that in just a minute.

9          Mr. Stevenson, if you can go back to slide seven.

10          Mr. Sheets, once you identified the employees at issue

11   and the date they left Syntel, what did you do next in your

12   analysis?

13   A.  So, once I was able to identify the number of employees and

14   when they were -- and when they left Syntel and were employed

15   by the defendants, I then computed what was the average hours

16   billed per year for each of those individuals.  Because it is a

17   group of individuals, my calculations is basically looking at

18   them in aggregate.

19   Q.  How did you decide what hours number to use for your

20   analysis?

21   A.  Well, I had several interviews with the management of

22   Syntel, both of whom testified in this matter that I was

23   watching remotely, Mr. Reddy and Mr. Mehta.  And with my

24   interviews with them, I made inquiries as to how many average

25   billable hours per year these employees on average would bill.

1   And he said it was roughly 2,088 was kind of their minimum

2   expectations, but their people were busy and generally working

3   more than that.

4   Q.  What number did you use for your analysis for average hours

5   billed?

6   A.  I used the 2,088 hours a year being a conservative estimate

7   of the minimum expectation, as opposed to what they might have

8   worked in addition to that.

9   Q.  So once you had the identified employees and the average

10  hours they would bill, what did you do next?

11  A.  From a business economics perspective, and looking at

12  damages, there is a term used called attrition.  When you look

13  at a base of activity, whether it's employees or it's

14  customers, if you were to stop that pool of employees at that

15  time, just focus on them, how many over time might have left in

16  this case Syntel for other reasons, they would have left for

17  other opportunities or other reasons.  So we call that

18  attrition.

19          So I can calculate that by looking historically at

20  what Syntel's attrition rate was.  And essentially it was

21  20 percent of their employees on average, not specific to these

22  84, but 20 percent of their employees on average would leave

23  over time.

24  Q.  Once you had your employees, the hours, and you accounted

25  for the leaving in the regular course of employees, what did

1   you do next in your calculation?

2   A.  Then I was provided information that allowed me to figure

3   out how much Syntel was charging their customers for these

4   specific employees.  And so with that I was able compute number

5   of employees, times the hours they would expect to work a year,

6   less the number of people that might leave throughout that

7   year, times the rate that they would bill to their customers

8   and ultimately receive in cash when the client paid them, and

9   that gives me revenue for those 84 individuals.

10  Q.  I see at the bottom of your slide a green box that says

11  total revenue $21,312,426.  What does total revenue mean here?

12  A.  Total revenue would be looking over the time period of

13  essentially the end of 2014, when the first hires were made by

14  the defendants, taken from Syntel, up through the date of this

15  trial.  Considering attrition, that would be the total amount

16  of revenue, which would convert, if they were paid by their

17  clients into cash that they would have available to them over

18  that little over six-year period.

19  Q.  Does that total revenue represent Syntel's lost profits for

20  these 84 employees?

21  A.  No, and I think Mr. Plumpe had put on the screen a graphic

22  that showed how you compute lost profits.  This is revenue

23  before you either subtract costs or multiply it by what's

24  called a margin percentage.

25  Q.  Did you take that next step to account for costs or margin

Kaq3syn3                    Sheets – Direct

1    in this revenue number?

2    A.  I did.

3    Q.  If we can put up slide nine, please, Mr. Stevenson.

4           The first bullet here we see apply Syntel's lost gross

5    margin.  Can you explain what you did in this step of your

6    calculation?

7    A.  Yes, I was provided a variety of financial information on

8    Syntel's healthcare and life sciences group, which is where

9    these 84 individuals were reporting through.  That business

10   unit.  And I saw that over a number of their clients and over a

11   number of years that the average margin was approximately

12   43.8 percent of revenue.

13          So because I observed from their financial records

14   that the gross margin percentage was 43.8 percent, I could

15   multiply that by the revenue that you showed me earlier which

16   is just over 21 million, and that result is $9,341 -- I'm

17   sorry.  $9,341,697.

18   Q.  Mr. Sheets, can you talk to us what you did once you

19   calculated that $9 million number.

20   A.  I'm measuring the economic loss to Syntel.  So you would

21   expect that as, over this six-year period, as Syntel's clients

22   are paying them cash, Syntel would have received that cash,

23   those lost profits, and they would have invested them into

24   their business like all businesses would.  Businesses take the

25   money that they make from their clients, they reinvest it into

Kaq3syn3                      Sheets - Direct

1    their business.  That allows them to grow.  That's a rate of

2    return or a rate on your investment.  And I went to the

3    industry average type of returns of about 14 percent a year.  I

4    used a financial calculation then to bring that up to what

5    those economic damages have been to Syntel as of the date of

6    this trial.  That would be 14,793,042.

7    Q.  If we can put up slide 10, Mr. Stevenson.

8            So Mr. Sheets, just to sort tie up your first

9    calculation, can you just tell us, what were the lost profits

10   to Syntel that you calculated for the loss of these 84

11   employees?

12   A.  Over the damage period that they were impacted, which is up

13   through trial today, it would be just under $15 million.

14   Q.  If we can go to slide 11, Mr. Stevenson.

15           Mr. Sheets, the jury has heard some testimony in this

16   case on Thursday and again briefly this morning about

17   Cognizant's hiring of five specific employees with

18   non-solicitation or non-competition clauses in their contracts.

19           Did you perform any analysis regarding the lost

20   profits to Syntel from those five employees?

21   A.  Yes, since those five are just a subset of the 84, I

22   used -- I subtracted everyone else but the five, I did the

23   exact same calculations, and that resulted in a total lost

24   profits for those five individuals of 1,239,256.

25   Q.  Mr. Stevenson, if we can go to slide 12, please.

Mr. Sheets, I want to move now and talk about the
second analysis that you did which you told us which was
defendant's unjust enrichment.  Can you tell us what number you
calculated?

A.  Yes, for the benefit realized by the defendants for hiring
84 people over the same period of time, up through the date of
trial, I calculated a benefit or an unjust enrichment of the
defendants of $19,039,998.

Q.  If we can go to slide 14, please, Mr. Stevenson.

Mr. Sheets, how did you go about calculating benefit
to defendants from hiring these 84 individuals?

A.  It was a very similar analysis that I did in lost profits,
but rather than focusing in on what the impact was to Syntel,
I'm looking at what the financial benefit most likely realized
by the defendants.  So I started with the number of people that
were hired by the defendants, I knew their start date.  I think
I've already testified that 10 out of the 84 had terminated
their employment with the defendants over a six-year period,
but that left 74 people still employed, at least as of the last
information that was provided by the defendants.

I then used the rate per hours that they were doing at
Syntel, because they were busy and I understand that's the type
of work that they provided.  And then I multiplied that by the
billing rate.  In this case I had to use Syntel's billing
rates, because I was not given anything from the defendants

Kaq3syn3                         Sheets - Direct

that would support the billable rates themselves, so I'm sure

that's conservative, but I expect if they hired these people

they probably gave them pay raises and stuff.  But I used the

more conservative number.

Q.  As a result of that calculation, what total revenue did you

calculate for defendants for the hiring of these 84 employees?

A.  For the same approximately six-year period up to the date

of trial, the revenue that the defendants realized on these 84

people, understanding 10 of them attritted or left over the

six-year time period, is $39,776,782.

Q.  Does that number represent the unjust benefit to defendants

from hiring these employees?

A.  That's the revenue, not what I would expect to be the net

benefit.

Q.  Did you take those factors into account in your analysis?

A.  I did.

Q.  Mr. Stevenson, if we can put up slide 15, please.

          Mr. Sheets, can you talk to us about applying

TriZetto's gross margin here in your analysis?

A.  Yes.  I was ultimately provided financial information from

TriZetto that showed that their gross margin on these types of

services where these employees would expect to have worked was

32.1 percent of revenue.  So I just calculated that by doing

the multiplication.  Multiplied the 32.1 percent by the over

$30 million number I testified earlier, giving me 12,768,347.

Kaq3syn3                          Sheets - Cross

1    Q.   What, if anything, did you do in your analysis to adjust

2    for that number up to the time of trial?

3    A.   Very similar approach with Syntel.  The defendants would

4    have realized, ultimately their customers would have paid them

5    in cash for the services these employees were providing on

6    behalf of the defendants, and that they would reinvest that

7    into their company.  That would grow up through the date of

8    this trial, which would be in the amount of $19,039,998.

9    Q.   Mr. Stevenson, if we can put up slide 17, please.

10            So, Mr. Sheets in conclusion, what was your final

11   conclusion regarding the lost profits to Syntel from losing

12   these 84 employees?

13   A.   Yes.  Looking at it from the perspective of what did Syntel

14   lose or what was the detriment to them for having these 84

15   employees hired, it was just under $15 million.

16   Q.   With respect to defendant's unjust enrichment from hiring

17   those 84 employees, what, if anything, conclusion did you

18   reach?

19   A.   As I just previously testified, the expected realization of

20   profits from the hiring of 84 people by the defendants would be

21   just over $19 million.

22            MS. PARKER:  Thank you, Mr. Sheets.  I have no further

23   questions.

24   CROSS-EXAMINATION

25   BY MS. CARSON:

1    Q.  Good morning, Mr. Sheets.  My name is Pat Carson.  I am

2    just going to ask you a few questions and I'm going to do my

3    best to make these yes-or-no answers, because I'm very short on

4    time, and I really appreciate it if you would try to answer the

5    questions as yes or no.  Okay?

6    A.  I'll do my best.

7    Q.  Now, you've talked about the 84 employees that you contend

8    that TriZetto hired away from Syntel.  And do you understand

9    that her Honor has already determined that it was not a

10    violation of the Master Services Agreement for TriZetto to hire

11    employees from Syntel, correct?

12    A.  I'm not sure if I'm able to give an answer on

13    interpretations of either court rulings or pleadings.  My

14    understanding is that the claims that I was preparing were in

15    relationship to the confidential information.  I don't know how

16    that plays in with the MSA.

17    Q.  So you're just here to talk about Syntel's claim that

18    TriZetto used information such as employees' names, their phone

19    numbers, and their salary information, information like that,

20    that Syntel claims is confidential in order to hire those

21    employees, correct?

22    A.  I believe that's correct.  I think there's more factors

23    than what you listed, but generally, yes.

24    Q.  Because I am short on time, I want to just move to your

25    calculations of unjust enrichment.  But before I do that, just

Kaq3syn3                              Sheets - Cross

1    to be clear, you're not issuing any opinions about whether or

2    not TriZetto actually used any confidential information,

3    correct?

4    A.   That's correct.

5    Q.   So you're just here to do calculations for the jury?

6    A.   Under the premises this jury will find the defendants

7    liable for inappropriate hiring of 84 people.

8    Q.   So let's talk about your calculations on unjust enrichment.

9    You agree that unjust enrichment damages are not limited to the

10   amount of profits that are lost, correct?

11   A.   I believe you would look at all the economic inputs and

12   they may not be limited by that, correct.

13   Q.   And in your expert report, you stated that a component of

14   unjust enrichment is costs saved, correct?

15   A.   Yes, one would consider the costs saved by somebody's

16   inappropriate actions to hire.

17   Q.   And costs saved are the same thing as avoided costs,

18   correct?

19   A.   Yes.

20   Q.   So, you say that Syntel lost almost $14.8 million due to

21   losing 84 employees, correct?

22   A.   Correct.

23   Q.   And did you hear Mr. Reddy's testimony that he personally

24   is responsible for overseeing 28,000 employees?

25   A.   I believe he said that.  But again, that was in the context

Kaq3syn3                          Sheets - Cross

1    of the Syntel's entire business.  And this was, these

2    individuals were working in the healthcare and life sciences

3    division, which was a smaller aspect of that.

4    Q.  But, you just testified that there was a 20 percent

5    attrition rate at Syntel, and that just means employees leaving

6    for reasons that have nothing to do or don't necessarily have

7    anything to do with TriZetto, correct?

8    A.  I believe that's correct.  It is a 20 percent annual

9    attrition rate.  That was based upon their historical review of

10   the attrition factor, beginning number of employees, those who

11   left at the end of any one year.

12   Q.  So for example --

13   A.  I'm sorry.  Just to -- I didn't finish my answer.  I'm

14   sorry.

15          And the information that I relied upon was specific to

16   the healthcare and life sciences business unit.  Not the entire

17   company as a whole.

18   Q.  But let's just say, taking that 20 percent on those 28,000

19   employees that Mr. Reddy says he's in charge of.  That would be

20   5,600 employees per year that just leave Syntel for various

21   reasons, correct?

22   A.  Well, I don't think I can answer that because I had just

23   testified that the information I was looking at for the

24   20 percent was limited to the healthcare and life sciences

25   group.

Kaq3syn3                        Sheets - Cross

1    Q.   I am asking you to do the math, Mr. Sheets.  If you take

2    20 percent of 28,000, how many employees is that?

3    A.   That would be I think 5600.

4    Q.   5,600 employees?

5    A.   In the context that that's not -- that's applying a

6    20 percent factor that is limited to a fraction of those number

7    of employees.

8    Q.   I want to go back to avoided costs.  You know that Syntel

9    actually estimated the costs to replace those 84 hires,

10   correct?

11   A.   I understand there was an analysis to appreciate or to kind

12   of measure what the damage was associated to the 84 or number

13   of employees leaving.  I don't think it was specific to the

14   replacement.  As I understand these were never replaced.

15   Q.   Mr. Thomas, if we can have PTX 5.

16        This is a document that you relied on in making your

17   calculations, correct?

18   A.   Based upon the first sheet, yes.  I'd have to look at the

19   rest of it, but that does appear familiar.

20   Q.   And the title of this document is "cost per hire employee

21   replacement cost."  Correct?

22   A.   That's the title, yes.  The context of what's behind it may

23   differ, but I agree with that's what it says.

24        MS. CARSON:  Mr. Thomas, if we can have from

25   Mr. Sheets' supplemental report Exhibit E2, schedule 2, PDF

Kaq3syn3                        Sheets - Cross

1    page 80, please.

2    Q.   While Mr. Thomas is pulling this up, in E2 schedule 2 to

3    your expert report, you showed that applying Syntel's own

4    numbers, it would have cost them $2.5 million in dollars of

5    2014 to replace those 84 employees, correct?

6    A.   I'm sorry.  Would you repeat that?

7    Q.   Looking at the appendix that you put on your supplemental

8    expert report, and using the document that I just showed you

9    from Syntel calculating the cost of replacing employees, you

10   calculated that it would be $2.5 million for Syntel to replace

11   those 84 employees in 2014, correct?

12   A.   You know, I don't recall.  I did make a calculation, I

13   don't recall the number.  If you could show me the appendix fee

14   schedule, that would allow me to verify that number.

15   Q.   Just while Mr. Thomas is finding that schedule.  I believe

16   you doubled that number, whatever the number was, you doubled

17   the number from 2014 to today.

18             Why did you do that?  Was that for time, the time

19   money, the value of the time?

20   A.   Yes, I think conceptually over the damage period, that

21   would have been moneys not spent by the defendants, and so that

22   would be cash available to invest in their company, and that

23   would have a return up through today.  I don't remember if it

24   was double, but it was -- I applied that calculation.

25   Q.   So assuming you said $2.5 million in 2014, if you took into

Kaq3syn3                          Sheets - Cross

1     account the value of the, time then it would become double in

2     today's numbers.

3     A.   I think I've already testified I can't remember if it was

4     exactly double.  The 5 million approximate number does ring a

5     bell.

6     Q.   So it doesn't appear that I am going to be getting your

7     exhibit in the time that I have.  So, I think that what I'd

8     like to do is just finish up with one last question.

9           I want to go back to the claim that you're here to

10    talk about, and that is that TriZetto hired away 84 employees

11    from Syntel using what Syntel claims is confidential

12    information like their phone numbers and their current

13    salaries, correct?

14    A.   I think I answered that question earlier in court today.  I

15    don't know that there was many more factors that Syntel is

16    considering confidential, but from the context of my

17    understanding is that the calculations are made are relevant to

18    the 84 individuals being hired inappropriately by the

19    defendants.

20    Q.   In your view, for those 84 employees, TriZetto should pay

21    anywhere from 15 to $19 million, correct?

22    A.   Yes, based upon the types of margins and the reinvestment

23    of the cash proceeds, yes.

24    Q.   Mr. Plumpe's opinion in this case is that for

25    misappropriation of 104 trade secrets that represented over

Kaq3syn3                    Sheets - Redirect

1   $500 million, and two decades of research, my client should

2   only get $4 million, correct?

3   A.  I have no opinions on that aspect of this case.

4            MS. CARSON:  Thank you, Mr. Sheets.

5            THE COURT:  Any redirect?

6            MS. PARKER:  Very briefly, your Honor.

7   REDIRECT EXAMINATION

8   BY MS. PARKER:

9   Q.  Mr. Sheets, just a few brief questions.  During your

10  cross-examination, counsel asked you about a PowerPoint that

11  you looked at that related to costs of hiring employees.  Do

12  you recall that?

13  A.  Yes, it is an analysis that when I reviewed as well as

14  discussed with management was an attempt to capture what the

15  entire organization, or at least what the healthcare and life

16  sciences division, what their kind of average costs per person

17  might be if they did have to replace somebody.

18  Q.  As part of your analysis and in speaking with management

19  and looking at that presentation, did you have an understanding

20  as to whether or not Syntel was actually able to hire the

21  employees if they would have paid those costs?

22  A.  Well, they weren't able to, from my discussions, and I

23  think there was testimony given to this jury that they said it

24  was an extremely difficult time, demand was rising, there was a

25  surge of hiring by the defendants, so there weren't available

Kaq3syn3

1    candidates.  So I understand that's going to be the position

2    that this jury will consider.

3    Q.  So if it were suggested that Syntel could have avoided the

4    lost profits by simply paying $5 million to hire those

5    employees, would you agree or disagree?

6    A.  Disagree.  That would be a hypothetical.  Based on my

7    discussions and the testimony, I think it's clear they did not.

8              MS. PARKER:  Thank you, Mr. Sheets.  No further

9    questions.

10             THE COURT:  Thank you.  You may be excused.  Although

11   I think Mr. Street will give you something to wipe down the

12   booth.

13             (Witness excused)

14             THE COURT:  Syntel, do you have any other witnesses?

15             MR. GROOMBRIDGE:  We have no further witnesses.  There

16   is one remaining matter that we probably need to take up with

17   your Honor before we rest.  However your Honor prefers to do

18   that is fine.  We would be happy to wait on that if TriZetto

19   wishes to call their rebuttal witness now.

20             THE COURT:  Does TriZetto have any rebuttal witnesses?

21             MR. DE VRIES:  Just one brief rebuttal witness, your

22   Honor.

23             THE COURT:  Okay.  Let's go ahead and do that.

24             MR. DE VRIES:  Your Honor --

25             THE COURT:  With five minutes for the booth.

Kaq3syn3                         Britven - Direct

1           MR. DE VRIES:  We'll note for the record that we have

2     Rule 50(a) motions relating to the parties' claims.

3           THE COURT:  I will reserve on those.  I think they

4     haven't yet rested, so you might want to repeat it again when

5     they do.

6           MR. DE VRIES:  Yes, your Honor.  I will.

7           MS. CARSON:  Your Honor, does the witness booth need

8     to rest?

9           THE COURT:  Sadly, yes.  Three more minutes.

10           Mr. De Vries, do you want to call your rebuttal

11     witness?

12           MR. DE VRIES:  Yes, your Honor.  In rebuttal we call

13     Mr. Thomas Britven.

14           (Witness sworn)

15           THE DEPUTY CLERK:  State and spell your first and last

16     name for the record.

17           THE WITNESS:  Thomas Britven, B-R-I-T-V-E-N.

18           THE COURT:  Welcome back.

19           THE WITNESS:  Thank you very much.

20      THOMAS BRITVEN,

21          called as a witness by the TriZetto,

22          having been duly sworn, testified as follows:

23     DIRECT EXAMINATION

24     BY MS. CARSON:

25     Q.  Welcome back, Mr. Britven.

Kaq3syn3                      Britven - Direct

1    A.  Thank you very much.

2    Q.  During Mr. Plumpe's cross-examination, there was discussion

3    about the latest date that revenue information from Syntel is

4    available.  Did you have information that went beyond

5    June 2018?

6    A.  I did not.

7    Q.  And does it appear that any of Syntel's experts had

8    information that went beyond June 2018?

9    A.  No.  Mr. Plumpe doesn't have it in his report, Mr. Sheets

10   doesn't have it in his report, and it's my understanding the

11   jury will be asked to determine damages through October of

12   2020.

13   Q.  In your experience as a certified fraud examiner, is there

14   any conclusion that you draw or any inferences that you draw

15   from the lack of information?

16   A.  Well, in this case, given the discovery issues around

17   revenues, it raises a red flag.

18            THE COURT:  It raises a?

19            THE WITNESS:  Red flag.

20   Q.  You've been present throughout this entire trial.  Have you

21   heard any testimony about any other instances where Syntel

22   concealed information?

23            MR. GROOMBRIDGE:  Objection, your Honor.

24            THE COURT:  Sustained.

25   Q.  Let me try to rephrase.

1          Have you become aware through this trial of any other
2     instances where there was not information provided by Syntel?
3     A.  Yes, with regards to Mr. Rubin's work, the neutral forensic
4     examiner, he was not able to look at all of Syntel's computers.
5     And then we heard last week that there was 17 computers hidden
6     in a closet in India.
7     Q.  Let's turn to your $284 million in unjust enrichment.  And
8     you're measuring that by avoided costs.  Does that depend in
9     any way on how much money Syntel made?
10    A.  No, it does not, and the reason it does not is because at
11    the time of the misappropriation, Syntel saved time, $284
12    million in money, as well as time.  So they saved the money and
13    they saved the time.  In terms of the time, they saved 10
14    years.  I didn't even include that in my calculations.
15    Q.  Have any of Syntel's damages experts calculated how much it
16    would have cost Syntel if they set out to develop the
17    misappropriated trade secrets?
18    A.  No, they have not.
19    Q.  Mr. Plumpe talked a lot about the Duff & Phelps report and
20    about obsolescence and royalty.  Let's start with obsolescence.
21    What does it mean when Mr. Plumpe makes this big obsolescence
22    adjustment to your $284 million?
23    A.  Mr. Plumpe is trying to reduce my number by two-thirds, so
24    basically one-third of my $284 million is $94 million.  And he
25    would have the jury to believe that Syntel, starting from

1    scratch, could develop all the software that was taken, all

2    those manuals and guides, all the tools, the Data Dictionary,

3    the whole basket of that for less than 100 million, and that's

4    just not real world.

5           In the real world, TriZetto with tremendous advantages

6    of the 200 people in New Jersey, and all of their legacy

7    knowledge, including Mike Noonan who has 20 years' experience,

8    including the advantages associated with having the prior

9    versions and the prior manuals and access to all of the

10   TriZetto clients, actually spent 284 million.

11   Q.  Mr. Britven, is Facets obsolete?

12   A.  No, not at all.  It is worth more today than it was when we

13   started this case.

14   Q.  Why do you say that?

15   A.  It's in more places, it is bigger, it's more complicated.

16   Healthcare laws have expanded, as has the program, and the

17   market has gotten bigger.

18   Q.  Mr. Plumpe also talked about the 10 percent royalty based

19   on the Duff & Phelps report.  Can you explain why Mr. Plumpe's

20   opinion is not correct.

21   A.  So, Mr. Plumpe wants to use the 10 percent from the Duff &

22   Phelps report, and that's on Exhibit 3.1., among other places.

23   Also on Exhibit 3.1 is a calculation of that royalty.

24          When you look at that exhibit, you can see that if you

25   take the 10 percent times the revenues for the payer portion of

1    the business, that's $950 million.  We know from the testimony

2    that Facets makes up half of the payer portion of the business.

3    That's $475 million.  And Mr. Plumpe would have you believe

4    that a reasonable royalty is around 1.7 million out of that

5    475.  That does not make sense.

6    Q.  I know we've talked about this before, but let's get to the

7    heart of the matter here.

8         Would these parties actually agree to a running

9    royalty?

10   A.  No, we talked about this last week.  These parties are not

11   getting along.  In that circumstance, it's going to be a lump

12   sum.  But more importantly, in this circumstance, where Syntel

13   will not provide accurate or complete revenue information under

14   court supervision in order for a royalty to be calculated, they

15   would have to provide that information to TriZetto in the

16   normal course of business, and I think that's highly unlikely.

17   Q.  Mr. Plumpe has attacked your 284 million figure as being

18   economically unreasonable and overstated.  What's your

19   response?

20   A.  So, what's economically unreasonable here is his notion

21   that Syntel gets a free roll of the dice.  Syntel does not get

22   to use all this information to build their business, and then

23   at the end say we didn't make any money, we don't owe anything.

24   That's not how it works.

25   Q.  I'm going to ask Mr. Thomas, I want to just talk briefly

Kaq3syn3                        Britven - Direct

about Mr. Sheets' opinion.  And Mr. Sheets did calculate based

on the Syntel document that I showed to him about how much it

would cost to replace employees.  He calculated how much would

it cost for Syntel to replace those 84 employees in 2014.

A.  That's correct.

          MS. CARSON:  Mr. Thomas, if you can pull that up.

A.  I think it's about 2.5 million, a little less.

Q.  I spoke to Mr. Sheets about why he doubled that number.

Can you explain to the jury why he doubled that number.

A.  He explained that, that was time value of money.  So, when

he brought that number forward, it basically a little more than

doubled.  So the 2.5 became a little over 5 million.

Q.  Mr. Britven, your $284 million, that's as of 2014, correct?

A.  That's right, I did not bring my number forward.

Q.  You didn't double your number, right?

A.  No.  If I had applied that same methodology, my number,

too, would also more than double.

Q.  I just want to ask you since you have been here through

this entire trial, is there anything that you've heard during

your trial that changes your view that the appropriate amount

that Syntel should pay to TriZetto for the trade secrets that

it stole is $284 million?

A.  No, my number hasn't changed.  It is a good number.

Q.  We've heard a lot about Syntel's activities in this during

the testimony.  Does your number include punitive damages?

Kaq3syn3                      Britven - Cross

1   A.  No, that's for the jury to decide.

2            MS. CARSON:  Thank you, Mr. Britven.

3            THE WITNESS:  Thank you.

4   CROSS-EXAMINATION

5   BY MR. GROOMBRIDGE:

6   Q.  Good morning or good afternoon at this point.

7   A.  Good afternoon.

8   Q.  Let's just talk about the 17 computers that you just

9   mentioned.

10  A.  Yes, sir.

11  Q.  In fact, you said they were locked in a closet.  But in

12  fact, they were computers that nobody could find, correct?

13  A.  I heard the testimony they were in the closet in India.

14  That's what I heard from the testimony.

15  Q.  Well, would you agree with me that if the ladies and

16  gentlemen want to find out what the best source of information

17  is here, they should look at the forensic examiner's report,

18  correct?

19  A.  Well, no.  He wouldn't know about them because they were

20  concealed from him.

21  Q.  Well, if the ladies and gentlemen want to find out whether

22  those were in a closet or whether they were computers that had

23  gone, that no one could track down, they should look at what

24  the forensic examiner said, correct?

25  A.  The forensic examiner will only be able to talk about what

Kaq3syn3                     Britven - Cross

1    he actually saw and his observations.  He won't know the rest

2    of the story.

