UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SYNTEL STERLING BEST SHORES MAURITIUS LIMITED and SYNTEL, INC., <br><br> Plaintiffs and Counterclaim-Defendants, <br><br> v. <br><br> THE TRIZETTO GROUP, INC. and COGNIZANT TECHNOLOGY SOLUTIONS CORP., <br><br> Defendants and Counterclaim-Plaintiffs. | 1:15-CV-00211 (LGS) (SDA) <br><br> Hon. Lorna G. Schofield |

**SYNTEL'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW, A NEW TRIAL, OR REMITTITUR PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 50(B) AND 59**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

LEGAL STANDARD........................................................................................................ 3

ARGUMENT ..................................................................................................................... 5

I.     The Court Should Grant JMOL in Favor of Syntel on the 102 Trade
Secrets Syntel Was Authorized to Use under the 2012 Amended MSA ............... 5

II.    TriZetto Waived Its Rights to, or Is Estopped from, Bringing Claims for
Trade Secret Misappropriation and Copyright Infringement................................ 10

    A.    Waiver................................................................................................... 10

    B.    Estoppel................................................................................................ 11

III.   No Reasonable Jury Could Have Found Any of the Asserted Trade Secret
Claims Qualified as Trade Secrets Because TriZetto Failed to Adequately
Specify Any Trade Secret ..................................................................................... 12

    A.    Software:  Facets, DBBLD, and Upgrade Framework ............................ 13

    B.    Guides and Manuals.............................................................................. 15

    C.    Tools:  Test Cases, Automation Scripts, Custom Code Impact
Analyzer, and Data Dictionary ................................................................ 16

IV.   A New Trial on TriZetto's Misappropriation Claims Is Required under the
General Verdict Rule ............................................................................................ 17

V.    The Court Should Grant JMOL in Favor of Syntel on TriZetto's DTSA
Claims .................................................................................................................. 18

    A.    Syntel Did Not Engage in Trade Secret Misappropriation after
May 11, 2016 ........................................................................................ 18

    B.    The Court Should Grant JMOL of No DTSA Damages or a New
Trial Based on a Lack of Causal Connection to the Alleged DTSA
Acts of Misappropriation ...................................................................... 21

VI.   Avoided Costs Damages Are Improper Here as a Matter of Law ....................... 24

VII.  No Reasonable Juror Could Award the Reasonable Royalty Damages
Sought by TriZetto ............................................................................................... 27

VIII. The Punitive Damages Award Is Grossly Excessive and Should Be
Reduced................................................................................................................ 30

CONCLUSION.................................................................................................................... 38

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*AgroFresh Inc.* v. *Essentiv LLC*,
  No. 16-cv-662 (MN), 2020 WL 7024867 (D. Del. Nov. 30, 2020) ...................... 12, 13, 15, 34

*Airday* v. *N.Y.C.*,
  406 F. Supp. 3d 313 (S.D.N.Y. 2019) .................................................................. 4

*Allied Erecting & Dismantling Co.* v. *Genesis Equip. & Mfg., Inc.*,
  511 F. App'x 398 (6th Cir. 2013) ....................................................................... 28

*Alsens Am. Portland Cement Works* v. *Degnon Contracting Co.*,
  222 N.Y. 34 (1917) .............................................................................................. 10

*Anderson Grp., LLC* v. *City of Saratoga Springs*,
  805 F.3d 34 (2d Cir. 2015) ............................................................................. 21, 25

*Big Vision Private Ltd.* v. *E.I. Dupont De Nemours & Co.*,
  1 F. Supp. 3d 224 (S.D.N.Y. 2014) ..................................................................... 5

*BMW of N. Am., Inc.* v. *Gore*,
  517 U.S. 559 (1996) ............................................................................................ 31

*Bridgeport Music, Inc.* v. *Justin Combs Pub.*,
  507 F.3d 470 (6th Cir. 2007) .......................................................................... 32, 35

*Cabral* v. *N.Y.C*,
  No. 12-cv-4659 (LGS), 2015 WL 4750675 (S.D.N.Y. Aug. 11, 2015) ...................... 4, 30, 31

*Calendar Rsch. LLC* v. *StubHub, Inc.*,
  No. 17-cv-04062-SVW-SS, 2020 WL 4390391 (C.D. Cal. May 13, 2020) .......... 12, 13, 14, 15

*Citcon USA, LLC* v. *RiverPay, Inc.*,
  No. 18-cv-2585, 2020 WL 5365980 (N.D. Cal. Sept. 8, 2020) ............................................ 36

*Conte* v. *Emmons*,
  895 F.3d 168 (2d Cir. 2018) ............................................................................... 4

*Cornell Univ.* v. *Hewlett-Packard Co.*,
  609 F. Supp. 2d 279 (N.D.N.Y. 2009) ................................................................ 27

*Cortez* v. *Trans Union, LLC*,
  617 F.3d 688 (3d Cir. 2010) ............................................................................... 31

*DiSorbo* v. *Hoy*,
  343 F.3d 172 (2d Cir. 2003) ............................................................................... 31

*E.J. Brooks Co.* v. *Cambridge Sec. Seals*,
  31 N.Y. 3d 301 (2018) ....................................................................................21, 28

*Epic Sys. Corp.* v. *Tata Consultancy Servs. Ltd.*,
  Nos. 19-1828, 19-1613, 2020 WL 6813872 (7th Cir. Nov. 19, 2020) ........................... *passim*

*Georgia-Pacific Corp.* v. *U.S. Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y 1970) ...............................................................................28

*Greenfield* v. *Philles Records, Inc.*,
  98 N.Y.2d 562 (2002) ..........................................................................................9

*Halifax Fund, L.P.* v. *MRV Commc'n, Inc.*,
  No. 00-cv-4878-HB, 2001 WL 1622261 (S.D.N.Y. Dec. 18, 2001) ................................11, 12

*Integro USA, Inc.* v. *Crain*,
  No. 19-cv-8752 (JPO), 2019 WL 6030100 (S.D.N.Y. Nov. 14, 2019) ........................5, 18, 20

*Johansen* v. *Combustion Eng'g, Inc.*
  170 F.3d 1320 (11th Cir. 1999) ...............................................................................31

*Juicy ZCouture, Inc.* v. *L'Oreal USA, Inc.*,
  No. 04-cv-7203, 2006 WL 1012939 (S.D.N.Y. Apr. 19, 2006) ...........................................11

*Katara* v. *D.E. Jones Commodities, Inc.*,
  835 F.2d 966 (2d. Cir. 1987)..................................................................................4, 17

*Kephart* v. *Certain Underwriters at Lloyd's of London*,
  427 F. Supp. 3d 508 (S.D.N.Y. 2019)..............................................................................5

*KCG Holdings, Inc.* v. *Khandekar*,
  No. 17-cv-3533, 2020 WL 1189302 (S.D.N.Y. Mar. 12, 2020)............................................19

*LaserDynamics Inc.* v. *Quanta Comput., Inc.*,
  694 F.3d 51 (Fed. Cir. 2012)....................................................................................28

*LinkCo, Inc.* v. *Fujitsu Ltd.*,
  230 F. Supp. 2d 492 (S.D.N.Y. 2002)..............................................................................24

*Mason Tenders Dist. Council Welfare Fund* v. *LJC Dismantling Corp.*,
  400 F. Supp. 3d 7 (S.D.N.Y. 2019)................................................................................10

*Motorola Sols. Inc.* v. *Hytera Commc'ns Ltd.*,
  No. 17-cv-1973, 2020 WL 6554645 (N.D. Ill. Oct. 19, 2020) ........................................26, 38

*Next Payment Sols., Inc.* v. *Clearesult Consulting, Inc.*,
  No. 17-cv-8829, 2020 WL 2836778 (N.D. Ill. May 31, 2020)................................................13

*O'Connor* v. *Pa. R.R. Co.*,
     308 F.2d 911 (2d Cir. 1962) ........................................................................................4

*Payne* v. *Jones*,
     711 F.3d 85 (2d Cir. 2013) .................................................................................31, 36

*PaySys Int'l, Inc.* v. *Atos SE, Worldline SA*,
     No. 14-cv-10105 (KBF), 2016 WL 7116132 (S.D.N.Y. Dec. 5, 2016) ............12, 13, 14

*Pierce* v. *N.Y.C.*,
     805 F. App'x 70 (2d Cir. 2020) ........................................................................3, 4

*RCC Ventures, LLC* v. *Am. DG Energy, Inc.*,
     No. 17-cv-3007 (AJN), 2018 WL 1415219 (S.D.N.Y. Mar. 19, 2018) ........................18

*ResQNet.com, Inc.* v. *Lansa, Inc.*,
     594 F.3d 860 (Fed. Cir. 2010) ....................................................................................28

*Robocast, Inc.* v. *Microsoft Corp.*,
     No. 10-cv-1055-RGA, 2014 WL 350062 (D. Del. Jan. 29, 2014) ..............................29

*Saber* v. *N.Y. State Dep't of Fin. Servs.*,
     No. 15-cv-5944, 2018 WL 3491695 (S.D.N.Y. July 20, 2018) ..............................4, 5

*Sang Lan* v. *AOL Time Warner, Inc.*,
     No. 11-cv-2870 (LBS)(JCF), 2013 WL 1820289 (S.D.N.Y. Apr. 30, 2013) ...............10

*Sit-Up Ltd.* v. *AC/Interactive Corp.*,
     No. 05-cv-9292 (DLC), 2008 WL 463884 (S.D.N.Y. Feb. 20, 2008) ........................13

*Softel, Inc.* v. *Dragon Med. and Sci. Comm'ns, Inc.*,
     118 F.3d 955 (2d Cir. 1997) ...............................................................................25, 28

*State Farm Mut. Auto. Ins. Co.* v. *Campbell*,
     538 U.S. 408 (2003) ....................................................................31, 32, 35, 36

*Thomas* v. *iStar Fin., Inc.*,
     652 F.3d 141 (2d Cir. 2011) .......................................................................................36

*Turley* v. *ISG Lackawanna, Inc.*,
     774 F.3d 140 (2d Cir. 2014) ..................................................................................5, 31

*Univ. Computing Co.* v. *Lykes-Youngstown Corp.*,
     504 F.2d 518 (5th Cir. 1974) ......................................................................................25

*Vaporstream, Inc.* v. *Snap, Inc.*,
     No. 17-cv-00220-MLH(KSx), 2020 WL 2543814 (C.D. Cal. Jan. 10, 2020) ............29

*VirnetX, Inc.* v. *Cisco Sys.*,
    767 F.3d 1308 (Fed. Cir. 2014)..........................................................................29

*West* v. *Media Gen. Operations, Inc.*,
    120 F. App'x 601 (6th Cir. 2005) .................................................................4, 17

**STATUTES**

18 U.S.C. § 1836(b)(1) ....................................................................................5, 18

18 U.S.C. § 1836(b)(3)(B) ...........................................................................21, 24

18 U.S.C. § 1839(3) .........................................................................................5, 18

18 U.S.C. § 1839(5) ....................................................................................5, 18, 20

**OTHER AUTHORITIES**

Fed. R. Civ. P. 50(b) ..............................................................................................3

Fed. R. Civ. P. 59(a)(1)(A) ....................................................................................4

## INTRODUCTION

The jury in this case found for TriZetto Group, Inc. and Cognizant Technology Solutions Corporation (collectively, "TriZetto") on all claims and awarded TriZetto $854,565,576 in damages. The jury's liability determinations, and its decision to award this vast amount of damages, are contrary to the law and are not supported by the evidence presented at trial. As a result, Syntel Sterling Best Shores Mauritius Limited and Syntel, Inc. (collectively, "Syntel") are entitled to judgment as a matter of law ("JMOL") pursuant to Fed. R. Civ. P. 50(b) concerning TriZetto's trade secret claims under the Defend Trade Secrets Act ("DTSA") and New York law, and its claims for copyright infringement, and on TriZetto's damages theories, and, in the alternative, are entitled to a new trial pursuant to Fed. R. Civ. P. 59 or remittitur.

