UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SYNTEL STERLING BEST SHORES MAURITIUS LIMITED, and SYNTEL, INC., | 1:15-CV-00211 (LGS) (SDA) |
| Plaintiffs and Counterclaim-Defendants, | Hon. Lorna G. Schofield |
| v. | |
| THE TRIZETTO GROUP, INC. and COGNIZANT TECHNOLOGY SOLUTIONS CORP., | |
| Defendants and Counterclaim-Plaintiffs. | |

**TRIZETTO'S OPPOSITION TO SYNTEL'S MOTION FOR JUDGMENT
AS A MATTER OF LAW, A NEW TRIAL, OR REMITTITUR AND MOTION FOR
A PERMANENT INJUNCTION AND PRE- AND POST-JUDGMENT INTEREST**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARD ......................................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.      The Amendment To The MSA Did Not Authorize Syntel's Misappropriation ................ 3

        A.      Syntel's Position On The MSA And Amendment Are Incorrect And
                Contrary To The Facts Adduced At Trial ................................................................ 4

II.     Trizetto Neither Waived Nor Is Estopped From Its Trade Secret Misappropriation
        And Copyright Infringement Claims .............................................................................. 10

III.    Syntel's Belated Attempt to Escape Liability For Trade Secret Misappropriation
        Should be Rejected ........................................................................................................ 14

        A.      TriZetto Adequately Identified the Misappropriated Trade Secrets ..................... 15

        B.      Syntel's Arguments That TriZetto's Identification of Each of the 104
                Trade Secrets Were Deficient are Unavailing. .................................................... 18

IV.     The General Verdict Is Proper and a New Trial is Not Needed ...................................... 21

V.      Substantial Evidence Supports the Jury's DTSA Verdict ............................................... 23

        A.      Substantial Evidence Supports the Jury's Finding of Misappropriation .............. 24

        B.      The Jury's Avoided-Cost Damages Award Is Causally Connected to
                Syntel's Misappropriation and No New Trial or Remittitur Should Be
                Awarded ............................................................................................................... 32

VI.     Avoided Costs Are Recoverable under the DTSA and the Jury's DTSA Award Is
        Supported by Substantial Evidence ............................................................................... 36

        A.      Avoided Costs Are Available under the DTSA ................................................... 36

        B.      Substantial Evidence Support's the Jury's DTSA Avoided Cost Award ............. 38

VII.    The Jury's Copyright and New York Trade-Secret Reasonable Royalty Awards
        Are Supported By Substantial Evidence ........................................................................ 39

        A.      Syntel's Disagreement with the Jury's Royalty Model Is a Basis for JMOL ....... 39

        B.      Mr. Britven's Opinion Is Proper and Supported by Substantial Evidence .......... 40

i

VIII.  The Jury Properly Awarded Punitive Damages .................................................. 41

    A.   The DTSA's Safeguards Ensure Punitive Damages Awards Are
Reasonable And Constitutional .................................................................. 42

    B.   The Second Circuit's Guideposts Confirm The Jury's Award Is
Reasonable And Constitutional .................................................................. 44

IX.  TRIZETTO'S REQUEST FOR INJUNCTIVE RELIEF ................................... 52

    A.   Syntel's Ongoing Misappropriation and Infringement Will Irreparably
Injure TriZetto and Remedies at Law are Inadequate to Compensate for
that Injury ................................................................................................. 52

    B.   The Balance of Hardships Favors Enjoining Syntel's Conduct ............................ 60

    C.   An Injunction is in the Public's Interest ............................................................. 61

    D.   A Worldwide Injunction is Necessary ................................................................ 61

    E.   If No Injunction is Granted, Syntel Should Pay Ongoing Royalties ................... 63

X.  Prejudgment Interest Should Be Awarded .......................................................... 63

XI.  Postjudgment Interest Should Be Awarded ....................................................... 65

CONCLUSION ................................................................................................................. 65

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abner v. Kansas City S. R.R. Co.*,
  513 F.3d 154 (5th Cir. 2008) ...............................................................................43

*Acumed LLC v. Stryker Corp.*,
  2007 WL 4180682 (D. Or. Nov. 20, 2007).............................................................56

*Advance Pharm., Inc. v. United States*,
  391 F.3d 377 (2d Cir. 2004)...............................................................................2, 22

*Alfred E. Mann Found. for Scientific Res. v. Cochlear Corp.*,
  2018 WL 6190604 (C.D. Cal. Nov. 4, 2018), *aff'd*, 798 F. App'x 643 (Fed.
  Cir. 2020) ............................................................................................................50

*Allam v. Meyers*,
  906 F. Supp. 2d 274 (S.D.N.Y. 2012)...............................................................42, 49

*Alsens Am. Portland Cement Works v. Degnon Contracting Co.*,
  222 N.Y. 34, 118 N.E. 210 (1917)........................................................................11

*Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*,
  2020 WL 5665065 (E.D.N.Y. Sept. 23, 2020) ................................................36, 39

*Anacomp, Inc. v. Shell Knob Servs., Inc.*,
  1994 WL 9681 (S.D.N.Y. Jan. 10, 1994) ..............................................................54

*Anderson Grp. LLC v. City of Saratoga Springs*,
  805 F.3d 34 (2d Cir. 2015)....................................................................................33

*Anderson v. Osborne*,
  2020 WL 6151249 (S.D.N.Y. Oct. 20, 2020) ........................................................45

*Arizona v. ASARCO LLC*,
  773 F.3d 1050 (9th Cir. 2014) (*en banc*) .........................................................43, 44

*Asa v. Pictometry Int'l Corp.*,
  757 F. Supp. 2d 238 (W.D.N.Y. 2010)...................................................................54

*Atlas Partners, LLC v. STMicroelecs., Int'l N.V.*,
  2015 WL 4940126 (S.D.N.Y. Aug. 10, 2015).........................................................8

*Autodesk, Inc. v. ZWCAD Software Co.*,
  2015 WL 2265479 (N.D. Cal. May 13, 2015).........................................................21

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assoc.*,
    No. 03-cv-00597, Dkt. No. 1047 (D. Ariz. Aug. 24, 2010)....................................................50

*Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*,
    448 F.3d 573 (2d Cir. 2006)...........................................................................................11

*Bianco v. Globus Med., Inc.*,
    2014 WL 1049067 (E.D. Tex. Mar. 17, 2014) ........................................................63

*Bladeroom Grp. Ltd. v. Emerson Elec. Co.*,
    331 F. Supp. 3d 977 (N.D. Cal. 2018) ........................................................... *passim*

*BMW of North America v. Gore*,
    517 U.S. 559 (1996)...........................................................................43, 47, 48, 49

*BNSF R. Co. v. U.S. Dep't of Labor*,
    816 F.3d 628 (10th Cir. 2016) ...............................................................................43

*Braun Inc. v. Optiva Corp.*,
    No. 98 CIV. 4070, 2000 WL 223840 (S.D.N.Y. Feb. 25, 2000)..............................36

*Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*,
    2013 WL 890126 (N.D. Cal. Jan. 23, 2013) ..........................................................58

*Cabral v. City of N.Y.*,
    2015 WL 4750675 (S.D.N.Y. Aug. 11, 2015)..........................................................2

*Calendar Research LLC v. StubHub, Inc.*,
    2020 WL 4390391 (C.D. Cal. May 13, 2020) .........................................................19

*Cash v. Cty. of Erie*,
    654 F.3d 324 (2d Cir. 2011)..................................................................2, 27, 29, 31

*Centripetal Networks, Inc. v. Cisco Sys., Inc.*,
    — F. Supp. 3d —, 2020 WL 5887916 (E.D. Va. Oct. 5, 2020) ..............................50

*Chadha v. Chadha*,
    2020 WL 1031385 (E.D.N.Y. Mar. 2, 2020).........................................................52

*Chanel, Inc. v. Bryan*,
    2008 WL 11336327 (N.D. Ga. Nov. 18, 2008) ......................................................60

*Choice Hotels Int'l Inc. v. Fultonville Hospitality Grp. Inc.*,
    2014 WL 12599390 (N.D.N.Y Mar. 10, 2014) ...............................................58, 60

*Chowdhury v. Worldtel Bangladesh Holding, Ltd.*,
    746 F.3d 42 (2d Cir. 2014)..............................................................................22, 23

*Citcon, USA, LLC v. RiverPay, Inc.*,
   2020 WL 5365980 (N.D. Cal. Sept. 8, 2020) ...........................................................49

*Complex Sys., Inc. v. ABN AMRO Bank N.V.*,
   2014 WL 1883474 (S.D.N.Y. May 9, 2014) .....................................................54, 55

*Comput. Assocs. Int'l v. Quest Software, Inc.*,
   333 F. Supp. 2d 688 (N.D. Ill. 2004) ......................................................................19

*Conseco Fin. Serv. v. N. Am. Mortg. Co.*,
   381 F.3d 811 (8th Cir. 2004) ..................................................................................47

*Cornell Univ. v. Hewlett-Packard Co.*,
   609 F. Supp. 2d 279 (N.D.N.Y. 2009) ....................................................................40

*Cush-Crawford v. Adchem Corp.*,
   271 F.3d 352 (2d Cir. 2001) ...........................................................................43, 48

*Dentsply Sirona, Inc. v. Dental Brands for Less LLC*,
   2020 WL 4038343 (S.D.N.Y. July 17, 2020) ..................................20, 27, 29, 30

*Deters v. Equifax Credit Info. Servs., Inc.*,
   202 F.3d 1262 (10th Cir. 2000) ..............................................................................43

*Diesel v. Town of Lewisboro*,
   232 F.3d 92 (2d Cir. 2000) .....................................................................................40

*Dish Network L.L.C. v. Cintron*,
   2013 WL 12385273 (M.D. Fla. Jan. 2, 2013) ........................................................56

*E.J. Brooks Co. v. Cambridge Sec. Seals*,
   105 N.E.3d 301 (N.Y. Ct. App. 2018) ....................................................................33

*E.J. Brooks Co. v. Cambridge Sec. Seals*,
   2015 WL 9704079 (S.D.N.Y. Dec. 23, 2015) .............................................. *passim*

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) ................................................................................................52

*Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*,
   2020 WL 6813872 (7th Cir. Nov. 30, 2020) ..........................................................51

*Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*,
   980 F.3d 1117 (7th Cir. 2020) .....................................................................35, 38, 51

*ExpertConnect, L.L.C. v. Fowler*,
   2019 WL 3004161 (S.D.N.Y. July 10, 2019) ..................................15, 16, 19, 20

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
   559 F.3d 110 (2d Cir. Mar. 9, 2009)....................................................57

*Farrior v. Waterford Bd. of Educ.*,
   277 F.3d 633 (2d Cir. 2002)..............................................................2

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
   2020 WL 3582029 (S.D.N.Y. July 1, 2020) ..........................................40

*In re FKF 3, LLC*,
   2018 WL 5292131 (S.D.N.Y. Oct. 24, 2018) ....................................64, 65

*Frommert v. Becker*,
   216 F. Supp. 3d 309 (W.D.N.Y. 2016) *aff'd*, 913 F.3d 101 (2d Cir. 2019) ..........65

*Garcia v. SigmaTron Int'l, Inc.*,
   842 F.3d 1010 (7th Cir. 2016) ...........................................................44

*Gierlinger v. Gleason*,
   160 F.3d 858 (2d Cir. 1998)..............................................................64

*GlobeRanger Corp. v. Software AG U.S of Am., Inc.*,
   836 F.3d 477 (5th Cir. 2016) .......................................................35, 37

*Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*,
   874 F.2d 431 (7th Cir. 1989) ...........................................................64

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
   481 F.3d 60 (2d Cir. 2007)...............................................................55

*Great Lakes Bus. Tr. v. M/T ORANGE SUN*,
   855 F. Supp. 2d 131 (S.D.N.Y. 2012), *aff'd*, 523 F. App'x 780 (2d Cir. 2013)........65

*Griffin v. United States*,
   502 U.S. 46 (1991)........................................................................22

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
   136 S. Ct. 1923 (2016)...................................................................50

*Harbor Software, Inc. v. Applied Sys., Inc.*,
   887 F. Supp. 86 (S.D.N.Y. 1995)........................................................20

*HarperCollins Publishers LLC v. Open Road Integrated Media, LLP*,
   58 F. Supp. 3d 380 (S.D.N.Y. 2014)....................................................61

*Holmes v. United States*,
   85 F.3d 956 (2d Cir. 1996)...........................................................7, 11

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*,
    2017 WL 4038884 (E.D. Tex. Sept. 13, 2017) .......................................................63

*Integrated Cash Mgmt. Servs., Inc. v. Dig. Transactions, Inc.*,
    920 F.2d 171 (2d Cir. 1990)........................................................................................20

*Intertek Testing Servs. v. Pennisi*,
    443 F. Supp. 3d 303 (E.D.N.Y. 2020) .......................................................................61

*Ismail v. Cohen*,
    899 F.2d 183 (2d Cir. 1990)..........................................................................................3

*Jones v. Treubig*,
    963 F.3d 214 (2d Cir. 2020)..........................................................................................2

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*,
    2020 WL 2844410 (C.D. Cal. Apr. 2, 2020) ............................................................50

*KAIST IP US LLC v. Samsung Elecs. Co., Ltd.*,
    No. 2:16-cv-01314, Dkt. No. 678 (E.D. Tex. Feb. 21, 2020) ...................................50

*KCG Holdings Inc. v. Khandekar*,
    2020 WL 1189302 (S.D.N.Y. Mar. 12, 2020) ........................................3, 19, 53, 57

*King v. GEICO Indem. Co.*,
    712 F. App'x 649 (9th Cir. 2017) ..............................................................................47

*Koch v. Greenberg*,
    14 F. Supp. 3d 247 (S.D.N.Y. 2014), *aff'd*, 626 F. App'x 335 (2d Cir. 2015).......................63

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
    274 F.3d 706 (2d Cir. 2001)................................................................................12, 13

*LinkCo, Inc. v. Fujitsu Ltd.*,
    230 F. Supp. 2d 492 (S.D.N.Y. 2002).......................................................................37

*LinkCo, Inc. v. Fujitsu Ltd.*,
    232 F. Supp. 2d 182 (S.D.N.Y. 2002).......................................................................63

*Live Face On Web, LLC v. Integrity Sols. Grp., Inc.*,
    421 F. Supp. 3d 1051 (D. Colo. 2019).......................................................................65

*LivePerson, Inc. v. [24]7.ai, Inc.*,
    2018 WL 5849025 (N.D. Cal. Nov. 7, 2018) ............................................... *passim*

*Lompe v. Sunridge Partners, LLC*,
    818 F.3d 1041 ............................................................................................................47

*Lore v. City of Syracuse*,
  670 F.3d 127 (2d Cir. 2012) ............................................................3, 7, 11

*MacQuesten Gen. Contracting, Inc. v. HCE, Inc.*,
  2002 WL 31388716 (S.D.N.Y. Oct. 22, 2002) ......................................25

*Marfia v. T.C. Ziraat Bankasi*,
  147 F.3d 83 (2d Cir. 1998), *modified on other grounds*, 271 F.3d 81 (2d Cir.
  2001) ....................................................................................................63

*Mason Tenders Dist. Council Welfare Fund v. LJC Dismantling Corp.*,
  400 F. Supp. 3d 7 (S.D.N.Y. 2019) ......................................................11

*Mastrovincenzo v. City of N.Y.*,
  435 F.3d 78 (2d Cir. 2006) ...............................................................6, 8

*Member Servs., Inc. v. Sec. Mut. Life Ins. Co. of N.Y.*,
  2010 WL 3907489 (N.D.N.Y. Sept. 30, 2010) ......................................49

*Merck Eprova AG v. Gnosis S.p.A.*,
  760 F.3d 247 (2d Cir. 2014) .................................................................55

*Minnesota Mining & Mfg. Co. v. Pribyl*,
  259 F.3d 587 (7th Cir. 2001) .....................................................17, 19, 20

*Motorola Credit Corp. v. Uzan*,
  509 F.3d 74 (2d Cir. 2007) ..........................................................42, 44, 45

*Motorola Sols., Inc. v. Hytera Commc'ns Corp.*,
  2020 WL 6554645 (N.D. Ill. Oct. 19, 2020) .............................32, 38, 48, 50

*Motorola, Inc. v. Lemko Corp.*,
  2012 WL 74319 (N.D. Ill. Jan. 10, 2012) .........................................17, 19

*Netlist Inc v. Diablo Techs. Inc.*,
  2015 WL 153724 (N.D. Cal. Jan. 12, 2015) ...........................................58

*Northpoint Tech., Ltd. v. MDS Am., Inc.*,
  413 F.3d 1301 (Fed. Cir. 2005) .............................................................23

*Olaf Soot Design, LLC v. Daktronics, Inc.*,
  406 F. Supp. 3d 328 (S.D.N.Y. 2019) .....................................................2

*OmniGen Research, LLC v. Yongqiang Wang*,
  2017 WL 5505041 (D. Or. Nov. 16, 2017) .............................................61

*Payne v. Jones*,
  711 F.3d 85 (2d Cir. 2013) ...................................................................50

*PaySys, Int'l, Inc. v. Atos Se*,
    2016 WL 7116132 (S.D.N.Y. Dec. 5, 2016) .......................................................................19

*Peerless Indus., Inc. v. Crimson AV LLC*,
    2015 WL 1275908 (N.D. Ill. Mar. 17, 2015)............................................................17, 19, 20

*Piroscafo v. Metro-N. Commuter R. Co.*,
    552 F. App'x 6 (2d Cir. 2013) ......................................................................................36

*Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*,
    422 F.3d 949 (9th Cir. 2005) .......................................................................................49

*Q-CO Indus., Inc. v. Hoffman*,
    625 F. Supp. 608 (S.D.N.Y. 1985)..............................................................................24

*Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*,
    272 F.3d 1335 (Fed. Cir. 2001)...................................................................................48

*Richard Feiner & Co. v. Turner Entm't Co.*,
    1998 WL 78180 (S.D.N.Y. Feb. 24, 1998)..................................................................61

*Robocast, Inc. v. Microsoft Corp.*,
    2014 WL 350062 (D. Del. Jan. 29, 2014)...................................................................41

*Romano v. U-Haul Int'l*,
    233 F.3d 655 (1st Cir. 2000)........................................................................................49

*S.E.C. v. Drexel Burnham Lambert Inc.*,
    837 F. Supp. 587 (S.D.N.Y. 1993), *aff'd*, 16 F.3d 520 (2d Cir. 1994)......................64

*S.E.C. v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)......................................................................................65

*S.E.C. v. Lipkin*,
    2006 WL 435035 (E.D.N.Y. Jan. 9, 2006) .................................................................65

*Shred-It USA, Inc. v. Mobile Data Shred, Inc.*,
    228 F. Supp. 2d 455 (S.D.N.Y. 2002), *aff'd*, 92 F. App'x 812 (2d Cir. 2004)........59

*Softel, Inc. v. Dragon Med. and Sci. Comm'ns, Inc.*,
    118 F.3d 955 (2d Cir. 1997)....................................................................................37, 40

*Sooroojballie v. Port Authority of N.Y. & N.J.*,
    816 F. App'x 536 (2d Cir. 2020) .................................................................................42

*Sowemimo v. D.A.O.R. Sec., Inc.*,
    2000 WL 546439 (S.D.N.Y. May 4, 2000) *aff'd*, 1 F. App'x 82 (2d Cir. 2001) ...36, 39, 40, 41

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003)................................................................................................. *passim*

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
  2018 WL 2172502 (E.D. Va. May 10, 2018) .........................................................32

*Taylor v. Metro. Transp. Auth.*,
  2019 WL 7283273 (S.D.N.Y. Dec. 27, 2019) .........................................................2

*Telcordia Techs., Inc. v. Cisco Sys., Inc.*,
  2014 WL 1457797 (D. Del. Apr. 14, 2014).............................................................63

*Thomas v. iStar Fin., Inc.*,
  652 F.3d 141 (2d Cir. 2011).......................................................................................2

*Ticor Title Ins. Co. v. Cohen*,
  173 F.3d 63 (2d Cir. 1999).........................................................................................57

*Toll Bros., Inc. v. Lin*,
  2009 WL 102848 (N.D. Cal. Jan. 14, 2009) ..............................................................8

*Trident Int'l Ltd. v. Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc.*,
  2008 WL 2909389 (S.D.N.Y. July 24, 2008) ............................................................8

*Trustees of the Local 813 I.B.T. Ins. Tr. Fund v. Chinatown Carting Corp.*,
  2008 WL 5111108 (E.D.N.Y. Dec. 4, 2008) ...........................................................65

*TXO Prod. Corp. v. Alliance Res. Corp.*,
  509 U.S. 443 (1993)............................................................................................47, 51

*U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*,
  2019 WL 9511402 (S.D.N.Y. Sept. 16, 2019), *aff'd*, 826 F. App'x 115 (2d
  Cir. 2020) ..................................................................................................................6

*U.S. Philips Corp. v. Iwasaki Elec. Co.*,
  607 F. Supp. 2d 470 (S.D.N.Y. 2009)......................................................................65

