UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SYNTEL STERLING BEST SHORES MAURITIUS LIMITED and SYNTEL, INC., <br><br> Plaintiffs and Counterclaim-Defendants, <br><br> v. <br><br> THE TRIZETTO GROUP, INC. and COGNIZANT TECHNOLOGY SOLUTIONS CORP., <br><br> Defendants and Counterclaim-Plaintiffs. | 1:15-CV-00211 (LGS) (SDA) <br><br> Hon. Lorna G. Schofield |

**SYNTEL'S MEMORANDUM IN SUPPORT OF ITS MOTION
FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO
FEDERAL RULES OF CIVIL PROCEDURE 50(B) AND 59**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

LEGAL STANDARD ...................................................................................................... 2

ARGUMENT ................................................................................................................... 3

    I.      The Damages Trial Violated the Second Circuit's Mandate ................................. 3

    II.     TriZetto Impermissibly and Unconstitutionally Expanded and Retread the
           Liability Jury's Findings ...................................................................................... 5

          A.      Syntel's Seventh Amendment Rights Were Violated ................................ 5

                1.      TriZetto Impermissibly Expanded the Liability Verdict ............... 6

                2.      The Damages Jury Reexamined the Issue of "Use" .................... 10

                3.      TriZetto Was Awarded Damages for Work Syntel Was
                      Authorized to Do ................................................................... 13

          B.      Syntel Did Not Forfeit Its Seventh Amendment Rights ........................... 15

                1.      Syntel's Pre-Trial Seventh Amendment Challenge Was
                      Timely .................................................................................... 15

                2.      Syntel's Post-Trial Challenges Are Timely ................................. 16

    III.    Syntel Is Entitled to JMOL or Remittitur of the Jury's Awards .......................... 16

          A.      A Reasonable Jury Would Not Have Awarded Lost Profits
                Damages Under New York Law ............................................................ 16

                 1.      But-For Causation Is Required for Lost-Profits Damages........... 17

                 2.      The Record Does Not Contain Evidence to Support a
                     Verdict for Lost Sales ............................................................ 18

                 3.      The Record Does Not Contain Evidence to Support a
                       Verdict for Price Erosion ....................................................... 22

          B.      A Reasonable Jury Would Not Have Awarded Reasonable Royalty
                 Damages Under the DTSA ................................................................... 26

          C.      A Reasonable Jury Would Not Have Awarded Damages for
                 Copyright Infringement ....................................................................... 27

CONCLUSION.................................................................................................................. 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Airday* v. *N.Y.C.*,
  406 F. Supp. 3d 313 (S.D.N.Y. 2019) ..................................................................................2

*Anderson Grp., LLC* v. *City of Saratoga Springs*,
  805 F.3d 34 (2d Cir. 2015) ..............................................................................................14

*Blyden* v. *Mancusi*,
  186 F.3d 252 (2d Cir. 1999) ..................................................................................... *passim*

*Cabral* v. *N.Y.C.*,
  2015 WL 4750675 (S.D.N.Y. Aug. 11, 2015) ...................................................................3

*Cohn* v. *Mass Mut. Life Ins. Co.*,
  189 F.R.D. 209 (D. Conn. 1999) ........................................................................................2

*Crystal Semiconductor, Corp.* v. *TriTech Microelectronics Int'l, Inc.*,
  246 F.3d 1336 (Fed. Cir. 2001) ...................................................................................23, 24

*DLC Mgmt. Corp.* v. *Town of Hyde Park*,
  163 F.3d 124 (2d Cir. 1998) ..............................................................................................3

*Frink America, Inc.* v. *Champion Road Mach. Ltd.*,
  2001 WL 34124761 (N.D.N.Y. Aug. 9, 2001) ...................................................................6

*Fuji Photo Film Co.* v. *Jazz Photo Corp.*,
  249 F. Supp. 2d 434 (D.N.J. 2003) ...................................................................................17

*Havlish* v. *650 Fifth Ave. Co.*,
  934 F.3d 174 (2d Cir. 2019) ......................................................................................4, 5, 6

*Knox* v. *John Varvatos Enters. Inc.*,
  512 F. Supp. 3d 470 (S.D.N.Y. 2021) ................................................................................3

*Lavoie* v. *Pac. Press & Shear Co.*,
  975 F.2d 48 (2d Cir. 1992), D.I. 1494 .............................................................................15

*Lopez* v. *MNAF Pizzeria, Inc.*,
  2023 WL 2707113 (S.D.N.Y. Mar. 30, 2023) ...................................................................4

*O'Connor* v. *Pa. R.R. Co.*,
  308 F.2d 911 (2d Cir. 1962) ..............................................................................................3

*Oiness* v. *Walgreen Co.*,
    88 F.3d 1025 (Fed. Cir. 1996)..................................................................25

*Panduit Corp.* v. *Stahlin Bros. Fibre Works*,
    575 F.2d 1152 (6th Cir. 1978) ..........................................................17, 20

*Robinson* v. *Metro-N. Commuter R.R. Co.*,
    267 F.3d 147 (2d Cir. 2001)....................................................................7

*Santa Maria* v. *Metro-N. Commuter R.R.*,
    81 F.3d 265 (2d Cir. 1996)...................................................................10

*Scentsational Techs., LLC* v. *PepsiCo, Inc.*,
    2018 WL 2465370 (S.D.N.Y. May 23, 2018) .......................................17

*Triolo* v. *Nassau County*,
    24 F.4th 98 (2d Cir. 2022) ......................................................................2

*Tse* v. *UBS Fin Servs.*,
    568 F. Supp. 2d 274 (S.D.N.Y. 2008)....................................................4

*Wechsler* v. *Macke Int'l Trade, Inc.*,
    486 F.3d 1286 (Fed. Cir. 2007)...........................................................24

*Weisgram* v. *Marley Co.*,
    528 U.S. 440 (2000)...................................................................3, 5, 10

*Zhu* v. *Salaam Bombay, Inc.*,
    2017 WL 11615748 (S.D.N.Y. Dec. 21, 2017) ................................6, 14

**Other Authorities**

U.S. Const. amend. VII ...................................................................... *passim*

Fed. R. Civ. P. 50.............................................................................1, 2

Fed. R. Civ. P. 59.........................................................................1, 3, 10

S. Rep. No. 114-220 (2016).................................................................26

Syntel respectfully submits this memorandum in support of its motion for judgment as a matter of law ("JMOL") under Rule 50(b) or, in the alternative, for relief under Rule 59.

## INTRODUCTION

TriZetto and Cognizant (collectively, "TriZetto") were permitted a second bite at the apple to fix their own strategic error in pursuing unlawful damages theories at the first trial. After a four-day damages-only trial, the Damages Jury awarded TriZetto nearly $70 million in compensatory damages for trade secret misappropriation and copyright infringement.[1] This verdict was the latest chapter in the parties' decade-old dispute. Five years earlier, a different jury returned an unlawful damages award at TriZetto's request. That award resulted from TriZetto's choice to go "all in" on an avoided-costs damages theory—ignoring Syntel's warnings that it was unlawful—resulting in a grossly excessive award that was ultimately vacated. Now, Syntel is once again faced with a damages award that is unlawful, excessive, and unsupported by the evidence.

As a threshold matter, Syntel should not have had to endure a second trial. The Second Circuit's mandate foreclosed a new trial on the damages theories TriZetto consciously abandoned and thus waived. In fact, the Second Circuit went out of its way to note that TriZetto "did not ask the jury to determine if (and what amount) TriZetto was entitled to lost profit damages" in expressly holding that it was *not* remanding for determination of such profits.

