UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
                                  :

SYNTEL STERLING BEST SHORES      :
MAURITIUS LTD., and SYNTEL, INC.,    :
                                  :

      Plaintiffs and Counterclaim Defendants,  :

                                  :        15 Civ. 211 (LGS)

             -against-             :

                                  :      **OPINION & ORDER**

THE TRIZETTO GROUP, INC. and      :
COGNIZANT TECHNOLOGY SOLUTIONS  :
CORP.,                              :
                                  :

      Defendants and Counterclaim Plaintiffs.  :

                                  :

---------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

      Syntel challenges a second jury's compensatory damages award to TriZetto for Syntel's misappropriation of TriZetto's trade secrets and Syntel's infringement of TriZetto's copyrights.[1] The second trial, which addressed only damages, followed a previous trial and jury's finding that Syntel had misappropriated TriZetto's trade secrets in violation of New York law and the Defend Trade Secrets Act of 2016 ("DTSA") and infringed TriZetto's copyrights in violation of the Copyright Act. *See Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, No. 15 Civ. 211, 2021 WL 1553926, at *1 (S.D.N.Y. Apr. 20, 2021), *aff'd in part, vacated in part, remanded*, 68 F.4th 792 (2d Cir. 2023).[2] The first jury also rejected all of Syntel's claims brought as Plaintiff against TriZetto as Defendant.

---

[1] Plaintiffs and Counterclaim Defendants are Syntel Sterling Best Shores Mauritius Limited and Syntel, Inc. (together, "Syntel"). Defendants and Counterclaim Plaintiffs are TriZetto Group, Inc. and Cognizant Technology Solutions Corporation (together, "TriZetto").

[2] For subsequent citations to Orders and Opinions entered in this case that are available on Westlaw, this Opinion uses the short form citation, including the date on first reference.

The first jury sat during the height of the COVID-19 pandemic, and on October 27, 2020, awarded TriZetto $284,855,192 in compensatory damages -- the maximum amount sought by TriZetto -- and double that amount, $569,710,384, in punitive damages -- the maximum amount the jury was instructed it could award. The award totaled over $850 million. The punitive damages award was remitted to $284,855,192, on account of the "large compensatory damages award" and "Syntel's reprehensible but not egregious [i.e., not murderous or life-threatening] conduct."[3] *Id.* at *11.

Even though the first jury rendered a verdict on both liability and damages, for ease of reference here, the first trial and first jury are referred to as the "Liability Trial" and the "Liability Jury," respectively. The second trial and second jury are referred to as the "Damages Trial" and the "Damages Jury," respectively. Familiarity with the facts of the underlying dispute is assumed. *See id.* at *1; *Syntel*, 68 F.4th at 796-99.

On appeal, the Second Circuit affirmed Syntel's liability and vacated and remanded as to damages. *See Syntel*, 68 F.4th at 815. The Second Circuit held that the avoided costs theory of compensatory damages supporting the Liability Jury's award under the DTSA was unavailable as a matter of law. *Id.* at 806-07. The Second Circuit had never previously addressed avoided costs as a theory of damages under the DTSA, and no appellate court had previously adopted the Second Circuit's view of DTSA damages. On remand, applying an analysis similar to the Second Circuit's analysis vacating the DTSA damages, this Court vacated the Liability Jury's remaining compensatory damages findings, which applied to the New York trade secrets claim and the federal copyright claim. *Syntel*, 2024 WL 1116090, at *3 (Mar. 13, 2024).

---

[3] Unless otherwise indicated, in quoting cases, all internal quotation marks, footnotes and citations are omitted, and all alterations are adopted.

2

That decision observed, regretfully, that it was "out of step with courts' general deference to, and respect for, the judgment of the jury," whose "awards expressed the jury's clear view about the harm to TriZetto and the maliciousness of Syntel's conduct." *Id.* at \*8.  The decision acknowledged that "[v]acating the entirety of the jury's compensatory damages . . . is in stark contrast to the jury verdict" and "in effect, penalizes TriZetto for presenting a theory of damages that had yet to be addressed by the Second Circuit and had been accepted by the Seventh Circuit." *Id.*

Following the same reasoning, this Court granted TriZetto's motion for a new trial: "Penalizing TriZetto with no compensatory damages for relying on a colorable theory in an unclear area of law would be a serious injustice and disrespect the jury's view." *Syntel*, 2024 WL 4553894, at \*2 (Oct. 23, 2024).  Nevertheless, to avoid the potential waste of judicial and party resources, this Court granted Syntel's motion requesting certification for interlocutory appeal the question of whether the Second Circuit's mandate permits a new trial on compensatory damages. The Second Circuit denied Syntel's request for leave to file the appeal.

The Damages Trial went forward from June 24, 2025, to June 30, 2025.  The Damages Jury awarded TriZetto $69,977,813 in compensatory damages, despite rulings that excluded the most inflammatory facts.  For example, evidence of Syntel's motive or state of mind was excluded because of "the risk of prejudice -- namely, painting Syntel as a bad actor -- or confusing the jury, which may mistakenly conclude that such considerations bear on the calculation of compensatory damages." *Syntel*, 2025 WL 1565327, at \*3 (June 3), *reconsideration denied*, 2025 WL 1642886 (June 9, 2025).

Following the Damages Trial, Syntel now moves to reduce or strike the compensatory damages awarded by the Damages Jury and the punitive damages awarded after the Liability

Trial. Specifically, before the case was submitted to the Damages Jury, both Syntel and TriZetto moved for judgment as a matter of law on all claims under Rule 50(a).[4] Ruling on the motions was reserved. After the damages verdict, Syntel renewed its motion for judgment as a matter of law under Rule 50(b), or in the alternative, a new trial or remittitur under Rule 59. Syntel also moves to amend or alter the previously entered judgment awarding TriZetto $284,855,192 in punitive damages.

For the reasons that follow, Syntel's motion for judgment as a matter of law or a new trial is denied. Syntel's motion to alter or amend the judgment as to the punitive damages award is granted to the extent the punitive damages award is remitted to $139,955,626. TriZetto's Rule 50(a) motion is denied as moot.

## I.    LEGAL STANDARD

Judgment as a matter of law under Rule 50(b) is appropriate only if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" opposing the request. Fed. R. Civ. P. 50(a)(1); *Syntel*, 68 F.4th at 800. "The court considering a Rule 50 motion may not make credibility determinations or weigh the evidence." *Palin v. N.Y. Times Co.*, 113 F.4th 245, 263 (2d Cir. 2024). A Rule 50 motion may be granted only if "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." *Ortiz v. Stambach*, 137 F.4th 48, 61 (2d Cir. 2025).

Under Rule 59, "[a] motion for new trial ordinarily should not be granted unless the trial court is convinced that the jury . . . reached a seriously erroneous result or that the verdict is a

---

[4] Unless otherwise indicated, all references to "Rules" are to the Federal Rules of Civil Procedure.

miscarriage of justice." *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 125 (2d Cir. 2024). "Remittiturs are a common procedure used by the courts to, in effect, reduce the amount of a damage award that the court concludes is impermissibly high." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 167 (2d Cir. 2014). Through this procedure, "a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 51 (2d Cir. 2015).