3    Q.  Have you ever read his report?

4    A.  I did.

5    Q.  You'd agree with me it's Exhibit 245, Defendant's Exhibit

6    245?

7    A.  I don't remember the number, sir.

8    Q.  You'd agree with me that one of the attachments to his

9    report has a list of the computers that he couldn't find,

10   right?

11   A.  That's correct.

12   Q.  And if the ladies and gentlemen want to find out whether

13   they were in a closet or they simply couldn't be tracked down,

14   the best thing for them to do would be to look at Defendant's

15   Exhibit 245, correct?

16   A.  And listen to the testimony where we learned that the

17   computers were hidden in a closet.

18   Q.  Well, you'd agree with me that TriZetto had the opportunity

19   to call the forensic examiner and decided not to, correct?

20   A.  I don't know how that works.

21   Q.  You don't know whether they said we're going to call him as

22   a witness and then they changed their minds and said we're not

23   going to call him as a witness?

24   A.  I don't know either way, sir.

25   Q.  Now, the computers that no one could find, you agree with

1    me that one of them belonged to the gentleman we talked about

2    last week by the name of Viral Dave?

3    A.   I don't recall.  I am just not that good.  I wish I was two

4    years ago, but I don't remember.

5    Q.   Let's see if while we are talking one of my colleagues can

6    find it in Defendant's Exhibit 245 that list of the computers

7    who -- who couldn't be tracked down.  I'm going to ask my

8    colleagues to see if they can find that.

9              Let me, in the interest of time, let's just refresh

10   ourselves about Mr. Dave.  Now he was the gentleman who did a

11   lot of downloading on Thursday, November 6, 2014, correct?

12   A.   I don't remember the day, but he did a lot of downloading

13   in November 2014, that's correct.

14   Q.   On a Thursday?

15   A.   In the week of Thanksgiving, yes.

16   Q.   Thanksgiving is later.  Right.  This is --

17   A.   You're correct.  You asked me last time if I remembered the

18   day and I didn't and I still don't remember the date, but I'll

19   accept your date.  It's in November, I agree.

20   Q.   That was a Thursday, right?

21   A.   That's what you told me last time, I agree.

22   Q.   And then, you told us that the Friday was his last day.

23   Right?

24   A.   I think we looked that up together.

25   Q.   And it turned out that the Monday following, the 10th, was

Kaq3syn3                    Britven - Cross

1    his first day working at Cognizant, right?

2    A.  Yes.

3    Q.  If it should turn out his is one of the computers that

4    couldn't be tracked down, would you agree with me that a much

5    more likely explanation is he downloaded those onto his

6    computer and took them with him to Cognizant?

7    A.  How could he take a computer to Cognizant if it's in the

8    closet?

9    Q.  You've heard the testimony Mr. Dave was working in

10   TriZetto's office in Colorado, correct?

11   A.  I don't remember his location specifically.

12   Q.  And in fact, what really happened, was on the Friday, he

13   stopped being a Syntel employee, and on the Monday he came back

14   to the same office, and sat down at the same desk, to do the

15   same work but he was now a Cognizant employee, right?

16   A.  I'll accept your representation.

17   Q.  And the reason that his computer couldn't be found is

18   because he still had it, right?

19   A.  I'll -- I don't know, sir.

20   Q.  So, do you know how many of those 17 people whose computers

21   couldn't be found, how many of them went to work at Cognizant?

22   A.  Specifically, no, I do not know.

23   Q.  Have you ever asked?

24   A.  No.  I think at one point I probably had a general idea,

25   but I don't recall.

Kaq3syn3                        Britven - Cross

1    Q.   Now let's just talk about some of the avoided costs here.

2    You didn't change your testimony from last week about avoided

3    costs?

4    A.   No.

5    Q.   So you said to me that what was going on here was it was

6    like someone set up their own Genius Bar to mend iPhones.

7    You're not changing that testimony?

8    A.   That was your analogy, sir.

9    Q.   Now, we do agree that you're saying that Syntel should pay

10   for the entire development of Facets, even though it's still a

11   very valuable product and TriZetto and Cognizant are making a

12   whole pile of money from it, right?

13   A.   Syntel should pay for what they took, that's how it works.

14   That's why it is called an unjust enrichment.

15   Q.   They've found this.  Let's blow up the part of the page

16   about missing computers.  Right.

17          Do you see that?  That's the 17 missing computers,

18   right?

19   A.   Those are 17, yes, sir.

20   Q.   Those are 17 that you were referring to in your direct

21   testimony just now, correct?

22   A.   I didn't know the specific names relative to the 17, but I

23   did say 17, I agree.

24   Q.   These are the 17 that you were referring to; am I right?

25   A.   I was referring to the 17 that were missing and correlating

1   that to what was in the closet.

2   Q.   There is nothing in here about it being in a closet.   It

3   just says they're missing, right?

4   A.   No we heard the testimony that they were in a closet.

5   There are missing computers that was in the closet.   That was

6   the testimony.

7   Q.   Would you agree with me that the ladies and gentlemen

8   should decide for themselves what they heard?

9   A.   That's true, but I also need to answer your complete -- or

10  answer your question completely.

11  Q.   Sir, would you agree with me that one of the persons whose

12  computer was missing was Viral Dave?

13  A.   Yes, sir.

14  Q.   And you see on the other side, the second and third

15  entries, Chelan Chaudhary and Chetankumar Chaudhary?

16  A.   Yes, sir.

17  Q.   Do you agree with me that's actually the same person,

18  correct?

19  A.   I'll accept that representation.

20  Q.   So it's really 16, not 17, correct?

21  A.   I'll accept that.

22  Q.   And Mr. Chaudhary was another person who got hired on at

23  Cognizant, right?   We've heard that?

24  A.   I don't recall that, but I'll accept your representation.

25  Q.   While we're at it, just recognizing names, do you see on

Kaq3syn3                        Britven - Cross

1   the other side it says Swapnil Adhav there?

2   A.  Yes, I see that.

3   Q.  That's another person about whom we've heard testimony

4   being hired on at Cognizant, right?

5   A.  I'm under oath.  I don't specifically recall, but that

6   would make sense.

7   Q.  And you are not able to tell me of the ones who aren't

8   highlighted how many of those people went to Cognizant and took

9   their computers, right?

10  A.  No, I don't have the list memorized.

11  Q.  Now, sir, we can take that down.  Thank you.

12          If I took your reasonable royalty -- what you said if

13  I remember is that for a reasonable royalty, you think that

14  TriZetto should pay $142 million?

15  A.  I think you mean Syntel.

16  Q.  I'm sorry.

17  A.  And that's correct.

18  Q.  I misspoke and I apologize.

19          You think that Syntel should pay $142 million,

20  correct?

21  A.  That's correct, sir.

22  Q.  And now, when you were testifying last week, the only

23  revenue that you pointed to us that Syntel had made by use of

24  the trade secrets we're talking about here was for the UHG

25  business, correct?

Kaq3syn3                    Britven – Cross

1   A.  Yes, I just presented the UHG revenues and lost profits.

2   Q.  So, and the number you presented for UHG revenues was about

3   $27 million, right?

4   A.  That sounds about right.

5   Q.  And that's revenue, correct?  That's not profit.

6   A.  Right, and my profit was 8.5 million.

7   Q.  But if we were going to express your royalty as a

8   percentage of revenue, would you agree with me that that would

9   be in the neighborhood of 500 percent?

10  A.  I have a calculator here.

11          You want to use it as revenue?

12  Q.  Yes.  As a percentage of revenue, what's 142 as a

13  percentage of 27?

14  A.  It is a little over 500 percent.

15  Q.  Right.  And so what you're saying, let's imagine that

16  hypothetical negotiation.  What you're saying is here is a $10

17  bill, here is a $1 bill, I'll sell it to you for $5.  That's

18  what you're saying?

19  A.  No, what I'm saying is that you are going to become the

20  leading third-party supplier of Facets services, and that's a

21  big stinking deal, and you're going to pay money for that.

22  Q.  What you are saying is for the opportunity to make $27

23  million, you are going to pay five times as much?

24  A.  That's one account for one period of time.  If you continue

25  to use the trade secrets beyond just that period, and there are

1    other clients as well, and you're missing the big picture here

2    with the value associated with becoming the leading provider,

3    lead third-party provider of Facets service.  That's what

4    Syntel and Atos are.

5    Q.  Sir, if I said I'll sell you a $100 bill for $500, would

6    you take that offer?

7    A.  You know I wouldn't and it's ridiculous and so is your

8    analogy.

9    Q.  Well, we do agree that it's $27 million in revenue?

10   A.  For one account.

11   Q.  You say $142 million in royalty?

12   A.  The 142 does not relate specifically to UHG.  You know

13   that.

14   Q.  Sir, again, the only revenue number you showed the jury was

15   for UHG, correct or not correct?

16   A.  That is technically correct.

17   Q.  Sir, you know that in the Duff & Phelps report they

18   actually looked at comparable royalty rates, correct?

19   A.  They say that, yes.

20   Q.  Well, are you now suggesting that Duff & Phelps was lying

21   in the report?

22   A.  No, they say that.  They say that in all those reports.

23   Q.  Let's back up.  What a comparable is, is a way of figuring

24   out the value of something, fair?

25   A.  Yes, that's correct.

Kaq3syn3                         Britven - Cross

1   Q.  So for example, if I want to figure out how much my house

2   is worth, I can hire someone who will look at other houses in

3   the neighborhood that are pretty similar to mine, see how much

4   they sell for, and that would be a good indication of how much

5   my house is worth, right?

6   A.  Yes.  And in the housing market that's how it works, I

7   agree.

8   Q.  In the valuation business, that's what we would call a

9   comparable, right?

10  A.  Yes.  And then we have to take into account the situation

11  we're looking at, and the situation here is the license would

12  cause sales to shift away from TriZetto.  So the royalty they

13  would charge would be higher.

14  Q.  Sir, let's just look at what Duff & Phelps said about that.

15  Mr. Stevenson, let's put up Plaintiff's Exhibit 846, and we'll

16  go to page 59, please.  Let's blow up the portion on the top

17  under existing and comparable third-party licensing.

18          This is Duff & Phelps talking about one of the things

19  they did to come up with their 10 percent royalty rate.

20  Correct?

21  A.  That's right.

22  Q.  And they said, "We conducted a generalized search for

23  publicly available information on licensing agreements for

24  technologies within industries similar to the company."  Right?

25  A.  Hmm-hmm.

Kaq3syn3                      Britven - Cross

1   Q.  And company here means TriZetto, right?

2   A.  That's correct.

3   Q.  And they looked at a database they call their ktMine.  You

4   see that?

5   A.  Yes.

6   Q.  That's a list of other license agreements that are

7   comparables, right?

8   A.  Well, it is a list in general, and they pulled down from

9   that database.

10  Q.  And what they said at the bottom is of the licenses they

11  found, the royalty rates ranged from a low of 5 percent to a

12  high of 25 percent?

13  A.  That's correct.

14  Q.  And median was 10 percent, right?

15  A.  Yes.

16  Q.  And those are license agreements that people did in the

17  ordinary course of business not in a lawsuit?

18  A.  I didn't hear the last part.

19  Q.  Not in a lawsuit.

20          THE COURT:  Not in a lawsuit.

21          THE WITNESS:  Not in a lawsuit.

22  A.  It depends on -- sometimes you will see royalty rates come

23  out of lawsuits.

24  Q.  Well, so the highest royalty rate that they were able to

25  find in a comparable license agreement was 25 percent, fair?

1    A.  That's what this is showing, yes, sir.

2    Q.  You are asking for 500 percent.

3    A.  Well, those are not comparable numbers.

4    Q.  Let's just talk a little bit, you have made some assertions

5    about information not being updated, right?

6    A.  That's correct.

7    Q.  And you said that it was a red flag, right?

8    A.  Yes, it is.

9    Q.  Now, you are aware there is not any allegation of fraud in

10   this case, correct?

11   A.  That's my understanding.

12   Q.  In the five years that this case has been pending, there's

13   never been an allegation of fraud, correct?

14   A.  I don't know of an allegation of fraud, but you are asking

15   me to make a representation under oath I haven't studied.

16   Q.  You certainly not coming into this court now and for the

17   first time suggesting that there was indeed a fraud, are you?

18   A.  No, that's not what I'm saying.  I'm saying the revenue

19   production here has been very anomalous and unusual, and that's

20   not the way this is supposed to work.

21   Q.  You have heard the testimony that Syntel de-emphasized the

22   Facets business, correct, in the last couple of years?

23   A.  I did hear that.  I can also see the advertisement where

24   they now claim to be the leading provider of Facets services,

25   so those two things are inconsistent.

Kaq3syn3                         Britven - Cross

1    Q.  And you would agree with me that what Cognizant is really

2    unhappy about is Syntel is competing with them to provide

3    services in the Facets area, correct?

4    A.  They're unhappy because they believe Syntel and Atos are

5    using the trade secrets to unfairly compete against them.

6    Q.  Well, sir, isn't it true those advertisements are just

7    saying you can come to us and we'll do Facets work for you?

8    A.  No, it's much more than that, sir.  It says "the," not "a,"

9    not "we want to be."  It says we are the leading third-party

10   provider.  They achieved their goal.

11   Q.  Sir, and that's what Cognizant is unhappy about, right?

12   A.  No.  Cognizant is unhappy about Syntel Atos using the trade

13   secrets in the confidential information to compete unfair.

14   Others compete fairly.  They simply want Syntel and Atos to

15   compete fairly.  They shouldn't have the benefit of the trade

16   secrets, because it does provide a tremendous competitive

17   advantage.

18            (Continued on next page)

19

20

21

22

23

24

25

KAQTSYN4                    Britven - Cross

1   BY MR. GROOMBRIDGE:

2   Q.  Now let's talk about what happened at the time when the

3   announcement was made that Cognizant was going to buy TriZetto.

4   A.  Okay.

5   Q.  And it was following that that the employees left Syntel to

6   go work for Cognizant, correct?

7   A.  Yes.

8   Q.  And one of the things that the jury is being asked to

9   decide are if they find that there was liability on that is

10  what is the monetary impact of those employees having gone to

11  Cognizant, correct?

12  A.  As a result of the use of the confidential information.

13  Q.  And now did you hear the testimony from Mr. Reddy that the

14  people who were hired were not just anybody, they were mentors?

15  A.  I understand some mentors moved, yes.

16  Q.  They were leaders in the organization, correct?

17  A.  I don't remember the word leaders, but they were part of

18  the mentoring group.  I remember that part.

19  Q.  And you remember he used the term "force multiplier,"

20  correct?

21  A.  I remember that term, yes, sir.

22  Q.  And a force multiplier is something that contributes beyond

23  just what it has itself, correct?

24  A.  Yes.

25  Q.  That's the term "multiplier?"

KAQTSYN4                      Britven - Cross

1    A.  Yes.

2    Q.  And so what he was saying here was you didn't just hire

3    away anybody, you hired away the people who were really the

4    core of our organization.  That's what he was saying, right?

5    A.  He's saying they took some of the mentors.  There's a lot

6    of people in the organization.  He said he took some of the

7    mentors, and I agree with that.

8    Q.  You agree that he took the mentors, right?

9    A.  I think that's what the testimony is.

10   Q.  And he also said that those mentors could train -- each one

11   of them could probably train up another ten people, right?

12   A.  Yes.

13   Q.  And you, in the course of your opinions, made no study of

14   the job market for people with Facets skills at this time in

15   the fall of 2014, correct?

16   A.  I'm not sure what you mean by no study of the job market.

17   Q.  Let's take a look at your deposition.

18           MR. GROOMBRIDGE:  And Mr. Stevenson, could you put up

19   Mr. Britven's January 30, 2019 deposition at page 85, line 7

20   through 13.

21   Q.  Mr. Britven, in your deposition you were asked this

22   question and gave this answer:

23   "Q.  For your report, did you investigate whether individuals

24   with experience working on TriZetto's products, such as Facets,

25   were common in the labor market?

1   "A.  I haven't performed an analysis of the labor market.  I do

2   have observations, but I didn't perform an analysis of the

3   labor market."

4           Is that your testimony?

5   A.  That's my testimony, and I think it's consistent with my

6   answer here today.

7   Q.  And you would agree, having heard the evidence, that people

8   with Facets experience were in short supply in the job market

9   at that time in the fall of 2014, correct?

10  A.  I think the market was tight at that time, yes, sir.

11  Q.  And so it wasn't a situation where Syntel could just go out

12  and hire people, couldn't just put a job ad on some internet

13  board and hire the people it needed, correct?

14  A.  Yes and no.  It depends on how badly they wanted people.

15  It's my understanding that folks that moved over to TriZetto

16  received wages.  I think money makes a difference in terms of

17  where people work.

18  Q.  While we're on that, are you referring to the fact that in

19  some cases Cognizant paid hefty increases in order to persuade

20  folks to leave TriZetto?

21  A.  I understand some folks were underpaid at Syntel and

22  TriZetto paid them more.

23  Q.  Whether you call that underpaid or not, we're agreeing on

24  the fact that in order to get people to leave TriZetto,

25  Cognizant offered them big raises, fair?

KAQTSYN4                    Britven - Cross

1    A.  Yes.

2    Q.  And that would suggest that Cognizant knew how much they

3    were making at Syntel, right?

4    A.  Somehow or another the employee or the candidate and

5    TriZetto got to a number.  I'm assuming there was some

6    disclosure by the employee.  That typically happens in our

7    interviews.

8    Q.  Somehow or another the employees' salaries at Syntel became

9    known to Cognizant, fair?

10   A.  I know that's an allegation.  I think salaries become known

11   in the interview process frequently, I don't know the specifics

12   you're referring to.

13   Q.  Would you agree with me that one of the effects of the

14   announcement that Cognizant was going to buy TriZetto was to

15   open up new opportunities in the market for Syntel?

16   A.  That is a pretty vague question.  There's talk of synergies

17   between TriZetto and Cognizant, and that could satisfy what

18   you're asking about.

19   Q.  Would you agree with me that there were certain customers

20   who didn't want to work with the combined company of TriZetto

21   and Cognizant?

22   A.  There's talk of that concerning the documents, I don't know

23   which company specifically.

24          MR. GROOMBRIDGE:  Let's take a look.  Let's put up

25   Plaintiff's Exhibit 143, please.

KAQTSYN4                       Britven - Cross

1  Q.  Now you're familiar with this document, right, Mr. Britven?

2  A.  Yes, sir.

3  Q.  And this is on September 21st, 2014, correct?

4  A.  Yes.

5  Q.  That's a Sunday, right?

6  A.  I don't know.

7  Q.  And it says prepared for board meeting, that means the

8  board of directors of Syntel, correct?

9  A.  Yes, sir.

10 Q.  What was going on here, and just we don't all move in the

11 same world, the board of directors is the very top management

12 of the company, right?

13 A.  Yes.

14 Q.  And what was going on here, this is six days after the

15 announcement that Cognizant was going to buy TriZetto, right?

16 A.  I agree.

17 Q.  And the board of Syntel convened a meeting to figure out

18 what was going to be their response and how this was going to

19 impact their business, correct?

20 A.  I guess fair.

21        MR. GROOMBRIDGE:  And let's look at slide number 3,

22 please, and let's blow up the part on the left that says "for

23 the market," the whole box.

24 Q.  So this is Syntel's management six days after the deal has

25 been announced talking about the reactions that they have seen,

KAQTSYN4                       Britven - Cross

1    right?

2    A.   Mm-hmm.

3    Q.   And the first thing it says, media buzz around the deal.

4    That's a really big deal, right?

5    A.   That's correct.

6    Q.   Then they say an early concern on some major customers.  Do

7    you see that?

8             And they're talking there that some of the customers

9    aren't very happy about the fact that this deal will take

10   place, correct?

11   A.   I think what the customers are talking about is they're a

12   little concerned about not having the option of getting some

13   services from TriZetto and then the options they're getting of

14   some services from Cognizant.  Some customers used to do that

15   and now those two combined.

16   Q.   So what is going on here is markets don't like monopolies.

17   That's what they're talking about, right?

18   A.   That's what it says.

19   Q.   And the point here is that the customers like and want

20   competition, correct?

21   A.   They do.

22   Q.   And the reason they like and want competition is because

23   competition brings us lower prices, all things being equal,

24   right?

25   A.   Generally speaking, that's true.

KAQTSYN4                        Britven - Cross

1    Q.  And competition brings us better quality services, all

2    other things being equal, correct?

3    A.  That's also true.

4    Q.  And so there was an opportunity here for Syntel to exploit

5    the fact that some of the customers might now be more

6    interested in buying services from Syntel, correct?

7    A.  And that's fine, and they could have exploited that without

8    the use of trade secrets.

9    Q.  And let's just look at the next slide, slide 4, please.

10          And here this again is a Syntel senior management

11   looking at what they think is going to happen in the

12   marketplace because of this deal, right?

13   A.  They're talking about the opportunities and risks.

14   Q.  The risks are things that are going to be bad for Syntel,

15   right?

16   A.  That's correct.

17   Q.  And the opportunities are the upside, are things that are

18   going to be good for Syntel, right?

19   A.  Correct.

20   Q.  And very first thing they say is monopolistic market, new

21   opportunities for Syntel, right?

22   A.  Well, they're calling it a monopolistic market, but that's

23   not the correct definition.  But there is additional

24   opportunities with the combination of TriZetto and Cognizant

25   for Syntel, for example, to do some of the low-end consulting

1    work that Cognizant used to do.

2    Q.  You have opined, sir, that the services market can be

3    broken into a low end, medium, and a complex series of pieces,

4    right?

5    A.  That's correct.

6    Q.  Would you agree with me that the only companies that

7    provide the complex service are Cognizant, now including

8    TriZetto on the one hand --

9    A.  That's correct.

10   Q.  -- and Syntel on the other hand.

11   A.  That's correct.

12   Q.  So if Syntel went away, Cognizant would have no competition

13   that that segment, right?

14   A.  Unless someone else decided to start wading in there and

15   making the investments that are necessary.

16   Q.  And just before we leave this, let's look at the last

17   bullet point under upside.  You there it says:  Open

18   competition versus loyalty to TriZetto can expand reach.

19        Do you see that?

20   A.  Yes.

21   Q.  What they're saying is now they can compete vigorously,

22   whereas, up until this point, they had had loyalty to TriZetto,

23   correct?

24   A.  Well, I looked at the documents.  They were far from being

25   loyal to TriZetto, so I'm not sure what you're saying there.

KAQTSYN4                    Britven - Cross

1   Q.  This is the board of directors talking to themselves in

2   private, why would they have any motivation to say something

3   that they don't think is true?

4   A.  The documents I saw would contradict that.

5   Q.  What they said here is there was a big opportunity to get

6   new business, correct?

7   A.  That loyalty to TriZetto could be from the customer

8   perspective, sir.

9   Q.  Well, focusing on upside, $70 million, what Syntel was

10  thinking to itself here six days after the deal announcement

11  was we have a chance to go out and pursue a whole lot of new

12  business, right?

13  A.  Yes.

14  Q.  But unfortunately they couldn't do that because all of

15  those mentors and leaders were hired away, right?

16  A.  Not all, sir.

17  Q.  They couldn't pursue the opportunities that otherwise would

18  have been available to them because a lot of the most important

19  people were hired away.  Yes or no?

20  A.  Yet somehow they became the leading third-party Facets

21  service provider without those folks.

22  Q.  Perhaps they worked very hard, right?

23  A.  They did a great job.

24          MR. GROOMBRIDGE:  Thank you.  No more questions.

25          THE WITNESS:  Thank you.

1           MS. CARSON:  Your Honor, quick redirect?

2           THE COURT:  I think you're out of time, but you have

3     three minutes.

4           MS. CARSON:  Thank you, your Honor.

5     REDIRECT EXAMINATION

6     BY MS. CARSON:

7     Q.  Mr. Britven, just three quick questions because I only have

8     three minutes.  One thing that Mr. Groombridge just pointed you

9     to was some Syntel testimony about how Syntel is allegedly

10    deemphasizing Facets, and you said that was inconsistent with

11    their current advertisements that they're the leading

12    third-party provider of Facets.  Can you explain that?

13    A.  Yes.  We saw earlier today that there's an advertisement

14    that says Facets is now the leading third-party service

15    provider -- or Syntel is the leading third-party service

16    provider on the Facets software, and some of the prior

17    advertisements noted that they were a leader, and it now

18    becomes the leader.

19    Q.  Now I just want to switch gears.  I think that during your

20    direct testimony we established that by Mr. Sheet's own

21    calculations it would have cost Syntel $2.5 million to replace

22    those 84 employees in 2014, correct?

23    A.  That's what they calculated internally, yes.

24    Q.  Did you see any testimony by Mr. Street as to whether or

25    not Syntel even tried to replace those employees?

KAQTSYN4

1    A.  I didn't hear any testimony to that effect.

2    Q.  And Mr. Groombridge asked you lot of questions about the

3    competition.  Are you saying that competition is bad?

4    A.  No, competition is good.  Competition is good.  And there

5    is competition.  There's competition -- there are other

6    platforms beyond the Facets platform.  There's competition in

7    low end consulting, there's competition in less complex

8    consulting.  There is, however, limited competition in complex

9    consulting because of the ginormous investments by TriZetto and

10   Cognizant.  And you're not going to see them continue to make

11   those investments if others can come and use those trade

12   secrets and not have to pay.

13   Q.  In your view, is it fair for Syntel to compete with

14   TriZetto using their stolen trade secrets?

15   A.  Of course not.

16          MS. CARSON:  No further questions.  Thank you, your

17   Honor, for indulging me.

18          THE COURT:  Thank you, Mr. Britven.

19          THE WITNESS:  Thank you, your Honor.

20          THE COURT:  Ladies and gentlemen, we'll break for a

21   half hour and then come back in.  And what we have planned for

22   the afternoon is we have the charge to the jury and then

23   summations by the lawyers.  That will probably take us to the

24   end of the day, so you will begin your deliberations first

25   thing tomorrow morning.  That is my guess.  They may decide to

KAQTSYN4

1    speak briefly, but I warn you that my charge is a little long

2    and I have given them each an hour.

3            So you're adjourned for lunch.  Please don't talk

4    about the case.  We're getting close to the end.

5            (Jury not present)

6            THE COURT:  Is there anything that anyone would like

7    to raise?

8            MR. GROOMBRIDGE:  Yes, your Honor.  This is frankly an

9    unusual situation that I have not encountered before, so maybe

10   I could just explain the situation.

11           Over the weekend, Cognizant, through its general

12   counsel, sent to the websites that have been the focus of

13   tension here two what appear to be so-called takedown letters.

14   They appeared Saturday, and they say it has come to our

15   attention that you put up on your website certain information

16   which is identified with specificity and we request it be taken

17   down.

18           THE COURT:  Sorry, this was sent to the Scribd

19   website?

20           MR. GROOMBRIDGE:  It was sent to the Scribd website

21   and also to the Dokumen Tips website, apparently, two separate

22   letters.

23           And on Saturday, TriZetto sent us these letters marked

24   as defendant's exhibits and said they would seek to admit them,

25   and we objected on the basis that they were hearsay.  And then

KAQTSYN4

1   yesterday TriZetto told us that they were withdrawing the

2   documents, both sides reconsidered their positions, and now we

3   would like to admit the documents and they oppose admission of

4   the documents.  So that's the rather unusual situation.