First, as a matter of law Syntel was expressly authorized to use the 102 trade secrets not subject to the Preclusion Order—*i.e.*, all but two of the trade secrets in the case. The 2010 Master Services Agreement ("MSA") prevented Syntel from competing with TriZetto and from using TriZetto's Confidential Information to compete. However, in 2012, at TriZetto's request and in exchange for tens of millions of dollars in reduced commitments to Syntel, ***TriZetto affirmatively and expressly removed all restrictions on Syntel's right to compete***. The proper interpretation of the 2012 Amended MSA—as confirmed by the subsequent Third-Party Access Agreement ("TPAA") TriZetto signed as part of Syntel's provision of Facets services to Capital District Physicians' Health Plan ("CDPHP")—was that Syntel was authorized to use TriZetto's Confidential Information while servicing Facets customers. Syntel is entitled to JMOL because as a matter of law Syntel did not misappropriate these 102 trade secrets, all of which were improperly submitted to the jury. This error requires a new trial limited to the test cases and automation scripts, and JMOL on the other 102 trade secrets.

1

Second, all of TriZetto's trade secret and copyright infringement claims are barred by waiver and laches.  TriZetto irrevocably waived its claims as result of the 2012 Amended MSA in which TriZetto knowingly and intentionally granted Syntel the right to use its materials in exchange for reduced financial commitments.  Alternatively, even if these claims were not waived, TriZetto is estopped from bringing them.  TriZetto's actions, including entering the 2012 Amended MSA and 2013 CDPHP TPAA, led Syntel to believe it was authorized to use TriZetto's Confidential Information to service customers.  TriZetto was fully aware that Syntel was servicing CDPHP and that TriZetto's materials would necessarily be used in doing so.  Yet, TriZetto remained silent until after Syntel won the United Healthcare Group ("UHG") bid and terminated the MSA, nearly 18 months after the CDPHP TPAA was executed.  Syntel relied on TriZetto's apparent authorization to continue servicing CDPHP and seek new customers.  By choosing to stay silent for years, TriZetto caused Syntel extreme prejudice, evidenced by the $855M verdict.

Third, no reasonable jury could have found for TriZetto on any of its trade secret claims because TriZetto failed to identify any of its 104 alleged trade secrets with the specificity required under both the DTSA and New York law.  No TriZetto witness even testified to *95 of the 104* trade secrets in their direct testimony.  This alone requires a new trial as there can be no dispute these trade secrets were not adequately specified and were improperly submitted to the jury.  For the other nine, TriZetto only provided the jury with publicly available general descriptions of purpose and function, suggesting that somewhere in millions of pages of documents and millions of lines of source code the trade secrets were to be found.  No reasonable jury could have determined these items actually qualified as trade secrets on this record.

Fourth, the Court should grant judgment in Syntel's favor on TriZetto's DTSA claim for the additional reason that TriZetto failed to identify any misappropriation after May 11, 2016—

the DTSA's effective date.  The alleged instances of misappropriation during this period—such as moving files from one location on a Syntel computer to another—simply do not constitute DTSA misappropriation.  Moreover, even if any of these actions did constitute misappropriation, the DTSA damages awarded by the jury should be greatly reduced because TriZetto failed to identify any causal connection between any of the alleged post-May 11, 2016 acts and the $285M in avoided costs the jury awarded.  That is because there is none.

Fifth, judgment must also be granted in Syntel's favor on the jury's reasonable royalty damages awards of $142M for New York trade secret misappropriation and $59M for copyright infringement.  Both are based on avoided costs that are inapplicable in this case.  Furthermore, both rest on a 50/50 split methodology that is improper as a matter of law and should be rejected.

Finally, the Court should grant judgment in Syntel's favor, or remittitur or a new trial, on the nearly $570M in punitive damages awarded by the jury.  These damages are not proportional to any alleged bad acts by Syntel, and go far beyond the constitutional limits of what is permitted to punish Syntel or deter future behavior.  Indeed, courts considering much more egregious actions than any alleged here—including criminal theft and wide-scale cover-ups—have deemed damages awards far below $570M to be unconstitutional.  At most, the record supports an award of $8.5M in punitive damages, equal to the actual harm to TriZetto, in the form of its lost profits, as to which any quantification was offered at trial.

## **LEGAL STANDARD**

A motion for JMOL may be granted if the Court finds a reasonable jury would not have a legally sufficient evidentiary basis to support the nonmoving party's claim.  *Pierce* v. *N.Y.C.*, 805 F. App'x 70, 72 (2d Cir. 2020); FED. R. CIV. P. 50(b).  The applicable guiding principle is whether "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that

3

reasonable [jurors] could have reached." *Airday* v. *N.Y.C.*, 406 F. Supp. 3d 313, 317 (S.D.N.Y. 2019). While the "trial court must view the evidence and all inferences most favorably to the party against whom the motion is made," "[t]he inferences which may be drawn must be within the range of reasonable probability, and must not be at war with undisputed facts." *O'Connor* v. *Pa. R.R. Co.*, 308 F.2d 911, 914-15 (2d Cir. 1962) (citation and footnote omitted). Thus, JMOL should be granted if a contrary verdict could only be based on "sheer surmise and conjecture." *Conte* v. *Emmons*, 895 F.3d 168, 171, 174 (2d Cir. 2018).

A district court may grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). A new trial can be granted "if the verdict is against the weight of evidence. A decision is against the weight of the evidence . . . if and only if the verdict is [1] seriously erroneous or [2] a miscarriage of justice." *Pierce*, 805 F. App'x at 71 (internal alterations and quotation marks omitted). Separately, under the "general verdict rule," a new trial must be ordered when "it is impossible to know, in view of the general verdict returned whether the jury imposed liability on a permissible or impermissible ground." *West* v. *Media Gen. Operations, Inc.*, 120 F. App'x 601, 621-24 (6th Cir. 2005) (quoting *Greenbelt Coop. Pub. Ass'n* v. *Bresler*, 398 U.S. 6, 11 (1970)); *Katara* v. *D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970-71 (2d. Cir. 1987).

A district court may also alter a judgment through remittitur. *Saber* v. *N.Y. State Dep't of Fin. Servs.*, No. 15-cv-5944 (LGS), 2018 WL 3491695, at *4 (S.D.N.Y. July 20, 2018). Remittitur is "'used by the courts to, in effect, reduce the amount of a damage award that the court concludes is impermissibly high.'" *Cabral* v. *N.Y.C.*, No. 12-cv-4659 (LGS), 2015 WL 4750675, at *6 (S.D.N.Y. Aug. 11, 2015) (quoting *Turley* v. *ISG Lackawanna, Inc.*, 774 F.3d 140, 167 (2d Cir. 2014)). Both compensatory and punitive damages awards may be reduced by

4

remittitur. *Turley*, 774 F.3d at 168 (punitive damages); *Saber*, 2018 WL 3491695, at *12 (compensatory damages).

## ARGUMENT

**I.      The Court Should Grant JMOL in Favor of Syntel on the 102 Trade Secrets Syntel Was Authorized to Use under the 2012 Amended MSA**

Syntel cannot be liable for misappropriation of 102 of the alleged trade secrets because TriZetto consented to Syntel's use of those trade secrets to compete with TriZetto through the 2012 Amendment to the MSA.  The two remaining alleged trade secrets—the test cases and automation scripts—are the subject of the Preclusion Order, as a result of which the jury was directed to find misappropriation, and therefore they do not fall into this category.

To be liable for trade secret misappropriation under both the DTSA and New York law, the use or acquisition of the trade secret must have been improper.  18 U.S.C. §§ 1836(b)(1), 1839(3), (5); *Integro USA, Inc.* v. *Crain*, No. 19-cv-8752 (JPO), 2019 WL 6030100, at *2 (S.D.N.Y. Nov. 14, 2019); *Big Vision Private Ltd.* v. *E.I. Dupont De Nemours & Co.*, 1 F. Supp. 3d 224, 273 (S.D.N.Y. 2014).  As to the acquisition of the asserted trade secrets, there appears to be no dispute that all of them were obtained by Syntel either directly from TriZetto using the Customer Exchange website to which TriZetto had given Syntel access, or from Syntel's customers who provided the materials in connection with Syntel's work to service the Facets product.  No reasonable jury could have found otherwise.

Thus the question of misappropriation turns on use, and specifically whether Syntel was permitted to use the alleged trade secrets for purposes other than work it was performing for TriZetto.  The answer is clearly yes.  And, because it depends entirely on contract interpretation is a matter of law for the Court, even on JMOL.  *Kephart* v. *Certain Underwriters at Lloyd's of London*, 427 F. Supp. 3d 508, 515 (S.D.N.Y. 2019).  While the 2010 MSA restricted Syntel's use

of TriZetto's Confidential Information, the 2012 Amendment expressly "deleted in their entirety" every "provision in the Agreement related to [Syntel] being restricted from competing with TriZetto." (PTX-162[1] at 1-2.)  Thus, under the correct interpretation of the MSA, Syntel's use was authorized and "proper," which defeats both the DTSA and New York law claims for the 102 alleged trade secrets not subject to the Preclusion Order.  Thus, the Court should grant JMOL in favor of Syntel on each of these 102 trade secret claims and, if needed, set a new trial limited to the test cases and automation scripts.  (*See infra* Section IV.)

From 2010 through July 1, 2012, the 2010 MSA controlled the parties' relationship. (PTX-27; PTX-162.)  In the 2010 MSA, the parties agreed that Syntel would not compete with TriZetto.  The purpose of this restriction was "to prevent any misuse or disclosure of Confidential Information."  (PTX-27 at 71 (§29.17).)  Among other things, the 2010 MSA (1) expressly provided that authorized "Services" to be performed by Syntel included "any new services agreed to by the Parties to be provided by the Service Provider pursuant to this Agreement"; (2) permitted use of TriZetto Data "in connection with providing the Services"; and (3) permitted use of TriZetto's Confidential Information with its "prior consent."  (PTX-27 at 17 (§1.01(99)), 44 (§13.01), 51 (§19.01).)  In other words, the 2010 MSA limited Syntel's use of TriZetto Confidential Information to uses TriZetto consented to, and prohibited Syntel from using that Confidential Information for any other uses, including for competing with TriZetto. Syntel abided by these limitations, and there was no allegation at trial to the contrary.