*United States v. Salameh*,
  152 F.3d 88 (2d Cir. 1998)........................................................................................24

*United States v. Salmonese*,
  352 F.3d 608 (2d Cir. 2003)......................................................................................22

*Univ. Comput . Co.* v. *Lykes-Youngstown Corp.*,
  504 F.2d 518 (5th Cir. 1974) ....................................................................................37

*Update Art, Inc. v. Modiin Pub., Ltd.*,
  843 F.2d 67 (2d Cir. 1988)........................................................................................62

*Vaporstream, Inc. v. Snap Inc.*,
    2020 WL 2543814 (C.D. Cal. Jan. 10, 2020) ........................................................41

*VIA Techs., Inc. v. ASUS Comput. Int'l*,
    2017 WL 3051048 (N.D. Cal. July 19, 2017)......................................................32

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)............................................................................41

*Warner Bros. Entm't Inc. v. RDR Books*,
    575 F. Supp. 2d 513 (S.D.N.Y. 2008)............................................................53, 60

*Warren v. Pataki*,
    823 F.3d 125 (2d Cir. 2016)....................................................................................2

*Waterside Ocean Nav. Co. v. Int'l Nav. Ltd.*,
    737 F.2d 150 (2d Cir. 1984)..................................................................................63

*WesternGeco LLC v. ION Geophysical Corp.*,
    138 S. Ct. 2129 (2018)..........................................................................................62

*Wickham Contracting Co. v. Local Union No. 3*,
    955 F.2d 831 (2d Cir. 1992)..................................................................................64

*WPIX, Inc. v. ivi, Inc.*,
    691 F.3d 275 (2d Cir. 2012)..................................................................................60

*Yung v. Grant Thornton, LLP*,
    563 S.W.3d 22 (Ky. 2018)..............................................................................45, 47

*Zhang v. Am. Gem Seafoods, Inc.*,
    339 F.3d 1020 (9th Cir. 2003) ...............................................................................7

**Statutes**

17 U.S.C. § 101...............................................................................................................52

17 U.S.C. § 502...............................................................................................................52

18 U.S.C. § 1836 ...................................................................................................... *passim*

18 U.S.C. § 1837...............................................................................................................62

26 U.S.C. § 6621...............................................................................................................65

28 U.S.C. § 1961...............................................................................................................65

35 U.S.C. § 284...............................................................................................................50

Cal. Civ. Code § 3426.3 ..................................................................................................49

**Rules**

Fed. R. Civ. P. 61 ....................................................................................................22, 23

N.Y. C.P.L.R. § 5001 .....................................................................................................63

N.Y. C.P.L.R. § 5004 .....................................................................................................63

**Other Authorities**

162 Cong. Rec. S1629-02 (daily ed. Apr. 4, 2016) (statement of Sen. Orrin Hatch) ...................64

H.R. Rep No. 114-529 ....................................................................................................64

## INTRODUCTION

Syntel does not deny that it used more than a hundred TriZetto trade secrets for years after terminating its relationship with TriZetto—including to build competing technologies that it falsely told customers were "proprietary" to Syntel—or that it repeatedly lied about and attempted to cover up that use during the nearly six years since it filed this lawsuit seeking over $6 billion in punitive damages from TriZetto based on claims that the jury entirely rejected.  Instead, Syntel asks this Court to overturn the jury's verdict by arguing that Syntel was "authorized" to take TriZetto's trade secrets (for "free," no less, according to Syntel), that TriZetto "waived" its intellectual property rights or is "estopped" from protecting those rights, and that TriZetto did not sufficiently identify the 104 trade secrets that Syntel stole.  And Syntel asks the Court to reduce the $854,565,576 in damages awarded by the jury by arguing that the Court should reconsider its previous decision that avoided cost damages are available here under the DTSA and that Syntel's theft and deceit is not as bad as some others who have misappropriated trade secrets and lied to cover it up.  Even after the jury's verdict, Syntel still refuses to acknowledge the true nature and extent of its brazen illegal conduct—insisting despite all the contrary evidence that its theft was just "vigorous completion [sic] in the marketplace," JMOL at 33—or to take responsibility for its unlawful actions.  The jury found in TriZetto's favor on every disputed issue in the case after listening to almost a dozen witnesses and considering hundreds of documents chronicling Syntel's unlawful actions.  Syntel tries to overturn the verdict by challenging almost every aspect of the jury's decision, raising six issues (and more sub-issues) in its post-trial brief.  As explained below, none has merit.  Rather than grant Syntel's motion, the Court should enter a permanent injunction and award TriZetto pre- and post-judgment interest.

## LEGAL STANDARD

Judgment as a matter of law is appropriate only if "a reasonable juror would have been

*compelled* to" rule in Syntel's favor. *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (emphasis in original). This is a demanding standard, "met only in rare occasions." *Taylor v. Metro. Transp. Auth.*, 2019 WL 7283273, at *1 (S.D.N.Y. Dec. 27, 2019). Syntel must show "a complete absence of evidence supporting the verdict" or such "overwhelming" evidence that "reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Warren v. Pataki*, 823 F.3d 125, 139 (2d Cir. 2016). In considering whether Syntel's arguments meet that standard, the Court must give TriZetto "the benefit of all reasonable inferences that the jury might have drawn in [its] favor from the evidence," *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020), and may not "weigh evidence, assess credibility, or substitute its opinion of the facts for that of the jury." *Olaf Soot Design, LLC v. Daktronics, Inc.*, 406 F. Supp. 3d 328, 336 (S.D.N.Y. 2019)

A motion for a new trial should not be granted unless a district court "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Olaf Soot*, 406 F. Supp. 3d at 337; *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002). Separately, the general verdict rule does not require a new trial where the jury could have based its verdict on multiple grounds as long as there is sufficient evidence to support at least one of those grounds. *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 391 (2d Cir. 2004).

As an alternative to a new trial, a court may order a conditional remittitur, "giv[ing] the plaintiff the choice of voluntarily remitting his award to a set lesser amount in lieu of a new trial." *Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 146 (2d Cir. 2011). Courts may not "unilaterally reduce" compensatory or punitive damages "awards that are excessive," and must give the defendant the option of a new trial even where a punitive damages award is constitutionally excessive. *Id.*; *Cabral v. City of N.Y.*, 2015 WL 4750675, at *6 (S.D.N.Y. Aug. 11, 2015). Nor should courts lightly disturb a damages verdict. "It is well settled that calculation of damages is the province of

the jury." *Ismail v. Cohen,* 899 F.2d 183, 186 (2d Cir. 1990). Remittitur is thus reserved for circumstances where the damages award "is so high as to shock the judicial conscience and constitute a denial of justice." *Lore v. City of Syracuse*, 670 F.3d 127, 177 (2d Cir. 2012).

## ARGUMENT

## I.   THE AMENDMENT TO THE MSA DID NOT AUTHORIZE SYNTEL'S MISAPPROPRIATION

For the first time in this case, after six years of litigation and a full trial on the merits, Syntel asserts that its 2012 Amendment to the 2010 MSA obviates all of TriZetto's claims as a matter of contract interpretation. But Syntel never before raised this position in a motion to the Court—not at summary judgment, motions *in limine*, or at any other point in time. Indeed, far from arguing this position, Syntel's witnesses have expressly contradicted it: during the course of this litigation, Syntel's General Counsel, Dan Moore, acknowledged that "Syntel ***has not*** taken the position that the amendment marked as Exhibit [PTX-162] permits it to use [TriZetto]'s confidential information to build competing products or services." Tr. 630:15-24. Even after Syntel apparently decided to change its mind about the contracts at issue, Syntel ***still*** was content to present this (now-allegedly legal) issue to the ***jury*** for decision, complete with jury instructions on how to resolve the myriad related factual issues. As such, Syntel's request for judgment as a matter of law based on this new theory is unequivocally waived. Moreover, Syntel's interpretation is incorrect and unsupported. Syntel offers its new theory for one reason: it lost on every claim at trial on the facts, and is still looking for a way out.[1]

---

[1] Notably, Syntel's "authorization" argument fails at the outset, because it is premised on the incorrect assertion that it can only be found liable under the "unauthorized use" prong of the DTSA—not the "acquisition by improper means" prong—because there is purportedly no evidence that Syntel acquired any trade secrets improperly. JMOL at 5. That premise is incorrect. Although the evidence at trial clearly established that Syntel misappropriated TriZetto's trade secrets through unauthorized use, its actions further constituted misappropriation by acquisition through improper means. *See KCG Holdings Inc. v. Khandekar,* 2020 WL 1189302, at *10 (S.D.N.Y. Mar. 12, 2020) (defendant violated the DTSA by improper acquisition when he downloaded and copied files into his own directory in violation of his employment agreement, which only authorized him access to perform his job duties for employer.).

## A.      Syntel's Position On The MSA And Amendment Are Incorrect And Contrary To The Facts Adduced At Trial

Syntel's argument faces serious obstacles from the get-go.  It is uncontested that Syntel's position on the 2012 Amendment—*i.e.,* that it allowed Syntel to freely use TriZetto's trade secrets against TriZetto in competition—is not supported by any express provision in the Amendment.  PTX-162.  There also is no dispute that the Amendment left intact Section 19.01, which protects the confidentiality of TriZetto's trade secrets and prevents Syntel from using TriZetto's trade secrets without TriZetto's prior consent.  Dkt. 960 ("JMOL") at 8, n.2.  Faced with these dispositive facts, Syntel takes a run at revisionist history by attempting to posit, out of innuendo and hidden meaning, that TriZetto gave Syntel (a competitor for Facets-related services) a blanket license to use all of the trade secrets that TriZetto spent many years and hundreds of millions of dollars developing.  Syntel ***first*** contends that the 2012 Amendment ***implicitly*** changed the definition of "Services"—which, in the 2010 MSA are the services Syntel ***agreed to provide for TriZetto,*** in exchange for ***payment from TriZetto***—to now include services ***in direct competition with TriZetto***.  But since that ***still*** would not provide Syntel with rights to TriZetto's trade secrets as part of that competition, Syntel takes it a step further, contending that this implicit change to the definition of "Services" somehow means that TriZetto unequivocally consented to Syntel's use of TriZetto's trade secrets.  JMOL at 7-8.  Syntel arrives at this highly dubious conclusion, despite every trial witness questioned on this subject on both sides confirming that Syntel never had such rights.  *See, e.g.*, Tr. 514:11-17 (Syntel's lead trial witness, Murli Reddy, unequivocally admitting that such an interpretation would be "flat wrong.").  Syntel's position finds no support in the evidence and its belated legal argument is incorrect.

First, the 2012 Amendment does not refer to any changes to the confidentiality provisions in the 2010 MSA.  *See generally* PTX-162.  That is significant because Syntel admits that the

relevant confidentiality provisions in the 2010 MSA—*i.e.*, Sections 13.01 and 19.01—prohibit Syntel from using TriZetto's trade secrets.  JMOL at 7-8.  Furthermore, the Amendment did not change the definition of "Services" nor indicate that TriZetto consented to Syntel's use of its trade secrets under Section 19.01—two necessary steps of Syntel's analysis to arrive at its conclusion.

Second, such an implied change to the definition of "Services" is inconsistent with the Amendment's actual changes to the contract language.  While the Amendment includes numerous edits to specific provisions in the MSA—including specific deletions to certain of the MSA's definitions—it is silent on the definition of "Services."  *See* PTX-162.  In fact, while the Amendment ***does*** state that the non-competition provision (Section 29.17) and any other "related" provisions are deleted, it specifically identifies the definitions that are impacted by that change— *i.e.,* "Noncompetition Services," "Restricted Period," and "TriZetto Products." *Id.* at 2. It does not reference the definition of "Services" at all.  The Amendment merely allowed Syntel to compete with TriZetto and thus put it on equal footing with other TriZetto competitors, none of whom had a license to use TriZetto's trade secrets to compete with TriZetto.  *See* Tr. 215:3-6, 387:1-13.

Syntel's assertions concerning the definition of "Services" are inconsistent with other aspects of the MSA.  To start, the MSA's payment provisions—where TriZetto agreed to pay Syntel—apply to "Services" provided by the "Service Provider" (*i.e.*, Syntel Mauritius).[2]  DTX-1.0046 (Section 16.01 "Designated Fees"). Obviously, TriZetto was not agreeing to pay for Syntel's provision of services that compete with TriZetto, as Syntel's interpretation would require. Similarly, with respect to all "Services," Syntel must provide hourly, daily, weekly, bi-weekly, monthly, and quarterly reports to TriZetto, which include tracking against project plans, estimates, budgets, and staff recruitment and retention—items that would not make sense if "Services"

---

[2] "Designated Fees" are "fees for the Designated Services," DTX-1.0012, and "Services" include "the Designated Services." DTX-1.0017.

included competing services. *See* DTX-1.0025 (Section 3.12); *see also* DTX-1.0390-426.

Moreover, the MSA defines "Service Delivery Organization" as "the personnel of Service Provider

[*i.e.*, Syntel Mauritius] and Service Provider Agents who provide **the Services**," DTX-1.0015

(emphasis added), and requires that "**[a]ll** members of the Service Delivery Organization shall be

dedicated on a **full time basis to the TriZetto account.**" *Id.* at 1.0038 (emphasis added).  Thus,

"Services" cannot encompass Syntel's competitive efforts, because everyone performing

"Services" must be dedicated full time to TriZetto's account, not that of UHG or another Syntel

customer.[3]   At bottom, Syntel's interpretation produces an absurd result that cannot possibly be

correct.  *Mastrovincenzo v. City of N.Y.*, 435 F.3d 78, 104 (2d Cir. 2006) ("absurd results should

be avoided") (citation omitted); *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, 2019 WL

9511402, at *13 (S.D.N.Y. Sept. 16, 2019) (similar), *aff'd*, 826 F. App'x 115 (2d Cir. 2020).

 Third, Syntel's strained reading is also inconsistent with the testimony of every witness

who was questioned on this subject.  Mr. Reddy, Syntel's lead witness, admitted that it would be

"flat wrong" to assert that it was "okay for you to use TriZetto's trade secrets to compete against

TriZetto." Tr. 514:11-17.  He further agreed that "when Syntel was competing against TriZetto,

Syntel was not allowed to use TriZetto's proprietary, confidential, trade secret or copyrighted

information in that effort." *Id.* 515:1-516:1; *see also id.* 517:7-13.  Likewise, Mr. Moore confirmed

the same in pre-suit correspondence and again at trial.  *See* PTX-753 (December 2014 letter to

TriZetto's General Counsel stating that "Syntel maintains and will continue to maintain its

confidentiality obligations."); Tr. 630:12-24 (confirming that "Syntel has not taken the position

---

[3] Other provisions would make no sense under Syntel's theory. *E.g.,* DTX-1.0364 (Syntel's competitive work would have to be performed at TriZetto approved locations); DTX-1.0041 (Syntel would be required to "deliver to TriZetto, for TriZetto's approval, a policy, process and procedures manual that describes how the [competitive] Services are to be performed"); DTX-1.0050 (Syntel would have to give TriZetto "a quality assurance policy and procedures manual that describes quality and assurance controls to be developed and implemented" for its competitive offerings); *see also* DTX-1.0381–382 (Governance Roles and Responsibilities Matrix delineating 39 of Syntel's and TriZetto's obligations to each other).

that the amendment marked as Exhibit 3 permits it to use [TriZetto's] confidential information to build competing products or services."). Mike Noonan, Vice President of Software Engineering for Facets Development, and Chuck Sanders, Vice President and Head of Strategic Alliances for TriZetto, confirmed this as well. Tr. 77:16-19 (Mr. Noonan confirming that he is not "aware of anyone at TriZetto or Cognizant who ever told or even implied to Syntel that Syntel could use [TriZetto's] trade secrets for any purpose that it would like"); Tr. 150:14-20 (Mr. Noonan disagreeing on cross "that after the date of this amendment, it would not be unauthorized if Syntel was competing with TriZetto"); Tr. 194:12-15 (Mr. Sanders confirming that Mr. Moore never said "that he believed that there were no confidentiality obligations because of an amendment in 2012"); *see also* Tr. 215:7-16. ***No one*** testified that he or she believed the Amendment allowed Syntel to use TriZetto's trade secrets to compete with TriZetto. Unable to rebut these undisputed facts, Syntel attempts to wash them away by claiming the Amendment is "unambiguous" in permitting Syntel's use of TriZetto's trade secrets to compete against it. JMOL at 9. But Syntel never presented this argument to the Court before now. Indeed, Syntel did not even present this new theory in its Rule 50(a) motion filed before the jury reached its verdict. To the contrary, Syntel argued that "TriZetto cannot meet its burden to show Syntel lacked TriZetto's consent to use its 102 alleged trade secrets." Dkt. 922 at 8. As such, Syntel has waived its new contract interpretation argument. *See Holmes v. United States*, 85 F.3d 956, 963 (2d Cir. 1996) (denying Rule 50(b) motion because the "issue was not mentioned in the government's Rule 50(a) motion"); *Lore*, 670 F.3d at 153 (denying Rule 50(b) motion where defendant's "50(a) motions requested JMOL on the ground of lack of evidence … [b]ut there was no argument in either of the [defendant]'s Rule 50(a) motions that reputational damages were unavailable as a matter of law" and therefore were insufficient to preserve this argument); *see also Zhang v. Am. Gem Seafoods,*

*Inc.*, 339 F.3d 1020, 1028-29 (9th Cir. 2003).  In any event, Syntel's unsupported claim that its interpretation is unambiguous is not enough to trump the contract's express language and witness testimony supporting it.  *Mastrovincenzo*, 435 F.3d at 104 ("Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them …."); *Atlas Partners, LLC v. STMicroelecs., Int'l N.V.*, 2015 WL 4940126, at *11 (S.D.N.Y. Aug. 10, 2015) ("Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation … .").

Fourth, Syntel's position requires the resolution of fact questions that the jury decided against it.  Specifically, whether TriZetto gave Syntel its "consent" to use its trade secrets under Section 19.01 is a quintessential fact issue.  *See Trident Int'l Ltd. v. Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc.*, 2008 WL 2909389, at *4 (S.D.N.Y. July 24, 2008) ("prior written consent" "is for a fact-finder to decide"); *Toll Bros., Inc. v. Lin*, 2009 WL 102848, at *3 (N.D. Cal. Jan. 14, 2009) (finding issues of fact existed regarding "prior written consent").  Indeed, Syntel previously acknowledged as much.  The Parties' ***joint*** proposed jury instructions defined "consent" and instructed the jury to decide whether "Syntel, without TriZetto's express or implied consent, … disclosed or used the trade secret.…"  Dkt. 903 at 10-11; *see also* Tr. 849:19-22; Dkt. 935-13 at 11-12; Dkt. 646-2 at 11; Tr. 920:14-18.

The jury resolved this factual dispute in TriZetto's favor based on substantial evidence. For example, Mr. Reddy testified that he—the lead person responsible for providing the "Services" for TriZetto—was "not aware" of any evidence that TriZetto had "give[n] Syntel permission to [use] its confidential information for any other purpose," *i.e.*, outside of work ***for TriZetto.***  Tr. 517:7-13.  Indeed, Syntel knew that it needed, but had not received, express consent from TriZetto, specifically commenting in September 2014 that TriZetto still could "refuse to sign [the Third

Party Access Agreement],” thereby denying Syntel permission to access and use TriZetto’s trade secrets to service third parties.[4]  PTX-143 at 4; *see also* Tr. 243:22-244:8 (Mr. Sanders explaining that TPAAs were required for third parties to access TriZetto’s confidential information to perform work directly for TriZetto customers); Tr. at 370:19-23 (Dr. Bergeron explaining the same).

Syntel’s remaining arguments are likewise unavailing.  Syntel contends that the CDPHP TPAA “confirms” its interpretation of the 2012 Amendment, that is not correct.  Quite to the contrary, the primary purpose of a TPAA is to allow TriZetto to grant third parties such as Syntel “access” to TriZetto trade secrets for limited approved uses when TriZetto deems it appropriate, such as to perform work directly for TriZetto customers on a specific project.  Tr. 243:22-244:8, 370:19-23.  As the CDPHP TPAA states: “if Company [*i.e.*, Syntel] obtains TriZetto Confidential Information and/or TriZetto IP ... *from* [CDPHP], which the parties acknowledge may be provided to Company for purposes of Company performing” any of four enumerated services, then “such Confidential Information and TriZetto IP shall be treated as having been obtained by Company from TriZetto under the [MSA]....”  PTX-838 at 1 (emphasis added).  This reflects a limited consent with respect to CDPHP only.  If anything, the fact that Syntel sought a TPAA after the Amendment shows that Syntel itself never interpreted the Amendment as providing consent.

Faced with this reality, Syntel again resorts to revisionist history, claiming the TPAA’s use of “acknowledge” meant the parties agreed that Syntel ***already had*** lawful access to TriZetto’s trade secrets to compete with TriZetto “by virtue of the 2012 Amendment.”  JMOL at 8.  But that would mean the TPAA had no purpose.  Instead, the use of the word “acknowledge” simply referred to the parties’ acknowledgment that information will be provided pursuant to the TPAA’s

---

[4] As discussed above, the jury also heard evidence that after TriZetto notified Syntel of potential breaches of Syntel’s confidentiality obligations under the MSA.  Mr. Moore represented that “Syntel maintains and will continue to maintain its confidentiality obligations.” PTX-753.

terms.  PTX-838 at 1.   At best, this is a fact question the jury resolved in TriZetto's favor.