Foreclosing a new trial made good sense because the trial that unfolded violated Syntel's Seventh Amendment rights. TriZetto repeatedly put forth evidence and argument that improperly (1) required the Damages Jury to reexamine liability issues that were within the sole province of the Liability Jury, and (2) expanded the Liability Jury's verdict, depriving Syntel of its right to a

---

[1] Syntel refers to the June 2025 trial and jury as the "Damages Trial" and "Damages Jury," and to the October 2020 trial and jury as the "Liability Trial" and "Liability Jury."

jury trial.  Among other things, TriZetto told the Damages Jury that 104 trade secrets were misappropriated when no such finding exists, did not limit its damages to even those 104 trade secrets, asked the jury to reexamine trade secret use, and requested damages for work that was authorized.  This deprived Syntel of its right to have *one* jury decide liability, and included damages for conduct for which there is *no* liability finding.  Excising all of the constitutionally violative evidence leaves TriZetto without sufficient evidence for any damages award, let alone the award it received.

But the issues did not stop there.  TriZetto also presented insufficient evidence to support the verdict.  A reasonable jury would not have concluded that TriZetto is entitled to anywhere near $70 million.  And at the very least, the award is excessive and against the weight of the evidence.  Indeed, TriZetto failed to, among other things, establish that any misappropriation caused its sought-after damages, as required, and presented damages calculations that were unsupported by the evidence and which Syntel was prohibited from properly cross-examining TriZetto's expert on.

Syntel respectfully requests that the Court enter JMOL as to each of the Damages Jury's awards.  In the alternative, Syntel respectfully requests that the Court remit the awards to the amount supported by the evidence.

## **LEGAL STANDARD**

JMOL may be granted if a reasonable jury would not have a legally sufficient evidentiary basis to support the nonmoving party's claim.  *Triolo* v. *Nassau County*, 24 F.4th 98, 105 (2d Cir. 2022); Fed. R. Civ. P. 50.  The guiding question is whether "the [admissible] evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [jurors] could have reached."  *Airday* v. *N.Y.C.*, 406 F. Supp. 3d 313, 317 (S.D.N.Y. 2019) (quotation omitted)*.*  While

the "trial court must view the evidence and all inferences most favorably to the party against whom the motion is made . . . [t]he inferences which may be drawn must be within the range of reasonable probability, and must not be at war with undisputed facts." *O'Connor* v. *Pa. R.R. Co.*, 308 F.2d 911, 914-15 (2d Cir. 1962) (citation and footnote omitted).  Further, a court can "excis[e] . . . erroneously admitted" evidence when rendering a decision on JMOL because "[i]nadmissible evidence contributes nothing to a 'legally sufficient evidentiary basis.'" *Weisgram* v. *Marley Co.*, 528 U.S. 440, 454, 457 (2000) (citation omitted)).

The standard for a motion under Rule 59 is less stringent.  A Rule 59 motion may be granted if the verdict is against the weight of the evidence, the damages are excessive, or the trial was unfair to the moving party.  *See Knox* v. *John Varvatos Enters. Inc.*, 512 F. Supp. 3d 470, 478-79 (S.D.N.Y. 2021).  The Court has the authority to order "a new trial without qualification" or order remittitur.  *Id*. at 492 (citation omitted); Fed. R. Civ. P. 59(a)(1)(A).

Remittitur is "used . . . to, in effect, reduce the amount of a damage award that the court concludes is impermissibly high." *Cabral* v. *N.Y.C.*, 2015 WL 4750675, at *6 (S.D.N.Y. Aug. 11, 2015) (quoting *Turley* v. *ISG Lackawanna, Inc.*, 774 F.3d 140, 167 (2d Cir. 2014)).  Unlike JMOL, remittitur "may be granted even if there is substantial evidence supporting the jury's verdict." *DLC Mgmt. Corp.* v. *Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998).  "Moreover, a trial judge is free to weigh the evidence [her]self, and need not view it in the light most favorable to the verdict winner." *Id*.

## **ARGUMENT**

### **I.    The Damages Trial Violated the Second Circuit's Mandate**

Syntel respectfully submits that the new trial was granted in error, and renews its argument on this point for this Court's post-trial consideration and appellate review.  *See* D.I. 1148; D.I. 1163; D.I. 1285; D.I. 1467 at 13-15.

A "district court must follow the mandate issued by an appellate court." *Havlish* v. *650 Fifth Ave. Co.*, 934 F.3d 174, 181 (2d Cir. 2019) (citations omitted).  Thus, "[w]here a mandate limits the issues open for consideration on remand, a district court ordinarily cannot consider additional issues." *Id.* at 182 (citation omitted).  And "[w]here an issue was ripe for review at the time of an initial appeal but was nonetheless foregone, the mandate rule generally prohibits the district court from reopening the issue on remand unless the mandate can reasonably be understood as permitting it to do so." *Id.* at 181-82 (citation omitted).  The Damages Trial contravened these well-settled principles.

The Second Circuit already held that TriZetto's *only* "compensable harm" was "$8.5 million in lost profits."  D.I. 1093 at 31-32.  However, the Second Circuit specifically emphasized that it was "*not* remand[ing] for the [district] court to determine if TriZetto is entitled to" those "lost profit damages" and expressly "d[id] not instruct the district court to consider the issue on remand," because (1) "the verdict form that TriZetto proposed . . . did not ask the jury to determine if (and to what amount) TriZetto was entitled to lost profit damages" and (2) "TriZetto [did] not argue on appeal that it [was] entitled to its lost profits if [the Circuit] vacate[d] the avoided costs award[.]"  *Id.* at 38 (emphasis in original).  That was the case because TriZetto strategically chose to *exclusively* pursue avoided costs compensatory damages at trial, notwithstanding that Syntel repeatedly (and correctly) warned that such damages were unlawful.  *See* D.I. 728; D.I. 781; D.I. 878; D.I. 879; D.I. 1113.

The Circuit's decision that TriZetto could not pursue even the *only* other non-avoided-costs damages it presented foreclosed a second trial on compensatory damages altogether.  And to the extent there is any doubt on that point, the express rationale for that ruling applies to *any* other category and theory of damages TriZetto could belatedly contrive:  (1) the verdict form TriZetto

proposed "did not ask the jury to determine if (and to what amount) TriZetto was entitled to" those damages and (2) "TriZetto [did] not argue on appeal that it [was] entitled to [such damages] if [the Circuit] vacate[d] the avoided costs award." D.I. 1093 at 38. The Damages Trial therefore contravened the Circuit's mandate. *Havlish*, 934 F.3d at 181-82.

At a minimum, even if the mandate permitted a new trial on TriZetto's New York trade secret and copyright claims (it did not), the mandate indisputably foreclosed a new trial on *DTSA* compensatory damages for the reasons just discussed, and because the Circuit specifically emphasized that it was *not* instructing this Court to consider DTSA compensatory damages. D.I. 1093 at 38 ("Of note, we *do not* remand for the court to determine if TriZetto is entitled to lost profit damages under § 1836(b)(3)(B)(i)(I) of the DTSA." (emphasis in original)).

## II.    TriZetto Impermissibly and Unconstitutionally Expanded and Retread the Liability Jury's Findings

Even if the Circuit's mandate permitted a damages trial, Syntel's Seventh Amendment rights were violated at that trial because TriZetto put forth evidence and argument that (1) required the Damages Jury to reexamine liability issues that were determined by the Liability Jury, and (2) expanded the scope of the Liability Jury's verdict. Thus, Syntel is entitled to JMOL because excising this inadmissible evidence leaves an insufficient record to support TriZetto's damages. *See Weisgram*, 528 U.S. at 454, 457. At a minimum, remittitur of the portion of the award that now has an insufficient evidentiary basis is appropriate. *See Anderson Grp., LLC* v. *City of Saratoga Springs*, 805 F.3d 34, 51-52 (2d Cir. 2015) (remittitur appropriate even if the surplus cannot be ascribed to a quantifiable error).