## II.    DISCUSSION

### A.  Damages Trial

Syntel argues that the Damages Trial violated the Second Circuit's mandate and Syntel's Seventh Amendment rights. Syntel consequently seeks vacatur of the Damages Jury's award. For the reasons below, these arguments are unavailing.

### 1.  Second Circuit Mandate

Syntel first argues that the Damages Trial violated the Second Circuit's mandate. This argument is unpersuasive because the Second Circuit's mandate did not foreclose any issue litigated at the Damages Trial.

"A district court must follow the mandate issued by the appellate court." *Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174, 181 (2d Cir. 2019). A court should "look[] to both the specific dictates of the remand order as well as the broader spirit of the mandate to determine what issues remain open." *Kotler v. Jubert*, 986 F.3d 147, 159 (2d Cir. 2021). "[T]he mandate is controlling only as to matters within its compass. When the mandate leaves issues open, the lower court may dispose of the case on grounds not dealt with by the remanding appellate court." *Statek Corp. v. Dev. Specialists, Inc. (In re Coudert Bros. LLP)*, 809 F.3d 94, 98 (2d Cir. 2015). However, the mandate rule extends "to issues that were ripe for review at the time of an initial appeal but

nonetheless foregone by a party." *United States v. Aquart*, 92 F.4th 77, 87 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1071 (2025).

As recorded on the verdict form, the Liability Jury found compensatory damages of $284,855,192 on the DTSA claim, which were based on a theory of development costs that Syntel had avoided by misappropriating TriZetto's trade secrets. The Liability Jury also found compensatory damages of $142,427,596 on the New York trade secrets claim and $59,100,000 on the Copyright Act claim. The latter two amounts were based on a theory of reasonable royalties that Syntel would have paid had it been licensed to use the stolen trade secrets. To avoid double counting, the Liability Jury found that TriZetto was entitled to the greatest of the three amounts, the damages under the DTSA.

The Second Circuit vacated the DTSA compensatory damages awarded by the Liability Jury and entered by the Court. *Syntel*, 68 F.4th at 814. The Second Circuit remanded "the case . . . to address the propriety of" the reasonable royalty awards under New York law and the Copyright Act. *Id.* The Second Circuit did "*not* remand . . . to determine if TriZetto is entitled to lost profit damages under § 1836(b)(3)(B)(i)(I) of the DTSA" because the verdict form "did not ask the jury to determine if (and to what amount) TriZetto was entitled to lost profit damages" and "[b]ecause TriZetto d[id] not argue on appeal that it is entitled to its lost profits." *Id.* at 814-15. On remand, the reasonable royalty awards were vacated because they bore no reasonable relation to the actual harm TriZetto had suffered. *Syntel*, 2024 WL 1116090, at *3. A new trial was granted to correct a manifest error of law because, at the initial trial, TriZetto had relied in good faith on a theory of damages that TriZetto and the trial court believed was available under relevant law, which understanding the Second Circuit later clarified was erroneous. *See Syntel*, 2024 WL 4553894, at *3.

The Second Circuit's mandate did not foreclose the Damages Trial.  Consistent with the Second Circuit's mandate, the Damages Jury was not asked to determine if TriZetto was entitled to lost profit damages under the DTSA.  Instead, the Damages Jury found that TriZetto was entitled to the highest of (1) lost profit damages under New York law; (2) reasonable royalty damages under the DTSA or (3) actual damages under the Copyright Act.  The highest of these damages turned out to be lost profit damages under New York law.  The Second Circuit's mandate did not address, and did not foreclose, any of these theories of damages on remand.  As the Second Circuit noted, TriZetto's New York law and Copyright Act damages were not on appeal.  *See Syntel*, 68 F.4th at 814.

Syntel argues that the Second Circuit's rationales for excluding DTSA lost profit damages on remand -- that the verdict form "did not ask the jury to determine if (and to what amount) TriZetto was entitled to" those damages, and "TriZetto d[id] not argue on appeal that it is entitled to [such damages] if [the Circuit] vacate[d] the avoided costs award," *id.* at 815 -- apply equally to the damages theories TriZetto pursued at the Damages Trial.  This theory of preclusion by implication is unsupported.  This case is unlike *Havlish*, in which the Second Circuit held that a district court violated the mandate rule where the Second Circuit remanded a case "only" for consideration of specified issues, but the district court proceeded to trial on other issues that the Second Circuit's decision had foreclosed as a matter of law.  934 F.3d at 182.

Syntel further argues that the Second Circuit held that TriZetto "suffered no compensable harm" beyond $8.5 million in lost profits, and the Damages Trial exceeded the mandate by allowing a damages award different from those lost profit damages.  *Syntel*, 68 F.4th at 811.  This argument is unavailing because it reads the Second Circuit's decision too broadly.  The Second Circuit held that avoided cost damages, which are available under the DTSA only where actual

harm does not adequately compensate a plaintiff, were not available to TriZetto under the DTSA because TriZetto suffered "no compensable harm *supporting an unjust enrichment award of avoided costs*" beyond its lost profits. *Id.* (emphasis added). The Second Circuit did not limit TriZetto's damages to DTSA lost profits. The Damages Trial was consistent with the Second Circuit's mandate.

### 2. Seventh Amendment

Syntel also argues that the Damages Trial violated its Seventh Amendment rights because TriZetto presented the Damages Jury with evidence and argument that required reexamination and expansion of the Liability Jury's findings. This argument fails because the Damages Jury neither reexamined nor expanded the Liability Jury's findings.[5]

The Seventh Amendment guarantees that "[i]n Suits at common law . . . the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. Consequently, "the Seventh Amendment's Reexamination Clause forbids review by a second fact-finder, whether a judge or another jury, of facts already determined by a jury." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 150 n.27 (2d Cir. 2015); *Mack v. FCA US LLC*, No. 24 Civ. 2990, 2025 WL 2403393, at *18 (E.D.N.Y. Aug. 19, 2025). "It is beyond dispute

---

[5] In a letter filed April 1, 2025, Syntel sought for the first time to bar "argument or evidence that damages should be based on any use of trade secrets that would require the damages jury to determine the scope or nature of use . . . or by re-presenting evidence as to scope of nature of use that was already presented to the first jury." This motion was, in substance, an untimely Seventh Amendment objection to the Damages Trial as a whole, which is and was waived. *See Syntel*, 2025 WL 1565327, at *2. Syntel now seeks to excise specific evidence and argument actually presented at the Damages Trial that, Syntel contends, violated the Seventh Amendment. This argument is not waived because it was not ripe until trial. *See Lavoie v. Pac. Press & Shear Co.*, 975 F.2d 48, 55 (2d Cir. 1992) (citing cases holding that Seventh Amendment challenge may be timely for post-trial motions).

that the grant of [a Rule 59(a) new trial motion] does not violate the Seventh Amendment." *Mazzei v. Money Store*, 829 F.3d 260, 267 (2d Cir. 2016) (analogizing class decertification to grant of new trial motion). "[D]ifferent juries may examine overlapping evidence as long as they do not decide factual issues that are common to both trials and essential to the outcome." *Au New Haven, LLC v. YKK Corp.*, No. 15 Civ. 3411, 2022 WL 10122844, at *3 (S.D.N.Y. Oct. 17, 2022); *see Blyden v. Mancusi*, 186 F.3d 252, 268 (2d Cir. 1999) ("[I]ssues may be divided and tried separately, but a given issue may not be tried by different, successive juries.").