5          What I might suggest, your Honor, is that we provide

6   your Honor with copies, because I think the analysis would be a

7   lot easier having seen them.  And they're essentially one page

8   each, and if your Honor is acceptable, given the Covid

9   procedures, I'm happy to hand up my copies.  Then perhaps

10  shortly -- so not to keep the jury waiting, but we reconvene

11  and get a ruling and we'll rest, and Mr. De Vries can make his

12  motion on the record.

13         THE COURT:  Why don't you give me the documents,

14  that's a good start.  Mr. Street, if you could take those, and

15  Mr. De Vries, if you want to tell me your position.

16         MR. DE VRIES:  Your Honor, I believe Mr. Alper, who is

17  taking the lead on the letter that your Honor ruled on

18  concerning this issue, is going to address this, with your

19  Honor's permission.

20         THE COURT:  Okay, that's fine.

21         MR. ALPER:  Good afternoon, your Honor.

22         THE COURT:  Good afternoon.

23         MR. ALPER:  So these letters obviously relate to the

24  exhibits that your Honor already excluded.  The reason for them

25  is obvious.  When our client found out about these things on

KAQTSYN4

1     the internet live, the natural response is to do what they did,

2     which is to ask them to be taken down.  While we were waiting

3     for an order on whether Syntel was going to be allowed to admit

4     the piracy website exhibits, we raised to them, so as to not

5     waive anything, these two potential exhibits.

6          Once your Honor excluded their exhibits as well as our

7     proposal to bring in the contextual exhibits to show that these

8     things were put up by an unknown hacker, we withdrew these

9     exhibits because our impression, which I believe was confirmed

10    by your oral order today, your Honor, was that your belief was,

11    as ours was, that any possible relevance here is greatly

12    outweighed by the misimpression that these affairs would create

13    for the jury in the ways that you already articulated during

14    your verbal order this morning.

15         And so from our perspective, at this point, for Syntel

16    to be able to now reput this in front of the jury to suggest to

17    the jury that this actually was an issue in this way when we

18    have been at this point precluded from bringing in our evidence

19    showing that this is actually an illicit hacker that put these

20    things out on the web, would not only further the prejudice and

21    further ring the bell that was already rung, from our

22    perspective improperly, by Syntel, it would also be further

23    contrary to law.  As your Honor knows, you included in the jury

24    instructions what I believe you found to be the very clear law

25    that when a third party, and particularly a hacker like this,

KAQTSYN4

1    puts something on the web, that doesn't destroy the trade

2    secret status of the trade secret.  So there's no really

3    relevance.

4              And I would say one last thing on this, your Honor,

5    that is, as you probably saw in our papers, this wasn't

6    something that was raised in Syntel's pretrial memo, this

7    wasn't something that was raised as an issue in this case in

8    Syntel's opening statement.  And what we feel is, given the

9    miniscule and potential relevance and the great potential for

10   prejudice, that allowing Syntel to continue to keep throwing

11   this out there at the jury will misdirect and confuse the jury

12   and misdirect them from what the real issues are.

13             For that reason, we think that not only those exhibits

14   should be excluded, but Syntel should not be permitted to raise

15   this issue in its closing because of the prejudice that it

16   would cause to our side.

17             THE COURT:  Should not be able to raise what issue?

18             MR. ALPER:  Should not be permitted to rely on the

19   exhibits that it showed the jury during the cross-examination,

20   which have now been excluded from evidence, in addition to

21   these letters they're proposing to bring into evidence now.

22             THE COURT:  Okay.  So what I'm going to do is I am

23   going to go and look at these and we'll all have lunch.  I'm

24   not going to preclude Syntel from raising what the jury saw,

25   there was no objection at the time, and so whatever they saw

1   and whatever happened here in court, they're not statements of

2   lawyers, which are not evidence, may be used in summation.

3          Let me look at these and see -- Mr. Groombridge, what

4   is the relevance of these documents?

5          MR. GROOMBRIDGE:  Your Honor, as we see it, the

6   relevance is these are party admissions by TriZetto showing

7   that specific documents they have called out here have in fact

8   been placed on the internet.  And that I fully accept, as they

9   say, they're not authorized.  It gives a URL, so it gives

10  details and specificity about this.

11         And in our view, your Honor, there's a legal question

12  about whether something, once published in a certain fashion,

13  can then continue to be a trade secret.  And it may well be

14  there is liability on the part of someone who published it

15  improperly, but our view of the law is that it ceases to be a

16  trade secret if it has become truly publicly available and

17  generally accessible, and to hold otherwise would be to

18  reinvent trade secret law.  And so we think that it is relevant

19  to show that.

20         And I understand your Honor ruled this morning.  It

21  may be this is a preservation issue, but we wanted to be clear

22  that's our view of why these letters matter.

23         THE COURT:  To be clear, what I'm going to instruct

24  the jury on as the law and what is reflected in the charge

25  which I've distributed is that the question for the jury, in

KAQTSYN4

1    substance, is whether the information has become generally

2    available.  And what I am instructing them is, as a matter of

3    law, it's not necessarily so that putting something on the

4    internet makes it generally available, and that makes it a fact

5    question to the jury, which, of course, you can argue that.

6    You shouldn't characterize that as a legal proposition because

7    it's inconsistent with what I will instruct them.

8             MR. GROOMBRIDGE:  Absolutely.  By the way, your Honor,

9    it will be Ms. Janghorbani doing the closing, and I'm quite

10   certain she will to that.

11            THE COURT:  I should be talking to you,

12   Ms. Janghorbani.

13            MS. JANGHORBANI:  All right.  We're a team.

14            THE COURT:  Thank you.  So I will reserve on this.  I

15   will go look at it.  I will tell you now I'm inclined not to

16   allow it, so you shouldn't be doing any planning during the

17   lunch break.  You can use that for whatever it's worth, and I

18   will come back and we'll bring the jury back.

19            Do you want to rest now?

20            MR. GROOMBRIDGE:  We will rest at this point, your

21   Honor.  Should your Honor come out a different place then --

22   but subject to that, we rest.

23            MR. DE VRIES:  And your Honor, just two notes.  One

24   was just for the record the admission of the cross exhibits

25   during Mr. Plumpe's recap, 1541, DTX 1543 and DTX 1546.  Those

KAQTSYN4

1    are the ones that I was allowed to use based on agreement and

2    not the ones that your Honor sustained the objections on.

3              Then I will note that we have --

4              THE COURT:  One moment.  No objection to that?

5              MR. GROOMBRIDGE:  There's no objection to those

6    exhibits being received, your Honor.

7              We do have one further follow-up point, but I think

8    Mr. De Vries is still --

9              THE COURT:  They're admitted.

10             (Defendant's Exhibits 1541 and 1546 received in

11   evidence)

12             MR. DE VRIES:  Thank you.  The other thing I note is,

13   as we said previously, we do have 50(a) motions on the party's

14   claims and defenses, and now that the case has been rested, we

15   wanted to note that again.

16             THE COURT:  Okay.  I will reserve on those motions.

17             Mr. Groombridge, did you have one more thing?

18             MR. GROOMBRIDGE:  I do, which is during the cross of

19   Mr. Plumpe, I'm sorry to say, it bore out our fears that the

20   3.4 billion, in our view, wasn't connected to any specific

21   intellectual property at issue in this case.  And if there's

22   going to be argument in summation along those lines, we very

23   much don't want to interrupt that, we would like to be able to

24   place an objection on the record if what is going to be said

25   here is that the 3.4 billion somehow shows the value of this

KAQTSYN4

1    intellectual property.

2              MR. DE VRIES:  Your Honor, what I established was that

3    DTX 1543, the announcement of the merger, provided as one of

4    its bases our investment in intellectual property.  That was a

5    statement that was made by a Syntel witness.

6              DTX 1541, which is a document that is also from Atos

7    Syntel that is also talking about their investments in IP

8    specifically refers to the tools and accelerators that we have

9    been talking about throughout this case.  So just as they have

10   argued that the $2.7 billion is somehow relevant to calculating

11   damages, we believe that the $3.4 billion is also, in the same

12   way, tied to the intellectual property.  I intend to say

13   nothing more than that.  I'm not going to say:  And all of the

14   $3.4 billion is attributable to that or try to quantify it.

15             THE COURT:  So the billion dollar numbers are in the

16   record on both sides representing the acquisition costs by

17   Cognizant and Atos respectively.  And given what you said, I

18   don't think there's anything that I need to offer or any

19   objection I need to sustain.  Let's take a break.

20             (Luncheon recess taken)

21             (Continued on next page)

22

23

24

25

KAQTSYN4

                        AFTERNOON SESSION

                          (1:40 p.m.)

1          THE COURT:  Counsel, I have taken a look at the two

2   proposed exhibits, DTX 1542 and 1543, I'm going to exclude them

3   on the ground of 403.  The probative value I find is slight.

4   These appear to be addressing documents found on the internet

5   on yet another day from the two days that have been at issue,

6   and I think for that reason have slight probative value, and I

7   think for the same reason the chance of confusing the jury

8   about what they are, what they mean, what they represent is

9   high, and also for the reasons that I already expressed this

10  morning about prejudice in precluding the other proposed

11  exhibits, so I will preclude those.

12          What we're going to do now is I will charge the jury.

13  I plan to do it from that box.  I find I cannot breathe behind

14  this thing well enough to speak at length.  I have given copies

15  to all the jurors.  I'm going to tell them they can write on

16  them.  I have given copies now to you and the court reporter,

17  and when we finish that, we'll take -- we may take a brief

18  break depending how long it takes, then we'll go directly into

19  our summations and finish summations today.

20          MR. ALPER:  Yes, your Honor.

21          THE COURT:  The other thing I would mention is, as you

22  know, the charge makes a reference to Court Exhibit 6, which is

23  the list of alleged trade secrets that you gave to me.  So I am

KAQTSYN4                    Charge

1       going to give that to the jury at the same time as the proposed

2       charge but I'm not going to read it.

3                   MR. ALPER:  Your Honor, earlier this morning we talked

4       about a potential short instruction on the amount of financial

5       data that was available to the parties.  We have prepared a

6       brief one with the intent of not assigning blame to anyone in

7       discovery, as you instructed.  Syntel objects to reading the

8       instruction in its entirety, and understanding that we're

9       trying to keep things moving, we wanted to ask you how you

10      would like to handle that.

11                  THE COURT:  I think that it came out sufficiently in

12      cross-examination that information after 2018 was not provided,

13      so I don't think that we need an instruction at this point.

14                  MR. ALPER:  Thank you, your Honor.

15                  THE COURT:  So let's get the jury.

16                  (Jury present)

17                  THE COURT:  Good afternoon, ladies and gentlemen, and

18      welcome back from lunch.  I discovered I can't talk at length

19      with a mask on, it is really too hard and I gasp for air, so

20      I'm standing in this box.  Also, I get to stand up, which is a

21      nice change.

22                  So we reached the part of the trial where both parties

23      or both sides have rested, which means they are done with the

24      presentation of evidence, and I'm about to give you the jury

25      charge.  And I left a copy of the jury instructions for you on

KAQTSYN4                    Charge

1    your chairs.  That is your copy to keep until the end of your

2    deliberations.  We'll shred them along with everything else

3    after the trial.  You can put your initials on the front page

4    so you know it's yours, and if, as we go through it, you would

5    like to circle anything or mark anything in the margins, please

6    feel free to do that.  This is your working copy.

7            I'm going to read this to you because that's what I'm

8    required to do, and you may find it helpful to follow along,

9    but if you're not the kind of person who finds it helpful to

10   follow along, you don't have to.  It's for your benefit if you

11   want to use it.

12           The first thing that I will point out is there's a

13   table of contents, and that table of contents is your friend,

14   because when you get the verdict form, and I will go through

15   that with you later, the verdict form is basically questions

16   that you need to answer.  And its organized in the same order

17   as Roman Numeral X down, and so you'll be able to refer to this

18   when you answer those questions, and that's why I'm giving you

19   your own personal copy.

20           So let me start.  Members of the jury, you've now

21   heard all of the evidence in this case.  You are about to hear

22   the final arguments of the parties and then you will undertake

23   your final and most important function as jurors.  You have

24   paid careful attention to the evidence, and I am confident that

25   you will act together with fairness and impartiality to reach a

KAQTSYN4                    Charge

1    just verdict in this case.

2            My duty at this point is to instruct you as to the

3    law.  It is your duty to accept these instructions and apply

4    them to facts as you determine them.  Just as it has been my

5    duty to preside over the trial and decide what testimony and

6    evidence was proper under the law for your consideration.

7            You are to consider these instructions together as a

8    whole; in other words, you're not to isolate or give undue

9    weight to any particular instruction.

10           It is a tradition and right of our legal system that

11   the parties involved in legal disputes have a jury chosen from

12   members of the community to render a verdict.  Your role, as

13   the jury, is to decide the factual issues in the case.  I, as

14   the judge, will instruct you on the law, and you must accept

15   the law as I state it to you.  Then you will apply that law to

16   the facts as you find them.  The result of your work will be

17   the verdict that you return.

18           You, as jurors, are the sole and exclusive arbiters of

19   the facts.  You determine the weight of the evidence.  You

20   appraise the credibility of the witnesses.  You draw reasonable

21   inferences from the evidence or lack of evidence.  And you

22   resolve such conflicts as there may be in the testimony.  In

23   determining these issues, no one may invade your province or

24   functions as jurors.  In order for you to determine the facts,

25   you must rely on your own recollection of the evidence, and I

will instruct you momentarily on what is and is not evidence.

Because you are the sole and exclusive arbiters of the facts, I do not mean to indicate any opinion as to the facts or what your verdict should be.  The rulings I have made during the trial are not any indication of my views on what your decision should be.  You are expressly to understand that the Court has no opinion as to the verdict you should render in this case.

My role as the judge is to instruct you on the law, and you are to apply the law to the facts you find them.  You, as jurors, are bound to accept my instructions of law even if you feel that the law should be different from what I say.

Also, if anyone states in their closing arguments, for example, a legal principle different from what I say in my instructions, it is my instructions you must follow.  You should not single out any one instruction or any one word or phrase in an instruction as alone stating the law, but you should consider the instructions as a whole.

All parties to a civil lawsuit are entitled to a fair trial.  Therefore, you must make fair and impartial decisions in order to arrive at a just verdict.  Under your oath as jurors, you are to be guided solely by the evidence or the lack of evidence presented during the trial, as well as the applicable law, without regard to your feelings, positive or negative, for any party or attorney.  All parties are entitled

KAQTSYN4                    Charge

1    to the same fair and conscientious consideration.  If you let

2    sympathy or bias interfere with your clear thinking, there is a

3    risk that you will not arrive at a just verdict.

4           As I have said, in determining the facts, you must

5    rely upon your own recollection of the evidence.  What is

6    evidence?  Evidence consists of the testimony of the witnesses,

7    the exhibits that I have received into evidence and any

8    stipulations.  The stipulations contain facts that the parties

9    have agreed on, and you are to take the facts as true.  By

10   contrast, what counsel have said in their opening statements,

11   in their questions and objections, as well as what they may say

12   in their closing arguments, is not evidence.  Also, and

13   anything that I have said or may say about the facts, as well

14   as anything you have heard outside the courtroom, is not

15   evidence.

16          You should bear in mind that a question put to a

17   witness is never evidence.  It is only the answer that is

18   evidence.  At times a questioner may have incorporated into a

19   question a statement that assumed certain facts to be true and

20   asked the witness if it was true.  If the witness denied the

21   truth of the statement and if there is no direct evidence in

22   the record proving the assumed fact to be true, then you may

23   not consider it simply because it was contained in a question.

24   You also may not consider any answer that I directed you to

25   disregard or that I directed be stricken from the record.

1            Exhibits that have been marked for identification or

2     have been identified as demonstrative aids are not evidence

3     unless they have been admitted into evidence by the Court.  If

4     a demonstrative aid misstates the underlying evidence, it is

5     the underlying evidence that you must consider.  Materials used

6     only to refresh a witness's recollection also are not evidence.

7            Arguments made by the attorneys are not evidence.  If

8     your recollection of the facts differs from the statements made

9     by attorneys in their arguments, then it is your recollection

10    that controls.

11           During the trial I have been called upon to make

12    various rulings.  There may have been objections, motions may

13    have been made to strike answer.  You are to disregard these

14    procedural matters.  They are matters of law.  And although you

15    may have been curious about them, you should not consider them.

16    Objections are not evidence.  Objections are a proper part of

17    trial process and you should make no inference or be influenced

18    in any way by an objection or by the Court's ruling on it.

19    Likewise, it is my function to cut off questioning, to strike

20    remarks, and to reprimand any person when I think it is

21    necessary, but you should draw no inference from that.

22           Also, the fact that I may have commented during the

23    course of the trial or asked questions of witnesses does not

24    indicate any feeling of mine about the facts or the credibility

25    of any witness.  I have no such feelings, and my comments were

KAQTSYN4                    Charge

1    intended only to clarify the issue at hand.  You should draw no

2    inference or conclusion of any kind, favorable or unfavorable,

3    with respect to any witness or any party because of any

4    comment, question, or instruction of mine.  It is for you alone

5    to decide the credibility of the witnesses and the weight, if

6    any, to be given to the testimony you have heard and the

7    exhibits you have seen.

8            Lastly, anything that you may have seen or heard when

9    court was not in session is not evidence.  You are to decide

10   the case solely on the evidence that is presented to you in the

11   courtroom.

12           There are two kinds of evidence that you may use in he

13   reaching your verdict, direct evidence and circumstantial

14   evidence.  Direct evidence is when a witness testifies about

15   something the witness knows by virtue of his or her own senses,

16   something the witness has seen, felt, touched or heard.  Direct

17   evidence may also be in the form of an exhibit admitted into

18   evidence.

19           Circumstantial evidence is evidence that tends to

20   prove a disputed fact by proof of other facts.  Circumstantial

21   evidence is of no less value than direct evidence.  It is a

22   general rule that the law makes no distinction between direct

23   evidence and circumstantial evidence.

24           There is an example of circumstantial evidence that is

25   often used in this courthouse.  Assume that when you came into

KAQTSYN4                    Charge

1    the courthouse this morning the sun was shining and it was a

2    nice day.  Assume that it the courtroom windows were covered,

3    the curtains, and you could not look outside, then as you were

4    sitting here someone walked in with an umbrella that was

5    dripping wet and a few minutes later someone else entered with

6    a wet umbrella.  Now you cannot look outside the courtroom to

7    see whether it's raining, so you have in direct evidence of

8    that fact.  But on the combination of facts that I asked you to

9    assume, it would be reasonable and logical for you to conclude

10   that it had been raining.

11          That's all there is to circumstantial evidence.  You

12   infer from one or more established facts, on the basis of

13   reason, experience and common sense, the existence or

14   non-existence of some other fact.  An inference is not a

15   speculation, a suspicion or guess.  An inference is a reasoned,

16   logical deduction or conclusion, that you, the jury, are

17   permitted but not required to draw from the facts that have

18   been established by either direct or circumstantial evidence.

19          There are times when different inferences may be drawn

20   from the same proven facts.  Here, the one side asks you to

21   draw one set of inferences while the other side asks you to

22   draw another.  It is for you to decide which inferences you

23   will draw.

24          You have now had the opportunity to listen to and

25   observe all of the witnesses.  It is now your job to decide how

KAQTSYN4                    Charge

believable you find each witness's testimony to be.  How do you

determine where the truth lies?  You should use all of the

tests for truthfulness that you would use in determining

matters of importance to you in your everyday life.

        One thing you should consider is any bias, hostility,

or affection that a witness may have shown for or against a

party.  It is your duty to consider whether the witness has

permitted any such bias to color his or her testimony.  If you

find a witness is biased, then you should view the witness's

testimony with caution, weigh it with care, and subject it to

close and searching scrutiny.

        You should also consider any other interest or motive

that the witness may have in cooperating with a particular

party, as well as any interest the witness may have in the

outcome of the case.  Interest in the outcome of the case

creates a motive to testify falsely, and may sway a witness to

testify in a way that advances his or her own interests.

Therefore, you should accept the testimony of an interested

witness with great care.  Keep in mind, though, that it does

not automatically follow that testimony given by an interested

witness is to be disbelieved.  There are many people who, no

matter how strong their interest in the outcome of a case,

would not testify falsely.  It is for you to decide, based on

your own perceptions and common sense, to what extent, if any,

the witness's interest has affected his or her testimony.

KAQTSYN4                    Charge

1          Additional factors you should consider are the

2      opportunity the witness had to see, hear, and know the things

3      about which he or she testified, the accuracy of the witness's

4      memory, the witness's candor or lack of candor, the witness's

5      intelligence, the reasonableness of the witness's testimony,

6      and the testimony's consistency or lack of consistency with

7      credible testimony.  In other words, what you must do in

8      deciding credibility is to size up a witness in light of the

9      witness's demeanor, the explanations given, and all of the

10     other evidence in the case.  Always remember that you should

11     use your common sense, your good judgment, and your own life

12     experience.

13          If you find that any witness has willfully testified

14     falsely to any material fact, that is, to an important matter,

15     then the law permits you to disregard the entire testimony of

16     that witness based upon the principle that someone who

17     testifies falsely about one material fact is likely to testify

18     falsely about everything.  You are not required, however, to

19     consider such a witness as totally unworthy of belief.  You may

20     accept as much of the witness's testimony as you deem true and

21     disregard what you feel is false.

22          While it is quite legitimate for an attorney to try to

23     attack the credibility of a witness, as the sole arbiters of

24     the facts, you must decide for yourselves which witnesses you

25     believe, what portion of their testimony you will accept, and

1   what weight you will give to at that that testimony.

2           You have heard testimony of certain witnesses in the

3   form of depositions which have been received into evidence.

4   You heard other testimony from witnesses by video with audio

5   from remote locations.  You may consider the testimony of a

6   witness given at a deposition or remotely according to the same

7   standards you would use to evaluate the live and in-person

8   testimony of a witness given at trial.

9           In this case, I have permitted certain witnesses to

10  express their opinions about matters that are in issue.  A

11  witness may be permitted to testify to an opinion on those

12  matters about which he or she has special knowledge, skill,

13  experience and training.  Such testimony is presented to you on

14  the theory that someone who is experienced and knowledgeable in

15  the field can assist you in understanding the evidence or in

16  reaching an independent decision on the facts.

17          In weighing this opinion testimony, you may consider

18  the witness's qualifications, his opinions, the reasons for

19  testifying, as well as all of the other considerations that

20  ordinarily apply when you are deciding whether or not to

21  believe a witness's testimony.  You may give the opinion

22  testimony whatever weight, if any, you find it deserves in

23  light of all of evidence in this case.  You should not,

24  however, accept opinion testimony merely because I allowed the

25  witness to testify concerning his or her opinion.  Nor should

KAQTSYN4                    Charge

you substitute it for your own reason, judge, and common sense.
The determination of the facts in this case rests solely with
you.

I am now going to explain the concept of "burden of
proof."  This is a civil case, so the burden of proof, unless
otherwise instructed, is proof by a preponderance of the
evidence.

Each party has the burden of proving each disputed
issue for their own claims.  The party with the burden of proof
on any given issue has the burden of proving to you every
disputed element of that party's claim by a preponderance of
the evidence.  If you conclude that the party bearing the
burden of proof has failed to establish that party's claim by a
preponderance of the evidence, you must decide against that
party on the issue you are considering.

What does a "preponderance of the evidence" mean?  To
establish a fact by a preponderance of the evidence means to
prove that the fact is more likely true than not true.  A
preponderance of the evidence means the greater weight of
evidence, which refers to the quality and persuasiveness of the
evidence, not the number of witnesses or documents.  In
determining whether a claim has been proved by a preponderance
of the evidence, you should consider the relevant testimony of
all witnesses, regardless of who may have called them, and all
of the relevant exhibits received in evidence, regardless of

KAQTSYN4                    Charge

what may have produced them.

           If you find that the credible evidence on a given
issue is evenly divided between the parties, meaning it is
equally probable that one side is right as it is that the other
side is right, then you must decide that issue against the
party having the burden of proof.  That is because the party
with the burden of proof must prove more than a simple equality
of the evidence.  On the other hand, the party with the burden
of proof does not need to prove any more than a preponderance
of the evidence.  This means that as long as you find on a
given issue that the scales tip, however slightly, in favor of
the party with the burden of proof, then you must find for that
party on that issue, as that issue will have been proved by a
preponderance of the evidence.

           Once more, I remind you, as I did at the beginning of
the trial, that proof beyond a reasonable doubt is the proper
standard of proof in a criminal trial.  That requirement does
not apply to a civil case like this one, and you should put it
completely out of your mind.

           So I'm now going to tell you about the law that you
will have to apply to the facts as you find them.  They are to
help you evaluate the evidence in light of what you're asked to
do now that you have heard all the evidence.  To the extent
that there are any differences between the preliminary
instructions that I gave you at the beginning of the trial and

KAQTSYN4                    Charge

these final instructions, the final instructions are the ones
you must follow in your deliberations.

          So first I'm going to walk through the parties'
claims.  Again, this part of the instructions track the same
order of the questions in the verdict form.

          So first I'm going to talk about TriZetto and
Cognizant's claims, and they have two of them.  The first one
is the misappropriation of trade secrets claim.

          TriZetto claims that Syntel Mauritius and Syntel,
Inc., which I will refer to together as Syntel, unlawfully took
and used TriZetto's trade secrets relating to its Facets
software in violation of the confidentiality provisions of the
Master Services Agreement, which I will call "the Agreement."
This is called misappropriation.  TriZetto claims that Syntel
misappropriated certain other of these alleged trade secrets
after Syntel's customers, who licensed Facets from TriZetto,
provided them to Syntel.

          TriZetto asserts two claims for the misappropriation
of trade secrets, one claim under federal law and one claim
under New York law.  In connection with both of claims,
TriZetto has alleged that it owns 104 different trade secrets
related to its Facets software.  Syntel denies that it is
liable on these claims and asserts what are called affirmative
defenses.  I will tell you about affirmative defenses later
after I talk about the parties' claims.

Kaq3syn5                    Charge

1              What is a trade secret?  It's something that TriZetto

2      claims to have had that provides it with an opportunity to

3      obtain an advantage over competitors who do not know or use it.

4      "Secret" means that the information was known substantially

5      only by TriZetto, or others who were obligated to keep the

6      information secret, and that TriZetto took precautionary

7      measures to keep the information secret.  Information is not

8      secret if it was publicly available.  Absolute secrecy -- in

9      the sense that no one else in the world possessed the

10     information -- is not required.

11             TriZetto contends that 104 items are trade secrets

12     that Syntel Inc. and Syntel Mauritius misappropriated.  The 104

13     items are listed in Court Exhibit 6, which I will provide to

14     you for your deliberations.  In fact, you already have it.  It

15     is the other piece of paper that was given to you.  I'm not

16     going to read it to you now or later, but if you just look at

17     it, you'll see that there is a list of 104 items, and those are

18     the items that are alleged by TriZetto to be trade secrets.

19             So, I told you there are two misappropriation of trade

20     secret claims.  One is under federal law and one is under New

21     York law.  So I'm going to talk now about the one under federal

22     law.