In 2012, TriZetto sought a change in the relationship and the MSA was amended.  (PTX-162; DTX-131 at 1; Reddy Tr. 475:16-18.)  Article 2 of the 2012 Amended MSA stated "***Section***

---

[1]     All PTX and DTX citations refer to the exhibits admitted during the trial.  All citations to "Tr." refer to the trial transcripts.  Where a transcript citation is to testimony provided by a trial witness, the witness's last name is included.

**_29.17 and any other provision in the Agreement related to Service Provider being restricted_**

**_from competing with TriZetto are deleted in their entirety_**." (PTX-162 at 1-2 (emphasis

added).) The 2012 Amended MSA also eliminated TriZetto's minimum commitment to Syntel

of approximately $1.7-2.2M per month—*i.e.*, between $20.4M and $26.4M per year. (Sanders

Tr. 209:7-210:22.) The result: Syntel received the right to compete with TriZetto in exchange

for a substantial loss in guaranteed revenue. (Reddy Tr. 475:2-15.)

The original 2010 MSA allowed the parties to expand the definition of "Services"

permitted under the agreement: "<u>Services</u>" include "**_any new services agreed to by the Parties_**

to be provided by Service Provider pursuant to this Agreement." (PTX-27 at 17 (99) (emphasis

added).) The 2012 Amendment did just that. In striking the prohibition on competition from the

MSA, TriZetto expressly agreed that Syntel could perform new services **_in competition with_**

**_TriZetto_** and thus such services were covered by the MSA's "Services" definition. (*Id.*) The

2012 Amended MSA thus permitted Syntel to use TriZetto Data and Confidential Information

while servicing customers, including UHG, which was previously prohibited under the non-

competition provisions of section 29.17 and the services restrictions of section 13.01. (*Id.* at 44

(§13.01), 71 (§29.17).)

This is confirmed by the TPAA that TriZetto and Syntel executed in 2013 with respect to

Syntel's customer CDPHP. That agreement states that Syntel may obtain TriZetto Confidential

Information directly from CDPHP, and that "the parties acknowledge" that such information

"may be provided" to Syntel for the purpose of performing services for CDPHP. (PTX-838.)

The TPAA further states that in this circumstance—where Syntel receives TriZetto Confidential

Information from CDPHP—the information "shall be treated as having been obtained by [Syntel]

from TriZetto under the Master Services Agreement dated June 30, 2012, as amended." (*Id.*)

This is significant for several reasons.  First, it shows conclusively that TriZetto agreed its alleged trade secrets could be used by Syntel in Syntel's work for CDPHP.  Second, and more importantly, it shows that material which is "TriZetto Confidential Information" under the MSA can have that status and yet still legitimately be used by Syntel for purposes other than Syntel's work in support of TriZetto—otherwise, there would have been no point in agreeing that such information obtained by Syntel directly from CDPHP "shall be treated as having been obtained . . . under the Master Services Agreement."  (*Id.*)  Lastly, the use of "acknowledge" is significant.  The TPAA states "the parties acknowledge" that TriZetto Confidential Information "may be provided to [Syntel] for purposes of [Syntel] performing the following services for [CDPHP.]"  (*Id.*)  The use of "acknowledge" rather than "agree" reflects the fact that such an agreement was already in place by virtue of the 2012 Amendment in which the two companies had already agreed Syntel could use Confidential Information to compete with TriZetto.[2]  It is clear that Syntel did not need the TPAA to use TriZetto's alleged trade secrets to service CDPHP, as confirmed by the TPAA itself.  Rather, CDPHP requested Syntel obtain a TPAA, likely to satisfy its own obligations with TriZetto.  (*See generally* Reddy Tr. 478:16-479:9.)

TriZetto never offered a competing interpretation of the 2010 MSA, 2012 Amended MSA, or the TPAA, or asserted an ambiguity in any of these contracts.  Instead, TriZetto relied entirely on parol evidence at trial to argue that the 2012 Amended MSA continued to prevent Syntel from competing by using TriZetto's Confidential Information.  (*See, e.g.*, Sanders Tr.

---

[2]    This does not mean the remainder of the 2010 MSA was eliminated, leaving TriZetto with no protection.  For example, section 19.01 of the 2010 MSA prevents Syntel from using, storing publishing, disseminating, transferring, or disclosing TriZetto's Confidential Information "without the disclosing Party's prior consent."  (PTX-27 at 51 (§19.01).)  While the 2012 Amendment provided TriZetto's prior consent to use and store TriZetto's Confidential Information *for purposes of competing with TriZetto in servicing Facets customers*, Syntel was still prohibited from publishing, disclosing, or using that information for other purposes.  (*Id.*)

212:11-215:16; Britven Tr. 430:16-432:4; TriZetto Closing Tr. 896:12-24.)  Most significantly, TriZetto argued in closing that this had been admitted by Syntel's witness Mr. Reddy:  "[H]e was asked . . . if someone from Syntel stood up and said that under the Master Services Agreement, this is the amendment, it was okay for you to use TriZetto's trade secrets to compete against TriZetto, that would be flat wrong, right?  And he answered it would be flat wrong. . . ." (TriZetto Closing Tr. 885:7-20.)  But, the interpretation of a contract is a question of law. *Greenfield* v. *Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002).  The testimony of Mr. Reddy, or any other witness, is irrelevant extrinsic evidence to these unambiguous agreements.  *Id*.  It cannot override TriZetto's contractual agreement to permit Syntel to use Confidential Information when competing.[3]

In addition, TriZetto's misappropriation theory renders the 2012 Amendment meaningless.  TriZetto's witnesses testified that some of the asserted trade secrets are ***required*** to perform Facets consulting services.  (*See, e.g.*, Bergeron Tr. 305:21-307:3.)  If, as TriZetto argued at trial, the 2012 Amended MSA continued to prevent Syntel from competing with TriZetto using TriZetto's Confidential Information, this would be a restriction on competition that survived the amendment.  But the unambiguous language of Article 2 stated ***any*** restrictions on competition in the 2010 MSA were "deleted in their entirety."  (PTX-162 at 1-2.)

Because the interpretation of these agreements is a matter of law, Syntel cannot be liable for misappropriation of these 102 alleged trade secrets under either the DTSA or New York law.  Therefore, JMOL in favor of Syntel should be granted for these 102 trade secrets and, to the extent necessary, a new trial held limited to test cases and automation scripts.

---

[3]      This is no different than TriZetto's own mistaken belief as to whether it would violate the non-solicitation clause by hiring Syntel employees.  (*See, e.g.,* Dkt. 935-12 at 22-23; Preliminary Instruction Tr. 26:17-27:3.)

II.        **TriZetto Waived Its Rights to, or Is Estopped from, Bringing Claims for Trade Secret Misappropriation and Copyright Infringement**

JMOL is also warranted because the undisputed facts establish that TriZetto waived its right to sue on any of its trade secret misappropriation claims and its copyright claims, or, in the alternative, is estopped from doing so.  No reasonable juror could have found otherwise.

A.        *Waiver*

TriZetto's actions, including its 2012 Amendment of the MSA and granting the CDPHP TPAA, were a knowing relinquishment of its right to sue Syntel on all trade secret and copyright claims arising from the competition TriZetto authorized.  A party that knowingly and intentionally abandons its right to sue has waived its claims.  *Sang Lan* v. *AOL Time Warner, Inc.*, No. 11-cv-2870 (LBS)(JCF), 2013 WL 1820289, at *3, (S.D.N.Y. Apr. 30, 2013).  Waiver "may arise by either an express agreement or by such conduct or a failure to act as to evince an intent not to claim the purported advantage." *Id.*  Waivers through express agreement are irrevocable and their interpretation is a matter of law.  *Mason Tenders Dist. Council Welfare Fund* v. *LJC Dismantling Corp.*, 400 F. Supp. 3d 7, 18-19 (S.D.N.Y. 2019); *Alsens Am. Portland Cement Works* v. *Degnon Contracting Co.*, 222 N.Y. 34, 37 (1917).

In 2012, in exchange for tens of millions of dollars in financial relief, TriZetto consented to Syntel competing to provide services work to Facets licensees, which, according to TriZetto, necessarily required that Syntel use some of the materials that now form the basis of TriZetto's trade secret and copyright claims.  (Bergeron Tr. 305:21-307:3.)  As explained above, the 2013 TPAA acknowledged that the 2012 Amended MSA authorized Syntel to use materials received from TriZetto to service Facets clients in direct competition with TriZetto, and that TriZetto was willing to confirm this for the benefit of a particular customer when the customer requested a TPAA.  Therefore, there can be no dispute that as of 2012 TriZetto knew of, and intentionally

10

consented to, Syntel's use of TriZetto Confidential Information when competing with TriZetto, which included all the support materials needed to service these clients.  Through express agreement, TriZetto has waived these claims.

     B.    *Estoppel*

    JMOL is further appropriate here because TriZetto is estopped from bringing its misappropriation and copyright claims.

    TriZetto is estopped because (1) TriZetto misled Syntel to believe it would not claim Syntel misappropriated trade secrets or infringed its copyrights, (2) Syntel relied on TriZetto's misleading actions, and (3) Syntel would be prejudiced from its reliance.  *Juicy ZCouture, Inc.* v. *L'Oreal USA, Inc.,* No. 04-cv-7203, 2006 WL 1012939, at \*35 (S.D.N.Y. Apr. 19, 2006); *Halifax Fund, L.P.* v. *MRV Commc'n, Inc.*, No. 00–cv-4878-HB, 2001 WL 1622261, at \*3 (S.D.N.Y. Dec. 18, 2001).  Where the parties are in a relationship, "the failure to disclose information[] may constitute an act of concealment" that misleads the other party.  *Halifax Fund*, 2001 WL 1622261, at \*3.  This includes "when one party . . . has an opportunity to speak in order to avoid harm or injury to the other party and fails to do so."  *Id.*  The evidence, interpreted in the light most favorable to TriZetto, confirms each element is present here.