Syntel also asserts that the purpose of Section 29.17 was "to prevent any misuse or disclosure of Confidential Information," but it is undisputed that the removal of Section 29.17 did not permit any such "misuse or disclosure."  While Section 29.17 refers to restricting Syntel from offering certain products and services outside the MSA, it also restricted Syntel from competing with TriZetto at all. DTX-1.0071. Removing that restriction allowed Syntel to bid on competing work; it did not allow Syntel to use TriZetto's trade secrets without further permission.

Finally, Syntel asserts that the Amendment permitted Syntel to use TriZetto's trade secrets to compete against TriZetto because such use of the trade secrets was necessary.  *See* JMOL at 9 (citing Tr. 305:21-307:3).  Nonsense.  Dr. Bergeron's testimony that some of the trade secrets were necessary for a certain Facets upgrade does not justify Syntel's misappropriation, especially considering that Syntel clearly knew it did not have permission to use TriZetto's trade secrets.  *See* Tr. 514:11-17, 515:23-516:1, 517:7-13, 630:12-24; PTX-753; PTX-143 at 4; PTX-838 at 1. Moreover, undisputed testimony established that Syntel could compete without using TriZetto's trade secrets, just as multiple other service providers had done.  *See* Tr. 387:1-13 (Mr. Britven testifying that TriZetto had competition from "multiple players" for "less complex" and "low-end" consulting work); Tr. 215:3-6 (Mr. Sanders testifying that the Amendment "gave Syntel the ability to do things like consulting services, or business process reengineering").  Even for the limited category of work that required use of certain TriZetto trade secrets, Syntel had available options other than misappropriation—including seeking a TPAA, as it did for CDPHP.  The Amendment was not "meaningless," JMOL at 9, it allowed Syntel to both work for and compete with TriZetto, which was not possible before the Amendment.

## II.    TRIZETTO NEITHER WAIVED NOR IS ESTOPPED FROM ITS TRADE SECRET MISAPPROPRIATION AND COPYRIGHT INFRINGEMENT CLAIMS

The "parties … consented to present [waiver and estoppel] to the jury for binding verdict." Dkt. 935-12 at 38 n.71. The evidence overwhelmingly supports the jury's verdict in TriZetto's favor on each issue and Syntel does not come close to meeting its burden of proving otherwise. Syntel also did not address waiver or estoppel in its Rule 50(a) motion and has waived each argument.  *Holmes*, 85 F.3d at 963; *Lore*, 670 F.3d at 152. And even if Syntel could establish waiver or estoppel, the jury's finding of unclean hands precludes these equitable defenses.

### A.      TriZetto Never Waived its Right to Sue

Syntel's waiver argument attempts to stretch the 2012 Amendment even further, claiming it amounts to an "express agreement" waiving TriZetto's right to sue Syntel for trade secret misappropriation and copyright infringement.  That is simply wrong.  Indeed, Syntel identifies no "express" statement by TriZetto relinquishing its rights to protect its intellectual property against Syntel's theft.  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 585 (2d Cir. 2006) ("[T]he defense of waiver requires a clear manifestation of an intent by plaintiff to relinquish her known right….") (internal quotation marks omitted).[5]  Instead, Syntel merely relies on the same arguments it advanced in connection with its failed authorization argument—*i.e.*, that TriZetto consented to Syntel's misappropriation because Syntel needed TriZetto's trade secrets to compete and the CDPHP TPAA "acknowledged" that Syntel was "authorized" to use TriZetto's trade secrets.  Those arguments are incorrect and do not amount to TriZetto's authorization of Syntel's misappropriation, much less an express waiver of its legal rights.  *See supra* Section I.A.

---

[5] Syntel's own cited cases confirm that TriZetto did not expressly waive its rights to sue Syntel for misappropriation and infringement.  *See Mason Tenders Dist. Council Welfare Fund v. LJC Dismantling Corp.*, 400 F. Supp. 3d 7, 18–19 (S.D.N.Y. 2019) (defendant waived its right to contest certain findings after it had explicitly "***stipulated that it did 'not dispute' any of the findings***."); *Alsens Am. Portland Cement Works v. Degnon Contracting Co.*, 222 N.Y. 34, 37, 118 N.E. 210 (1917) (reversing directed verdict on waiver and explaining that express waiver "[o]ccasionally [] is proved by ***the express declaration*** of the party…").  Here, TriZetto made no stipulation or declaration forgoing its rights and the jury correctly found that TriZetto's actions did not amount to waiver.

These arguments certainly do not warrant undoing the jury's finding of no waiver of either of TriZetto's trade secret claims or its copyright claim, Dkt. 931 at 7, which Syntel previously agreed were properly issues for the jury.  Tr. 669:21-22.  As demonstrated at trial, TriZetto consistently took extensive measures to protect its trade secrets and limit access to such trade secrets.  Tr. 170:2-173:17, 69:5-70:14; DTX-523; DTX-526; DTX-1320; DTX-527; DTX-1340-41.  Both sides' witnesses also repeatedly confirmed that Syntel was required to abide by its confidentiality obligations. Tr. 215:7-16, 517:7-13, 630:15-24.  There is simply no evidence that TriZetto ever intended to give up those rights.  Nor would it make any sense for TriZetto to do so. Indeed, the evidence adduced at trial shows that TriZetto was not aware of the misappropriation for years while it was happening because, among other reasons, Syntel concealed its theft by relabeling TriZetto's trade secrets as its own in internal technical documents and confidential responses to customer requests for proposals.  Tr. 280:15-281:10, 276:22-278:7, 301:18-302:8, 369:16-20, 576:9-583:24; DTX-36; DTX-41; DTX-1162; DTX-89; DTX-90; DTX-78; DTX-15. Moreover, as soon as TriZetto became aware of facts suggesting misappropriation, it raised those issues to Syntel in November 2014, and filed its counterclaims shortly thereafter.  Nothing in the record supports waiver, and the jury's verdict is supported by substantial evidence.

### B.    Estoppel Does Not Apply To TriZetto's Claims

The jury's verdict rejecting Syntel's estoppel defense is also supported by substantial evidence.  *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001). (equitable estoppel "is ultimately a question of fact.").  Syntel's argument—that estoppel applies because TriZetto signed the CDPHP TPAA years before accusing Syntel of trade secret misappropriation and never "alert[ed]" Syntel of its unauthorized use—is unavailing.  Syntel failed to establish any of the three elements for estoppel, *see id.*, and it therefore cannot come close to showing that the jury's findings on this defense should be overturned.

12

First, TriZetto did not misrepresent or conceal anything from Syntel, which is required to prove estoppel. *Id.* Syntel relies on the CDPHP TPAA, and Mr. Reddy's uncorroborated testimony that TriZetto congratulated Syntel on getting **the CDPHP work,** as evidence that TriZetto somehow misrepresented that Syntel could use its trade secrets **for other work.** JMOL at 11. More nonsense. If anything, the TPAA shows that Syntel **was required** to obtain explicit written permission from TriZetto before it could obtain specific trade secrets from a specific customer for specific work. *See Supra* § I.A. Far from a misrepresentation, the fact that TriZetto required the TPAA confirmed that although the 2012 Amendment removed restrictions on Syntel's ability to compete, Syntel was **not** authorized to use TriZetto's trade secrets to do so.

Second, Syntel's assertion that TriZetto concealed its claims by not accusing Syntel of misappropriation until "[y]ears later" is also meritless. JMOL at 12. As discussed above, **Syntel** concealed its theft **from TriZetto** by, among other things, planning its theft internally, relabeling TriZetto's trade secrets as its own, and only sharing its newly-relabeled tools and accelerators in confidential responses to customer requests for proposals. Tr. 280:15-281:10, 276:22:8-278:7, 301:18-302:8, 369:16-20, 576:9-583:24; DTX-36; DTX-41; DTX-1162; DTX-89; DTX-90; DTX-78; DTX-15. Moreover, the unrebutted evidence shows that TriZetto immediately notified Syntel of its misappropriation claim—in a November 2014 letter to Syntel's General Counsel—just "days" after becoming aware of the issue. Tr. 188:4-24; PTX-42 at 2. TriZetto then filed counterclaims for misappropriation in February 2015. Dkt. 21. TriZetto did not conceal anything; it was Syntel that concealed its "go to war" and "Trojan Horse" plans against TriZetto, who was paying Syntel $26 million annually because it believed Syntel was a trustworthy partner. DTX-83.1-2; DTX-84 at 11; Tr. 499:9-505:25, 187:14-19.

Third, as for Syntel's reliance, there was none: even after TriZetto accused Syntel of

stealing its intellectual property, Syntel's misappropriation continued unabated through trial.  Tr. 299:9-16, 302:24-303:6, 307:4-10.  Indeed, Syntel anticipated and was made aware of TriZetto's assertion of its rights for years, and yet proceeded down an illegal path.  After the 2013 CDPHP TPAA was signed, Syntel recognized in a Syntel Board Meeting presentation that TriZetto could still "refuse to sign TPAA," preventing its use of TriZetto's trade secrets.  PTX-143 at 4. Moreover, Mr. Reddy testified that Syntel knew that, using TriZetto's trade secrets to compete against TriZetto would be "flat wrong" under the Amended MSA.  Tr. 514:11-17; *see also id.* 515:23-516:1, 517:7-13.  Indeed, years after the TPAA, in December 2014, Syntel's General Counsel specifically acknowledged and confirmed its ongoing confidentiality obligations, vitiating Syntel's claim of reasonable reliance.  *See* PTX-753.  Thus, substantial evidence supports the jury's finding of no estoppel and Syntel's motion for JMOL should be denied.

## III.   SYNTEL'S BELATED ATTEMPT TO ESCAPE LIABILITY FOR TRADE SECRET MISAPPROPRIATION SHOULD BE REJECTED

After spending years touting TriZetto's trade secrets to its customers and prospects as its own key "tools and accelerators," Syntel now contends that the trade secrets the jury concluded it misappropriated are not trade secrets at all—not because the materials are not secret or do not derive value from being secret, but because TriZetto purportedly failed to adequately ***identify*** them.  Not so.  TriZetto's witnesses, from Mr. Noonan through its technical expert Dr. Bergeron, spent hours (of its limited trial time) painstakingly describing each of the trade secrets in detail and identifying each by number (1-104), name, category, and corresponding exhibit number—in addition to extensively describing their substance.  The parties also jointly filed a list identifying the 104 asserted trade secrets by name, which the jury received for its deliberations.  Dkt. 935, Ex. 6. While Syntel complains that TriZetto's trade secrets are too vague, it had no problem identifying and touting them in its responses to its customers' requests for proposals, where it spent pages

discussing the benefit of its "Facets Tools & Accelerators," including the custom code impact analyzer, data dictionary, and repository of Facets test cases and automation scripts.  DTX-15.0015, .0033-35, .0070; DTX-78 at 16-17.  Syntel never even served an interrogatory requesting any identification or description of the asserted trade secrets.  *See* Dkt. 800 at 3; Dkt. 832 at 1 ("Syntel has never moved to compel TriZetto to provide a more specific description.").  Nor did Syntel move for summary judgment on this issue.  Only after it lost at trial does Syntel spring this argument on TriZetto and the Court, but it cannot meet the heavy burden necessary to overturn the verdict.  *See E.J. Brooks Co. v. Cambridge Sec. Seals*, 2015 WL 9704079, at *8 (S.D.N.Y. Dec. 23, 2015) (JMOL "should be granted cautiously and sparingly.").

### A.    TriZetto Adequately Identified the Misappropriated Trade Secrets

Contrary to Syntel's assertions, numerous witnesses identified TriZetto's trade secrets with great specificity, and TriZetto went far beyond what the laws requires.[6]  At trial, TriZetto presented extensive testimony from two fact witnesses and both its experts identifying the 104 asserted trade secrets, describing them, discussing their development (including the associated costs), explaining each one's value (including how each derived value from not being generally known and not being capable of reproduction through proper means), and enumerating the extensive measures TriZetto utilizes to maintain their secrecy.[7]  For each trade secret, moreover, TriZetto identified the

---

[6] The existence of a trade secret, including whether it was adequately described, is a question of fact that may be determined by the jury.  *E.J. Brooks Co.*, 2015 WL 9704079, at *7 (citation omitted); *see also ExpertConnect, L.L.C. v. Fowler*, 2019 WL 3004161, at *5 (S.D.N.Y. July 10, 2019).  Whether a party adequately described an asserted trade secret ultimately turns on whether the description enables a defendant to defend itself at trial, and only sufficient notice is required.  *LivePerson, Inc. v. [24]7.ai, Inc.*, 2018 WL 5849025, at *9 (N.D. Cal. Nov. 7, 2018) (New York law requires specificity sufficient to allow "a defendant [to] know what constitutes a plaintiff's trade secret … so that the defendant can defend itself at any trial.").

[7] Tr. 65:1-69:16 (describing the trade secrets), 70:9-25 (testifying that software, tools, and guides and manuals are TriZetto's trade secrets), 90:13-18 (discussing development costs), 113:3-10 (identifying three categories of asserted trade secrets: software, tools, and guides and manuals), 113:11-117:25 (identifying and describing the software trade secrets: Facets itself, DBBLD software, and upgrade framework software), 118:1-128:2 (identifying and describing the tools trade secrets: Data Dictionary, Custom Code Impact Tool, and Test Cases and Automation Scripts), 128:3-132:2 (identifying and describing the guides and manuals trade secrets); Ex. 3 at DDX-14.5, 14.10, 14.12-.22; Tr.

particular exhibit(s) corresponding to the actual document(s) or source code file(s) that constitute each specific trade secret.  Tr.  265:22-266:22, 281:23-283:13, 292:23-293:7, 297:8-298:8, 299:9-300:10, 302:9-19; Ex. 1 at DDX-2.35, .40-.41, .45, .49, Ex. 2 at DDX-2.66-79.

For example, after explaining TriZetto's development of its trade secret software and service offerings, as well as the operation of the Facets software and its many benefits to users, Tr. 63:22-73:17, 80:14-85:21, 86:8-87:4, Mr. Noonan walked through the trade secrets in detail.  He first discussed the three categories of trade secrets and identified the particular trade secrets in each category.  Tr. 78:24-85:21, 86:18-91:18, 113:3-117:25, 118:1-119:1, 122:22-123:23, 124:20-24, 127:8-19, 128:3-129:10.  Then, for each trade secret he (1) explained the technology, (2) how it was developed, (3) the value of the trade secret, (4) and how the material was maintained as confidential.  Tr. 113:13-132:2; *see also id.* at 70:9-25.  Notably, Syntel did not ask Mr. Noonan a single cross question about his identification or explanation of the trade secrets.  Nor did Syntel call its own technical expert to rebut TriZetto's extensive evidence of its trade secrets.

TriZetto's identification of a voluminous set of information Syntel misappropriated mirrors the methods courts have routinely approved.  *E.g.*, *E.J. Brooks Co.*, 2015 WL 9704079, at *8-*9 (plaintiff's identification of its manufacturing process as the trade secret and disclosure of the design and operation of that process was adequate because it enabled the defendant to defend itself); *ExpertConnect*, 2019 WL 3004161, at *4 (identification that "identifies specific documents that are alleged to be trade secrets" sufficient); *LivePerson*, 2018 WL 5849025, at *9 (under New York law, description of trade secrets as XML data generated by plaintiff's software platform

---

265:22-266:22 (describing Facets and the trade secrets), 281:13-287:20 (identifying the 104 trade secrets by name and exhibit number, and opining that they all constitute actual trade secrets); Ex. 1 at DDX-2.23-.27, Ex. 2 at DDX-2.66-.79; Tr. 170:2-174:20, 175:22-176:13; Ex. 4 at DDX-12.5-.12; Tr. 384:9-385:5; DTX-0020; DTX-0106; DTX-0108; DTX-1257; DTX-1348; DTX-1355; DTX-1356; DTX-1357; DTX-1358; DTX-1359; DTX-1360; DTX-1361; DTX-1362; DTX-1346; DTX-1347; DTX-1350; DTX-1351; DTX-1352; DTX-1353; DTX-1354; DTX-0496; DTX-1423; DTX-1424; DTX-1425.

combined with identification of some specific examples was sufficient); *Minnesota Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 595-96 (7th Cir. 2001) (identification of the trade secret as more than 500 pages of internal operating procedures and manuals sufficient); *Motorola, Inc. v. Lemko Corp.*, 2012 WL 74319, at *16-*19 (N.D. Ill. Jan. 10, 2012) (identification of large volumes of documents and source code "by Bates number, file type, and/or location" sufficient); *Peerless Indus., Inc. v. Crimson AV LLC*, 2015 WL 1275908, at *12 (N.D. Ill. Mar. 17, 2015) (identification of "30,000 pages of 'spec packages' and lists of tools" sufficient).

TriZetto further identified its trade secrets in connection with TriZetto's evidence of Syntel's misappropriation.[8]   *E.g.*, Tr. 296:23-297:3 (Syntel's D2 Data Generator same as TriZetto's Data Dictionary); Tr. 299:9-16 (Syntel's Step Up Probe same as TriZetto's Custom Code Impact Tool); Tr. 301:14-302:23 (Syntel used TriZetto's Test Case and Automation Script trade secrets); Tr. 306:23-307:3 (Syntel used Facets, DBBLD, and Upgrade Framework trade secrets); 307:15-309:7 (Syntel used all of TriZetto's Manuals and Guides trade secrets).   While Syntel now claims it cannot identify TriZetto's trade secrets, prior to litigation, it frequently touted its "Facets Tools & Accelerators"—including its custom code impact analyzer, data dictionary, and repository of Facets test cases and automation scripts—in its responses to potential customers' requests for proposals.  DTX-15.0015, 0033-35, .0070; DTX-78 at 16-17; DTX-435.0018-19.  For example, Syntel identified test cases and automation scripts as "key deliverables" and stated it had "pre-built" test cases and 500 automation scripts "that will be leveraged…."  DTX-15.0015, .0034-35.  These same materials also reference Syntel's use of TriZetto's DBBLD software.  DTX-15.0022; DTX-78 at 11; DTX-22.1.  Far from being unable to identify TriZetto's trade secrets, one

---

[8] The evidence showed that Syntel tried to hide this conduct, Tr. 274:25-280:14, 290:14-293:7, 310:23-311:6, which supports the conclusion that TriZetto adequately identified its trade secrets.  *E.J. Brooks Co.*, 2015 WL 9704079, at *9 (fact that defendants took steps to conceal their conduct was evidence that trade secrets were adequately identified).

of Syntel's core trial themes was that its use of the specific TriZetto technologies and materials TriZetto asserted as its trade secrets in this case was permitted (despite clear U.S. law prohibiting that use).  Tr. 341:4-6 (Syntel's counsel stating:  "I think that there is no dispute in this case that Syntel used TriZetto materials of the type that you opine are trade secrets, correct?").

This issue was squarely put to the jury.  At the close of evidence, the Court provided the jury with the jointly submitted list of TriZetto's 104 trade secrets, which included the corresponding trade secret number and title for each.  Dkt. 935, Ex. 6; Tr. 847:11-14; Tr. 846:18-853:11.  The Court's final instructions to the jury expressly referenced this list and instructed the jury that TriZetto was required to prove by a preponderance of the evidence "[w]hat the trade secret is -- i.e., TriZetto must identify the trade secret with adequate specificity so you can understand what TriZetto was protecting and requiring to be maintained as a secret…."  Dkt. 935, Ex. 13 at 10, 14; Tr. 846:18-853:11.  The jury then returned a complete verdict for TriZetto, necessarily and justifiably finding all 104 trade secrets were sufficiently identified and misappropriated.  Dkt. 931; Tr. 975:8-17.  Substantial evidence supports the verdict, which should not be overturned.  *See E.J. Brooks Co.*, 2015 WL 9704079, at *7.

> **B.    Syntel's Arguments That TriZetto's Identification of Each of the 104 Trade Secrets Were Deficient are Unavailing.**

Despite TriZetto's detailed identification of its trade secrets, Syntel nonetheless asserts that TriZetto failed to adequately identify the trade secrets.  None of Syntel's three arguments refutes TriZetto's specific, particularized identification of the 104 trade secrets misappropriated by Syntel.