### A.  Syntel's Seventh Amendment Rights Were Violated

The Seventh Amendment provides two relevant, inviolable protections: it prohibits reexamination of issues decided by a jury, *Blyden* v. *Mancusi*, 186 F.3d 252, 268 (2d Cir. 1999),

5

and guarantees a right to a jury trial on liability, *Havlish*, 934 F.3d at 183. These constitutional protections required TriZetto to pursue *only* damages that arose from the Liability Jury's findings. TriZetto did not. Instead, TriZetto supported a once-again inflated damages claim with evidence and argument that: (i) expanded Syntel's liability, (ii) required the Damages Jury to reexamine what acts constituted "use," and (iii) sought damages for work Syntel was authorized to do.

### 1. *TriZetto Impermissibly Expanded the Liability Verdict*

As this Court and the Second Circuit recognized, TriZetto had to identify trade secrets with specificity to prove liability, D.I. 977 at 9; D.I. 1093 at 13, and did so by "linking the title of each individual trade secret to specific exhibits," D.I. 1093 at 12. As a result, TriZetto presented 104 specific alleged trade secrets—down to particular versions—to the Liability Jury. *Id.* at 12-13. Nevertheless, the verdict form, which TriZetto advocated for and the Court adopted over Syntel's opposition, required that the Liability Jury determine *only* whether TriZetto had proved it "possessed *one or more trade secrets* that was/were misappropriated by Syntel." D.I. 931 at 2 (emphasis added). The verdict is thus ambiguous as to how many and which of the 104 trade secrets were misappropriated.

The Seventh Amendment required TriZetto to assert a damages theory that comported with this non-specific liability finding: "[A] damages calculation may rely *only* on the factual and legal *findings* [adjudicated during the liability trial], and may not introduce any new facts or legal arguments not raised before or during trial." *Zhu* v. *Salaam Bombay, Inc.*, 2017 WL 11615748, at *6 (S.D.N.Y. Dec. 21, 2017) (emphasis added). TriZetto likewise was forbidden from seeking damages for "trade secrets" that it cannot show Syntel was found liable for misappropriating—it is "axiomatic that, where there is no liability, there are no damages." *Frink America, Inc.* v. *Champion Road Mach. Ltd.*, 2001 WL 34124761, at *10 (N.D.N.Y. Aug. 9, 2001). Moreover, the law prohibited the Damages Jury from finding additional or different liability, as that would require

an impermissible reexamination of issues. *Robinson* v. *Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 170 n.14 (2d Cir. 2001) (Seventh Amendment violated if "one trier-of-fact" decides "a disputed issue that must [then] be decided by a subsequent jury"); *Blyden*, 186 F.3d at 269.

Recognizing the non-specific nature of the Liability Jury's findings, and this clear law, the Court instructed the Damages Jury that Syntel misappropriated "one or more" trade secrets, Tr. 751:1-11, and "preclude[ed] TriZetto from introducing evidence, testimony, argument or suggestion that the prior jury found all of the 104 alleged trade secrets were both trade secrets and were misappropriated," D.I. 1494 at 17.[2]  In doing so, the Court rejected TriZetto's proposed instruction that *all* 104 secrets were misappropriated.  D.I. 1228 at 2-5, 11-12; D.I. 1413 at 1-4.

Nevertheless, TriZetto conducted the Damages Trial as though all 104 asserted trade secrets had been found to be misappropriated, going so far as to claim damages for unidentified "trade secrets" that were never established to be part of that operative set of 104.  This violated Syntel's Seventh Amendment rights.

For example, TriZetto affirmatively elicited testimony that "we know" Syntel misappropriated "more than one" trade secret, Tr. 463:7-18 (Mehta), repeatedly made the point that it was entitled to damages for "use of 104 trade secrets," Tr. 606:20-607:1 (Jarosz), and that specific tools were, in fact, "items . . . misappropriated from TriZetto," D.I. 1560-2 at 278:17-20 (Mehta Dep.), all despite no jury findings to this effect.

TriZetto's expert, Mr. Britven, also presented a "lost profits" damages theory that purported to compute the dollar value of the work Syntel did using the misappropriated trade secrets.  Tr. 274:12-275:1 (Britven).  That damages theory is inherently problematic because it

---

[2] All citations to "Tr." refer to the Damages Trial, while all citations to "Liability Tr." refer to the Liability Trial.

requires knowledge of *which* of the 104 trade secrets were misappropriated and *whether* they were used in particular projects, which is unknowable from the verdict form.

Compounding that issue further, Mr. Britven testified that he relied upon TriZetto's other experts, Drs. Wicker and Kursh, to causally connect the purported trade secret use to damages as required for his damages theory. *See* Tr. 261:2-6, 320:24-321:6 (Britven); *see infra* at 21. But neither Dr. Wicker nor Dr. Kursh limited their analyses to even the 104 trade secrets considered by the Liability Jury.

Dr. Wicker flatly admitted that he did not analyze whether the Syntel work he identified, and Mr. Britven therefore factored into his damages calculation, involved one of the 104 trade secrets. Tr. 218:1-10 (Wicker). That failure pervaded his testimony. For example, he testified that a March 25, 2015 Syntel email asking a colleague for Facets manuals (DTX-0036) supported TriZetto's damages, without establishing that the manuals were the specific documents TriZetto asserted as one of the 104 alleged trade secrets or even that the manuals were ever sent.[3] Tr. 200:17-23 (Wicker). Dr. Wicker also testified that unspecified "trade-secret documents" were stored on Syntel's systems, without any evidence that the documents he was referencing were the 104 alleged trade secrets, let alone that they were trade secrets Syntel was found liable for misappropriating. Tr. 200:5-16 (Wicker); *see also* Tr. 199:22-200:4 (Wicker) (testifying that Syntel employees were emailing trade-secret documents without any evidence that these documents were part of the 104 alleged trade secrets or the ones for which Syntel was found liable for misappropriating). Dr. Wicker likewise testified that a spreadsheet merely listing a "Data

---

[3] Though Dr. Wicker testified that DTX-2033 showed that specifically-identified guides and manuals were provided, DTX-2033 was sent March 12, thirteen days *before* DTX-0036 was sent. *See* Tr. 200:24-201:4 (Wicker) (citing DTX-2033). No reasonable jury could have accepted the testimony that a March 12 email was a response to a March 25 request.

Dictionary" showed misappropriated trade secret use, without even attempting to identify it as the specific Data Dictionary versions TriZetto contended were misappropriated. Tr. 195:10-20 (Wicker) (citing DTX-0040, DTX-0039). He also testified that Syntel used certain TriZetto tools, without any jury finding that those tools were misappropriated. Tr. 196:22-197:4 (Wicker) (citing DTX-0096); Tr. 198:22-199:11 (Wicker) (citing DTX-0393).

Dr. Kursh, for his part, testified that Syntel advertised the trade secrets in various pitches without tying those trade secrets to the 104, let alone the specific trade secrets the Liability Jury found to be misappropriated. *See, e.g.*, Tr. 237:13-16 (Kursh); Ex. 1, DDX-5.75; Tr. 234:11-20 (Kursh) (citing DTX-0078). Dr. Kursh even showed one pitch, DTX-2915, as an example of Syntel advertising TriZetto's trade secrets. Tr. 237:12-16 (Kursh). But TriZetto then elicited uncontroverted testimony that Facets "isn't even mentioned" in DTX-2915 and that "the trade secrets would be totally irrelevant . . . because [DTX-2915] has nothing to do with Facets," so the jury should "disregard" it. Tr. 482:10-20 (Mehta). Nonetheless, TriZetto sought damages for this advertisement, telling the jury it showed that Syntel was "telling [customers] we have got the trade secrets, you can get them from us, come and get them" and therefore "us[ing] the trade secrets." Tr. 773:14-22 (Summation) (showing DDX-9.19, which included DTX-2915); Ex. 2, DDX-9.19.