The Damages Trial did not violate Syntel's Seventh Amendment rights because the Damages Jury neither expanded Syntel's liability nor reexamined facts adjudicated by the Liability Jury. The Liability Jury found that Syntel misappropriated "one or more trade secrets" and copyrights possessed by TriZetto. The Damages Jury was instructed to accept the Liability Jury's liability findings and to consider evidence "only for the purpose of identifying the extent to which Syntel's trade secret misappropriation and copyright infringement led to damages suffered by TriZetto." Damages Trial Transcript ("Transcript") at 751:14-21 (June 30, 2025), Dkt. 1594. "Juries are presumed to follow their instructions." *Carroll v. Trump*, 151 F.4th 50, 81 n.33 (2d Cir. 2025).

Syntel argues, notwithstanding the jury instructions, that the Damages Jury necessarily reexamined the Liability Jury's findings because TriZetto's presentation of evidence and damages theories necessitated that the Damages Jury find that Syntel misappropriated specific trade secrets. These arguments lack merit, as explained below.

### a.  Expansion of Liability Verdict

Syntel argues that TriZetto's presentation of evidence expanded the Liability Jury's verdict because TriZetto presented evidence that Syntel misappropriated all 104 of the trade

secrets at issue -- not "one or more," as the Liability Jury found.  Syntel argues that this evidence must be excluded, and without this evidentiary basis, the Damages Jury's verdict is unsupported by the evidence.  These arguments are unavailing because TriZetto's presentation of evidence was consistent with the Liability Jury's verdict, and Syntel provides no basis to conclude that the Damages Jury's verdict was inconsistent with the prior verdict.

### i.    Specific Trade Secrets

Syntel argues that TriZetto compelled the Damages Jury to expand the Liability Jury's verdict because TriZetto elicited testimony from Syntel witnesses that Syntel misappropriated specific trade secrets, and such testimony does not comport with the Liability Jury's non-specific finding that Syntel misappropriated "one or more" trade secrets.  This argument is unpersuasive because TriZetto permissibly elicited testimony regarding the extent of Syntel's misappropriation of trade secrets that had been presented to the Liability Jury.  For instance, Syntel cites examples of TriZetto's eliciting that Syntel had used "at least three" named trade secrets that were among the list of 104 trade secrets presented both to the Liability Jury and the Damages Jury.[6]  This line of questioning was relevant to the extent of Syntel's use of trade secrets and did not require the Damages Jury to expand the Liability Jury's finding.  *See Au New Haven*, 2022 WL 10122844, at *7 (stating that different juries may examine overlapping evidence).

Syntel also faults TriZetto for seeking damages based on internal Syntel documents that described Facets-related work without specifically identifying the misappropriated trade secrets.

---

[6] *Compare, e.g.*, Transcript at 461:24-462:17, 463:7-22 (June 26, 2025), Dkt. 1590 (eliciting testimony that Syntel used trade secrets including the "the data dictionary, the custom code impact tool, and the test cases and automation scripts"), *with* Court Ex. 15, Final Jury Charge, Ex. 1, Dkt. 1568-15, (listing "Facets Data Dictionary," "Facets Custom Code Impact Tool," "Facets Test Cases" and "Facets Automation Scripts" as "trade secrets at issue in the previous trial").

Specifically, Syntel argues that TriZetto's experts Dr. Stephen Wicker and Dr. Steven Kursh presented evidence that Syntel misappropriated unspecified trade secrets without explicitly tying that evidence to one of the 104 at-issue trade secrets.

This argument is unpersuasive because, in substance, it challenges the sufficiency of TriZetto's evidence supporting the extent of Syntel's use of trade secrets and does not raise a Seventh Amendment issue. The Damages Jury was instructed to accept that Syntel misappropriated one or more of 104 specified trade secrets, and that "[a]ny damages . . . award[ed] for trade secret misappropriation *must be based on* harm caused by Syntel's trade secret misappropriation regarding" those listed trade secrets. Transcript at 751:22-25 (June 30, 2025), Dkt. 1594 (emphasis added). The Damages Jury is presumed to have followed these instructions. *See Carroll*, 151 F.4th 81 & n.33. Under such circumstances, these asserted weaknesses in TriZetto's expert testimony do not raise a Seventh Amendment issue.

### ii.    Lost Sales Theory

TriZetto partially based the damages calculation presented to the Damages Jury on a "lost sales" theory of damages, which TriZetto described as "the sales Syntel took from TriZetto" through misappropriation. Syntel argues that this theory of damages is inherently problematic because the theory requires knowledge of which of the 104 asserted trade secrets were misappropriated and whether Syntel used those trade secrets in particular projects. This argument is unpersuasive because TriZetto's theory of damages did not require the Damages Jury to find that Syntel used specific trade secrets -- instead, TriZetto sought damages based on evidence of business Syntel won that TriZetto instead would have won but for the misappropriation. No part of that theory requires the Damages Jury to make a liability finding with respect to a specific trade secret.

### b.  Reexamination of Trade Secret Use

Second, Syntel argues that TriZetto's presentation of evidence required the Damages Jury to determine which acts constituted trade secret use, which resulted in impermissible reexamination of the Liability Jury's findings regarding use.  This argument is unavailing because TriZetto's presentation of evidence was consistent with its proof of liability from the first trial.  Syntel's arguments otherwise lack merit.

### i.    Lost Sales Theory

Syntel argues that TriZetto's lost sales theory of damages necessitated reexamination of the question of trade secret use.  This argument is unavailing because that theory did not require the Damages Jury to find that TriZetto used any specific trade secret.  Instead, the theory based damages on business Syntel won that TriZetto would have won but for the misappropriation.

### ii.    Specific Trade Secrets

Syntel argues that TriZetto improperly presented evidence regarding use that TriZetto did not explicitly tie to any of the 104 trade secrets presented to the Liability Jury.  This argument is a challenge to the sufficiency of TriZetto's evidence, not a Seventh Amendment challenge.  The Damages Jury was instructed to award damages relating only to Syntel's use of the 104 trade secrets presented to the Liability Jury, *see* Transcript at 751:22-25 (June 30, 2025), Dkt. 1594, and is presumed to have followed those instructions, *see Carroll*, 151 F.4th at 81 & n.33.

Syntel also argues that TriZetto impermissibly presented evidence that was not shown to the Liability Jury.  This argument is unpersuasive because TriZetto presented testimony tying the

challenged evidence to one of the 104 trade secrets presented to the Liability Jury.[7]  Thus, this evidence is consistent with TriZetto's proof of liability at the Liability Trial.