23             The Defend Trade Secrets Act became effective on

24     May 11, 2016.  In determining whether TriZetto has proven its

25     claim for misappropriation of trade secrets under the Defend

Kaq3syn5                    Charge

1    Trade Secrets Act, you may consider any acts of

2    misappropriation that occurred or continued to occur on or

3    after May 11, 2016, for each of the 104 alleged trade secrets.

4             A trade secret is defined in the Defend Trade Secrets

5    Act to include all forms and types of financial, business,

6    scientific, technical, economic or engineering information.

7    Under the DTSA, which is what I'm calling that federal law,

8    TriZetto must prove by a preponderance of the evidence that the

9    104 items are protectable trade secrets by demonstrating for

10   each item that:

11            1.  It is not generally known to another person who

12   can obtain economic value from the disclosure or use of the

13   item;

14            2.  Another person cannot readily discover the item

15   through proper means;

16            3.  The item derives independent economic value,

17   actual or potential, from not being known to, and not being

18   readily ascertainable through proper means by another person

19   who can obtain economic value from the disclosure or use of the

20   item; and

21            4.  TriZetto has taken reasonable steps to keep the

22   item secret.

23            Information that necessarily loses its secrecy as a

24   result of having been placed in the marketplace by TriZetto or

25   which is publicly available or ascertainable from public

sources is not a trade secret.  Absolute secrecy, however, is

not required.  Publication of a trade secret on the internet

does not necessarily mean the secret has become generally

known.

        In making your determination of whether TriZetto has

proven by a preponderance of the evidence that any of the 104

items are trade secrets under the Defend Trade Secrets Act, you

may consider that products or services sold or licensed to

customers without duties of confidentiality generally are not

trade secrets, because they do not maintain their secrecy and

do not derive their value from are being kept secret.

        For TriZetto to prove that Syntel misappropriated the

trade secrets under the DTSA, TriZetto must prove four elements

by a preponderance of the evidence for each alleged trade

secret:

        1.  TriZetto owns the information at issue;

        2.  That the information is a trade secret that was

protected as such at the time of the alleged misappropriation;

        3.  That Syntel, without TriZetto's express or implied

consent, (a) acquired the trade secret knowing or having reason

to know that the trade secret was acquired by improper means,

or (b) disclosed or used the trade secret and either (i) used

improper means to acquire the secret, or (ii) at the time of

disclosure or use, knew or had reason to know that the trade

secret was acquired under circumstances giving rise to a duty

Kaq3syn5                    Charge

to maintain the secrecy of the trade secret, derived from or

through a person who owed such a duty or derived from or

through a person who used improper means to acquire it; and

       4.   The trade secret is related to a product used in,

or intended for use in interstate or foreign commerce.

      "Improper means," a term I just used, includes theft,

bribery, misrepresentation, breach, meaning breach of an

agreement or inducement of a breach of a duty to maintain

secrecy, or espionage through electronic or other means, and

does not include reverse engineering, independent derivation or

any other lawful means of acquisition.

      Express consent is consent that is clearly and

unmistakably stated.  Implied consent is consent that is

inferred from conduct that indicates approval or acceptance,

rather than from direct expression.

      If you find that TriZetto has not proven by a

preponderance of the evidence that any one of the 104 items is

a trade secret, then you must find in Syntel's favor for that

particular trade secret.  If you find that none of these 104

items is a trade secret, then you must find in Syntel's favor

on the claim.

      So that's the federal claim.  Let's talk now about the

New York misappropriation claim.

      Under New York law, a trade secret is a formula,

pattern, device, or compilation of information that gives a

Kaq3syn5                      Charge

1    party an opportunity to obtain an advantage over competitors

2    who do not know or use it.  Generally, a trade secret is a

3    process or device for continuous use in the operation of a

4    business.

5             You should consider several factors to determine

6    whether any of the 104 items that TriZetto claims are trade

7    secrets in fact rise to the level of a trade secret:

8             1.   The extent to which the item is known by others

9    outside of TriZetto;

10            2.   The extent to which the item is known by TriZetto

11   employees and others involved in TriZetto's business;

12            3.   The extent of measures taken by TriZetto to guard

13   the secrecy of the item;

14            4.   The value of the item to TriZetto and its

15   competitors;

16            5.   The amount of effort or money expended by TriZetto

17   in developing the item; and

18            6.   The ease or difficulty with which the item could

19   be properly acquired or duplicated by others.

20            The most important consideration in determining

21   whether TriZetto has proven by a preponderance of the evidence

22   that it possesses a trade secret is whether the particular item

23   has been kept secret by TriZetto, or, instead, whether the

24   secret nature of the item has been necessarily lost by virtue

25   of TriZetto's placing it in the marketplace.  Absolute secrecy,

Kaq3syn5                    Charge

1    however, is not required.  Generally, trade secrets cannot be

2    information that is publicly available or ascertained from

3    public sources.  Publication of a trade secret on the internet

4    does not necessarily mean the secret has become generally

5    known.  A combination of characteristics or components,

6    however, may be a trade secret, even where each element is in

7    the public domain, if the combination of publicly available

8    characteristics and components is unique and not publicly

9    known.  You may consider that products or services sold or

10   licensed to customers without duties of confidentiality

11   generally are not trade secrets because they do not maintain

12   their secrecy and do not derive their value from being kept

13   secret.

14        If you find that TriZetto has not proven by a

15   preponderance of the evidence that any one of the 104 items is

16   a trade secret, then you must find in Syntel's favor for that

17   particular trade secret.  If you find that none of these 104

18   items is a trade secret, then you must find in Syntel's favor

19   on that claim.

20        The four requirements to prove a misappropriation

21   claim under New York law are similar but not identical to those

22   under federal law.  TriZetto must prove by a preponderance of

23   the evidence for each established trade secret:

24        1.  What the trade secret is, in other words, TriZetto

25   must identify the trade secret with adequate specificity so you

Kaq3syn5                    Charge

1    can understand what TriZetto was protecting and requiring to be

2    maintained as secret;

3           2.   TriZetto must also prove that it possessed the

4    trade secret;

5           3.   The item was a trade secret at the time of the

6    alleged misappropriation;

7           4.   Syntel used the trade secret; and

8           5.   That Syntel's alleged use was in violation of a

9    agreement, confidential relationship or duty or that Syntel

10   used the alleged trade secret as a result of discovery by

11   improper means.

12          "Improper means" under New York law generally are

13   means that fall below the generally accepted standard of

14   commercial morality and reasonable conduct.  You will have to

15   decide whether TriZetto has proved its trade secret

16   misappropriation claims by a preponderance of the evidence.

17          So there are a couple of other instructions that apply

18   both to claims under New York law and federal law.

19          Under the DTSA and New York law, you may find that a

20   person used another's trade secret even if he uses it with

21   modifications or improvements, so long as the substance of the

22   resulting product is substantially derived from the other's

23   trade secret.

24          I instructed you during the trial that Syntel

25   misappropriated TriZetto's test cases and automation scripts.

Kaq3syn5                    Charge

1    It is for you to determine whether the test cases and

2    automation scripts are trade secrets and whether Syntel

3    misappropriated the other alleged trade secrets.

4             So now I'm going to move on to TriZetto's other claim

5    which is a copyright claim against Syntel.

6             TriZetto claims that Syntel infringed TriZetto's

7    copyrights related to its Facets product.  TriZetto claims that

8    Syntel infringed TriZetto's copyrights in the Facets 5.10

9    computer software as well as two presentations titled "Best

10   Practices in ICD-10 Configuration" and "Facets Roadmap Review."

11   Sometimes I will refer to Facets 5.10 and the two presentations

12   collectively as TriZetto's works, other times I'll refer to

13   them individually.

14            What is a copyright?  Copyright is the legal

15   protection of original works against unauthorized copying by

16   others.  Copyright protection subsists in a work the moment

17   that it is fixed in any tangible medium of expression, and does

18   not extend to ideas, procedures or processes embodied in the

19   work.  Syntel denies infringing TriZetto's copyrights and

20   asserts affirmative defenses, which I will discuss after the

21   parties' claims.  Under the copyright law, originality means

22   that the work was independently created by the author and not

23   copied from other works and possesses a minimal degree of

24   creativity.

25            To bring a civil action for copyright infringement of

Kaq3syn5                        Charge

1    TriZetto's works, TriZetto was required to register each work

2    with the U.S. Copyright Office.  I instruct you that TriZetto's

3    presentations titled "Best Practices in ICD-10 Configuration"

4    and "Facets Roadmap Review" are registered.  Registration

5    creates a presumption that the work and its elements are

6    original and protectable.  However, the mere fact that a work

7    is registered does not mean that every element of the work may

8    be protected.  The parties dispute, and you will have to

9    determine, whether TriZetto can satisfy the registration

10   requirement to bring an action based on copying of Data

11   Dictionary.

12            There are two ways TriZetto can do so, both based on

13   Facets 5.10 registration.  First, TriZetto can prove by a

14   preponderance of the evidence that the Data Dictionary software

15   tool was registered as part or a subpart of Facets 5.10.

16   Alternatively, TriZetto may establish by a preponderance of the

17   evidence that the Data Dictionary software tool is a derivative

18   work based on Facets 5.10, and that the Data Dictionary

19   software tool incorporates protected elements from the Facets

20   5.10 computer software.

21            A derivative work is a work based upon one or more

22   preexisting works.  If you find in favor of TriZetto on that

23   alternative theory, TriZetto can bring an action for copyright

24   infringement for the protected elements from the Facets 5.10

25   computer software that are incorporated in the Data Dictionary

Kaq3syn5                        Charge

1    software.

2            To succeed on its copyright infringement claim,

3    TriZetto must prove by a preponderance of the evidence two

4    elements:

5            First, that TriZetto is the owner of valid copyrights

6    in the TriZetto works at issue; and second, that Syntel copied

7    original elements from the copyrighted works.  I will discuss

8    each these elements.

9            First, ownership of valid copyrights.  As stated

10   above, the presentation titled "Best Practices in ICD-10

11   Configuration," "Facet Roadmap Review" and the software, Facets

12   5.10, are registered with U.S. Copyright Office, and you are

13   instructed that the certificates of registration provided as

14   Exhibits DTX 1378, 1379, and 1381 are sufficient to establish

15   that TriZetto owns a valid copyright in those works.  I will

16   now turn to the second element of copyright infringement, that

17   Syntel copied original elements from the copyrighted works.

18           TriZetto may demonstrate copying directly, for

19   example, a witness who testifies that Syntel copied original

20   elements.  TriZetto may also prove copying indirectly by what's

21   called, and what I described as, circumstantial evidence.  If

22   you find by a preponderance of the evidence that:  (1) Syntel

23   had access to TriZetto's works; and (2) Syntel's works and

24   original elements of TriZetto's works are substantially

25   similar, you are instructed to find copying, unless Syntel

Kaq3syn5                    Charge

establishes that its work was independently created or some

other explanation for the similarities.

          To determine whether Syntel's works are substantially

similar to TriZetto's works, you must consider:  (a) consider

only the protectable elements of TriZetto's works, filtering

out the unprotected ones, and (b) ask yourself whether an

ordinary observer would conclude that the protectable elements

are substantially similar to Syntel's accused works.

Protectable expression includes elements that are original to

TriZetto and original combinations of unoriginal elements.

Unprotectable elements include mere ideas, elements dictated by

efficiency, elements required by factors external to the

program itself, and elements taken from the public domain.

          So that is the summary of TriZetto's claims against

Syntel.  Now I'm going to turn to the other side of the case,

which is Syntel's claims against TriZetto and Cognizant.

          I've just summarized for you TriZetto and Cognizant's

claims against Syntel.  I will now tell you about Syntel's

claims against Cognizant and TriZetto.  As I said, TriZetto and

Syntel Mauritius had an agreement between them called the

Master Services Agreement.  Syntel Mauritius claims that

TriZetto breached the agreement by violating the

confidentiality provision of the agreement, which prohibited

TriZetto from using Syntel Mauritius's confidential information

without consent.

Kaq3syn5                    Charge

1          I didn't read the heading right there.  But that first

2     claim, which is Syntel's first claim, is called breach of

3     contract.

4          To prevail on a breach of contract claim, Syntel

5     Mauritius must prove by a preponderance of the evidence four

6     elements:

7          1.  Syntel Mauritius had a contract with TriZetto;

8          2.  Syntel Mauritius performed as it was required to

9     do under the contract;

10          3.  TriZetto breached the contract by not doing what

11     it was required to do under the contract; and

12          4. Syntel Mauritius was damaged by the breach.

13          As to the first element, the parties agree that the

14     agreement is a valid contract, so you will need to determine

15     only the second, third and fourth elements of this claim.

16          With respect to the confidentiality provision under

17     the agreement, TriZetto was not permitted to use, store,

18     publish, disseminate, transfer or disclose Syntel Mauritius's

19     confidential information without first obtaining the consent of

20     Syntel Mauritius, and I'll refer to this as the confidentiality

21     provision.  Syntel Mauritius contends that TriZetto breached

22     the confidentiality provision of the MSA by using,

23     disseminating, transferring or disclosing the confidential

24     information related to the employees of Syntel Mauritius,

25     Syntel Inc. and their affiliated companies that were deployed

Kaq3syn5                     Charge

by Syntel Mauritius to provide services to TriZetto under the
agreement without first obtaining the consent of Syntel
Mauritius.  The parties define confidential information under
the agreement to include information that a reasonable person
would recognize as confidential.

TriZetto contends that it did not breach the
confidentiality provision, and that in any event, Syntel
Mauritius materially breached the agreement, thereby excusing
TriZetto's performance under the agreement.  But again, not
every breach of contract constitutes a material breach that
excuses another person's performance, and to be material, a
breach must be significantly substantial as to defeat the
purpose of the entire transaction.

If you decide that Syntel Mauritius did not materially
breach the agreement, and that TriZetto breached the
confidentiality provision of the agreement, you will find for
Syntel Mauritius on its breach of contract claim, and you will
go on to consider Syntel Mauritius's damages.

If you decide that TriZetto did not breach the
confidentiality provision of the agreement, or that Syntel
Mauritius materially breached the agreement, thereby excusing
TriZetto's performance under the agreement, you will find for
TriZetto on Syntel Mauritius's breach of contract claim.

So, going on to the next claim of Syntel, which is
misappropriation of confidential information claims.

Kaq3syn5                    Charge

1          Syntel Mauritius also claims that Cognizant and

2    TriZetto misappropriated Syntel's confidential information

3    about its employees in order to hire them way from Syntel.  The

4    parties define confidential information under the agreement to

5    mean information that a reasonable person would recognize as

6    confidential.  Matters of general knowledge in an industry are

7    not confidential, and protection afforded to confidential

8    information is lost if it is disclosed to the general public.

9          In order to establish the claims against Cognizant and

10   TriZetto, Syntel Mauritius must prove by a preponderance of the

11   evidence that they used Syntel Mauritius's confidential

12   information for the purpose of securing a competitive

13   advantage.

14         A competitive advantage has been found when

15   confidential information allows a party to avoid costs, gives a

16   party exclusive access to the information, or allows a party to

17   prevent another party from reaping the full profits of its own

18   information.

19         Syntel Mauritius alleges that TriZetto and/or

20   Cognizant used this information to identify, target, recruit,

21   and hire employees of Syntel Mauritius, Syntel Inc., and their

22   affiliated companies that were deployed by Syntel Mauritius to

23   provide services to TriZetto under the agreement for the

24   purpose of securing a competitive advantage.

25         Because Syntel Mauritius and TriZetto were parties to

1    the agreement, for Syntel Mauritius to prevail on its

2    misappropriation claim against TriZetto, Syntel must also prove

3    that TriZetto's use of Syntel Mauritius's confidential

4    information violated a duty that is independent from the

5    contractual duty under their agreement.  An independent legal

6    duty must arise from the circumstances outside of the contract,

7    although it may be connected with and dependent upon the

8    contract.  The focus is on whether a defendant violated a duty

9    imposed on the parties as a matter of social policy as opposed

10   to a duty that the parties agreed to in their contract.

11          You have seen evidence and heard argument concerning

12   the non-solicitation provision of the agreement, including

13   documents in which TriZetto questioned whether it or Cognizant

14   could hire Syntel's employees in light of that provision.

15   Prior to trial I determined that the non-solicitation provision

16   did not prohibit TriZetto or Cognizant from hiring Syntel

17   employees, and that neither TriZetto nor Cognizant violated

18   this provision of the agreement by hiring Syntel employees.

19   However, you may consider such evidence in your consideration

20   of Syntel's misappropriation claim that TriZetto provided

21   Syntel confidential employee information to Cognizant.

22          Iii.  Syntel's intentional interference with contract

23   claim.

24          Syntel also brings a claim against Cognizant called

25   intentional interference with contract.  Cognizant is a company

Kaq3syn5                    Charge

1    that acquired TriZetto and is a competitor of Syntel.  Syntel

2    claims that Cognizant intentionally caused TriZetto to breach

3    the agreement between Syntel Mauritius and TriZetto by inducing

4    TriZetto to use confidential information about Syntel employees

5    to hire them away from Syntel.

6            To prove this claim, Syntel must show the following by

7    a preponderance of the evidence:

8                1.  Syntel Mauritius had a contract with TriZetto;

9                2.  Cognizant knew about the contract;

10               3. Cognizant intentionally induced TriZetto to breach

11   the contract;

12               4. TriZetto did in fact breach the contract;

13               5. TriZetto would not have breached the contract if it

14   had not been for Cognizant's conduct; and

15               6. Syntel sustained damages as a result of TriZetto's

16   breach.

17           The first element again is not in dispute as the

18   agreement was a contract between Syntel Mauritius and TriZetto.

19   Syntel must prove that Cognizant knew about the agreement, but

20   it is not necessary that Cognizant knew about the agreement's

21   specific terms.

22           Syntel must also prove that Cognizant intentionally

23   induced TriZetto to breach the agreement.  An act is

24   intentional if it's done deliberately and for the purpose of

25   inducing a party to a contract to breach it.  An act induces a

Kaq3syn5                    Charge

1    breach if it causes a party who otherwise would have complied

2    with the contract not to do so.

3           However, inducing a breach of contract is justified

4    when an entity that is responsible for protecting the interests

5    of another entity acts to protect those interests.  If you find

6    that Cognizant had an economic interest in TriZetto, then

7    Syntel must prove that Cognizant acted illegally or with

8    malice.

9           iv.  Syntel Inc.'s intentional interference with

10   contract relations.

11          Syntel Inc. makes claims that TriZetto and Cognizant

12   each intentionally and improperly interfered with the

13   employment contracts of five employees of Syntel Inc., which I

14   will call the employment contracts.  That's the five contracts.

15   To establish this claim against TriZetto, Syntel Inc. must

16   prove the following six elements as applied to TriZetto.

17   Likewise, to prove the claim against Cognizant, Syntel must

18   prove the six elements as applied to Cognizant.  Syntel Inc.

19   must prove each element by a preponderance of the evidence:

20          1.  That Syntel Inc. had employment contracts with the

21   five employees at the time of the interference.

22          That TriZetto or Cognizant, depending on whom you are

23   considering

24          2.  Knew of the contracts;

25          3.  Intentionally interfered with the contracts;

Kaq3syn5                    Charge

4.   Improperly interfered with the contracts;

5.   Caused Syntel Inc.'s employees to breach their employment contracts; and

6.   That Syntel was damaged as a result.

When I say that Syntel Inc. must prove that TriZetto or Cognizant intentionally interfered with the employment contracts, the third element, I mean that their primary, but not necessarily sole, purpose was to cause Syntel Inc.'s employees to breach their employment contract, or that they acted knowing that their conduct was certain or substantially certain to cause Syntel Inc.'s employees to breach their employment contracts.

Improper interference, the fourth element, is conduct that is one of the following:  Fraudulent, unlawful, unethical or unjustified under any circumstances.

A general comment about a doctrine called respondeat superior.  In deciding the issues in this case, keep in mind that an employer's responsible for the act of its employee if the act is in furtherance of the employer's business and is within the scope of the employee's authority.  An act is within the scope of an employee's authority if it is performed while the employee is engaged generally in the performance of his or her assigned duties or if the act reasonably is necessary or incidental to the employment.  The employer need not have authorized the specific act in question.

Kaq3syn5                    Charge

1            So that discussion or statements that I just made

2      relates to the claims of the parties.  Now I'm going to turn to

3      the issue of damages, which is money to be awarded to the

4      parties, if any.

5            So, first I am going to talk to you about compensatory

6      damages.  If, and only if, you found that a party has proven by

7      a preponderance of the evidence its claims against another

8      party, then you must determine whether the prevailing party is

9      entitle to any damages and, if so, the amount.

10           The fact that I am instructing you on damages does not

11     mean that any party is entitled to recover damages.  I am

12     expressing no opinion one way or the other.  It is exclusively

13     your function to decide whether a party has proven its claims,

14     and I am instructing you on damages, if any, only so that you

15     will have guidance should you decide that a party has done so.

16           If you find by a preponderance of the evidence that a

17     party has proven one or more claims, you must then go on to

18     consider the question of compensatory damages for any such

19     claim.  The purpose of compensatory damages is to award, as far

20     as possible, just and fair compensation for the loss, if any,

21     which you believe it actually sustained as a proximate result

22     of the other parties' misconduct.  Damages must be determined

23     with reasonable certainty from the evidence presented.

24     Mathematical precision need not be shown, but you are not to

25     guess or speculate as to damages.  You are to consider each

Kaq3syn5                     Charge

type of compensatory damage for each claim and then determine

which form of compensatory damage is most appropriate, if any.

Compensatory damages are not intended to punish the

liable party.  Compensatory damages measure fair and just

compensation, commensurate with the loss or injury sustained

from the wrongful act.  Damages intended to punish the liable

party are known as punitive damages, which I will instruct you

on later.

There is also a general principle called mitigation of

damages.  The law imposes on an injured person the duty to take

advantage of reasonable opportunities to reduce or minimize the

loss or damage that the party could have avoided with

reasonable effort.  The duty to reduce or avoid damages arises

when the party becomes aware of the injury.  If the injured

party made reasonable efforts to reduce or avoid its losses, it

does not matter if in hindsight another better means of

limiting the financial injury was possible.

A party seeking mitigation of damages bears the burden

of proving by a preponderance of the evidence that the other

party failed to use reasonable efforts to reduce or avoid its

losses and the amount of damages that could have been avoided.

For certain claims, if you find that a party failed to reduce

or avoid its damages with a particular amount, you should

reduce that party's recoverable damage by the amount of damage

that the party could have avoided through reasonable effort.

Kaq3syn5                    Charge

1          There is also the issue of double recovery, and you'll

2     see two specific questions on the verdict form that relate to

3     this.  I just highlight it for you.

4          As you've heard, the parties in this case are

5     asserting several claims and seeking damages for those claims.

6     However, even if you find a party liable for more than one

7     claim, you must not award damages in a manner that results in

8     double or multiple recoveries for the one single injury.

9          So, now let's talk about compensatory damages for

10    TriZetto's claims.  First, the misappropriation of trade

11    secrets claims.

12         If, and only if, you have found that TriZetto has

13    proven by a preponderance of the evidence that Syntel

14    misappropriated any of TriZetto's trade secrets, then you must

15    determine whether TriZetto is entitled to any damages, and if

16    so, the amount.

17         There are several types of compensatory damages that

18    could be available to TriZetto for its trade secret

19    misappropriation claims.  I will instruct you on each one

20    separately.

21         First one is lost profits.  TriZetto seeks lost

22    profits for its claim that Syntel misappropriated trade

23    secrets.  If you find that Syntel has misappropriated one or

24    more trade secrets under either New York or federal law, you

25    must determine the amount of lost profits for the

1    misappropriated trade secrets TriZetto is entitled to recover.

2    In determining lost profits damages, you should determine what

3    additional profits TriZetto would have made, if any, had Syntel

4    not misappropriated the trade secret information.

5            To recover lost profits, TriZetto must prove:

6            1.  A reasonable probability that if the

7    misappropriation had not occurred, TriZetto would have made

8    additional profit; and

9            2.  The amount of that profit.

10           Second, the second kind of recovery is called unjust

11   enrichment.  TriZetto also seeks compensatory damages in the

12   form of unjust enrichment for its claims that Syntel

13   misappropriated trade secrets.  Unjust enrichment is the amount

14   that Syntel benefited as a result of any misappropriation.

15           One form of unjust enrichment can be measured by

16   accounting for the infringer's profits earned by using the

17   trade secrets, when such profits can be proven.  An alternative

18   form of unjust enrichment is called avoided costs.  Avoided

19   costs may be considered only for TriZetto's federal

20   misappropriation claim, and not for its state misappropriation

21   claim.  Avoided costs are the amount that Syntel would have

22   incurred to achieve the same result without the use of the

23   appropriated trade secret.

24           If you find that TriZetto has proven by a

25   preponderance of the evidence that it is entitled to Syntel's

Kaq3syn5                    Charge

unjust enrichment damages in excess of TriZetto's actual loss,
you must deduct the cost and expenses, if any, that Syntel
proves by a preponderance of the evidence that Syntel incurred
related to that benefit.  You may award damages for unjust
enrichment only to the extent that they were not taken into
account in computing TriZetto's actual loss.

          And the third kind of damages on the trademark claim
is call reasonable royalty damages.  As an alternative to lost
profits or unjust enrichment, you may award TriZetto damages
for trade secret misappropriation in the form of a reasonable
royalty.  You may not award reasonable royalty damages to
TriZetto if you have decided to award lost profits or unjust
enrichment damages to TriZetto.

          A reasonable royalty is the price that would be agreed
upon by the owner of the trade secret and the misappropriator
for use of the trade secret.  You may award a royalty to cover
only the time period during which damages apply, which I will
discuss with you in a moment.

          Some of the factors you may consider in determining
the amount of a reasonable royalty include:

          1.  Royalties, including as a portion of profits or
selling price, paid for the technology or comparable
technology, including to the owner;

          2.  The nature and scope and term of the
misappropriator's use of the trade secret and the commercial

Kaq3syn5                    Charge

relationship between the parties;

       3.   The total value of the trade secret to the owner,
including its development costs, if any;

       4.   The time and effort that would have been required
before the misappropriator could have acquired or likely
acquired the same or equivalent information through proper
means;

       5.   The benefits of the technology, its lifespan, and
the effect of the technology;

       6.   The profitability of the product made under the
technology, and the extent and value of the use of the
technology by the misappropriator.

       This is not intended as an exclusive list of the
factors which you may consider, although it will give you the
idea of the kind of things to consider in setting a reasonable
royalty.

       I mentioned time frame.  You will be asked to
determine TriZetto's damages for misappropriation of trade
secrets under both New York and federal law.  Under New York
law, you are to determine damages from January 1, 2012 to
October 18, 2020.  Under federal law, the Defend Trade Secrets
Act you are to determine damages from May 11, 2016 to
October 18, 2020.

       If you decide to make an award of damages on either or
both of TriZetto's trade secret claims, please refer to the

Kaq3syn5                    Charge

1    mitigation of damages instruction above to determine if the

2    amount of damages you have determined should be reduced.

3           Now let's turn to the copyright infringement claim,

4    which is TriZetto's claim against Syntel.  If, and only if, you

5    have found that TriZetto has proven by a preponderance of the

6    evidence that Syntel infringed one or more of TriZetto's three

7    copyrighted works at issue, then you must determine the amount

8    of damages TriZetto may recover.