    TriZetto's actions misled Syntel to believe it was authorized to use Confidential Information to service Facets customers.  In addition to amending the MSA in 2012, TriZetto was aware Syntel bid against TriZetto to service CDPHP, one of its Facets customers.  (Reddy Tr. 476:8-477:8.)  After Syntel won, TriZetto executives congratulated Syntel and signed the CDPHP TPAA acknowledging Syntel was authorized to use TriZetto's materials to complete that work.  (*Id.*; PTX-838.)  Relying on TriZetto's apparent authorization to use these materials, Syntel continued working for CDPHP and openly sought new Facets customers to service to replace the lost revenue under the 2010 MSA.  (*See, e.g.*, Britven Tr. 418:19-25.)  Yet TriZetto

remained silent.  At no point prior to termination did TriZetto raise concerns with Syntel regarding any improper use of its Confidential Information.  (Reddy Tr. 478:11-15; Mehta Tr. 571:19-572:21.)  Years later, TriZetto accused Syntel of misappropriating its trade secrets through its work with CDPHP.  (*See* DTX-100; DTX-104; Britven Tr. 410:16-19.)  Thus, even if, *arguendo*, TriZetto had not actually authorized Syntel to use its information while servicing third parties, Syntel was reasonable in assuming it did,[4] and TriZetto's failure to alert Syntel its belief was mistaken is an act of concealment.  *Halifax Fund*, 2001 WL 1622261, at *3.

And there can be no question TriZetto's prolonged silence has caused Syntel extreme harm: Syntel faces a verdict of $855M on claims of misappropriation and copyright infringement for servicing CDPHP and others with materials Syntel believed it was authorized to use.  Because TriZetto's silence in the face of Syntel's reliance on its apparent authorization misled Syntel and caused Syntel extreme prejudice, TriZetto is estopped from bringing any of its claims.

### III.     No Reasonable Jury Could Have Found Any of the Asserted Trade Secret Claims Qualified as Trade Secrets Because TriZetto Failed to Adequately Specify Any Trade Secret

JMOL is appropriate because not a single witness or document in the record identified any alleged trade secret with the specificity required under both New York law and the DTSA, let alone adequately specified all 104 of them.  *AgroFresh Inc.* v. *Essentiv LLC*, No. 16-cv-662 (MN), 2020 WL 7024867, at *6-7 (D. Del. Nov. 30, 2020); *PaySys Int'l, Inc.* v. *Atos SE, Worldline SA*, No. 14-cv-10105 (KBF), 2016 WL 7116132, at *10-11 (S.D.N.Y. Dec. 5, 2016); *Calendar Rsch. LLC* v. *StubHub, Inc.*, No. 17-cv-04062-SVW-SS, 2020 WL 4390391, at *4 (C.D. Cal. May 13, 2020).  The party asserting a trade secret must describe each alleged trade

---

[4]     In addition to the TPAA, Mr. Reddy testified it was Syntel's belief that Syntel was permitted to use materials received directly from the customer in connection with servicing that customer.  (Reddy Tr. 532:23-533:14.)

secret with "adequate specificity."  *Sit-Up Ltd.* v. *AC/Interactive Corp.*, No. 05-cv-9292 (DLC), 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008); *Next Payment Sols., Inc.* v. *Clearesult Consulting, Inc.*, No. 17-cv-8829, 2020 WL 2836778, at *1, *11 (N.D. Ill. May 31, 2020).  That burden is not met through categorical descriptions or overly broad assertions, especially in a case such as this where the technology is complex.  *Calendar Rsch. LLC*, 2020 WL 4390391, at *4.  "Unless the ***plaintiff engages in a serious effort to pin down the secrets*** a court [or jury] cannot do its job."  *Id.* (emphasis added).  Specificity is essential to "permit defendant[s] to ascertain at least the boundaries within which the secret lies."  *Id.* at *5; *PaySys Int'l, Inc.*, 2016 WL 7116132, at *10.  This specificity is of even greater importance here in view of TriZetto's forthcoming motion for a permanent injunction.

No reasonable juror could find that TriZetto met its burden.  Dr. Bergeron's testimony made TriZetto's improper approach explicit:  "[I]f there is ***a trade secret in the document, the document is a trade secret***."  (Bergeron Tr. 337:5-338:6 (emphasis added).)  Even crediting TriZetto's testimony, all the jury could have found is that there are 104 unidentified trade secrets ***somewhere within*** the "millions of pages of documents" and millions of lines of code that TriZetto declares are its 104 asserted trade secrets.  (Bergeron Tr. 337:5-338:6, 377:4-13.)  This perfunctory analysis offered no guidance to the jury and cannot carry TriZetto's burden. *Calendar Rsch. LLC*, 2020 WL 4390391, at *4.

A.     *Software:  Facets, DBBLD, and Upgrade Framework*

TriZetto's first "category" of trade secrets consisted of the Facets source code itself, and two pieces of software used for implementing upgrades, DBBLD and Upgrade Framework. (Bergeron Tr. 282:19-283:1.)  But TriZetto failed to specify what in the software, which Dr. Bergeron testified consists of millions of lines of very complex code (Bergeron Tr. 266:7-17), is actually a trade secret.  It is not enough for TriZetto to point to millions of lines of code and

assert that somewhere within lies a trade secret. *Calendar Rsch. LLC*, 2020 WL 4390391, at *4, *6 (finding plaintiff failed to identify the "methods, techniques, processes, procedures, programs, or codes" in its mobile application that could establish the "Virality Capability" as a trade secret); *PaySys Int'l, Inc.*, 2016 WL 7116132, at *10-11 (finding plaintiff failed to adequately specify trade secret where it asserted every line of the source code, consisting of millions of lines, was a trade secret). TriZetto had to actually identify the particular parts of code that constitute each trade secret, which it never did.

To the extent TriZetto asserts the entire source code for each piece of software is the trade secret, TriZetto's overbroad assertion is an "extreme position [that] avoids the identification of a single specific (and therefore testable) trade secret" and cannot support the jury's findings. *PaySys Int'l, Inc.*, 2016 WL 7116132, at *10-11; *Calendar Rsch. LLC*, 2020 WL 4390391, at *4. For Facets in particular, this assertion ignores the undisputed fact that the entirety of Facets is not a secret. First, a portion of the source code was publicly filed with the Copyright Office, and, as a result, it is not the case that the entirety of the source code remains a secret. (DTX-1381; DTX-1395); *PaySys Int'l, Inc.*, 2016 WL 7116132, at *12. Second, Mr. Sanders testified Facets is protected, at least in part, by patents—but Dr. Bergeron did not consider any patents or what they disclose. (Sanders Tr. 169:2-6; Bergeron Tr. 330:10-331:17.)

Instead of an identification of what each trade secret is, the jury heard only a generic description of how each software program works and why customers desire them. (*See, e.g.*, Noonan Tr. 60:11-16, 66:21-67:8, 78:24-85:21, 115:6-117:15.) But TriZetto's own public filings in this case, and the fact that all trial testimony was offered in open court, confirm that these general descriptions of software functions are not the trade secrets TriZetto was required to identify (but did not). (Dkt. 538 at 8; Dkt. 670 at 1-2.)

14

B.      Guides and Manuals

TriZetto's second category of trade secrets was "guides and manuals." Of these 97 alleged trade secrets, TriZetto's witnesses named only two on direct examination, and two additional titles were mentioned only when Dr. Bergeron admitted on cross examination that they were publicly available on Google. (Noonan Tr. 88:13-19; Sanders Tr. 190:11-23; Bergeron Tr. 322:10-324:24, 327:4-328:18.) For the ***95 guides/manuals never even mentioned*** by any TriZetto witness on direct, and the Facets System Reference Manual, which Mr. Sanders mentioned only in passing, TriZetto itself elicited testimony that these documents are extremely voluminous: they are literally "millions of pages." (Bergeron Tr. 378:5-8). Those millions of pages include much information that cannot possibly be a trade secret, for example an explanation of a QWERTY keyboard (DTX-203 at 19), or an overview of how HMO plans work (DTX-1479 at 23). TriZetto made no effort at trial to differentiate between what was and was not a trade secret. As a result, no reasonable juror could find that TriZetto adequately specified the trade secrets contained within each of these 96 manuals. *AgroFresh Inc.*, 2020 WL 7024867, at *6-7; *Calendar Rsch. LLC*, 2020 WL 4390391, at *4.

For the single manual substantively discussed, TriZetto's failure is equally clear. Mr. Noonan testified that the Data Models Guide (DTX-893) was the "heart of Facets" and disclosed the architecture of the Facets database. (Noonan Tr. 87:9-91:1.) While he testified the document (which is 213 pages (DTX-893)) "***contains*** TriZetto's trade secrets," he never specified what those trade secrets were or where in the manual they were located. (Noonan Tr. 87:9-91:1 (emphasis added).) Moreover, Dr. Bergeron confirmed that an earlier version of this manual was available via Google. (Bergeron Tr. 319:19-322:9.) On redirect Dr. Bergeron testified, contrary to his cross testimony, that he limited the trade secrets to the litigated versions of the guides and manuals. (*Compare* Bergeron Tr. 324:17-20 *with* 373:14-18.) But he never testified to having

15

done any comparison of these different versions, which only further highlights TriZetto's failure to adequately specify its trade secrets. If earlier versions of the Data Models Guide are not trade secrets, including publicly available version 4.51, what specific trade secret is in DTX-893 that is not found in other versions? No witness answered this question for the jury, and it is too late to do so now.

C.  Tools:  Test Cases, Automation Scripts, Custom Code Impact Analyzer, and Data Dictionary

The third category are these so-called "tools." Here again TriZetto failed to specify what exactly the trade secrets are: its witnesses provided only generic descriptions of how each tool works, what each tool's purpose is, or why customers like using the tool. (*See* Noonan Tr. 118:13-119:1, 122:22-124:19, 125:21-128:2; Sanders Tr. 177:11-19; Bergeron Tr. 297:5-299:16, 299:18-300:25.) But these descriptions, which were given in open court and were included in public filings, are not secret.[5] (*See* Dkt. 215 at 12, 20.) TriZetto's evidence consisting of public information is insufficient to carry its heavy burden of adequately specifying the supposed trade secrets at issue.

\*       \*       \*

For the reasons above, Syntel is entitled to JMOL on all 104 trade secrets, as TriZetto's cursory attempts to identify its trade secrets, coupled with the flawed and superficial analysis of Dr. Bergeron, come nowhere close to meeting TriZetto's heavy burden. No reasonable jury could have found any of these items to be trade secrets.

---

[5]     As Mr. Sanders testified, the descriptions of Syntel's tools, which TriZetto alleges are the same as its trade secret tools, have been publicly available on Syntel's website for years, yet TriZetto has never once asserted that these public descriptions disclosed its trade secrets. (DTX-1162 at 2; *see also* DTX-166; Dkt. 521 at 10-11.)

**IV.      A New Trial on TriZetto's Misappropriation Claims Is Required under the General Verdict Rule**

As explained above, all of the 104 trade secrets were improperly submitted to the jury, either because their use was authorized or because they were not adequately specified.  To the extent the Court does not grant JMOL on all of TriZetto's trade secret claims, a new trial should be ordered under the general verdict rule.