First, Syntel asserts that TriZetto provided only "categorical descriptions or overly broad assertions."  *E.g.*, JMOL at 13-14, 16.  Syntel argues that, "all the jury could have found is that there are 104 unidentified trade secrets somewhere within the 'millions of pages of document' and millions of lines of code that TriZetto declares are its 104 asserted trade secrets."  *Id.* at 13; *see*

*also id.* at 14.[9]  Not so.  TriZetto did far more than just point the jury to documents; to the contrary, Mr. Noonan, Mr. Sanders, and both TriZetto's experts extensively described the technology and value of the trade secrets.  *See* § III.A, *supra.*  Moreover, the jury was free to examine the exhibit(s) that constituted a specific trade secret and analyze whether the exhibit(s) as a whole met the requirements for being a trade secret.  Dr. Bergeron performed that exact analysis when he concluded that each of the materials as a whole constituted a trade secret.  Tr. 337:5-20 ("[T]he way I approached my determination of trade secret is does this document as a whole constitute a trade secret. I didn't go through and pick out various items within each document."), 281:23-283:13; Ex. 1 at DDX-2.64-.65, Ex. 2 at DDX-2.66-79.  Courts have endorsed this analysis where a trade secret owner identifies its trade secrets as entire documents or a program's entire source code.  *E.g.*, *Motorola, Inc.*, 2012 WL 74319, at *16-*19; *Minnesota Mining*, 259 F.3d at 595-96; *ExpertConnect*, 2019 WL 3004161, at *4; *Peerless*, 2015 WL 1275908, at *12.

Second, Syntel argues that "TriZetto made no effort at trial to differentiate between what

---

[9] Courts have rejected Syntel's argument that the entirety of TriZetto's source code for each program cannot constitute a trade secret. *E.g. KCG Holdings*, 2020 WL 1189302, at *10 (trade secret consisted of the entire source code); *see also Comput. Assocs. Int'l v. Quest Software, Inc.*, 333 F. Supp. 2d 688, 695 (N.D. Ill. 2004) ("Despite defendants' claims to the contrary, the entire [] source code may qualify for trade secret protection.") (citation omitted); *see also LivePerson, Inc.*, 2018 WL 5849025, at *10 (concluding that because plaintiff "is claiming the entire set of data, and [defendant] cannot plausibly allege that it is unable to identify that set" and rejecting defendant's argument as "premised on its unsupported assumption that only portions of the XML can be protectable").  The cases Syntel cites acknowledge that an entire program may be protectable. *PaySys, Int'l, Inc. v. Atos Se*, 2016 WL 7116132, at *10 (S.D.N.Y. Dec. 5, 2016) (identification deficient because plaintiff "avoid[ed] the identification of ***a single*** specific (and therefore testable) trade secret …."); *Calendar Research LLC v. StubHub, Inc.*, 2020 WL 4390391, at *13 (C.D. Cal. May 13, 2020) (explaining what plaintiff must show "[i]f Plaintiff seeks to establish the Klutch code as a protectable trade secret based on a compilation of publicly-available information….").

was and was not a trade secret."[10]  JMOL at 15, *see also id.* at 14.[11]  In other words, Syntel claims

TriZetto was required to separate—in its own, internal trade documents and source code—what

was generally known from what was not.  *Id.* at 16.[12]  No such requirement exists.  *E.g.*, *Minnesota*

*Mining*, 259 F.3d at 595-96 (rejecting argument that, for a trade secret covering more than 500

pages of internal documents, plaintiff needed to "point to specific items within its manuals that are

not known by the industry").  A trade secret can exist in a combination of materials that are all

public, so there is no need to attempt to separate out individual, allegedly public portions as long

as the other requirements for trade secret protection are met.  *See Integrated Cash Mgmt. Servs.,*

*Inc. v. Dig. Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990) (a trade secret may exist in the

"unique combination" of individual components that are publicly available); *Harbor Software, Inc.*

---

[10] Contrary to Syntel's argument, TriZetto sufficiently identified the guides and manuals trade secrets.  JMOL at 15. Dr. Bergeron showed the jury the titles of each manual and guide trade secret, the technology each guide or manual covered, and the corresponding exhibit number(s) for the actual document(s) that constituted each trade secret. Ex. 2 at DDX-2.68-79; Tr. 283:2-13; *see also* Tr. 68:17-25, 171:10-175:13, 190:7-23.  The list of the trade secrets also included the titles of each of 97 guides and manuals, and the corresponding exhibit numbers. Dkt. 935, Ex. 6; Tr. 847:11-14.  Accordingly, there was no doubt about what each trade secret encompassed. Nothing more is required. *E.g.*, *ExpertConnect*, 2019 WL 3004161, at *4; *LivePerson*, 2018 WL 5849025, at *9.

[11] Syntel's arguments that the entirety of Facets cannot constitute a trade secret—because it is allegedly publicly known—fail for several more reasons.  First, Syntel previously argued in a motion *in limine* that the Facets source code could not constitute a trade secret because part of it was publicly filed with the Copyright Office.  *See* Dkt. 754; *see also* Dkt. 923.  The Court rejected this argument, concluding "it was not a pure legal issue." Dkt. 832.  This is now law of the case, and Syntel cannot re-raise the argument.  *Dentsply Sirona, Inc. v. Dental Brands for Less LLC*, 2020 WL 4038343, at *3 (S.D.N.Y. July 17, 2020); *see also* Tr. 103:7-21.  Second, contrary to Syntel's assertion, Mr. Sanders never testified that Facets is patent protected.  *See* JMOL at 14 (citing Tr. 169:2-6 (TriZetto "protect[s] our intellectual property through trade secrets, through copyrights, and through patents.")).  And Syntel did not proffer any evidence that any portion of Facets is patented.  *See* Tr. 329:4-333:2.

[12] In addition, Syntel argues that trade secret number 25 (the Data Models Guide), was not adequately described because TriZetto never showed what information in the version that constitutes the trade secret is not in the "publicly available version 4.51." JMOL at 15-16.  This argument misses the mark.  The three manuals and guides that Syntel presented to the jury came from piracy websites.  The availability of a document on a piracy website, however, does not establish that the document was generally known, especially where, as here, there is no evidence establishing when the document was put on the piracy website or who put it there.  *See*, Dkt. 920.  The jury was instructed on this very point: "Publication of a trade secret on the internet does not necessarily mean the secret has become generally known." Tr. 849:2-4; *see also id.* at 848:4-13.  TriZetto presented substantial evidence that each of the guides and manuals trade secrets were not generally known. Tr. 129:18-130:18.  Nor is there merit to Syntel's suggestion that Dr. Bergeron contradicted his testimony on cross.  JMOL at 15.  On direct, he said the manuals and guides trade secrets constituted only the specific exhibits identified in his demonstratives.  Tr. 283:2-13.  During cross, he simply indicated that the prior versions of the guides are trade secrets not that they are asserted trade secrets in this case.  Tr. 324:17-20.

*v. Applied Sys., Inc.*, 887 F. Supp. 86, 89-90 (S.D.N.Y. 1995) (stating the same for software programs).  In any event, the evidence here confirmed that the TriZetto trade secrets were created entirely within TriZetto through years of research and development effort, and kept secret.[13]  *E.g.*, Tr. 69:2-70:25, 91:13-18, 117:16-25, 119:2-6, 122:18-21, 124:17-19, 125:3-20, 127:5-128:2, 129:18-130:18, 169:18-173:17, 175:22-176:13, 283:14-286:24; Ex. 4 at DDX-12.5-.12.  Notably, Syntel did not ask Mr. Noonan or Mr. Sanders a single question on this topic.  Regardless, the jury was free to consider what impact, if any, any allegedly public material had on whether the document as a whole constituted a trade secret.  And, the undisputed evidence established that Syntel used the entirety of the documents, so TriZetto did not need to parse the trade secrets as Syntel suggests.  *E.g.*, Tr. 288:16-312:7, 341:1-12; DTX-15; DTX-22; DTX-95; DTX-96; DTX-101; DTX-104; DTX-393; DTX-476; DTX-1162; DTX-1424; DTX-1425.  Syntel cites no cases imposing this requirement, and this Court should not impose one.  *See supra* note 10.

Third, Syntel suggests TriZetto's identification was insufficient because the identifications themselves did not disclose the actual trade secrets.  *E.g.*, JMOL at 14, 16.  Syntel cites no support for this proposition, which defies logic and contradicts the law.  *See Autodesk, Inc. v. ZWCAD Software Co.*, 2015 WL 2265479, at *5 (N.D. Cal. May 13, 2015) ("A plaintiff need not 'spell out the details of the trade secret,' but must minimally provide 'reasonable notice of the issues which must be [met] at the time of trial….").  *E.J. Brooks Co.*, 2015 WL 9704079, at *8-*9.

TriZetto presented substantial evidence for the jury's finding that it identified each of the 104 trade secrets with specificity, and this finding should not be disturbed.  *See E.J. Brooks Co.*, 2015 WL 9704079, at *7-*9; *LivePerson*, 2018 WL 5849025, at *9.

## IV.    THE GENERAL VERDICT IS PROPER AND A NEW TRIAL IS NOT NEEDED

---

[13] And while Syntel suggests that TriZetto nevertheless should have separated out portions that are public, TriZetto does not agree that any of its trade secrets are public.

Syntel admits the Court need not reach its general verdict argument if the Court rejects Syntel's arguments related to authorization (JMOL § I), waiver and estoppel (*id.* § II), and trade-secret specification (*id.* § III).   Those arguments fail for the reasons explained in §§ I-III, *supra*, and thus, no new trial should be granted.  *See* JMOL at 17.

Even if the Court concludes that Syntel's arguments in §§ I-III of its brief have merit (which they do not), a new trial still is not warranted.[14]  Syntel makes no argument that the jury rested its verdict on "mistake about the law."  *United States v. Salmonese*, 352 F.3d 608, 624 (2d Cir. 2003) (citation omitted).  Rather, Syntel's arguments each assert the jury made a "mistake concerning the weight or the factual import of the evidence."  *Id.* (citation omitted).  As a result, so long as there is sufficient evidence to support the misappropriation of any trade secret or copyright, no new trial should be granted.[15]  *Advance Pharm.,* 391 F.3d at  391 (where jury not required to specify which grounds it relied on to find liability, "[i]f the evidence was sufficient to support either reason, there cannot be 'a complete absence of evidence supporting the verdict,' requiring a court to set aside the judgment").

Finally, before a new trial can be granted, Syntel must prove that any error was not harmless. Fed. R. Civ. P. 61; *Chowdhury v. Worldtel Bangladesh Holding, Ltd.*, 746 F.3d 42, 50 (2d Cir. 2014) (explaining the Second Circuit has also "engrafted a … harmless error gloss onto the basic principle" of the general-verdict rule).  Syntel cannot meet its burden here because there is "adequate evidentiary support for a jury to find [Syntel] liable."  *See id*.  TriZetto requested compensatory damages of $284.9M for its trade-secret misappropriation claim.   TriZetto's

---

[14] At a minimum, if the Court rejects Syntel's sole challenge to the copyright infringement verdict (waiver/estoppel), then the copyright verdict must stand because the jury was asked separate questions about trade secret misappropriation and copyright infringement liability and damages.  Dkt. 931 at 2, 4.

[15] In *Griffin v. United States*, 502 U.S. 46, 59 (1991), the Supreme Court clarified that where a jury may "rely[] upon a legally inadequate theory," a new trial may be granted, whereas if jurors "have been left the option of relying upon a factually inadequate theory," none would be necessary "since jurors *are* well equipped to analyze the evidence."  In *Advance Pharmaceuticals*, the Second Circuit applied that reasoning in a civil case.  391 F.3d at 391.

witnesses explained that, for Syntel to independently develop any **one** of trade secrets 1-4 and 102-104, Syntel would have needed access to the full Facets software platform. Tr. 66:21-68:4, 113:13-18, 115:6-116:7, 120:2-14, 122:18-21, 289:17-19, 300:21-25.   Based on that testimony, Mr. Britven explained that if Syntel misappropriated any **one** of trade secrets 1-4 or 102-104, it should be liable for the full $284.9M in compensatory damages. Tr. 403:2-12, 427:15-428:12.  Given the jury's award of $284.9M, it is clear the jury did not rely solely on trade secrets 5-101, for which TriZetto requested only $189.9M in compensatory damages.  Accordingly, even if the general-verdict rule applied, Syntel must show that the verdict with respect to **all** of trade secrets 1-4 and 102-104 were insufficiently supported; otherwise, any error would necessarily be harmless.  Fed. R. Civ. P. 61; *Chowdhury*, 746 F.3d at 50; *Northpoint Tech., Ltd. v. MDS Am., Inc.*, 413 F.3d 1301, 1312 (Fed. Cir. 2005) ("When a general verdict may have rested on factual allegations unsupported by substantial evidence, we will uphold the verdict if the evidence is sufficient with respect to any of the allegations.") (citation omitted).  Syntel cannot do so.

## V.     SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S DTSA VERDICT

Syntel next asks the Court to overturn the jury's verdict that Syntel misappropriated TriZetto's trade secrets under the DTSA.  JMOL at 18.  But TriZetto presented substantial evidence supporting the jury's determination that Syntel continued to use TriZetto's trade secrets after May 11, 2016.  While Syntel argues that only four "alleged post-2016 actions" support post-May 11, 2016 use, JMOL at 18-21, TriZetto presented substantial evidence of Syntel's continued use of all 104 asserted trade secrets after the DTSA's effective date.

Syntel also argues the jury's award of $285M based on Mr. Britven's avoided-costs calculation is not "causally related" to Syntel's misappropriation.  But the causal relation is clear and supported by substantial evidence: as Mr. Britven explained, Syntel was unjustly enriched by $285M—the amount Syntel avoided in development costs—by stealing and using TriZetto's trade

secrets instead of developing those trade secrets on its own.

### A.   Substantial Evidence Supports the Jury's Finding of Misappropriation

The evidence presented at trial left no question that Syntel continued to offer and provide Facets services—services that it provided utilizing TriZetto's trade secrets—long after May 11, 2016.  Not only did Syntel's own website tout its ongoing provision of such services to prospective customers for years after that date, (DTX-41; DTX-1162), but Syntel's own financial records establish that it actually performed these services and generated revenue from them for years after enactment of the DTSA.  Tr. 734:24-736:7, 759:12-760:6; DTX-1236.  And, as enumerated below, TriZetto presented substantial evidence that, individually and collectively, establishes Syntel's use of all of the trade secrets after May 11, 2016.  *See Q-CO Indus., Inc. v. Hoffman*, 625 F. Supp. 608, 618 (S.D.N.Y. 1985) (in most cases plaintiffs asserting trade secret misappropriation "must contruct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place."); *Bladeroom Grp. Ltd. v. Emerson Elec. Co.*, 331 F. Supp. 3d 977, 984-86 (N.D. Cal. 2018) (denying JMOL and finding circumstantial evidence can be sufficient to establish trade secret misappropriation).  The jury was properly instructed that it needed to find evidence of use and not mere possession of the trade secrets to find misappropriation under the DTSA.  Dkt. 935-13 at 10-12.  The jury found for TriZetto, and is presumed to have followed the Court's instructions.  *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998) ("[J]uries are presumed to follow their instructions.").  Rather than address the complete panoply of evidence of use of the asserted trade secrets after May 11, 2016 that was presented at trial, Syntel instead myopically focuses on four "alleged post-2016 actions" that support the jury's proper determination that the asserted trade secrets were used by Syntel after the DTSA's effective date.  JMOL at 18-21.  Even then, Syntel's arguments do not properly characterize and credit that

24

evidence, which is far more than sufficient to support the jury's verdict.  For each of the three

buckets of trade secrets considered by the jury—software, tools, and manuals/guides—substantial

evidence supports a conclusion that the trade secrets were used by Syntel after May 11, 2016, and

the jury's verdict should not be disturbed.  *See E.J. Brooks Co.*, 2015 WL 9704079, at *7 (denying

JMOL because substantial evidence supported the jury's trade secret misappropriation verdict).

**Software Trade Secrets (Nos. 1-3)**.  TriZetto presented various forms of substantial,

unrebutted evidence that reasonably support a conclusion that Syntel used the software trade

secrets after May 11, 2016.  First, Dr. Bergeron testified that the UHG Facets "upgrade was

actually done in November of 2016." Tr. at 306:19-22.  Far from being conclusory, Dr. Bergeron's

opinion was based on his analysis of substantial evidence including Syntel's own witness's

admission that the go-live for UHG's facets upgrade occurred in November 2016. Ex. 5 (3/22/18

Reddy Dep. Tr.) at 246:14-17; *see also MacQuesten Gen. Contracting, Inc. v. HCE*, Inc., 2002

WL 31388716, at *2 (S.D.N.Y. Oct. 22, 2002) ("[E]xpert analysis is often based on reported

information rather than firsthand knowledge, and that is no bar to its admissibility.").  And Syntel's

own financial records indicate that the end date for the "UHG - Facets Upgrade" project was

December 2017 and that Syntel generated costs associated with this project in 2017 and 2018, and

revenues in 2016.  PTX-1507 at tabs Q218, Q118, 2017, 2016 at rows 69; *see also* PTX-1508 at

row 72 (UHG - Facets Upgrade revenues in 2016).  This evidence shows that Syntel was

performing work for UHG long after May 11, 2016 and further supports Dr. Bergeron's opinion

that the go-live date for the UHG upgrade was November 2016.  And Dr. Bergeron further opined

that, in order to perform this upgrade in November 2016, Syntel used each of the software trade

secrets. Tr. 306:23-307:3.  This evidence is far more than sufficient for the jury to have reasonably

concluded that Syntel used the software trade secrets after May 11, 2016.

25

Ignoring this evidence, Syntel suggests that Dr. Bergeron's opinion about the go-live date for the UHG upgrade was based solely on a September 16, 2015 email. *See* JMOL at 20. Not so. Dr. Bergeron only relied on this email to support his opinion that for Syntel to actually perform this upgrade, it would have to use all three of TriZetto's software trade secrets when the go-live occurred, "because going from that early version to a later version is going to require two versions of Facets, also both versions of that upgrade software tool, the database build tool [the DBBLD] as well as the upgrade framework tool." Tr. 306:23-307:3. Syntel never cross-examined Dr. Bergeron about any of this testimony, nor did it present contradicting evidence.

Second, Syntel's post-May 2016 advertising additionally supports a conclusion that it used TriZetto's software trade secrets for long after that date. It is undisputed that long after May 11, 2016, Syntel's website touted its "comprehensive range of services across leading core administration and care management platforms such as FACETS," including "[o]ver 30% faster ***upgrades*** using our layered upgrade framework and tools" and "[o]ver 40% savings on FACETS configuration tasks on provider and code sets." DTX-1162. TriZetto presented substantial evidence that Syntel necessarily would have used the asserted trade secrets, including the software trade secrets, to perform such work. *E.g.*, Tr. 116:2-21, 117:13-15, 119:7-120:1, 124:5-16, 280:14-281:10, 285:12-22, 299:18-300:20, 306:23-307:10; DTX-36.2; DTX-393; DTX-22; DTX-101; DTX-219.3.[16] This amounts to, at a minimum, circumstantial evidence of Syntel's use of the software trade secrets after May 11, 2016, which certainly is adequate to sustain the jury's verdict. *See Bladeroom Grp.*, 331 F. Supp. 3d at 984-86 (circumstantial evidence can be sufficient to establish trade secret misappropriation). Syntel's own financial records, moreover, establish that it actually performed these advertised services for customers after May 11, 2016. Tr. 734:24-

---

[16] As such, Syntel's advertisement does not merely mention the trade secrets; it advertises services that entail using the trade secrets. DTX-1162.

736:7, 759:12-760:6; DTX-1236.  This constitutes additional evidence that Syntel was actually using TriZetto's software trade secrets after the DTSA's effective date.[17]

Third, Syntel's motion fails to address the unrebutted testimony of Dr. Bergeron that there was no evidence that Syntel ever stopped using TriZetto's asserted trade secrets, including the software trade secrets.  Tr. 312:5-7.  And Syntel's own witness, Mr. Moore, corroborated this testimony, admitting that he did not testify about any steps Syntel took to stop using the trade secrets.  Tr. 631:19-632:17.  The testimony from these witnesses, combined with the substantial evidence of Syntel's pre- and post-enactment use of the trade secrets, constitutes additional substantial evidence that Syntel continued to use TriZetto's software trade secrets after May 11, 2016, constituting misappropriation under the DTSA.  *See Cash*, 654 F.3d at 338 (jury entitled to rely on unrebutted expert testimony); *Bladeroom Grp.*, 331 F. Supp. 3d at 984-86.  Based on this evidence, separately or in combination, the jury certainly could reasonably conclude that Syntel used all of the software trade secrets after May 11, 2016.