Telling the jury that all 104 trade secrets were misappropriated, and presenting damages for "trade secrets" that it failed to establish were the specific versions that were part of the asserted 104 secrets—let alone ones the Liability Jury found misappropriated—necessarily: (1) invited the Damages Jury to award damages for misappropriation of trade secrets for which there is no liability and/or (2) required the Damages Jury to reexamine liability as to each trade secret. Both are improper, *see supra* at 6-7, and also resulted in a trial that was fundamentally unfair to Syntel,

further requiring relief under Rule 59, *e.g.*, *Santa Maria* v. *Metro-N. Commuter R.R.*, 81 F.3d 265, 273 (2d Cir. 1996).

Accordingly, all such evidence must be excised to preserve Syntel's Seventh Amendment rights. *See Weisgram*, 528 U.S. at 454. That includes (1) all testimony that 104 trade secrets were misappropriated, (2) Drs. Wicker's and Kursh's testimony, which was not limited to the trade secrets at issue in the Liability Trial, and (3) Mr. Britven's damages calculation which rested on Drs. Wicker's and Kursh's flawed analyses. Doing so results in an insufficient basis for *any* damages claim, entitling Syntel to JMOL on TriZetto's claims. Alternatively, at a bare minimum, this Court should order remittitur to no more than $8.5 million, the lost-profit damages TriZetto calculated when it used (as it was required to here) *only* evidence that the Liability Jury based its verdict on. D.I. 1093 at 30-31. Indeed, TriZetto admitted that its increased damages figure relied upon a "different evidentiary record" than the one before the Liability Jury. D.I. 1342 at 3.

### 2. The Damages Jury Reexamined the Issue of "Use"

A damages trial "violate[s] the Seventh Amendment" when "[t]he bifurcation ordered by the district court allow[s] the damages juries to reexamine issues decided by the liability jury[.]" *Blyden*, 186 F.3d at 268. That is what happened here. The Damages Jury was asked to determine which acts constituted trade secret *use*. That required reexamination of a question the Liability Jury was tasked with answering: whether TriZetto proved that Syntel "used" one or more trade secrets, as use was an element of TriZetto's misappropriation claim. D.I. 935-12 at 9, 13, 15.

When Syntel raised this impending Seventh Amendment violation, the Court concluded that this could be resolved if TriZetto limited its Damages Trial evidence to "the extent of Syntel's use of the same trade secrets with the same customers from the first trial, and link[ing] that use to specific harm caused to TriZetto" "consistent with its proof of liability from the first trial." D.I. 1494 at 14. But as discussed *supra* at 7-9, that was ultimately *not* the case, because TriZetto

pursued a damages theory at trial that required knowing which trade secrets were misappropriated, which is unknowable from the verdict form. And in any event, TriZetto ignored this Court's ruling and introduced new "use" evidence that required the Damages Jury to improperly reconsider *whether* there was "use" in the first place, rather than the extent of the use the Liability Jury already found.[4]

Indeed, TriZetto's experts repeatedly testified about trade secret "use" that was not shown to relate to one of the specific 104 alleged trade secrets from the Liability Trial. *See supra* at 7-9. TriZetto likewise failed to limit its evidence to "use" that was connected to use with the same customers from the Liability Trial as the Court required. Dr. Wicker, for example, testified that an advertisement on Syntel's website (DTX-1162) showed use of trade secrets, without establishing that a single customer from the Liability Trial saw this advertisement. Tr. 190:23-191:9 (Wicker) (DDX-4.21 displaying DTX-1162); Ex. 3, DDX-4.21. Dr. Kursh offered near identical testimony, stating that DTX-1162 and DTX-0041 (another advertisement) showed use, but likewise failed to establish that any specific customers saw them. Tr. 236:19-237:12 (Kursh), Ex. 1, DDX-5.48. And Dr. Wicker's testimony that a spreadsheet mentioning an unspecified Data Dictionary (DTX-0039, DTX-0040) (*see supra* at 8-9), and Syntel's storage and emailing of unspecified "trade-secret documents" (*see supra* at 8) reflected "use" was likewise untethered to any specific customer.

Worse still, TriZetto testified that documents that were never even *shown* to the Liability Jury evidenced "use," including: (1) a customer pitch that was produced prior to the Liability Trial, but never shown, Tr. 233:16-234:1 (Kursh) (testifying that slide DDX-5.61, which displayed

---

[4] Although TriZetto may contend that the evidence it presented shows the *extent* of use, a first step to considering the *extent* of use is identifying the acts that constitute said use, which the Damages Jury could not do.

DTX-3185, showed Syntel "use[d TriZetto's] tools in its bid"); Ex. 1, DDX-5.61, and (2) DTX-2033 which, as discussed *supra* at 8 n.3, Dr. Wicker erroneously claimed showed trade secrets being provided in response to an internal Syntel request, Tr. 200:24-201:4 (Wicker).

Such evidence—and particularly the evidence never even *shown* to the Liability Jury—unequivocally did not reflect "use of the same trade secrets with the same customers from the first trial . . . consistent with [TriZetto's] proof of liability from the first trial."  D.I. 1494 at 14.  As a result, any finding of the "extent" of use shown in that evidence would have required impermissible reexamination and a *new* use determination in violation of the Seventh Amendment and this Court's clear ruling.

*Blyden* is instructive.  There, the Seventh Amendment was violated because—as here—the liability jury made a non-specific finding as to which acts constituted an element of the underlying claim, and the damages jury was (again, as here) "asked to determine for themselves which particular acts" constituted the same element, "without regard to how the liability jury viewed that particular act."  186 F.3d at 268-69.  Specifically, the damages jury was asked to determine which acts constituted retaliation, based on the earlier jury's finding that there had been at least some retaliation.  *Id.*  That violated the Seventh Amendment because it "created . . . a probability . . . that acts found to be '[retaliation]' by the liability jury were different from the acts found to be '[retaliation]' by the damages juries."  *Id.* at 269; *see also Cohn* v. *Mass Mut. Life Ins. Co.*, 189 F.R.D. 209, 219 (D. Conn. 1999) ("Reconsideration of issues by a second jury would violate the Seventh Amendment.").  So too here.  TriZetto asked the Damages Jury to reexamine whether acts constituted use, despite that the Liability Jury was tasked with deciding that issue.  Worse yet, because TriZetto relied upon a different evidentiary record, D.I. 1342 at 3, it created a certainty—

rather than just a probability—that the Damages Jury's use findings would differ from the Liability Jury's findings.

At the Liability Trial, TriZetto offered evidence of use as to only one client—UHG. D.I. 1093 at 6, 31. That is the "use" evidence TriZetto should have been restricted to at the Damages Trial. Excising the impermissible use evidence from the record, i.e., evidence of use that does not underlie Syntel's liability, TriZetto could prove no more than roughly $8.5 million in lost-profit damages. Tr. 277:5-14 (Britven) (showing the jury DDX-6.68 with lost-profits calculations); Ex. 4, DDX-6.68. Thus, this Court should order remittitur to, at most, that amount— though even that may be excessive because, as noted *supra* at 6-10, excising the impermissible expansion of liability leaves TriZetto without *any* supportable damages presented to the Damages Jury and entitling Syntel to JMOL.

### 3. *TriZetto Was Awarded Damages for Work Syntel Was Authorized to Do*

TriZetto requested damages for work Syntel performed for BSC and CDPHP. Tr. 276:6-277:14 (Britven); Ex. 4, DDX-6.68. Such damages are impermissible because any damages for these customers required new liability findings *or* awarded damages in the absence of a liability finding, either of which violates Syntel's Seventh Amendment rights.