*Blyden*, which Syntel cites, is not to the contrary.  *Blyden* involved a class action in which a liability jury found, in the aftermath of the Attica prison riot, that the defendants had used excessive force or were responsible for the use of excessive force against at least one of the named plaintiffs -- i.e., against "the plaintiffs or any of them."  186 F.3d at 260.  The district court then considered how to determine class-wide damages via representative damages trials with "typical" plaintiffs representing subclasses.  *Id*.  Counsel for the appellant, an Assistant Deputy Superintendent at Attica, *id.* at 256, objected, refusing to stipulate that the "plaintiffs or any of them" language established his client's liability to the class.  *Id.* at 261.  The court apparently accepted the argument in part and conducted two "damages trials" -- one with an unrepresentative plaintiff whose injuries might be so great as to be beyond the appellant's supervisory responsibility, and another with a plaintiff whose claims and injuries were more typical.  *See id*. at 257, 261.  The appellant appealed the two damages judgments against him and in favor of each of the two respective plaintiffs.  *Id*. at 256.  The Second Circuit reversed on several grounds, including a Seventh Amendment violation.  *Id.* at 268.  Both juries were specifically directed to judge whether any particular act was a "reprisal" constituting cruel and unusual punishment, and

---

[7] Syntel cites one instance in which Dr. Kursh testified that Syntel used trade secrets, including "Step-Up Probe," "Data Dictionary" and "Factory," in a bid.  *Compare* Transcript at 233:16-21 (June 25, 2025), Dkt. 1588 (testimony that Syntel used "Step-Up Probe," "Data Dictionary" and "Factory" in a bid), *with id.* at 191:2-7 (testimony that Syntel referred to trade secret 104 as "Step Up Probe" and trade secrets 102 and 103 as "Factory"), *and* Court Ex. 15, Final Jury Charge, Ex. 1, Dkt. 1568-15 (listing trade secret 4 as "Facets Data Dictionary").  Syntel cites another instance in which Dr. Wicker testified that four trade secret documents were attached to an email. The Damages Jury could reasonably have inferred that these asserted trade secret documents were among the 104 trade secrets.  *Compare* DTX-2033 (listing filenames), *with* Court Ex. 15, Final Jury Charge, Ex. 1, Dkt. 1568-15 (trade secrets 10, 26, 28, 48).

one of the juries "was even asked to revisit [the appellant's] supervisory liability . . . without regard to how the liability jury viewed that particular act."  *Id.* at 269; *see id.* at 266 (stating that damages jury was instructed "not to hold [appellant] liable for solitary and unrepeated acts by a renegade officer" in contravention of the instructions given to the liability jury).

Unlike in *Blyden*, the Damages Jury did not reexamine the Liability Jury's finding that Syntel is liable.  The Damages Jury was instructed specifically what the Liability Jury had found, including that "Syntel misappropriated one or more of TriZetto's trade secrets listed in Exhibit 1" in violation of the DTSA and New York law during the relevant period.  Transcript at 751:2-9 (June 30, 2025), Dkt. 1594; *see also* Court Ex. 15, Final Jury Charge, Ex. 1, Dkt. 1568-15.  The Damages Jury was directed to "accept those determinations for all purposes in this trial" and "not revisit the matter of Syntel's liability."  Transcript at 751:14-16 (June 30, 2025), Dkt. 1594.  The Damages Jury was further instructed that all evidence could be considered "only for the purpose of identifying the extent to which Syntel's trade secret misappropriation . . . led to damages suffered by TriZetto. . . .  Your role is not to determine whether Syntel misappropriated TriZetto's trade secrets . . . because the Phase 1 Jury already decided that Syntel did.  Your only job in this case is to determine the amount of damages, if any, that Syntel owes as a result of misappropriating TriZetto's trade secrets."  *Id.* at 751:18-752:6.  Notably, and unlike in *Blyden*, the Damages Jury was not instructed to consider whether Syntel misappropriated any individual trade secret, nor did the verdict form ask the Damages Jury to award damages based on individual trade secrets.

### iii.    Customers

Syntel further argues that TriZetto improperly presented evidence regarding customers that were not presented at the Liability Trial.  This argument lacks merit.  First, Syntel argues that

14

TriZetto presented evidence not explicitly tied to any customer -- for example, an advertisement on Syntel's website that, Syntel argues, TriZetto did not establish any at-issue customer saw. Again, this argument challenges the sufficiency of TriZetto's evidence.  TriZetto may permissibly rely on circumstantial evidence (for example, inviting the Damages Jury to draw the inference that an at-issue customer saw an advertisement on Syntel's website) without violating the Seventh Amendment.

Second, Syntel argues that TriZetto expanded its damages theory to seek recovery for damages against six customers, not the one customer TriZetto presented for an exemplary calculation of lost profits damages at the Liability Trial (United Health Group).  This argument is unpersuasive because TriZetto's presentation of evidence relating to customers other than United Health Group is consistent with TriZetto's proof of liability.  At the Liability Trial, TriZetto performed an exemplary lost profits damages calculation based on United Health Group and presented evidence that Syntel also won work from other customers.  TriZetto did not argue at the Liability Trial that United Health Group was the only at-issue customer.[8]  TriZetto concedes that it changed its damages theories between the Liability Trial and the Damages Trial.  That change did not require reexamination of the Liability Jury's liability findings because the new damages theories were consistent with TriZetto's proof of liability.

### c. Authorization

Syntel finally argues that TriZetto's presentation of evidence and request for damages relating to work that Syntel performed for two customers, Blue Shield of California ("BSC") and

---

[8] Liability Trial Transcript at 410:16-19 (Oct. 21, 2020), Dkt. 947 (expert testimony that $8.5 million in lost profits from United Health Group was not all of TriZetto's lost profits); Liability Trial Transcript at 896:2-11 (Oct. 26, 2020), Dkt. 953 (TriZetto stating in summation:  "[I]t wasn't just UHG.").

Capital District Physicians' Health Plan ("CDPHP"), exceeded the Liability Jury's findings.

Specifically, Syntel argues that the work it performed for BSC and CDPHP was authorized, so

the Liability Jury "could not" have found that the work involved misappropriation. Syntel made

a version of this argument in its summation of the Liability Trial, in post-trial motions for that

trial and on appeal, and the argument was rejected at each turn. *See Syntel*, 2021 WL 1553926, at

\*3; *Syntel*, 68 F.4th at 806. The argument remains unavailing for the same reasons. The

Damages Trial did not violate Syntel's Seventh Amendment rights.

### B.  Jury Award

Syntel argues that the Damages Jury's award should be vacated or remitted because the

award is not supported by substantial evidence or, in the alternative, is excessive and against the

weight of the evidence. These arguments fail because the evidence is legally sufficient and

supports the Damages Jury's award. Also, the Damages Jury's award is not excessive or against

the weight of the evidence as would justify remittitur. "[D]etermining the amount of damages is

a quintessential responsibility of juries." *Jennings v. Yurkiw*, 18 F.4th 383, 390 (2d Cir. 2021).

The Damages Jury found that TriZetto was entitled to $69,977,813 in lost profits damages

under New York law and awarded this amount in compensatory damages.[9] Syntel's arguments,

most of which the Damages Jury heard and rejected, largely go to the weight of the evidence.