9           You must determine the amount of actual damages, if

10   any, suffered as a result of the copyright infringement, and

11   any profits of Syntel Mauritius and/or Syntel Inc. that are

12   attributable to the infringement that are not taken into

13   account in computing the actual damages.  In establishing the

14   infringer's profits, the copyright owner is required to present

15   proof only of the infringer's gross revenue, and the infringer

16   is required to provide its deductible expenses and the elements

17   of profit attributable to facts other than the copyrighted

18   work.

19          Actual damages.  One way to measure actual damages is

20   by determining TriZetto's lost profits, if any, by reason of

21   the infringing conduct.  Another way to measure actual damages

22   is by determining a reasonable royalty.  A reasonable royalty

23   is the fair market value of a license covering the infringing

24   use, which is the reasonable license fee on which a willing

25   buyer and a willing seller would have agreed for use of the

Kaq3syn5                         Charge

copyrighted work.

Profits of the infringer.  To the extent not taken
into account in computing actual damages, if TriZetto proves
infringement of one or more of the three TriZetto works,
TriZetto is entitled to recover the profits that Syntel made
through October 18, 2020, because of Syntel's infringement of
one or more of the registered TriZetto works.  Syntel's profits
are revenues that Syntel made because of the infringement,
minus Syntel's expenses in providing its services.  TriZetto
must prove Syntel's revenues and a causal relationship between
the infringement and those revenues.  Syntel must prove its own
expenses and any portion of its profits that resulted from
factors, other than infringement of one or more of TriZetto's
works.  In other words, only the portion of Syntel's profits
that are attributable to the infringement of the particular
TriZetto work and not to other factors may be considered for
recovery.

Again, if you decide to make an award of damages on
TriZetto's copyright claim, please refer to the mitigation of
damages instruction above to determine if the amount of damages
you have determined should be reduced.

So, we've now talked about potential damages that
could be awarded to TriZetto, let's now talk about potential
damages that could be awarded to Syntel, first on its breach of
contract claim.

1        If, and only if, Syntel Mauritius has proved all the

2   elements of breach of contract claim, then you must determine

3   the amount of damages, if any, Syntel Mauritius may recover.

4   Syntel Mauritius seeks lost profits for its claim that TriZetto

5   breached the agreement's confidentiality provision.  To

6   determine lost profits damages, you should determine what

7   profits Syntel Mauritius would have made had TriZetto not

8   breached the agreement.  To recover lost profits, Syntel

9   Mauritius must prove by a preponderance of the evidence:

10       1.  A reasonable probability that if the breach of the

11  agreement's confidentiality provision had not occurred, Syntel

12  Mauritius would have made an additional profit;

13       2.  The amount of that profit.

14       And that's it.  Only those two things.

15       If you decide to make an award of damages on Syntel

16  Mauritius's breach of contract claim, please refer to the

17  mitigation of damages instruction above to determine if the

18  amount of damages you have determined should be reduced.

19       Next, or second is the intentional interference with

20  contract claim.  If, and only if, you have found that Syntel

21  has proven by a preponderance of the evidence that Cognizant

22  intentionally interfered with the agreement, then Syntel may

23  recover damages.

24       In determining lost profits damages, you should

25  determine what profits Syntel would have made, if any, had

Kaq3syn5                    Charge

1   Cognizant not tortiously interfered with the contract.

2           To recover lost profits Syntel must prove:

3           1.  A reasonable probability that if the tortious

4   interference had not occurred, Syntel would have made

5   additional profits; and

6           2.  The amount of that profit.

7           Instead of lost profits, you may award direct damages

8   stemming from the alleged breach.  In determining direct

9   damages, you may look at the costs incurred rather than the

10  profits lost as a result of the breach.

11          Then the next claim, misappropriation of confidential

12  information claims.  If, and only if, you have found that

13  Syntel Mauritius has proven by a preponderance of the evidence

14  that TriZetto/Cognizant misappropriated confidential

15  information, then Syntel Mauritius may recover damages against

16  TriZetto/Cognizant.

17          In determining lost profits damages, you should

18  determine what profits Syntel Mauritius would have made, if

19  any, had the other party not misappropriated the information.

20  To recover lost profits, Syntel Mauritius must prove:

21          1.  A reasonable probably that if the misappropriation

22  had not occurred, Syntel Mauritius would have made additional

23  profit; and

24          2.  The amount of that profit.

25          Unjust enrichment is the amount that TriZetto and/or

Kaq3syn5                      Charge

1    Cognizant benefited as a result of any misappropriation.  If

2    you find that Syntel Mauritius has proved by a preponderance of

3    the evidence that it is entitled to TriZetto and/or Cognizant's

4    unjust enrichment damages in excess of Syntel Mauritius's

5    actual loss, you must deduct the costs and expenses that

6    TriZetto and/or Cognizant proved by a preponderance of the

7    evidence that they incurred related to that benefit.  You may

8    award unjust enrichment damages only to the extent that they

9    were not taken into account in computing Syntel Mauritius's

10   actual loss.

11          The next claim, the last one, intentional interference

12   with contractual relations.  If, and only if, you found that

13   Syntel Inc. has proved by a preponderance of the evidence that

14   TriZetto and/or Cognizant intentionally interfered with the

15   five employment contracts at issue, then Syntel Inc. may

16   recover damages against TriZetto and/or Cognizant.

17          In determining lost profits damages, you should

18   determine what profits Syntel Inc. would have made, if any, had

19   the other party not interfered with the employment agreements.

20          To recover lost profits, Syntel Inc. must prove:

21          1.  A reasonable probability that if the interference

22   had not occurred, Syntel Inc. would have made additional

23   profits; and

24          2.  The amount of that profit.

25          So that concludes the discussion of what are called

Kaq3syn5                    Charge

compensatory damages.  Let me now discuss with you punitive

damages.  In contrast to compensatory damages, punitive damages

are intended to punish and deter the wrongdoer and others from

committing similar acts in the future.  If you find that

TriZetto is entitled to compensatory damages for

misappropriation of trade secrets under New York or federal

law, or that Syntel is entitled to compensatory damages for

misappropriation of confidential information or intentional

interference with contract against Cognizant, then you may, but

are not required to, award punitive damages in addition to

awarding damages to compensate the injured party for its

injuries.  You may not award punitive damages for TriZetto's

federal copyright claim, Syntel's breach of contract claim, or

Syntel's intentional interference with contractual relations,

the one regarding five employment contracts.

        To award punitive damages, you must find that a party

has proven by a preponderance of the evidence the other party's

conduct was malicious and wanton, and not merely unreasonable.

Meaning that in committing the act, the other party acted with

deliberate intent to injure or interfere with the party's

rights and with conscious indifference and utter disregard of

its effect on the safety and rights of others.

        Punitive damages may be awarded against an employer

because of an act by its employee only if you find:

        1.  The employer authorized the doing and the manner

Kaq3syn5                      Charge

of the act; or

       2.  The employee was unfit and the employer was reckless in employing him or her; or

       3.  The employee was employed in a managerial capacity and was acting in the scope of his or her employment; or

       4.  The employer or manager of the employer ratified or approved the act.

       In determining whether an employee is acting in a managerial capacity, you should consider the employee's authority and discretion to make decisions, and not only the employee's title.

       Only if you decide to award punitive damages, you must then determine the amount of damages using sound reason.  It must not reflect bias, prejudice or sympathy toward any party, and you should consider the following factors for each wrongdoer in determining the amount:

       1.  The nature and reprehensibility of what the wrongdoer did.  In considering the amount of punitive damages to award, you should weigh this factor heavily.

       2.  The actual and potential harm caused by the conduct.  The amount of punitive damages that you award must be both reasonable and proportionate to the actual and potential harm suffered that the wrongdoer knew was likely to occur, and to the compensatory damages you have awarded the claimant.

       3.  You may also consider the financial condition of

Kaq3syn5                    Charge

1    the party liable for wrongdoing.

2              For TriZetto's federal trade secret misappropriation

3    claim, if you find that Syntel acted willfully and maliciously,

4    you may, but need not, award TriZetto an amount of punitive

5    damages up to two times the amount of compensatory damages you

6    award TriZetto for trade secret misappropriation for the time

7    during which Syntel acted willfully and maliciously.  If you

8    find that punitive damages are appropriate for this claim, you

9    must use sound reasoning in setting the amount of those damages

10   and consider the same factors as above.

11             And let me just say again, perhaps I don't need to.

12   I'm not suggesting by instructing you on punitive damages that

13   you should award punitive damages or anyone is entitled to

14   them.  I'm simply instructing you in case you decide that's the

15   case.

16             Let me now talk to you about sort of the final

17   category.  We've talked about the claims, we've talked about

18   the damages.  Now let me tell you about defenses.

19             First, Syntel's affirmative defenses.  If you find

20   that TriZetto has proved any of its claims against Syntel, you

21   should then consider three affirmative defenses that Syntel

22   asserts:  Laches, waivers and estoppel.

23             Laches.  To establish laches, Syntel must prove by a

24   preponderance of the evidence that TriZetto delayed filing the

25   lawsuit for an unreasonably long and inexcusable period of

Kaq3syn5                    Charge

1    time, and Syntel has been or will be prejudiced in a

2    significant way due to TriZetto's delay in filing the lawsuit.

3    Unreasonable delay means an unreasonable lack of diligence

4    under the circumstances in initiating the action.  Prejudice is

5    harm or injury that results from a party's actions.

6              Second, waiver.  To establish waiver, Syntel must

7    prove that TriZetto knowingly and intentionally abandoned its

8    right to sue Syntel for misappropriation of trade secrets or

9    copyright infringement.  Syntel must prove waiver for

10   TriZetto's claims of copyright infringement and for

11   misappropriation of trade secrets under the Defend Trade

12   Secrets Act by a preponderance of the evidence, the standard of

13   proof that I have already explained.  Syntel must prove waiver

14   for TriZetto's claim for misappropriation of trade secrets

15   under New York law by a different standard, that is clear proof

16   that there was a voluntary and intentional relinquishment of a

17   known and otherwise enforceable right.

18             And the final defense is estoppel.  To establish

19   estoppel, Syntel must prove that:

20             TriZetto misled Syntel to believe TriZetto would not

21   claim that Syntel misappropriated trade secrets or infringed

22   copyrights;

23             2.  Syntel relied on this; and

24             3.  As a result, Syntel will be materially harmed due

25   to such a claim by TriZetto.

Kaq3syn5                       Charge

1           Syntel must prove each element of estoppel for

2    TriZetto's claims of copyright infringement and for

3    misappropriation of trade secrets under the Defend Trade

4    Secrets Act by a preponderance of the evidence.  Syntel must

5    prove estoppel for TriZetto's claims for misappropriation of

6    trade secrets under New York law by clear and convincing

7    evidence, which means evidence that satisfies you that each

8    element of estoppel was highly probable.

9           Finally, unclean hands is a principle that both sides

10   are asserting.  Unclean hands is a principle that prohibits a

11   party from obtaining certain relief if that party has committed

12   some unconscionable act that is directly related to the subject

13   matter in litigation and has injured the other party.  You will

14   be asked whether either party has shown by a preponderance of

15   the evidence that the adverse party acted with unclean hands.

16          So that is the end of the instructions.  Apologies,

17   ladies and gentlemen, that they are so long.

18          With these instructions in mind, you're now going to

19   hear closing arguments from the lawyers.  And I'll just remind

20   you that what the lawyers say is not evidence, because they are

21   not witnesses.  But what they say to you in their closing

22   arguments is intended to help you understand the evidence and

23   reach your verdict.  So please pay close attention to their

24   arguments.

25          And my plan is that we will hear the first summation,

1    we'll take a very short bathroom break at that point, we'll

2    hear the second summation, and then we'll hear very brief

3    rebuttal.  And I need something to wipe this down.

4             MR. DE VRIES:  Your Honor, may I approach the podium?

5             THE COURT:  You may.

6             MR. DE VRIES:  Your Honor, may I remove my mask?

7             THE COURT:  You may.

8             MR. DE VRIES:  Thank you, your Honor.  And I'd like to

9    reserve 10 minutes of my hour, which I understand is the

10   maximum time for my rebuttal.

11            THE COURT:  Yes.

12            MR. DE VRIES:  Thank you.  Mr. Thomas, are we

13   generally ready?

14            Your Honor, may I proceed?

15            THE COURT:  You may.

16            MR. DE VRIES:  Good afternoon, members of the jury.  I

17   want to start again where I started the trial, and that is to

18   thank all of you for the time and the sacrifice that you've

19   made in performing your service in this trial.  I know I speak

20   on behalf of everyone here that it is deeply meaningful to all

21   of us, and we appreciate you helping administer justice in this

22   case.

23            The evidence is in, and the time has come for you to

24   make the decision here.  And I understand that her Honor has

25   instructed you that that decision is to be based on the

Kaq3syn5                     Summation - Mr. De Vries

1    evidence, not on the arguments that I or any of the other

2    attorneys make.  And you'll have an opportunity to take a look

3    at the evidence in the jury room.  Anything that you want will

4    be available to you on a computer, and I encourage you to do

5    that, to look at each of the items of evidence that we've

6    talked about.

7            This has been a long trial, and I don't have the

8    ability to walk through every piece of evidence here.  But as I

9    said, and I will have on my slides particular exhibit numbers

10   that you can go to look at to see what I am talking about and

11   examine the documents and other evidence in detail.

12           With the evidence in, we've shown what we set out to

13   show, and I don't think the same can be said for Syntel.

14           We've shown that there was a betrayal of trust.  My

15   client paid an awful lot of money to Syntel, for its

16   assistance, over $100 million, and it trusted Syntel with its

17   trade secrets.  But for only one purpose, and that was to help

18   TriZetto.

19           Syntel betrayed that trust by taking the trade

20   secrets, and using them for all types of other purposes,

21   including to make other tools that it went out and told our

22   customers, our joint customers and in some cases other

23   customers, belong to it.

24           And over the course of this case, which has been

25   nearly six years, this lawsuit, and this is going to be the end

Kaq3syn5                    Summation - Mr. De Vries

1     of it for this part of the case, the story that Syntel has

2     told, it's kept changing.  Its excuses have changed constantly.

3     First, it said it didn't do it, for years.  But we found more

4     information and more information, and with the help of the

5     neutral forensic examiner, we showed that that was false.

6                And so what did they do?  They came up with a new

7     story and another new story.  And the stories that you've seen

8     presented now are that they did do it, but it was okay.  Either

9     because they got it from United Health Group, or because it's

10    just competition and that 2012 amendment made competition okay.

11               But those new excuses, the new stories for why they

12    did what they did, are no more believable than the first ones.

13               And the last thing I'll say before I present my slides

14    is that the evidence is also clear that Syntel refuses to take

15    responsibility for what it's done.  You heard Mr. Moore, the

16    top attorney at Syntel, say that he didn't testify about a

17    single thing they've done to stop using the trade secrets, to

18    take the trade secrets out of their files, to do anything

19    whatsoever to respect my client's hard earned, intellectual

20    property rights.  That the law of the United States protects.

21               They won't listen to us, but after six years of

22    litigation, there is someone they have to listen to, and that

23    is you.

24               Mr. Thomas, can I get my slides, please.  Thank you.

25               In the opening statement, Syntel said that they

Kaq3syn5                    Summation - Mr. De Vries

1    weren't stealing the information, and that this is a case about

2    a relationship gone bad.

3              But you heard her Honor instruct you during trial that

4    Syntel misappropriated TriZetto's test cases and automation

5    scripts.  The misappropriation under the law involves an

6    unlawful taking or use of a trade secret.  Here, so long as

7    we're able to prove that these test cases and automation

8    scripts are trade secrets -- which they clearly are, you can

9    see it in document after document after document from Syntel

10   that they are highly valuable -- then we have proved our claims

11   of trade secret misappropriation under federal and New York

12   law.

13             Her Honor also instructed you that there is no

14   evidence that Syntel independently developed TriZetto's

15   platform management tool trade secret.  That involves the Data

16   Dictionary, the Step-up Probe, and also the test cases and

17   automation scripts.  And again, we provided unrebutted evidence

18   that each of those tools, that to this day Syntel continues to

19   sell, were unlawfully copied and based on my client's trade

20   secrets.

21             During questioning of our technical expert

22   Dr. Bergeron, counsel for Syntel asked:

23   "Q.  And there is no dispute in this case that Syntel used

24   TriZetto materials of the type that you opine are trade

25   secrets, correct?

1    "A.  You are asking me if there is no what dispute?

2    "Q.  I don't think anyone in the room disputes that Syntel used

3    certain TriZetto material, confidential material."

4              While that may be the case as of the middle of this

5    trial, for the last six years, that has not been the story that

6    we've heard from Syntel.

7              And there is no question that the use of my client's

8    trade secrets was wrong.  And all you have to do is look at the

9    testimony from Mr. Murli Reddy from this trial where he was

10   asked if someone on your side, if someone from Syntel stood up

11   and said that under the amended Master Services Agreement, this

12   is the amendment, it was okay for you to use TriZetto's trade

13   secrets to compete against TriZetto, that would be flat wrong,

14   right?  And he answered it would be flat wrong, as long as we

15   take something that we got from TriZetto and use it.

16             And then he testified, upon being shown his

17   deposition, that when Syntel was competing against TriZetto,

18   Syntel was not allowed to use TriZetto's proprietary,

19   confidential, trade secret or copyrighted information in that

20   effort, right?  And his answer was yes.

21             This is the evidence that I respectfully submit should

22   guide you in deciding whether the latest excuses from Syntel

23   are correct or not.

24             And finally, Syntel's top attorney, Mr. Dan Moore,

25   when I asked him whether stealing trade secrets is a

Kaq3syn5                         Summation – Mr. De Vries

1    relationship gone wrong, he agreed that they're not.   That

2    stealing trade secrets is not a relationship gone wrong.

3          Now, we showed you a lot of evidence that shows the

4    misappropriation of the trade secrets and the copying of the

5    copyrighted materials.   The key Syntel employees who were on

6    those materials are listed here.   Ankur Chadha, he is a name

7    who you've seen a lot.   Sandeep Sinha and many others.   And

8    these are senior managers at Syntel.   Mr. Chadha was head of

9    the PCT team.   Mr. Sinha, the Facets architect at Syntel.

10         But you didn't see a single one of these witnesses

11   come to provide live testimony to you in this trial, to tell

12   you they thought it was okay to take my client's trade secrets

13   and use them.   To tell you that they believed that they had

14   some kind of right to take the trade secrets and use them to

15   build competing tools, or that they got everything from UHG.

16   Those are attorney arguments; that's not evidence from the

17   witnesses who didn't come.

18         (Continued on next page)

19

20

21

22

23

24

25

1          MR. DE VRIES:  And as you can see from DTX 1539, this

2     is a document you can look at, it says Mr. Chadha's links in

3     profile, I believe it was printed a week ago, he works for Atos

4     Syntel today, in San Francisco.  If he wanted to testify at

5     trial and to tell you what the answer was, he had every ability

6     to do that, and it has to tell you something that none of those

7     witnesses came to face you and explain what they have done.

8          There's another big empty chair here that is very

9     unusual.  We presented through Dr. Bergeron substantial

10    evidence of exactly how it was that Syntel copied and used the

11    trade secrets and the copyrights, and Syntel did not bring a

12    technical expert to say that anything that Dr. Bergeron said

13    was wrong.  It is unrebutted technical testimony.

14         And the witnesses that they did bring, they did not

15    tell you a different story.  Mr. Reddy was asked:  We are not

16    going to hear you say today that those tools and accelerators

17    came from anywhere else but TriZetto.

18         And he said:  I'm not going to say that.

19         Very similar question to Mr. Mehta:  You are not

20    providing any evidence or testimony that the tools, the Step Up

21    Probe, the Data Dictionary or the 3,000 test cases or 500

22    automation scripts, came from anywhere other than TriZetto,

23    correct?

24         No, I'm not providing that testimony.

25         Now this is important stuff.  You heard from Mike

KAQTSYN6                    Summation - Mr. De Vries

Noonan, the first witness in the trial, who spent over 20 years
of his life as a senior software engineer developing the
Facets-related trade secrets.  And this software, although you
never heard about it before this trial, very likely, is one of
the most important, if not the most important healthcare
administration software in the United States.  As you heard, it
covers approximately 170 million lives.

        And TriZetto trusted Syntel with that information, as
Mr. Noonan explained.  And they did didn't do it for free.
Syntel received over $100 million from TriZetto for the work
that it did.  And in return, in addition to providing the
services from its -- the staffing services from its employees,
it agreed to keep that information confidential, and as their
witnesses told you, to use it only to help TriZetto.

        But that's not what happened.  There are a series of
documents that you have seen in this trial that show that,
unbeknownst to TriZetto, to my client, years before the merger
with Cognizant and the termination and the few months dispute
about 84 employees that you heard a lot about from Syntel, that
there was a plan, and that plan from the very beginning was
focused on tools and accelerators.

        And you can take a look at this document, it's DTX 83,
there are the notes.  On the first page you can see that the
plan that Syntel undertook was to build the tools and
accelerators, and by 2015 to go into all-out war with TriZetto

1    that was built on an arsenal of tools and accelerators it

2    called its differentiators.

3            In that same document, there is a drawing about the

4    $500 million total addressable market.  And Mr. Reddy admitted

5    that that drawing was a target.  And who did it target?  Well,

6    first it targeted Cognizant, who at the time was separate, but

7    then TriZetto, first its troubled accounts, then its direct

8    accounts.  That was the purpose of the plan.

9            And it's not in just this one document.  Another

10   document from 2012, DTX 160, it says that there's a focus on

11   leveraging tools, that they're going to create differentiated

12   tools, the impact analyzer, the Data Dictionary, and that they

13   were going to do this using the work that they were performing

14   for my client as a Trojan horse.  This is a document that until

15   we were in the middle this litigation, my client never got to

16   see.

17           And by the time we get to 2014, years, by that point,

18   into the plan, they're still focused on Step Up, that's that

19   Step Up Probe, the accelerators.  Mr. Noonan explained those

20   are the tools.  They call that their IP, and their plan is to

21   use those technologies for their billion dollar goal and their

22   hundred million dollar per year goal.

23           Now Mr. Reddy said that they never implemented the

24   plan.  But I respectfully submit to you all that if you look at

25   the evidence, there is no doubt that the plan was implemented.

KAQTSYN6                    Summation - Mr. De Vries

1           This is one of the documents, it's DTX 149 that

2     Mr. Reddy wrote in October of 2014.  It talks about

3     accelerators and tool kits.  It talks about being aggressive

4     with UHG, going for the kill for UHG.  And then there's a lot

5     of combat terminology that you may remember.  And one thing

6     that Syntel said is well, the discussion about combat and going

7     to war, that's really about not wanting to lose people.  But

8     look carefully at this document.  It talks very clearly about

9     accelerators and tool kits, and what it says is you're going to

10    go for the kill with UHG.

11          I think another thing Syntel said, well, this

12    particular document doesn't talk about the trade secret, but

13    over and over and over again the internal documents at Syntel

14    leave no doubt that what Syntel did was take the trade secrets

15    from my client and use them to build the tools.  This is DTX

16    100.  I encourage you to look at it.  This is an internal

17    Syntel document that says I got the TriZetto supply Data

18    Dictionary, it put it on the PCT-shared drive.  This is a link

19    to that drive.  The link has in its name "tools," and then a

20    link to TriZetto Data Dictionary source code.

21          And what did Dr. Bergeron explain?  He said he looked

22    at all the source code for the party's products, the Data

23    Dictionary from my product and the renamed D2 Data Dictionary,

24    the one that Syntel says it developed.  And the source code for

25    the heart of that product was exactly the same, function after

KAQTSYN6                    Summation - Mr. De Vries

1    function, value after value, line after line and page after

2    page, it is exactly the same.  There is no explanation for that

3    other than that they took our source code, they copied it into

4    their tool, and then they told the world that they developed a

5    D2 Data Dictionary.  That testimony is entirely unrebutted.  No

6    one came to say that that was wrong.

7         The same is true for the Step Up Probe.  Please create

8    rule sheet for our IA tool, that's the impact analyzer tool,

9    the Step Up Probe, and they say base it on the attached

10   spreadsheet.  If you open up that spreadsheet, I encourage you

11   to, DTX 96, and look at the print preview mode, you will see it

12   says TriZetto confidential and proprietary.

13        And test cases and automation scripts, I remind you of

14   her Honor's instructions.  Here at the top is a test case that

15   was found in their files.  It says right on there, TriZetto

16   confidential and proprietary.  It wasn't the only one, hundreds

17   of these were found in their files.  What did they do?

18        They went and told the customers this was their tool.

19   They called it Factory, like they renamed the Data Dictionary

20   the D2, here they called it Factory, and they told the

21   customers that that's why they should go with them.

22        What about the software?  The software trade secrets?

23   They downloaded in very short time frames EXE file after EXE

24   file after EXE file to create an internal secret repository of

25   our software on their system to use with other customers.

1            And the manuals, you've seen this document a lot, but

2    DTX 5 explains, there's been a lot of dispute about who

3    downloaded what and when and where they -- when they went to

4    which company, but all you have to do is focus on this email.

5    Mr. Sinha says to Mr. Mehta and Mr. Chadha that in the next two

6    months to build Syntel capabilities very strong around TriZetto

7    products, because once we're out from TriZetto, we will not be

8    having access to their products, documentations and manuals.

9    And what you saw in the earlier slide in DTX 100 is that they

10   created on that PCT-shared drive a repository of all of these

11   materials that they took so that they could use them with other

12   customers.

13           And then months later, you can see that Mr. Chadha is

14   asking:  Send me the list of exact T dollar sign Z manuals that

15   you need.  He's asking what manuals do you need?  You should go

16   look at this document.  And his co-worker in the PCT group,

17   which the testimony establishes was never supposed to it have

18   these materials, says we were looking at the following manuals

19   and there's a whole list of the trade secret guides that's

20   coming out of their internal repository.

21           So what did they say?  This is where the changing

22   stories comes in.  In 2018, two years ago, little bit more

23   because this was in February, we asked Mr. Chadha:  Have you

24   ever had access to TriZetto's information about its products?

25   No.

KAQTSYN6                    Summation - Mr. De Vries

1            Have you ever had any access to any TriZetto

2     information?  Not that I know of.

3            Well, we got these documents that Mr. Chadha sent,

4     wrote, send me the list of TriZetto manuals.

5            Here's another one that he's copied on:  I got the

6     TriZetto supplied Data Dictionary.

7            I will leave it to you to conclude, but there is a

8     complete disconnect between this testimony and the written

9     evidence.

10           And it happened over and over again.  We asked

11    Mr. Chadha:  Are you aware of anyone on the PCT team using any

12    of TriZetto's materials to carry out their work?  Again, to the

13    best of my knowledge, he testified under oath, I don't know of

14    anyone who used TriZetto material.

15           But years earlier he was on an email that says:  I got

16    the TriZetto supply Data Dictionary, the same as placed on

17    PCT-share drive.

18           That was their story then.

19           What about Mr. Sinha?  He's another current employee

20    of theirs who you saw by deposition but not on trial, and he

21    was asked:  Does Syntel have a tool to analyze the impact of

22    the upgrade on custom code?  I don't know.

23           What is the Syntel step up tool kit?  I don't know.

24           So in all your work at Syntel you never heard of the

25    Step Up Probe being used to analyze the impact on custom code

KAQTSYN6                    Summation - Mr. De Vries

1   upgrade?  I don't remember.