Under the "general verdict rule," a new trial must be ordered when "it is impossible to know, in view of the general verdict returned whether the jury imposed liability on a permissible or impermissible ground."  *West*, 120 F. App'x at 621-24; *Katara*, 835 F.2d at 970-71.  That is exactly the situation here, where asserted trade secrets were improperly submitted to the jury and likely formed the basis of its verdict.  The Court rejected Syntel's proposed verdict form, which required a finding on each asserted trade secret separately, and adopted TriZetto's proposal, which required the jury to identify only whether "TriZetto proved that it possessed ***one or more*** trade secrets that was/were misappropriated."  (Dkt. 931 at 2 (emphasis added); Dkt. 903-3.) TriZetto's verdict form rendered it impossible to determine how many trade secrets the jury found Syntel misappropriated, let alone which ones, and whether the damages awarded would have been different had the improperly submitted trade secrets been withheld from the jury.  And the record is clear that TriZetto urged the jury to find, in the alternative, on only those trade secrets that Syntel was authorized to use, such as the data dictionary, or only on the guides and manuals that TriZetto failed to adequately identify.  (*See, e.g.*, Britven Tr. 407:9-409:3.) Because it is impossible to know whether the jury's verdict rested on the many impermissible grounds of liability it was presented, a new trial is necessary.

**V.      The Court Should Grant JMOL in Favor of Syntel on TriZetto's DTSA Claims**

The jury's award of $285M in avoided costs was based on a finding that Syntel was liable for trade secret misappropriation under the DTSA.  But, to establish DTSA misappropriation, TriZetto was required to show that Syntel acquired, used, or disclosed its alleged trade secrets *after* May 11, 2016.  18 U.S.C. §§ 1836(b)(1), 1839(3), (5); *Integro USA*, 2019 WL 6030100, at *2  ("The DTSA, therefore, contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use." (citation omitted)); *RCC Ventures, LLC* v. *Am. DG Energy, Inc.*, No. 17-cv-3007 (AJN), 2018 WL 1415219, at *2 (S.D.N.Y. Mar. 19, 2018) ("[O]nly misappropriations occurring after May 11, 2016 are actionable.").  At trial, TriZetto made no allegation that Syntel ever disclosed its trade secrets, let alone after May 11, 2016.  Instead, TriZetto's DTSA claim was based entirely on four alleged post-2016 actions:  (1) Syntel website advertisements of its Facets services; (2) the movement of files consisting of TriZetto manuals on Syntel employee computers; (3) a "go live" date of November 2016 for UHG's upgraded Facets system; and (4) a statement by Dan Moore that unspecified "tools" were used in 2018.  No reasonable jury could find that any of these constitute DTSA misappropriation.  However, even if one did, none are causally related to the $285M in avoided costs damages awarded by the jury.  Thus, the Court should grant judgment in favor of Syntel on TriZetto's DTSA claim.

*A.     Syntel Did Not Engage in Trade Secret Misappropriation after May 11, 2016*

The Court should enter judgment for Syntel on TriZetto's DTSA claims because no reasonable jury could find that TriZetto established misappropriation after May 11, 2016.

**Website Advertisements Are Not DTSA Misappropriation**:  TriZetto failed to establish that the two-page advertisements on Syntel's website constituted "use" under the DTSA of any TriZetto trade secrets.  It is undisputed that Syntel does not sell Facets or any of the tools

18

mentioned in these advertisements. (Noonan Tr. 134:1-3; Britven Tr. 424:1-10; Reddy Tr.
470:15-471:14.) Thus, all that is offered in the advertisements are Syntel's own services. (*See*
DTX-1162 at 1; *see also* DTX-1541 at 2.) Nor is there any authority for the proposition that the
mere mention of a trade secret constitutes "use." *See, e.g.*, *KCG Holdings, Inc.* v. *Khandekar*,
No. 17-cv-3533, 2020 WL 1189302, at *13 (S.D.N.Y. Mar. 12, 2020) (distinguishing use from
"merely discuss[ing] possession of a trade secret"). On the contrary, "use" refers to "[t]he act of
putting something to work, or employing or applying a thing" not merely referring to it. *Id*. at
*11 (quoting *Oxford English Dictionary*).

      **File Movement Is Not DTSA Misappropriation**:  Next, TriZetto pointed to portions of
the Forensic Examiner's Report finding that files containing TriZetto manuals had been moved
on Syntel employee computers. (Bergeron Tr. 308:22-309:15.) As an initial matter, TriZetto
failed to offer evidence as to which if any of these files were among the 97 manuals it claimed as
trade secrets. And, as discussed *supra* Section III, TriZetto failed to offer any evidence as to
which parts of these manuals contained the alleged trade secrets. However, even if, *arguendo*, it
were sufficient for TriZetto to allege that buried somewhere within the moved files was a trade
secret, TriZetto failed to even argue that any of the relocated files were acquired after May 11,
2016 and failed to offer any evidence, aside from a single conclusory statement of its expert Dr.
Bergeron, that the movement indicated an ***intent*** to use the files (Bergeron Tr. 308:22-309:7),
that any trade secret within the manuals ***was actually used*** after May 11, 2016. At most TriZetto
showed that files remained on employee computers—but possession is not misappropriation
under the DTSA. *Epic Sys. Corp.* v. *Tata Consultancy Servs. Ltd*., Nos. 19-1828, 19-1613, 2020
WL 6813872, at *10-12 (7th Cir. Nov. 19, 2020) (affirming vacating of DTSA misappropriation
jury verdict where evidence was only that information was downloaded "[w]ithout a link from

19

this information to any use").  Instead, TriZetto was required to show that Syntel "*actually used*" this information.  *Id*.  It did not.

**UHG Work Is Not DTSA Misappropriation**:  TriZetto also failed to establish misappropriation based on Syntel's work for UHG.  There is no dispute that Syntel pitched for, won, and conducted work for UHG long **before** 2016.  But the sole document cited by Dr. Bergeron in arguing the UHG upgrade "was actually done in November 2016" was a September 16, **2015** email reporting statistics from a September 14 "Test Run."  (Bergeron Tr. 306:19-307:3; DTX-393 at 1.)  No reasonable jury could find, based on this 2015 email and Dr. Bergeron's conclusory testimony, that Syntel used the alleged trade secrets in November 2016.  And even if, *arguendo*, UHG's Facets upgrade did go live in November 2016, TriZetto failed to offer any evidence to the jury regarding what work was done by Syntel between May 12, 2016 and November 2016, as opposed to the two years before, let alone what specific trade secrets, if any, were used during that period of work.[6]

**Moore Testimony Regarding Using Unspecified "Tools" Is Not DTSA Misappropriation**:  As its final piece of evidence under the DTSA, TriZetto pointed to a single sentence of testimony from Mr. Moore in which he agreed that Syntel continued to use "tools" in connection with providing Facets services in 2018.  (Moore Tr. at 617:13-16.)  But the question

---

[6]     TriZetto did not argue that Syntel *acquired* any trade secrets from UHG after May 11, 2016.  However, even if TriZetto had, it was TriZetto's burden to show that Syntel had the *mens rea* required by the DTSA.  *See* 18 U.S.C. § 1839(5).  But TriZetto adduced no evidence that would allow a reasonable juror to conclude that, when Syntel acquired materials from its customers, it knew or had reason to know this was improper.  *Id*.; *Integro USA*, 2019 WL 6030100, at *2-3 (finding plaintiff failed to submit any evidence indicating defendant's acquisition of the alleged trade secret was improper).  Syntel's witnesses testified that Syntel believed it was entitled to use materials provided by customers to perform Facets work.  (Reddy Tr. 516:9-13; *see also* Mehta 548:17-24.)  Thus, there is no evidence from which a reasonable jury could find DTSA misappropriation for acquisition of material from Syntel's customers, because there is not sufficient evidence to find the required knowledge.

posed to Mr. Moore—and thus his answer—was not specific to any tool, let alone any of the

tools at issue in this case.  No reasonable jury could conclude from this answer that Syntel was

still using any of the alleged trade secrets in 2018.

Because TriZetto failed to meet its burden of showing misappropriation after May 11,

2016, the Court should grant judgment in Syntel's favor on the DTSA claims.

> B.    *The Court Should Grant JMOL of No DTSA Damages or a New Trial Based on a*
> *Lack of Causal Connection to the Alleged DTSA Acts of Misappropriation*

Even if TriZetto had shown DTSA misappropriation, the Court should grant judgment in

Syntel's favor or remittitur to a maximum of $8.5M or a new trial on the jury's DTSA damages

award because no reasonable jury could find that the nearly $285M in avoided costs awarded are

causally related or proportional to the alleged post-DTSA misappropriation by Syntel.

The DTSA is clear that any damages awarded, whether for actual loss or unjust

enrichment, must be "***caused by*** the misappropriation of the trade secret" at issue.  18 U.S.C.

§ 1836(b)(3)(B) (emphasis added).  Causation requires "[t]he damages . . . to be so near to the

cause . . . that they may be reasonably traced to the event."  *E.J. Brooks Co.* v. *Cambridge Sec.*

*Seals*, 31 N.Y. 3d 301, at 448-49 (2018) (quoting *Steitz* v. *Gifford*, 280 N.Y. 15, 20 (1939)).

"Because compensatory damages are intended to redress the concrete loss that the plaintiff has

suffered by reason of the defendant's wrongful conduct, courts will not permit recovery when the

connection between the claimed loss and the tortious act is speculative or uncertain."  *Anderson*

*Grp., LLC* v. *City of Saratoga Springs*, 805 F.3d 34, 52 (2d Cir. 2015) (internal quotations and

citations omitted).  Here, there is no evidence providing the requisite connection between any of

the instances of alleged DTSA misappropriation and the jury's $285M avoided costs award.

Indeed, Mr. Britven testified that the avoided costs he calculated covered the period of 2004 to

2014 because "the alleged misappropriation stopped in 2014."  (Britven Tr. 398:1-5.)  TriZetto

failed to demonstrate harm or explain how any action occurring two years later is causally connected to a such a calculation.

**Website Advertisements**:  TriZetto failed to adduce evidence that would permit a reasonable juror to conclude that the presence of an advertisement on the internet caused nearly $285M of harm to TriZetto, or $285M of unjust enrichment to Syntel.  Indeed, TriZetto offered no evidence that any customer ever saw the website advertisements, let alone that the advertisements resulted in any additional Facets services work for Syntel.  Taken seriously, TriZetto's argument would mean that anyone who advertised possession of these tools, regardless of whether they actually possessed or used them, would cause TriZetto $285M in harm.  That cannot be correct.  Thus, even assuming, *arguendo*, that these advertisements were DTSA "use," there is no causal connection to the avoided costs awarded here.  This is confirmed by the CDPHP TPAA, which explicitly authorized Syntel to use the tools and manuals TriZetto argues were advertised here at ***zero cost*** to Syntel.  (Moore Tr. 601:13-15; Plumpe 722:4-723:3.)