**Tools Trade Secrets (Nos. 4, 102-104)**.  TriZetto also presented multiple forms of substantial, unrebutted evidence that reasonably support a conclusion that Syntel used the tools trade secrets after May 11, 2016.  First, Syntel advertised its ongoing use of the tools trade secrets for years after the enactment of the DTSA, up until and through trial.  DTX-1162; DTX-1541. This advertising touted Syntel's use of TriZetto's trade secrets to prospective customers, including by stating that Syntel was "leveraging" Facets "tools and accelerators" including the "Step-up probe," "D2 Data generator," a "[r]epository with 3,000+ FACETS test cases and 500+ automation

---

[17] Syntel's advertising is evidence that it used the trade secrets to perform services for customers.  In addition, but separately, Syntel's advertising also constitutes use under this Court's prior rulings.  The Court already rejected Syntel's argument that its advertisement cannot constitute "use," and this ruling constitutes law of the case.  Tr. 103:7-21; *see also* Dkt. 588 at 22-24; *Dentsply Sirona, Inc.*, 2020 WL 4038343, at *3.  And TriZetto offered unrebutted testimony that Syntel's current marketing materials established Syntel's use of the trade secrets up until and during the trial "[b]ecause these are active marketing materials used to actively bid or attract business in this space."  Tr. 280:14-281:10; *see also* Tr. 204:10-205:25, 296:23-297:3, 299:9-16, 302:25-303:6, 307:5-10; DTX-41; DTX-1162.

scripts," and other "[p]latform management tools," as well as investing in "IP-based solutions, tools and accelerators." DTX-1162 at 2; DTX-1541 at 2. TriZetto presented substantial evidence that Syntel necessarily would have used tools trade secrets while performing Facets services, Tr. 116:2-21, 117:13-15, 119:7-120:1, 124:5-16, 280:14-281:10, 285:12-22, 299:18-300:20, 306:23-307:10; DTX-36.2; DTX-393; DTX-22; DTX-101; DTX-219.3, and Syntel's own financial records, establish that it actually performed these services for customers well after May 11, 2016.[18] Tr. 734:24-736:7, 759:12-760:6; DTX-1236. This constitutes substantial evidence reasonably supporting a conclusion that Syntel actually used TriZetto's tools trade secrets after May 11, 2016.

Second, Syntel's use of the tools trade secrets in connection with services it advertised and performed after May 11, 2016 was corroborated by Syntel's own witness, Mr. Moore. He agreed that as of 2018, "Syntel continued to use tools in connection with providing Facets services at that time." Tr. 617:13-16. Syntel now argues his testimony was not specific to any of the trade secret tools at issue here, so his testimony cannot support the jury's verdict. JMOL at 20-21. Syntel's suggestion that the jury's verdict can be overturned based on such a distinction understandably finds no support in the law or the facts of this case. Syntel does not identify any tools, other than those at issue here, that Mr. Moore might have been referencing. And Mr. Moore's testimony was in the context of questioning about Syntel specifically advertising the tools at issue in this case. Tr. 615:4-616:1. Accordingly, the jury certainly was free to consider this unrebutted testimony as additional evidence of Syntel's continued to use of the tool trade secrets at least as late as 2018.[19]

Third, Dr. Bergeron testified that Syntel never stopped using TriZetto's asserted trade

---

[18] That the go-live for the UHG upgrade project was in November 2016 and that the project did not end until December 2017 is additional evidence that Syntel actually used the tools trade secrets after May 11, 2016. *See* PTX-1507; PTX-1508; Tr. at 306:19-22. Indeed, evidence adduced at trial established that Syntel instructed its employees working on this project to "[e]nsure that you are using [the data dictionary] on a daily basis." DTX-101.

[19] Moreover, if Syntel was using TriZetto's tools, it was necessarily also using the Facets software. Tr. 120:2-14, 122:18-21, 289:17-19, 297:8-298:11, 299:18-300:25

secrets, including the tools trade secrets.  Tr. 312:5-7.[20]  And as noted above, Mr. Moore admitted

he did not testify about any steps Syntel took to stop using TriZetto's trade secrets.  This was on

top of substantial record evidence that Syntel possessed the tools trade secrets, including after May

11, 2016.  *E.g.*, Tr. 312:1-4, 267:19-23, 269:1-270:6, 270:13-271:6, 271:23-272:14, 278:8-20 (in

2017 Syntel found over 700 test cases and scripts on its computers), 281:4-10, 289:21-290:3,

290:5-292:5, 298:25-299:7, 301:1-10, 302:4-23 (same).  And this Court previously held that

possession of the asserted trade secrets could be sufficient for the jury to infer use of those trade

secrets, including specifically with reference to the possession of test cases and automation scripts

found on Ankur Chadha's computer after May 2016, which is now law of the case.  Dkt. 588 at

24; *Dentsply Sirona, Inc.*, 2020 WL 4038343, at *3.  All of this evidence is more than sufficient

to support a conclusion that Syntel continued to use the tools trade secrets after May 11, 2016.  *See*

*Cash*, 654 F.3d at 338; *Bladeroom Grp.*, 331 F. Supp. 3d at 984-86.

**Manuals and Guides Trade Secrets (Nos. 5-101)**.  TriZetto also presented multiple forms

of substantial, unrebutted evidence that Syntel used the guides and manuals trade secrets after May

11, 2016.  First, the evidence at trial established that in the months immediately prior to Syntel

terminating the MSA, Syntel improperly amassed a repository of TriZetto's manuals and guides—

including the asserted manuals and guides trade secrets—because it knew that "once we are out

from TriZetto we will be not having access to their Product documentation/manuals."  DTX-5.1;

*see also* Tr. 273:13-274:24, 308:3-11; DTX-87; DTX-36.2.  A Court appointed neutral forensic

examiner analyzed Syntel's computers and networks looking for evidence of "downloading,

dissemination, and/or deletion" of the TriZetto manuals and guides downloaded by Syntel—as

identified on TriZetto's audit record.  DTX-245 ¶ 4 (citing DTX-87).  His analysis established that

---

[20] Mr. Britven also testified that Syntel was still using the tools advertised on its website.  Tr. 423:13-16.

Syntel possessed almost two-thirds of TriZetto's manuals and guides trade secrets after May 11, 2016.  *See generally* DTX-245; Dkt. 935-6.   As the Court already decided, which now amounts to law of the case, evidence of possession can be sufficient for the jury to infer use of the manuals and guides trade secrets.  Dkt. 588 at 24; *Dentsply Sirona, Inc.*, 2020 WL 4038343, at *3.

Second, the forensic examiner uncovered additional evidence further supporting a conclusion that Syntel's employees actually used these trade secrets long after May 11, 2016: the forensic examiner found that nearly 150 manuals and guides were moved or attached to emails by Syntel employees after May 11, 2016.  *See* DTX-245.0903-0908, .0922.  Because the scope of the forensic examination was limited to only manuals and guides that Syntel's employees downloaded that appear on TriZetto's audit record, all of these manuals and guides correspond to TriZetto's manuals and guides that Syntel's employees improperly downloaded to create the repository. DTX-245 ¶ 4.  And, contrary to Syntel's assertion, at least 15 of the manuals and guides Syntel employees moved or attached to emails after May 11, 2016 are ***actually*** asserted trade secrets. *See*, *infra* note 24.  Dr. Bergeron testified that this activity—all of which occurred after May 11, 2016—established that Syntel employees were "clearly using TriZetto trade secrets," Tr. 308:22-309:7; Ex. 1 at DDX-2.63, which is an undeniably rational conclusion.  Dr. Bergeron made clear that this evidence establishes "actual use," Tr. 308:22-309:15, not merely possession or intended use as Syntel asserts.  *See* JMOL at 19-20.  And this evidence reasonably supports a conclusion that Syntel continued to make use of the entire repository of materials, including ***all*** of the asserted manuals and guides trade secrets housed there, after May 11, 2016, not just the specific asserted trade secrets that the forensic examination happened to uncover were moved as part of their use. *See Bladeroom Grp.*, 331 F. Supp. 3d at 984-86.

While in response to Dr. Bergeron's testimony Syntel claims there was only "a single

conclusory statement" supporting Syntel's actual use of the manuals and guides trade secrets after May 11, 2016, *see* JMOL at 19, Dr. Bergeron also explained why he relied on file movement, rather than file accesses, to support his opinion that Syntel actually used TriZetto's manuals and guides trade secrets after May 11, 2016.  Tr. 309:8-15.   This makes sense: why would a Syntel employee move files or attach files to an email unless the employee was using those files?   The jury was free to credit this evidence and its verdict should not be disturbed.  *Cash*, 654 F.3d at 338.

Third, Syntel's motion again fails to address the unrebutted testimony of Dr. Bergeron, who testified that Syntel never stopped using TriZetto's asserted trade secrets.  Tr. 312:5-7.  This testimony was corroborated by Mr. Moore when he admitted that he did not testify about any steps Syntel took to stop using TriZetto's trade secrets.  Tr. 631:19-632:17.  The testimony from these witnesses, combined with the substantial evidence of Syntel's post-enactment possession and use of the guides and manuals trade secrets, constitutes additional substantial evidence that Syntel continued to use TriZetto's guides and manuals trade secrets after May 11, 2016.  *See Cash*, 654 F.3d at 338; *Bladeroom Grp.*, 331 F. Supp. 3d at 984-86.

Fourth, evidence adduced at trial established that Syntel employees used TriZetto manuals and guides to perform services for UHG's upgrade.  DTX-219.  Because the go-live for this project was in November 2016 and the project did not end until December 2017, the jury could infer that Syntel was continuing to use the guides and manuals trade secrets after May 11, 2016.[21]  *See* PTX-1507; PTX-1508; Tr. at 306:19-22.

Fifth, TriZetto presented evidence that Syntel hid computers from the forensic examiner, preventing him from examining those computers for additional evidence of Syntel's misappropriation.   Dkt. 961-4 at 2-3, (2/16/18 Philip Dep. Tr.) at 80:22-81:3, 86:5-86:17.  TriZetto

---

[21] The jury also could have reasonably inferred use of the guides and manuals trade secrets from Syntel's advertising of its Facets related services.  *See* DTX-1162; DTX-1541

also presented evidence that Ankur Chadha, the head of Syntel's PCT, lied under oath about possessing TriZetto's manuals and guides.  *Compare* Dkt. 961-2 at 2, (2/20/18 Chadha Dep. Tr.) at 37:5-14 *with* DTX-245.902 *and* DTX-36. This is circumstantial evidence supporting the jury's verdict.  *See E.J. Brooks Co.*, 2015 WL 9704079, at *9 (steps taken to conceal conduct are "further evidence that Defendants knew they were misappropriating trade secrets.").

Therefore, substantial evidence—direct and circumstantial—supports the jury's verdict that Syntel misappropriated each of the trade secrets under the DTSA.[22]

### B.    The Jury's Avoided-Cost Damages Award Is Causally Connected to Syntel's Misappropriation and No New Trial or Remittitur Should Be Awarded

The DTSA expressly provides a trade secret holder may be " awarded [] damages for ***any unjust enrichment*** caused by the misappropriation of the trade secret that is ***not addressed in computing damages for actual loss*.**"  *See* 18 U.S.C. § 1836(b)(3)(B)(II) (emphases added).  As the jury was instructed, unjust enrichment measures the benefit to the defendant, Dkt. 843 at 3, and "avoided costs are appropriately considered as part of … unjust enrichment damages." *E.g.*, *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 2018 WL 2172502, at *6 (E.D. Va. May 10, 2018) (DTSA case); *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 2020 WL 6554645, at *12 (N.D. Ill. Oct. 19, 2020) (same); *VIA Techs., Inc. v. ASUS Comput. Int'l*, 2017 WL 3051048, at *3-4 (N.D. Cal. July 19, 2017) (same); Dkt. 843 at 3.  The R&D dollars that Syntel avoided spending through its misappropriation undeniably benefited Syntel.  Tr. 383:3-11, 385:16-20.  Mr. Britven explained how he calculated that benefit, which he grouped into three different buckets of trade secrets: software, tools, and guides and manuals. *See* Ex. 6, DDX-3.15; Tr. 398:16-399:22.  For

---

[22] Syntel also asserts there was no post-2014 misappropriation based on Mr. Britven's statement that the "misappropriation stopped in 2014".  JMOL at 21.  That testimony related to the time period for which Mr. Britven calculated avoided costs, which was a subset of the overall development period.  Mr. Britven (and Mr. Plumpe) calculated damages for trade secret misappropriation through 2018, confirming that both experts agreed the misappropriation was ongoing. Tr. 410:4-12 (Britven); Tr. at 720:16-721:9 (Plumpe).

misappropriation of all trade secrets, Mr. Britven explained that the total amount of avoided costs was $284.9 million, which eliminated double counting between the three amounts he calculated. Tr. 409:7-22.  And Mr. Britven further explained that the amount TriZetto spent to develop these trade secrets was a reasonable proxy for the amount Syntel saved through its misappropriation.[23] Tr. 398:6-14.

Even if the three buckets are viewed separately, however, the avoided costs damages award is still fully supported.  *First*, with respect to the Facets software trade secrets that Syntel misappropriated (TS 1-3), Mr. Britven explained that the avoided costs associated with those trade secrets was $284.9 million, based on his analysis of data from TriZetto's accounting system and Facets-development spend from 2004 to 2014.  *Id.* at 399:1-403:12.  Hence, the substantial evidence of Syntel's use of the software trade secrets during the DTSA damage period, described above, is alone sufficient to support the jury's avoided costs damages award.

*Second*, with respect to the tools trade secrets (TS 4, 102-104), the use of each of these trade secrets necessarily means the Facets software trade secrets were used and thus, the use of TS 4 and 102-104 supports the full DTSA award.  For example, Mr. Britven explained that the avoided costs associated with the tool Data Dictionary (TS 4) were $118 million; but that if Data Dictionary was used, "there has to have been use of the software [trade secrets]," i.e. Facets (TS 1-3), and damages would be $284.9 million.  *Id.* at 407:19-409:6.  The same was true of the test cases (TS 102), automation scripts (TS 103), and the custom code impact tool (TS 104).  *Id.* at 297:5-298:11, 427:15-428:1.  Although Syntel attempts to divorce these tools from Facets to argue that the $284.9

---

[23] Neither *E.J. Brooks* nor *Anderson*, on which Syntel relies, is a DTSA case.  *Anderson* did not deal with avoided costs (or any form of unjust enrichment), and *E.J. Brooks* recognized that "the *plaintiff's actual* development costs will commonly be used as a proxy for the *defendant's saved* development costs (under a damages regime that permits recovery of unjust gains)," which is precisely the type of damages regime under the DTSA.  *Anderson Grp. LLC v. City of Saratoga Springs*, 805 F.3d 34, 52 (2d Cir. 2015); *E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E.3d 301, 312 (N.Y. Ct. App. 2018).

million award is not supported, Syntel did not dispute that use of these tools necessarily means Syntel was using Facets. JMOL at 22. This was further corroborated by Syntel's UHG work. *See* Section V.A., *supra*. Thus, Syntel's ongoing use of the "tools and accelerators," as evidenced by these advertisements and together with the other evidence of use described above, supports the jury's $285 million award. *See* Tr. 417:3-19, 423:17-25, 459:5-460:18.

*Third*, Mr. Britven explained how he calculated TriZetto's cost of developing the trade secrets from the specific manuals and guides that Syntel downloaded (the "X analysis" for TS 5-101) and used after May 11, 2016. Mr. Britven categorized *every* document that Syntel downloaded into 13 different categories, determined what portion of the documents in a category related to trade secret information used after May 11, 2016, and used TriZetto's time sheets to determine how much was spent developing trade secrets in each category. Tr. 128:6-129:10, 130:19-132:2, 403:13-407:18; Ex. 6 at DDX-3.17-23.[24] Mr. Britven concluded that the avoided costs for the manuals and guides was $189 million, but this $189 million was not additive with the $285 million for Facets or the $118 million for Data Dictionary alone. Tr. 406:7-22, 409:7-22.

Syntel does not dispute that Mr. Britven accurately calculated the costs Syntel would have incurred to develop each trade secret. Rather, Syntel argues no causal connection exists because the amount of avoided costs exceeds the amount Syntel made through its misappropriation and claims it could have used all of TriZetto's trade secrets for free. JMOL at 26. But the causal link between Syntel's misappropriation and how it benefitted could not be more clear: without

---

[24] *Compare* Ex. 2 at DDX-2.68-2.79 *with* DTX-245.0870-0975; *see also* PTX-1520 (Britven's "X analysis"); DTX-245 (post-DTSA use for TS 1-2, 6-7, 12-13, 16-18, 22, 24, 26, 29-41, 43, 47-48, 52, 56, 59-63, 71-74, 76-77, 79-81, 83-84, 85-87, 90-91, 93-94, and 96-102); DTX-85 (Syntel emailing TS manuals on June 1, 2016). The following are emails attaching the specified TS manuals on July 15, 2016: DTX-1208, DTX-1209, DTX-1211 (TS manuals); DTX-656, DTX-1522 (TS 56); DTX-650, DTX-695 (TS 36); DTX-659, DTX-1528 (TS 62); DTX-654, DTX-701 (TS 63); DTX-689, DTX-648 (TS 21); DTX-647, DTX-1510 (TS 11); DTX-662, DTX-1529 (TS 71); DTX-690, DTX-646 (TS 5); DTX-876, DTX-649 (TS 6); DTX-660, DTX-1527 (TS 61); DTX-139, DTX-1533 (TS 83); DTX-657, DTX-1526 (TS 98); DTX-664, DTX-1530 (TS 73); DTX-670, DTX-1534 (TS 84); DTX-533, DTX-1538 (TS 97); DTX-256 (TriZetto R&D); DTX-258 (TriZetto R&D per TS-manual category); DTX-1205, DTX-1206 (TriZetto R&D).

misappropriating TriZetto's trade secrets, Syntel would have needed to spend at least $285M (likely much more) to independently develop the trade secrets itself, assuming it could even do so. Tr. 383:3-11, 385:16-20, 417:3-19, 423:17-25, 459:5-460:18.  And Syntel benefitted from saving those hundreds of millions when it used TriZetto's trade secrets after the DTSA was enacted. While Syntel may be disappointed that it failed to meet its billion-dollar goal from its misappropriation, Tr. 417:23-419:16, there is nothing "shocking" about the costs to develop over 100 trade secrets exceeding $285 million.  *GlobeRanger Corp. v. Software AG U.S of Am., Inc.*, 836 F.3d 477, 500 (5th Cir. 2016) ("[T]he wrongdoer should not benefit from hindsight perspective that its gamble of misappropriating the trade secret turned out not to be so profitable."); *see also Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, 980 F.3d 1117, 1130 (7th Cir. 2020) (affirming $140 million in avoided costs without reference to the amount of profit misappropriator's profit).

The jury was also free to reject Syntel's argument that the CDPHP TPAA values a license to TriZetto's trade secrets at zero dollars.  Dkt. 960 at 22.  The CDPHP TPAA gave Syntel the ability to obtain TriZetto confidential information from CDPHP only to perform four enumerated services for CDPHP, and no more.  PTX-838 at 1; § I.A, *supra*.  The CDPHP TPAA plainly did not authorize the actual misappropriation that Syntel engaged in: which included copying trade secret code from TriZetto's data dictionary into a competing tool that—along with other trade secret tools that it misappropriated from TriZetto—claimed was its own proprietary tool. Tr. 269:9-270:5, 272:20-273:7, 289:21-290:3; DTX-41.  Given the great lengths Syntel undertook to conceal its theft (including during the litigation), Syntel's argument that it could have simply obtained permission to do so for free is not credible and was appropriately rejected by the jury. *See, e.g.*, Tr. 277:14-278:7, 279:14-280:13, 301:18-302:8; 369:16-20; Dkt. 961-4 at 3-4; DTX-245; DTX-89; DTX-90; DTX-36; DTX-21; DTX-160.  Syntel's arguments amount to nothing more than an

attempt to reargue its deficient damages theory, which does not nearly suffice to overturn the jury's verdict. *Piroscafo v. Metro-N. Commuter R. Co.*, 552 F. App'x 6, 8 (2d Cir. 2013); *Braun Inc. v. Optiva Corp.*, No. 98 CIV. 4070, 2000 WL 223840, at *5 (S.D.N.Y. Feb. 25, 2000).

## VI.  AVOIDED COSTS ARE RECOVERABLE UNDER THE DTSA AND THE JURY'S DTSA AWARD IS SUPPORTED BY SUBSTANTIAL EVIDENCE

The jury heard significant evidence about how Mr. Britven calculated the costs Syntel avoided through its misappropriation.  *See* § V.B., *supra*.  The jury also heard evidence from Syntel about its disagreements with those calculations and its position on the amount of damages.  In the end, the jury credited Mr. Britven, as it was entitled to do.  *Sowemimo v. D.A.O.R. Sec., Inc.*, 2000 WL 546439, at *5 (S.D.N.Y. May 4, 2000) *aff'd*, 1 F. App'x 82 (2d Cir. 2001).  Unhappy with the verdict, Syntel presents several arguments for why avoided costs should not be available in this case, which are wholly untethered from the DTSA and relevant precedent.  Again, Syntel's wish that the jury credited its theory of the case is not grounds for JMOL.  *Sowemimo*, 2000 WL 546439, at *5; *Am. Tech. Ceramics Corp. v. Presidio Components, Inc.*, 2020 WL 5665065, at *14 (E.D.N.Y. Sept. 23, 2020).