Contrary to this Court's earlier conclusion, there is no indication that the prior jury "considered and rejected" Syntel's authorization argument for BSC or CDPHP. D.I. 1494 at 8. The verdict form reveals no such findings, D.I. 931 at 2, and neither the "one or more" misappropriation finding nor TriZetto's awarded-costs damages theory required the Liability Jury to reach that question, *see* Liability Tr. 403:9-12, 408:18-409:3, 412:22-413:2. For this same reason, the Second Circuit's holding that Syntel was not permitted to use the trade secrets to compete with TriZetto generally, *see* D.I. 1494 at 12, cannot be construed to say anything about BSC and CDPHP specifically.

13

In fact, the Liability Jury could not have found that work for BSC and CDPHP involved misappropriation. *First*, both TriZetto and this Court have recognized that work was authorized. *See* D.I. 993 at 7-8 (Syntel may use TriZetto's trade secrets and copyrighted works from BSC and CDPHP to service BSC and CDPHP); D.I. 989-2 at 7-9 (joint proposed injunction with carveouts for BSC and CDPHP). *Second*, TriZetto presented no evidence whatsoever about BSC at the Liability Trial. And the evidence TriZetto presented regarding "the use of materials provided by CDPHP to service CDPHP was *not*" presented to prove liability as it relates to CDPHP. D.I. 977 at 8 (emphasis added); *see also* D.I. 963 at 10 ("Syntel had available options *other than* misappropriation—including seeking a TPAA, as it did for CDPHP." (emphasis added)). Indeed, the lost-profit damages TriZetto presented at the Liability Trial confirm that TriZetto did not even attempt to show the Liability Jury that Syntel's work for BSC and CDPHP involved misappropriation—TriZetto elicited testimony from its damages expert related to only one client, UHG, resulting in $8.5 million in lost profits. Liability Tr. 410:4-19.

As a result, any finding of damages for BSC and CDPHP required the Damages Jury to either (1) find liability that was not even *presented to*, let alone decided by, the Liability Jury, violating the Reexamination Clause, *see Blyden*, 186 F.3d at 269, or (2) award damages for which *no* liability finding by *any* jury exists, violating the Seventh Amendment, *Zhu*, 2017 WL 11615748, at *6; *Lopez* v. *MNAF Pizzeria, Inc.*, 2023 WL 2707113, at *4 (S.D.N.Y. Mar. 30, 2023). Accordingly, any award for such work would be intrinsically excessive and subject to remittitur of at least $28,778,636, the amount TriZetto told the jury it should award in lost-sales damages for BSC and CDPHP. *See Anderson Grp*, 805 F.3d at 51-52; *Tse* v. *UBS Fin Servs.*, 568 F. Supp. 2d 274, 299-300 (S.D.N.Y. 2008); Tr. 276:21-277:14 (showing lost-profit figures by client on DDX-6.68); Ex. 4, DDX-6.68.

### B.  Syntel Did Not Forfeit Its Seventh Amendment Rights

Syntel did not forfeit its Seventh Amendment rights, contrary to the Court's prior ruling. D.I. 1494 at 3.  But even if Syntel had forfeited a *pre-trial* challenge, Syntel certainly did not forfeit a *post-trial* challenge that arose from TriZetto's trial presentation.

### 1.  Syntel's Pre-Trial Seventh Amendment Challenge Was Timely

Syntel's pre-trial Seventh Amendment challenge was not ripe until expert discovery occurred.  TriZetto had the burden to prove its damages and, until expert discovery, Syntel did not (and could not) know how it planned to do so.  The timing of Syntel's pre-trial motion was also appropriate considering that Syntel did not seek to prevent a bifurcated trial under the Seventh Amendment wholesale; instead it sought to ensure that the trial was conducted consistent with the Seventh Amendment.  *See* D.I. 1208 at 1 (seeking to bar "argument or evidence" that would violate the Seventh Amendment); D.I. 1348 at 9 ("Syntel has not argued that bifurcation between damages and liability is impermissible.").  It is unclear how Syntel could have raised that challenge any earlier, and Syntel is not aware of authority holding a pre-trial Seventh Amendment challenge to limit trial evidence—which arose during discovery—amounts to forfeiture.

The case this Court relied upon in holding otherwise—*Lavoie* v. *Pac. Press & Shear Co.*, 975 F.2d 48, 56 (2d Cir. 1992); D.I. 1494 at 3—shows Syntel did *not* waive its challenge.  The *Lavoie* defendant did not raise a Seventh Amendment objection until appeal.  *Lavoie*, 975 F.2d at 55-56.  In holding that waiting until appeal is too late, the Second Circuit cited cases holding that Seventh Amendment objections were timely raised where they were asserted *after* the jury returned a verdict, pre-appeal.  *Id.*  Here, Syntel raised the issue well *before* the jury even returned a verdict. *See* D.I. 1208; D.I. 1348; D.I. 1468 at 18-22.

### 2. *Syntel's Post-Trial Challenges Are Timely*

Even if Syntel had forfeited a pre-trial challenge, Syntel has not forfeited its right to raise the issue post-trial. This Court recognized as much at the pretrial conference, noting that TriZetto would be "acting at [its] own peril" if it "tr[ied] to show harm from something that didn't arise out of the misconduct that under[pinned] the liability finding"—as it ultimately did—because Syntel "would have [its] Seventh Amendment argument." Pretrial Tr. 94:3-9. TriZetto ignored this sound warning, and introduced evidence and argument that trampled Syntel's rights. *See supra* at 6-14. This post-trial challenge did not arise until TriZetto in fact presented such evidence.

## III. Syntel Is Entitled to JMOL or Remittitur of the Jury's Awards

Syntel is entitled to JMOL as to each damages award because the awards are not supported by legally sufficient evidence. In the alternative, Syntel is entitled to remittitur because the awards are excessive and against the weight of the evidence.

### A. A Reasonable Jury Would Not Have Awarded Lost Profits Damages Under New York Law

The jury awarded TriZetto $69,977,813 in lost profits for New York trade secret misappropriation. D.I. 1567 at 2. Because the verdict form did not require the jury to specify the components of its award,[5] it is impossible to know whether this figure derived from lost sales, price erosion, or some combination of the two.[6] Under all circumstances, however, the award is not supported by the evidence and is plainly excessive. Syntel is thus entitled to JMOL on TriZetto's lost profits claim or, in the alternative, remittitur to no more than $9.2 million.

---

[5] The Court denied Syntel's request for a more specific verdict form and adopted the general form over Syntel's objection. *See* Tr. 669:18-670:8; D.I. 1472 at 7-8; D.I. 1472-2 at 1-2.

[6] Although it is impossible to be certain, the jury may have awarded TriZetto's total requested lost sales amount ($54,530,252) plus 10% of TriZetto's requested price erosion amount ($154,475,611). *See* Ex. 2, DDX-9.60.

### 1. *But-For Causation Is Required for Lost-Profits Damages*

To recover lost-profit damages, TriZetto was required to prove causation—i.e., "[a] reasonable probability that if the misappropriation had not occurred, TriZetto would have made additional profit[.]"  D.I. 1568-14 at 15; *Scentsational Techs., LLC* v. *PepsiCo, Inc.*, 2018 WL 2465370, at *6 (S.D.N.Y. May 23, 2018).  TriZetto attempted to satisfy this burden through the factors set forth in *Panduit Corp.* v. *Stahlin Bros. Fibre Works*, 575 F.2d 1152 (6th Cir. 1978). *See, e.g.*, Tr. 265:15-19 (Britven).  These factors require a plaintiff to prove:  "(1) demand for the [trade secrets], (2) absence of acceptable non-infringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made." *Panduit Corp.*, 575 F.2d at 1156; *see also* D.I. 1568-14 at 15, 15 n.31.