The Damages Jury plainly considered the weight of the evidence in awarding compensatory

damages of nearly $70 million -- less than the approximately $209 million in lost profits TriZetto

---

[9] The Damages Jury's award on the DTSA trade secret misappropriation claim was based on
TriZetto's reasonable royalty theory, and the award on the copyright claim was based on
TriZetto's lost profits theories. Although the parties addressed the propriety of these awards in
their motion papers, they are not addressed here because the Damages Jury, to avoid double
counting, did not factor them into total compensatory damages and relied exclusively on the
$69,977,813 for the trade secret misappropriation claim under New York law.

sought under New York law, and more than the $9.2 million lost profit calculation that Syntel presented to the Damages Jury.

TriZetto advanced two theories in support of its claimed lost profit damages under New York law:  lost sales and price erosion.  For both theories, TriZetto's expert Thomas W. Britven relied on the four-factor test announced in *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152 (6th Cir. 1978), to link Syntel's misappropriation to TriZetto's lost profits.  Under that test, a trade secret owner must prove "(1) demand for the [service provided through trade secrets], (2) absence of acceptable non-infringing substitutes, (3) [the owner's] manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit [the owner] would have made."  *Id.* at 1156; *see Novartis Vaccines & Diagnostics, Inc. v. Regeneron Pharms., Inc.*, No. 18 Civ. 2434, 2019 WL 3050678, at *4 (S.D.N.Y. July 12, 2019) ("In determining a patentee's entitlement to lost profits, courts often, but are not required to, apply the *Panduit* test, first articulated by the Sixth Circuit.").

### 1.  Lost Sales

TriZetto presented evidence that it was entitled to up to $54.5 million in damages attributable to lost sales resulting from Syntel's misappropriation.  Syntel argues that TriZetto failed to prove lost sales damages as a matter of law because TriZetto failed to prove *Panduit* factors two and three -- the existence of acceptable non-infringing substitutes and TriZetto's ability to complete Syntel's sales.  Syntel argues in the alternative that the amount of the Damages Jury's award is not supported by substantial evidence because a reasonable jury could not have awarded more than $9.2 million in lost sales damages.  These arguments are unpersuasive because, viewing the evidence in the light most favorable to TriZetto, a reasonable

17

jury could find that TriZetto was entitled to lost sales damages up to the maximum amount TriZetto sought.

### a.  Substitutes

As for *Panduit* factor two -- the existence of acceptable non-infringing substitutes -- Syntel argues that TriZetto's evidence was insufficient because TriZetto neither established a two-supplier market (such that the Damages Jury could infer that TriZetto would have made all of Syntel's sales), nor provided evidence regarding market share (such that the Damages Jury could infer what percentage of Syntel's sales TriZetto would have won).  This argument is unavailing because the Damages Jury's verdict is supported by permissible inferences from the evidence presented.

The Damages Jury could have reasonably concluded that there were no acceptable non-infringing substitutes for TriZetto's Facets-related services work.  Although, as Syntel notes, other entities competed with TriZetto for Facets-related consulting and services, TriZetto presented evidence that these entities did not offer the specific tools and services that Syntel and TriZetto offered, which required the use of TriZetto's trade secrets.  Specifically, TriZetto presented evidence that Syntel identified itself internally as the "only alternative" to TriZetto. TriZetto also presented evidence that Syntel advertised its services externally by reference to its use of TriZetto's trade secrets.  Despite Syntel's argument that these statements were aspirational, the Damages Jury was free to take them at face value and conclude that other competitors' offerings "lack[ed] the advantages of [Facets]" and thus "can hardly be termed a substitute acceptable to the customer who wants those advantages."  *Panduit*, 575 F.2d at 1162; *see Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1285-86 (Fed. Cir. 2017).

For the same reasons, and contrary to Syntel's arguments otherwise, TriZetto was not required to present market share analysis to substantiate damages. The evidence supports a finding that, but for Syntel's misappropriation, TriZetto would have won Syntel's business.

### b.  Ability to Complete Sales

As for *Panduit* factor three -- the capability to exploit the demand of the infringing sales -- Syntel argues that TriZetto did not present evidence to show that TriZetto had the capacity to perform, and would have performed, the projects that Syntel won through misappropriation. This argument is unpersuasive because the evidence permitted inferences that TriZetto would have completed the sales that Syntel made. TriZetto had pre-existing Facets-servicing relationships with all six customers for which TriZetto sought damages, and TriZetto's CEO testified that these relationships were "extremely important" to TriZetto. TriZetto also presented expert testimony from Mr. Britven that TriZetto had capacity to perform the work that Syntel won during the relevant period. This evidence supports a finding that TriZetto had the capacity to complete Syntel's sales.

### c.  Amount of Award

In the alternative, Syntel argues that no reasonable jury could have awarded lost sales damages in excess of $9.2 million. This argument fails because substantial evidence supports a greater award for lost sales damages.

TriZetto presented expert testimony to support its requested lost sales damages. Dr. Wicker testified about the scope of Syntel's use of TriZetto's trade secrets. Dr. Wicker analyzed Syntel's statements of work with the six at-issue customers and identified which statements of work were Facets-related. Dr. Wicker testified that Syntel "needed the trade secrets and copyrighted material" to perform Facets-related work. TriZetto also presented testimony from

Mr. Britven, who relied on Dr. Wicker's analysis to estimate TriZetto's lost sales damages.  This expert testimony supports up to $54.5 million in lost sales damages.

Syntel's contrary arguments lack merit.  Syntel argues that TriZetto provided inconsistent damages calculations, including calculations that included damages for non-Facets work.  This argument is unavailing because TriZetto presented testimony to account for the differences in its damages calculations, which the Damages Jury was permitted to accept -- namely, that the highest $54.5 million number was based only on Facets-related work, and that the number was higher than previous calculations, which included non-Facets-related work, because the $54.5 million number included newly discovered information about Syntel's work for one of the customers (Anthem).

Syntel further argues that TriZetto did not limit its damages estimates to "upgrades" work that Syntel performed, which Syntel contends is the only type of work for which TriZetto plausibly established that it was the only acceptable alternative to Syntel.  This argument is unavailing because, as explained above with respect to *Panduit* factor two, the Damages Jury permissibly may have concluded that TriZetto was the only acceptable alternative for all work that Syntel performed.

Finally, echoing its Seventh Amendment arguments, Syntel argues that the Damages Jury could not permissibly award damages related to work performed for BSC and CDPHP, which Syntel contends was authorized.  This argument fails because the Liability Jury already rejected Syntel's authorization argument.  *See Syntel*, 2021 WL 1553926, at *3.

## 2. Price Erosion

TriZetto argued that it was entitled to a maximum of approximately $154 million in damages attributable to TriZetto's lowering its prices in response to market pressure resulting

from Syntel's misappropriation. Syntel argues that TriZetto's theory of price erosion damages is inadequate as a matter of law and consequently cannot support any damages. Syntel's arguments are unavailing because they seek to compel inferences that a reasonable jury would not be obligated to draw.

### a. Consumer Price Index

Syntel argues that TriZetto's price erosion theory is deficient because TriZetto used the Consumer Price Index ("CPI") as a benchmark for TriZetto's prices over the damages period. Syntel made this argument in summation, and it was the subject of multiple witnesses' testimony at the Damages Trial. This criticism is unavailing because a reasonable jury could conclude that the CPI is an appropriate benchmark.