2          But he wrote these emails on the right, DTX 95 and --

3   sorry, I think DTX 80, I will check that.  And Mr. Sinha says:

4   Please create the rule sheet for our IA tool.

5          And the second one:  We know that current Step Up tool

6   rule sheet is designed to work for these places.  Please run

7   Step Up with new rule sheet on UHG inventory.

8          But he couldn't remember at his deposition whether in

9   all of his work at Syntel he ever heard of the Step Up Probe.

10  He said he didn't remember.

11         And this was a declaration from another employee of

12  Syntel, this time from 2017.  And Ms. Muthuraman said that

13  Syntel never possessed a repository of 3,000 plus Facets test

14  cases and 500 plus Facets automation scripts.  That was

15  declared under penalty of perjury to be correct.  But as the

16  Court instructed you, I instructed you during the trial, that

17  Syntel misappropriated TriZetto's test cases and automation

18  scripts.

19         Now I mentioned the neutral forensic examiner, and I

20  think that's because, in part, it helps to explain the change

21  in story.  The neutral forensic examiner found additional

22  TriZetto documents at Syntel.  He found ongoing movement and

23  use of those documents in 2017.  And hundreds of files that

24  were deleted in the middle of this case right as we were asking

25  these people these questions in 2017.  You can look at it, DTX

KAQTSYN6                    Summation - Mr. De Vries

245.  And he found this additional information.

And I know there's been a lot of talk about this, but you saw this deposition, the Syntel witness explained when asked:  Did you testimony the forensic examiner there was a store room of TriZetto assets that were available?  Answer: No, I did not.

And I know you've heard a lot of discussion between the attorneys and the experts about this, I encourage you to focus on the evidence and what it shows when considering these issues.

So what are the new excuses now that they, I think, admit that they used all the trade secrets?  Well, now they say they were using information that they got fair and square from UnitedHealth Group, from UHG.  That's what was going on.  Is that true?  No.  How do you know it?  Because they were taking our trade secrets that they had been using.

You heard Mr. Moore, in 2012 is when they started using the tools, years before United.  And they said that they came to UHG and said our tools, the Step Up Probe.  You can see it there, Factory, DT Data Dictionary, this is in DTX 78, they were offering the trade secrets to United, not vice versa.

And we asked Mr. Mehta about it:  If they came from TriZetto, you would agree it wouldn't have been fair for to you tell UHG that they were Syntel's tools, right?  I would agree, sir, yeah.

1            And that's right.  It wasn't fair.

2            And it wasn't just UHG.  DTX 149 is another important

3     document.  Syntel knew that because it had taken my client's

4     trade secrets that by 2014, when Cognizant acquired TriZetto,

5     it believed there were no other alternatives.  And why?

6     Because we have accelerators and tool kits.  That's what they

7     were telling the clients.  These are not materials they got

8     from the clients, they said these are ours, we got them, we're

9     the only other ones who have them except for the ones who came

10    up with them, and that that's why there were no other

11    alternatives.

12            So there's the other new story that, as far as I could

13    tell, they came up with at trial, and it's that this 2012

14    amendment somehow meant that they could take my client's trade

15    secrets and copyrights and do whatever they wanted with them.

16    That is flat wrong.  And you don't have to take it from me,

17    that was Mr. Reddy's words.  So whatever argument you hear on

18    this issue, I would encourage you to remember what they said

19    under oath in this trial, that if someone stands up and said

20    that under the MSA, as amended, it was okay for you to use

21    TriZetto's trade secrets to compete, it would be flat wrong.

22    Using our trade secrets to compete is unfair competition, not

23    competition.  Nothing about this amendment or about competition

24    in general allows them to use the trade secrets.

25            There's another very important part of competition

KAQTSYN6                    Summation - Mr. De Vries

1    that is protected by the IP laws of this country, and that is

2    if intellectual property like trade secrets and copyrights are

3    not protected, companies like TriZetto, who invested over half

4    a billion dollars in creating these, they will stop doing it.

5    They will stop making those investments to create the

6    intellectual property.  And so yes, that means that they get to

7    own what they created.  that's what the law provides, and no

8    amount of competition and argument that low costs are good can

9    overcome that.

10          So what about today?  Well, they're still doing it.

11   They're advertising right now on their website sustained

12   investments, IP based solutions, tools and accelerators.

13   They're still saying it in 2020.  Those weren't their

14   investments, those were TriZetto's investments.  The Step Up

15   Probe, Factory, D2 Data Generator, those were all taken, but

16   they're still advertising them.

17          And they touted their investments in their acquisition

18   with Atos.  When Atos purchased Syntel in 2018, in the middle

19   of this lawsuit, two years ago, Syntel was still saying our

20   investments in high-impact domain-led services and intellectual

21   property, that's one of the reasons for this investment that

22   was made.  But again, those are my client's investments.

23          And so finally, then I will get into the claims, I had

24   a chance to ask Mr. Moore about what they had done about my

25   client's trade secrets and copyrights.  I asked:  You did not

KAQTSYN6                    Summation - Mr. De Vries

1    testify about any steps that your company took to step using

2    TriZetto's trade secrets.  That's correct.

3           You did not identify any steps in your testimony that

4    Syntel took to remove TriZetto's trade secrets and copyrighted

5    materials from its files.  That is correct.

6           You didn't testify about any steps that Syntel took to

7    redesign any of the products to stop using my client's trade

8    secrets and copyrights.  That's correct.

9           And finally I asked him:  You did not testify about

10   any action that your company took whatsoever to take

11   responsibility for what it's done with my client's intellectual

12   property.  And he very candidly said:  I agree with that.

13          And you heard him just this morning, he had an

14   opportunity it come up after I finished asking questions and he

15   could have said we actually did, we do take responsibility, I

16   forgot to mention it before, we do respect the intellectual

17   property laws, we're going to stop, we have a plan in place.

18   You heard nothing like that.  They will not take

19   responsibility.  They take no accountability for what they have

20   done.  And frankly, it is you who has the decision to hold them

21   accountable.

22          And so I think that what you will see is that the

23   bedrock facts that we set out to prove at the beginning of this

24   trial, each and every one of them we have proved by the

25   evidence, not through our arguments, but through the evidence.

1             So let's talk about the claims.  Trade secret

2    misappropriation.  Some of this is undisputed.  I don't think

3    there's any dispute that TriZetto owns these materials.

4    There's a dispute about whether the information is a trade

5    secret, and also whether Syntel used the trade secret in a way

6    that is prohibited.

7             They clearly did.  They used the trade secrets.  It's

8    apparently no longer disputed.  They didn't have an expert come

9    and say they didn't.  And they did it in violation of a duty to

10   maintain the secrecy of the trade secret, their agreement with

11   us.

12            And then this last factor is not disputed.  You have

13   heard lots of evidence about all of the measures that TriZetto

14   takes to protect its trade secrets.  It marks these documents

15   time and time and time again as trade secret property, trade

16   secret property, trade secret information.  They testified

17   about -- Mr. Noonan and Mr. Sanders testified about computer

18   security, physical security, limited access control, only

19   certain people could see certain materials for certain

20   purposes.  That's the exactly what a trade secret is.

21            And some of the trade secrets are shared on a

22   need-to-know basis with certain people as customers.  But you

23   heard that all companies have to sign a confidentiality

24   agreement before they could access that.  That's what

25   Mr. Sanders explained.  And as her Honor just instructed you,

KAQTSYN6                    Summation - Mr. De Vries

1    "secret" means that the information was known substantially

2    only by TriZetto or others who are obligated to keep the

3    information secret.

4           And one other thing, I think you will hear from Syntel

5    that maybe these were not trade secrets because they weren't

6    available.  They're not sure that they can reuse them enough,

7    that they're not particularly important.  But ask yourself, if

8    they're not important, why do all of their internal documents

9    say that the tools and accelerators are the most important

10   thing, that that makes Syntel the only alternative to us in the

11   market, that the Factory repository test cases and automation

12   scripts is so important that it is still advertised on the

13   website today.  That is completely contrary to any argument

14   that these are not valuable as trade secrets.

15          And we provided extensive, unrebutted use of each of

16   the categories, the tools, the software, the guides and

17   manuals.  As I mentioned, it appears that this is no longer

18   disputed by them, and they had no expert come and say that

19   there was a dispute.

20          Her Honor instructed you that during the trial Syntel

21   misappropriated TriZetto's test cases and automation scripts,

22   and that there's no evidence that Syntel independently

23   developed the platform tool trade secrets.

24          And there's another very important point, that is the

25   Defend Trade Secrets Act.  That was enacted by Congress in the

KAQTSYN6                    Summation - Mr. De Vries

1    middle of 2016.  So I want to show you multiple pieces of

2    evidence that leave absolutely no doubt that the use of the

3    trade secrets, the unauthorized use by Syntel occurred after

4    that date.  So for the tools, I asked Mr. Moore when I got to

5    question him last week:  In 2018, Syntel continued to use tools

6    in connection with providing Facets services at that time.  And

7    he answered:  That is correct.

8            And of course, still up on the web today is DTX 1162,

9    their advertising.  So, of course, they have used the tools

10   after May of 2016.

11           The same is true for the software.  The software EXE

12   files and the upgrade scripts, they were all used, as

13   Dr. Bergeron testified in unrebutted form, in November of 2016

14   when they finished the upgrade for that particular customer.

15   And then again, up on the web today they're still advertising

16   layered upgrade framework and tools.  They've clearly continued

17   to use the software trade secrets after May of 2016.

18           And guides and manuals, they used those, too.  For

19   example, the forensic examiner explained that there was

20   movement of files, and Dr. Bergeron explained that the movement

21   of files in 2017, November 2016 and these other dates, show

22   clear use of the TriZetto trade secrets in the guides and

23   manuals.

24           So there are two questions on the verdict form, one is

25   for the Defend Trade Secrets Act, that's the federal claim, and

KAQTSYN6                    Summation - Mr. De Vries

1    one is for the New York law claim.  And it asks whether we have

2    proved that we possessed one or more trade secrets that was or

3    were misappropriated by Syntel.  Again, as long as you conclude

4    that the trade secret -- sorry, that the test cases and

5    automation scripts are trade secrets, her Honor's instructions

6    means that both of these should be checked yes.

7              But this isn't a close call.  The evidence we have

8    shown, ongoing sustained unexplained use of the trade secrets,

9    is extensive.  And we have proven, I would respectfully the

10   suggest, that there's been misappropriation of all 104 trade

11   secrets without question.

12             For copyright infringement, that's our second claim,

13   there are two elements.  The first is that TriZetto owns the

14   copyrights and the second is that Syntel copied.  For copying,

15   if there's access and substantial similarity, the Court has

16   instructed you to find copying unless Syntel establishes that

17   its work was independently created.

18             There was one question, and that is:  Does the Facets

19   1.0 registration cover the Data Dictionary?  The evidence that

20   you heard unequivocally establishes that it does.  Frankly, it

21   makes no sense to suggest that it does not.  Mr. Noonan

22   testified that the Data Dictionary software is part of the

23   overall Facets software.  And then Mr. Sanders:  Data

24   Dictionary is part of Facets 1.0.  And you will see the

25   instruction says:  Was it a part, was it a subpart?  This

1   evidence conclusively establishes that it was, so it's

2   registered.

3         So the only other question is:  Did they copy it?

4   Well, you heard Dr. Bergeron say they had the source code for

5   the Data Dictionary, our Data Dictionary, in their files and

6   the source code in the middle of their D2 Data Dictionary, it's

7   precisely the same.  And that is unrebutted.

8         So there is unquestionably also copyright

9   infringement, and so we respectfully suggest that the right

10  answer, when asked whether TriZetto has proved that Syntel

11  infringed one or more of TriZetto's copyrights, is yes.

12        Now I want to briefly come back to their new excuses,

13  because you will find them in the form of defenses, and I would

14  like to speak about that.  So one thing that they said in

15  opening statement was that the vast majority of the information

16  was provided by TriZetto to Syntel.  But you know that that

17  information was provided to use only for TriZetto.  We asked

18  Mr. Reddy on the stand, and showed him his deposition

19  testimony:

20        Question:  And the reason that TriZetto gave

21  confidential information to Syntel was to execute work for

22  TriZetto in the context of the MSA.

23        That's right.

24        TriZetto did not give Syntel permission to give its

25  confidential information for any other purpose?

1           And he said:  I'm not aware of it.

2           What about the 2012 amendment?  I already talked about

3    this, but I want to remind you of the evidence.  Did that let

4    them use my client's trade secrets for any purpose that they

5    wanted to?  Of course not.  Mr. Reddy said that that was flat

6    wrong.

7           Mr. Moore, who testified, he, in PTX 44, I encourage

8    you to look at this letter, in 2014, years after the amendment,

9    he told my client:  Syntel has not breached the MSA and

10   maintains confidentiality.  And he refers to his

11   confidentiality obligations.  It makes no sense to say that he

12   believed that the 2012 amendment somehow let them do anything

13   they wanted with the trade secrets if he wrote this letter two

14   years later.  Again, this is an instance about looking at what

15   they said before the lawsuit not what they're saying at trial.

16          And when I asked Mr. Moore in his testimony, you may

17   remember I made a mistake and I didn't write the page down

18   properly during my questioning, I found it ultimately, and I

19   reminded him that in 2018 when I talked to him, he admitted

20   that at that time, years after the amendment, Syntel had not

21   discussed or taken a position that the amendment permits it to

22   use my client's confidential information to build competing

23   products or services.  Whatever they're telling you at trial,

24   the evidence just doesn't support it.

25          And again, this amendment allows competition, it

1    didn't allow unfair competition.  And when Mr. Reddy was asked

2    whether using someone else's trade secrets against them in

3    competition to compete with them without their permission,

4    that's not fair competition, he said:  That's right.

5           And finally, the argument that they just got it all

6    from UnitedHealthcare, all you need to do is look at the

7    timeline.  The timeline shows you that they got the trade

8    secrets and developed their own competing tools and the other

9    things they are bringing to United before they ever got to

10   United.  It just doesn't add up.

11          And I think at the end of the day her Honor told you

12   that you need to bring your common sense to the table.

13          THE COURT:  Five minutes.

14          MR. DE VRIES:  And that the common sense questions are

15   that if Syntel thought it could use TriZetto's trade secrets,

16   why it did it lie and cover up?  Why it did continue to

17   maintain its confidentiality obligations in December 2014 if it

18   thought the amendment allowed it to compete?

19          Let me address just a couple of other things.  One is

20   there's some discussion with Dr. Bergeron about whether the

21   trade secrets were on the internet.  And her Honor instructed

22   you that publication of a trade secret on the internet does not

23   necessarily mean that the secret has been generally known.  And

24   there's no evidence in the record or elsewhere that any of the

25   trade secrets became generally known.  In fact, the discussion

KAQTSYN6                         Summation - Mr. De Vries

related to only three documents out of 104 trade secrets, and

if they were actually available on the internet, then why did

they take them from my client years earlier?  The answer is

that they did not.

And then finally for transition rebates, there is

simply nothing that is in the record that suggests that this

provides an excuse either.

And so let me then finally take you to her Honor's

instructions about their defenses.  Did Syntel believe TriZetto

would not claim that they misappropriated, or did Syntel

believe that my client abandoned the right to sue or delayed

filing the lawsuit?  There's no evidence of that.  This lawsuit

has been going on since nearly the very beginning of when we

started to discover the problem, and most of what we're talking

about here we discovered in the middle of the lawsuit.

So we suggest that it should be no on all of the

affirmative defenses.  The same is true for the unclean hands

defense.  There's nothing that my client has done that is

directly related to the subject matter of the trade secret or

copyright claims.

And so damages.  Compensatory damages can include

unjust enrichment for the federal claim.  And the law that

you've been instructed on is avoided costs may be considered.

Mr. Britven gave you the avoid cost number of $284.8 million.

There was no alternative calculation that was given.  And

KAQTSYN6                    Summation - Mr. De Vries

1    Mr. Britven explained why this was a reasonable amount, this

2    $284 million, which was much less than the overall price of the

3    development.  And as you can see, if you compare it to the

4    documents that they were looking at and working on at the time

5    of the theft, like PTX 189, this avoided cost number is only a

6    tiny fraction of the overall money that they hoped to make,

7    which brings me to the amount of money that they did make.

8            As I talked with Mr. Plumpe about today, we don't have

9    any data from after mid-2018 about what money they have

10   actually made.  So Mr. Plumpe admitted that there is no rule

11   that avoided costs, which are permitted under the law, somehow

12   have to be limited to the actual amount.  But as you can see

13   here, we simply don't know what that amount is.

14           The reasonable royalty, that is only for the New York

15   claim, and the reason is the avoided costs are only available

16   for the federal claim.  So for the New York claim, it's that

17   $142.4 million reasonable royalty, and for the copying

18   allegation, it's $59 million.  And so I would like to say one

19   more thing about this, and that is that for the dollar amount

20   of damages, for the federal claim, which permits recovery of

21   avoided costs, as you can see on the verdict form, it's

22   284,855,192.  For the New York claim, it's the reasonable

23   royalty of 142.4 million.  For copyright, it's 59.1 million.

24   And it's very important, we don't want you to double count, the

25   amount of recovery that should be totaled up at the bottom here

KAQTSYN6                    Summation - Mr. De Vries

1    should be no more than $284,855,192 to ensure we're not double

2    counting.

3              So then there's punitives.

4              And your Honor, may I ask a question?  I have 45

5    minutes on my timer.  Am I right that I have five minutes from

6    now?

7              THE COURT:  That's what Mr. Street told me.  Let me

8    double-check with him.

9              You have five more minutes now.

10             MR. DE VRIES:  Yes, your Honor, thank you.  I wanted

11   to make sure I understood.

12             THE COURT:  Yes.

13             MR. DE VRIES:  Thank you.

14             So ladies and gentlemen, that brings me to punitive

15   damages.  Punitive damages are to be awarded in your sole

16   discretion.  We believe they're clearly warranted here.  We

17   have shown deliberate intent, conscious indifference, changing

18   stories, new excuses, each of which is frankly inconsistent

19   with the other.  And as her Honor just instructed you, the

20   purpose of punitive damages is to punish and deter wrongdoer

21   and others.

22             Here, if they're not punished for what they did, then

23   as I said in my opening, other companies will look at this case

24   as a playbook for taking intellectual property that's been

25   created and belongs to a company saying whatever they need to

1    to try to avoid taking responsibility and then move on.

2    Punitive damages are absolutely warranted here.  And as her

3    Honor just instructed you, under the federal law, federal law

4    says that punitive damages can be up to two times the amount of

5    compensatory damages.  And so we are asking you to award the

6    maximum possible extent under the law to punish and deter of

7    $569,710,384, which is two times the avoided costs that are

8    permitted under the Defend Trade Secrets Act.  Without that

9    award, companies like Syntel will look at this case and decide

10   that crime pays -- sorry, not crime, but trade secret

11   misappropriation pays, and that is not okay.

12            Finally, let me address their claims.  Their claims

13   represent mostly a few months between 2014 and 2015; in

14   contrast to our claims, which started in 2012 and continue to

15   this day.  And we believe that the evidence that's been put on,

16   we have no doubt that there is no liability whatsoever.

17   TriZetto and Cognizant did not do anything wrong.  If you look

18   at the evidence I'm about to show you, you will see that.

19            Mr. Moore talked about poaching.  But as her Honor

20   instructed you, the non-solicitation provision did not prohibit

21   TriZetto or Cognizant from hiring Syntel employees, and neither

22   TriZetto nor Cognizant violated this provision of the MSA or

23   the Master Services Agreement by hiring Syntel employees.

24   There was nothing wrong with hiring those employees.

25            So what did they say?  Well, they said that we took

KAQTSYN6                    Summation - Mr. De Vries

1    confidential information.  But what was that?  Well, names,

2    their work for Syntel, their experience working for Syntel and

3    their compensation.  Mr. Moore testified over and over again

4    that Syntel did not instruct its employees to keep any of that

5    information confidential.  And when I asked him whether he

6    could identify any Syntel policy prohibiting its employees from

7    sharing their compensation with others outside of Syntel, he

8    said:  Yes, I am unaware of any such policy.

9         This is not confidential material, and they lose on

10   all of their claims unless it is.  And Mr. Sanders, he was

11   here, he's the person who they accused of providing

12   information, and he said no, I didn't provide any information

13   that was Syntel confidential information.  And you may recall,

14   he said they didn't even have the compensation information to

15   begin with.  That was not something that Syntel shared with

16   TriZetto.

17        This, you can see, is a LinkedIn profile from one of

18   their employees showing you exactly this kind of information

19   because they were permitted to share it.  As I said, this is

20   public, and where did the current pay come from?  Go look at

21   DTX 1413.  You will see that what Cognizant was doing was to

22   ask all external candidates to provide their pay.  This is the

23   evidence that shows you where that information was coming from.

24        Finally, I will say this, what about the interference

25   with the five contracts?  Her Honor instructed you that to find

KAQTSYN6

1    intentional interference there must be improper interference;

2    fraudulent, unlawful, unethical or unjustified interference

3    with a contract.  But Mr. Sanders explained that Cognizant was

4    not a Syntel plan.  That's something that Mr. Moore agreed with

5    when I asked him.  And Mr. Moore, when he wrote a letter saying

6    don't interfere with the contracts, he said that the employees

7    were prohibited from going to work, directly or indirectly, for

8    providing services to any entity that is or was a Syntel

9    client.  And there was no evidence whatsoever to suggest that

10   anyone at TriZetto or Cognizant believed that those hires

11   violated these contracts.

12          I have just a few more minutes left at the end, so

13   thank you very much for your time in listening to me.

14          THE COURT:  Thank you.  Ladies and gentlemen, I know

15   you have been sitting patiently.  Thank you for being

16   attentive.  We have one more summation to hear, then a short

17   rebuttal, but let's take a ten-minute break and then we'll come

18   back.

19

20          (Jury not present)

21          THE COURT:  Let's take ten minutes.

22          (Recess taken)

23          MR. DE VRIES:  Your Honor, I recognize that I went

24   over at least a minute and a half, so I know that I was into my

25   next part, so --

KAQTSYN6

1          THE COURT:  I thought you only had five minutes, but

2    you ten, so that may have thrown you off.

3          MR. DE VRIES:  No problem, thank you.

4          THE COURT:  Also I wanted to put on the record that

5    Mr. Street has been given an external drive with all of the

6    exhibits and the exhibit list on it.  If the parties could

7    confirm that you both reviewed it and agreed to the contents

8    and they include only the exhibits that have been admitted and

9    an exhibit list, I would appreciate that.

10          MS. JANGHORBANI:  I can confirm for Syntel, your

11    Honor.

12          MR. DE VRIES:  Confirmed for TriZetto and Cognizant.

13          THE COURT:  So we will put that on our internal drive

14    so it's accessible to the jury tomorrow.

15          MR. KANE:  Your Honor, Mr. Street may have mentioned

16    this to you, but there are a couple other admitted exhibits

17    here that are computer hardware.  So they're here, and both

18    sides have looked at it and okayed it, it's just if we should

19    bring that back to the jury room as well.

20          THE COURT:  My intention was to leave it out here, and

21    if they ask for it, to send it in.  But I gather the

22    significance of it is that the computer contains source code,

23    but I doubt they will want to see the source code.  And rather

24    than have computer hardware go in and out, I think we'll leave

25    that here.

1          MR. KANE:  Thank you, your Honor.

2          (Jury present)

3          THE COURT:  You may proceed.

4          MS. JANGHORBANI:  Thank you, your Honor.

5          I want to begin by thanking you all for your service.

6    As her Honor told you a little while ago, you alone are the

7    finder of fact, and that's a very important role in our system.

8    We trust juries to resolve factual disputes between parties.

9    It's untrusted to them by our Constitution.  So we are grateful

10   to all of you for being here today to serve in that incredibly

11   critical role.

12         As the judge instructed you, you're not supposed to

13   leave your common sense outside of the courtroom.  You are

14   supposed to use your common sense and apply it to the evidence

15   that you see.  And I will submit that if you look closely at

16   the evidence, you look closely at the context, you will find on

17   behalf of my client.

18         These are pictures of various former and current

19   Syntel employees as well as the names of many other former and

20   current Syntel employees.  Mr. De Vries asked you to find that

21   every single one of these people is a liar and a thief.  And I

22   will ask you to trust your common sense.  Ask yourself:  Does

23   that seem right?  Does that seem supported by the evidence that

24   you've seen in this case?

25         TriZetto wants you to have tunnel vision.  They want

KAQTSYN6                    Summation - Ms. Janghorbani

1    you to see the fact that individuals at Syntel had access to

2    the Facets software, the Facets guides, the Facets manual, the

3    Data Dictionary, that they were making use of these products

4    and service of TriZetto and in service of other clients, that

5    that in itself was wrong.

6           But that's not the whole picture, ladies and

7    gentlemen.  Syntel was given those materials, had access to

8    those materials via TriZetto who provided those materials to

9    Syntel, and via UHG, CDPHP, and all of our other customers, and

10   the record on this is clear.

11          We're in an election cycle, so we've been hearing a

12   lot about fact checking lately, right?  I remind you that you,

13   the jury, are the ultimate fact checkers.  Don't just look at

14   the snippet, look at the entire document.  You will recall,

15   when they examined Mr. Reddy, they tried to suggest that the

16   Army is ready was about us somehow unfairly competing with

17   TriZetto.  And Mr. Reddy said I think your interpretation is

18   probably one I don't agree with.

19          So then we showed him the entire document, DTX 149.

20   And again, on all of these slides, I set forth the actual

21   exhibit number.  And I would encourage you to look at the

22   actual exhibits.  some of the slides that you just saw in

23   opposing counsel's presentation looked like ransom notes there

24   were so many different pieces cut out of different documents

25   and stacked together.  Look at the document and look at the

1    context.  Look at what is actually happening.  This document

2    was about poaching, poaching from Cognizant, not about any sort

3    of unfair competition by us, it was about unfair competition by

4    them.  And that was what Mr. Reddy's testimony showed.

5           Mr. Britven testified about this $950 million payment

6    or $950 million value in the payer unit that he said is in the

7    Duff & Phelps report.  Mr. Plumpe testified it's not in there.

8    Mr. Britven retook the stand.  He didn't show us where in there

9    it is, and we'll submit, ladies and gentlemen, if you want to

10   look at 846, that's the Duff & Phelps report, that number is

11   nowhere to be found.

12          This is one of those slides that starts to look like

13   it's a ransom note.  And this is Ankur Chadha, who they set up

14   as sort of a mysterious, shadowy, evil figure.  And I submit

15   nothing could be further from the truth.  Look closely at the

16   dates, look closely at who is using what for what purpose.  If

17   you look at the email on the left, this is DTX 100, the

18   material that Mr. Chadha is talking about, the material that is

19   being presented that Mr. Chadha is CC'd on is from CDPHP.  That

20   is the client with whom we had a TPAA.  That is the client who

21   TriZetto knew we were working for.  And I will submit there is

22   nothing wrong with TriZetto with -- sorry, with Syntel's

23   product consulting team having the copy of material from CDPHP

24   in order to service CDPHP.