**File Movement**:  TriZetto also failed to offer evidence of any harm to TriZetto or benefit to Syntel based on the alleged movement of TriZetto manuals on employee computers.  Even crediting Dr. Bergeron's unsupported assertion that this file movement evidenced an intent to use these documents (Bergeron Tr. 308:22-309:7), TriZetto offered no evidence of any actual use of the files, let alone any explanation of how movement of specific individual files is causally related or proportional to the jury's $285M award of the full 10-year development costs of Facets.  And, while Mr. Britven testified that the full development cost of ***all 97 manuals and guides*** at issue in the litigation was $189M (Britven Tr. 407:15-18), TriZetto offered no evidence to show the development cost of any subset of those manuals, let alone any subset that might actually have been represented within the files identified as being moved post-May 11, 2016.

**UHG Work**:  TriZetto similarly failed to establish any connection between Syntel's UHG post-May 2016 Facets work and the jury's damages award.  Mr. Britven testified that Syntel obtained approximately $27M in total revenue from UHG which resulted in $8.5M in lost profits to TriZetto.  (Britven Tr. 806:22-807:6.)  There is no dispute that Syntel won the UHG work before May 2016.  (*See* Britven Tr. 418:19-25; PTX-43 at 2; DTX-393.)  Thus, any statements made in pitching for that work in 2014—which, like the advertisements discussed above, would not be "use" regardless of when made—and any work performed prior to May 2016, are irrelevant to DTSA damages.  And, even assuming Syntel's UHG Facets work continued past May 11, 2016, TriZetto failed to offer evidence of any one of its 104 alleged trade secrets actually being used to service UHG *after* May 11, 2016.

**Moore Testimony**:  Nor does Mr. Moore's testimony support the jury's verdict.  That testimony (Moore Tr. 617:13-16), as explained *supra*, does not identify *any* specific tool used with *any* specific customer, let alone any benefit to Syntel or loss to TriZetto from doing so that is causally related to the jury's $285M verdict.  Even if it were assumed, improperly, that the "tools" referenced by Mr. Moore must be those at issue in this case, the only customer TriZetto identified for purposes of assessing DTSA damages and for whom TriZetto says Syntel performed work after May 2016 was UHG and, as set forth above, TriZetto failed to show any relationship between any post-May 2016 UHG work and the jury's verdict, which was 10 times Syntel's total UHG revenue and 27 times TriZetto's lost profits on the project.  (Britven Tr. 418:1-18, 806:22-807:6; Plumpe 720:16-721:9.)

Because there is no causal connection between the alleged DTSA misappropriation and the jury's damages award, judgment should be granted for Syntel.  Alternatively, the Court

should grant remittitur to a maximum of $8.5M in DTSA damages or order a new trial on DTSA damages because the jury's award of $285M is against the weight of evidence.

## VI.        Avoided Costs Damages Are Improper Here as a Matter of Law

The jury's $285M DTSA damages award should be vacated for the additional reason that allowing TriZetto to recover its avoided costs in this case is improper as a matter of law.

The DTSA allows damages for actual harm and, to the extent not already accounted for, unjust enrichment.  18 U.S.C. § 1836(b)(3)(B).  Here, the maximum actual harm to TriZetto from Syntel's misappropriation and corresponding unjust enrichment to Syntel were easily calculable.  Mr. Britven testified that Syntel's total revenue from its UHG work—the only work he presented to the jury as a basis for TriZetto's claimed damages—was approximately $27M, and that TriZetto's lost profits from Syntel's misappropriation were approximately $8.5M. (Britven Tr. 419:4-8, 806:22-807:6.)  Because TriZetto's actual damages and unjust enrichment were easily calculable, there was no need to resort to the nontraditional proxy remedy of avoided costs for calculating unjust enrichment.  *See generally LinkCo, Inc.* v. *Fujitsu Ltd.*, 230 F. Supp. 2d 492, 502-04 (S.D.N.Y. 2002) (noting divergence from straight lost profits analysis for trade secret misappropriation cases where plaintiff's losses and defendant's actual gain cannot be easily computed).  Yet, TriZetto did.

There is no dispute that TriZetto's avoided costs calculation encompassed all TriZetto Facets development costs from 2004 to 2014.  (Britven Tr. 402:12-14.)  Nor is there any dispute that Syntel did not destroy the value of Facets.  To the contrary, Mr. Noonan confirmed that Facets remains "very valuable" and Mr. Britven confirmed Facets "is worth more today than it was when we started this case."  (Noonan Tr. 136:6-137:5; Britven Tr. 797:11-17.)  In fact, TriZetto continues to make hundreds of millions of dollars licensing Facets.  (Britven Tr. 423:3-8.)  Because there was no destruction by Syntel of any alleged trade secrets, avoided cost proxy

damages are unavailable to TriZetto as a matter of law.  Indeed, Second Circuit precedent has flatly rejected the rare remedy of avoided costs outside of the narrow context of destruction.  *See, e.g.*, *Softel, Inc.* v. *Dragon Med. and Sci. Comm'ns, Inc.*, 118 F.3d 955, 969 (2d Cir. 1997) ("the total value of the secret to the plaintiff, including the plaintiff's development costs" is "appropriate only where the defendant ha[s] destroyed the value of the secret."); s*ee also Univ. Computing Co.* v. *Lykes-Youngstown Corp.*, 504 F.2d 518, 535-36, 538 (5th Cir. 1974) (noting that "normally the value of the secret to the plaintiff is an appropriate measure of damages only when the defendant has in some way destroyed the value of the secret").

Here, TriZetto's use of avoided costs was not an attempt to ascertain the actual harm caused by Syntel's alleged actions.  Instead, TriZetto used avoided costs to multiply the harm, effectively turning compensatory damages into punitive damages, and obtaining a compensatory damages windfall more than 27 times its actual claimed lost profits and more than 10 times the total revenue Syntel earned.  "[C]ompensatory damages are designed to place the plaintiff in a position substantially equivalent to the one that he would have enjoyed had no tort been committed."  *Anderson Grp., LLC*, 805 F.3d at 52 (internal quotations and citations omitted). TriZetto's attempt here to use avoided costs to convert its compensatory damages claim into a *de facto* punitive damages claim is improper as a matter of law and should be rejected.

The punitive nature of TriZetto's calculation is confirmed by the fact that the undisputed evidence shows Syntel would have never needed to develop the alleged trade secrets for itself in order to use them for providing Facets services to third parties, let alone spend $285M doing so. Instead, the record at trial was clear that TriZetto's practice, though not consistently communicated or applied, was to permit third parties to service Facets licensees using the very materials TriZetto alleges are trade secrets if they signed a TPAA.  (Noonan Tr. 135:14-136:5;

Sanders Tr. 243:22-244:13; Reddy Tr. 478:16-479:9.)  Thus, the only "cost" Syntel avoided was the "cost" to obtain a TPAA:  *zero dollars*.  (Moore Tr. 601:13-15; Plumpe 722:4-723:3; Sanders Tr. 243:22-244:13.)  Holding Syntel liable for the entire development costs of a product it never sold or wished to sell, when TriZetto allows Syntel and others providing related services to access and use the product and tools for free, is untethered to reality and punitive in nature.

The present case is easily distinguishable from cases awarding avoided costs under the DTSA.  For example, in *Motorola Sols. Inc.* v. *Hytera Commc'ns Ltd.*, avoided costs were awarded where defendant used plaintiff's trade secrets *to develop and sell a competing product*. No. 17-cv-1973, 2020 WL 6554645, at *2 (N.D. Ill. Oct. 19, 2020).  Similarly, in *Epic Systems Corp.* v. *Tata Consulting Servs.*, the court affirmed an award for avoided costs based on the defendant's use of trade secrets to develop a comparative analysis to improve *its own competing product*.  2020 WL 6813872, at *9.  But here, there is no allegation that Syntel sold a competing product or used any trade secret to improve a competing product for sale.  In addition, as the Seventh Circuit noted, the parties in *Tata* had *not offered evidence regarding actual harm* to the plaintiff on which damages could actually be based.  *Id*. at *18-19, n.5 ("there is hardly evidence that [plaintiff] suffered any economic harm").  Here, in contrast, TriZetto's expert quantified its actual lost profits and Syntel's corresponding unjust enrichment.  That TriZetto wished the number were higher does not justify the extraordinary remedy of avoided costs.  In addition, neither *Epic Systems* nor *Motorola* suggests the trade secret holders in those cases readily allowed others to use their trade secrets to service clients at zero cost, as TriZetto does here.

**VII.     No Reasonable Juror Could Award the Reasonable Royalty Damages Sought by TriZetto**

Judgment should also be entered in Syntel's favor on the jury's awards of reasonable royalty damages for New York trade secret misappropriation and copyright infringement, as both damages calculations are improper as a matter of law.

First, TriZetto's reasonable royalty damages calculations, which were adopted by the jury, are contrary to the law because they are based purely on avoided costs. TriZetto's reasonable royalty figures for New York trade secret misappropriation and copyright infringement damages were each calculated as half of the avoided costs TriZetto's damages expert, Mr. Britven, calculated for these two buckets of intellectual property. (*See* Britven Tr. 412:22-413:23; Plumpe Tr. 729:7-12, 730:11-21.) These royalty figures were an order of magnitude greater than the ***entirety*** of Syntel's profits (and even revenues) that Mr. Britven himself calculated through the date of trial and presented at trial from Syntel's alleged use of the intellectual property at issue.[7]  (Britven Tr. 410:4-19, 417:8-418:18, 448:5-11.)

Since, as discussed *supra*, avoided costs are not an appropriate measure of damages here, starting with avoided costs is likewise improper. *See Cornell Univ.* v. *Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 290-93 (N.D.N.Y. 2009); *Softel*, *Inc.*, 118 F.3d. at 969. Moreover, a royalty analysis based purely on avoided costs, and untethered in any way to comparable royalties or the revenues and profits Mr. Britven testified actually resulted from the use of the intellectual property, is contrary to the *Georgia-Pacific* reasonable royalty framework on which Mr. Britven purported to rely. (*See, e.g.*, Britven Tr. 411:14-22, 441:19-23.) The overarching aim of a

---

[7]      Notably, Mr. Britven did not even attempt to quantify any financial benefit, other than revenues and profits, that Syntel allegedly received, that was tied to Syntel's specific use of the trade secrets or copyrights at issue.

*Georgia-Pacific* royalty analysis is to determine, for the use made of the intellectual property at issue, the amount that "a prudent licensee . . . would have been willing to pay as a royalty and yet be able to make a reasonable profit." *Georgia-Pacific Corp.* v. *U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y 1970). Reasonable royalty law (which has been developed largely in the patent context) stresses that a royalty must be based on "sound economic and factual predicates" and must be tied to the use actually made of the intellectual property by the wrongdoer and the harm caused. *LaserDynamics Inc.* v. *Quanta Comput., Inc*., 694 F.3d 51, 67-68 (Fed. Cir. 2012); *ResQNet.com, Inc.* v. *Lansa, Inc*., 594 F.3d 860, 869 (Fed. Cir. 2010) ("At all times, the damages inquiry must concentrate on compensation for the economic harm caused by infringement of the claimed invention."); *see also Softel*, 118 F.3d. at 969 (noting that development costs were, at most, only "a factor (among several) to be considered when calculating a hypothetical license as a measure of trade secret damages"). Contrary to the law, Mr. Britven's royalty calculation rests entirely on avoided costs, and ignores—indeed, flies in the face of—comparable rates in the record (as reflected in the Duff & Phelps Report) and Mr. Britven's calculation of profits and revenues related to the use at issue. (PTX-846 at 57; Britven Tr. 417:8-418:18, 447:19-448:11, 806:12-811:1; Plumpe Tr. 732:2-24.)