### A.  Avoided Costs Are Available under the DTSA

The Court already rejected Syntel's argument that avoided costs are not recoverable under the DTSA, Dkt. 843 at 3, and should do so again here.  As Courts have recognized, the DTSA expressly provides for unjust enrichment damages, which measures the defendant's benefit. *See* § V.B., *supra*.  Syntel cites no authority to the contrary, but nonetheless argues avoided costs are only available under limited circumstances.  Syntel's arguments ignore the plain language of the DTSA, rely exclusively on mischaracterizations of non-DTSA cases, and ignore facts that confirm avoided costs damages are appropriate here.  For example, Syntel contends avoided costs are only available as a "nontraditional proxy remedy" where "actual damages and unjust enrichment" are

not "easily calculable." JMOL at 24. This argument rests on the faulty premise that avoided costs are not a form of unjust enrichment; they are, as explained above. Moreover, the DTSA specifies that a reasonable royalty, not avoided costs, is to be awarded "in lieu of damages measured by any other methods." 18 U.S.C. § 1836(b)(3)(B)(ii). The case Syntel cites, *LinkCo, Inc. v. Fujitsu Ltd.*, addresses the availability of a reasonable royalty for unfair competition claims, but says nothing about avoided costs or the DTSA. 230 F. Supp. 2d 492, 503-04 (S.D.N.Y. 2002).

Syntel also argues that avoided costs are not available "[b]ecause there was no destruction by Syntel of any alleged trade secrets." JMOL at 24-25. Syntel's reliance on non-DTSA cases is misplaced, as those cases deal with circumstances under which a trade-secret holder may be awarded the "total value of the secret [], including [] development costs." *Univ. Comput . Co.* v. *Lykes-Youngstown Corp.*, 504 F.2d 518, 535-37 (5th Cir. 1974); *Softel, Inc. v. Dragon Med. and Sci. Comm'cns, Inc.*, 118 F.3d 955, 969 (2d Cir. 1997) (rejecting royalty rate of 3.5 to 5.5 times total development costs under NY law). TriZetto did not seek its total development costs, which exceeded $500 million, let alone the total value of Facets. Tr. 421:1-6, 423:17-25. TriZetto sought the costs *Syntel* avoided incurring through its misappropriation. Tr. 416:15-22, 417:14-19. Although Mr. Britven relied on a portion of TriZetto cost data to calculate a portion of the Facets development costs, he explained these costs approximated what Syntel would have expended. Tr. 398:6-14. And the same trade-secret law that *University Computers* applied "allows calculation of damages based on defendant's avoided costs. *GlobeRanger*, 836 F.3d at 499.

Syntel's final argument that avoided costs are only available where "defendant used plaintiff's trade secrets to develop and sell a competing product" also fails. JMOL at 26. As discussed above, Syntel relabeled TriZetto's tools and other trade secrets as its own, which it then listed as the top "*Syntel*" "Value Add[s]" to makes sales to its customers. Tr. 280:15-281:10,

277:8-278:7, 579:10-580:16; DTX-41; DTX-1162.  That is not just a competing product, it is using

a direct copy of TriZetto's misappropriated trade secrets to complete.  Moreover, the Court rejected

this argument, explaining that "[a]s potential unjust enrichment damages -- which measures the

benefit to the defendant and not loss to the plaintiff --[] it is of no import that Syntel did not

'develop a competing platform' with the trade secrets it stole or that TriZetto uses and licenses the

Facets software."  Dkt. 843 at 3.  Neither *Motorola* nor *Epic* imposed a "competing product"

requirement for avoided costs, and Syntel identifies nothing in the DTSA that so limits damages.

*Motorola*, 2020 WL 6554645, at *12; *Epic*, 980 F.3d at 1130.  Syntel's unsupported "rule" ignores

the significant time and cost savings Syntel received by stealing TriZetto's trade secrets, and that

Syntel misappropriated TriZetto's trade secrets specifically to compete with TriZetto. Tr. 76:7-15;

Tr. 267:10-18.  Avoided costs were therefore properly awarded in this case.

### B.  Substantial Evidence Support's the Jury's DTSA Avoided Cost Award

Syntel's argument that the jury's avoided-cost verdict is not supported by substantial

evidence and is therefore "punitive" fares no better.  JMOL at 25.  According to Syntel, "the only

'cost' Syntel avoided was the 'cost' to obtain a TPAA: zero dollars."  *Id.* at 25–26. As explained

in § V.B, *supra*, the jury was free to (and properly did) reject that argument.  Syntel fails to

acknowledge, let alone explain why, it passed off copied versions of TriZetto's trade secret

technologies as Syntel's own "proprietary" tools, which no TPAA authorizes.  Syntel's own

conduct belies its claim that it could have simply obtained a TPAA.  Not only did Syntel conceal

its theft during the litigation, it expressly acknowledged in a Board Meeting presentation that

TriZetto could "***refuse to sign TPAA***," preventing Syntel's use of TriZetto's trade secrets.  PTX-

143 at 4.  Syntel knew what the agreements and record clearly reflect: that TriZetto was under no

obligation to sign additional TPAAs and had no financial incentive to do so.  Moreover, the jury

was instructed (without objection) that "unjust enrichment is the amount that Syntel benefited as

a result of any misappropriation." Tr. 868:10-14.  Syntel does not dispute Mr. Britven accurately

calculated the costs associated with developing each of the trade secrets Syntel misappropriated

and the jury heard ample evidence regarding the benefits to Syntel from its theft.  *See, e.g.*, Tr.

267:11-275:24; Tr. 383:3-11, 385:16-20.  A JMOL motion, like Syntel's, "that effectively 'asks

the court to reweigh conflicting evidence, a function belonging to the jury,' is ripe for denial." *Am.*

*Tech. Ceramics*, 2020 WL 5665065, at *14; *Sowemimo*, 2000 WL 546439, at *5.

## VII.  THE JURY'S COPYRIGHT AND NEW YORK TRADE-SECRET REASONABLE ROYALTY AWARDS ARE SUPPORTED BY SUBSTANTIAL EVIDENCE[25]

As with avoided costs under the DTSA, the jury heard substantial evidence regarding how

Mr. Britven calculated a reasonable royalty for TriZetto's copyright claim and New York trade-

secret claim.  Mr. Britven explained that he considered all *Georgia-Pacific* factors, including

development costs, and calculated the royalty amount the parties would have agreed to in a

hypothetical negotiation. Tr. 411:16-412:21; Tr. 380:3-463:22; Ex. 6 at DDX-3.31-32.  Mr.

Britven's testimony addressed and rebutted Syntel's arguments, including the *Georgia-Pacific*

factors Syntel argued weighed in its favor, Tr. 411:14-412:21, and the Duff & Phelps report, Tr.

444:9-448:4, 462:14-463:16.  Based on his analysis, Mr. Britven explained that a royalty of at least

50% of Syntel's avoided costs was appropriate. Tr. 411:6-413:2, 441:19-442:9.  The jury credited

Mr. Britven's testimony. *Sowemimo*, 2000 WL 546439, at *5.  The Court should deny Syntel's

request to disregard the jury's credibility findings and reweigh the evidence anew.  *Id.*

### A.  Syntel's Disagreement with the Jury's Royalty Model Is a Basis for JMOL

Syntel argues that the jury's reasonable royalty award is "contrary to the law because [it

is] based purely on avoided costs." JMOL at 27.  Syntel cites no case holding avoided costs cannot

---

[25] Syntel did not request a new trial or remittitur for the jury's copyright infringement or New York trade secret awards.

form the basis of a reasonable royalty under New York law or copyright law.[26]  Moreover, the jury was specifically instructed—*without objection from Syntel*—to consider a variety of factors, including the "total value of the secret to the owner, *including its development costs*, if any" and the "time and effort that would have been required before the misappropriator could have acquired or likely acquired the same or equivalent information through proper means."  Dkt. 935-12 at 30. By failing to object, Syntel forfeited the ability to challenge the jury's reliance on avoided costs for the royalty award.  *See Diesel v. Town of Lewisboro*, 232 F.3d 92, 110 (2d Cir. 2000).

Syntel is thus left to disagree with how the jury weighed the evidence.  While Syntel may believe that the Duff & Phelps report or its profits were a better measure of the royalty, the jury disagreed and substantial evidence supports its decision.  Contrary to Syntel's argument that Mr. Britven's analysis rests entirely on avoided costs, Mr. Britven analyzed all *Georgia-Pacific* factors, including those that favored Syntel, such as Syntel's actual revenue. *See* § VII., *supra*.  Syntel's disagreement with the jury's application of the royalty instruction to the evidence is no basis for JMOL. *See Sowemimo*, 2000 WL 546439, at *5.

### B.    Mr. Britven's Opinion Is Proper and Supported by Substantial Evidence

For the first time on JMOL, Syntel argues Mr. Britven's opinion that a reasonable royalty would award at least 50% of Syntel's avoided costs to TriZetto is "impermissible as a matter of law."  This new argument is waived.  *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 2020 WL 3582029, at *1 (S.D.N.Y. July 1, 2020).  Syntel also cites no case holding that "50/50 split[s are] impermissible as a matter of law" or granting JMOL on those grounds.  JMOL at 29.  Rather,

---

[26] In *Cornell Univ. v. Hewlett-Packard Co.*, the Court granted JMOL in a patent case because the jury's royalty base violated the entire market value rule, which is not at issue. 609 F. Supp. 2d 279, 292 (N.D.N.Y. 2009).  In *Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, the court rejected plaintiff's argument that it should be awarded development costs plus a 3.5-5.5% kicker because it failed to establish it was entitled to the "total value" of the trade secrets.  118 F.3d 955, 969 (2d Cir. 1997).  TriZetto does not seek the "total value" of the misappropriated trade secrets, and Mr. Britven's royalty opinion was less than his calculation of the portion of Syntel's avoided costs. Tr. 411:6-413:2.

Syntel's cases are (i) *Daubert* or new trial decisions; (ii) that hold the expert's opinion was not sufficiently tied to the facts of the case.[27]  Mr. Britven did not use a 50/50 "rule of thumb" nor did he offer a mere "cursory explanation."  JMOL at 29.  Rather, he carefully analyzed the industry size, expected growth and competitive landscape, Syntel's anticipated revenue ($1 billion) and aspiration to break into a new addressable market ($500 million), TriZetto's position as the market innovator and leader, and TriZetto's investments. Tr. 390:7-393:3, 411:14-412:21, 417:23-419:16, 380:3-463:22; PTX-189; DTX-83; Ex. 6 at DDX-3.31-32.

Syntel also contends that there is no "economically sound evidence Syntel would have agreed to pay $285M in avoided costs" because it made a "fraction" of that in revenues and because it could have obtained a license for "free."  JMOL at 29-30.  However, the jury awarded $142.5 million as a royalty, not $285 million, Dkt. 931 at 4, and the jury rejected that very argument. *See* § I., *supra*.  Syntel's motion for JMOL should be denied. *Sowemimo*, 2000 WL 546439, at *5.

## VIII.  THE JURY PROPERLY AWARDED PUNITIVE DAMAGES

The jury was presented with overwhelming evidence of Syntel's intentional bad acts and appropriately awarded $569 million in punitive damages.  Dkt. 931 at 6.  Far from legitimate competition, this case revealed massive theft, concealment, and greed by a multi-billion dollar corporation that still has access through its work to the technologies of many of the largest companies in the world.  The magnitude of the theft—over 100 trade secrets, including the direct copying of source code it took over a decade to develop—is staggering, as is Syntel's disregard for not only TriZetto's intellectual property, but the judicial process, which it ran roughshod over

---

[27] *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332 (Fed. Cir. 2014) (where defendant filed *Daubert*, vacating damages award because expert did not "sufficiently establishing that the premises of the theorem actually apply to the facts"); *Vaporstream, Inc. v. Snap Inc.*, 2020 WL 2543814, at *5 (C.D. Cal. Jan. 10, 2020) (granting *Daubert* where expert "fail[ed] to sufficiently tie this fact to his 50/50 profit split conclusion."); *Robocast, Inc. v. Microsoft Corp.*, 2014 WL 350062, at *3 (D. Del. Jan. 29, 2014) (similar).

in repeatedly offering false testimony, destroying evidence, and refusing to comply with the most basic discovery requests. The jury correctly recognized Syntel must be punished to deter it and every other billion-dollar company considering the same conduct from ever doing this again.

The jury's award award is thus neither grossly excessive nor unconstitutional. To the contrary, the jury's verdict is consistent with—and expressly authorized by—the DTSA's substantive requirements and the Act's 2-to-1 cap on punitive damages, a legislative judgment about the appropriate size of punitive damages awards that deserves "substantial deference" and largely resolves the fair notice concerns underlying the constitutional limits on such awards. *Allam v. Meyers*, 906 F. Supp. 2d 274, 293 (S.D.N.Y. 2012).[28]

### A.     The DTSA's Safeguards Ensure Punitive Damages Awards Are Reasonable And Constitutional

Jurors "have considerable flexibility" in setting the amount of a punitive damages award. *Id.* "Only when an award can fairly be categorized as 'grossly excessive'" does the award "enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *Id.* The Second Circuit has identified three guideposts for determining whether a punitive damages award is excessive: (1) the "degree of reprehensibility of the defendant's conduct"; (2) the "disparity between the actual or potential harm suffered by the plaintiff and the punitive damage award"; and (3) "the difference between the punitive damages awarded by the [fact-finder] and the civil penalties authorized or imposed in comparable cases." *Motorola Credit Corp. v. Uzan*, 509 F.3d 74, 85 (2d Cir. 2007); *Sooroojballie v. Port Authority of N.Y. & N.J.*, 816 F. App'x 536, 548-49 (2d Cir. 2020). None supports a finding of excessiveness here.

And the "landscape of [this Court's] review is different" when considering a punitive

---

[28] Syntel suggests TriZetto treated the preclusion order as a directed verdict, but TriZetto was careful not to treat the Court's instructions as a directed verdict and specifically told the jury that it needed "to prove that the[] test cases and automation scripts are trade secrets." Tr. 864:3-20.

damages award under a statute that clearly sets forth the conduct necessary to trigger punitive damages and caps the ratio of punitive to compensatory damages. *Arizona v. ASARCO LLC*, 773 F.3d 1050, 1055 (9th Cir. 2014) (*en banc*); *see also BNSF R. Co. v. U.S. Dep't of Labor*, 816 F.3d 628, 643 (10th Cir. 2016).   A "rigid application of the *Gore* guideposts is less necessary or appropriate" where, as here, "the legislature has spoken explicitly on the proper scope of punitive damages." *ASARCO*, 773 F.3d at 1056; *Abner v. Kansas City S. R.R. Co.*, 513 F.3d 154, 164 (5th Cir. 2008).   The constitutional limits on punitive damages awards stem from two related concerns: (1) that a defendant "receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty" that may be imposed; and (2) avoiding arbitrary awards imposed in an "imprecise manner" without any meaningful limits. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003).   Robust statutory punitive damages schemes address these concerns and eliminate the need for judicial scrutiny of individual awards.

The DTSA's safeguards ensure punitive damages awards under the statute comport with due process.   First, the DTSA clearly sets forth the conduct and mindset necessary to trigger punitive damages: "willfully and maliciously misappropriat[ing]" a trade secret.   18 U.S.C. § 1836(b)(3)(C).   Second, the statute identifies the types of compensatory damages a jury may award and caps punitive damages at "an amount not more than 2 times the amount of damages awarded" by the jury. *Id.* § 1836(b)(3)(B)-(C); *see also Cush-Crawford v. Adchem Corp.*, 271 F.3d 352, 359 (2d Cir. 2001) (concern about limitless punitive damages awards "is eliminated by the imposition of the statutory caps").   Given these twin safeguards, since the DTSA's enactment, Syntel and anyone else tempted to misappropriate trade secrets have had fair notice regarding the type of conduct that could subject them to punitive damages and the severity of that potential punishment. *See ASARCO*, 773 F.3d at 1057 (reaching same conclusion for Title VII); *Deters v.*

*Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1272 (10th Cir. 2000) (same).  Moreover, the DTSA's 2x cap removes any arbitrariness concerns by joining a long legislative tradition of providing for double, triple, or quadruple damages to deter and punish, which the Supreme Court intimated would likely survive any due process challenge.  *See State Farm*, 538 U.S. at 425.

The DTSA's statutory requirements also satisfy the Second Circuit's three guideposts.  The DTSA ensures punitive damages are reserved for reprehensible conduct by requiring willful and malicious behavior.  *See ASARCO*, 773 F.3d at 1057.  Its 2:1 ratio limits any significant disparity between compensatory and punitive damages award and is less than half the 4:1 ratio the Supreme Court has suggested "might be close to the line of constitutional impropriety."  *State Farm*, 538 U.S. at 425.  As for the third guidepost, the damages provisions in the DTSA provide express legislative guidance that malicious misappropriation warrants significant punishment.  18 U.S.C. § 1836(b)(3)(C); S. Rept. 114-220, at 1-3 (2016); *see also Garcia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1024 (7th Cir. 2016).  The Court need look no further than the language of the DTSA to confirm that the jury's punitive damages award is appropriate and should not be disturbed.

**B.    The Second Circuit's Guideposts Confirm The Jury's Award Is Reasonable And Constitutional**

Even subjecting the jury's award to the three-guidepost analysis, the amount is constitutionally permissible and appropriately tailored to punish Syntel's behavior.

**Syntel's Reprehensible Conduct:**  The most important factor for determining the reasonableness of a punitive damages award is the "degree of reprehensibility of the defendants' conduct."  *Motorola*, 509 F.3d at 85.  Five considerations guide this Court's assessment:  whether "the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and

the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm*, 538 U.S. at 419.   No one factor is dispositive, and "a purely economic injury can justify a substantial award," *Motorola*, 509 F.3d at 87.  The most important consideration is instead whether Syntel's conduct was "so reprehensible as to warrant imposition of further sanctions."  JMOL at 31.  In reviewing Syntel's conduct, the Court must view the evidence in the light most favorable to TriZetto.  *See Anderson v. Osborne*, 2020 WL 6151249, at *8 (S.D.N.Y. Oct. 20, 2020).

Syntel willfully and maliciously misappropriated over 100 trade secrets.  None of its actions were accidental.  The documents and testimony are crystal clear on what happened here: Syntel formed a plan in 2012 "to go to war" with a "Trojan Horse" plan to kill TriZetto from the inside, using an "arsenal" of tools and accelerators that it could use to literally "target" TriZetto's customers—but not its tools and accelerators, *TriZetto's* tools and accelerators, that it would steal to achieve its near-term "$1B goal."  DTX-83.1-2; Tr. 505:12-13; PTX-189.9.  As part of that plan, Syntel employees who were supposed to access the trade secrets only to service TriZetto's customers instead shared those tools with Syntel's internal product consulting team.  DTX-95; DTX-96; DTX-100; Tr. 269:14-271:14, 517:5-15.  This was not an isolated incident.  Syntel downloaded more than 700 test cases and automation scripts, while its Facets Architect urged his colleagues to download as many manuals as possible before they lost access.  DTX-5.1; Tr. 278:17-20.[29]  Syntel not only misappropriated these trade secrets, it told its customers the stolen tools and test cases were "our tools" and "Syntel's test asset[s]."  DTX-15.34, .70; DTX-78.16-17; DTX-149.3.  Syntel executed this plan for years, through the filing of this lawsuit, with Syntel's employees all the while internally committing to this same "TriZetto Combat Plan" where, when

---

[29] Syntel briefly hints only repeated actions "against [] different parties" merit punitive damages, but courts routinely find repeated acts of misappropriation or fraud directed toward the plaintiff are reprehensible and justify significant financial penalties.  *E.g.*, *Motorola*, 509 F.3d at 86; *Yung v. Grant Thornton, LLP*, 563 S.W.3d 22, 66-67 (Ky. 2018).

the time was right, it would "go for the kill" using TriZetto's trade secrets against it.  DTX-149;

DTX- 5.1.  Syntel made similar misrepresentations on its website through trial, and its General

Counsel admitted Syntel continued using those tools through at least 2018.  DTX-1162.1-2; Tr.

280:15-281:10 (Bergeron), 617:9-16 (Moore), 631:7-23 (Moore).

Syntel then lied and destroyed documents to conceal its misappropriation.  TriZetto first

raised concerns about potential misappropriation in 2014.  Syntel assured TriZetto it would honor

its confidentiality obligations, even though Syntel had already misappropriated TriZetto's

software, tools, and guides.  PTX-44.  The head of its PCT team intentionally misspelled words to

frustrate searches for emails discussing TriZetto's trade secrets.  DTX-36; Tr. 276:22-277:7.  After

TriZetto filed suit, Syntel deleted almost 300 files to conceal the magnitude of its theft.  DTX-245;

Tr. 278:22-280:13.  Two PCT team leaders testified they never accessed TriZetto's software tools

despite being copied on emails distributing those trade secrets.  Dkt. 961-2 at 2, 10-11, (2/20-21/18

Chadha Dep.) 37:5-14, 462:19-25; Dkt. 961-1 at 2-3, (3/5/18 Sinha Dep. Tr.) 102:9-11, 103:3-4,

104:5-8; DTX-97; DTX-100.   Another senior manager testified Syntel never possessed a

repository of TriZetto test cases and automation scripts.  DTX-21.  Syntel later produced hundreds

of scripts and test cases.  Tr. 278:17-20.  These repeated efforts to conceal its misappropriation

further illustrate Syntel's willingness to say anything to get its way, confirming the reprehensibility

of Syntel's conduct.