The second factor requires a showing that there were no non-infringing substitutes (i.e., competitor products or services) in the market.  *Fuji Photo Film Co.* v. *Jazz Photo Corp.*, 249 F. Supp. 2d 434, 454 (D.N.J. 2003), *aff'd*, 394 F.3d 1368 (Fed. Cir. 2005).  In circumstances where there are no such competitors, i.e., there exists a "two-supplier market" in which plaintiff and defendant are the only two entities, "it is reasonable to assume, provided the [plaintiff] has the manufacturing and marketing capabilities, that it would have made the [defendant's] sales." D.I. 1494 at 6 (citation omitted).  The same assumption is not appropriate, however, "in situations involving multiple competitors."  *See Fuji Photo*, 249 F. Supp. 2d at 454.  This makes sense.  In multi-supplier markets, it is "unreasonable" to assume "that all of the [defendant's] sales would have accrued to the [plaintiff]" because third parties could have won some sales.  *Id.*  Thus, plaintiffs may satisfy the second factor by proving either (i) a two-player market or (ii) the plaintiff's "market share," to allow a fact finder to determine what percentage of the defendant's sales would have been won by the plaintiff versus another entity.  *Id.*  TriZetto did neither.  This failure entitles Syntel to JMOL.

17

### 2. *The Record Does Not Contain Evidence to Support a Verdict for Lost Sales*

***TriZetto Failed to Prove the Elements of the* Panduit *Test.*** TriZetto failed to satisfy *Panduit* because (1) no reasonable jury could conclude that TriZetto and Syntel existed in a two-supplier market, (2) TriZetto offered no evidence of market share, and (3) TriZetto did not prove it had capacity to complete Syntel's sales.

*First*, TriZetto could not prove a two-supplier market. Both the documentary evidence and testimony prove there were numerous competitors for Facets-related work during the relevant period. In fact, *every fact witness who testified live at trial* testified to the existence of these competitors. Tr. 101:23-25 (DiNardo); Tr. 134:16-18 (Mengert); Tr. 444:4-21, 453:2-4 (Mehta); *see also* D.I. 1560-4 at 52:4-24 (Kearns Dep.) (testifying "customers or third parties configure [Facets] without TriZetto" and listing third-party servicers). So did both parties' damages experts. *See, e.g.*, Tr. 323:24-323:1 (Britven); Tr. 571:6-10 (Jarosz). The record is clear that these competitors not only competed for Facets-related services, but that TriZetto *often lost* work to them. Tr. 322:24-323:5 (Britven); PTX-2944 at 92; PTX-2761 at "Losses" (identifying competitors under the heading "competition" and noting work won by competitors). TriZetto's only evidence to the contrary consisted of internal *Syntel* emails and marketing materials where Syntel positioned itself, self-referentially, as the "only alternative" to TriZetto. *See, e.g.*, Tr. 269:15-23 (Britven). Syntel does not dispute that some of its documents contained these aspirational positioning statements, but that is all they are: the business dreams of a smaller market entrant. Tr. 448:19-449:2 (Mehta). The uncontroverted evidence proves that the Facets-servicing market was *not* a two-supplier market. *See, e.g.*, Tr. 322:24-323:5 (Britven); PTX-2944 at 92; PTX-2761.

18

In an effort to avoid this inevitable conclusion, over the course of the trial, TriZetto attempted to define the relevant market ever more narrowly. *Compare, e.g.*, Tr. 43:22-44:6 (Opening) (describing Syntel as the "only alternative" for "Facets-servicing work") *with* 114:20-115:4 (DiNardo) (describing Syntel and TriZetto as the only competitors for "customization and upgrade services" for Facets); 778:6-9 (Summation) (Syntel was the only competitor for "core upgrade activities"). But no matter how TriZetto attempted to redefine the market, the evidence established competition. *See, e.g.*, PTX-2761 at "Wins" Tab (identifying five competitors for Facets "upgrades" work); *see also* Tr. 243:20-244:1 (Kursh) (clients could perform upgrades themselves); Tr. 712:20-714:9 (Britven) (TriZetto may have lost upgrades work to an entity other than Syntel); Tr. 549:11-550:7 (Jarosz) ("[T]here are lots of players in this business attempting to do Facets upgrade or doing Facets servicing work.").

Nor can TriZetto satisfy *Panduit* by defining the relevant market as entities in possession of the trade secrets. *E.g.*, Tr. 269:19-20 (Britven). TriZetto's own documents showed that TriZetto routinely granted third-party competitors access to the trade secrets via TPAAs to service shared clients. *See, e.g.*, Tr. 581:4-24 (Jarosz); Ex. 5, PDX-5.228; PDX-5.229; PDX-5.230 (listing TPAAs). Indeed, TriZetto's own expert testified that he expected that TriZetto *encouraged* the development of this third-party servicing marketplace because it was good for business. Tr. 255:9-256:2 (Kursh).

*Second*, having failed to show a two-supplier market, TriZetto's only other avenue to satisfy *Panduit* was to offer evidence of its market share to allow the jury to determine what percentage of Syntel's sales TriZetto would have won. *See, e.g.*, D.I. 1568-14 at 15-16. TriZetto offered *no* evidence of its market share for purposes of *Panduit* or otherwise. Mr. Britven even conceded that he did not perform a market share analysis. Tr. 322:12-15 (Britven).

*Third*, TriZetto failed to prove that it had the capacity to, and would have, performed the projects that Syntel won. *Panduit Corp.*, 575 F.2d at 1156. A TriZetto engineer testified that it was only after Cognizant's acquisition of TriZetto—two years into the damages period—that TriZetto had "all the labor [it] needed" to satisfy demand without relying on an outsourced labor partner. Tr. 79:3-21 (DiNardo). It remained in TriZetto's interest to allow third parties trade secret access—i.e., to perform Facets-related work—even after that, Tr. 255:9-256:2 (Kursh), and TriZetto did so as evidenced by the numerous TPAAs it entered with competitors, Tr. 346:23-347:10 (Britven).

Syntel is therefore entitled to JMOL because TriZetto's evidence is insufficient as a matter of law to prove causation for lost sales under *Panduit*.

**The Jury's Award Is Not Supported By the Evidence.** Even if TriZetto had satisfied *Panduit*, however, or attempted to establish causation a different way (i.e., through proving TriZetto competed for and *would have won* the work), the evidence does not support the jury's lost-sales award. Over the course of this litigation, TriZetto has offered no fewer than four lost-sales figures: (i) $20 million prior to the Liability Trial; (ii) $8.5 million at the Liability Trial; (iii) $44.6 million in its Damages Trial opening statements; and (iv) $54.5 million in its Damages Trial closing statements. Liability Tr. 419:4-8; Tr. 46:5-6 (Opening), 318:5-11 (Britven testifying to $20 million), 772:9-17 (Summation). These many and varying numbers alone show that TriZetto's calculations are impermissibly speculative. The jury's award is higher than all four of these wildly varying calculations and is unsupported by the record.

The Damages Jury was instructed that it could only award lost sales for *Facets-related* services TriZetto would have been able to make *but for* Syntel's misappropriation. D.I. 1568-14 at 16. No reasonable jury applying those instructions could have awarded more than $9.2 million

20

in lost sales based on the evidence.