TriZetto's CEO testified that TriZetto generally increases its rates in line with the CPI. TriZetto's CEO also testified that, during the damages period, TriZetto lowered its prices and gave certain clients a "break on CPI." Mr. Britven linked this departure from the CPI to Syntel's misappropriation. A reasonable jury could credit this evidence and conclude that the CPI was an appropriate benchmark for price erosion damages.

Syntel's arguments otherwise are without merit. Syntel argues that the CPI is an inappropriate benchmark because it tracks inflation in consumer prices, not enterprise software servicing. This argument is unavailing because a reasonable jury could credit TriZetto's testimony that TriZetto in fact bases its rates on the CPI. Syntel also argues that there was actually "very little correlation between the CPI and TriZetto prices." TriZetto rebutted this argument through fact testimony that TriZetto used the CPI as a benchmark and expert testimony that TriZetto's prices lagged behind the CPI during the misappropriation period and exceeded the

CPI once the misappropriation ended.  The Damages Jury could have permissibly concluded that the CPI is an appropriate benchmark.

### b.  Elasticity

Syntel also argues that TriZetto's price erosion theory is flawed because TriZetto did not account for price elasticity of demand -- i.e., the economic principle that if TriZetto had charged higher prices for its services, TriZetto's sales may have decreased.  This argument is unavailing because a reasonable jury could permissibly credit Mr. Britven's testimony that an elasticity adjustment was unnecessary because TriZetto's real prices decreased over the damages period.

### c.  Causation

Syntel further argues that TriZetto's price erosion theory fails because TriZetto did not establish that any erosion was attributable to Syntel's misappropriation.  This argument is unpersuasive.  Mr. Britven calculated the total amount of TriZetto's price erosion against the CPI benchmark over the damages period, isolated the percentage of that amount relating to Facets-related servicing and further isolated the percentage attributable to the six at-issue customers and Blue Cross Blue Shield health plans.  TriZetto further presented fact and expert testimony that the Blue Cross Blue Shield health plans communicated with each other regarding pricing, making it appropriate to consider price erosion for those accounts in the aggregate even though Syntel did not win business from all of those accounts.  The Damages Jury may permissibly have credited this testimony and awarded price erosion damages.

Syntel contends that TriZetto offered no evidence that customers chose Syntel over TriZetto due to lower prices.  This argument fails because TriZetto presented evidence that Syntel

marketed itself as a lower-cost alternative to TriZetto,[10] which supports a permissible inference that cost was a relevant consideration for the at-issue clients.

Syntel also contends that TriZetto did not account for other market factors in its price erosion estimates. This argument fails because TriZetto presented evidence that its expert, Mr. Britven, did calculate price erosion attributable only to Syntel's misappropriation.[11]

### d. Methodology

Syntel finally contends that TriZetto's price erosion theory of damages is methodologically unsound as a matter of law. Specifically, Syntel argues that TriZetto's expert analysis is flawed because it (1) relies on TriZetto's CEO for the percentage of TriZetto's work that is Facets-related; (2) includes price erosion from clients that Syntel did not service and (3) is not limited to any market for which TriZetto established no acceptable non-infringing substitutes.

These arguments lack merit. First, it is permissible for TriZetto's expert to rely on TriZetto's CEO for information about the company's business, particularly because TriZetto also presented testimony corroborating that figure.[12] *See Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 355 (S.D.N.Y. 2023) (stating in rejecting *Daubert* challenge that "it is not uncommon for experts to rely on interviews . . . in forming their opinions"). Second, TriZetto presented evidence that price erosion with respect to the six at-issue clients also resulted in lower prices for TriZetto's other clients (specifically, Blue Cross Blue Shield health plans).[13] And third,

---

[10] *See* Transcript at 284:1-285:6 (June 25, 2025), Dkt. 1588.

[11] *See* Transcript at 703:4-21 (June 30, 2025), Dkt. 1594.

[12] *See* Transcript at 125:23-126:3 (June 25, 2025), Dkt 1588.

[13] *See* Transcript at 427:12-24 (June 26, 2025), Dkt. 1590; Transcript at 133:19-134:1 (June 25, 2025), Dkt. 1588.

the Damages Jury could have permissibly concluded that there were no acceptable non-infringing substitutes for TriZetto's Facets-related services work, including because TriZetto presented evidence that Syntel referred to itself as the "only alternative" to TriZetto and advertised its services externally by referencing its use of TriZetto's trade secrets.

Syntel's motion for judgment as a matter of law or remittitur of the Damages Jury's compensatory damages award is denied.

### C. Punitive Damages

Syntel seeks alteration or amendment of the judgment awarding TriZetto $284,855,192 in punitive damages. This motion is granted as follows: the punitive damages award is remitted to $139,955,626, a 2:1 ratio with the compensatory damages awarded by the Damages Jury. This amount is consistent with New York law and the Fourteenth Amendment Due Process Clause.

### 1. Second Circuit Mandate

Despite each party's argument otherwise, the Second Circuit's mandate permits amendment of the punitive damages awarded after the Liability Trial.

Syntel argues that the Second Circuit vacated all DTSA damages, including punitive damages, because the court stated that the "DTSA damages judgment is vacated," *Syntel*, 68 F.4th at 814 -- consequently, Syntel argues, punitive damages are $0. This argument is unavailing. The Second Circuit vacated only the compensatory damages awarded under the DTSA. *Id.* at 806-07. The Second Circuit noted that Syntel did "not directly challenge the legality of . . . [the] punitive damages award." *Id.* at 806 n.19. The Second Circuit did not analyze the propriety of the punitive damages award, nor did it provide any instructions for remand relating to the punitive damages award. The Second Circuit's mandate did not vacate the punitive damages award.

TriZetto, on the other hand, argues that the Second Circuit's mandate bars amendment of the punitive damages awarded after the Liability Trial. Specifically, TriZetto argues that the Second Circuit foreclosed amendment of the punitive damages award because the court noted that Syntel requested the Circuit "to direct the district court on remand to adjust the punitive damages award," but the Circuit did not include that instruction in the remand. *Id.* This argument is also unavailing. The Second Circuit addressed only the compensatory damages award and explicitly foreclosed only one issue on remand -- lost profit damages under § 1836(b)(3)(B)(i)(I) of the DTSA. *Id.* at 814. Other than noting Syntel's request that punitive damages be modified in the event that compensatory damages were adjusted, the Second Circuit did not analyze the punitive damages awarded. *See id.* at 806 & n.19.

*Tronzo v. Biomet, Inc.*, 236 F.3d 1342 (Fed. Cir. 2001), which TriZetto cites, is not persuasive here. First, *Tronzo* is an out-of-circuit case and not binding on this Court. Second, in *Tronzo*, unlike here, the defendant had only implicitly argued on appeal that the punitive damages award should be reduced. *Id.* at 1348 (holding mandate rule barred revisiting of punitive damages where defendant "never . . . questioned in any way, the *amount* of the punitive damages on appeal"). Here, Syntel explicitly argued on appeal for an "accordingly adjusted punitive damages award." Final Form Brief for Plaintiffs-Counter-Defendants-Appellants at 60, *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, No. 21-1370 (2d Cir. Jan. 6, 2022). Syntel did not waive remittitur on punitive damages because Syntel specifically requested that relief. Nor did the Second Circuit, in noting Syntel's request, foreclose that relief on remand.