25          On the right, this is for a different client,

 1    different date, different group of people.  Again, Facets Data

 2    Dictionary, but it's the UHG group, and it's located -- if you

 3    look in the slide, it's located in the UHG project folder.  UHG

 4    had the Data Dictionary.  UHG could give Syntel the Data

 5    Dictionary to do whatever it wanted for UHG.

 6          Now TriZetto and Syntel had a seven-year relationship.

 7    During that time we were servicing TriZetto, we were servicing

 8    other customers, we were servicing UHG.  And if you look at the

 9    use as it lines up over that period of time, you will see, if

10    you look at what was being done closely, you will see that what

11    was being used was being used for an entirely proper purpose.

12          Now let's talk about TPAA.  TPAA, those are these

13    agreements that give access to Syntel to a client's information

14    other than TriZetto.  Not all of the customers had them, and

15    Mr. Reddy testified about this.  Some of the clients never

16    required TPAAs.  So Syntel is working off of what it knows from

17    its client in terms of what is required to service that client,

18    CDPHP.  We did have a TPAA, we serviced them.  We didn't hear a

19    lot about CDPHP coming out of opposing counsels' mouth.  What

20    is the reason?  That's our largest customer, that's the bulk of

21    the profits that Syntel made, and that's clear from the record.

22          Instead, they're trying to do a gotcha on UHG.  UHG

23    never required a TPAA.  They claim that UHG should have.  They

24    say it's in their contract with UHG.  But Syntel never knew

25    what was in the contract with UHG, nor could it have.  That

KAQTSYN6                    Summation - Ms. Janghorbani

1    contract was confidential.

2           These two individuals, Mr. Chadha, Ms. Muthuraman,

3    they shared a series of emails about the TriZetto manuals that

4    you need.  TriZetto talked about the empty chair, but they

5    never called these witnesses.  They had the same ability to

6    call these witnesses that we did.  We didn't call them because

7    I will submit they would have testified completely consistently

8    with the other Syntel employees that we called.  They didn't

9    call them for the same reason.

10          Facets.  Not a secret what this email is about, no one

11   was hiding anything.

12          We've heard a lot about this email, a lot about this

13   set of notes that were attached to an email in early 2012.  Now

14   first of all, this is a period where we are competing with

15   Cognizant.  That's not disputed.  Cognizant had nothing to do

16   with TriZetto at that point in time, and we were completely

17   entitled to compete with Cognizant.  That's what was in the

18   bull's eye of these notes.

19          Second of all, to the extent they claim it's a plan,

20   it was never implemented.  These were notes from someone who

21   worked for Mr. Reddy, and the alleged plan was never

22   implemented.  Again, they're asking you to believe that

23   Mr. Reddy is a liar.  Look at the dates, look at the names,

24   look at what people were actually doing, and at the end of the

25   day, trust your common sense.

KAQTSYN6                    Summation – Ms. Janghorbani

1          Opposing counsel put up this testimony as well.  You

2     would agree with me that stealing trade secrets is not a

3     relationship gone wrong, correct?  I think we would all agree

4     with that.  And the question clearly to gentleman is what

5     occurred, has the relationship gone wrong or was this some

6     massive theft?  I submit it's very clearly a relationship gone

7     wrong.

8          Cognizant and TriZetto were partners.  Then, we

9     understand from Mr. Reddy's testimony, that relationship fell

10     apart.  And so TriZetto was looking for someone to provide

11     services so that it could continue to compete with Cognizant.

12     In comes TriZetto -- sorry, in comes Syntel.  Syntel and

13     TriZetto have a long and productive partnership.  Then

14     Cognizant comes back, and what happens?  They want Syntel to

15     pay.  They want Syntel out of the picture.  Why is that, ladies

16     and gentlemen?  Why was TriZetto so amenable to our using,

17     having various materials, but all the sudden when Cognizant

18     shows up, it's not okay anymore.  Well, I will submit it's

19     because Cognizant competes with Syntel.

20          Cognizant, there's been a lot of talk in this case

21     about keys to the kingdom.  I submit that it's our position

22     that none of this is really keys to the kingdom, but it is

23     stuff that you use in order to be able to provide these

24     services.  Syntel had access, Cognizant had access, clients had

25     access.  TriZetto gave out a lot of keys, a lot of keys, ladies

1   and gentlemen.  Now that Cognizant has TriZetto, it wants to

2   take all those keys back.  Why is that?

3          Now that Cognizant and TriZetto are together, Syntel

4   could be the only alternative so that they have a choice of

5   avoiding a monopoloy.  This is about Cognizant making sure that

6   no one else can compete with it in this space.  They're trying

7   to drive Syntel out and make an example of Syntel despite the

8   fact that Syntel never did anything wrong.

9          Syntel and TriZetto's relationship.  They start a

10  partnership to compete with Cognizant, and that relationship is

11  fantastic.  We heard that from everybody.  They became

12  partners, and TriZetto trains up Syntel on every aspect of the

13  business, gives access to materials, they train them, they work

14  together.  There's an entire list of reference manuals and

15  guides.  Syntel was given access to that.  They're working side

16  by side.  Mr. Mehta testified that it was hard to distinguish

17  who was whom in the Denver offices where the Syntel folks and

18  TriZetto folks were working side by side.

19         And I want to point out something from her Honor's

20  instructions earlier, you are supposed to consider whether a

21  witness has an interest in the matter at hand.  Mr. Mehta does

22  not even work for Syntel anymore.  He appeared voluntarily.  He

23  testified to you, and he has no dog in this fight.

24         What happens next?  They formalize the relationship.

25  In June 2010 the Master Services Agreement was signed.  Let's

KAQTSYN6                      Summation - Ms. Janghorbani

 1    take our time and look at this agreement, ladies and gentlemen,

 2    because it controlled the relationship that we're considering

 3    now.  What was in the original 2010 Master Services Agreement?

 4            First of all, it defined the services that Syntel was

 5    going to provide.  And in 2010, those services were exclusively

 6    to TriZetto.  Syntel was going to provide services to TriZetto.

 7    But they left open the possibility that the agreement, under

 8    the agreement, any new services agreed by the parties to be

 9    provided by Syntel, those would also be covered by this

10    agreement.

11            Similarly, TriZetto data continues to be the property

12    of TriZetto.  It cannot be used by Syntel unless it's in

13    connection with providing services as the services are defined.

14            Article 19, confidentiality.  We have shown you this

15    language a bunch of time to establish there's a confidentiality

16    obligation in this document.  That's true.  They have not

17    pointed out the language in here that it cannot be used without

18    the disclosing party's prior consent.

19            And finally, the non-competition clause.  And the

20    point of this non-competition clause, if you read it, was in

21    order to prevent the misuse or disclosure of confidential

22    information.  So in order to prevent that, Syntel was not

23    allowed to compete.  Why is that?  It's because TriZetto

24    recognized that these materials will necessarily be used when

25    servicing a client directly.  Whether they come from the client

1    or whether they come from TriZetto, those materials are

2    necessary to providing these services.  If someone is going to

3    provide you services, they have to have access to those

4    materials.  So now what happens when that contract is amended?

5           It was amended because TriZetto wanted to pay less

6    money.  They didn't want to use as many people.  So we said

7    okay, we'll amend it, but in exchange, we have all these

8    employees who need to work, need jobs, so we're going to also

9    want to compete directly.  And they said okay.  And so an

10   agreement was reached between Mr. Reddy and Jay Cook, who was

11   the head of that division at the time.  That's who was actually

12   negotiating the agreement, and they reached a deal.  We would

13   get paid less, but we could compete.  That was then reduced to

14   a document by the lawyers.  So the agreement was amended to

15   state that any provision related to service provider being

16   restricted from competing with TriZetto are deleted in their

17   entirety.

18          This is the contract that governs the parties'

19   relationship today.  And I the note you have not heard any

20   emphasis on it by TriZetto, and that is because continue Syntel

21   was the party that has consistently followed this contract.

22          Non-competition was removed.  We were now allowed to

23   provide services directly to customers.  What did that mean?

24   That means that the parties have now agreed that the services

25   that Syntel is allowed to provide are not just limited to the

1   services to TriZetto, they now include the services that Syntel

2   wants to provide to the customers.

3            What does that mean about confidential information?

4   It's still confidential.  It still remains confidential.  No

5   one is telling you that is not.  But what this means is

6   TriZetto acknowledged that we would have to be using the very

7   things that they're complaining about today, the Data

8   Dictionary, certain of the tools, that we have to use those to

9   service these clients.  And that service, services, is now

10  captured, because we negotiated for the right to do that.

11           Now again, confidentiality, parties' prior consent.

12  What do they consent to us doing?  They consented to us

13  competing and using these materials to compete.

14           So how did this go, this new world?  It was great.

15  Everybody got along.  They pitched together with TriZetto on

16  various accounts, Cambia, ICB-10, others.  Then CDPHP requested

17  an RFP.  TriZetto -- not Syntel, TriZetto decided it wanted to

18  pitch on its own for that one.  So we pitched on our own for

19  that one, and after that happened, Mr. Reddy told you they

20  congratulated us and said good job.

21           We also started working for UHG.  That happened over

22  the summer of 2014.  We entered into an agreement with them.

23  And again, they had to provide us with their materials so that

24  we could service them.  Was that wrong?  No.  It was consistent

25  with the contract.  And how do you know this, ladies and

KAQTSYN6                        Summation - Ms. Janghorbani

1    gentlemen?  Because the folks at TriZetto were aware that we

2    had all of these engagements.  And they never complained about

3    it, never complained about it until Cognizant came on the

4    scene.

5              And did we engage in of fair competition with

6    TriZetto?  Absolutely.  We won the right to compete with

7    TriZetto.  That's something -- they're showing you a quote from

8    Mr. Reddy that would suggest that somehow he thought that we

9    weren't allowed to use these materials in competition.  He

10   knows we used these materials in competition.  Look at the

11   context, look at what was actually said, look at what was

12   actually talking about.

13             Now let's talk about the PCT.  The PCT, that's the

14   team run by Mr. Chadha that's become their evil plot happening

15   over at TriZetto -- I mean happening over at Syntel.  But

16   TriZetto was aware of it at the time.  This was a team that was

17   created to provide specialized services to clients, including

18   TriZetto.

19             Did the PCT ever do work with or for TriZetto?  Yes.

20             Did anyone at TriZetto ever voice the opinion that the

21   PCT was doing anything improper?  No.  They liked these

22   additional services.  And PCT worked for other clients as well.

23             And in connection with that work, did TriZetto allow

24   Syntel and individuals at PCT to have various materials?  Yes,

25   they did.

1          And then Mr. Reddy gave you a long answer.  I won't

2     make you read the whole thing with me now, but he gave you a

3     long answer about the various projects that the PCT did with

4     TriZetto.  And again, they make a big deal of Mr. Chadha saying

5     he didn't have TriZetto materials that he was aware of.  We'll

6     talk about that a couple of times, but certainly his team did.

7     He was a manager.  He wasn't down in the weeds, just like

8     Mr. Reddy isn't actually the one working with these tools.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. JANGHORBANI:  (Continuing)  But he was the manager

2     of this team, and everybody knew, we knew, they knew, that

3     these individuals were providing services for and with

4     TriZetto.

5          Then what happens?  We have a conference.  Again, if

6     they really thought any of this we were doing in 2014 was

7     wrong, here is a conference where we're invited.  And there is

8     200-plus customers, they're introducing us to their customers,

9     even though they know at this point we're competing with them.

10    They introduce us to the customers and we are official

11    partners.  We are up on stage we're participating in the

12    keynote.

13         And who else was there?  The PCT team.  They were

14    there.  And TriZetto didn't say, oh my goodness, these guys are

15    so bad, they're taking our stuff.  They are saying this a great

16    service for us, and we can sell it to our clients coming to

17    this conference.

18         They talked about the fact that they paid us tens of

19    millions of dollars.  They did.  Because of all of the work

20    that we did for and with them.  And it's not disputed, ladies

21    and gentlemen, that we did that.

22         Then what starts to happen.  There are rumors of

23    Cognizant acquiring TriZetto, and things go off the rails.

24    Cognizant is going to acquire TriZetto for about 2.7 billion.

25    And now, all of a sudden, TriZetto decides it wants out of the

1    deal that lets us compete.  We saw this e-mail from Chuck

2    Sanders, stating unfortunately, Jake Sorg eliminated the

3    non-compete language.  I can't explain the rationale for this

4    change.

5            They're realizing, uh-oh, Cognizant is not going to

6    like the fact that we've let one of its biggest competitors

7    have the right to compete in this space.

8            And here we have Mr. Sanders saying, Tom, Jude has

9    asked me to step in and help with -- and that's the CEO -- has

10   asked me to help EPAM, Syntel, Infosys.  Who are those?  Those

11   are the other companies that also compete with Cognizant.  So

12   they need to come up with a plan as to these other service

13   providers and what they're going to do about them because

14   Cognizant wants them gone.

15           And so what is the plan?  If we need to play hardball

16   with them, it is a little bit of a stretch, a little bit of a

17   stretch because we have a contract that sets forth that they

18   are allowed to do this.  But it is a little bit of a stretch,

19   but we can tie them up in a dispute if necessary.

20           Ladies and gentlemen, I will submit that's exactly

21   what they've done.  Why are they doing this?  Again, discourage

22   competition in this space.

23           So after the merger occurs, we terminate the contract.

24   This is where the contract gets terminated, and what do we do.

25   We say we want payment of the rebates.  And now, this

1    stipulation, ladies and gentlemen, these are uncontested facts

2    as her Honor instructed you.  We requested payment of the

3    rebate.  Those are basically like severance payment, several

4    million dollars.  They didn't contest to the penny what they

5    owed.  You can take a look at all of the stipulation.  Instead

6    what did they do.  They sent back a letter the next day saying

7    we're starting to think maybe you're misappropriating

8    something.  That you're violating your obligations under the

9    MSA.  If true, if true, we have a dispute.

10           So that's the first time that TriZetto ever complains

11   about our behavior under the MSA.  First time they ever

12   complained about our use of the confidential information.

13           But TriZetto agreed, finally, right before this trial,

14   to pay us $5.183 million.  That's what they owed us.  We went

15   to them when this relationship ended, and said basically this

16   has been great, it's over now, we are entitled to this money.

17   And instead of saying, here's your money, walk away.  What did

18   they do?  They came after us and they came after us hard.  Tie

19   us up in a dispute.  They knew they owed us all along, that's

20   why they paid it the Friday before this trial started.

21           Let's talk about this misappropriation that they

22   thought they were seeing.  This various suspicious downloads

23   that they saw.  We've picked through a couple of these, ladies

24   and gentlemen, and I will submit you can take a look at the

25   records in evidence, and I will point some of them out to you

Kaq3syn7                    Summation - Ms. Janghorbani

1    and you will be able to see that this not a nefarious plot.

2    This is just a record of what's on various people's computers

3    in a time when they were entitled to be working on these

4    things.

5             So Viral Dave.  You'll remember Mr. Dave.  They say

6    that he stole documents on Thursday, November 6.  His last day

7    was the next day.  He started working at Cognizant on Monday.

8    Do we really think that Mr. Dave was stealing those materials

9    to somehow benefit a plot by Syntel?

10            You can do this yourself, ladies and gentlemen, if you

11   look at DTX 245.  That's the forensic examiner's report.  There

12   is a lot of charts, but I'll submit you can go to page 866 --

13   it is a big document -- and there is a column, last written

14   time or date opened.  You can look at that.  I'll submit that

15   that's the most useful column.  You can look at the other

16   columns, some of which Mr. De Vries pointed out in his

17   presentation.  Those only show that essentially there is a

18   document on someone's computer or that the document moved

19   around.  This is when someone actually used them.  You can go

20   through it yourself.  Go all way through it.  It also shows

21   dozens of documents that were in employees' recycle bins.

22   Again, you can see that for yourself.  Anjulika Srivastava, one

23   of their liars, one of their thieves, you look in the report

24   245, and you look at pages 913 to 917, you'll find a giant

25   block of documents that based on their file path says recycle

1     bin.  They are all just sitting in a recycle bin somewhere.

2             Mr. Chadha at some point realized that in fact he did

3     have TriZetto documents on his computer, on his system.  And

4     what did he do?  He raised his hand and he reported it.  Now,

5     ladies and gentlemen, this is like if you were shopping, put

6     some gum in your purse, walk out, forget to pay, realize you

7     forgot to pay, go back inside, and pay.  Is that a sign that

8     you were trying to steal the gum?  I'll submit it is exactly

9     the opposite.  It is exactly the opposite.

10             What is the more natural inference here?  Is that he

11     was lying and then for some reason all of a sudden decided to

12     confess?  Or is it that he didn't know this stuff was on his

13     computer.  We all have stuff on our computers and our phones

14     that we're sure we don't know is there.  Their technical expert

15     testified to that.  That while he, Dr. Bergeron, probably knows

16     everything on his computer, the rest of us probably don't.

17             There are other examples.  I would point out just a

18     couple.  Ramu Baru, Chetan Chaudhary, these are other

19     individuals, if you look, they are listed at DTX 87.  Those are

20     individuals that have downloads.  They're hired, PTX 851,

21     they're hired by TriZetto Cognizant.

22             And what's more interesting here.  They complain in

23     November about the fact that there were these suspicious

24     looking downloads.  These suspicious looking downloads in

25     November, they knew about them then.  They hired these folks in

Kaq3syn7                        Summation – Ms. Janghorbani

1    March.  Clearly they didn't think that these folks had done

2    anything wrong, because they're hiring them after they knew

3    about this supposedly inappropriate behavior.

4           Let's walk through the claims briefly.  First I want

5    to point out that despite that letter that TriZetto sent saying

6    you may be in breach of the MSA, TriZetto hasn't sued us for

7    violating the contract.  Why is that important?  I will submit,

8    ladies and gentlemen, because it shows that we were a good

9    faith partner in all of this.  If anyone has behaved in bad

10   faith, it is Cognizant and TriZetto.  Again, let's get rid of

11   the competition.

12          What does the contract mean in terms of your

13   deliberations?  Two things.  One, it means there is no

14   misappropriation where that is a question for you.  And of

15   course her Honor has already instructed you as to two alleged

16   trade secrets, and we'll talk about those in a moment, where

17   you don't have to determine whether or not there is

18   misappropriation.  But as to the rest of it, you can ask

19   yourself, did they have a right under the contract to access

20   this material, to have this material, to use this material.

21   And I will submit that they did, and you should find for my

22   client as to all of the remaining of those claims.

23          As to Syntel's defenses -- and this goes for all of

24   their claims -- this goes for misappropriation, this goes for

25   copyright, this goes for everything.  If they knowingly and

1    intentionally abandoned their right to sue us for using this

2    stuff, and that's what happened here.  They entered into a

3    contract that said here are the things you can use our

4    intellectual property for, and that's then what we used their

5    intellectual property for.  That's exactly what happened.  They

6    waived it by intentionally entering into that contract.

7           On estoppel, did they mislead us into believing that

8    we had the right to do this.  Okay.  Say they disagree with us

9    on what the contract said -- I don't think they do -- but say

10   they do.  For two years, for two years, we operated under that

11   contract.  We competed with them, they knew about it, and they

12   didn't say boo.  We relied on that.  We had no reason to think

13   what we were doing was wrong.  They cannot now turn around and

14   smack us for it.

15          Let's talk about the claims under New York law and

16   DTSA for trade secrets.  Her Honor instructed you there is

17   basically two pieces you have to find.  One is are these trade

18   secrets, and that's as to all 104 of the alleged trade secrets.

19   And then is there misappropriation.  That's as to 102 of them.

20          Trade secrets can't be publicly available or generally

21   known.  Now, we heard detailed testimony from Mr. Noonan about

22   the Facets manuals and guides.  We heard that DTX 893.55, the

23   claim data model, that was the heart of Facets.  And we all saw

24   that this showed the important architecture, lots of

25   information about Facets, and you'll recall it was that little

series of bubbles with the writing.  You can look at it in that

document if you want to refresh your recollection.

        Dr. Bergeron testified that he didn't find these

documents on the internet when he looked.  Now why did he look?

Why did he Google them?  Because he knew that would interfere

with their ability to be trade secrets.  And her Honor's

instructed you that just the fact that something's on the

internet isn't enough.  It has to be generally known.  But what

does generally known mean.  I submit to you that it means if a

competitor wanted to find this easily, they could.

        There is the document from 893.  As best as you can

tell, Dr. Bergeron, it appears to be the data guide that he

testified about.  It appears to be, he testified.  And then I

said, Would you agree with me that at least some subset of the

trade secrets are publicly available on the internet?  He said

That's correct, yes, based on these documents you just showed

me.  And then he said, I asked him if he could dispute it, and

he said there are at least three documents that some version is

available to download by anyone from Google.

        What else was important from Dr. Bergeron's testimony

about whether these are trade secrets?  Patents.  This is how

you know that this claim is not as baked as they'd like you to

believe.  Patents cannot be trade secrets.  Their expert

readily admitted that.

        But we heard from Mr. Sanders that there are patents

1  on this material.  TriZetto has patents on the material.  But

2  did they ask Dr. Bergeron to look at those patents and see what

3  overlapped and what didn't in terms of his alleged trade

4  secrets?  No.  They never asked him to look at that.  I would

5  submit they didn't ask him to look at that because there would

6  be overlap, ladies and gentlemen.

7           Here is another factor in terms of whether or not

8  something is a trade secret.  In order to be a trade secret,

9  under both the DTSA and New York law, the item at issue has to

10  have value.  Now, I will submit they can't satisfy this, ladies

11  and gentlemen.

12           I want to start first with the two of the 104 trade

13  secrets.  That's where the only question you're being asked is

14  are they a trade secret.  Those are the -- the words are

15  escaping me.  Those are the test cases and the automation

16  scripts.  The test cases and the automation scripts, I will

17  submit, they showed you this fun graphic of this guy with the

18  super squeegee.  The test cases and the automation scripts are

19  these rags.  They are used to do a job, but then once they are

20  used, they're done.  Okay.  Now several of the other pieces in

21  this case are also rags.  For various reasons, either because

22  they've gotten to be so old, or because otherwise they cannot

23  be used again.

24           So let's look at the test cases and automation

25  scripts.  Mr. Mehta, do they have value for customers other

Kaq3syn7                    Summation - Ms. Janghorbani

1    than the one for which they were created?  He said no.  They're

2    very involved, they're very customer specific.  So they're used

3    for that one customer.  So to the extent that they're talking

4    about this repository of these specific test cases, they don't

5    have a value going forward, except to the client who actually

6    has that test case itself.

7         Mr. Chadha, same thing.  Do they have a high degree of

8    reusability?  No.  They don't.

9         Now, Mr. Noonan said that there have been many, many

10   dozens of different versions of Facets over the years.  I will

11   submit, ladies and gentlemen, you can think about this in the

12   context of Mr. Plumpe's testimony about obsolescence.  Some of

13   the trade secrets that are being referred to in this case, if

14   you take a look at them, are quite old.  Think about what phone

15   you had many, many years ago.  Think about what car you had

16   many, many years ago.  Is it as valuable as the brand new

17   model?  No.

18        Misappropriation.  Now again, you are going to be

19   asked only as to 102 of the trade secrets, so I'm not talking

20   about these right now.  Anything related to the test cases and

21   automation scripts, that's not what I'm talking about right

22   now.  But what they're telling you is we copied and stole their

23   tool.  But that's just not right, ladies and gentlemen.

24        What actually happened?  They gave us the tool to use.

25   That was part of the contract.  That was part of our

Kaq3syn7                    Summation - Ms. Janghorbani

1    relationship.  The customer also gave us the tool to use.

2             So if we look at their original premise, the idea that

3    they have this super squeegee, and only by stealing it can we

4    service these customers, that's just not right.  They gave it

5    to us, the customers gave it to us.

6             So, they say, ladies and gentlemen, that we copied it

7    and we copied it and used it improperly.  I will submit that if

8    you look at the record, when we were copying it, we were

9    copying it to use it with a customer who had access to it.  So

10   that is essentially a red herring.

11            But even so, even so, you haven't heard any testimony

12   that the tools that we copied were any different than the

13   standard TriZetto tools.  They've made a big point of that.  So

14   we could have always used the customer version.  What have they

15   pointed to?  They've pointed to ads where we say we can use

16   these tools, we have these tools.

17            Now, these customers are savvy.  They know what the

18   tools are.  What we're advertising is our ability, our

19   knowledge, what we've gained throughout this relationship.

20            And why do they not want us doing that?  Because

21   Cognizant doesn't want it to be the case that TriZetto gave

22   away the keys to the kingdom, taught, taught Syntel how to do

23   all of this stuff over the period of their long relationship.

24            Now, adequate specificity.  This is for the New York

25   claim only.  This instruction is not in the DTSA.  They have to

Kaq3syn7                    Summation - Ms. Janghorbani

1   allege the trade secrets at issue with adequate specificity.

2   Now, let's think about what that means.  It means you have to

3   know what is the trade secret.  Dr. Bergeron did not specify

4   what the trade secrets were.  How much of the document has to

5   be a trade secret in order to make the document trade secret?

6   He said if there is a trade secret in the document, the

7   document is a trade secret.  So if there is anything secret in

8   the document, then the whole document becomes a trade secret?

9   Well, in general, yes, I mean, not to be absurd about it.  But

10  yes.  In general.  That's your opinion.  That's how you

11  proceeded in your analysis of this case, right?  Answer yes.

12          He testified then on redirect with opposing counsel

13  that if you were going to print all of the trade secrets how

14  tall would it be.  Many, many stories.

15          Ladies and gentlemen, all he's told you is there is a

16  many stories high pile of documents that somewhere within them

17  lies some trade secrets.  If you have to be guessing what is

18  and isn't a trade secret or what is and isn't alleged to be a

19  trade secret, then I will submit there has not been adequate

20  specificity under New York law.

21          Now, the DTSA only, DTSA only covers acts of

22  misappropriation that occurred or continued to occur on or

23  after May 11, 2016.  I want you to think very carefully, ladies

24  and gentlemen, about what evidence there has been that anything

25  occurred after 2016.  Certainly nothing from any of the fact

Kaq3syn7                    Summation - Ms. Janghorbani

1    witnesses in this case.  And I will submit, nothing in the

2    record evidence as well.  He showed you testimony from one of

3    his experts that there was something that was occurring in

4    2016, after May in 2016.  But his other expert testified that

5    the alleged misappropriation stopped in 2014.

6            Which of his experts is to be believed?  I will submit

7    you're to believe the evidence in this case.

8            Copyright.  Let me go through this quickly.  We've

9    seen that there are these registrations, and as you know from

10   her Honor's instruction, as to two of them, the Facets Roadmap

11   Review and the Best Practices and ICD-10 Configuration, those

12   are registered.  The other is this Facets Data Dictionary they

13   are arguing is copyrighted, but the registration that they have

14   is for Facets 5.1.

15           Now, first, ladies and gentlemen, I'll submit that you

16   have not heard much, if at all, about the Facets Roadmap Review

17   or the Best Practices and ICD-10 Configuration.  Again, these

18   are documents that you haven't heard what the value was, why

19   are these two pieces of paper worth as much as Mr. Britven has

20   told you that they're worth.

21           But let's talk for a minute just about the Data

22   Dictionary.  You have to establish that the Data Dictionary was

23   a part or subpart of Facets 5.1.  Well, is it a part or is it

24   not a part?  I will submit that their witnesses testified

25   inconsistently.