Second, TriZetto's reasonable royalty damages claims are contrary to the law because they are improperly based on a 50/50 split between TriZetto and Syntel for avoided costs. Plaintiffs must establish a causal link between their proven claim and their alleged damages: "[t]he damages . . . need to be so near to the cause . . . that they may be reasonably traced to the event." *E.J. Brooks*, 31 N.Y. 3d at 448-49 (quoting *Steitz*, 280 N.Y. at 20); *see also Allied Erecting & Dismantling Co.* v. *Genesis Equip. & Mfg., Inc*., 511 F. App'x 398, 403 (6th Cir. 2013). Here, Mr. Britven testified that for both trade secret and copyright damages, he

calculated reasonable royalties by halving his calculated avoided costs to provide a "level playing field."  (Britven Tr. 412:22-414:1, 441:19-442:13.)

Calculating a royalty based on such an arbitrary 50/50 split is also impermissible as a matter of law and has been consistently rejected as insufficiently tied to the facts.  *VirnetX, Inc.* v. *Cisco Sys.*, 767 F.3d 1308, 1331-34 (Fed. Cir. 2014) ("Such conclusory assertions cannot form the basis of a jury's verdict."); *Vaporstream, Inc.* v. *Snap, Inc.*, No. 17-cv-00220-MLH(KSx), 2020 WL 2543814, at *2-6 (C.D. Cal. Jan. 10, 2020) (a 50-50 split is "an arbitrary, general rule, unrelated to the facts of this case" since the expert fails to explain what "necessarily leads to the conclusion that the parties would have agreed to a 50/50 split, and why a 40/60, 30/70, 20/80 or any other split would not have been appropriate"); *Robocast, Inc.* v. *Microsoft Corp.*, No. 10-cv-1055-RGA, 2014 WL 350062, at *3 (D. Del. Jan. 29, 2014) (like the 25% rule of thumb, a 50-50 split is a "non-starte[r] in a world where damages must be tied to the facts of the case").

Mr. Britven's use here of a 50-50 split is even more egregious and improper than in the caselaw that has consistently rejected such an analysis.  As noted, he offered no justification or explanation for using such a split beyond a cursory explanation of some of the factors he considered, unlike the "Nash Bargaining Solution" justification offered in *VirnetX* or the opinions that the licensor would have had greater bargaining leverage relied on as justification in *Vaporstream* and *Robocast*.  *See VirnetX*, 767 F.3d at 1331-34; *Vaporstream*, 2020 WL 2543814, at *4; *Robocast*, 2014 WL 350062, at *1, n.1.  There is no economically sound evidence Syntel would have agreed to pay $285M in avoided costs in order to make, at most, a fraction of that amount in revenue from its Facets consulting services.  This is reinforced by the fact that Syntel could have used all of the TriZetto materials at issue here to provide Facets services by entering a TPAA for which it would have paid no money, just as it did when

requested by CDPHP.  (Sanders Tr. 243:22-244:13; Moore Tr. 601:13-15; Plumpe Tr. 722:7-723:3.)  Thus, TriZetto's reasonable royalty and copyright damages based on a 50-50 split are contrary to the law.

**VIII.       The Punitive Damages Award Is Grossly Excessive and Should Be Reduced**

The jury awarded TriZetto $569,710,384 in punitive damages.  (D.I. 931 at 6.)  But, as this Court has recognized, "'[j]udicial review of the size of punitive damages awards has been a safeguard against excessive verdicts for as long as punitive damages have been awarded.'" *Cabral*, 2015 WL 4750675, at *6 (quoting *Honda Motor Co.* v. *Oberg*, 512 U.S. 415, 421 (1994)).  "'[C]ourts bear the responsibility to ensure that judgments as to punitive damages conform, insofar as reasonably practicable, to the prevailing norms of the legal system and are not excessive.'"  *Id.* at *6 (quoting *Stampf* v. *Long Island R.R. Co.*, 761 F.3d 192, 209 (2d Cir. 2015)).  The jury's award of over half a billion dollars in punitive damages, following a closing argument in which, despite TriZetto's promises it would not treat the Preclusion Order as a directed verdict, TriZetto repeatedly emphasized to the jury that the Court directed the jury to find misappropriation and aggressively leveraged the Order to inflame the jury (*see, e.g.*, TriZetto Argument 356:1-17; TriZetto Closing Tr. 900:20-23, 952:12-16; *see also id*. at 890:21-891:6 (arguing no Syntel witness offered testimony of independent tool development)), is the very type of award courts are meant to police.  There can be no question that if compensatory damages are reduced, the jury's punitive damages award must necessarily be reduced, and in view of the facts Syntel respectfully submits that no punitive award is warranted.  However, even if the jury's $285M award of avoided costs were affirmed, the punitive damages amount, which is grossly excessive and violates Syntel's due process rights, should be remitted.

If the Court finds the jury's award to be so excessive it is unconstitutional, the verdict

should be reduced as a matter of law.  *See Turley*, 777 F.3d at 168 (ordering direct reduction of

damages on constitutional grounds "might well be permissible"); *Cortez* v. *Trans Union, LLC*,

617 F.3d 688, 716 (3d Cir. 2010) (constitutionally excessive punitive damage awards may be

reduced as a matter of law); *Johansen* v. *Combustion Eng'g, Inc*., 170 F.3d 1320, 1331 (11th Cir.

1999) (reduction of unconstitutional punitive damages award "proceeds under Rule 50, not Rule

59").  Even if not constitutionally excessive, remittitur should be granted as an alternative to a

new trial.  The Second Circuit has outlined four considerations in determining whether a punitive

damages award is excessive:  (1) the "degree of reprehensibility of the defendant's conduct"; (2)

the "relationship of the punitive damages to the compensatory damages"; (3) "civil penalties

imposed by the state's law for the misconduct in question"; and (4) a comparison "with punitive

damages awards in similar cases."  *Payne* v. *Jones*, 711 F.3d 85, 101, 104 (2d Cir. 2013);

*Cabral*, 2015 WL 4750675, at *6.  Each supports a finding of excessiveness here.

**Factor 1—Degree of Reprehensibility**:  The most important factor in assessing punitive

damages is the "degree of reprehensibility of the defendant's conduct."  *BMW of N. Am., Inc.* v.

*Gore*, 517 U.S. 559, 575 (1996).  Assessing reprehensibility requires more than merely asking

whether conduct was unacceptable.  *DiSorbo* v. *Hoy*, 343 F.3d 172, 186 (2d Cir. 2003).  Instead,

because a plaintiff is made whole by compensatory damages, "punitive damages should only be

awarded if the defendant's culpability, after having paid compensatory damages, is so

reprehensible as to warrant imposition of further sanctions to achieve punishment or deterrence."

*State Farm Mut. Auto. Ins. Co.* v. *Campbell*, 538 U.S. 408, 419 (2003).

Five elements are relevant in assessing reprehensibility:  whether "[1] the harm caused

was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a

reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Id*. "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id*. An evaluation of these elements confirms the jury's punitive damages award is not supported.

Elements 1, 2, and 3 are indisputably not present here. TriZetto alleged only purely economic harms from Syntel's actions, none of which threatened the health or safety of others. And TriZetto is hardly financially vulnerable. Mr. Britven confirmed TriZetto is "making hundreds of millions of dollars still today from Facets." (Britven Tr. 423:3-8.)

Regarding Element 4, courts are divided as to whether the repeated actions must be actions against various different parties or whether repeated actions against TriZetto are sufficient. *See Bridgeport Music, Inc.* v. *Justin Combs Pub.*, 507 F.3d 470, 487 (6th Cir. 2007) (similar conduct against different parties required); *Epic Sys.*, 2020 WL 6813872, at *17 (repeated conduct against same party). Here, there is no allegation Syntel committed similar acts against any third parties. However, even if Syntel's conduct were found repetitive, it would not support the level of punitive damages here.

Finally, for Element 5, there is no evidence that Syntel engaged in intentional malice, trickery, or deceit. Syntel did not lie or trick TriZetto to obtain access to its alleged trade secrets. As Mr. Noonan testified, TriZetto itself gave Syntel access from 2007-2015. (Noonan Tr. 137:24-139:6, 142:17-25; *see also* Mehta Tr. 547:4-11.) At worst, TriZetto alleges that Syntel used its manuals and copies of its tools to compete with TriZetto for Facets services contracts,

that Syntel won the CDPHP and UHG services contracts, and that as a result TriZetto lost $8.5M in profits.  This is not the type of egregious conduct that warrants $570M in punitive damages.[8]

TriZetto's suggestion that Syntel was planning to "go to war"[9] with TriZetto also fails to support a finding of malice, trickery, or deceit.  Mr. Reddy testified there was no war.  (Reddy Tr. 525:16-21.)  But even if that testimony is rejected—as the jury was free to do—all that is described is vigorous completion in the marketplace.  Notably all of the evidence of "going to war" is dated after the 2012 Amendment in which Syntel bargained for and obtained the right to compete.  TriZetto plainly knew what it was agreeing to, and thus, the argument that TriZetto trusted Syntel and Syntel somehow "betrayed that trust" (TriZetto Closing Tr. 882:19-23) is inconsistent with the undisputed facts.  In short, there is no basis to suggest even aggressive competition could support the jury's punitive damages award here.

Even viewed in the light most favorable to TriZetto the evidence of reprehensible conduct is scant—for example amateurish effort to remove TriZetto copyright marking supposedly in an effort to cover up the provenance of certain information.  The evidence here does not begin to reach, for example, the far more egregious conduct in *Epic Systems*, including "intentional attempts to deceive" by falsifying information to gain access to a confidential database and engaging in a coordinated series of lies to cover up those actions, which was found

---

[8]    While TriZetto suggested at trial that Syntel's failure to obtain a TPAA for its UHG work showed Syntel knew the work was improper (Sanders Tr. 243:25-244:13), there is no evidence Syntel knew a TPAA was required for UHG.  (Moore Tr. 605:16-606:2.)  Syntel understood that TriZetto did ***not*** require all clients to obtain TPAAs.  (Reddy Tr. 478:16-479:9.)  And neither UHG nor TriZetto, the only parties aware of ***UHG's obligation*** to have Syntel get a TPAA, informed Syntel one was required.  (Sanders Tr. 242:21-243:3; Moore Tr. 605:16-606:2.)  The record shows Syntel was willing to seek a TPAA when a customer thought it appropriate.