Syntel's brief confirms it still feels no remorse.  Rather than accept responsibility, Syntel

characterizes its deliberate misappropriation as "vigorous competition in the marketplace."  JMOL

at 33.  But the 2012 Amendment did not give Syntel the right to covertly use TriZetto's trade

secrets and market them as Syntel's proprietary technology.  As Syntel's chief delivery officer—

and lead trial witness—acknowledged, "[i]t would be flat wrong" to use TriZetto's trade secrets to

compete against TriZetto.  Tr. 514:6-17, 515:23-516:1, 620:22-24.  Indeed, there is no evidence

that ***anyone*** at Syntel believed they had the right to use the trade secrets to build a competing

business when the misappropriation occurred.  Tr. 630:1-11, 630:15-21.  Syntel's lawyers invented

that theory years later.  Syntel in other places attempts to blame its customers, asserting that UHG

"provided Syntel with access to TriZetto's information."  JMOL at 34 n. 10.  Also not true.  Syntel

first misappropriated the tools years before servicing UHG, and used the stolen test cases and other

tools as part of its sales pitch to UHG.  DTX-78.16-17; Tr. 578:15-580:16, 616:17-617:1.  Syntel's

remaining arguments fail to accept the facts found by the jury.

   **Ratio Of Punitive To Compensatory Damages:**  The second guidepost "compares actual

*and potential* damages to the punitive award."  *BMW of North America v. Gore*, 517 U.S. 559, 582

(1996) (rejecting a 500:1 ratio).  The 2:1 ratio applied by the jury raises no constitutional concerns.

Although the Supreme Court "ha[s] been reluctant to identify concrete constitutional limits on the

ratio" between compensatory and punitive damages, it has repeatedly suggested statutorily

authorized double, triple, or quadruple punitive damages awards will rarely, if ever, violate due

process.  *State Farm*, 424-25; *Gore*, 517 U.S. at 581.  This remains true even for substantial

compensatory damages.  Indeed, the Ninth Circuit has held that when "there are significant

economic damages, a four-to-one ratio is a good proxy for the limits of constitutionality."  *King v.

GEICO Indem. Co.*, 712 F. App'x 649, 650 (9th Cir. 2017) (quotation marks omitted).  Other

courts likewise routinely approve of punitive damages multipliers that "far exceed 1-to-1" on top

of "substantial" compensatory damages awards.  *Lompe v. Sunridge Partners, LLC*, 818 F.3d 1041,

1085-86 (collecting cases).[30]  As these cases illustrate, Syntel's argument that the Constitution

---

[30] *See also TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 451, 462 (1993) (plurality) (affirming $10 million punitive damages award where jury awarded $19,000 in actual damages); *Conseco Fin. Serv. v. N. Am. Mortg. Co.*, 381 F.3d 811, 825 (8th Cir. 2004) (approving a 2:1 ratio and a $47 million punitive damages award); *Yung*, 563 S.W.3d

requires a 1:1 ratio whenever the jury awards significant damages is baseless and contradicts the express terms of the DTSA.

Syntel's argument that the Court should ignore the avoided costs damages awarded by the jury when judging the reasonableness of the punitive damages is equally meritless.  Avoided costs are part of the compensatory damages authorized by the DTSA and are properly considered part of the actual damages the jury awarded.  *See Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 272 F.3d 1335, 1350-51 (Fed. Cir. 2001) (rejecting argument that the ratio between unjust enrichment and punitive damages is not "the proper point of comparison"); 18 U.S.C. § 1836(b)(3)(B).   Ignoring those costs would artificially limit punitive damages awards, undermining Congress's legitimate interest in deterring future willful misappropriation.  Here, Syntel attempts to cap the punitive damages award at $8.5M—less than 3% of the costs it saved by deliberately misappropriating the trade secrets.  That is not a meaningful deterrent.

Only comparing the punitive damages to TriZetto's actual losses also ignores the "*potential harm*" from Syntel's misconduct.  *Gore*, 517 U.S. at 582; *State Farm*, 538 U.S. at 418.  Syntel projected its misappropriation would create a $1 billion opportunity that would generate $100 million per year.  PTX-189.2, .9.  It would be "unseeml[y] for [Syntel] who engage[d] in malicious or reckless violations of legal duty to escape either the punitive or deterrent goal of punitive damages merely because" its scheme was less successful than anticipated, especially where it withheld important damages information.  *Cush-Crawford*, 271 F.3d at 359; Tr. 410:16-19, 459:5-460:18.  Even if the Court disregards avoided costs, TriZetto's lost profits are not the correct denominator.  The jury awarded a $142 million reasonable royalty for Syntel's misappropriation under New York law, which measures the actual harm to TriZetto and results in a constitutionally

---

at 73 (affirming $80 million in punitive damages based on 4:1 ratio); *Motorola*, 2020 WL 6554645, at *1, 12, 15-16 (approving 2:1 ratio where jury awarded $209 million in compensatory damages for trade secret misappropriation).

permissible 4x punitive damages multiplier. *See Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists*, 422 F.3d 949, 962 (9th Cir. 2005); *Member Servs., Inc. v. Sec. Mut. Life Ins. Co. of N.Y.*, 2010 WL 3907489, at *27 & n. 52 (N.D.N.Y. Sept. 30, 2010).

Syntel strays even further from the law when it asks the Court not to "award any additional punitive damages." JMOL at 36. The jury found Syntel's conduct warranted punitive penalties, and neither the DTSA nor the Constitution permits this Court to substitute its judgment about whether the compensatory damages were "sufficient to both compensate TriZetto and punish Syntel." *Id.* The lone case Syntel cites in support of its novel argument—*Citcon, USA, LLC v. RiverPay, Inc.*—applied the **California** Uniform Trade Secrets Act, which makes courts responsible for setting the amount of punitive damages. *See* 2020 WL 5365980, at *4, 5-6 (N.D. Cal. Sept. 8, 2020); Cal. Civ. Code § 3426.3(c).

**Civil Penalties And Similar Cases:** Turning to the third and final guidepost, the Court must compare punitive damages awards with the civil or criminal penalties imposed for comparable conduct. Congress made a reasoned judgment that the punitive damages the jury awarded here—"an amount not more than 2 times the amount of the [compensatory] damages," 18 U.S.C. § 1836(b)(3)(C)—are appropriate for willful misappropriation. Syntel contends this punitive damages cap "is of no moment," JMOL at 36, but the Supreme Court has instructed courts to give "'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue," *Gore*, 517 U.S. at 583. The purpose of looking at the available penalties is to assess whether Syntel "received fair notice 'that the wrongful conduct could entail a sizeable punitive damages award,'" *Allam*, 906 F. Supp. 2d at 293, and the DTSA's damages cap confirms Syntel was fully aware of this. *See Romano v. U-Haul Int'l*, 233 F.3d 655, 674 (1st Cir. 2000).

A review of similar cases confirms a significant punitive damages award is appropriate

here.  In *Motorola Solutions, Inc. v. Hytera Comm. Corp.*, another recent trade secrets case, the jury awarded $418 million in punitive damages.  2020 WL 6554645, at *1, 12, 15-16 (N.D. Ill. Oct. 19, 2020) (awarding $209 million in compensatory damages for misappropriation). Syntel contends the conduct in *Motorola* "was far more reprehensible," but its conduct was equally malicious.  JMOL at 38.  As in *Motorola*, Syntel continued to perform work for TriZetto even while it surreptitiously stole trade secrets.  Syntel used the misappropriated trade secrets to build its competing consulting services, just as Hytera used trade secrets to develop a competing product, and even after the jury verdict, Syntel has failed to take adequate steps to change its behavior. Dkt. 958 at 4-5.  More importantly, Syntel's efforts to draw fine distinctions between cases misses the point.  *See Payne v. Jones*, 711 F.3d 85, 104-05 (2d Cir. 2013) (comparing rulings across cases "is precarious because the factual differences between cases can make it difficult to draw useful comparisons").  What matters is whether courts have entered similar awards for willful trade secret misappropriation, not whether courts have entered identical awards for identical conduct.

Other courts have entered nine-figure enhanced damages awards for willful patent infringement without suggesting those awards may violate due process.[31]  Like willful trade secret misappropriation, those awards arise from a congressionally authorized scheme that permits "damages up to three times the amount found or assessed" for willful infringement.  35 U.S.C. § 284; *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016).  Like punitive damages under the DTSA, these awards seek to punish reprehensible conduct that inflict purely economic injuries.  These awards are thus further evidence that the award here does not offend due process.

---

[31] *See Centripetal Networks, Inc. v. Cisco Sys., Inc.*, — F. Supp. 3d —, 2020 WL 5887916, at *70 (E.D. Va. Oct. 5, 2020) (awarding $1.13 billion in enhanced damages); *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 2020 WL 2844410, at *15, 17 (C.D. Cal. Apr. 2, 2020) (awarding $389 million); *KAIST IP US LLC v. Samsung Elecs. Co., Ltd.*, No. 2:16-cv-01314, Dkt. No. 678 at 2 (E.D. Tex. Feb. 21, 2020) (awarding $102 million); *Alfred E. Mann Found. for Scientific Res. v. Cochlear Corp.*, 2018 WL 6190604, at *35, 37 (C.D. Cal. Nov. 4, 2018), *aff'd*, 798 F. App'x 643 (Fed. Cir. 2020); *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assoc.*, No. 03-cv-00597, Dkt. No. 1047 at 2 (D. Ariz. Aug. 24, 2010) (awarding $186 million).

Syntel relies heavily on *Epic Systems*, but even that decision approved a $140 million punitive damages award. *See Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.,* 2020 WL 6813872, at *20-21 (7th Cir. Nov. 30, 2020). It makes no difference that the Seventh Circuit cut the district court's $280 million award in half and held the Constitution required a 1:1 ratio in the circumstances of that case. *Id.* at *20. Critically, *Epic Systems* did not involve misappropriation under the DTSA, and the Seventh Circuit did not consider whether the DTSA's statutory safeguards (or the safeguards under the Wisconsin statute at issue in that case) addressed its due process concerns. *Id.* The conduct in *Epic Systems* was also less reprehensible than Syntel's conduct here. The defendant in that case, Tata, used the trade secrets to identify gaps in its own software, *id.* at *3, 8-9, rather than rebranding the trade secrets as its own propriety technology, as Syntel did here. When its misappropriation was discovered, unlike Syntel, Tata also did not destroy files or offer false testimony from its leadership denying that it had access to the trade secrets. To the extent case comparisons matter despite the express terms of the DTSA, Syntel's conduct justifies both a greater punitive damages amount and multiple than *Epic* awarded.

Because the jury's punitive damages award is reasonable, in line with awards in similar cases involving the theft of intellectual property, and expressly authorized by Congress, it does not offend due process. There are no rigid constitutional benchmarks a punitive damages award may not surpass, and the size of the award here appropriately reflects the amount of money potentially at stake and the reprehensibility of Syntel's conduct. *See TXO*, 509 U.S. at 462. Indeed, there is no question Syntel had fair notice of the severity of the potential penalty for its misappropriation: in its original complaint, Syntel demanded ***$6.135 billion*** in punitive damages for what amounted to a baseless misappropriation claim. Dkt. 1 at 6. And Syntel's actions have shown only a significant punitive damages award will adequately punish and deter its egregious misconduct.

51

## IX.    TRIZETTO'S REQUEST FOR INJUNCTIVE RELIEF

The Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. ("DTSA"), and the Copyright Act, 17 U.S.C. § 101 *et seq.*, entitle TriZetto to permanent injunctive relief on terms the Court deems reasonable[32] because TriZetto meets the prerequisites for issuance of an injunction.  *See Chadha v. Chadha*, 2020 WL 1031385, at *15 (E.D.N.Y. Mar. 2, 2020).  To decide whether TriZetto meets the prerequisites for a permanent injunction, courts consider whether TriZetto (1) "suffered an irreparable injury," (2) the "remedies available at law . . . are inadequate to compensate for that injury," (3) "considering the balance of hardships between [TriZetto] and [Syntel], a remedy in equity is warranted," and (4) "the public interest would not be disserved by a permanent injunction."  *Id.* (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).  All of the factors weigh in favor of granting a permanent injunction in favor of TriZetto.  Accordingly, TriZetto respectfully requests that the Court enter a permanent injunction enjoining Syntel, its officers, agents, servants, employees, and attorneys, and all those acting together with any of them[33] from continuing to misappropriate TriZetto's trade secrets and infringe TriZetto's copyrights, including use, duplication, or advertisement of TriZetto's trade secrets to sell Syntel's products or services, anywhere in the world.[34]

### A.    Syntel's Ongoing Misappropriation and Infringement Will Irreparably Injure TriZetto and Remedies at Law are Inadequate to Compensate for that Injury

TriZetto succeeded on the merits of its trade secrets misappropriation and copyright

---

[32] The DTSA authorizes the Court to "grant an injunction . . . to prevent an actual or threatened misappropriation . . . on such terms as the court deems reasonable."  18 U.S.C. § 1836(b)(3)(A).  The Copyright Act authorizes the court to "grant . . . final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright."  17 U.S.C. § 502(a).

[33] TriZetto specifically requests that the permanent injunction also enjoin Atos-Syntel Inc., which formed after Atos S.E. acquired Syntel, Inc. in 2018.

[34] As seen in the accompanying [Proposed] Permanent Injunction Order, TriZetto requests that the Court's injunction include audit rights that permit TriZetto to periodically inspect Syntel's activities to ensure Syntel remains in compliance with the injunction.

infringement claims when the jury found Syntel liable on all counts, including awarding punitive damages for Syntel's willful and malicious behavior.  *See* Dkt. 931.  Having succeeded on the merits of its trade secret and copyright claims at trial, TriZetto is entitled to a presumption of irreparable harm.  *Warner Bros. Entm't Inc. v. RDR Books*, 575 F. Supp. 2d 513, 552 (S.D.N.Y. 2008) ("generally when a copyright plaintiff makes out a prima facie showing of infringement, irreparable harm may be presumed"); *see KCG Holdings,* 2020 WL 1189302, at *16 (similar for trade secret misappropriation).  Even if such a presumption did not apply, the facts plainly establish that irreparable injury will occur absent an injunction and the remedies available at law are insufficient to compensate TriZetto.  TriZetto has lost and will continue to lose customer work it earned through investing years and millions of dollars into research and development, as well as protection, of its intellectual property.  Indeed, the MSA Syntel breached in misappropriating TriZetto's trade secrets specifically provides that injunctive relief may be sought for a breach, the very circumstances here.  DTX-1 § 22.06. The jury's damages award does not obviate the need for an injunction in this case because it remedies only a portion of the time and money TriZetto spent to develop its trade secrets and does not address Syntel's unquantifiable head start.  Tr. 398:8-14.

      1.      **Syntel's continued misappropriation and infringement has irreparably harmed TriZetto's goodwill and reputation, and caused TriZetto to lose customer work**

      TriZetto devoted over 25 years and more than 500 million dollars to the development of TriZetto's trade secret software tools and accelerators as part of the Facets architecture.  Tr. 70:9-14; 91:13-18; 167:18-23.  Through that investment, TriZetto positioned itself as the leading technology provider in the healthcare payer market with approximately 66 percent share of Medicare and Medicaid related health plans and over 170 million lives, about 59 percent of the U.S. population, on its platform.  Tr. 168:6-24; 179:11-13.  Before TriZetto developed and sold its Facets architecture, health insurance companies were administering health plans manually or with

older, legacy systems that were not as flexible or scalable as Facets, and which could not keep up with changes in healthcare.  Tr. 77:22-78:4.  Thus, TriZetto's trade secret software tools and documentation are valuable assets that drive TriZetto's business.  Tr. 70:9-14, 167:14-25 (Mr. Sanders explaining that TriZetto's intellectual property is "extremely important" to TriZetto's business and its innovations are a "unique value product for" TriZetto's business).  Syntel's misappropriation and infringement detract from the value held in TriZetto's intellectual property.  Tr. 70:15-20, 176:8-13, 385:9-15.  And the MSA that Syntel breached by engaging in its misappropriation provided that injunctive relief could be sought for just such a breach.  DTX-1 § 22.06.  Syntel's theft of TriZetto's tools and software, which were then used to unfairly compete against TriZetto, and will continue to be, compromised TriZetto's business and its position as a market leader.  Tr. 76:7-15; 156:10-13.  *Anacomp, Inc. v. Shell Knob Servs., Inc.*, 1994 WL 9681, at *5 (S.D.N.Y. Jan. 10, 1994) ("loss of the advantage of being the pioneer in [a] field and [a] market leader, may constitute irreparable harm.").

Continued unauthorized use of TriZetto's trade secret technology will also irreparably harm TriZetto's goodwill.  *Complex Sys., Inc. v. ABN AMRO Bank N.V.*, 2014 WL 1883474, at *12-13 (S.D.N.Y. May 9, 2014) ("[P]laintiff was irreparably injured because defendant's unauthorized use and misappropriation of plaintiffs['] music database enabled defendant to compete directly with plaintiff's core business.") (internal quotation marks omitted); *Asa v. Pictometry Int'l Corp.*, 757 F. Supp. 2d 238, 244 (W.D.N.Y. 2010) (finding irreparable harm where "[plaintiff] stands to lose customer goodwill, as well as actual customers").  TriZetto invested substantial time and money into developing its Facets technology, which differentiated TriZetto from others in the market and brought value to customers.  Tr. 91:13-18 (TriZetto's Facets architecture is the result of 25 years and $500 million of investment).  Although Syntel ultimately

removed its website advertisement touting TriZetto's "tools" and "accelerators" as its own, Syntel *still* claims that the test cases and automation scripts it uses are its *own* design. Dkt. 957 at 2. This intentional deceit of its customers about whose technology Syntel is using results in further irremediable injury to TriZetto's market position. Tr. 387:14-388:17; DTX-0149; *See Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 262 (2d Cir. 2014) (explaining that in the false advertising context, "where the parties are direct competitors in a two-player market, and where literal falsity and willful, deliberate deception have been proved, the presumption[] of injury . . . may be used for the purposes of awarding [] injunctive relief.").

Syntel has unfairly taken customer work away from TriZetto through its misappropriation and infringement. This constitutes irreparable harm. *Complex Sys.,* 2014 WL 1883474, at *12-13 ("[I]t is well-established that a movant's loss of current or future market share may constitute irreparable harm.") (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2d Cir. 2007)). In the three-tiered consulting marketplace, TriZetto and Cognizant were the only significant players in the complex consulting market prior to Syntel's misappropriation of TriZetto's trade secrets and infringement of its copyrighted code. Tr. 387:1-13; DTX-149 (Syntel email calling Syntel the "only alternative" to a "monopolized market."). TriZetto earned that market position by building customer relationships, centered around TriZetto's trade secret technologies. As Mr. Noonan explained at trial, TriZetto's "customers that rely on Facets use it for their core business of healthcare [and] [t]hey rely on us for upgrades, the upgrades are the changes to the software." Tr. 65:12-16, 387:1-13; DTX-149 (Syntel email calling Syntel the "only alternative" to TriZetto). But Syntel was able to enter into the complex market simply by taking and using TriZetto's intellectual property (just as it planned). Tr. 385:16-20 (Syntel's misappropriation allowed it to "leapfrog" investment into research and development and "go right

to market with the associated products."); DTX-149.

Syntel did in fact take Facets-based consulting work from TriZetto, using TriZetto's misappropriated trade secrets, including for customers such as United Health Group ("UHG"), one of TriZetto's five largest customers.  Tr. 243:16-17.  Syntel also admittedly performed Facets work for Anthem, BCBS Tennessee, BSC, CDPHP, and Presbyterian Health Systems.  *See* DTX-80. And Syntel has made clear that it intends to continue doing Facets work, admitting after trial that it continues to service at least CDPHP and BSC under its rejected authorization argument.[35] Without an injunction putting a halt to Syntel's misappropriation, TriZetto will likely continue to lose customer work as a result of Syntel's misappropriation and infringement.  *Acumed LLC v. Stryker Corp.*, 2007 WL 4180682, at *4-6 (D. Or. Nov. 20, 2007) (finding irreparable injury and inadequate remedies at law based on patent plaintiff's "loss of market share and customers."); *see Dish Network L.L.C. v. Cintron*, 2013 WL 12385273, at *7-8 (M.D. Fla. Jan. 2, 2013) (finding "significant" harm to DMCA plaintiffs absent a permanent injunction because "Plaintiffs will continue to suffer damage to their business reputations and goodwill and will continue to lose customers and profits."); Ex. 7 ¶¶ 8-15.