*First*, TriZetto's expert confessed that the lost-sales damages TriZetto presented in its opening, $44.6 million, *included damages for non-Facets work*. Tr. 347:15-17 (Britven). Remarkably, TriZetto later argued that excluding damages for non-Facets work resulted in an *even higher* figure—$54.5 million. Tr. 46:5-6 (Opening), 772:9-17 (Summation). This higher calculation, purportedly based on work performed by Dr. Wicker, was ostensibly limited to Facets-related work, even though: (1) not all the work Dr. Wicker included as "Facets-related" was actually Facets-related, Tr. 507:15-24 (Clip); 217:4-15 (Wicker); and (2) even if the work was all Facets-related, Mr. Britven conceded that it was possible that some of the work did not require use of trade secrets. Tr. 350:6-25 (Britven). TriZetto therefore presented a damages figure that its own expert could not certify was caused by the misappropriation.

*Second*, neither TriZetto's original nor revised damages figure is limited to revenues from "upgrades," i.e., the only types of sales for which TriZetto attempted to argue Syntel was the "only alternative" and, thus, for which it could have even arguably established causation under *Panduit*. *See* Tr. 710:18-711:4, 712:15-19 (Britven) (conceding that "customizations and upgrades" are not discussed in TriZetto's expert reports). Again, TriZetto is not entitled to damages beyond those for which it can establish causation. *See, e.g.*, D.I. 1568-14 at 15-16.

*Third*, the jury was permitted to consider revenues from BSC and CDPHP, two entities for which TriZetto authorized Syntel to perform services. Tr. 276:6-12 (Britven). As set forth above, the jury should never have been permitted to hear evidence about these entities. *See supra* at 13-14. This resulted in an impermissible, higher anchoring of the damages award. To the extent the award encompassed any of these damages, it is unlawful and excessive.

Ultimately, *a reasonable jury could not have awarded more than $9.2 million in lost sales*,

the figure proffered by Syntel's expert Mr. Jarosz.  Mr. Jarosz was the only expert at trial to consider which work TriZetto attempted to win and therefore may have won if Syntel had not, as the jury was required to find to award lost-sales damages.  Tr. 544:4-546:16 (Jarosz).  Any higher award, and certainly the nearly $70 million award, is, to the extent it is based in any part on lost sales, unsupported by the record and clearly excessive.  Notably, Mr. Jarosz's $9.2 million was strikingly similar to the $8.5 million lost-profits figure Mr. Britven presented at the Liability Trial, which Mr. Britven calculated because it reflected work for which there was evidence Syntel and TriZetto competed.  Tr. 316:12-18 (Britven).  Despite Syntel's strenuous objection, Syntel was, however, prohibited from properly cross-examining Mr. Britven about his $8.5 million calculation. D.I. 1527 at 2, 4-6; D.I. 1545 at 1.  This significantly prejudiced Syntel's case.  Had Syntel been permitted to properly cross-examine Mr. Britven, it would only further solidify that no reasonable jury could have departed from Mr. Jarosz's $9.2 million calculation for lost sales.

### 3. The Record Does Not Contain Evidence to Support a Verdict for Price Erosion

Syntel is entitled to JMOL to the extent any portion of the Damages Jury's lost-profits award is premised on price erosion.  This damages theory—which was conspicuously absent at the Liability Trial—should never have been presented to the jury in the first place.  Indeed, Syntel's motion to exclude price erosion, and related request for reconsideration, were improperly denied, as the insufficient evidence TriZetto presented at trial made even more clear.  D.I. 1494 at 4-7; D.I. 1516.  Further compounding the problem, Syntel was improperly precluded from cross-examining Mr. Britven about the absence of a price erosion analysis at the Liability Trial—or even about *any* differences in "his prior versus current damages *theories* or *approaches*."  D.I. 1493 at 4 (emphasis in original).

As Syntel argued pre-trial (D.I. 1240 at 3-4), and as further established at trial, Mr. Britven's methodology and purported support are inadequate as a matter of law to "show," as required, that "'but for' infringement, [TriZetto] would have sold its [services] at higher prices," *Crystal Semiconductor, Corp.* v. *TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1357 (Fed. Cir. 2001). Specifically, TriZetto did not (1) prove the existence of an appropriate "benchmark" to measure erosion against, (2) account for price elasticity—i.e., the reduced demand resulting from higher prices, or (3) prove that purported "erosion" was *caused by* the misappropriation. *See generally id.* at 1357-61; D.I. 1568-14 at 16.

***Application of an Unreliable Benchmark.*** TriZetto's entire price erosion analysis rested on an inapposite and unreliable benchmark: the Consumer Price Index ("CPI"). *See, e.g.*, Tr. 289:12-19 (Britven). As TriZetto's own expert admitted, the CPI tracks inflation in *consumer products* not "goods and services purchased by companies" or, in particular, the "enterprise software servicing" at issue in this case. Tr. 365:16-366:4 (Britven); *see also* Tr. 563:15-20 (Jarosz). In fact, Mr. Britven testified he could not identify a *single* economic source or authority supporting the use of the CPI here. Tr. 366:22-367:1 (Britven). Nor could he provide an example, in his 40-year career, of an instance in which he or another expert applied the CPI to a price-erosion analysis. Tr. 723:1-7 (Britven).

Unable to point to economic authority, TriZetto insisted that the specific facts of this case proved an anomaly, namely, that TriZetto's hourly rates should have tracked CPI. The record shows otherwise. In fact, Mr. Britven confessed that TriZetto prices and CPI do not always track each other. Tr. 367:9-11 (Britven). And he failed to offer the jury an analysis that would establish the existence of a trend between CPI and TriZetto's prices, or lack thereof, before the misappropriation. Tr. 362:23-363:5 (Britven). The only pre-misappropriation analysis the jury

heard was from Mr. Jarosz, who explained that "if you look earlier, you'll see that there's very little correlation between the CPI and the TriZetto prices.  They vary from one another quite dramatically from one year to the next."  Tr. 566:21-24 (Jarosz).

No reasonable juror could conclude on the basis of this evidence that CPI offered a reliable benchmark for calculating price erosion.  *See Crystal Semiconductor*, 246 F.3d at 1357 (price erosion requires an appropriate "benchmark").

***Lack of Price Elasticity Evidence.***  Even if the CPI were a reliable benchmark, TriZetto did not, as it "must," "present evidence of the (presumably reduced) amount of product the [plaintiff] would have sold at the higher price."  *Id*.  Mr. Britven himself conceded that he did not analyze—and did not know—if TriZetto would have lost sales if it had maintained or increased prices.  Tr. 369:22-370:4, 368:10-13 (Britven).  This failure renders TriZetto's presentation foundationally defective.  *See Crystal Semiconductor*, 246 F.3d at 1359 ("To show causation with reliable evidence, a [plaintiff] must produce credible economic evidence to show the decrease in sales, if any, that would have occurred at the higher hypothetical price.").

***Caused by Syntel's Misappropriation.***  Both parties' damages experts agree that price-erosion damages must isolate the impact of the misappropriation and exclude other factors. Tr. 352:17-20 (Britven); Tr. 561:6-17 (Jarosz).  But TriZetto did not—and could not—prove that any purported price erosion was due to misappropriation.  *See Wechsler* v. *Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1294 (Fed. Cir. 2007) (granting JMOL because price-erosion damages were not supported by evidence "tying the lower price [the plaintiff] received for his product to [defendant's] infringing sales").  Indeed, TriZetto admitted it had no evidence establishing that clients chose Syntel over TriZetto due to lower prices.  *See, e.g.*, Tr. 168:11-18 (Mengert); Tr. 370:23-371:2 (Britven).