TriZetto also argues that a footnote in a prior opinion of this Court "held" that the prior punitive damages award was not within the scope of the Second Circuit's remand. *See Syntel*, 2024 WL 1116090, at *1 n.2. To the extent TriZetto argues that the law of the case doctrine

counsels against revisiting that statement, the argument is unavailing.  That statement appeared in an Opinion vacating the Liability Jury's remaining compensatory damages awards and granting TriZetto attorneys' fees.  *Id.* at *8.  Other than the referenced footnote, that Opinion did not address the punitive damages award.

### 2.  Applicable Law

New York law governs the appropriateness of the punitive damages award.  The Liability Jury's finding that TriZetto was entitled to punitive damages did not distinguish between federal and New York law.  New York law governs here because TriZetto receives "the most complete recovery" from basing the punitive damages award on the compensatory damages actually awarded, as opposed to the lower damages amounts the Damages Jury found appropriate under the DTSA or the Copyright Act.  *See Restivo v. Hessemann*, 846 F.3d 547, 587 (2d Cir. 2017); *Russo v. Tuttnauer USA Co.*, No. 21 Civ. 1720, 2025 WL 1604063, at *12 (E.D.N.Y. June 6), *reconsideration denied*, 2025 WL 2324268 (E.D.N.Y. Aug. 12, 2025).  The Court previously analyzed the punitive damages award under the DTSA and federal common law because the Liability Jury awarded twice the amount of DTSA compensatory damages awarded, which were the compensatory damages the Liability Jury actually awarded.  *Syntel*, 2021 WL 1553926, at *8.  Here, by contrast, the Damages Jury's compensatory damages award was based on New York law.

Additionally, although both parties primarily briefed the propriety of the punitive damages award under federal law, "the Constitution is not the most relevant limit to a federal court when assessing punitive damages, as it comes into play only after the assessment has been tested against statutory and common-law principles."  *Epic Sys. Corp. v. Tata Consultancy Servs.*

26

*Ltd.*, 980 F.3d 1117, 1140 (7th Cir. 2020).  Notably, Syntel takes the position that "[t]he choice of law makes no difference to the punitive damages determination here."

Under New York law, "[i]n reviewing the propriety of a punitive damages award, [a court] must consider whether the amount deviates materially from what would be reasonable compensation, including whether it is reasonably related to the harm done and the flagrancy of the conduct," as well as "[a] defendant's wealth."  *In re 91st St. Crane Collapse Litig.*, 62 N.Y.S.3d 11, 24 (1st Dep't 2017); *see Hall v. Middleton*, 211 N.Y.S.3d 349, 351 (1st Dep't 2024), *leave to appeal denied*, 257 N.E.3d 122 (N.Y. 2025).  "[T]here is no formula by which the finder of fact must determine punitive damages," so long as the punitive damages "bear a reasonable relationship to the wrong committed."  *Wright v. Musanti*, 887 F.3d 577, 588 (2d Cir. 2018) (New York law).

To comport with the Fourteenth Amendment Due Process Clause, an award of punitive damages must be "fair, reasonable, predictable, and proportionate."  *Carroll*, 151 F.4th at 83.  In reviewing the constitutionality of a punitive damages award, courts examine three "guideposts" set forth in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996):  (1) "the reprehensibility of the defendant's conduct"; (2) "the ratio between harm, or potential harm, to the plaintiff and the punitive damages award" and (3) "the disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases."  *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 112 F.4th 93, 104-05 (2d Cir. 2024).  In addition to the guideposts, comparison with punitive damages awards in similar cases can also provide useful guidance.  *See Payne v. Jones*, 711 F.3d 85, 104 (2d Cir. 2013).

27

### 3. Discussion

Applying New York law, the punitive damages award is remitted to $139,955,626, which is a 2:1 ratio of punitive to compensatory damages. This remitted amount comports with due process.

### a. New York Law

Under New York law, a 2:1 ratio of punitive to compensatory damages -- here, resulting in a $139,955,626 award -- is appropriate. The Liability Jury, which heard evidence about the flagrancy of Syntel's conduct in this case, assessed punitive damages at a 2:1 ratio with the compensatory damages the Liability Jury found. This amount is appropriate in "consideration of the harm done, the flagrancy of the conduct, and the impact on" Syntel. *Hall*, 211 N.Y.S.3d at 351. In contrast, the previously awarded punitive damages of nearly $285 million -- which the Court based on a now-vacated compensatory damages award -- is not reasonably related to the harm done to TriZetto as found by the Damages Jury. *See In re 91st St. Crane Collapse Litig.*, 62 N.Y.S.3d at 25.

The remitted amount of approximately $140 million is also reasonable giving due consideration to Syntel's financial condition. *See id.*; *Wright*, 887 F.3d at 588 ("New York law permits the fact finder to consider evidence of a defendant's wealth when setting the amount of punitive damages, in order to determine what amount would be sufficient to punish that particular defendant and deter others of similar mind."). Syntel argues that the previous punitive damages award of $285 million is excessive because its parent company recently emerged from reorganization with €3 billion in debt that will need to be repaid beginning in 2029, and the parent company posted a €2.7 billion operating loss in 2024. This argument does not merit a reduction below a 2:1 ratio. Syntel concedes that its parent company's financial condition

28

"supports a 1:1 ratio," and does not demonstrate that an additional $70 million in damages constitutes excessive punishment. *Cf. Patterson v. Balsamico*, 440 F.3d 104, 122 (2d Cir. 2006) (stating, under federal law, that punitive damages award may not "result in the financial ruin of the defendant").

Because the remitted punitive damages amount is based on New York law rather than the DTSA, the award is not capped at a 2:1 ratio of the DTSA damages found by the Damages Jury.

### b. Due Process Clause

Applying the *Gore* guideposts, the remitted award of $139,955,626 also comports with due process. Because the remitted award of $139,955,626 is constitutionally permissible, this Court need not address whether the previous award violates due process. *See Epic*, 980 F.3d at 1140.

### i. Reprehensibility of Conduct

The first guidepost -- reprehensibility of the conduct -- is "perhaps the most important consideration." *Jennings*, 18 F.4th at 390. The Court previously held that Syntel's conduct was "reprehensible, but not on par with murderous or life-threatening conduct," and the evidence presented at the Damages Trial did not change the evaluation of this factor. *Syntel*, 2021 WL 1553926, at *9.

Five factors are relevant to the reprehensibility assessment: whether "[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm Mut.*

*Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).  The first three factors do not apply here. *Syntel*, 2021 WL 1553926, at *9.