1          So, Data Dictionary.  You said it comes with Facets.

2    Is that right?  Yes.  And then if it comes with something else

3    is not a part.  Is it ever possible to get Facets and not have

4    the Data Dictionary?  Yes, yes, you can break those things up.

5    They are separate things.

6          Then Mr. Sanders came and he sat here during the

7    testimony of Mr. Noonan.  Then he got up and he said is it

8    part?  And he said yes.

9          That's what they're trying to prove, ladies and

10   gentlemen.  And I will submit there is an alternative way that

11   you can be a derivative work, but Mr. De Vries didn't argue

12   that to you just now, and I'll submit there is no evidence of

13   that either.  All of these, again, it fits with a piece.  All

14   of these were registered in connection with this lawsuit.  None

15   of these registrations existed prior to the lawsuit.

16         Let's talk about damages.  Why am I talking about

17   damages when I think I've made my position pretty clear that

18   there's no -- we do not believe that there is any liability

19   that should lie in this case?  But I think that damages fit

20   with what we've been talking about in terms of their liability

21   claim as well.  This is about crushing a potential competitor.

22   This is not about compensation for a specific harm.  Britven

23   has a range of damages.  Avoided costs, reasonable royalty,

24   lost profits.  $284.9 million.  That is a huge number, ladies

25   and gentlemen.  And his reasonable royalty is half of that.

1   Lost profits 8.5 million.  Now, that one is not as crazy.  But

2   the fact that they're here arguing for a nearly $300 million

3   award of damages from you, and I just heard Mr. De Vries say

4   he'd actually like you to double it so it's punitive so they

5   can discourage other companies from doing this.

6          That's exactly what they want to do. They want to

7   discourage other companies from competing with them.  It's not

8   about an IP violation.  An IP violation, a violation as to

9   their trade secrets, her Honor has instructed you that has to

10  be caused.  The damages have to be caused by the actual

11  infringing conduct.  There has to be a tie.  And they've

12  provided no such tie.

13         Okay.  Let's start with unjust enrichment.  Unjust

14  enrichment, unjust enrichment you were just instructed by her

15  Honor is often the infringer's profits.  Unjust enrichment is

16  often the infringer's profits.  Now, what were the profits

17  here?  The entire profits made by Syntel in connection with the

18  services that they're complaining about, $10.2 million.  The

19  vast majority of that, nearly 7 million of that, was CDPHP the

20  client that we had a TPAA to service.  What's left?  3 million.

21  Of that, UHG only, the profits are $823,000.  That's the only

22  competition that you actually heard about in this case that

23  they complained about, right.  They said that we were doing

24  this UHG work and we shouldn't be.  But they haven't shown you

25  any evidence that they would have otherwise gotten that UHG

Kaq3syn7                    Summation - Ms. Janghorbani

work if we hadn't gotten it.  In fact, the evidence is to the

contrary.  The evidence is very clear that United Health Group

did not want to work with a monopolist.  So once Cognizant

shows up, they're coming to us.

          Avoided costs make no sense here, and I wrote

something down on this post-it I brought up with me to do this.

The avoided costs, Mr. Britven testified those are costs saved.

What costs were actually saved by Syntel here?  Zero.  Zilch.

Why is that?  Because as to any of these materials we were

using with these clients, they could have given us a TPAA for

free.  The record is that a TPAA costs nothing.  So, when you

heard Mr. Britven say that avoided costs equals costs saved,

that to me is the death knell of avoided costs.

          We've heard a lot of other reasons why avoided costs

make no sense.  It is the cost of development of the entire

product.  The 10 years of development of the product.  But

TriZetto still has the product.  And unlike the money that

Syntel was making off of the services, TriZetto makes hundreds

of millions of dollars a year licensing out this product.

There is no evidence that Syntel took or in any way destroyed

the value of Facets.  All there is evidence of is Syntel is

competing with Cognizant for the services.

          It is highly disproportionate to the profits, it is

absolutely economically unreasonable, and when you think of

avoids costs as costs saved, I want you to think about the fact

1    Syntel could get these from the clients for free.  And this is

2    just testimony, never disputed, that the software is very

3    valuable.  Multiple witnesses testified to that.  Hundreds of

4    millions.  Mr. Britven, Syntel doesn't sell software that

5    competes with Facets.  Syntel doesn't sell Facets software.

6    Syntel is a services company.

7              So what does this mean?  We are a services company.

8    We use these tools to service this product.  Right.  That is

9    not commensurate with the entire cost of developing the

10   product.  And I think that's something that fits in the theme

11   from earlier of use your common sense, ladies and gentlemen.

12   You rent a car for a week.  You go on vacation.  You don't pay

13   for the cost of building the car.  There is no tie, no link

14   between the alleged wrongdoing and the cost to develop assets.

15             And I want to remind you something else about these

16   avoided costs damages that are so massive.  They only apply to

17   the DTSA claims, and again, we're going to go back to that idea

18   that whatever damages they get has to be caused, caused by

19   whatever conduct was the wrongdoing.  I want you to ask

20   yourself, even if you can find something in the evidence that

21   was done after 2016, what harm did that actually cause?  Did it

22   harm TriZetto to the tune of $300 million?

23             Now, let's move to reasonable royalty.  Reasonable

24   royalty is supposed to be what Syntel would have agreed to pay

25   for use based on full knowledge of actual benefit and actual

Kaq3syn7                    Summation - Ms. Janghorbani

1    use.  i.e. what would I pay to rent this.  What would I pay to

2    rent this thing, to use it for my purposes.  And again, Syntel

3    used it to make about $10 million.  What would they have paid

4    to do that?

5           Under Britven's avoided cost calculation, renting

6    apartment 6D is the cost to buy the entire building.  The

7    reasonable royalty is only a little bit better.  It's half the

8    cost to buy the entire building.  We've all rented apartments,

9    I assume.  And when you go to rent the apartment, you know it

10   costs a lot less to rent it than to buy it.  It also costs a

11   lot less to rent the piece of the building that you are going

12   to be using than it would cost to buy the entire building.

13          And Mr. Britven claims he did some sort of reasonable

14   royalty, but he didn't.  He just took half, half of his avoided

15   costs number.  Just divided it in two.

16          What would a reasonable royalty look like in this

17   case?  We submit you can look at the Duff & Phelps report.

18   This is a document it's in evidence, 846.  It was prepared to

19   value the very assets that Cognizant acquired when it acquired

20   TriZetto.  It was for public reporting, it was done in

21   accordance with accounting principles.  This is a document that

22   has nothing to do with this litigation and it's reliable.

23          And what do they say.  They said the royalty rate of

24   the technology that Cognizant was acquiring from TriZetto was

25   10 percent.  That's a reasonable royalty rate.  And so,

Kaq3syn7                    Summation - Ms. Janghorbani

1   Mr. Britven's numbers for revenue are 26 million that Syntel

2   made and that's revenue, not profits, right, so that's before

3   we take out the costs.  Revenue on the UHG project.  10 percent

4   of that would be 2.7 million.  Mr. Britven said yes.  So, a

5   reasonable royalty based on his numbers would be 2.7 million.

6   A reasonable royalty based on Mr. Britven's numbers,

7   Mr. Britven's revenue numbers, which come from the actual

8   financial data of the company, that's $1.7 million.

9          That's what rent looks like.  That's what rent looks

10  like compared to the cost of the actual thing.

11         And lost profits, lost profits are of course over

12  inclusive, right.  Mr. Plumpe calculated them to be $4.6

13  million.  Britven, $8.5 million.

14         Now these are the profits that each of the parties

15  think that if this were wrong, if liability were appropriate,

16  what TriZetto could have earned on UHG that it did not.  This

17  is over inclusive, right, because there are other aspects to

18  these lost profits.  The work that's done isn't just these

19  trade secrets.  It isn't just the manuals and the tools.  And

20  there's been no testimony, nothing at all, that shows that UHG

21  somehow would have given this work to TriZetto if it hadn't

22  given it to Syntel, or it wouldn't have given it to Syntel but

23  for the fact that Syntel did what it is that TriZetto alleges

24  it did wrong.

25         Copyright damages.  Let's remember it is those three

things, two documents that you've heard almost nothing about,

and the Data Dictionary which may or may not be covered by the

copyright.  And yet what he's coming after is not specific to

those documents or how they were used.  It is not a rent for

using them the way that we did.  It is one-half of the entire

cost to develop the Data Dictionary.  Even if you think that

that's somehow appropriate, it is over inclusive because it

includes the costs of the trade secrets.  Not just the

copyright.  And you'll see in her Honor's instructions that you

can also award lost profits, you don't need to do a reasonable

royalty as a proxy for lost profits.  We know what the lost

profits were, that 8.5 million.  Again, over inclusive, because

that includes all of the work, not just whatever part of the

work was tied to these three materials.

What's Mr. Plumpe's damages calculation.  $823,899.

I'll submit that if you find that there was copyright

infringement here, that's a much more appropriate number.  And

even that overstates because it's based on the entirety of the

profits from the UHG work.

Let's go through Syntel's claims.  I have about 12

minutes remaining by my math.  Okay.  They're broken into two

categories.  First it is the breach of the MSA.  This is the

contract, ladies and gentlemen.  It all comes back to the same

contract.  It is that they took our confidential information in

violation of the MSA, and used it to hire our people, that's as

Kaq3syn7                    Summation - Ms. Janghorbani

1    against TriZetto.  Misappropriation.  Misappropriation is that

2    they took our confidential information and used it improperly

3    separate and apart from the MSA.  And intentional interference

4    with the MSA, that's as against Cognizant.  That Cognizant

5    worked with TriZetto, so that TriZetto -- because we didn't

6    have an MSA with Cognizant.  We had an MSA with TriZetto.  It

7    was that Cognizant tried to interfere with our contract with

8    TriZetto.

9          We saw people getting poached.  And who was getting

10   poached?  There were two sets of employees that were being

11   targeted:  Senior people, knowledgeable people.  The folks that

12   were looked at as role models, the folks that other people

13   followed, the people who could take the business and grow it

14   and develop it.  People who were leaders.  That's who they

15   wanted to take from us.

16          And so we reported it.  We reported it to Mr. Kearns

17   and Mr. Ray.  What did they do?  They denied it.  They said

18   we're not Cognizant.  We don't think Cognizant's doing anything

19   either, but we're not working with Cognizant.  That wasn't

20   true.  They were working with Cognizant, they were secretly

21   sending information to Cognizant.  They admitted to providing

22   Cognizant with Syntel employee information.  They were

23   providing confidential information.

24          Now they said that job descriptions, that's what you

25   can find on LinkedIn.  It says I was an assistant manager of

1    whatever.  That's the description, that's not the role.  This

2    information, ladies and gentlemen, and please, look at it, far

3    more detailed.  That's what projects they were working,

4    specifically their roles on different teams.  Very detailed.

5    Names, locations, current role, and current pay.  We need

6    names, locations, current role, and current pay.  They also

7    needed cell phone numbers.  I've already given the heads up to

8    the recruitment team that we'll share names.  They got that

9    information.  They got that information.

10         And this goes back to my fact check theme from the

11   beginning.  Now, I don't have a copy of Mr. De Vries' slides

12   but he showed you at the very end of his presentation -- I

13   mean, I do have a copy, I have one in my hand.  I don't have a

14   copy I can put up electronically.  He shows you an e-mail

15   saying that Cognizant had interviewed the following candidates

16   and asked external candidates to confirm their current and

17   expected salary.  He showed you that e-mail.

18         We haven't seen that e-mail before during the trial.

19   Nobody testified about it.  Why is that?  These aren't Syntel

20   employees, ladies and gentlemen.  They're asking for salary

21   information from folks that they're hiring from other places.

22   They didn't need to ask for it in terms of our people.  They

23   already had it from our people because they took it.  They took

24   it from TriZetto inappropriately.  TriZetto and Cognizant took

25   it from Syntel inappropriately.  And that's DTX 1413, if you

Kaq3syn7                    Summation - Ms. Janghorbani

1    want to check what I'm saying for yourself.

2          TriZetto admitted it was providing lots of

3    information.  But they kept denying that they were poaching.

4    They kept denying it.  And in fact they kept saying we know we

5    can't hire your employees.  Now, the judge has already

6    instructed you that it turns out under the MSA, they could

7    hire, they could hire the employees.  They didn't know that.

8    So what did they do.  Instead they came up with this very

9    elaborate process of funneling secret information from TriZetto

10   to Cognizant so Cognizant could make these hires.  And then

11   you've seen e-mails about how they were going to pay back,

12   Cognizant and TriZetto then had a cost sharing arrangement

13   because these were really, these are really going to be

14   TriZetto employees.  Again, they thought that they couldn't do

15   it one way, so they tried to find another way.  And they kept

16   it secret from us.  They didn't tell us.

17         Now, were they relying on LinkedIn?  No.  Use your

18   common sense, ladies and gentlemen.  If you have a LinkedIn

19   profile, if you've ever looked at a LinkedIn profile, nobody

20   puts their salary on their LinkedIn profile.  The vast majority

21   of people don't put their cell phone number on a LinkedIn

22   profile.  Use your common sense.  They also knew very business

23   specific information about who these folks were and what they

24   were doing.

25         They hired 84 of our people.  84 direct hires.

Kaq3syn7                    Summation - Ms. Janghorbani

1    Employees are our greatest asset.  What we have are people with

2    knowledge who have been trained, who can lead, who can serve a

3    client.  These are our folks that we want to keep employed with

4    us.  So it was a huge loss to lose these people.  They're

5    losing the leaders, they're losing the force multipliers.

6    Obviously, it was a very big impact for us, said Mr. Reddy.

7            Now, I know that opposing counsel sort of shrugged his

8    shoulders at the idea that we've identified the value of their

9    various IP claims, the use of some paper, some paper that

10   clients had that TriZetto was giving out to lots of different

11   people, the use of that paper, the use of those bits of

12   software, they've said that we are undervaluing that.  Well,

13   I'll submit they're undervaluing people.  "Resources" as we've

14   heard them referred to throughout this trial.  It caused great

15   alarm.  It was a knowledge loss.  When you take a group of

16   people, the entire project is gone.  So, we were working on

17   projects, we had entire groups of people who weren't just

18   individuals, they were also working as a team and they stole

19   those teams.

20           And you heard Mr. Sheets this morning testify to the

21   lost profits of 14,793,042 and then the unjust enrichment to

22   defendants to TriZetto of stealing these folks.  And this is

23   straightforward, ladies and gentlemen there is no magic in this

24   math.  He walked you through it.  It is literally just the

25   billable hours basically, reduced by some factors of which

Kaq3syn7                    Summation - Ms. Janghorbani

1     folks we might have lost from our teams anyway even if they

2     hadn't done the poaching.

3           Now, our last claim, intentional interference with

4     employee contracts.  These are five contracts,

5     non-solicitation, non-compete.  Five individuals we have

6     contracts with them.  And what did they do?  They hired them

7     away from us.  Now, they can't claim that they didn't know that

8     they weren't supposed to hire these people away from us.  We

9     put them on notice.  We put them on notice on December 31,

10    2014.  And what did they do after that?  They hired four of

11    these five people.

12          I want to talk about Swapnil Adhav.  He was one of the

13    ones that was hired before that date.  But what do we know

14    about him?  We heard a lot of testimony from Mr. Mehta about

15    the fact that Swapnil Adhav, this was one of his key folks

16    where they were trying to negotiate the end date with TriZetto.

17    They knew specifically this was someone that we were trying to

18    keep.  We told them.  And what did they do?  They sat on their

19    hands, they didn't implement a plan.  So they didn't give us

20    the chance to keep our people.  Instead they interfered and

21    they took him too.  That's $1.2 million, ladies and gentlemen,

22    for those individuals.

23          Now I am going to go back to where I started.  Their

24    case asks you to believe that all of these employees, former

25    and current Syntel employees, they're liars and they're

1    thieves.  Does that sound right to you, ladies and gentlemen?

2    Check the evidence and I submit it will not support that

3    conclusion.  Now, the names that are now in red, those are the

4    liars and thieves, those are the people who they've accused of

5    somehow wrongfully having or using information.  Those people

6    were all hired by TriZetto and Cognizant.  Swapnil Adhav, who

7    we were talking about.  Ramu Baru, we talked about Viral Dave.

8    All of these people, they were hired by TriZetto and Cognizant.

9            We've also heard a lot today about these computers.

10   They're theoretically hidden somewhere in a closet in India.

11   You look and you can again, you can look at the report from the

12   forensic examiner, it will walk through the computers that were

13   missing.  Which computers are missing?  These folks.  These are

14   all folks who now work for TriZetto and Cognizant whose

15   computer was never found.

16           What's more likely, they're hidden somewhere or these

17   folks took them with them maybe?  It wouldn't be that strange,

18   right?  We heard from Mr. Mehta, they were working in Denver.

19   They went home over the weekend.  They came back.  They were

20   working in the same office in Denver.  All that changed was

21   their business card.  No longer said Syntel.  Now it said

22   TriZetto Cognizant.

23           So I ask you, are these liars and thieves that they

24   hired?  I think you know the answer.  We asked Mr. Sanders, And

25   you certainly wouldn't have hired him if you thought he was a

Kaq3syn7                        Rebuttal – Mr. De Vries

1    thief, right?  If we thought he was a thief?  Chances are we

2    would not hire someone who we thought was a thief.

3            Ladies and gentlemen, thank you for your time.  Thank

4    you for your service, especially during all of this, a little

5    more unusual than even usual.  And thank you in advance for

6    your careful deliberation on behalf of all of the parties.  We

7    really appreciate it.

8            THE COURT:  Thank you.  You have 10 minutes left.

9    Then we'll excuse you for the day and thank you for your

10   patience.

11           MR. DE VRIES:  Mr. Thomas, I'm going to use my opening

12   deck, just a couple of slides.  It's not the rebuttal deck.

13   Thank you very much.

14           Your Honor, may I remove my mask?

15           THE COURT:  You may.

16           MR. DE VRIES:  Your Honor, am I right that I have 10

17   minutes?

18           THE COURT:  You're right, you have 10 minutes.

19           MR. DE VRIES:  Okay.  May I proceed, your Honor?

20           THE COURT:  Yes.

21           MR. DE VRIES:  Okay, members of the jury.  Counsel for

22   Syntel and I agree that your deliberation and decision in this

23   case should be guided by the evidence, not by arguments from

24   attorneys.  And I submit that if you look at the evidence,

25   you'll reach the just result.

1          Mr. Thomas, can we please go to slide 21 in my deck.

2          Syntel did obviously very bad things.  There was no

3     response to this.  They copied the computer code that had been

4     written by my client's engineers into a tool that they renamed

5     the D2 Data Dictionary and sold to others.  That's obviously

6     wrong.

7          Please go to the next slide, Mr. Thomas.

8          The Step-up Probe tool, they wanted to create it based

9     on the spreadsheet that was attached that says TriZetto

10    confidential and proprietary.  That's obviously wrong.

11         And if we can go, Mr. Thomas, to slide two, please.

12         Her Honor instructed you during the trial that Syntel

13    misappropriated TriZetto's test cases and automation scripts.

14    That means if those were trade secrets, and they obviously

15    wanted them, so they clearly are, that means that they

16    unlawfully used my client's trade secrets.

17         You can take that down, Mr. Thomas.

18         They got caught.  And what did they do?  They denied

19    it.  For years.  You heard nothing to contradict what I told

20    you, which is until this trial, six years later, they denied

21    that they had taken the trade secrets.  We're able to show you

22    that that was false.

23         So now, they have new excuses.  Literally more excuses

24    than I can count, and certainly more than I can ever respond to

25    in 10 minutes.  And they're different excuses than the ones

Kaq3syn7                       Rebuttal - Mr. De Vries

1    that they had before trial.  Before trial, they said that they

2    didn't use them.  Now, they're going back into an agreement

3    creating arguments through the lawyers to say that it was okay

4    somehow.  Yeah, we did it, but it's okay.

5            But if you trust yourself to look at the evidence,

6    what you'll see is that no one at Syntel believed any of those

7    excuses.  All of the arguments that it's presented at this

8    trial, that's not actually what was motivating them.  They

9    didn't actually think they could steal our source code and put

10   it into their products and call it their own.  They didn't

11   actually think they could just steal all of our trade secret

12   test cases and automation scripts and then go use them.  Look

13   at the evidence and you'll see the truth and the just result.

14           They say that it was my client's fault.  Not only does

15   Syntel not take responsibility for what it's done, they

16   actually say that it was TriZetto's fault.  That TriZetto

17   should have said something earlier.  They should have sued

18   earlier.  They should have said, hey, wait, stop.

19           But think about it.  We didn't even know about the

20   things I just showed you until years in this litigation, this

21   lawsuit.  And even then, only after a neutral forensic examiner

22   came and found not only use, but movement of files.  I'm sorry.

23   Possession, but movement of files, which Dr. Bergeron told you

24   that's use.  In 2017, at the same time that they were denying

25   using the trade secrets.

1          And another thing, one of their excuses is that we

2    didn't prove that they used it after May of 2016, but you'll

3    remember, I walked you through that evidence in three different

4    slides.  That excuse is because they don't want to have to pay

5    the avoided costs that the verdict form you'll see will tell

6    you, and her Honor's instructions, are available under the

7    Defend Trade Secrets Act.  We are the only one who has

8    presented that number.  They've provided no alternative

9    calculation.  It is what needs to be paid under the law when

10   you violate the United States trade secret law.

11         And we've showed you, and it wasn't just through our

12   experts.  Mr. Moore, I asked him, and I showed you just before,

13   he admitted that they were using the tools in 2018, years after

14   2016.  And of course, they're still up on the web today.  The

15   same things.  The upgrades, the Data Dictionary, the test cases

16   and automation scripts, all of these services that they have

17   been offering using the trade secrets for many years.

18         And all the other excuses, I tried my best to address

19   them in my opening remarks.

20         Did TriZetto give them the trade secrets?  Yeah.  But

21   explicitly only to be used to do work for us.  And although

22   there was a lot of lawyer argument about what it was that the

23   contract allowed, again ask yourself, what does the evidence

24   show.

25         Mr. Thomas, please show slide five from my opening

1    presentation.

2            Mr. Reddy said that if someone stood up and said it

3    was okay to use TriZetto's trade secrets to compete because of

4    the amendment, that would be flat wrong.  And he admitted, he

5    knew, that when Syntel was competing against TriZetto, Syntel

6    was not allowed to use TriZetto's proprietary, confidential,

7    trade secret or copyrighted information.

8            That's what the evidence tells you.  No amount of

9    lawyer argument about contract provisions can change what they

10   have admitted.  They did something that is obviously wrong, and

11   they've taken no steps to remediate it or to apologize for it.

12   They say that it's just competition.  Anything goes.

13           But you heard them, their witnesses tell you that, no,

14   it's unfair competition to use our trade secrets, nothing about

15   this 2012 amendment allowed them to do what they did.  And of

16   course, as I said, we didn't know what they did until we got

17   into this lawsuit.

18           They said that the trade secrets are on the internet.

19   That's not where they got them from.  That related to three

20   manuals out of the 104 trade secrets.  They weren't the same

21   version, they were from years earlier, and common sense will

22   tell you, of course, the trade secrets are not on the internet.

23           And what about patents?  You weren't shown any patent

24   that actually disclosed any of the trade secrets.  The only

25   patent that's come up in this trial is 40 pages long, and the

Kaq3syn7                        Rebuttal - Mr. De Vries

1    point of the five-story building, if I'm remembering the height

2    right, was to show if you were to print out all of the trade

3    secrets that they took, improperly, and used, just how much

4    material is there.  And that's material that it took TriZetto

5    decades and hundreds of millions of dollars to develop, and

6    they should have to pay for what they took.

7          What about the their claims against TriZetto?  They're

8    grasping of straws.  Read her Honor's instructions.  It's not

9    any information that's used, it's only confidential

10   information.  And the information that we're talking about is

11   information about co-workers, their name, what are they working

12   on, what is their phone number.  Okay.  And about salaries.

13   Mr. Sanders already told you they didn't have the salaries.

14   That's not something that TriZetto paid.  But more importantly,

15   Mr. Moore admitted to me they had no policy over at Syntel

16   prohibiting anyone from sharing that information.  It's simply

17   not confidential.  And that's the only thing that that contract

18   prohibits.

19         And another thing.  It's not an excuse.  Their claims

20   do not excuse the theft of their trade secrets.  It's been six

21   years of a lawsuit, many days for you all to sit here, and I

22   thank you again for doing that.  I would ask you as you

23   deliberate to think about what they've done.  They have not

24   apologized, they've not taken responsibility, they have not

25   taken accountability, and as I said at the beginning of my

1    remarks today, they won't listen to anyone, but they have to

2    listen to you.  And unless you find that they took the trade

3    secrets and award the maximum damages that the law provides,

4    other companies will see this case as a playbook for what to

5    do, and that's a kind of lawless society that I for one don't

6    want to live in.

7              Thank you again for your time.  This is the last thing

8    I am going to say.  And on behalf of I know everyone in the

9    courtroom, thank you again for your sacrifice in being here and

10   doing your service.  We all greatly appreciate it.

11             THE COURT:  Thank you, Mr. De Vries.  Ladies and

12   gentlemen, everybody's been thanking you, but I want to thank

13   you as well.  You have been so patient and very attentive and

14   we all so much appreciate it.

15             So tomorrow I have the verdict form which I'll give to

16   you and show you and then you'll begin your deliberations.  The

17   question is what time should we start.  I'm thinking 9:30 is

18   probably a good time just so you'll have a full day.  Unless

19   there is a unanimous view what that we need to start earlier or

20   later than that.  But I think 9:30 is probably --

21             A JUROR:  That's fine.

22             THE COURT:  Okay.  So we'll see you at 9:30 tomorrow

23   morning.  Get a good night's sleep.  Don't even think about

24   this.  And we'll see you tomorrow.  Please leave all your

25   notes, everything that I passed out to you, everything here.

Kaq3syn7

1    And we'll lock up overnight.

2              (Jury excused)

3              THE COURT:  Counsel, thank you for all your work and

4    your exchange of drafts with the Court over the weekend.  I

5    really appreciate that.  Without that, I don't know how we

6    would have gotten here.

7              I wish you all a good night and see you tomorrow at

8    9:30.

9              (Adjourned until October 27, 2020, at 9:30 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      INDEX OF EXAMINATION

 2   Examination of:                            Page

 3    DANIEL MOORE

 4   Redirect By Mr. Groombridge  . . . . . . . . . 710

 5    JOHN PLUMPE

 6   Direct By Ms. Janghorbani  . . . . . . . . . . 713

 7   Cross By Mr. De Vries  . . . . . . . . . . . . 755

 8   Redirect By Ms. Janghorbani  . . . . . . . . . 768

 9    GLENN SHEETS

10   Direct By Ms. Parker . . . . . . . . . . . . . 770

11   Cross By Ms. Carson  . . . . . . . . . . . . . 785

12   Redirect By Ms. Parker . . . . . . . . . . . . 792

13    THOMAS BRITVEN

14   Direct By Ms. Carson . . . . . . . . . . . . . 794

15   Cross By Mr. Groombridge . . . . . . . . . . . 800

16   Redirect By Ms. Carson . . . . . . . . . . . . 822

17                      DEFENDANT EXHIBITS

18   Exhibit No.                             Received

19    1541 and 1546  . . . . . . . . . . . . . . . 830
```

```
20

21

22

23

24

25
```