[9]    As Mr. Reddy explained, some documents shown by TriZetto to suggest Syntel's "army" was ready actually addressed creating "a line of defense to protect [Syntel] from [a] poaching war from Cognizant."  (DTX-149 at 1-2; Reddy Tr. 511:12-21, 531:11-532:9.)

"reprehensible" but not to such "an extreme degree" that would be required to support a $280M punitive damages award—less than half of the award at issue here. *Epic Sys.*, 2020 WL 6813872, at *18; *see also AgroFresh Inc.*, 2020 WL 7024867, at *20 (targeting of plaintiffs' customers and affirmative acts to shield former employee from discovery indicated reprehensibility "but not strongly").

To the contrary, witnesses for both Syntel and TriZetto confirmed that as a result of the 2012 Amendment, and in exchange for tens of millions of dollars, Syntel obtained the right to compete. (Reddy Tr. 475:2-476:16; Sanders Tr. 220:6-21; PTX-427 at 1.) That TriZetto later deemed the decision "unfortunate[e]" (PTX-427 at 1) and now wishes to have a monopoly in Facets services is irrelevant. TriZetto was aware of the competition, congratulated Syntel on winning the CDPHP bid, and signed the CDPHP TPAA. (Reddy Tr. 476:22-477:8; Sanders Tr. 244:9-13; PTX-838.) Yet, TriZetto did not raise any concerns regarding Syntel's use of its Confidential Information before the MSA was terminated. (Reddy Tr. 478:11-15.) To the extent the parties now dispute what Syntel was allowed to do as part of its right to compete, including with respect to TriZetto materials provided directly to Syntel from UHG—whose contract with TriZetto Syntel was not privy to and for whom neither TriZetto nor UHG ever suggested to Syntel a TPAA was required (Moore Tr. 605:16-606:2; Sanders Tr. 242:12-243:11; *see also* Mehta Tr. 573:14-17)—such dispute does not suggest the required ill intent, trickery, or theft.[10] Indeed, Cognizant hired dozens of the employees accused of misappropriation. (DTX-87; DTX-245 at 16-17; PTX-851.) And as Mr. Sanders confirmed, Cognizant would not hire thieves. (Sanders Tr. 245:22-25.)

---

[10]     Indeed, while it was UHG that provided Syntel with access to TriZetto's information in alleged violation of the TriZetto/UHG agreement, TriZetto has taken no action against UHG. (Sanders Tr. 243:1-11.)

These elements do not support the finding of extreme reprehensibility necessary to justify $570M in punitive damages.

**Factor 2—Relationship of Punitive Damages to Harm**:  The Court must next examine the relationship between punitive damages and the "harm or potential harm" to TriZetto.  *State Farm*, 538 U.S. at 424.  As the Supreme Court explained in *State Farm*, a party "should be punished for the conduct that harmed [the other party], not for being an unsavory individual or business."  538 U.S. at 423.  Thus, where compensatory damages include elements unrelated to the harm ***actually suffered***, the relevant comparator for evaluating punitive damages is the portion of compensatory damages actually tied to the harm—not the full compensatory damages award.  *Bridgeport Music*, 507 F.3d at 489.  Indeed, as the Supreme Court has noted, compensatory damages awards have, at times, included punitive components.  *State Farm*, 538 F.3d at 426 (finding compensatory damages for emotional distress beyond economic injury "likely were based on a component which was duplicated in the punitive award").  In such cases, looking at the compensatory damages number as a whole for judging the reasonableness of punitive damages would improperly inflate the punitive damages number even further.  Here, the avoided costs damages awarded by the jury do not reflect any harm to TriZetto.[11]  To the contrary, TriZetto's witnesses repeatedly confirmed that Facets is "very valuable" today.  (Noonan Tr. 136:6-137:5; Britven Tr. 422:3-8, 422:19-423:8, 797:11-17.)  The only quantifiable

---

[11]    In *Epic Systems*, the Seventh Circuit recognized that the compensatory damages award of $140M in avoided costs did not reflect the harm to Epic and that any "quantifiable economic harm" suffered by Epic would be "significantly smaller."  2020 WL 6813872, at *18.  However, the court found that the parties did not argue that any number other than $140M should be evaluated when assessing punitive damages and thus waived any argument for consideration of a smaller number reflecting the actual harm to Epic.  *Id*.  Syntel, in contrast, has not waived this argument here.

economic harm identified by TriZetto was $8.5M in UHG lost profits.  (Britven Tr. 418:19-419:13.)  The jury's punitive award of nearly $570M is more than *67 times* this harm.

Moreover, whether or not avoided costs were the proper comparator, the 2:1 ratio applied by the jury cannot be supported.  "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee."  *State Farm*, 538 U.S. at 425; *see also Epic Sys*., 2020 WL 6813872, at *19. There can be no question that the jury's award of $285M in avoided costs far exceeds what courts have considered "substantial."  *See Epic Sys*., 2020 WL 6813872, at *19 ($140M avoided costs award "far exceeds what other courts have considered substantial").  Indeed, courts routinely find compensatory damages less than 1% of the jury's award here to be "substantial." *See, e.g., State Farm*, 538 U.S. at 426 ($1M in compensatory damages substantial); *Payne*, 711 F.3d at 103 ($60,000 compensatory damages award substantial); *Thomas* v. *iStar Fin., Inc.*, 652 F.3d 141, 149 (2d Cir. 2011) (agreeing $279,450 in compensatory damages was substantial). Should the Court affirm the jury's already "substantial" avoided costs award, it should decline to award any additional punitive damages as these damages are sufficient to both compensate TriZetto and punish Syntel.  *See Citcon USA, LLC* v. *RiverPay, Inc*., No. 18-cv-2585, 2020 WL 5365980, at *5 (N.D. Cal. Sept. 8, 2020) (awarding no DTSA punitive damages where unjust enrichment damages were sufficient to punish defendant and deter similar conduct).

**Factor 3—Civil and Criminal Penalties**: This factor examines relevant civil and criminal penalties imposed by the law for the conduct giving rise to the punitive damages.  Here, New York has not adopted any statute governing civil penalties for trade secret misappropriation. But, the fact that the jury's 2:1 ratio does not exceed the DTSA's punitive damages cap is of no moment.  Even punitive damages awards within a statutory cap may "exceed the outermost

36

limits of the due process guarantee." *See Epic Sys.*, 2020 WL 6813872, at *20 (finding maximum compensatory to punitive damages ratio to be 1:1 despite 2:1 statutory cap).

    **Factor 4—Similar Cases**:  A review of similar cases confirms that a significant reduction in punitive damages is proper.  For example, in *Epic Systems*, which appears to have provided the blueprint for TriZetto's arguments here, the jury, based on an avoided costs analysis from TriZetto's expert Mr. Britven,[12] awarded Epic $280M in avoided costs for Tata's misappropriation of information related to Epic's software and $700M in punitive damages.  2020 WL 6813872, at *4-5.  The district court reduced the compensatory damages award to $140M and the punitive damages award to $280M prior to appeal.  *Id.* at *5.  While the $280M punitive damages award was within the applicable 2x punitive damages cap under Wisconsin law, the Seventh Circuit remanded the case with instructions to enter a punitive damages award no greater than $140M.  *Id.* at *20-21.  In spite of the fact that Tata knew it lacked authority to access Epic's confidential information, had acquired that information though intentional deception, and had engaged in lies to cover up its actions (*id.* at *18), the court found punitive damages exceeding a 1:1 ratio with the already "substantial" compensatory damages were prohibited by the federal Constitution and remanded the case for further consideration by the district court.  *Id.* at *20-21.  Here, the jury's compensatory damages award alone already exceeds the total maximum damages found justified in *Epic Systems*.

---

[12]    The district court rejected Mr. Britven's original avoided costs calculation which, like his calculation in this case, was based on the costs "incurred developing the modules underlying *all* the documents" misappropriated by Tata, not just information actually used by Tata.  *Epic Sys.*, 2020 WL 6813872, at *4.  The revised avoided costs calculation presented to the jury was based "only on the confidential information and trade secrets" Tata incorporated into the spreadsheet that it created and used to improve its own software product.  *Id.*  In addition, unlike here, Mr. Britven's avoided costs calculation in *Epic* accounted for "technology decay over time."  *Id.*

In *Motorola Solutions, Inc.* v. *Hytera Comm. Corp.*, another recent trade secret case, the conduct at issue was far more reprehensible than that found here.  In that case the defendant hired two of the plaintiff's employees who continued to work for plaintiff even while they surreptitiously stole trade secrets; those employees invoked the Fifth Amendment more than 100 times in the testimony at trial.  *Motorola*, 2020 WL 6554645, at *2, *9.  The defendant built and sold a competing product based on the misappropriated trade secrets, and even after learning that the competing product included stolen source code stated it would not stop until it was "number one in the . . . market."  *Id*. at *5.  Even in view of this highly egregious conduct, the award of punitive damages ($418M) was only approximately three times the actual economic loss suffered by the plaintiff ($136M).  *Id*. at *12.  In view of the conduct at issue here, both the amount and the multiple should be far less.

Because the jury's punitive damages award is neither reasonable nor proportionate to any harm suffered by TriZetto, or any wrong committed by Syntel, it is unconstitutional and the Court should grant remittitur on punitive damages.  If any punitive damages are awarded, the maximum award should be no more than $8.5M, equal to TriZetto's $8.5M in lost profits.

## CONCLUSION

For the foregoing reasons, Syntel respectfully requests that the Court enter judgment in Syntel's favor on TriZetto's DTSA and New York trade secret misappropriation claims, and TriZetto's copyright claims.  In the alternative, Syntel respectfully requests that the Court order remittitur or, to the extent necessary, a new trial.

Dated: December 4, 2020          Respectfully submitted,
New York, New York

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By: */s/ Nicholas P. Groombridge*
     Nicholas P. Groombridge
     Jaren Janghorbani
     Kripa Raman
     Crystal Parker
     Joshua D. Reich
     Cecilia Copperman
     1285 Avenue of the Americas
     New York, NY 10019-6064
     Tel: (212) 373-3000
     Fax: (212) 757-3990
     Emails:  ngroombridge@paulweiss.com
            jjanghorbani@paulweiss.com
            kraman@paulweiss.com
            cparker@paulweiss.com
            jreich@paulweiss.com
            ccopperman@paulweiss.com

     J. Steven Baughman
     Melissa Alpert
     2001 K Street, NW
     Washington, DC 20006-1047
     Tel: (202) 223-7340
     Fax: (202) 403-3740
     Emails: sbaughman@paulweiss.com
            malpert@paulweiss.com

     *Attorneys for Plaintiffs and Counterclaim-*
     *Defendants Syntel Sterling Best Shores*
     *Mauritius Limited and Syntel, Inc.*