### 2. Syntel's continued misappropriation risks disclosure of TriZetto's trade secrets

Syntel's theft and use of TriZetto's trade secrets will be a disincentive to TriZetto's future innovation if not enjoined, particularly given that Syntel's employees have already taken steps to disseminate TriZetto's trade secrets.  Tr. 385:9-15.  For example, Ankur Chadha testified that he

---

[35] The TPAA allowed CDPHP to provide Syntel with TriZetto Confidential Information—including TriZetto's trade secrets—*only* so that Syntel could perform four enumerated services for CDPHP, not for any other client or for any other purpose.  PTX-838 at 1.  Nor did the CDPHP TPAA authorize Syntel to rebrand and claim TriZetto's trade secret materials as its own.  Although Syntel removed certain advertisements from its website after the jury found Syntel had willfully and maliciously misappropriated TriZetto's trade secrets, Syntel continues to argue that its advertisements are not misappropriation because it does not sell Facets or the tools mentioned in the advertisements. *See* Dkt. 960 at 18-19.

emailed TriZetto trade secret manuals so that they could be used on a project with UHG.[36]
TriZetto's misappropriated trade secrets were also found on Syntel's servers in India, and as Mr.
Reddy explained, Syntel has "global operations across the world," including service delivery
centers "in the U.S. . . . Poland . . . Bulgaria . . . India, and also one in Manila."  Tr. 470:3-12.
There is also clear evidence that Syntel did not respect the confidentiality of Trizetto's trade secrets
and instead utilized material across customers.  DTX-104; DTX-100.   Even Syntel's General
Counsel, Daniel Moore, testified that he did not know one way or another whether Syntel ever
transferred or disclosed TriZetto's confidential information.  Tr. 618:3-9.  Thus, this is no longer
a situation where "the misappropriator . . . ha[s] the same incentive as the originator to maintain
the confidentiality of the secret in order to profit from the proprietary knowledge."  *See Faiveley
Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 119 (2d Cir. Mar. 9, 2009).   Absent an
injunction, nothing will stop Syntel from forwarding TriZetto trade secrets outside Syntel without
any approval by TriZetto and without that customer having any confidentiality agreement in place
with TriZetto.  The danger in this case that, unless enjoined, Syntel's continued misappropriation
will likely result in dissemination further establishes irreparable harm.  *See KCG Holdings,* 2020
WL 1189302, at *16; *see Faiveley,* 559 F.3d at 118-119.

### 3.    Money damages cannot adequately compensate for Syntel's theft and infringement

In addition to the harm to TriZetto's reputation and loss of customers described above, the
difficulty in calculating monetary damages confirms that Syntel's theft and infringement cannot
be adequately remedied at law.  *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999)

---

[36] Dkt. 961-2 at 10-11 (Chadha Dep. Designation), 463:8-466:2.  In addition, Syntel was acquired by Atos in 2018.
That acquisition included Syntel's alleged tools and accelerators, which are actually TriZetto's trade secrets, and the
information was likely disseminated to Atos, at a minimum during due diligence and undisputedly thereafter, once
Atos acquired Syntel (and TriZetto's trade secrets).

(finding irreparable injury because "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come."). *First*, the jury's verdict only accounted for a portion of TriZetto's costs related to the development of the trade secrets known to be misappropriated by Syntel, notwithstanding the fact that Syntel used all of TriZetto's Facets program to divert customers from TriZetto. Mr. Noonan explained that he had been working on the development of Facets for over 20 years and that there have been "many dozens" of versions and releases of Facets. Tr. 61:2-3, 63:22-24. Mr. Britven, however, only calculated Syntel's avoided R&D from 2004 to 2014 because the breadth of Syntel's theft exceeded the time period for which sufficiently reliable cost information was available. Tr. 384:24-385:1. Monetary damages are thus inadequate to compensate TriZetto for Syntel's theft. *See Choice Hotels Int'l Inc. v. Fultonville Hospitality Grp. Inc.*, 2014 WL 12599390, at *2-3 (N.D.N.Y Mar. 10, 2014) (granting injunction where ability to calculate compensatory damages was limited).

*Second*, Syntel obtained an unquantifiable head start through its misappropriation. "An injunction may be used to eliminate any unfair head start a defendant may have gained by improper use of confidential information, and is appropriate if it 'place[s the defendant] in the position it would have occupied if the breach' had not occurred." *Netlist Inc v. Diablo Techs. Inc.*, 2015 WL 153724, at *7 (N.D. Cal. Jan. 12, 2015). While Mr. Britven calculated costs Syntel avoided spending through its misappropriation, that does not mean Syntel could have, in fact, developed the trade secrets had they actually spent the money. *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, 2013 WL 890126, at *4 (N.D. Cal. Jan. 23, 2013). Indeed, Syntel presented no evidence that it had the capability to develop a single one of TriZetto's trade secrets, let alone that it even ***tried*** to do so. Accordingly, Syntel maintains an unfair advantage from its misappropriation. *See id.*,

at *9 (entering injunction where defendant failed to provide evidence of inevitable discovery "through proper means" or "evidence about how long those proper means would take").

*Third*, monetary damages are not adequate to compensate TriZetto for Syntel's misappropriation because "the extent to which" Syntel will continue its misappropriation and infringement "in the future is uncertain." *Shred-It USA, Inc. v. Mobile Data Shred, Inc*., 228 F. Supp. 2d 455, 466 (S.D.N.Y. 2002), *aff'd*, 92 F. App'x 812 (2d Cir. 2004).  Throughout this case, Syntel attempted to obfuscate its possession and use of TriZetto's trade secrets.  Tr. 316:17-317:8 (giving instruction because Syntel attempted to suggest its "obtaining and using in the first instance were authorized"); *see also id.* 353:1-360:1.  Even now, with a verdict of willful and malicious misappropriation, Syntel makes no guarantee that it is not using "the specific manuals, tools, or test cases and automation scripts that were the subject of the trial," and instead offers its "belie[f]" that this is the case.  Dkt. 957 at 2.  Syntel also admits that it continues to use TriZetto's confidential documents and manuals, along with test cases and automation scripts that Syntel claims to have independently developed.  *Id.* at 2-3.  The jury, however, rejected Syntel's argument that it lawfully obtained TriZetto's confidential documents and manuals, and Syntel is precluded from arguing that it independently developed test cases and automation scripts.  Dkt. 931 (jury verdict); Dkt. 276 (preclusion order).  Syntel's conduct thus demonstrates that "there is a significant probability that [it] will continue" its misappropriation and infringement, but the extent of this conduct is "uncertain[]" and will be difficult to ascertain.  *See Shred-It*, 228 F. Supp. 2d at 466.

Syntel's unreliable reporting of its Facets-related revenues exacerbates the uncertainty.  For example, during discovery, Syntel provided a letter identifying what it claims were revenues from Facets work it performed, DTX-80, and it was only in its rebuttal expert report that Syntel provided entirely different financial data that did not reconcile with what it had previously provided.  *See*

59

Ex. 8.  Since the 2018 Atos acquisition, Syntel has provided no documentation of its Facets-related financials, instead providing an unsupported statement that its "total Facets consulting revenue for 2020 will be approximately $7.5 million" from three customers.  Dkt. 957 at 2.  Syntel's failure to provide reliable financial information regarding the revenues it has earned through its misappropriation confirms ongoing misappropriation and infringement cannot be adequately remedied at law.  *See Choice Hotels*, 2014 WL 12599390, at *2-3.

### B.      The Balance of Hardships Favors Enjoining Syntel's Conduct

Syntel has not identified, and will not suffer, any legally cognizable harm from an injunction prohibiting its continued illegal use of TriZetto's intellectual property.  Syntel's purported Facets-related revenues in 2020 comprises less than 1% of Atos's healthcare segment 2020 revenues (and less than 1/10 of a percent of its overall 2020 revenues).[37]  Even if Syntel could establish that this loss of revenue were significant, the law does not protect purported hardship based on the loss of continued infringement or misappropriation.  *See Warner Bros.*, 575 F. Supp. 2d at 553 (citation omitted); *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012) ("[A]s the district court noted, '[i]t is axiomatic that an infringer of copyright cannot complain about the loss of ability to offer its infringing product.'").  Moreover, nothing in the requested injunction stops Syntel from competing fairly in the market without use of the technology it stole from TriZetto.

TriZetto, on the other hand, will face significant and irreparable harm if Syntel's future illegal actions are not enjoined, and may be forced to again turn to the Court to protect its property interests.  *See Chanel, Inc. v. Bryan*, 2008 WL 11336327, at *7 (N.D. Ga. Nov. 18, 2008).  TriZetto's potential burden of having to try to monitor Syntel's actions, without any audit rights,

---

[37] Dkt. 957 at 2 (stating Syntel expected $7.5 million in Facets revenues for 2020); Ex. 9 at 1; Ex. 10 at 2.  Atos reports its financial results in Euros.  The current Euro to USD exchange rate is $1.23.

is significant given Syntel's lack of disclosure or destruction of evidence,[38] seriously outweighs the zero recognizable harm that Syntel would face if a permanent injunction issues in this case.

### C.     An Injunction is in the Public's Interest

The public interest also provides no basis for allowing Syntel to continue to profit from TriZetto's stolen technology, at the expense of TriZetto's business.  Trade secrets law serves to encourage innovation and protection of trade secrets is in the public interest.  *Intertek Testing Servs. v. Pennisi*, 443 F. Supp. 3d 303, 347 (E.D.N.Y. 2020) ("injunctive relief would serve the public interest by ensuring that . . . protecting plaintiff's . . . secrecy of its trade secrets and confidential information."); *HarperCollins Publishers LLC v. Open Road Integrated Media, LLP*, 58 F. Supp. 3d 380, 386 (S.D.N.Y. 2014) (similar for copyright).  TriZetto invested years and hundreds of millions of dollars to develop products, protected by its intellectual property, that affect millions of people in the United States.  An injunction in this case encourages continued and future investment in innovation, which strongly favors the public's interest.  Moreover, an injunction will not harm customers or the public generally because TriZetto is capable of satisfying demand for additional Facets-related services if Syntel is enjoined.  Ex. 11 ¶¶ 4-6.

### D.     A Worldwide Injunction is Necessary

TriZetto respectfully requests that the Court enter a worldwide injunction enjoining Syntel's conduct.  *See, e.g.*, *OmniGen Research, LLC v. Yongqiang Wang*, 2017 WL 5505041, at *24 (D. Or. Nov. 16, 2017) (worldwide injunction "appropriate and necessary" where "Defendants' wrongful actions have included conduct occurring in China"); *Richard Feiner & Co. v. Turner Entm't Co.*, 1998 WL 78180, at *1-3 (S.D.N.Y. Feb. 24, 1998) (issuing worldwide

---

[38] Tr. 279:14-280:7; 310:12-20 (explaining that Syntel's demonstrative of supposed file downloads was inaccurate and underrepresented because Syntel destroyed and hid computers before the forensic examiner had a chance to review them); 795:2-796:6 (Dr. Britven explaining the absence of financial information in this case raises a "red flag" based on his experience as a certified fraud examiner, and discussing destruction of computer forensic evidence in this case).

injunction in copyright infringement case).  A worldwide injunction is an appropriate domestic application of the DTSA and Copyright Act because Syntel's misappropriation and copying (the "focuses" of the relevant statutes) occurred in the United States, as explained below.  *See WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2137 (2018) ("If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application of the statute, even if other conduct occurred abroad."); *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988).  At a minimum, a worldwide injunction is appropriate because Syntel Inc. is a U.S. corporation, and both Syntel Inc. and Syntel Mauritius committed acts in furtherance of its misappropriation in the United States (also discussed below), thus, the DTSA would apply to extraterritorial conduct.  18 U.S.C. § 1837.

TriZetto maintained (and continues to maintain) a customer exchange website where it housed confidential and copyrighted materials, and which customer employees can access with a specific ID and password.  Tr. 69:5-70:12.  Syntel employees, including employees located in the U.S., downloaded TriZetto's trade-secret and copyrighted materials from that server in abnormally high volumes, which Dr. Bergeron testified (and email evidence further supported) indicated Syntel "was actively creating a repository."  Tr. 274:15-24; *see* DTX-1449 (audit logs).  Syntel also obtained through its CDPHP-related work TriZetto confidential documents, which Syntel could then use with other clients.  Tr. 275:1-24; DTX-104.  Those materials were then placed by Syntel employees on a Syntel shared drive for use and access by other Syntel employees located throughout the world.  *See* DTX-100.  Syntel's theft and continued misappropriation of TriZetto's trade secrets and copyrighted code and use of them, without an injunction, will allow Syntel to enrich itself from sales of services using that stolen intellectual property around the world.  Because Syntel's illegal conduct has continued around the world—and will continue absent an

injunction reaching its activities abroad—a worldwide injunction should issue.

### E.     If No Injunction is Granted, Syntel Should Pay Ongoing Royalties

No "exceptional circumstances that render an injunction inequitable" exist here, and, for the reasons explained above, a permanent injunction should enter.  18 U.S.C. § 1836(b)(3)(A)(iii). If, however, the Court disagrees, Syntel should at a minimum be required to pay TriZetto an ongoing royalty for its continued use of the misappropriated trade secrets and infringed copyrights. *Bianco v. Globus Med., Inc*., 2014 WL 1049067, at *12 (E.D. Tex. Mar. 17, 2014).  Consistent with Syntel's actions in this case and the jury's verdict, if an injunction is not entered, an ongoing royalty in the amount of $14M for each year (calculated based on the jury's royalty award) Syntel continues to use TriZetto's trade secrets and copyrights should be awarded.  Ex. 7 ¶¶ 16-24.  In addition, because the jury found Syntel's misappropriation to be willful and malicious misappropriation, to the extent Syntel intends to continue its willful and malicious misappropriation, the ongoing royalty should be enhanced (up to $42M/year).[39]

## X.     PREJUDGMENT INTEREST SHOULD BE AWARDED

In cases arising under federal law, "whether to award prejudgment interest … has[,] in the absence of a statutory directive[,] been placed in the sound discretion of the district courts." *Waterside Ocean Nav. Co. v. Int'l Nav. Ltd.*, 737 F.2d 150, 153 (2d Cir. 1984) (citation omitted).[40] In deciding whether to award prejudgment interest, courts consider "(i) the need to fully

---

[39] *See, e.g.*, *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co*., 2017 WL 4038884, at *3 (E.D. Tex. Sept. 13, 2017) (enhancing damages where "[d]efendants' continued infringement [is] unreasonable, deliberate and willful in nature"); *Telcordia Techs., Inc. v. Cisco Sys., Inc*., 2014 WL 1457797, at *4 (D. Del. Apr. 14, 2014) (similar).

[40] If, however, prejudgment interest were calculated based on the jury's reasonable royalty award for New York trade-secret misappropriation, New York state law would apply.  *Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998), *modified on other grounds*, 271 F.3d 81 (2d Cir. 2001).  In that circumstance, prejudgment interest would be mandatory, and would accrue at 9% annually, beginning on February 23, 2015.  N.Y. C.P.L.R. §§ 5001(a), 5004; *see also LinkCo, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 192 (S.D.N.Y. 2002).  In addition, under New York law, TriZetto would also be entitled to post-verdict, prejudgment interest on [the] punitive damages award, from the date of that verdict …, until the date the Court enters its final judgment.  *Koch v. Greenberg*, 14 F. Supp. 3d 247, 286 (S.D.N.Y. 2014), *aff'd*, 626 F. App'x 335 (2d Cir. 2015); *see* Ex. 7 ¶¶ 25-29 (prejudgment interest under New York law of $72,773,081 through October 26, 2020, and daily amount of $193,407).

compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co. v. Local Union No. 3*, 955 F.2d 831, 833-34 (2d Cir. 1992). "[A]bsent a sound reason to deny prejudgment interest, such interest should be awarded." *In re FKF 3, LLC*, 2018 WL 5292131, at *12 (S.D.N.Y. Oct. 24, 2018). "Without it, compensation of the plaintiff is incomplete and the defendant has an incentive to delay." *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) (prejudgment interest "presumptively available" under federal law).

The remedial purpose of the DTSA, along with considerations of fairness and equity, compel prejudgment interest in this case. Preventing a misappropriator from reaping the benefits of its misappropriation is the very purpose of the DTSA's remedial provisions, which specifically provide for the recovery of the misappropriator's unjust enrichment. 18 U.S.C. § 1836(b)(3); 162 Cong. Rec. S1629-02, at 8 (daily ed. Apr. 4, 2016) (statement of Sen. Orrin Hatch) (without DTSA, thieves "unfairly exploit and profit from the fruits of American know how in the global economy."); H.R. Rep No. 114-529, at 3 (DTSA intended to deter "thieves looking for a quick payday or to replicate the market-leading innovations developed by trade secret owners."). Without prejudgment interest, Syntel would "enjoy an interest-free loan" for the amount it avoided spending through its misappropriation "for as long as it can delay" paying the judgment. *See Gierlinger v. Gleason*, 160 F.3d 858, 874 (2d Cir. 1998). Thus, "[t]he award of prejudgment interest, like an award of disgorgement, deprives the [defendants] of their ill-gotten gains and prevents unjust enrichment." *S.E.C. v. Drexel Burnham Lambert Inc.*, 837 F. Supp. 587, 612-13 (S.D.N.Y. 1993), *aff'd*, 16 F.3d 520 (2d Cir. 1994). Given Syntel's willful and malicious misappropriation, and its continued "refus[al] to acknowledge their wrongdoing," fairness requires

Syntel be prevented from maintaining the benefit from its misappropriation. *S.E.C. v. Lipkin*, 2006 WL 435035, at *3 (E.D.N.Y. Jan. 9, 2006); *see also Trustees of the Local 813 I.B.T. Ins. Tr. Fund v. Chinatown Carting Corp.*, 2008 WL 5111108, at *5 (E.D.N.Y. Dec. 4, 2008) (prejudgment interest "appropriate" "given the Defendants' flagrant defiance of their contractual obligations").

Prejudgment interest should be awarded on the DTSA award at the adjusted prime rate, compounded quarterly, which strikes the appropriate balance between the New York statutory rate of 9% and the "advantageous" (to Syntel) T-bill rate.[41]  *See Frommert v. Becker*, 216 F. Supp. 3d 309, 316 (W.D.N.Y. 2016) *aff'd*, 913 F.3d 101 (2d Cir. 2019); *see also S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476-77 (2d Cir. 1996) (awarding "advantageous" T-bill rate "would seem highly inappropriate in the circumstances here, where defendants have had the use of the money"). Prejudgment interest that should be awarded in the amount of $75,175,972 through October 27, 2020 and accruing daily in the amount of $31,908 through entry of judgment.[42]  Ex. 7 ¶¶ 25-29.

## XI.   POSTJUDGMENT INTEREST SHOULD BE AWARDED

TriZetto is entitled to post-judgment interest under 28 U.S.C. § 1961, as of the date judgment is entered, and respectfully requests that post-judgment interest be granted accordingly.

## CONCLUSION

For the foregoing reasons, the Court should deny Syntel's motion and grant TriZetto's motion for a permanent injunction.

---

[41] *FKF 3*, 2018 WL 5292131, at *15 (awarding prejudgment interest at prime rate); *Great Lakes Bus. Tr. v. M/T ORANGE SUN*, 855 F. Supp. 2d 131, 156–57 (S.D.N.Y. 2012) (similar), *aff'd*, 523 F. App'x 780 (2d Cir. 2013); *U.S. Philips Corp. v. Iwasaki Elec. Co.*, 607 F. Supp. 2d 470, 482-83 (S.D.N.Y. 2009) (similar). Awarding the prime rate is also consistent with the underpayment rate from 26 U.S.C. § 6621(1), which has been used to assess prejudgment interest in other disgorgement cases.  *See, e.g.*, *Lipkin*, 2006 WL 435035, at *3.  Section 6621(a)(2) defines the underpayment interest rate as the federal short term rate plus three percentage points, which has generally exceeded the prime rate during the relevant period.  *Compare* Ex. 12 at 1, *with*, Ex. 13 at 1-2.

[42] If prejudgment interest at the prime rate were calculated on the copyright award, it would be $15,597,048 through October 27, 2020 and a daily amount of $6,620 thereafter. Ex. 7 ¶ 28.  Prejudgment interest on the copyright award would be proper because the royalty awarded by the jury is a proxy for TriZetto's actual loss. *See Live Face On Web, LLC v. Integrity Sols. Grp., Inc.*, 421 F. Supp. 3d 1051, 1073-74 (D. Colo. 2019).

Dated: January 5, 2021

/s/ Gianni Cutri
Michael W. De Vries
Justin Singh
Benjamin A. Herbert
Andrew Morrill
Samuel Blake
Gavin Moler
KIRKLAND & ELLIS LLP
555 S. Flower St.
Los Angeles, CA 90071
Tel: (213) 680-8400
Fax: (213) 680-8500
michael.devries@kirkland.com
justin.singh@kirkland.com
benjamin.herbert@kirkland.com
drew.morrill@kirkland.com
gavin.moler@kirkland.com

Adam R. Alper
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Tel: (415) 439-1400
Fax: (415) 439-1500
aalper@kirkland.com

Gianni Cutri
Adam M. Kaufmann
Kyle Kantarek
Jake Rambeau
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200
gianni.cutri@kirkland.com
adam.kaufmann@kirkland.com
kyle.kantarek@kirkland.com
jake.rambeau@kirkland.com

Patricia Carson
Leslie M. Schmidt
Joshua L. Simmons
Ryan Kane
KIRKLAND & ELLIS LLP
601 Lexington Ave.

66

New York, NY 10022
Tel: (212) 446-4800
Fax: (212) 446-4900
patricia.carson@kirkland.com
leslie.schmidt@kirkland.com
joshua.simmons@kirkland.com
ryan.kane@kirkland.com

*Attorneys for Defendants and Counterclaim-*
*Plaintiffs The TriZetto Group, Inc. and*
*Cognizant Technology Solutions Corp.*