24

Furthermore, TriZetto did not prove that price erosion, if any, was caused by Syntel's misconduct rather than the many other confounding market factors occurring at the time.  *See* Tr. 568:1-4 (Jarosz).  These factors included the passage of the Affordable Care Act, which restricted the amount TriZetto's customers could pay for information technology; consolidation in the payer market, which resulted in entities that were better positioned to leverage their size in pricing negotiations with TriZetto; and Cognizant's 2014 acquisition of TriZetto, which the market anticipated would create pricing shocks for Facets services.  Tr. 570:19-571:24 (Jarosz); PTX-2759 at 27 (showing impact of the acquisition on customer behavior); DTX-134 at 2 (anticipating price impact following Cognizant acquisition).  Mr. Britven's analysis did not account for these alternative, confounding market factors.  *See, e.g.*, Tr. 373:22-374:6 (Britven) (admitting he did not account for these alternative factors).  Syntel is entitled to JMOL on price erosion for this reason alone.  *Oiness* v. *Walgreen Co.*, 88 F.3d 1025, 1032 (Fed. Cir. 1996) (vacating jury award where plaintiff "did no market analysis to determine if market forces other than infringement, might have forced the price . . . to dip").

***Methodologically Unsound.***  Furthermore, TriZetto's price erosion analysis is deficient as a matter of law.  TriZetto's own expert conceded that he factored in price erosion that is *not* attributable to misappropriation.  Specifically, Mr. Britven testified that he applied a never-before-seen "bottom-up" approach by first calculating "erosion" for *all* TriZetto clients who received Facets services, and reducing that total to:  (1) the percentage of TriZetto's total work Mr. Mengert told him is Facets-related (70%) and (2) the percentage of revenue TriZetto earns from not only clients Syntel serviced (19.5%), but *dozens* of additional clients Syntel *never serviced* that he speculates would have been impacted (together with Syntel's clients, 44.0%).  Tr. 352:22-354:3, 358:10-16, 295:18-23 (Britven); Ex. 4, DDX-6.89; Ex. 4, DDX-6.99.  Indeed, the 70% figure

critical to Mr. Britven's novel "bottom-up" analysis is unsupported by any documentary evidence. Tr. 354:4-355:7 (Britven). Nor is it, as Mr. Britven confirmed, limited to the "upgrades and customizations" work for which TriZetto attempted (and failed) to establish a two-supplier market and satisfy causation under *Panduit*. Tr. 357:11-17 (Britven). This flaw is separately fatal to TriZetto's price erosion theory.

### B. A Reasonable Jury Would Not Have Awarded Reasonable Royalty Damages Under the DTSA

As set forth above, TriZetto is not entitled to damages under the DTSA. *See supra* at 4-5. Syntel is therefore entitled to JMOL on the jury's $59,700,000 reasonable-royalty award. Even if not foreclosed by the Second Circuit's mandate, however, a royalty award is available under the DTSA only as a "last resort," where actual losses are too speculative or difficult to calculate. S. Rep. No. 114-220 at 9, 9 n.17 (2016) ("It is not the Committee's intent to encourage the use of reasonable royalties to resolve trade secret misappropriation."). That is not the case here. Indeed, the jury and all parties agreed lost profits could be calculated. Tr. 270:18-21 (Britven); Tr. 539:8-14 (Jarosz). And, as the Circuit noted, "TriZetto's expert testified" at the Liability Trial that TriZetto "suffered $8.5 million in lost profits." D.I. 1093 at 38. For this reason alone, the reasonable-royalty award should be rejected. In any event, the amount awarded by the jury is not supported by the evidence.

The jury awarded the amount of DTSA royalty damages TriZetto requested. *See* Tr. 263:13-19 (Britven); D.I. 1567 at 2. All parties agreed that a reasonable royalty is the price that would be agreed upon in a hypothetical negotiation. *See* D.I. 1568-14 at 17; *see also* Tr. 302:12-21 (Britven). The jury verdict is facially implausible under that guidance because it would mean that Syntel would have agreed to pay a royalty nearly $20 million *higher* than Mr. Britven's calculation of Syntel's total profits. Tr. 305:15-22 (Britven) (calculating Syntel's

actual profits as $42.8 million). More substantively, Mr. Britven's reasonable royalty calculation is foundationally flawed because it considered two manifestly unreliable inputs. Tr. 306:2-7 (Britven).

First, Mr. Britven's calculation included and relied upon the $44.6 million lost sales figure that TriZetto abandoned mid-trial and that Mr. Britven conceded "includes revenue from non-Facets-related work." Tr. 709:22-710:1 (Britven). Second, it also relied on Mr. Britven's nearly $155 million price erosion calculation, which, for the reasons set forth above, was both unsupportable and, indeed, ultimately rejected by the jury. Tr. 306:2-7 (Britven). Thus, Mr. Britven's calculation was fundamentally flawed as a matter of law. The Court should grant Syntel JMOL on the DTSA reasonable royalty award, or remit the award down to no more than $14.8 million. Tr. 587:3-8 (Jarosz).

### C. A Reasonable Jury Would Not Have Awarded Damages for Copyright Infringement

The jury awarded TriZetto $65,261,913 for copyright infringement. D.I. 1567 at 2. The single-line general verdict form collapses "(1) actual damages as lost sales/profits; (2) actual damages as price erosion; and (3) reasonable royalty into one flat dollar amount." D.I. 1472 at 7; D.I. 1567 at 2.[7] It is therefore impossible to know which damages theory—lost sales, price erosion, or a royalty—this figure is derived from.[8] Under any circumstance, the jury's damages award is not supported by the record evidence and is plainly excessive.

---

[7] The Court denied Syntel's request for a more specific verdict form. *See* Tr. 669:18-670:8; D.I. 1472; D.I. 1472-2 at 4-5.

[8] Although it is impossible to be certain, the jury may have awarded TriZetto's total requested lost sales amount for copyright ($49,814,352) plus 10% of TriZetto's requested price erosion amount ($154,475,611). *See* Ex. 2, DDX-9.60.

TriZetto presented "largely the same analysis" with respect to copyright damages as it did for New York and DTSA trade secret misappropriation, including the same lost profits it claimed for *all* of the trade secrets, which it adjusted solely for the copyright time period. Tr. 300:9-15, 310:4-9 (Britven). The jury's copyright award therefore suffers from the same flaws discussed *supra* at 17-25 (lost profits) and 26-27 (reasonable royalty), and the additional flaw that TriZetto did not establish that the copyright individually warranted the same lost-profit damages as *all* the trade secrets. For the reasons set forth above, Syntel is entitled to JMOL on TriZetto's copyright claim or, in the alternative, to remittitur to, at most, $8 million—the highest amount Mr. Jarosz established TriZetto would be entitled to (if anything) for copyright damages. Tr. 588:3-12 (Jarosz).

## <u>CONCLUSION</u>

For the foregoing reasons, Syntel respectfully requests that the Court enter a judgment of $0 on TriZetto's claims for compensatory damages or, in the alternative, remittitur to the amount supported by the evidence.

Dated: August 14, 2025
New York, New York

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By: */s/ Jaren Janghorbani*
    Jaren Janghorbani
    Gregory F. Laufer
    Crystal Lohmann Parker
    Emily Vance
    Tiana Voegelin
    Phoebe H. King
    1285 Avenue of the Americas
    New York, NY 10019-6064
    Tel: (212) 373-3000
    Fax: (212) 757-3990
    Emails:  jjanghorbani@paulweiss.com
           glaufer@paulweiss.com
           cparker@paulweiss.com
           evance@paulweiss.com
           tvoegelin@paulweiss.com
           pking@paulweiss.com

*Attorneys for Plaintiffs and Counterclaim-Defendants Syntel Sterling Best Shores Mauritius Limited and Syntel, Inc.*

29

## **Word Limit Certification**

Pursuant to this Court's July 7, 2025 Order (D.I. 1576) and Local Civil Rule 7.1(c), I

hereby certify that the foregoing Memorandum complies with the Court's 8,750-word limit.


By:
*/s/ Jaren Janghorbani*
Jaren Janghorbani