As previously held, the fourth and fifth factors support reprehensibility.  *Id.*  At the Liability Trial, TriZetto presented evidence that Syntel adopted a plan in 2012 "to go to war" with TriZetto, using an "arsenal" of TriZetto's trade secrets to target TriZetto's customers.  TriZetto also presented evidence that Syntel attempted to conceal possession or use of trade secrets, for example by using references like "T$Z" to thwart later email searches and hiding marks identifying a document as TriZetto's, and that, when a neutral forensic examiner assigned by the Court attempted to examine Syntel's computers for TriZetto trade secrets, seventeen of the computers could not be found and were later discovered apparently hidden in a closet in India. The Liability Jury, which heard this evidence, awarded TriZetto the maximum amount of punitive damages that jury was instructed it could award.  The reprehensibility of Syntel's conduct, as reflected by the Liability Jury's now-remitted award, supports $139,955,626 in punitive damages.

### ii.    Relationship to TriZetto's Harm

The second guidepost -- the relationship of punitive damages to harm -- also justifies a 2:1 ratio.  The Damages Jury awarded compensatory damages of nearly $70 million based on TriZetto's lost profits.  The Damages Jury found that TriZetto has suffered "significant, quantifiable harms," and a 2:1 ratio of punitive damages to those harms is appropriate.  *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 108 F.4th 458, 502 (7th Cir.), *reh'g and reh'g en banc denied*, No. 22-2370, 2024 WL 4416886 (7th Cir. Oct. 4, 2024), *cert. denied*, 145 S. Ct. 1182 (2025).

This award does not conflict with the prior decision on punitive damages following the Liability Trial.  After the Liability Trial, this Court remitted punitive damages in this case to a 1:1

30

ratio in part because the compensatory damages award was "based on Syntel's unjust enrichment and not TriZetto's actual loss, which is much less." *Syntel*, 2021 WL 1553926, at *11. The present compensatory damages award, however, is based on TriZetto's actual lost profits as found by the Damages Jury. The present compensatory award is also nearly $200 million lower than the amount awarded by the Liability Jury. The changed circumstances of the case thus support a greater ratio than the 1:1 ratio previously awarded.

Syntel argues that a lower ratio is appropriate because the compensatory damages award is already substantial. This argument is unpersuasive because, "[e]ven where compensatory damages are substantial, punitive damages awards that are a multiple higher may be warranted because of the deterrent function of punitive damages." *Jennings*, 18 F.4th at 392. Syntel's conduct here merits a greater than 1:1 ratio of the present compensatory damages award -- indeed, the Liability Jury found Syntel's conduct sufficiently reprehensible to warrant the maximum punitive award that jury was instructed it could award. *Turley*, which Syntel cites, is not to the contrary. There, the Second Circuit described a $1.32 million compensatory award for "intangible -- and therefore immeasurable -- emotional damages" as "particularly high" and "largely arbitrary," which supported remittitur to a "roughly 2:1 ratio." 774 F.3d at 165-66; *see also State Farm*, 538 U.S. at 426 (describing $1 million compensatory award for emotional distress as "substantial"). Here, the Damages Jury's award was not based on "intangible" or "immeasurable" damages -- instead, it was based on lost profits, which the Damages Jury was instructed it could award only if TriZetto proved by "a reasonable probability" that it "would have actually made [the] additional profit." Transcript at 753:23-754:1 (June 30, 2025), Dkt. 1594.

### iii.    Comparable Civil Penalties

The third guidepost -- penalties imposed by law for the conduct giving rise to punitive damages -- provides no assistance here.  There is no relevant civil penalty for comparison.  *See Syntel*, 2021 WL 1553926, at \*11.  However, the DTSA's punitive damages cap suggests that Congress has judged that a 2:1 ratio is within the permissible range of penalties for trade secret misappropriation.  *See Motorola*, 108 F.4th at 496.

### iv.    Comparison with Similar Cases

In addition to the guideposts, comparison with punitive damages awards in similar cases can also provide useful guidance.  *See Payne*, 711 F.3d at 104.  Similar cases show that a $139,955,626 award is justified here.

In a trade secret case involving closely analogous facts, the Seventh Circuit upheld a 2:1 ratio on a $135.8 million compensatory damages award for trade secret misappropriation. *Motorola*, 108 F.4th at 495.  There, as here, the defendant had engaged in a "large and blatant theft of trade secrets," *id.* at 468; attempted to conceal the theft, *id.* at 470, and engaged in "severe" "litigation misconduct," *id.* at 500.  Also as here, the jury awarded punitive damages at a 2:1 ratio with compensatory damages.  *Id.* at 495.  The district court remitted the jury's compensatory damages award and remitted the punitive damages award to a 2:1 ratio in light of the jury's (by then advisory) verdict.  *Id.* at 495.  *Motorola* supports a 2:1 ratio here.

Syntel cites cases in which courts have found a 1:1 ratio appropriate, but these cases do not compel the conclusion that a higher ratio is inappropriate in this case -- particularly when a jury has awarded the maximum amount it was instructed it could award.  For instance, Syntel relies on *Continental Industries Group, Inc. v. Altunkilic*, No. 14 Civ. 790, 2020 WL 3884312 (S.D.N.Y. July 1, 2020), in which the court held on a post-default judgment inquest (i.e., without

jury fact-finding) that a 1:1 ratio was appropriate. *Id.* at \*8. Similarly, in *Paz Systems, Inc. v. Dakota Group Corp.*, 514 F. Supp. 2d 402 (E.D.N.Y. 2007), the court awarded punitive damages at a 1:1 ratio after a bench trial. *Id.* at 409-10. *Epic*, which this Court previously cited in remitting to a 1:1 ratio, is no longer as factually analogous because the Seventh Circuit there found remittitur appropriate in part because the compensatory damages award was "not [based on] of any harm suffered by Epic." 980 F.3d at 1143. Giving due weight to the *Gore* guideposts and awards in similar cases, a punitive damages award of $139,955,626 comports with due process.

### 4. Remedy

The Seventh Amendment states that "no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. When a jury renders an excessive damages verdict, a court may, consistent with the Seventh Amendment, apply a conditional remittitur -- that is, the court may give the plaintiff the option to accept a lower damages award in lieu of a new trial on damages. *See Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 146 (2d Cir. 2011). Although the Second Circuit has not addressed whether a court may unilaterally remit a punitive damages award, the court's uniform practice has been to provide plaintiffs the option of a conditional remittitur. *Id.* at 146-47; *see Turley*, 774 F.3d at 168 (reserving question of whether court may directly reduce punitive damages award that violates due process). Consequently, given the excessive punitive damages award here, TriZetto is given the option of accepting the remitted amount of $139,955,626 in punitive damages or electing a third trial in this action on the issue of punitive damages.

## III.      CONCLUSION

For the reasons stated, Syntel's motion for judgment as a matter of law or for a new trial is **DENIED**.  Syntel's motion to amend the judgment as to punitive damages is **GRANTED** as follows:  the punitive damages award will be reduced to $139,955,626 if TriZetto agrees to remittitur.  Otherwise, a new trial will be ordered on the issue of punitive damages pursuant to Rule 59(d).  By **April 10, 2026**, TriZetto shall file a letter stating its decision.  TriZetto's motion for judgment as a matter of law is **DENIED** as moot.

The Clerk of Court is respectfully directed to terminate the motions at Dkts. 1565, 1566, 1579 and 1585.

Dated: March 27, 2026
      New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**

34